Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Paige S. Poupart (State Bar No. 343547)
ppoupart@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Secured Creditor
ARCHWAY BROADWAY LOAN SPE, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Lead Case No. 2:24-bk-12079-VZ |
| SEATON INVESTMENTS, LLC, *et al.*, | Jointly Administered with Case Nos.: |
| Debtors and Debtors-in-Possession. | 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; 2:24-bk-12082-VZ; 2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ; and 2:24-bk-12076-VZ |
| Affects: | Chapter 11 |
| ☐ All Debtors<br>☐ Seaton Investments, LLC<br>☐ Colyton Investments, LLC<br>☒ Broadway Avenue Investments, LLC<br>☐ SLA Investments, LLC<br>☐ Negev Investments, LLC<br>☐ Alan Gomperts<br>☐ Daniel Halevy<br>☐ Susan Halevy | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ARCHWAY BROADWAY LOAN SPE, LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY**<br><br>Date:      October 29, 2024<br>Time:      10:30 a.m.<br>Crtrm.:    1368<br>            255 E. Temple Street<br>            Los Angeles, CA 90012<br><br>Hon. Vincent P. Zurzolo |

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

### TABLE OF CONTENTS

Page

I.    Introduction ......................................................................................... 6

II.   Background ........................................................................................... 7

      A.    Archway makes a $17 million loan to Broadway. ......................... 7

      B.    Broadway and the guarantors default under the Broadway Loan. ........... 8

      C.    The parties restructure the Broadway Loan. ................................. 8

      D.    Archway makes three new loans as part of the restructure. ................ 8

      E.    The New Loan obligors have combined net worths of over $60 million. ....... 9

      F.    The Archway loan obligations mature. ....................................... 9

      G.    The Debtors file chapter 11 petitions. ...................................... 9

      H.    The Corporate Debtors self-designate as "single asset real estate" debtors. ..... 9

      I.    Broadway acknowledges the Property is significantly underwater. ........... 10

      J.    The Debtors file an untimely and defective "Joint Plan." .................. 10

      K.    Archway demands that the Debtors commence making interest payments. .......... 10

      L.    Archway's files proofs of claim. ............................................ 10

      M.    Broadway now owes Archway over $18 million. ................................. 11

      N.    Mr. Gomperts refuses to make a mandatory cash call on Broadway members. ...... 11

      O.    Mr. Gomperts transfers properties to newly-formed LLCs. .................... 12

      P.    Ms. Halevy transfers a multi-million dollar property to a non-debtor LLC .......... 13

III.  Discussion ............................................................................................ 14

      A.    The Court should grant relief from stay under § 362(d)(2). .................... 14

            1.    There is no equity in the Property. .................................... 15

            2.    The Property is not necessary to an effective reorganization. ........... 15

                  (a)    Exclusivity has expired. ....................................... 15

                  (b)    The Joint Plan was filed after the SARE deadline expired. ......... 16

                  (c)    The Joint Plan omits critical exhibits and information. ............ 16

(d)  The Joint Plan does not designate classes of claims and interests................................................................16

(e)  The Joint Plan fails to specify the treatment to creditors. ................17

(f)  The Joint Plan lacks an adequate means of implementation. ...........17

(g)  The Joint Plan is not feasible under § 1129(a)(11). .........................18

(h)  The Joint Plan is not being proposed in good faith. .........................19

(i)  The Joint Plan violates the absolute priority rule. ...........................20

(j)  The Debtors may not amend their deficient plan now. ....................21

B.  The Court should grant relief under § 362(d)(3)........................................22

1.  The Property is "single asset real estate." ......................................22

2.  No plan or interest payments within 90 days of the order for relief. ...........23

C.  "Cause" exists under § 362(d)(1) for the Court to grant the Stay Relief Motion. ........................................................................................................23

D.  The Court should waive the 14-day stay imposed by Rule 4001(a)(3)...................25

IV.  Conclusion....................................................................................................................25

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*In re CBJ Dev., Inc.*,
   202 B.R. 467 (B.A.P. 9th Cir. 1996)..................................................................22, 23

*In re Claar Cellars LLC*,
   623 B.R. 578 (Bankr. E.D. Wash. 2021)............................................................17, 18

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
   922 F.3d 1031 (9th Cir. 2019)...................................................................................19

*In re Gen. Teamsters, Warehousemen & Helpers Union, Loc. 890*,
   265 F.3d 869 (9th Cir. 2001).....................................................................................20

*In re Green Pharms., Inc.*,
   617 B.R. 131 (Bankr. C.D. Cal. 2020).......................................................................21

*MacDonald v. MacDonald (In re MacDonald)*,
   755 F.2d 715 (9th Cir. 1985).....................................................................................23

*In re Marsch*,
   36 F.3d 825 (9th Cir. 1994)........................................................................................24

*In re O'Neal*,
   490 B.R. 837 (Bankr. W.D. Ark. 2013)......................................................................17

*In re RYYZ, LLC*,
   490 B.R. 29 (Bankr. E.D.N.Y. 2013)..........................................................................21

*In re Source Hotel, LLC*,
   606 F. Supp. 3d 952 (C.D. Cal. 2022)........................................................................23

*In re Sun Valley Newspapers, Inc.*,
   171 B.R. 71 (B.A.P. 9th Cir. 1994)........................................................................14, 15

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365 (1988)....................................................................................................14

**State Cases**

*Berg & Berg Enterprises, LLC v. Boyle*,
   178 Cal. App. 4th 1020 (2009)....................................................................................20

**Federal Statutes**

11 U.S.C. § 101(51B)..............................................................................................9, 22

11 U.S.C. § 301(b).........................................................................................................23

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

11 U.S.C. § 362(d)(1) ................................................................................................ 23, 25

11 U.S.C. § 362(d)(2) ................................................................................................ 14, 22

11 U.S.C. § 362(d)(3) ................................................................................ 10, 16, 21, 22, 23

11 U.S.C. § 362(g) ........................................................................................................ 14

11 U.S.C. § 1121(c)(3) .................................................................................................. 15

11 U.S.C. § 1123 ..................................................................................................... 16, 17

11 U.S.C. § 1127(a) ...................................................................................................... 21

11 U.S.C. § 1129(a)(1) .................................................................................................. 16

11 U.S.C. § 1129(a)(3) .................................................................................................. 19

11 U.S.C. § 1129(a)(11) ................................................................................................ 18

**Rules**

Rule 4001(a)(3) ............................................................................................................ 25

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 362.07[3][a] .................................................................. 23

7 COLLIER ON BANKRUPTCY ¶ 123.01[3] ...................................................................... 17

9 COLLIER ON BANKRUPTCY ¶ 4001.05 ........................................................................ 25

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Secured creditor, Archway Broadway Loan SPE, LLC, a Delaware limited liability company, successor in interest to Archway Real Estate Income Fund I REIT, LLC ("Archway"), submits this Memorandum of Points and Authorities in support of its *Motion for Relief From Automatic Stay* ("Stay Relief Motion") (Dkt. *pending*) filed in the lead case of those jointly-administered debtors, Seaton Investments, LLC ("Seaton"), Colyton Investments, LLC ("Colyton"), Broadway Avenue Investments, LLC ("Broadway"), SLA Investments, LLC ("SLA"), and Negev Investments, LLC ("Negev" and collectively with Seaton, Colyton, Broadway and SLA, the "Corporate Debtors") and Alan Gomperts ("Mr. Gomperts"), Daniel Halevy ("Mr. Halevy"), and Susan Halevy ("Ms. Halevy" and collectively with Mr. Gomperts and Mr. Halevy, the "Individual Debtors" and collectively with the Corporate Debtors, the "Debtors").

## I.    Introduction

The debtor, Broadway, is a single asset real estate debtor that owns commercial real estate located at 737 South Broadway in Downtown Los Angeles.

The property is an eight-story office building, which has been vacant for over four and a half years and generates no rent or other income. The Debtor and its management have grossly mismanaged this property both before and after the bankruptcy filing. At this late date, the property still has no occupancy certificate from the City of Los Angeles and may not be used by anyone for anything as a result. The property is worth $11.5 million, per Broadway, whereas Archway is owed over $18 million secured by a first-position deed of trust.

**Over 200 days** have elapsed since these jointly-administered cases were filed. In that time, the Debtors have failed to file a plan that has any chance of success.

Exclusivity has long since expired, and there is no effective reorganization in sight.

The Debtors filed a purported "Joint Plan," but that plan was filed *after* the 90-day SARE deadline. The Joint Plan is also patently unconfirmable—missing mandatory exhibits as well as terms of proposed treatment to creditors, including Archway.

Despite demand, Broadway has failed to commence paying Archway its nondefault interest payments. In fact, Broadway has not made a payment to Archway since well before the loan matured back in early December 2023.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

On top of all this, Broadway's manager and members have engaged in a bad faith scheme to shield their assets. Broadway's manager, Mr. Gomperts, refused to make a mandatory capital call on Broadway's members—themselves debtors and Archway obligors—while Broadway was insolvent and its creditors went unpaid. ***This happened while these same members had combined net worths of over $60 million*** per personal financial statements they provided to Archway in late June of 2023. Further, about two months before Archway's loans matured and while Broadway was insolvent, Ms. Halevy transferred a multi-million dollar real property located in Beverly Hills to a non-debtor entity. Mr. Halevy then immediately converted $1.3 million in equity in that property into cash. A few months later, the Debtors filed chapter 11 petitions. Where these funds went is unknown. Mr. Gomperts also made transfers during this time, which were not disclosed.

As it stands today, Broadway's case is hopeless. Exclusivity has expired. The Joint Plan is missing mandatory exhibits and is patently unconfirmable. It was also filed *after* the mandatory SARE deadline expired and no contract interest payments have been made to Archway. Broadway is utterly insolvent and generating no income. The Broadway property is significantly underwater, and Archway is not being paid.

Mr. Gomperts has *still* not made the mandatory capital call on Broadway's members as required under Broadway's operating agreement. Ms. Halevy has not sought to avoid the transfer of the Canon Drive Property for the benefit of her creditors.

The Court should terminate the stay as to Archway and waive the 14-day stay.

## II.    Background

The following section sets forth the basic background facts, which are relevant to the Stay Relief Motion.

### A.    Archway makes a $17 million loan to Broadway.

On July 21, 2021, Archway made a business loan to Broadway in the principal amount of $16,942,500.00 ("Broadway Loan"). The Broadway Loan is evidenced, in part, by a Promissory Note ("Broadway Note") whereby Broadway promised, among other things, to pay Archway the principal amount of $16,942,500.00, plus interest, costs, fees, and other charges as set forth therein.

In connection with the Broadway Loan, Broadway executed and delivered to Archway that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Broadway Deed of Trust"), whereby Broadway granted Archway a first-position lien on the property as described therein, which includes that certain real property located at 737 South Broadway, Los Angeles, CA 90014 ("Property"). Archway caused the Broadway Deed of Trust to be recorded in the Los Angeles County Recorder's Office on July 26, 2021, which recording was assigned document number 20211142009.

Mr. Gomperts, Mr. Halevy, among others, guarantied Broadway's obligations to Archway under the Broadway Note.

**B.        Broadway and the guarantors default under the Broadway Loan.**

Later, Broadway and the Broadway Loan guarantors defaulted under the terms of the Broadway Loan Documents, including, without limitation, failing to obtain a certificate of occupancy by January 21, 2022, for the Property, as required by Section 5.1(o) of the Broadway Loan Agreement, and by failing to pay the Broadway Loan obligation in full as of the scheduled maturity date, August 1, 2022 (collectively, "Existing Defaults").

**C.        The parties restructure the Broadway Loan.**

In connection with the Existing Defaults, and at Broadway's request, Broadway, the Broadway Loan guarantors, and Archway entered into that certain Settlement and Loan Modification Agreement on April 19, 2023 ("Settlement Agreement"). Among other things, the Settlement Agreement extended the maturity date of the Broadway Loan to December 1, 2023, at which time the entire principal under the Broadway Loan plus all accrued and unpaid interest and other amounts would be due and payable as provided under the Settlement Agreement. The Existing Defaults otherwise remained uncured.

**D.        Archway makes three new loans as part of the restructure.**

As part of the restructure, Archway made three additional loans—(1) a loan in the principal amount of $1,300,000.00 to Negev ("Negev Loan"), (2) a loan in the principal amount of $125,000.00 to SLA (guarantied by Mr. Gomperts, Ms. Halevy, and Mr. Halevy, among others) ("SLA Loan"), and (3) a loan in the principal amount of $2,575,000.00 to Ms. Halevy's self-

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    settled inter-vivos revocable trust, the Halevy Family Trust, dated September 8, 2010 ("Halevy

2    Trust"), Mr. Gomperts's self-settled inter-vivos revocable trust, the Gomperts and Halevy Family

3    Trust ("G&H Trust"), and to Mr. Halevy ("Guarantor Loan" and collectively with the Negev and

4    SLA Loans, the "New Loans").

5    **E.    The New Loan obligors have combined <u>net worths</u> of over $60 million.**

6    In or around August 21, 2023, Mr. Gomperts provided a personal financial statement to

7    Archway reflecting his $28,652,000.00 net worth, Ms. Halevy provided a personal financial

8    statement to Archway reflecting her $27,028,000.00 net worth, and Mr. Halevy provided a

9    personal financial statement to Archway reflecting his $4,577,000.00 net worth. Combined, the

10    total *net* **worths** of these Broadway owners, per their own personal financial statements, totals

11    over $60 million.

12    **F.    The Archway loan obligations mature.**

13    On December 1, 2023, the Broadway Loan, as well as the three other New Loans described

14    in the Settlement Agreement, matured without being paid in full, which constituted, among other

15    things, a maturity default under the applicable Broadway Loan Documents.

16    **G.    The Debtors file chapter 11 petitions.**

17    On March 18, 2024, the Individual Debtors filed voluntary chapter 11 petitions in the

18    United States Bankruptcy Court for the Central District of California, commencing three of the

19    instant bankruptcy cases.

20    The next day, on March 19, 2024, Broadway and the other Corporate Debtors filed chapter

21    11 petitions, commencing the relevant corporate bankruptcy cases.

22    **H.    The Corporate Debtors self-designate as "single asset real estate" debtors.**

23    On Broadway's petition, just as the other Corporate Debtors, it self-designated this as a

24    single asset real estate case as defined in 11 U.S.C. § 101(51B). *See* Chapter 11 Petition

25    2:24-bk-12081-VZ Dkt. 1 at ¶ 7.

26    The Court subsequently, on April 1, 2024, entered orders of joint administration,

27    designating Seaton's case as the lead case. *See* Order for Joint Administration Dkt. 16.

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**I.      Broadway acknowledges the Property is significantly underwater.**

On April 9, 2024, Broadway filed its Schedules A/B and D (2:24-bk-12081-VZ Dkt. 22), reflecting Broadway's valuation of the Property at $11,500,000.00 and also reflecting that Archway is owed significantly more than that at over $15 million.

**J.      The Debtors file an untimely and defective "Joint Plan."**

On June 18, 2024, Broadway filed a document entitled "Disclosure Statement and Plan of Reorganization" ("Joint Plan") (Dkt. 107). The Joint Plan is missing mandatory and option exhibits to which it refers, including exhibits which purportedly describe the plan treatment for Archway and others. *See, generally*, Joint Plan at Dkt. 107.

**K.      Archway demands that the Debtors commence making interest payments.**

On July 1, 2024, Archway's counsel send a letter to the Corporate Debtors' counsel, pointing out that the Joint Plan was untimely and patently unconfirmable.

In that letter, Archway's counsel noted that the Joint Plan was missing exhibits, patently unconfirmable, and was filed after the 90-day single asset real estate deadline of June 17, 2024 ("SARE deadline").

Accordingly, Archway demanded that the SARE Debtors (Broadway, Negev, and SLA) immediately begin paying Archway nondefault contract rate interest on those obligations pursuant to 11 U.S.C. § 362(d)(3). (The letter further demanded an accounting of unauthorized cash collateral used by the Debtors postpetition.)

The Debtors have never commenced making any such nondefault contract rate interest payments to Archway; no payments have been made to Archway by the Debtors since well before the December 2023 maturity. (No accounting of unauthorized cash collateral use has ever been provided by the Debtors.)

**L.      Archway's files proofs of claim.**

On July 15, 2024, Archway filed its proofs of claim in the respective bankruptcy cases of the debtor-obligors, which proofs of claim reflect amounts owed as of the respective March 18 and March 19 petition dates for the Individual and Corporate Debtors, respectively.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**M.    Broadway now owes Archway over $18 million.**

As of September 23, 2024, Broadway owes Archway not less than $18,105,949.00. Archway has not received any payments from the Debtors since well before the Loans matured in December of 2023.

**N.    Mr. Gomperts refuses to make a mandatory cash call on Broadway members.**

Broadway's operating agreement ("Operating Agreement") provides that Broadway was organized to purchase, own, finance, manage, maintain, improve, operate, sell, exchange, dispose of or otherwise deal with the Property. Operating Agreement at § 1.4. To that end, the Operating Agreement provides that if Broadway needs additional cash for its operations or capital expenditures, the Manager, Mr. Gomperts, "shall advise the Members of such requirement in writing … and shall specify the date when the additional capital contributions are due." Operating Agreement at § 2.1 Broadway's members are composed of Mr. Gomperts, Ms. Halevy, and Mr. Halevy. Mr. Gomperts is the manager of Broadway.

In other words, the Operating Agreement requires Mr. Gomperts, as manager, make a cash call notice, advising Broadway's members, ***including himself***, Ms. Halevy, and Mr. Halevy, of Broadway's need for additional capital for operating expenses and capital expenditures. *See* Operating Agreement at § 2.1.

At his meeting of creditors, Mr. Gomperts testified that not only was he aware of this mandatory cash call provision, but he also and a conversation about it with Broadway's other members, Ms. Halevy and Mr. Halevy, at or around the time of the Archway loan maturities. *See* Transcript at 16:19–24.

Mr. Gomperts admitted that he never sent the cash call notice as required under the Operating Agreement. *See* Transcript of May 4, 2024, Meeting of Creditors at 16:2–5. When asked why, Mr. Gomperts testified that, "There was not enough cash to pay off the loan. No one, none of the members, had cash available to pay off the loan." Transcript at 16:6–9. Mr. Gomperts clarified that sometime around the time the note was due, he spoke with Broadway's members about a cash call, but that it was "pretty clear none of us had the 19.1 million to pay off the debt." Transcript at 16:23–24.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

But instead of Mr. Gomperts making the mandatory capital call as required under the Operating Agreement—or otherwise tapping into his, Ms. Halevy's, and Mr. Halevy's combined **$60 million in net worths**—Mr. Gomperts, Ms. Halevy, and Mr. Halevy went a different direction.

### O. Mr. Gomperts transfers properties to newly-formed LLCs.

On September 8, 2023, less than three months before the Archway loan maturities, Mr. Gomperts formed three LLCs, Oakhurst Drive Investments, LLC ("Oakhurst LLC"), Canfield Avenue Investments, LLC ("Canfield LLC"), and Bagley Avenue Investments, LLC ("Bagley LLC" and collectively, the "Gomperts-LLCs"). Mr. Gomperts was the sole manager and member of the Gomperts-LLCs.

A few weeks later, Mr. Gomperts, as trustee of the G&H Trust, promptly transferred (a) the real property located at 264 S. Oakhurst Drive, Beverly Hills, CA 90212 ("Oakhurst Property") from the G&H Trust to the Oakhurst LLC; (b) the real property located at 2247 S. Canfield Ave., Los Angeles, CA 90034 ("Canfield Property") from the G&H Trust to the Canfield LLC; and (c) the real property located at 2220 Bagley Ave., Los Angeles, CA 90034 ("Bagley Property") from the G&H Trust to the Bagley LLC.

On December 8, 2024, one week after the Archway loans matured, Mr. Gomperts caused the Gomperts-LLCs to transfer their properties back to the G&H Trust, his self-settled revocable trust.

Then, on March 11, 2024, **just days before the Debtors filed bankruptcy**, Mr. Gomperts filed LLC terminations with the California Secretary of State for each of the Gomperts-LLCs.

**Less than a month later**, Mr. Gomperts filed schedules and a statement of financial affairs stating under penalty of perjury that he had *not* transferred any property outside of the ordinary course within two years of the petition date. Gomperts SOFA ¶ 18 2:24-bk-12074-VZ Dkt. 33 at 45 of 60. He further stated that he had *not* transferred any property to a self-settled trust of which he is a beneficiary. *Id.* He further failed to disclose his ownership interests in and connections to the Gomperts-LLCs. *See* Gomperts SOFA ¶ 27 2:24-bk-12074-VZ Dkt. 33 at 46 of 60. Mr. Gomperts has amended schedules and Statements of Financial Affairs, but has never

disclosed these transfers or this existence of or connections to the Gomperts-LLCs. *See, generally*, Gomperts Amended Schedules and SOFAs 2:24-bk-12074-VZ Dkts. 42 and 43.

**P.      Ms. Halevy transfers a multi-million dollar property to a non-debtor LLC.**

On September 26, 2023, just two months before the Archway loan maturities and one month after Mr. Gomperts, Ms. Halevy, and Mr. Halevy provided Archway with personal financial statements reflecting their combined $60 million in net worths, Ms. Halevy caused a grant deed to be recorded, transferring real property located at 341 South Canon Drive, Beverly Hills, California 90212 ("Canon Drive Property") from the Halevy Trust (Ms. Halevy's self-settled inter-vivos revocable trust, of which she is the sole beneficiary [see Ms. Halevy's Declaration Dkt. 87 at ¶ 2], which itself is an obligor to Archway under the so-called Guarantor Loan) to her newly-revived, wholly-owned LLC 341 South Cannon LLC ("Cannon LLC").

It is unclear what consideration or value Ms. Halevy received from Cannon LLC in exchange for this transfer, but it appears to be a gift deed for no consideration. In her Statement of Financial Affairs, Ms. Halevy values the Canon Drive Property at $2.3 million. *See* Susan Halevy SOFA 2:24-bk-12076-VZ Dkt. 41 at 16 of 19. *Compare* Ms. Halevy's Declaration Dkt. 87 at ¶ 3 (reflecting $2.6 million valuation). But on her schedules, she states that the value of the Cannon LLC is "unknown." Schedule A/B 2:24-bk-12076-VZ Dkt. 31 at 11 of 45. Moreover, Ms. Halevy states that, in exchange for this transfer, she received "100% ownership interest in LLC." Susan Halevy SOFA 2:24-bk-12076-VZ Dkt. 41 at 16 of 19. But this statement is at odds with the records of the California Secretary of State, which reflect that Ms. Halevy formed Cannon LLC *two years prior to* the transfer and that she was the only member and manager of Cannon LLC.

Moreover, immediately after the transfer, Mr. Halevy, purporting to act as manager of Cannon LLC, obtained a $1.3 million loan from a private lender, which is apparently secured by a deed of trust against the Canon Drive Property ("Canon Drive Deed of Trust"). The Canon Drive Deed of Trust was recorded on September 26, 2023, and it provides that this $1.3 million loan apparently matured on October 1, 2024. It is unclear whether Ms. Halevy is using or has used her membership interests, outside of the ordinary course, to cause Cannon LLC to address its own loan maturity.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    Upon information and belief, Ms. Halevy and Mr. Halevy transferred the Canon Drive

2    Property to Cannon LLC for no reasonable equivalent value in exchange and as a means of

3    shielding assets and extracting $1.3 million in cash at a time when Broadway was insolvent (and

4    while they were just two months away from the Archway loans maturing and only a few more

5    months away from these jointly-administered bankruptcy cases being filed). They have never

6    accounted for such loan proceeds.

7    By refusing to make the mandatory capital call, shielding portions of their $60 million in

8    net worths through various transfers, and then placing Broadway into bankruptcy, Mr. Gomperts,

9    Ms. Halevy, and Mr. Halevy effectively shifted all of the risk of Broadway's failure away from

10    themselves and upon Archway.

**III.    Discussion**

12    The following section sets forth the relevant legal standard and applies that standard to the

13    relevant facts, which analysis demonstrates that Archway is entitled to the relief it seeks.

14    **A.    The Court should grant relief from stay under § 362(d)(2).**

15    Section 362(d)(2) provides that "the court shall grant relief from the stay ... (2) with respect

16    to a stay of an act against property under subsection (a) of this section, if-- (A) the debtor does not

17    have an equity in such property; and (B) such property is not necessary to an effective

18    reorganization…."

19    While "the party requesting such relief has the burden of proof on the issue of the debtor's

20    equity in property[,] ... the party opposing such relief has the burden of proof on all other issues."

21    11 U.S.C. § 362(g). Accordingly, the party opposing the relief from a stay bears the burden to

22    demonstrate that such property is necessary to an effective reorganization. *See United Sav. Ass'n*

23    *of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988). The party opposing

24    relief from stay must demonstrate "that the property is essential for an effective reorganization *that*

25    *is in prospect*. This means ... that there must be a reasonable possibility of a successful

26    reorganization within a reasonable time." *Id.* at 375–76 (citations and internal quotation marks

27    omitted). The burden of proof "is a 'moving target which is more difficult to attain as the Chapter

28    11 case progresses." *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994)

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

(citation omitted). "In the early stage of the case, the burden of proof ... is satisfied if the debtor can offer sufficient evidence to indicate that a successful reorganization within a reasonable time is plausible. Near the expiration of the exclusivity period, the debtor must demonstrate that a successful reorganization within a reasonable time is probable. ***After the expiration of the exclusivity period, the debtor must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is assured.*** Regardless of the amount of time a case has been pending, if the evidence indicates that a successful reorganization within a reasonable time is impossible, the court must grant relief from the stay." *Id.* (emphasis added) (citations and internal quotation marks omitted).

## 1.    There is no equity in the Property.

Here, Broadway admits that there is no equity in the Property. Per Broadway's schedules, as of the petition date, the Property is worth $11.5 million and Archway is owed over $15 million. The actual amounts owed to Archway are much greater, but it does not appear to be contested that the Property is significantly underwater.

## 2.    The Property is not necessary to an effective reorganization.

As discussed below, the Property is also not necessary to an effective reorganization that is in prospect.

### (a)    Exclusivity has expired.

Exclusivity has long since expired. *Compare* 11 U.S.C. § 1121(c)(3) (requiring that the plan be accepted by each class of impaired claims or interests within 180 days after the order for relief) *with* Lead Case CM/ECF Docket (reflecting no such acceptances of the Joint Plan having been made prior to mid-September, when the 180-day exclusivity deadline expired).

Accordingly, because exclusivity has expired, Broadway must demonstrate that it is "assured" that the Joint Plan will bring about a successful reorganization within a reasonable time. *See Sun Valley Newspapers, Inc.*, 171 B.R. at 75 (citations omitted).

Broadway will be unable to meet this heavy burden. This case has been pending for **over 200 days**. The Joint Plan was filed late—after the SARE Deadline. Moreover, the Joint Plan is patently unconfirmable, as discussed below.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**(b)      The Joint Plan was filed after the SARE deadline expired.**

Broadway is a self-designated single asset real estate debtor. *See* Chapter 11 Petition 2:24-bk-12081-VZ Dkt. 1 at ¶ 7. Accordingly, Broadway had a deadline of 90 days after Broadway's March 19, 2024, petition date, or by June 17, 2024, to either file a plan that has a reasonable possibility of being confirmed within a reasonable time or to commence making nondefault contract rate interest payments to all creditors with secured claims against the Property. *See* 11 U.S.C. § 362(d)(3) (discussed more fully below). Broadway has done neither of these things. The Joint Plan is patently unconfirmable, as discussed more fully below. Despite Archway demanding that Broadway cure these defects back on July 1, 2024, Broadway has not done so. Moreover, Broadway has failed to commence making nondefault contract rate interest payments to Archway.

Therefore, the Joint Plan is unconfirmable.

**(c)      The Joint Plan omits critical exhibits and information.**

The Joint Plan omits *all* of the mandatory exhibits, including the Declaration of Mr. Gomperts (Exhibit A); the list of claims (Exhibit B); the list of all property of the estate, along with valuations (Exhibit C); projections and plan payments, including sources of funds and explanations of fluctuations, to support feasibility (Exhibit D); and financial records (Exhibit E).

The Joint Plan also omits secured creditor classes and the *proposed plan treatment* (Exhibit G). As a result, Archway cannot ascertain proposed creditor treatment from the Joint Plan. *See* Joint Plan Dkt. 107 at ¶ E (stating that Class 4's treatment is set forth in Exhibit G1, but no such exhibit was attached to the Joint Plan or otherwise served on Archway or filed on the docket).

The Joint Plan is, therefore, unconfirmable on its face.

**(d)      The Joint Plan does not designate classes of claims and interests.**

Under § 1129(a)(1), a plan must comply with applicable provisions of Title 11, including § 1123. Section 1123(a)(1) is a mandatory provision that requires a plan to designate classes of claims and interests.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017–2427
(323) 852–1000

1    Here, the Joint Plan violates this mandatory provision because it does not specify the

2    names of creditors, including Archway, and the classes to which such creditors are assigned. *See*

3    *In re O'Neal*, 490 B.R. 837, 842 (Bankr. W.D. Ark. 2013) (determining that plan could not be

4    confirmed because it failed to specify the names of creditors and the classes to which each creditor

5    was assigned).

6    Accordingly, the Joint Plan is patently unconfirmable.

7    **(e)    The Joint Plan fails to specify the treatment to creditors.**

8    Section 1123(a)(3) is another mandatory provision which requires that a plan "specify" the

9    treatment to impaired classes. The term "specify" as used in § 1123(a)(3) means that the plan must

10    contain "clear concrete descriptions for the treatment of impaired classes." *In re Claar Cellars*

11    *LLC*, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021) (citations omitted). *See also O'Neal*, 490 B.R.

12    at 842 (providing that plan was not confirmable where it failed to specify the treatment for certain

13    creditors); 7 COLLIER ON BANKRUPTCY ¶ 123.01[3] ("[S]ection 1123(a)(3) requires the plan to

14    specify the amount of payments to be made and the date when such payments will be due.").

15    Here, the Joint Plan violates this mandatory requirement because it fails to disclose the

16    proposed treatment of creditors, including the amount of payments to be made and when such

17    payments will be due for impaired classes.

18    Accordingly, the Joint Plan is not confirmable.

19    **(f)    The Joint Plan lacks an adequate means of implementation.**

20    Section 1123(a)(5) is another mandatory provision that requires that the plan provide an

21    adequate means of implementation. A plan that lacks sufficient detail to show how the plan will be

22    implemented violates § 1123(a)(5) and is not confirmable. *See Claar Cellars LLC*, 623 B.R. at 592

23    (providing that § 1123(a)(5) "requires that the plan specify means sufficient to allow all terms,

24    including whatever creditor payments are proposed in the plan, to be completed").

25    In this case, the Joint Plan fails to specify what the proposed plan payments to creditors

26    will be, when they will be made, or the sources of such payments. The Joint Plan announces that

27    the Corporate Debtors are "projecting to lease out vacant space that will drive cash flow and

28

dramatically increase property values." Joint Plan at § III.C. But no *evidence* of such leases or the projected likelihood of any such cash flow for Broadway is provided in the plan.

Accordingly, the Joint Plan's means of implementation is inadequate, and the plan is therefore unconfirmable.

### (g)    The Joint Plan is not feasible under § 1129(a)(11).

Section 1129(a)(11) requires that plan confirmation be "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." "Feasibility" requires that the debtor show that the plan has a "reasonable probability of success." *In re Claar Cellars LLC*, 623 B.R. at 595 (citation omitted). "[E]stablishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success." *Id.* (citation omitted). "[C]ourts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur." *Id.* (citation omitted). "Plans which extensively rely on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan." *Id.* (citation omitted).

Here, the Joint Plan states that the Corporate Debtors "are projecting to lease out vacant space that will drive cash flow and dramatically increase property values." Joint Plan at 5 § III.C. But the plan fails to support this assertion with *any evidence*, plan projections, financials, or sources of funds or means of implementation.

The Joint Plan points to Exhibit D for the income and other contributions that will fund the Plan, but that exhibit is missing. *See* Joint Plan at §§ V.A. V.C. There are no financials for the most recent 12-month calendar year or subsequent months. Indeed, Exhibit E is also missing. *See* Joint Plan at § V.D.

The Joint Plan states that Class 4 secured claims will be paid over a period of **seven years** followed by a balloon payment. *See* Joint Plan at § V.E.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

18

MEMORANDUM OF POINTS AND AUTHORITIES

1    But there is no indication as to which creditors are included within in Class 4 versus

2    Class 3, what their proposed payments are, or what the proposed discount rates are, etc.

3    The Joint Plan states:

4    The Plan calls for Class 4 secured claims to receive regular interest payments
     during the course of the Plan followed by a ballon payment at the end of year 7. In
5    order to make the ballon payment and complete Plan payments, Debtors will need
     to refinance or sell those properties that secure loans with projected balloon
6    payments. How easily Debtors will be able to do this depends upon a multitude of
     micro and macro-economic factors such as the value of the properties and the
7    strength of the applicable real estate market.

8    Joint Plan § III.E.

9    But there is *no evidence* showing that such future sales or refinancings would be

10   likely to occur. Moreover, there is no "drop-dead" date or milestones for the Debtors to sell

11   or refinance the Property. Under the Joint Plan, the Debtors have ***seven years*** of essentially

12   unchecked discretion as to how and when to sell or refinance the Property.

13   Accordingly, the Joint Plan is not feasible and, therefore, it is unconfirmable.

14            **(h)    The Joint Plan is not being proposed in good faith.**

15   Section 1129(a)(3) requires that a "plan has been proposed in good faith and not by any

16   means forbidden by law." The focus is on the proposal of a plan, not the terms of the plan. *See*

17   *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019). "Under the good

18   faith prong of § 1129(a)(3), courts must determine whether the plan achieves a result consistent

19   with the objectives and purposes of the Code." *Id.* n. 3 (citation and internal quotation marks

20   omitted).

21   Here, the Joint Plan is not being proposed in good faith. The plan proposes to appoint

22   Mr. Gomperts as the plan's disbursing agent and post-confirmation fiduciary to creditors. *See* Joint

23   Plan at § III.E. But, as discussed herein, Mr. Gomperts has breached his continuing fiduciary

24   duties to creditors of insolvent Broadway. Such duties include specifically Mr. Gomperts's duty as

25   manager of Broadway to make a mandatory cash call on the members of Broadway, including

26   *himself*. These failures include transferring properties from his self-settled revocable trust, the

27   G&H Trust, to the Gomperts-LLCs and then not disclosing these transfers on his schedules or

28   Statement of Financial Affairs. These continued failures by Mr. Gomperts constitute continuing

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  breaches of his fiduciary duties to Archway as a creditor of insolvent Broadway. *See Berg & Berg*

2  *Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1040–41 (2009) (discussing California's trust

3  fund doctrine, which imposes fiduciary duties on officers and directors to creditors of insolvent

4  corporations).

5          In addition, it seems likely that Mr. Gomperts may not be motivated to investigate and

6  pursue his own mother-in-law or her wholly-owned LLC, Cannon LLC, to avoid and recover the

7  putatively fraudulent transfer of the Cannon Drive Property made by her to the LLC for apparently

8  the purpose of shielding her significant net worth and for no reasonably-equivalent value in

9  exchange.

10          Specifically, Ms. Halevy transferred the Canon Drive Property to the Cannon LLC for

11  apparently no value, in September of 2023 while she and the other Archway-obligors, including

12  Broadway, were facing a looming maturity deadline. This transfer occurred just one month after

13  Mr. Gomperts, Ms. Halevy, and Mr. Halevy provided personal financial statements to Archway,

14  reflecting their combined **net worths of over $60 million**. This transfer was also accomplished at

15  a time when Broadway was hopelessly insolvent. Shortly after the transfer, real property records

16  reflect a $1.3 million deed of trust being recorded against the Canon Drive Property. This all

17  occurred just months before the Debtors filed bankruptcy.

18          Ms. Halevy disclosed this transfer on her Statement of Financial Affairs, where she values

19  the Canon Drive Property at 2.3 million. *See* Susan Halevy SOFA 2:24-bk-12076-VZ Dkt. 41 at

20  16 of 19.  However, on Schedule A/B, she values the Cannon LLC as "unknown." Susan Halevy

21  Schedule A/B 2:24-bk-12076-VZ Dkt. 31 at 11 of 45. The $1.3 million loan also apparently

22  matured on October 1, 2024, and it is unclear whether Ms. Halevy used her LLC membership

23  interests to address the Cannon Drive LLC's loan maturity.

24          Accordingly, the Joint Plan is not being proposed in good faith. As a result, the Joint Plan

25  is not confirmable.

26                    **(i)        The Joint Plan violates the absolute priority rule.**

27          "Claims of equity holders are always junior to claims of both secured and unsecured

28  creditors." *In re Gen. Teamsters, Warehousemen & Helpers Union, Loc. 890*, 265 F.3d 869, 873

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

(9th Cir. 2001). "If a debtor retains its interest in the estate, then the objecting class is entitled to one hundred cents on the dollar; otherwise, the plan violates the absolute priority rule." *In re Green Pharms., Inc.*, 617 B.R. 131, 136 (Bankr. C.D. Cal. 2020) (citing *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 (9th Cir. 1994)).

Here, the Joint Plan provides that Classes 2 and 4 are impaired. And, although the Plan does not disclose the proposed treatment of these classes, it does reference a **seven year** interest-only payment structure. *See* Joint Plan at § V.E. But the Joint Plan also states that "Shareholders simply retain their shares of stock." Joint Plan at § F. In other words, the Joint Plan apparently proposes to stretch out impaired classes for seven years while the interest-holders retain their interests. Because the Corporate Debtors' shareholders are retaining their equity interests, while not paying impaired classes in full on the Effective Date, the Joint Plan violates the absolute priority rule.

Accordingly, the Joint Plan could not be confirmed over the objection of such impaired, dissenting classes.

### (j)      The Debtors may not amend their deficient plan now.

Courts have refused to allow SARE debtors to play fast and loose with the SARE deadline by filing a "token plan" and then waiting significant amounts of time before trying to amend that token plan to cure glaring deficiencies. *See In re RYYZ, LLC*, 490 B.R. 29, 38 (Bankr. E.D.N.Y. 2013) ("To be sure, a debtor may not file a token plan within the 90–day period and then defend a lift stay motion by arguing that its late-filed amended plan can be confirmed. While 11 U.S.C. § 1127(a) allows a debtor to file an amended plan, this general provision cannot be used as an end-run around the more specific language in Section 362(d)(3).").

Here, **several months** have passed since the Debtors filed their defective Joint Plan. Archway pointed out all of these defects in a letter sent to the Debtors' counsel on July 1, 2024. But the Debtors have made no effort to correct these defects in the Joint Plan in the several months that have passed since that time.

Accordingly, the Debtors may not defend a lift stay motion by arguing that their late-filed plan can be amended and then confirmed as amended.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    For all these reasons, Broadway will be unable to demonstrate that it is "assured" that it

2 will be able to reorganize successfully within a reasonable time. Far from being "assured," the

3 Joint Plan is patently unconfirmable.

4    The Court should terminate the stay under § 362(d)(2).

5    **B.    The Court should grant relief under § 362(d)(3).**

6    Bankruptcy Code § 362(d)(3) provides that the court shall grant relief from the automatic

7 stay with respect to a stay of an act against single asset real estate unless, within 90 days of the

8 filing of the order for relief, the debtor (a) files a plan that has a reasonable possibility of being

9 confirmed within a reasonable time or (b) commences monthly payments at the contract rate. If a

10 debtor fails to either file a plan or commence making contract interest payments within this 90-day

11 period, relief from stay is mandatory. *In re CBJ Dev., Inc.*, 202 B.R. 467, 470 (B.A.P. 9th Cir.

12 1996) (citing *NationsBank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 327 (Bankr. E.D.

13 Va. 1996) ("relief under § 362(d)(3) is mandatory where its provisions are not strictly complied

14 with")).

15    As analyzed herein, this is a single asset real estate case where the debtor failed to file a

16 plan or commence making monthly contract rate interest payments to Archway within the 90-day

17 period following the order for relief. Accordingly, as discussed more fully below, the Court should

18 terminate the stay as to Archway under § 362(d)(3).

19    **1.    The Property is "single asset real estate."**

20    As a threshold matter, the Property definitely constitutes "single asset real estate" within

21 the meaning of § 101(51B). In Broadway's voluntary petition, it designated itself as a single asset

22 real estate debtor under § 101(51B). *See* Chapter 11 Petition 2:24-bk-12081-VZ Dkt. 1 at ¶ 7.

23 Moreover, Broadway was formed for the purpose of acquiring, developing, and operating the

24 Property. *See* Gomperts Declaration Dkt. 87 ¶ 18.

25    The Property is a single parcel of non-residential real property that generates no income.

26 *See* Khorshidi Decl., Exh. 2 (reflecting single APN as legal description of property subject to deed

27 of trust); Cash Collateral Motion Dkt. 87 at 16:11–13 (providing that the Property does not

28 generate rent); Gomperts Declaration Exh. 9 at 55 (reflecting "N/A" postpetition cash collateral);

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Broadway Statement of Financial Affairs 2:24-bk-12081-VZ Dkt. 22 at ¶¶ 1–2 (reflecting no

revenue since January of 2023). Properties which generate no income qualify as single asset real

estate. *See In re Source Hotel, LLC*, 606 F. Supp. 3d 952, 958 (C.D. Cal. 2022).

Broadway is also not a "family farmer," as defined under § 101(18), because, among other

things, it is not engaged in a farming operation, and its aggregate debts exceed $11,097,350.

Accordingly, the Property comes within the definition of "single asset real estate," which

does not appear to be disputed by Broadway.

**2.    No plan or interest payments within 90 days of the order for relief.**

Broadway filed a voluntary chapter 11 petition on March 19, 2024. *See* Chapter 11 Petition

2:24-bk-12081-VZ Dkt. 1. Such filing constituted an order for relief. *See* 11 U.S.C. § 301(b).

Accordingly, Broadway had until June 17, 2024, to either (a) file a plan of reorganization that has

a reasonable possibility of being confirmed within a reasonable time or (b) commence making

monthly interest payments at the nondefault contract rate. *See* 11 U.S.C. § 362(d)(3)(A)–(B). If

not, then under § 362(d)(3), relief from stay is mandatory. *See In re CBJ Dev., Inc.*, 202 B.R. at

470 (citation omitted).

Here, Broadway filed its Joint Plan on June 18, 2024, after the expiration of the 90-day

SARE deadline. What Broadway did file—late—is unconfirmable on its face. Moreover,

Broadway has not made any payments to Archway since well before December of 2023.

Accordingly, the Court should enter an order terminating the stay as to Archway.

**C.    "Cause" exists under § 362(d)(1) for the Court to grant the Stay Relief Motion.**

Under § 362(d)(1) of the Bankruptcy Code, a bankruptcy court shall grant relief from the

automatic stay "for cause." "Because there is no clear definition of what constitutes 'cause,'

discretionary relief from the stay must be determined on a case by case basis." *MacDonald v.

MacDonald (In re MacDonald)*, 755 F.2d 715, 717 (9th Cir. 1985). The existence of "bad faith" in

commencing a bankruptcy case also constitutes "cause" for granting relief from the stay under

§ 362(d)(1). 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][a] (Richard Levin & Henry J. Sommer, eds.,

16th Ed.) (citations omitted). Hallmarks of a "bad faith" filing include, in pertinent part, no

available sources of income to fund a plan of reorganization or fund adequate protection

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  payments, bankruptcy filed to prevent foreclosure, and where bankruptcy offers little more than

2  further delay. *See In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) (citing *In re Little Creek Dev.*

3  *Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986)) (other citations omitted).

4    Here, in addition to all of the reasons set forth above as to why the late-filed Joint Plan is

5  patently unconfirmable, Broadway's manager and members have engaged in a bad faith scheme to

6  shield their assets. Broadway's manager, Mr. Gomperts, has failed and refused to make a

7  mandatory capital call on Broadway's members—themselves debtors and Archway obligors—

8  while Broadway was hopelessly insolvent and while these same members had combined **net**

9  worths of **over $60 million** per personal financial statements they provided to Archway in late

10  June of 2023. Instead of making the capital call, the Broadway members started transferring multi-

11  million dollar properties to newly-formed or revised LLCs—just months before filing bankruptcy

12  and while Broadway was insolvent.

13    For example, Ms. Halevy transferred the Canon Drive Property to Cannon LLC for

14  apparently no consideration. Mr. Halevy then promptly obtained a $1.3 million loan secured by a

15  deed of trust on that property on behalf of Cannon LLC. All of this occurred in the lead-up to the

16  December 2023 maturity of Archway's obligations and the subsequent bankruptcy filings.

17    Initially, Ms. Halevy did not disclose this transfer on her schedules. Instead, she first

18  disclosed this transfer after Archway's counsel questioned here about it at her May 17, 2024,

19  meeting of creditors. Only then did she amend her Statement of Financial Affairs to disclose the

20  transfer. And, although her Statement of Financial Affairs states that she received "100%

21  ownership interest in LLC" (Susan Halevy SOFA 2:24-bk-12076-VZ Dkt. 41 at 16 of 19), this

22  statement is belied by the records of the California Secretary of State. Those records reflect that

23  Ms. Halevy formed Cannon LLC *two years prior to the transfer* and that she was the only member

24  and manager of Cannon LLC.

25    Notably, there have been no actions by Ms. Halevy, Mr. Gomperts, or any of the Debtors

26  to avoid this putatively fraudulent transfer or to recover the Canon Drive Property for the benefit

27  of these jointly-administered estate.

28    Mr. Gomperts has never disclosed the transfers of his properties to the Gomperts-LLCs.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    This further demonstrates bad faith.

2    Accordingly, based on these facts, "cause" exists under § 362(d)(1) for the Court to

3    terminate the stay as to Archway.

4    **D.    The Court should waive the 14-day stay imposed by Rule 4001(a)(3).**

5    Rule 4001(a)(3) provides for a 14-day stay of an order granting relief from stay, "unless

6    the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3). The purpose of this temporary 14-day

7    stay is to allow the debtor to seek a stay pending appeal. *See* 9 COLLIER ON BANKRUPTCY

8    ¶ 4001.05 (R. Levin & H. J. Sommer eds., 16th ed.).

9    Here, as grounds for waiver of the 14-day stay, given the facts of this matter, even if a

10    party in interest objects to the Stay Relief Motion, there would be only a very low chance that the

11    Court or any appellate court, including a district court or the bankruptcy appellate panel, would

12    grant a stay pending appeal of the order granting such motion.

13    Accordingly, the Court should waive the temporary 14-day stay of Rule 4001(a)(3).

14    **IV.    Conclusion**

15    As analyzed herein, the Court should enter an order granting the Stay Relief Motion in full,

16    terminating the automatic stay as to Archway in this Broadway case and permitting it to proceed

17    with its nonbankruptcy rights and remedies with respect to the Property.

18    DATED:  October 8, 2024                FRANDZEL ROBINS BLOOM & CSATO, L.C.
                                             MICHAEL GERARD FLETCHER
19                                           PAIGE S. POUPART

20

21

22                                           By:  _____/s/ Michael Gerard Fletcher_____
                                                  MICHAEL GERARD FLETCHER
23                                                Attorneys for Secured Creditor
                                                  ARCHWAY BROADWAY LOAN SPE, LLC
24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000