1 | Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
2 | Paige S. Poupart (State Bar No. 343547)
ppoupart@frandzel.com
3 | FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
4 | Los Angeles, California 90017-2427
Telephone: (323) 852-1000
5 | Facsimile: (323) 651-2577

6 | Attorneys for Secured Creditor
ARCHWAY BROADWAY LOAN SPE, LLC
7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **LOS ANGELES DIVISION**

11

| | |
|---|---|
| In re | Lead Case No. 2:24-bk-12079-VZ |
| SEATON INVESTMENTS, LLC, *et al.*, | Jointly Administered with Case Nos.: |
| Debtors and Debtors-in-Possession. | 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; 2:24-bk-12082-VZ; 2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ; and 2:24-bk-12076-VZ |
| Affects: | Chapter 11 |
| ☐ All Debtors<br>☐ Seaton Investments, LLC<br>☐ Colyton Investments, LLC<br>☒ Broadway Avenue Investments, LLC<br>☐ SLA Investments, LLC<br>☐ Negev Investments, LLC<br>☐ Alan Gomperts<br>☐ Daniel Halevy<br>☐ Susan Halevy | **SUPPLEMENTAL DECLARATION OF BOBBY KHORSHIDI IN SUPPORT OF ARCHWAY BROADWAY LOAN SPE, LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY**<br><br>Date:      October 29, 2024<br>Time:      10:30 a.m.<br>Crtrm.:    1368<br>           255 E. Temple Street<br>           Los Angeles, CA 90012<br><br>Hon. Vincent P. Zurzolo |

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

I, Bobby Khorshidi, declare:

1.       I am a director of Archway Real Estate Income Fund I REIT, LLC fka Archway Real Estate Income Fund I SPE I, LLC, a Delaware limited liability company, who is a manager of secured creditor, Archway Broadway Loan SPE, LLC, a Delaware limited liability company ("Archway").

2.       If called as a witness, I could and would competently testify to all facts within my personal knowledge, except where stated upon information and belief.

3.       This declaration is submitted in support of Archway's *Motion for Relief From Automatic Stay* ("Stay Relief Motion") (Dkt. *pending*) filed in the lead case of those jointly-administered debtors, Seaton Investments, LLC ("Seaton"), Colyton Investments, LLC ("Colyton"), Broadway Avenue Investments, LLC ("Broadway"), SLA Investments, LLC ("SLA"), and Negev Investments, LLC ("Negev" and collectively with Seaton, Colyton, Broadway and SLA, the "Corporate Debtors") and Alan Gomperts ("Mr. Gomperts"), Daniel Halevy ("Mr. Halevy"), and Susan Halevy ("Ms. Halevy" and collectively with Mr. Gomperts and Mr. Halevy, the "Individual Debtors" and collectively with the Corporate Debtors, the "Debtors").

**Archway makes a $17 million loan to Broadway.**

4.       On July 21, 2021, Archway made a business loan to Broadway in the principal amount of $16,942,500.00 ("Broadway Loan"). The Broadway Loan is evidenced, in part, by a Promissory Note ("Broadway Note") whereby Broadway promised, among other things, to pay Archway the principal amount of $16,942,500.00, plus interest, costs, fees, and other charges as set forth therein. A true and correct copy of the Broadway Note, with allonge endorsed to , is attached as **Exhibit 1.**

5.       In connection with the Broadway Loan, Broadway executed and delivered to Archway that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Broadway Deed of Trust"), whereby Broadway granted Archway a first-position lien on the property as described therein, which includes that certain real property located at 737 South Broadway, Los Angeles, CA 90014 ("Property"). Archway caused the Broadway Deed of Trust to be recorded in the Los Angeles County Recorder's Office on July 26, 2021, which

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    recording was assigned document number 20211142009. A true and correct copy of the recorded

2    Broadway Deed of Trust is attached hereto as **Exhibit 2.** Mr. Gomperts, Mr. Halevy, among

3    others, guarantied Broadway's obligations to Archway under the Broadway Note.

4                   **Broadway and the guarantors default on their loan obligations.**

5         6.       Later, Broadway and the Broadway Loan guarantors defaulted under the terms of

6    the Broadway Loan Documents, including, without limitation, failing to obtain a certificate of

7    occupancy by January 21, 2022, for the Property, as required by Section 5.1(o) of the Broadway

8    Loan Agreement, and by failing to pay the Broadway Loan obligation in full as of the scheduled

9    maturity date, August 1, 2022 (collectively, "Existing Defaults").

10                      **The parties restructure the Broadway Loan.**

11        7.       In connection with the Existing Defaults, and at Broadway's request, Broadway,

12   the Broadway Loan guarantors, and Archway entered into that certain Settlement and Loan

13   Modification Agreement on April 19, 2023 ("Settlement Agreement"). Among other things, the

14   Settlement Agreement extended the maturity date of the Broadway Loan to December 1, 2023, at

15   which time the entire principal under the Broadway Loan plus all accrued and unpaid interest and

16   other amounts would be due and payable as provided under the Settlement Agreement. A true and

17   correct copy of the Settlement Agreement is attached hereto as **Exhibit 3.**

18        8.       As part of the restructure, Archway made three additional loans—(1) a loan in the

19   principal amount of $1,300,000.00 to Negev ("Negev Loan"), (2) a loan in the principal amount of

20   $125,000.00 to SLA (guarantied by Mr. Gomperts, Ms. Halevy, and Mr. Halevy, among others)

21   ("SLA Loan"), and (3) a loan in the principal amount of $2,575,000.00 to Ms. Halevy's self-

22   settled inter-vivos revocable trust, the Halevy Family Trust, dated September 8, 2010 ("Halevy

23   Trust"), Mr. Gomperts's self-settled inter-vivos revocable trust, the Gomperts and Halevy Family

24   Trust ("G&H Trust"), and to Mr. Halevy ("Guarantor Loan" and collectively with the Negev and

25   SLA Loans, the "New Loans").

26                 **The New Loan obligors have combined net worths of over $60 million.**

27        9.       In or around August 21, 2023, Debtor Broadway's owners (who are also the New

28   Loan obligors) Mr. Gomperts, Ms. Halevy, and Mr. Halevy, each provided personal financial

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  statements to Archway. Those personal financial statements reflect that (1) Mr. Gomperts had a

2  $28,652,000 net worth, (2) Ms. Halevy had a $27,028,000.00 net worth, and (3) Mr. Halevy had a

3  $4,577,000.00 net worth. Combined, the total net worths of these Broadway owners, per these

4  personal financial statements, totals over $60 million. True and correct copies of these personal

5  financial statements are attached hereto, collectively, as **Exhibit 4.**

6  **The Archway loan obligations mature.**

7  10.    On December 1, 2023, the Broadway Loan (as well as the three other New Loans

8  described in the Settlement Agreement) matured without being paid in full, which constituted a

9  maturity default under the applicable Broadway Loan Documents, among other things.

10  **The Debtors file chapter 11 petitions.**

11  11.    On March 18, 2024, the Individual Debtors filed voluntary chapter 11 petitions in

12  the United States Bankruptcy Court for the Central District of California, commencing three of the

13  instant bankruptcy cases. The next day, on March 19, 2024, Broadway and the other Corporate

14  Debtors filed chapter 11 petitions, commencing the relevant corporate bankruptcy cases.

15  **The Corporate Debtors self-designate as "single asset real estate" debtors.**

16  12.    On Broadway's petition, just as the other Corporate Debtors, it self-designated this

17  as a single asset real estate case as defined in 11 U.S.C. § 101(51B). *See* Chapter 11 Petition

18  2:24-bk-12081-VZ Dkt. 1 at ¶ 7.

19  13.    The Court subsequently, on April 1, 2024, entered orders of joint administration,

20  designating Seaton's case as the lead case. *See* Order for Joint Administration Dkt. 16.

21  **Broadway acknowledges the Property is significantly underwater.**

22  14.    On April 9, 2024, Broadway filed its Schedules A/B and D (2:24-bk-12081-VZ

23  Dkt. 22), reflecting Broadway's valuation of the Property at $11,500,000.00 and also reflecting

24  that Archway is owed significantly more than that at over $15 million.

25  **The Debtors file an untimely and defective "Joint Plan."**

26  15.    On June 18, 2024, Broadway filed a document entitled "Disclosure Statement and

27  Plan of Reorganization" ("Joint Plan") (Dkt. 107). The Joint Plan is missing mandatory and option

28

exhibits to which it refers, including exhibits which purportedly describe the plan treatment for Archway and others. *See, generally*, Joint Plan at Dkt. 107.

**Archway demands that the Debtors commence making interest payments.**

16.     On July 1, 2024, Archway's counsel send a letter to the Corporate Debtors' counsel ("SARE Demand Letter"), pointing out that the Joint Plan was untimely and patently unconfirmable due.

17.     In that letter, Archway's counsel noted that the Joint Plan was missing exhibits, patently unconfirmable, and was filed after the 90-day single asset real estate deadline of June 17, 2024 ("SARE Deadline").

18.     Accordingly, Archway demanded that the SARE Debtors (Broadway, Negev, and SLA) immediately begin paying Archway nondefault contract rate interest on those obligations pursuant to 11 U.S.C. § 362(d)(3). (The letter further demanded an accounting of unauthorized cash collateral used by the Debtors postpetition.)

19.     A true and correct copy of the SARE Demand Letter is attached hereto as **Exhibit 5.**

20.     The Debtors have never commenced making any such nondefault contract rate interest payments to Archway; no payments have been made to Archway by the Debtors since well before the December 2023 maturity. (No accounting of unauthorized cash collateral use has ever been provided by the Debtors.)

**Archway files proofs of claim.**

21.     On July 15, 2024, Archway filed its proofs of claim in the respective bankruptcy cases of the debtor-obligors, which proofs of claim reflect amounts owed as of the respective March 18 and March 19 petition dates for the Individual and Corporate Debtors, respectively.

**Broadway now owes Archway over $18 million.**

22.     As of September 23, 2024, Broadway owes Archway the following amounts under the Broadway Loan Documents:

Principal Balance of not less than $15,241,093.00; plus

Accrued Interest (12/1/23–9/23/2024) of not less than $1,202,564.57; plus

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Default Interest (12/1/23–9/23/2024) of not less than $1,075,978.83; plus

Advances, including legal fees and costs, of not less than $525,348.22.

Accordingly, the balance as of September 23, 2024, is not less than $18,105,949.00.

Per Diem $7,620.55 ($4,021.96 contract per diem + $3,598.59 default per diem)

23.    Archway has not received any payments from the Debtors since well before the Loans matured in December of 2023.

**Broadway's manager refuses to make a mandatory capital call.**

24.    Broadway's members include Mr. Gomperts, Ms. Halevy, and Mr. Halevy. Mr. Gomperts is the manager of Broadway.

25.    A true and correct copy of the Broadway Operating Agreement ("Operating Agreement") is attached hereto as **Exhibit 6.**

26.    Upon information and belief, Mr. Gomperts refused to make the mandatory cash call required under § 2.1 of the Operating Agreement—while Broadway was insolvent—and instead placed Broadway into a chapter 11 case.

**Broadway member Ms. Halevy transfers property to non-debtor entity.**

27.    On September 26, 2023, a grant deed was recorded, transferring real property located at 341 South Canon Drive, Beverly Hills, California 90212 ("Canon Drive Property") from the Halevy Trust (Ms. Halevy's self-settled inter-vivos revocable trust, which itself is an obligor to Archway under the so-called Guarantor Loan) to Ms. Halevy's wholly-owned LLC, a non-debtor entity, 341 South Cannon LLC ("Cannon LLC"). A true and correct copy of the recorded grant deed is attached hereto as **Exhibit 7.**

28.    The records of the California Secretary of State, which I have reviewed, reflect that Cannon LLC was formed on November 3, 2021, two years prior to the Canon Drive transfer. The Secretary of State's records also reflect that Ms. Halevy is the only member and manager of Cannon LLC. True and correct copies of these records of the California Secretary of State are attached hereto, collectively, as **Exhibit 8.**

29.    On September 26, 2023, a Deed of Trust, Assignment of Leases and Rents, Fixture Filings, and Security Agreement was recorded against the Canon Drive Property in the Los

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Angeles Recorder's Office, as document number 20230646028 ("Canon Drive Deed of Trust"). A true and correct copy of the Canon Drive Deed of Trust is attached hereto as **Exhibit 9.**

30.     The Canon Drive Deed of Trust references a $1.3 million loan, which the private lender apparently provided to Cannon LLC, which loan matures on October 1, 2024.

31.     It is unclear what happened to these loan proceeds or whether Ms. Halevy has caused Cannon LLC to pay off this loan or otherwise deal with it.

32.     Upon information and belief, Ms. Halevy and Mr. Halevy transferred the Canon Drive Property to Cannon LLC for no reasonable equivalent value.

### Assignment of Broadway Loan

33.     On September 30, 2024, Archway Real Estate Income Fund I REIT, LLC assigned its right, title, and interest in the Broadway Loan Documents (defined below) to Archway Broadway Loan SPE, LLC.

34.     True and correct copies of the relevant assignment documents, whereby Archway Real Estate Income Fund I REIT, LLC assigned its right, title, and interest in the Broadway Loan Documents, are attached hereto, collectively, as **Exhibit 10.**

### Custodian of Records

35.     I am one of the custodians of the books, records, and files of Archway as to those books, records, and files that pertain to loans and extensions of credit given to the Debtors as set forth in this Declaration and in these jointly-administered bankruptcy cases.

36.     I have personally worked on such books, records, and files, and as to the facts set forth in this Declaration, I know such facts to be true of my own knowledge or I have gained knowledge of them from the business records of Archway on behalf of Archway, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Archway's business at or near the time of the acts, conditions, or events to which they relate.

37.     Any such document was prepared in the ordinary course of business of Archway by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such acts, conditions, or events.

[Signature on Following Page]

1        I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct and that this Declaration was executed on this 3rd day of

3    October, 2024, at _____Paradise Valley_____, Arizona.

4

5                        Bobby Khorshidi

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

5344418v1 | 101415-0002

SUPPLEMENTAL DECLARATION OF BOBBY KHORSHIDI

# Exhibit 1

# Exhibit 1

# PROMISSORY NOTE

$16,942,500.00                                                          As of July 21, 2021

FOR VALUE RECEIVED, **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100  Dollars ($16,942,500.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be

BOBBY-010

construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

737 S Broadway - Promissory Note

BOBBY-011

EXECUTED as of the date first written above.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By
Name: Alan Gomperts
Title: Manager

BOBBY-012

## ALLONGE

FOR VALUE RECEIVED, the undersigned, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Archway*"), the original payee under that certain Promissory Note, dated as of July 21, 2021, in the original principal amount of $16,942,500.00, made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), and payable to the order of Archway (the "*Note*"), to which this endorsement is affixed, absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company ("("*Archway Broadway*"), its successors and assigns, the Note, without recourse, representation or warranty of any kind, except as and to the extent set forth in the Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Archway to Archway Broadway, dated on or about the hereof. This assignment includes the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: September 30, 2024

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC, formerly known as ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent

BOBBY-013

# Exhibit 2

# Exhibit 2

BOBBY-014



**This page is part of your document - DO NOT DISCARD**



## 20211142009



**Pages:**
**0022**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**07/26/21 AT 08:00AM**

| | |
|---|---|
| FEES: | 147.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 372.00 |



**L E A D S H E E T**



**201107261000021**

**00020896342**



**012479545**

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E521952

0621014460

Recording Requested By
Old Republic Title

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 440-4100
Email: jmogin@raineslaw.com

---

*(space above this line for recorder's use only)*

**BROADWAY AVENUE INVESTMENTS LLC**, as grantor
(Borrower)

to

**OLD REPUBLIC TITLE**, as trustee
(Trustee)

for the benefit of

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, as beneficiary

(collectively, Lender)

---

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,**
**SECURITY AGREEMENT AND FIXTURE FILING**

---

Dated:          July **23**, 2021

Address:      737 S. Broadway
                    Los Angeles, CA 90014

THIS INSTRUMENT IS TO BE INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING FILED AS A FINANCING STATEMENT.

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE. TO THE EXTENT THE GOODS ARE FIXTURES UNDER THE LAWS OF THE STATE OF CALIFORNIA, THE FIXTURES ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY LOCATED IN LOS ANGELES COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED ON <u>EXHIBIT A</u> ATTACHED TO THIS SECURITY INSTRUMENT.

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing is executed as of July **23**, 2021, by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("***Borrower***") to **OLD REPUBLIC TITLE** ("***Trustee***"), for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company, as beneficiary ("***Lender***").

This instrument is made in connection with a loan in the amount of $16,942,500.00 as evidenced by the Loan Agreement.

### W I T N E S S E T H:

In order to secure payment of the Indebtedness and performance of Borrower's obligations under the Loan Documents, Borrower hereby irrevocably grants, bargains, sells and conveys to Trustee IN TRUST, WITH POWER OF SALE, the following property and rights, whether now owned or held or hereafter acquired and Borrower further grants to Trustee a first priority security interest in the Property.

### GRANTING CLAUSE ONE

All of Borrower's right, title and interest in and to the Land.

### GRANTING CLAUSE TWO

All of Borrower's right, title and interest in and to the Additional Land.

### GRANTING CLAUSE THREE

All of Borrower's right, title and interest in and to the Improvements.

### GRANTING CLAUSE FOUR

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy, property, possession, claim and demand whatsoever, both in law and in equity, of Borrower in, of and to the Real Property and every part and parcel thereof, with the appurtenances thereto.

### GRANTING CLAUSE FIVE

All right, title and interest in and to the Equipment and the right, title and interest of Borrower in and to any of the Equipment which may be subject to any Security Agreements (as defined in the Uniform Commercial Code) superior, inferior or pari passu in lien to the lien of this Security Instrument. In connection with Equipment which is leased to Borrower or which is subject to a lien or security interest which is superior to the lien of this Security Instrument, this Security Instrument shall also cover all right, title and interest of each Borrower in and to all deposits and the benefit of all payments now or hereafter made with respect to such Equipment.

### GRANTING CLAUSE SIX

All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property or any part thereof, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade or for any other injury to or decrease in the value of the Real Property.

### GRANTING CLAUSE SEVEN

All leases and subleases (including, without limitation, all guarantees thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or any part thereof, now or hereafter entered into (including any use or occupancy arrangements created pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including, but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

### GRANTING CLAUSE EIGHT

All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

### GRANTING CLAUSE NINE

All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

### GRANTING CLAUSE TEN

The right, in the name of and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Lender in the Real Property or any part thereof and all awards and/or judgments received by Borrower from any source whatsoever.

### GRANTING CLAUSE ELEVEN

All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Borrower now has or may hereafter acquire in the Real Property or any part thereof.

### GRANTING CLAUSE TWELVE

All rights which Borrower now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

### GRANTING CLAUSE THIRTEEN

All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

### GRANTING CLAUSE FOURTEEN

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

WITH RESPECT to any portion of the Property which is not real estate under the laws of the State of California, Borrower hereby grants, bargains, sells and conveys the same to Lender for the purposes set forth hereunder and the references above to Trustee shall be deemed to be to Lender with respect to such portion of the Property and Lender shall be vested with all rights, power and authority granted hereunder or by law to Trustee with respect thereto.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns for the benefit of Lender and the successors and assigns of Lender forever.

IN TRUST, WITH POWER OF SALE, to secure the payment to Lender of the Indebtedness at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition, if Borrower shall well and truly pay to Lender the Indebtedness at the time and in the manner provided in the Note and this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void;

AND Borrower represents and warrants to and covenants and agrees with Lender and Trustee as follows:

Borrower warrants to Trustee for the benefit of Lender, and agrees to defend title to the Property against the claims of any Person or Governmental Authority, subject to the Permitted Encumbrances. This Security Instrument will have no further force or effect on the Termination Date. Trustee on behalf of Lender will (unless otherwise required by Applicable Law) release this Security Instrument within 30 days after the Termination Date, at Borrower's expense.

Borrower acknowledges receiving good and valuable consideration, including the Indebtedness, to execute and deliver this Security Instrument.

3

AND Borrower represents and warrants to and covenants and agrees with Lender and Trustee as follows:

## ARTICLE I.
## Definitions and Loan Documents

1.1     Loan Documents. All representations, covenants and other terms (including those terms that apply to all Loan Documents) of the other Loan Documents are, by reference, fully incorporated in this Security Instrument. All covenants in the Loan Documents are covenants running with the Land.

1.2     Definitions. Capitalized terms not otherwise defined below will have the meanings set forth in the Loan Agreement. Each of the below capitalized terms has the following meaning:

"*Additional Land*" means all additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental Deed of Trust or otherwise, be expressly made subject to the lien thereof.

"*Collateral*" means the Property and all of Borrower's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Borrower's assets.

"*Equipment*" means all machinery, equipment, fixtures, goods which are or are to become fixtures, furnishings, inventory and other property of every kind and nature whatsoever owned by Borrower or in which Borrower has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto and usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Borrower or in which Borrower has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto or usable in connection with the present or future operation and occupancy of the Real Property, including but not limited to all heating, ventilating, air conditioning, plumbing, lighting, communications and elevator machinery, equipment and fixtures.

"*Foreclosure Statute*" has the meaning set forth in Section 4.2 below.

"*Improvements*" means any and all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Land or any part thereof.

"*Land*" the real property or properties described on *Exhibit A* attached hereto.

"*Loan Agreement*" means the Loan Agreement, dated as of the date hereof, between Lender and Borrower.

"*Payment Notice*" means Lender's notice to Tenant of an Event of Default Period.

"*Personal Property*" means all (i) Awards, (ii) Leases, (iii) all of Borrower's accounts (as defined in the UCC), goods (as defined in the UCC), fixtures, accessions (as defined in the UCC), general intangibles (as defined in the UCC), chattel paper (as defined in the UCC), investment property (as defined in the UCC) and deposits accounts (as defined in the UCC) (including any accounts opened in connection with cash management), which are ever situated on, derived from or used in connection with the Property, (iv) Additional Collateral, (v) all insurance policies covering the Property, the other Personal Property and the liability of any Borrower, Trustee or Lender, and all insurance proceeds from any of the policies, (vi) amounts deposited in the Tax and Insurance Escrow Account, and (vii) all proceeds of the Personal Property described in (i) – (vi).

"*Property*" means the Real Property and the Personal Property.

"*Real Property*" means, collectively, (i) the Land (as legally described in *Exhibit A* annexed to this Security Instrument), (ii) the Improvements, (iii) Leases, Rents and Awards, (iv) all fixtures, accessions and appurtenances to the Land or Improvements, (v) all easements and rights of way now or hereafter benefiting the Land, (vi) all of Borrower's interest in any lands adjoining the Land, (vii) all water and all of Borrower's water rights benefiting the Land, and (viii) all rights, estates and privileges appurtenant or incident to the foregoing.

"*Security Instrument*" means this Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, as amended, modified, restated and extended.

"*Termination Date*" means day on which Borrower fully pays the Indebtedness and performance all of Borrower's obligations under the Loan Documents.

"*Transferee*" means any Person, including Lender, who takes title to any Collateral after a Transfer Event.

"*Trustee*" means Old Republic Title, and the successors and substitutes Lender designates.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code of the State of California, as amended.

1.3     Terms Generally; References and Titles.  References in this Security Instrument to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules annexed to this Security Instrument are incorporated in, and are a part of, this Security Instrument for the purposes set forth in this Security Instrument. Any term defined in this Security Instrument may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Security Instrument, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

1.4     Prepayment Premium.  Unless Lender specifically waives the Prepayment Premium (as defined in the Loan Agreement) in any purported payoff statement, the Prepayment Premium is due and payable as provided in the Loan Agreement.

### ARTICLE II.
### Assignment of Leases and Rents

2.1     Assignment.  For the Indebtedness and other good and valuable consideration, Borrower absolutely and unconditionally assigns and transfers to Lender (a) the Leases, (b) the Rents, and (c) any and all guaranties of payment of the Rent. Borrower does hereby absolutely and unconditionally assign to Lender its right, title and interest in all current and future Leases and Rents and all proceeds from the sale, cancellation, surrender or other disposition of the Leases, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise to impose any obligation upon Lender. Borrower agrees to execute and deliver to Lender such additional instruments in form and substance satisfactory to Lender, as may hereafter be requested by Lender to further evidence and confirm such assignment. Nevertheless, subject to the terms of this Section 2.1, Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents. Borrower shall hold the Rents, or a

portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums. During an Event of Default Period, the license granted to Borrower herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property. Lender is hereby granted and assigned by Borrower the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its reasonable discretion shall deem proper. It is further the intent of Borrower and Lender that the Rents hereby absolutely assigned are no longer, during the term of this Security Instrument, property of Borrower or property of any estate of Borrower as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Borrower.

2.2     Application of Rent.

(a)     Each Tenant may, until Lender delivers a Payment Notice, pay Rent directly to Borrower (or its designee). Borrower shall hold all Rent it (or its designee) receives in trust for the benefit of Lender and the Loan. Unless Lender otherwise agrees, Borrower must first only use the Rent to satisfy obligations arising under the Loan Documents, including payment of all Real Estate Taxes, insurance premiums, maintenance and repair costs, for the Property.

(b)     After a Tenant receives a Payment Notice, Tenant shall pay directly to Lender all Rent thereafter accruing. Tenant is relieved of its obligations to pay Borrower under any Lease to the extent of all Rent Tenant pays to Lender.

(c)     Lender may use any Rent it receives for (in the priority and amounts as Lender determines in its discretion): (i) (1) the expenses to operate, maintain and manage the Property, and (2) the expenses incident to taking and retaining possession of the Property and collecting Rent; and (ii) the Indebtedness. The assignment in Section 2.1 above does not reduce the Indebtedness unless Lender actually receives Rent and applies it to the Indebtedness.

(d)     Lender may, at its option and without impairing its rights under the assignment in this Section 2.1, release any Rent Lender receives to Borrower.

(e)     As between Borrower, Lender and any other Person, except a Tenant who has not received a Payment Notice, the assignment in Section 2.1 above is absolute, unconditional and presently effective. Lender's delivery of a Payment Notice is solely for the benefit and protection of each Tenant and does not otherwise benefit or affect Borrower or any Person claiming through or under Borrower.

(f)     Lender is not required to institute legal proceedings to enforce the terms of this Section.

2.3     No Third Party Beneficiary. The assignment in Section 2.1 above is not made for the benefit of any Person other than Lender.

2.4     Release and Termination. The assignment in Section 2.1 above terminates upon Lender's release of this Security Instrument.

## ARTICLE III.
## **Leases**

3.1     Intentionally Omitted.

3.2     Approval. Except as set forth below and in the Loan Agreement, no Lease (including any Lease amendments) will be effective unless approved by Lender.

3.3     Terms. Notwithstanding the terms of any Lease made on or after the Closing Date, each Lease is subordinate to this Security Instrument and each Tenant shall, if Lender elects, execute an instrument (in form and substance acceptable to Lender in its sole discretion) subordinating the Tenant's

leasehold interest to Lender's liens and security interests. Unless Lender specifically agrees in writing, no Leases may impose obligations upon Lender or any Transferee prior to or following a Transfer Event.

      3.4     <u>Lender's Preapproval</u>. Notwithstanding <u>Section 3.2</u> above and subject to <u>Sections **Error! Reference source not found.**</u> and <u>3.3</u> above, Borrower may enter into and modify, but not terminate, Leases (except ground or master Leases) that:

      (a)     are with Tenants who are not affiliated with Borrower;

      (b)     do not grant Tenant's more than 1 month of free rent for each year of the lease or renewal term or any reduced Rents, except as permitted pursuant to clause (d) hereof;

      (c)     do not afford Tenants any termination rights;

      (d)     are an arm's length transaction on economic terms conforming to current market conditions;

      (e)     have a market rental rate; and

      (f)     do not contain any rights of first refusal or options to purchase.

## ARTICLE IV.
### Remedies

      4.1     <u>Possession</u>. During an Event of Default Period, Lender may (a) enter upon and take possession of the Property and (b) exercise, without Borrower's interference, any rights which Borrower has with respect to the managing, possessing, operating, leasing, protecting or preserving the Property. If Lender rents any of the Property, Lender will do so for the account of Borrower, and Lender may deduct from the Rents all expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property. Lender may apply any remaining Rents to the Indebtedness in any manner Lender chooses. All costs, expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property, which exceed the Rents Lender actually collects from Tenants will be Additional Costs. If Lender elects to take possession of the Property, then Borrower will quietly surrender possession of the Property. If Borrower fails to quietly surrender possession of the Property, then Lender may invoke all legal remedies to dispossess Borrower.

      4.2     <u>Foreclosure</u>. Borrower grants Trustee on behalf of Lender a power of sale. During an Event of Default Period, Trustee, if Lender directs, on behalf of Lender may exercise the power of sale and foreclose the liens and security interests created by this Security Instrument in any manner provided at law or in equity (as amended, replaced or re-codified, the "***Foreclosure Statute***"). If the Foreclosure Statute is no longer in force or effect, then, in addition to Lender's other rights at law or in equity, Lender may foreclose pursuant to the rules set forth in the last effective Foreclosure Statute. In addition to the power of sale and non-judicial foreclosure rights granted to Trustee on behalf of Lender, if Trustee on behalf of Lender desires, then Trustee on behalf of Lender may file suit on the Indebtedness and for the foreclosure of the liens and security interests created by this Security Instrument.

      4.3     <u>Receiver</u>. In addition to all other remedies in the Loan Documents, at law or in equity, during an Event of Default Period, (a) without notice to any Borrower Party, (b) whether or not Borrower is solvent, (c) whether or not a Borrower Party commits fraud or mismanages the Property, (d) even if the Property is sufficient to repay the Indebtedness, or (e) without filing any proceeding other than a proceeding seeking the appointment of a receiver, Lender will be entitled to the appointment of a receiver or receivers for the Property and the Rents. Borrower irrevocably consents to the appointment of a receiver and waives all defenses to any Lender application for a receiver. During a receivership for the Property, Borrower irrevocably consents to (i) Lender commencing any additional proceeding to enforce any other right or remedy under the Loan Documents, at law or in equity, and (ii) Trustee on behalf of Lender conducting a non-judicial sale of the Collateral pursuant to the Foreclosure Statute. Any money Lender advances in

connection with a receivership will be Additional Costs. This *Section* is an express condition upon which the Loan is made.

    4.4    <u>Proceeds of Sale</u>. The proceeds of any Trustee's or receiver's sale of the Property in foreclosure of the liens evidenced by this Security Instrument will be:

> **FIRST**, applied to the payment of all costs of the sale, and a reasonable fee, to Trustee acting under <u>Section 4.2</u> above; **SECOND**, applied to the Indebtedness, in the order Lender elects, until the Indebtedness is paid in full; and **THIRD**, the remainder, if any, paid to any Person (including Borrower) as required by Applicable Law.

    4.5    <u>Lender as Purchaser</u>. Lender may purchase the Property at any foreclosure sale. In connection with any foreclosure sale, Lender may credit bid in an amount up to the Indebtedness then owed to Lender.

    4.6    <u>Uniform Commercial Code</u>. During an Event of Default Period, Lender may exercise its rights of enforcement with respect to the Collateral under the UCC. In addition to or in substitution for Lender's UCC rights and remedies:

    (a)    Lender may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable, subject to the rights of any Tenants;

    (b)    Lender may require Borrower to assemble the Collateral and make it available at the Property or any place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Collateral;

    (c)    Lender may mail written notice to Borrower as provided in the Loan Agreement ten (10) days prior to the date of any sale of the Collateral, and such notice will constitute reasonable notice under the UCC;

    (d)    Lender need not take possession of the Collateral prior to any Transfer Event; and

    (e)    prior to applying Transfer Event proceeds to the Indebtedness, Lender may apply the proceeds to the reasonable expenses (including Lender's legal expenses and reasonable attorneys' fees, including allocated in-house counsel expenses) incurred to collect the Indebtedness, enforce the Loan Documents or to take possession of, hold or prepare the Collateral for transfer.

    4.7    <u>Delivery of Possession After Foreclosure</u>. Immediately after a Transfer Event, Borrower and any Person claiming any Collateral interest by, through or under Borrower, who is occupying or using the Property or other Collateral, will become the tenant or lessee of the Transferee. Subject to the terms of the applicable Lease and to any non-disturbance and attornment agreement between Lender and a Tenant, the post-Transfer Event tenancy will be a tenancy at will, terminable at the will of either Transferee or the tenant, at a daily fair market rental. If a Tenant fails to surrender possession of the Collateral to Transferee after Transferee's demand, then Transferee may institute and maintain an action for forcible entry and detainer of the Property.

ARTICLE V.
**Miscellaneous**

    5.1    <u>Successor Trustee</u>. Lender may remove Trustee, or Trustee may resign, at any time with or without cause. If Trustee dies, resigns or is removed, then Lender may, in writing, appoint a successor or substitute trustee. Lender may exercise its right to remove any Trustee or appoint any number of successor or substitute trustees as often as Lender desires until the Termination Date. Lender may appoint a single or multiple substitute trustees to act instead of the original trustee. If multiple substitute trustees are appointed, then each may act alone without the other substitute trustees. Immediately after a successor or substitute trustee is appointed, (i) all of the Trustee's estate in and title to the Collateral vests in the

8

successor or substitute trustee(s), (ii) the successor or substitute trustee(s) will succeed to all rights, powers, privileges and immunities conferred upon Trustee, and (iii) the prior Trustee(s) shall assign, transfer and deliver to the successor or substitute Trustee(s) all of the Collateral the prior Trustee holds. Upon the written request of Lender or of the successor or substitute Trustee(s), the prior Trustee shall execute and deliver an instrument transferring to the successor or substitute Trustee(s) all of the estate in and title to the Collateral.

   5.2    Authorization to File Financing Statement.  Borrower authorizes Lender to file in any jurisdiction a reproduction of this Security Instrument or financing statements covering the Collateral. If Lender desires, Lender may describe the Collateral in any financing statement as "*all assets*" of Borrower or words of similar effect.

   5.3    Fixture Filing.  This Security Instrument is a financing statement filed as a fixture filing. For purposes of this Security Instrument being a financing statement: Borrower is the debtor, Lender is the secured party, and the collateral is the Personal Property, including fixtures.

   5.4    Dealing with Successor.  If Borrower no longer owns the Collateral, then Lender may, without notice to Borrower, deal with Borrower's successor in interest concerning this Security Instrument and the Indebtedness in the same manner as with Borrower, without in any way vitiating or discharging Borrower's liability under the Loan Documents or for the Indebtedness. Notwithstanding the foregoing, Lender does not consent to any transfer of the Collateral, except as expressly set forth in the Loan Documents or as Lender hereafter agrees in writing.

   5.5    Subrogation.  If Loan proceeds pay indebtedness secured by any outstanding lien, security interest or prior encumbrance against the Collateral, then Lender has advanced the proceeds at Borrower's request and Lender is subrogated to all rights, security interests and liens held by the holder of the outstanding liens, security interests or encumbrances, irrespective of whether the liens, security interests or encumbrances are released. However, the terms and provisions of the Loan Documents will govern the rights and remedies of Lender and supersede the terms, provisions, rights and remedies under and pursuant to the instruments creating the original lien, security interest or encumbrance.

   5.6    Application of Indebtedness.  If this Security Instrument or any of the Collateral cannot lawfully secure any of the Indebtedness or if the liens or security interests created by this Security Instrument are invalid or unenforceable as to any of the Indebtedness or any of the Collateral, then all payments made on the Indebtedness will be applied first to all of the Indebtedness which is not secured by this Security Instrument or the Collateral.

   5.7    Agents.  Lender or Trustee may appoint one or more Persons as agent to perform any act necessary or incidental to any sale of the Collateral, in the name and on behalf of Lender or Trustee.

   5.8    Transfer Recitals.  All statements of fact in any instrument evidencing a Transfer Event concerning (i) nonpayment of the Indebtedness, (ii) any Event of Default, (iii) acceleration of the Indebtedness, or (iv) any other matter, are prima facie evidence of the truth of the recited fact.

   5.9    Notices.  Any notice required or permitted to be given under this Security Instrument shall be in writing and either (a) shall be mailed by certified mail, postage prepaid, return receipt requested, or (b) sent by overnight air courier service, or (c) personally delivered to a representative of the receiving party, or (d) sent by facsimile or email. All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

|  |  |
|---|---|
| To Lender: | Archway Real Estate Income Fund I SPE I, LLC |
|  | 16 N. Marengo Avenue, Suite 212 |
|  | Pasadena, California 91101 |
|  | Attention: Chuck Ng |
|  | Phone: (310) 779-6505 |

Email: cng@oakhurstfunds.com

with a copy to:

Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 440-4100
Email: jmogin@raineslaw.com

To Borrower:

Broadway Avenue Investments LLC
264 S. Oakhurst Drive
Beverly Hills CA 90212
Attention: Alan Gomperts
Phone: (310) 621-5350
Email: alangomperts@hotmail.com

with a copy to

Feldman Berman Schwartz LLP
20750 Ventura Blvd., Ste. 201
Woodland Hills, CA 91364
(818) 707-1465 ext. 3
Attention: Craig Berman
cberman@fbsllp.com

Trustee:

Old Republic Title
8060 Santa Teresa Blvd. Ste 100
Gilroy, CA 95020
Attention: Jamie Buchanan
Phone: (408) 847-1505
Email: jbuchanan@ortc.com

Any notice so addressed and sent by United States mail or overnight courier shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee. Any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, Lender or Indemnitor, as the case may be. Notices transmitted by facsimile or email shall be deemed received on the date of transmission, provided that a confirming copy of such notice is also sent by mail, overnight courier or personal delivery, as provided above. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

ARTICLE VI.
**Concerning the Trustee**

6.1    <u>Trustee's Fees</u>.  Borrower shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

10

6.2     Substitute Trustee.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Lender may remove Trustee at any time or from time to time and select a successor trustee by filing the appropriate instrument in the office where this Security Instrument is recorded.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, with full power of substitution to file, execute and record any document required to appoint such substitute trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.  Borrower agrees to the foregoing for itself, its successors and assigns.

6.3     Power of Sale.

(a)     Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Lender, shall sell or offer for sale the Property in such portions, order and parcels as Lender may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located.  Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any Personal Property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Borrower obligated to pay the Note and other secured indebtedness secured by this Security Instrument according to the records of Lender in accordance with applicable law.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

(b)     At any such public sale, Trustee may execute and deliver in the name of Borrower to the purchaser a conveyance of the Property or any part of the Property in fee simple.  In the event of any sale under this Security Instrument by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Lender in its sole discretion may elect, and if Lender so elects, Trustee may sell the Personal Property covered by this Security Instrument at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted shall not extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full.  If the Note and other secured indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts or guaranty, assignments of lease, or other security instruments, Lender at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Lender may determine.

11

(c)     Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(d)     In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including, without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Lender), to payment of the outstanding principal balance of the Indebtedness, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Borrower, or to the person or entity lawfully entitled thereto.

(e)     In case Trustee shall have proceeded to enforce any right or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every case, Borrower, Lender and Trustee shall be restored to their former positions and the rights, powers and remedies of Lender and Trustee herein provided or arising, or existing otherwise as herein set forth shall continue as if no such proceeding had been taken.

6.4     Acceptance by Trustee. Trustee accepts the Property when this Security Instrument, duly executed and acknowledged, becomes a public record as provided by law. Trustee shall not be obligated to perform any act required hereunder unless the performance of such act is requested in writing and Trustee is reasonably indemnified against loss, cost, liability and expense.

6.5     Acts of Trustee. From time to time, upon written request of Lender and without affecting the liability of any person for payment of any indebtedness or performance of the obligations secured hereby, Trustee may, without liability therefor and without notice reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof. Trustee may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trust hereunder and the enforcement of the rights and remedies available hereunder, and Trustee may obtain orders or decrees directing or confirming or approving acts in the execution of said trust and the enforcement of said remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Security Instrument.

6.6     No Liability of Trustee. The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except due to the Trustee's gross negligence, breach of agreement, fraud or willful misconduct. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by them hereunder, believed by the Trustee in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law or under the Loan Documents), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

6.7     Trustee Powers. Trustee may exercise any of its powers through appointment of attorney-in-fact or agents. Trustee may select and employ legal counsel at the expense of Borrower.

6.8     Priority. All amounts advanced by either of Lender or Trustee hereunder shall be secured by this Security Instrument with priority dating back to the date of the grant of this Security Instrument.

6.9     Ratification.   Borrower hereby ratifies and confirms every act that Trustee and its successors may lawfully do at the Property by virtue of powers granted to Trustee hereunder.

## ARTICLE VII.
## State Law Provisions

7.1     Conflicts.   This Article VII will control any conflict between the terms of this Article VII and the other provisions of this Security Instrument and the other Loan Documents.

7.2     Full Reconveyance.   Upon written request of Lender stating that all sums secured hereby have been paid, upon surrender to Trustee of the Note and the original or a certified copy of this Security Instrument for cancellation and retention, and upon payment of its fees, Trustee shall fully reconvey, without warranty, the entire remaining Property then held hereunder.  The recitals in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof.  The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

7.3     Dwellings.   No portion of the proceeds of the Loan shall be used by Borrower to finance the purchase or construction of real property containing four (4) or fewer residential units or on which four (4) or fewer residential units are to be constructed.  No portion of the Property is or will be a "dwelling" within the meaning of Section 10240.1 or Section 10240.2 of the California Business and Professions Code.

7.4     Civil Code.   Borrower represents, warrants and acknowledges that the Loan is not subject to the provisions of Chapter 3, Title IV, Part 4, Division Third of the Civil Code of the State of California (Civil Code Sections 1912 et seq.) other than Section 1916.1 thereof.

7.5     Indemnity; Expenses.   Borrower will pay or reimburse the Trustee and the Lender for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, action, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Indebtedness, this Security Instrument or the interest created herein, or the Property, or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Lender, activities related to protection of Lender's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Borrower, and any such amounts paid or incurred by the Trustee or the Lender shall be added to the Indebtedness and shall be secured by this Security Instrument.  The agreements of this subsection shall expressly survive in perpetuity satisfaction of this Security Instrument and repayment of the Indebtedness, any release, reconveyance, discharge of foreclosure of this Security Instrument, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by trustee's conveyance of the Property.  Notwithstanding the forgoing, Borrower shall have no liability under this Section for any fees, costs or expenses arising solely from the gross negligence, fraud, or willful misconduct of Lender.

7.6     Supplemental Environmental Provisions.   In the event that any portion of the Property is determined to be "environmentally impaired" (as "environmentally impaired" is defined in California Code of Civil Procedure Section 726.5(e)(3)) or to be an "affected parcel" (as "affected parcel" is defined in California Code of Civil Procedure Section 726.5(e)(1)), then, without otherwise limiting or in any way affecting Lender's or Trustee's rights and remedies under this Security Instrument, Lender may elect to exercise its right under California Code of Civil Procedure Section 726.5(a) to (i) waive its lien on such environmentally impaired or affected portion of the Property, and (ii) exercise the rights and remedies of an unsecured creditor, including reduction of its claim against Borrower to judgment and any other rights and remedies permitted by law.  Lender shall have the right under Section 7.1 of this Security Instrument to allocate amounts recovered on the Indebtedness first to those portions thereof other than damages and

13

other amounts recoverable under California Code of Civil Procedure Section 736, and thereafter to damages and other amounts recoverable under said Section.

7.7    Foreclosure By Power of Sale.

(i) Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall deliver to Trustee a written declaration of default and demand for sale, and shall deposit with Trustee this Security Instrument and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(a)    Upon receipt of notice from Lender, Trustee shall cause to be recorded, published and delivered to Borrower such notice of default and election to sell as is then required by law. Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Lender may direct Trustee so to do, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matter or fact shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers.

(b)    Subject to applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

7.8    Separate Sales. The Property may be sold in one or more parcels and in such manner and order as Lender, in its sole discretion, may direct Trustee so to do. A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein, and subsequent sales may be made hereunder until all obligations secured hereby have been satisfied, or the entire Property sold, without defect or irregularity.

7.9    Release of and Resort to Collateral. Lender may release, regardless of consideration and without the necessity for any notice to a consent by the holder of any subordinate lien on the Property, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests created in or evidenced by the Loan Documents or their stature as a first and prior lien and security interest in and to the Property. For payment of the Indebtedness, Lender may resort to any other security in such order and manner as Lender may elect.

7.10    Waiver of Redemption, Notice and Marshalling of Assets. To the fullest extent permitted by law, Borrower hereby irrevocably and unconditionally waives and releases (i) all benefit that might accrue to Borrower by virtue of any present or future statute of limitations or law or judicial decision exempting the Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment, (ii) all notices of any Event of Default or of Trustee's election to exercise or his actual exercise of any right, remedy or recourse provided for under the Loan Documents, and (iii) any right to a marshalling of assets or a sale in inverse order of alienation.

7.11    Discontinuance of Proceedings. If Lender shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower

14

and Lender shall be restored to their former positions with respect to the Indebtedness, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Lender thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default.

7.12     No Mortgagee in Possession. Neither the enforcement of any of the remedies under this Security Instrument nor any other remedies afforded to Lender under the Loan Documents, at law or in equity, shall cause Lender or Trustee to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender or Trustee to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

7.13     Concerning the Trustee. With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ and consult with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution and interpretation of the Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his or her agents or attorneys, (iii) to select and employ, in and about the execution of his or her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee (and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence, bad faith, fraud or willful misconduct), and (iv) any and all other lawful action that Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered. Borrower will, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save and hold Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of Trustee's duties.

7.14     Retention of Money. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, and shall be segregated from any other moneys of Trustee.

7.15     Successor Trustees. Trustee may resign by the giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting in the execution of this trust, or if, for any reason, Lender, in Lender's sole discretion and with or without cause, shall prefer to appoint a substitute trustee or multiple substitute trustees, or successive substitute trustees or successive multiple substitute trustees, to act instead of the aforenamed Trustee, Lender shall have full power to appoint a substitute trustee (or, if preferred, multiple substitute trustees) in succession who shall succeed (and if multiple substitute trustees are appointed, each of such multiple substitute trustees shall succeed) to all the estates, rights, powers and duties of the aforenamed Trustee. Such appointment may be executed by any authorized agent of Lender, and if such Lender be a corporation and such appointment be executed on its behalf by any officer of such corporation, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any

15

superior officer of the corporation. Borrower hereby ratifies and confirms any and all acts which the aforenamed Trustee, or his or her successor or successors in this trust, shall do lawfully by virtue hereof. If multiple substitute trustees are appointed, each of such multiple substitute trustees shall be empowered and authorized to act alone without the necessity of the joinder of the other multiple substitute trustees, whenever any action or undertaking of such substitute trustees is requested or required under or pursuant to this Security Instrument or applicable law. Any prior election to act jointly or severally shall not prevent either or both of such multiple substitute Trustees from subsequently executing, jointly or severally, any or all of the provisions hereof.

7.16   Perfection of Appointment. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

7.17   Succession Instruments. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its, his or her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in such Trustee's place.

7.18   No Representation by Trustee or Lender. By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Trustee or Lender pursuant to the Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, neither Trustee nor Lender shall be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or affirmation with respect thereto by Trustee or Lender.

7.19   Border Zone. To Borrower's knowledge, Borrower represents to Lender that, as of the date hereof, the Property has not been designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be designated as Border Zone Property.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Borrower has executed this Security Instrument on the date of the below acknowledgement, but to be effective on the Closing Date.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By: _____
Name: Alan Gomperts
Title: Manager

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

BOBBY-033

ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *Los Angeles*

On _July_ _13_ , 20*21*, before me, _REGINA BULAONG BENETUA_ (a notary public), personally appeared _Alan Gomperts_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

> REGINA BULAONG BENETUA
> Notary Public - California
> Los Angeles County
> Commission # 2357355
> My Comm. Expires May 12, 2025

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

# ILLEGIBLE NOTARY SEAL CERTIFICATION

(Government Code 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary : _Regina Bulaong Benetua_

Commission Number : _2357355_

Vendor No. : _NNA1_

County/State where
Bond is filed : _Los Angeles County, CA_

Commission Exp. Date : _May 12, 2025_

Executed in the City of ___San Jose___, State of California

eRecording Partners Network

_07/22/2021_

Date

By: _[signature]_

Signature of Declarant

_Lauren Montana_

Type or Print Name

██████  ████  █████

## EXHIBIT A

LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

BOBBY-036

# Exhibit 3

# Exhibit 3

BOBBY-037

## SETTLEMENT AND LOAN MODIFICATION AGREEMENT

This SETTLEMENT AND LOAN MODIFICATION AGREEMENT ("Agreement"), is dated as of April 19, 2023, by and among BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower"), ALAN GOMPERTS ("Alan"), an individual, DANIEL HALEVY ("Daniel"), an individual, and DAVID HALEVY ("David", an individual together with Alan and Daniel, collectively and individually hereinafter referred to as "Guarantor"), on the one hand, and ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), on the other hand, with respect to the following facts, matters and issues. Borrower and Guarantor together when referred to with Lender shall be collectively hereinafter referred to as the "Parties."

## RECITALS

A.      Lender has heretofore made a loan (the "Broadway Loan") to Borrower in the original maximum principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (i) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Note"), in the original principal face amount of $16,942,500.00, executed by Borrower to and in favor of Lender, and (ii) that certain Loan Agreement dated July 21, 2021, by and between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Loan Agreement").

B.      As security for, among other things, the indebtedness and obligations under the Broadway Loan, Borrower, as trustor, executed and delivered to and in favor of Lender, as beneficiary, that certain  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Deed of Trust"), encumbering, without limitation, certain real property more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (as more particularly described therein, the "Property").

C.      Payment and performance of Borrower's indebtedness and obligations in connection with the Broadway Loan was and is guaranteed by Guarantor pursuant to a Continuing Guaranty executed by Guarantor and dated as of July 21, 2021 (the "Continuing Guaranty").

D.      Pursuant to the Deed of Trust, Borrower granted to and in favor of Lender a first priority security interest in and lien upon certain real and personal property described in the Deed of Trust (the "Deed of Trust Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Broadway Loan and the Note.  The Deed of Trust Collateral and any other collateral securing the indebtedness and obligations under the Broadway Loan shall be collectively referred to as the "Collateral." Lender's security interest in the Collateral was and is perfected under applicable law.

E.      This Agreement, the Note, Loan Agreement, Deed of Trust, Continuing Guaranty, and all other agreements, instruments and other documents executed by Borrower or Guarantor

BOBBY-038

in connection with the Broadway Loan shall at times hereinafter be referred to collectively as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

F.    Lender alleges that Borrower and Guarantor defaulted under the terms of the Broadway Loan Documents by, among other things, failing to obtain a certificate of occupancy for the Property by January 21, 2022 and failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively hereinafter the "defaults").

G.    On September 28, 2022, Lender filed its Verified Complaint for Breach of Guaranty against Guarantor in the Los Angeles County Superior Court entitled *Archway Real Estate Income Fund I SPE I, LLC, Plaintiff v. Alan Gomperts, et al., Defendants* Case Number 22STCV31742 (the "Litigation").

H.    On August 30, 2022, Lender caused to be commenced non-judicial foreclosure proceedings through the filing of a notice of default ("NOD") as instrument no. 20220859022 in the Official Records of Los Angeles County, California. The NOD is still pending.

I.    The Parties now desire to modify the Broadway Loan Documents, resolve and settle the Litigation, and rescind the NOD, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.    Recitals. The recitals are incorporated herein by this reference as are all exhibits attached hereto. Borrower and Guarantor, and each of them, represent and warrant to Lender that the factual information recited above is true and correct. Except as specified herein, all of the terms and conditions of the Broadway Loan Documents, and each of them, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms, conditions, and provisions of this Agreement and the Broadway Loan Documents, the terms, conditions, and provisions of this Agreement shall prevail.

2.    Reaffirmation. This Agreement is, in part, a reaffirmation of the obligations and indebtedness of Borrower and Guarantor to Lender as evidenced by the Broadway Loan Documents. Therefore, Borrower and Guarantor each represent, warrant, covenant, and agree, that except as specified herein, all of the terms and conditions of the Broadway Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

3.    Acknowledgments.

A.    Borrower and Guarantor, and each of them, acknowledge the validity, priority and extent of the Broadway Loan Documents and acknowledge that the following sums are owed to the Lender as of April 19, 2023:

BOBBY-039

| | | |
|---|---|---|
| (1) | Principal balance in the amount of | $16,942,500.00 |
| (2) | Non-default interest in the amount of | $1,171,385.63 |
| (3) | Default interest ("Default Interest") in the amount of | $1,656,129.46 |
| (4) | Late charges ("Late Charges") in the amount of | $0.00 |
| (5) | Legal and Trustee fees and costs ("Legal/Trustee Fees') in the amount of | $65,000.00 (FRBC) $30,000.00 (TC) $16,489.00 (Trustee) |
| (6) | GRAND TOTAL ("Amounts Owed") | $19,881,504.09 |

In addition, interest continues to accrue at the rate of $8,471.25 per day, inclusive of default interest (the "Per Diem").

B.    Borrower and Guarantor, and each of them, acknowledge and confirm that neither Borrower nor Guarantor has any valid offset or defense to the Amounts Owed, obligations, and liability under the Broadway Loan Documents.

4.    New Loans.

A.    Concurrently with the execution of this Agreement, Lender shall make three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "New Loans"), as follows:

(1)    A loan to _Negev Investments, LLC ("Negev") in the principal amount of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00) ("Negev Loan"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California ("Foxdale Property") and guaranteed by David.  The guaranty shall be secured by his membership interest in Negev.  The documents and instruments evidencing the Negev Loan are identified in Exhibit "B-1" attached hereto;

(2)    A loan to SLA Investments, LLC ("SLA") in the principal amount of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) ("SLA Loan"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California ("Los Angeles Property") and guaranteed by David, Sue Halevy ("Sue"), Alan, Sharon Gomperts a/k/a Sharon Halevy ("Sharon") and Daniel.  The guaranty shall be secured by David, Sue, Alan, Sharon and Daniel's membership interest in SLA.  The documents and instruments evidencing the SLA Loan are identified in Exhibit "B-2" attached hereto; and

(3)    A loan to David, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("G&H Trust") and Daniel in the principal amount of Two Million Five Hundred Seventy-Five Thousand and No/100 Dollars

($2,575,000.00) ("Guarantor Loan"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel. The documents and instruments evidencing the Guarantor Loan are identified in Exhibit "B-3" attached hereto.

B.    The proceeds of the New Loans ("New Loans Proceeds") shall be disbursed and allocated as provided in the Negev Loan, SLA Loan and Guarantor Loan, as more particularly described in Exhibit "C" attached hereto, and shall be used for the creation of an interest reserve for the New Loan, payment of past due amounts owed by Broadway to Lender under the Broadway Loan Documents, creation of an interest reserve for the Broadway Loan and to pay certain fees and costs. To the extent that the New Loans Proceeds are insufficient to make all payments or deposits required pursuant to this Agreement, the Negev Loan, SLA Loan and Guarantor Loan, or any of them, Guarantor shall be required to do so, from their own funds, concurrently with the Settlement Closing (as herein defined).

5.    Amendments to Broadway Loan.

Upon Settlement Closing:

A.    The Maturity Date under the Broadway Loan shall be extended to December 1, 2023, at which time the entire principal balance under the Broadway Loan plus all accrued and unpaid interest thereon shall be due and payable as provided under the Broadway Loan Documents. From and after the Settlement Closing, any and all references in the Note, Loan Agreement, and the other Broadway Loan Documents to a maturity date of "August 1, 2022" shall be replaced with "December 1, 2023."

B.    The obligations of Borrower to obtain the Certificate of Occupancy on the Property no later than January 21, 2022 pursuant to Section 5.1(a) of the Loan Agreement is hereby amended to be required as soon as is reasonably practicable in the best efforts of Borrower, but in any event no later than the Maturity Date.

6.    Interest Reserve Deposit.    Concurrently with the Settlement Closing, Guarantor shall deposit the sum of $892,874.03 (the "Interest Reserve Shortfall") into the Interest Reserve. The Interest Reserve Shortfall shall not bear interest. Borrower continues to authorize Lender, on a monthly basis, to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of Section 12(b) of the Loan Agreement without further authorization on the part of Borrower. Such disbursements by Lender may be made by such means (including, as shall be satisfactory to Lender, in its sole and absolute discretion. Notwithstanding the Interest Reserve, Borrower remains liable and obligated to pay all accrued and unpaid interest when it is due and payable, in the event that the amounts in the Interest Reserve are insufficient to do so.

7.    Conditions Precedent to Settlement Closing.    The obligations of Lender hereunder are expressly conditioned upon the following having occurred, or Lender having received on or prior to April 19, 2023 ("Settlement Closing"), all of the following amounts, documents, and

instruments in form and content satisfactory to Lender, in its sole and absolute discretion, opinion, and judgment:

A.      This Agreement, fully executed by Borrower and Guarantor;

B.      The closing of the Negev Loan;

C.      The closing of the SLA Loan;

D.      The closing of the Guarantor Loan;

E.      Payment of the Legal/Trustee Fees;

F.      Payment and/or deposit of any additional monies required pursuant to Section 6, above;

G.      At Borrower's expense, endorsements to Lender's existing policy of title insurance insuring the continuing priority of the lien of the Deed of Trust in a first priority position; and

H.      A Memorandum of Modification to the Deed of Trust, fully executed by Borrower and notarized for recording purposes.

8.      <u>Rescission of NOD; Dismissal of Action</u>. Upon the Settlement Closing:

A.      Lender will cause the NOD to be rescinded, subject to the right of Lender to cause to a new notice of default to be recorded in the event there is any default under this Agreement or any of the other Broadway Loan Documents subsequent to the Settlement Closing. Further, as long as there is no default under this Agreement or any of the other Broadway Loan Documents from and after the date of this Agreement, interest on the Broadway Loan shall accrue and be payable at the non-default rate of interest provided for in the Note. Furthermore, upon the Settlement Closing, Lender shall waive its right to collect the Default Interest and Late Charges.

B.      Lender will cause to be filed with the Court a dismissal without prejudice of the Litigation, subject to the right of Lender to commence a new action or proceeding against Guarantor and any other parties, as determined by Lender, if there is a default under this Agreement or any of the other Broadway Loan Documents by which Guarantor is bound.

9.      <u>Representations and Warranties of Borrower and Guarantor</u>. Borrower and Guarantor hereby represent and warrant to Lender and covenant and agree with Lender as follows:

A.      Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Borrower and Guarantor and the consummation by Borrower and Guarantor of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower and Guarantor. This Agreement is a valid and binding obligation of

BOBBY-042

Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with its terms.

B.      Neither the execution and delivery of this Agreement by Borrower and Guarantor, or either of them, nor the consummation by Borrower and Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower and Guarantor, or either of them, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject.

C.      There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower or Guarantor, in relation to its obligations to Lender or involving the validity and enforceability of this Agreement, or any of the other Broadway Loan Documents, as applicable, at law or in equity, or before or by any Governmental Agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform their obligations to Lender.

D.      Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, and each of them, contained in the Broadway Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

10.      Revival of Obligation.

A.      Borrower and Guarantor acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Lender related thereto, including, without limitation, relief from stay or similar proceedings), the liability of Borrower and Guarantor to Lender shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lender.

B.      Nothing set forth herein is an admission that such Voidable Transfer has occurred.  Borrower and Guarantor expressly acknowledge that Lender may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Lender's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, Borrower and Guarantor shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

11.      Waiver of Certain Bankruptcy Rights.

BOBBY-043

Borrower and Guarantor acknowledge and agree that but for Lender entering into this Agreement with Borrower and Guarantor, Lender would have continued to diligently pursue all of its rights and remedies under the Broadway Loan Documents, at law and in equity, against Borrower and Guarantor. As an additional inducement to and material consideration for Lender agreeing to the modifications and extension provided in this Agreement, Borrower and Guarantor agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined in this Section 11) is commenced which subjects Lender to any stay in the exercise of Lender's rights and remedies under the Broadway Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by Section 362 of the United States Bankruptcy Code (individually and collectively, "Stay"), then Borrower and Guarantor irrevocably consent and agree that such Stay shall automatically be lifted and released against Lender with respect to the Collateral, and Lender shall thereafter be entitled to exercise all of its rights and remedies under the Broadway Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement. Borrower and Guarantor acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to Borrower and Guarantor under the terms of this Agreement are valuable consideration for such waiver. As used in this Section 11, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against Borrower and Guarantor, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against Borrower and Guarantor, or either of them, any action where Borrower and Guarantor, or either of them, are adjudicated as bankrupt or insolvent, any action for dissolution of Borrower and Guarantor, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Lender of its rights and remedies with respect to the Collateral under the Broadway Loan Documents.

12.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrower and Guarantor and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

13.    Release by Borrower and Guarantor.

A.    Borrower and Guarantor, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower and Guarantor, or either of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or

BOBBY-044

in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and Guarantor, or either of them, to Lender, or the lending arrangements between Lender and Borrower and Guarantor, all individually and collectively.

       (1)     As to the matters released herein, Borrower and Guarantor expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."

       (2)     Borrower and Guarantor expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower and Guarantor acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower and Guarantor, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

       B.     Borrower and Guarantor are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Borrower and Guarantor shall indemnify, defend and hold Lender and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

       14.    <u>No Joint Venture, Management or Control</u>. Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

       A.     Lender is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower, Guarantor or any other Person;

BOBBY-045

B.      Lender shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower or Guarantor; and

C.      Borrower and Guarantor, or either of them, do not have any claims, causes of action or defenses to their obligations to Lender based on any allegations of management or control exercised by Lender. Borrower and Guarantor, and each of them acknowledge and agree that Lender does not manage or control them in any way.

15.     <u>No Further Commitments to Lend</u>.   Borrower and Guarantor agree and acknowledge that Lender will not and has no obligation to advance, provide or loan any further or additional monies or credit to Borrower and the obligation of Lender to advance any further sums to Borrower under the Broadway Loan Documents has been terminated thereunder. Borrower and Guarantor further agree and acknowledge that Lender will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lender by Borrower and Guarantor, or either of them.

16.     <u>Miscellaneous.</u>

A.      Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

B.      This Agreement may be executed in one or more counterparts but all of the counterparts shall constitute one agreement; provided, however, this Agreement shall not be effective and enforceable unless and until it is executed by all parties hereto.

C.      This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

D.      This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents.  Nothing contained in this Agreement shall be deemed to constitute a waiver by Lender of any required performance by Borrower and Guarantor, or either of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents.  In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

E.      Borrower and Guarantor hereby further represent and warrant as follows:

(1)     Borrower and Guarantor have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes;

BOBBY-046

(2)    Except as expressly stated in this Agreement, neither Lender nor any other person or entity has made any statement or representation to Borrower or Guarantor regarding facts relied upon by Borrower or Guarantor;

(3)    Borrower and Guarantor do not rely upon any statement, representation or promise of Lender or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(4)    The terms of this Agreement are contractual and not a mere recital;

(5)    This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower; and

(6)    This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and Borrower and Guarantor acknowledge that Lender is expressly relying on the finality of this Agreement as a substantial, material factor inducing Lender's execution of this Agreement.

F.    This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California. This Agreement shall be construed under the laws of the State of California.

G.    Upon indefeasible payment and performance in full of the Broadway Loan Documents, Lender shall provide Borrower the <u>Limited Release</u> in the form of Exhibit "D" attached hereto.

H.    The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term. No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

17.    <u>JUDICIAL REFERENCE</u> – The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans. ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.***

The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

| | | |
|---|---|---|
| Borrower's Initials | Alan's Initials | Daniel's Initials |
| David's Initials | Guarantor's Initials | Lender's Initials |

[SIGNATURE PAGE FOLLOWS]

BOBBY-048

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**BORROWER:**

BROADWAY AVENUE INVESTMENTS LLC.
a California limited liability company

By: _____
Name: Alan Gomperts
Its: Manager

**GUARANTOR:**

_____
ALAN GOMPERTS, an individual

_____
DANIEL HALEVY, an individual

_____
DAVID HALEVY, an individual, by Daniel Halevy as his attorney in fact

**LENDER:**
ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
A Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

4816693v7 | 101415-0002                              12

## EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

BOBBY-050

## EXHIBIT "B-1"
## NEGEV LOAN

1. Loan Agreement
2. Promissory Note
3. Assignment of Leases and Rents
4. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Guaranty
6. Borrower's Closing Certificate
7. Borrower's Resolutions
8. Building Laws Indemnity Agreement
9. Hazardous Materials Indemnity Agreement
10. Undelivered Items Letter
11. Pledge and Security Agreement

BOBBY-051

## EXHIBIT "B-2"
## SLA LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Assignment of Leases and Rents
5. Guaranty
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrowers Incumbency Certificate and Resolutions
9. Borrower's Closing Certificate
10. Undelivered Items letter
11. Pledge Agreement

BOBBY-052

# EXHIBIT "B-3"
# G&H LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument (Greenfield) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Security Instrument (Horner Street) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Security Instrument (Palm Drive) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrower's Closing Certificate
9. Undelivered Items letter

BOBBY-053

# EXHIBIT "C"
## ALLOCATION OF NEW LOANS PROCEEDS

| SLA Loan | | | Negev Loan | | | Guarantor Loan | |
|---|---|---|---|---|---|---|---|
| Sources | | | Sources | | | Sources | |
| Loan | $ 125,000.00 | | Loan | $ 1,300,000.00 | | Loan | $ 2,575,000.00 |
| Total Sources | $ 125,000.00 | | Total Sources | $ 1,300,000.00 | | Total Sources | $ 2,575,000.00 |
| | | | | | | | |
| Uses | | | Uses | | | Uses | |
| Interest Reserve SLA Loan | $ 6,927.08 | | Interest Reserve Negev Loan | $ 72,041.67 | | Interest Reserve Guarantor Loan | $ 142,697.92 |
| Per Diem SLA Loan (4/19-5/1) | $ 395.83 | | Per Diem Negev Loan (4/19-5/1) | $ 4,116.67 | | Per Diem Guarantor Loan (4/19-5/1) | $ 8,154.17 |
| Back Pay Broadway (4/19) | $ 36,605.80 | | Back Pay Broadway (4/19) | $ 380,700.33 | | Back Pay Broadway (4/19) | $ 754,079.50 |
| Per Diem Broadway Loan (4/19-5/1) | $ 1,508.23 | | Per Diem Broadway Loan (4/19-5/1) | $ 15,685.62 | | Per Diem Broadway Loan (4/19-5/1) | $ 31,069.60 |
| 8-Month IR Broadway Loan | $ 26,394.08 | | 8-Month IR Broadway Loan | $ 274,498.44 | | 8-Month IR Broadway Loan | $ 543,718.05 |
| Paydown Broadway Loan | $ 53,168.97 | | Paydown Broadway Loan | $ 552,957.28 | | Paydown Broadway Loan | $ 1,095,280.76 |
| | | | | | | | |
| Total Uses | $ 125,000.00 | | Total Uses | $ 1,300,000.00 | | Total Uses | $ 2,575,000.00 |

BOBBY-054

## EXHIBIT "D"
## LIMITED RELEASE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), hereby releases:

a.      BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower") from all contractual liability and obligations under the Note and any of the other Loan Documents executed by Borrower in favor of Lender, except as otherwise provided in this Limited Release ("Release").

b.      ALAN GOMPERTS ("Alan"), DANIEL HALEVY ("Daniel") and DAVID HALEVY ("David," and together with Alan and Daniel, individually and collectively, "Guarantor") from all contractual liability and obligations under the Continuing Guaranty and any of the other Loan Documents executed by Guarantor in favor of Lender, except as otherwise provided in this Release.

1.      Notwithstanding the foregoing, the Release shall not apply to and hereby excludes Borrower's obligations and liability under (a) that certain Hazardous Materials Indemnity Agreement, dated July 21, 2021 by Borrower in favor of Lender, (b) Guarantor's obligations and liabilities under clause (g) of "Recourse Amounts" under Section 1 Definitions of the Continuing Guaranty, and (c) any other obligations, liability or indemnity contained in any Loan Document that survives repayment of the Note and any other obligations under the Loan Documents.

2.      Borrower and Guarantor acknowledge and agree that in the event that all or any part of any payment or credit that reduces or pays off the Note or any other obligation under the Loan Documents is declared by a court of competent jurisdiction  declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then this Release shall be null and void, and of no force and effect, unless and until the Note and any such obligations under the Loan Obligations are indefeasibly paid in full.

3.      Any capitalized term not expressly defined in this Release shall have the meaning ascribed to it in that certain Settlement and Loan Modification Agreement by and among Borrower, Guarantor and Lender, dated as of April __, 2023.

This Release is executed by the undersigned as of the ___ day of _____, 202_.

ARCHWAY REAL ESTATE INCOME FUND I
SPE I, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

BOBBY-055

# Exhibit 4

# Exhibit 4

BOBBY-056

**PERSONAL FINANCIAL STATEMENT**    **CONFIDENTIAL**

IMPORTANT: Please do not leave any questions unanswered. Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Alan Gomperts | Name: | |
| Address: | 264 S. Oakhurst Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | Chief Financial Officer | Position/Occupation: | |
| Business Name: | agron, inc. | Business Name: | |
| Business Address: | 2440 S. Sepulveda Blvd. #201 | Business Address: | |
| City, State, Zip: | Los Angeles, CA 90212 | City, State, Zip: | |
| Home Telephone: | | Home Telephone : | |
| Bus No.: | | Bus No.: | |
| DOB: | Relationship: | D.O.B: | Relationship: |

### PERSONAL INFORMATION (Applicant)

| | |
|---|---|
| Do you have a will? ☑ Yes ☐ No | If so, name of executor: Philip Gomperts |
| Are you partner or officer in any other venture? If so, describe: No | Income Tax Settled Through (Date): |
| | Personal bank accounts carried at: Wells Fargo Bank |
| Are you delegated to pay alimony, child support or separate maintenance payments? If so, describe: No | Are you a defendant in any suits or legal actions? If so, describe: No |
| Are any assets pledged other than as described on schedules. If so, describe: No | Have you ever declared bankruptcy? If so, describe: No |

### STATEMENT OF FINANCIAL CONDITION
### As of (Date): June 30, 2023

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $ 831,000 | Notes Payable to Banks (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | 995,000 | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax ☐ Fed ☐ State | |
| Real Estate Owned (Schedule D) | 24,055,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | 82,000 | Real Estate Mortgages Payable (Schedule D) | 16,163,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | 18,852,000 | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | TOTAL LIABILITIES | $ 16,163,000 |
| | | NET WORTH | $ 28,652,000 |
| TOTAL ASSETS | $ 44,815,000 | TOTAL LIABILITIES and NET WORTH | $ 44,815,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $ 700,000 | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 50,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $ 750,000 | Amount of Contested Income Tax Liens | |

Initials    Initials

Page 1 of 3

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

| SCHEDULE A - Cash on Hand in Banks | | | |
|---|---|---|---|
| Name of Bank | Type of Account | Type of Ownership | On Deposit |
| Wells Fargo Bank | Checking and Savings | Personal | 111,000.00 |
| Chase Bank | Checking | Shal Investments, LLC | 470,000.00 |
| PNC Bank | Savings | Personal | 250,000.00 |
| | | Carry Over from Additional Attached Pages | |
| | | TOTALS $ | 831,000.00 |

| SCHEDULE B - U.S. Government and Marketable Securities | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
| | T-Bills | Alan Gomperts | | | 281000 | | | ☐ Yes ☑ No | |
| | T-Bills | Shal Investments, LL | | | 714000 | | | ☐ Yes ☑ No | |
| | | | | | | | | ☐ Yes ☐ No | |
| | | Carry Over from Additional Attached Pages | | | | | | | |
| | | | TOTALS $ | 995,000.00 | $ - | $ - | | | |

| SCHEDULE C - Non-Marketable Securities | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
| | | | | | | | ☐ Yes ☐ No | |
| | | | | | | | ☐ Yes ☐ No | |
| | | | | | | | ☐ Yes ☐ No | |
| | | | Carry Over from Additional Attached Pages | | | | | |
| | | | | | | TOTALS $ - | | |

| SCHEDULE D - Real Estate Owned | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable | | |
| | | | | | | | Balance Due | Monthly Payment | Maturity | Payable to Whom |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | Carry Over from Additional Attached Pages | | | | | | | |
| | | | | TOTALS $ - | $ - | | | | |

| SCHEDULE E - Insurance | | | | | | |
|---|---|---|---|---|---|---|
| (List only those policies that you own) | | | | | | |
| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
| Northwestern Mutual | Alan Gomperts | 150,000.00 | 68,000.00 | 0 | 0 | Sharon Gomperts |
| | | | | | | |
| | | | | | | |
| | Carry Over from Additional Attached Pages | | | | | |
| | | | TOTALS $ | - | $ - | |

| SCHEDULE F - Notes and Accounts Receivables | | | | | | |
|---|---|---|---|---|---|---|
| (Money Payable or Owed to you individually- Indicate by v if others have an Ownership Interest) | | | | | | |
| Maker/ Debtor | V | When Due | Original Amount | Monthly Payment | Balance Due | Security |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Carry Over from Additional Attached Pages | | | | | |
| | | TOTALS $ | - | $ - | | |

| SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained | | | | | | |
|---|---|---|---|---|---|---|
| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  | Carry Over from Additional Attached Pages |  |  |
|  |  |  |  | TOTALS | $        - |  |

| SCHEDULE H - Notes, Accounts and Bills Payable | | | | | |
|---|---|---|---|---|---|
| (Other than banks, Mortgage and Insurance Company Loans) | | | | | |
| Payable to | Other Obligors    (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| Carry Over from Additional Attached Pages | | | | | |
|  |  | TOTALS | $        - | $        - |  |

| Signature (Applicant) | 21-Aug-23 | Signature (Joint Applicant) | Date: |
|---|---|---|---|
| Alan Gomperts |  | Print Name (Joint Applicant) | Social Security No. |

_____ _____
Initials  Initials

Page 3 of 3

BOBBY-059

*Alan Gomperts - SREO as of 06/30/2023*

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Outstanding | Lender | Maturity Date | Interest Rate | Payment | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 Seaton Street Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lenore Halevy, 9% Simon Harkham) | 25% | $37,000,000 | $9,250,000 | $28,700,000 | $7,175,000 | KDM Financial | 2023 | 6.50% | $155,458 | |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2022 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | |
| 264 S. Oakhurst Dr. Beverly Hills, CA 90212 | 2008 | $1,777,000 | 2,321 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $3,250,000 | $3,250,000 | $1,250,000 | $1,250,000 | Wells Fargo | 2035 | 3.13% | $3,250 | |
| 3558 Greenfield Ave. Los Angeles, Ca 90034 | 1998 | $332,000 | 1,152 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $1,600,000 | $1,600,000 | $188,000 | $188,000 | Wells Fargo | 2035 | 6.00% | $1,415 | $2,575,000 Second with Archway |
| 2247 S. Canfield Ave., Los Angeles, Ca 90034 | 2003 | $730,000 | 1,858 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $2,200,000 | $2,200,000 | $573,000 | $573,000 | Wells Fargo | 2047 | 4.13% | $2,050 | |
| 2220 Bagely Ave., Los Angeles, Ca 90034 | 2004 | $1,400,000 | 1,963 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $2,350,000 | $2,350,000 | $746,000 | $746,000 | Wells Fargo | 2047 | 4.50% | $4,195 | |
| TOTAL | | | | | | $24,655,000 | | | $16,163,000 | | | | | |

BOBBY-060

**IMPORTANT:** Please do not leave any questions unanswered.  Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Sue Halevy | Name: | |
| Address: | 247 S. Linden Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | | Position/Occupation: | |
| Business Name: | | Business Name: | |
| Business Address: | | Business Address: | |
| City, State, Zip: | | City, State, Zip: | |
| Home Telephone: | ███ | Bus No.: | |
| D.O.B.: ███ | Relationship: ███ | D.O.B.: | Relationship: |

### PERSONAL INFORMATION (Applicant)

| | |
|---|---|
| Do you have a will?  ☑ Yes   ☐ No | If so, name of executor: Efrem Harkham |
| Are you partner or officer in any other venture?  If so, describe: No | Income Tax Settled Through (Date): |
| | Personal bank accounts carried at: Bank of America |
| Are you delegated to pay alimony, child support or separate maintenance payments? If so, describe: No | Are you a defendant in any suits or legal actions?  If so, describe: No |
| Are any assets pledged other than as described on schedules.  If so, describe: No | Have you ever declared bankruptcy?  If so, describe: No |

### STATEMENT OF FINANCIAL CONDITION
#### As of (Date):June 30, 2023(Required Field)

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $ 198,000 | Notes Payable to Banks  (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax   ☐ Fed   ☐ State | |
| Real Estate Owned (Schedule D) | 58,200,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | | Real Estate Mortgages Payable (Schedule D) | 31,370,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | TOTAL LIABILITIES | $ 31,370,000 |
| | | NET WORTH | $ 27,028,000 |
| TOTAL ASSETS | $ 58,398,000 | TOTAL LIABILITIES and NET WORTH | $ 58,398,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $ | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 75,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | 55,000 | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $ 130,000 | Amount of Contested Income Tax Liens | |

BOBBY-061

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

## SCHEDULE A - Cash on Hand in Banks

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| Bank of America | Checking | Personal | 173,000 |
| Wells Fargo Bank | Checking | Personal | 25,000 |
| | | | |
| | | *Carry Over from Additional Attached Pages* | |
| | | TOTALS $ | 198,000.00 |

## SCHEDULE B - U.S. Government and Marketable Securities

| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | *Carry Over from Additional Attached Pages* | | | | | | | | |
| | | | TOTALS | $  - | $  - | $  - | | | |

## SCHEDULE C -Non-Marketable Securities

| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | *Carry Over from Additional Attached Pages* | | | | | |
| | | | | | | TOTALS $  - | | |

## SCHEDULE D - Real Estate Owned

| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Balance Due | Monthly Payment | Maturity | Payable to Whom |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | *Carry Over from Additional Attached Pages* | | | | | | | |
| | | | | TOTALS | $  - | $  - | | | | |

## SCHEDULE E - Insurance
**(List only those policies that you own)**

| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | *Carry Over from Additional Attached Pages* | | | | |
| | | | TOTALS | $  - | $  - | |

## SCHEDULE F - Notes and Accounts Receivables
**(Money Payable or Owed to you Individually- Indicate by √ if others have an Ownership Interest)**

| Maker/ Debtor | √ | When Due | Original Amount | Monthly Payment | Balance Due | Security |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | *Carry Over from Additional Attached Pages* | | | | |
| | | | TOTALS $  - | $  - | | |

BOBBY-062

| SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained | | | | | | |
|---|---|---|---|---|---|---|
| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | Carry Over from Additional Attached Pages | | | |
| | | | | TOTALS | $          - | |

| SCHEDULE H - Notes, Accounts and Bills Payable | | | | | |
|---|---|---|---|---|---|
| (Other than banks, Mortgage and Insurance Company Loans) | | | | | |
| Payable to | Other Obligors   (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
| | | | | | |
| | | | | | |
| | | | | | |
| Carry Over from Additional Attached Pages | | | | | |
| | | TOTALS | $          - | $          - | |

| Signature (Applicant) | Date: 08/20/2023 | Signature (Joint Applicant) | Date: |
|---|---|---|---|
| Sue Halevy | ███████ | Print Name (Joint Applicant) | Social Security No. |

*Sue Halevy - SREO as of 06/30/2023*

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Oustanding | Lender | Maturity Date | Interest Rate | Payment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 421 Colyton St. Los Angeles, CA 90013 | 7/7/2011 | $2,500,000 | 31,000 SF - Commercial Building - Warehouse and Light Industrial | Colyton Investments, LLC - Single Member, LLC (100% David Halevy) | 100% | $15,000,000 | $15,000,000 | $9,000,000 | $9,000,000 | KDM Financial | 2024 | 6.50% | $48,750 | Cross Collateralized with Seaton Investments, LLC |
| 422 Seaton Street Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lemore Halevy, 9% Simon Harkham) | 41% | $37,000,000 | $15,170,000 | $28,700,000 | $11,767,000 | KDM Financial | 2024 | 6.50% | $155,458 | Cross Collateralized with Colyton Investments, LLC |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2023 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | $125,000 second loan with Archway at 9% |
| 257 S. Linden Ave. Beverly Hills, CA 90212 | 1/16/2008 | $2,190,000 | 2,093 SF - SFR | 100% - David and Sue Halevy | 100% | $4,250,000 | $4,250,000 | $1,357,000 | $1,357,000 | Wells Fargo | 2035 | 5.00% | $7,933 | |
| 341 S. Canon Dr. Beverly Hills, CA 90212 | 11/28/2000 | $660,000 | 1,384 SF - SFR | 100% - David and Sue Halevy | 100% | $2,500,000 | $2,500,000 | $535,000 | $535,000 | Wells Fargo | 2035 | 3.50% | $2,678 | |
| 133 S. Palm Dr. Beverly Hills, CA 90212 | 8/8/1995 | $670,000 | 6 unit - apartment building | 100% - David and Sue Halevy | 100% | $5,500,000 | $5,500,000 | $1,500,000 | $1,500,000 | First Foundation | 2049 | 3.00% | $5,211 | $2,575,000 Second with Archway |
| 600 East New York Ave, Brooklyn, NY | 6/22/1905 | $110,000 | Land | 100% - David and Sue Halevy | 100% | $3,500,000 | $3,500,000 | $275,000 | $275,000 | ASC | 2030 | 4.00% | $1,452 | |
| 12800 Foxdale Drive, Desert Hot Springs, CA 92240 | 5/15/2014 | $1,100,000 | 24 Unit Hotel | 100% - David and Sue Halevy | 100% | $3,500,000 | $3,500,000 | $- | $0 | | | | | $1,300,000 Loan with Archway at 9% |
| 140 S. Roxbury Dr. Beverly Hills, CA 90212 | 1989 | $750,000 | 16 unit apartment building | 50% - David and Sue Halevy, 50% - Haskell Muhtar (non-related party) | 50% | $6,750,000 | $3,375,000 | $1,410,000 | $705,000 | Chase | 2024 | 5.00% | $8,243 | |
| **TOTAL** | | | | | | | $58,200,000 | | $31,370,000 | | | | | |

**IMPORTANT:** Please do not leave any questions unanswered. Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Daniel Halevy | Name: | |
| Address: | ▮. Palm Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | Owner/Founder | Position/Occupation: | |
| Business Name: | Commune Events, Inc. | Business Name: | |
| Business Address: | 802 Mateo Street | Business Address: | |
| City, State, Zip: | Los Angeles, CA 90021 | City, State, Zip: | |
| Home Telephone: ▮▮▮ | Bus No.: | Home Telephone : | Bus No.: |
| D.O.B: ▮▮ | Relationship: ▮ | D.O.B: | Relationship: |

## PERSONAL INFORMATION (Applicant)

| | |
|---|---|
| Do you have a will?   ☐ Yes   ☒ No | If so, name of executor: |
| Are you partner or officer in any other venture?  If so, describe: No | Income Tax Settled Through (Date): |
| | Personal bank accounts carried at: Chase Bank |
| Are you delegated to pay alimony, child support or separate maintenance payments? If so, describe: No | Are you a defendant in any suits or legal actions?  If so, describe: No |
| Are any assets pledged other than as described on schedules.  If so, describe: No | Have you ever declared bankruptcy?  If so, describe: No |

## STATEMENT OF FINANCIAL CONDITION
### As of (Date): June 30, 2023

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $        8,000 | Notes Payable to Banks  (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax   ☐ Fed   ☐ State | |
| Real Estate Owned (Schedule D) | 21,755,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | | Real Estate Mortgages Payable (Schedule D) | 17,186,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | TOTAL LIABILITIES | $    17,186,000 |
| | | NET WORTH | $     4,577,000 |
| TOTAL ASSETS | $   21,763,000 | TOTAL LIABILITIES and NET WORTH | $   21,763,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $     115,000 | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 30,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $     145,000 | Amount of Contested Income Tax Liens | |

BOBBY-065

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

### SCHEDULE A - Cash on Hand in Banks

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| Chase Bank | Checking | Personal | 5,000 |
| Wells Fargo Bank | Checking | Personal | 3,000 |
| | | | |
| | | Carry Over from Additional Attached Pages | |
| | | TOTALS $ | 8,000.00 |

### SCHEDULE B - U.S. Government and Marketable Securities

| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | Carry Over from Additional Attached Pages | | | | | | | | |
| | | | TOTALS | $ - | $ - | $ - | | | |

### SCHEDULE C - Non-Marketable Securities

| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | Carry Over from Additional Attached Pages | | | | | |
| | | | | | TOTALS | $ - | | |

### SCHEDULE D - Real Estate Owned

| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable Balance Due | Monthly Payment | Maturity | Payable to Whom |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | Carry Over from Additional Attached Pages | | | | | | | | |
| | | | | | TOTALS | $ - | $ - | | | |

### SCHEDULE E - Insurance
(List only those policies that you own)

| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Carry Over from Additional Attached Pages | | | | | |
| | | | TOTALS $ | - | $ - | |

### SCHEDULE F - Notes and Accounts Receivables
(Money Payable or Owed to you individually- indicate by √ if others have an Ownership Interest)

| Maker/ Debtor | √ | When Due | Original Amount | Monthly Payment | Balance Due | Security |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Carry Over from Additional Attached Pages | | | | | |
| | | | TOTALS $ | - | $ - | |

_____   _____
Initials    Initials

BOBBY-066

| SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained | | | | | | |
|---|---|---|---|---|---|---|
| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| | | | | | *Carry Over from Additional Attached Pages* | |
| | | | | | TOTALS $ | - |

| SCHEDULE H - Notes, Accounts and Bills Payable | | | | | |
|---|---|---|---|---|---|
| (Other than banks, Mortgage and Insurance Company Loans) | | | | | |
| Payable to | Other Obligors    (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| *Carry Over from Additional Attached Pages* | | | | | |
| | | TOTALS | $                               - | $                           - | |

| | | | |
|---|---|---|---|
| Signature (Applicant) | Date: 08/20/2023 | Signature (Joint Applicant) | Date: |
| Daniel Halevy | ▮▮▮▮▮ | Print Name (Joint Applicant) | Social Security No. |

*Daniel Halevy - SREO as of 06/30/2023*

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Oustanding | Lender | Maturity Date | Interest Rate | Payment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 Seaton Street Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lemore Halevy, 9% Simon Harkham) | 25% | $37,000,000 | $9,250,000 | $28,700,000 | $7,175,000 | KDM Financial | 2023 | 6.50% | $155,458 | |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2022 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | |
| 802 Mateo Street, Los Angeles, Ca 90021 | 2015 | $3,500,000 | 5,000 SF - Industrial Building | 802 Mateo St, LLC | 100% | $5,000,000 | $5,000,000 | $3,000,000 | $3,000,000 | Harvest Small Business Finance | 2045 | 6.00% | $19,329 | |
| 8561 Horner Street, Los Angeles, CA 90035 | 2016 | $1,157,500 | 2,851 SF - Duplex | Daniel Halevy | 100% | $2,100,000 | $2,100,000 | $780,000 | $780,000 | Athas Capital | 2025 | 7.00% | $5,513 | $2,575,000 Second with Archway |
| TOTAL | | | | | | | $21,755,000 | | $17,186,000 | | | | | |

# Exhibit 5

# Exhibit 5

BOBBY-069

# FRANDZEL

July 1, 2024

**VIA FIRST CLASS MAIL, RETURN RECEIPT REQUESTED, AND E-MAIL**

Derrick Talerico, Esq.
Weintraub Zolkin Talerico & Selth LLP
11766 Wilshire Blvd, Suite 730
Los Angeles, CA 90025
dtalerico@wztslaw.com

**Re:**  *In re Seaton Investments, LLC*, **Case No. 2:24-bk-12079-VZ (Lead Case);** *In re Broadway Avenue Investments, LLC*, **Case No. 2:24-bk-12081-VZ (Broadway);** *In re Negev Investments, LLC*, **Case No. 2:24-bk-12091-VZ (Negev);** *In re SLA Investments, LLC*, **Case No. 2:24-bk-12082-VZ (SLA)**

Dear Mr. Talerico:

As you know, we represent Archway Real Estate Income Fund I SPE I, LLC ("Lender"), a creditor in the above referenced jointly administered chapter 11 bankruptcy cases filed by, among others and as relevant here, Broadway Avenue Investments, LLC ("Broadway"), Negev Investments, LLC ("Negev"), SLA Investments, LLC ("SLA" and collectively with Broadway and Negev, the "Corporate Debtors") and Alan Gomperts ("Alan"), Daniel Halevy ("Daniel"), and Susan Halevy ("Susan" and collectively with Alan and Daniel, the "Individual Debtors" and collectively with the Corporate Debtors, the "Debtors").

As you also know, Lender holds secured claims against the Debtors totaling over $20 million.

The Debtors filed voluntary chapter 11 bankruptcy petitions on March 18 and 19 respectively. The Corporate Debtors each indicated on their petitions that they were "single asset real estate debtors" as defined under 11 U.S.C. § 101(51B). Under § 362(d)(3), these Corporate Debtors were each required, not later than 90 days after entry of the order for relief, to:

> (a) file a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or (b) commence monthly payments that (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a

**Frandzel Robins Bloom & Csato, L.C.**
Attorneys at Law

www.frandzel.com

**Los Angeles Office**
1000 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90017-2427

Tel 323.852.1000  Fax 323.651.2577

**Fresno Office**
516 West Shaw, Suite 200
Fresno, CA 93704-2515

Tel 559.221.2591  Fax 559.221.2660

BOBBY-070



Mr. Talerico
July 1, 2024
Page 2

**Re:** *In re Seaton Investments, LLC*, **Case No. 2:24-bk-12079-VZ (Lead Case);** *In re Broadway Avenue Investments, LLC*, **Case No. 2:24-bk-12081-VZ (Broadway);** *In re Negev Investments, LLC*, **Case No. 2:24-bk-12091-VZ (Negev);** *In re SLA Investments, LLC*, **Case No. 2:24-bk-12082-VZ (SLA)**

> judgment lien or by an unmatured statutory lien); and (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate…

The deadline for the Corporate Debtors to either (a) file a reasonably confirmable plan, or (b) pay Lender's non-default contract rate of interest expired on June 17, 2024.

On June 18, 2024, the Debtors untimely filed a "Disclosure Statement and Plan of Reorganization" (Dkt. 107) ("Joint Plan"). The Joint Plan is not only late, but missing Exhibit G, which supposedly is to contain secured creditor plan treatment, including the proposed plan treatment for Lender. Far from being "a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time," the Joint Plan is patently unconfirmable, on its face.

Accordingly, under § 362(d)(3), the Debtors must immediately commence paying nondefault interest to Lender. As of July 1, 2024, Broadway owed Archway $120,658.65 in accrued interest for the month of June 2024; Negev, $10,291.67; and SLA, $989.58, calculated at the respective non-default contract rate of interest for each.[1] Be advised that Lender has not received any such payments, nor is the Plan reasonably confirmable. As a consequence, Lender is entitled to immediate remedies for such failures.

**Lender expects to receive by wire transfer the above interest payments immediately.** Let me know if you need that wire transfer instruction.

In addition, you are continuing to fail to provide the cash collateral accounting that Archway demanded, a long time ago. Please immediately, but no later than five business days from the date of this letter, turnover a complete accounting of all unauthorized cash collateral use from the petition date to the present.

Lender reserves and preservers all of its rights, claims, and contentions.

---

[1] Non-default contract rate interest accrues at the per diem rate of $4,021.96 for Broadway, $343.06 for Negev, and $32.99 for SLA, as of the date of this letter.

BOBBY-071



Mr. Talerico
July 1, 2024
Page 3

**Re:** *In re Seaton Investments, LLC*, **Case No. 2:24-bk-12079-VZ (Lead Case);** *In re Broadway Avenue Investments, LLC*, **Case No. 2:24-bk-12081-VZ (Broadway);** *In re Negev Investments, LLC*, **Case No. 2:24-bk-12091-VZ (Negev);** *In re SLA Investments, LLC*, **Case No. 2:24-bk-12082-VZ (SLA)**

Very truly yours,

FRANDZEL ROBINS BLOOM & CSATO, L.C.

MICHAEL GERARD FLETCHER
mfletcher@frandzel.com


CC:    Zev Shechtman, Esq.
       Saul Ewing LLP
       1888 Century Park East, Suite 1500, Los Angeles, CA 90067
       Zev.Shechtman@saul.com

BOBBY-072

# Exhibit 6

# Exhibit 6

**OPERATING AGREEMENT**
**OF**
**BROADWAY AVENUE INVESTMENTS, LLC**
**a California limited liability company**

THIS OPERATING AGREEMENT (the "Agreement") of **BROADWAY AVENUE INVESTMENTS, LLC** (the "Company") is entered into and effective as of July 30, 2013, (the "Effective Date") by and among the individuals identified on <u>Exhibit A</u> attached hereto each a "Member" and collectively, the "Members"). Unless otherwise indicated, capitalized words used in this Agreement shall have the meanings specified in Article 13 of this Agreement.

RECITALS:

The Members desire to enter into this Agreement to delineate their rights and liabilities as members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Beverly-Killea Limited Liability Company Act (the "Act").

AGREEMENT

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS AND UNDERTAKINGS HEREIN SPECIFIED AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, WITH THE INTENT TO BE OBLIGATED LEGALLY AND EQUITABLY, THE PARTIES HERETO AGREE AS FOLLOWS:

ARTICLE 1
ORGANIZATION

1.1     <u>Formation</u>. The Members have formed a California limited liability company pursuant to the Act. Except as expressly provided in this Agreement to the contrary, the Members' rights and obligations and the Company's administration and termination shall be governed by the Act.

1.2     <u>Name</u>. The Company's name is "BROADWAY AVENUE INVESTMENTS, LLC".

1.3     <u>Manager</u>. The Company shall be managed by Alan Gomperts (the "Manager").

1.4     <u>Purpose</u>. Notwithstanding anything to the contrary in the Articles (as defined below), the Company is organized to (i) purchase, own, finance, manage, maintain, improve, operate, sell,

1

BOBBY-074

exchange, dispose of or otherwise deal with that certain real property located at **737 Broadway Avenue, Los Angeles, CA 90014** (the "Property"), and (ii) engage in and carry on any lawful business purpose or activity which is required to conduct the Business that is not prohibited by the Act or other applicable law.

1.5     Term.  The Company's existence shall continue until dissolved and liquidated pursuant to the provisions of Article 10.

1.6     Office and Registered Agent.  The Company's principal place of business shall be unless changed by mutual consent of the Members.  The name and address of the Company's registered agent for service of process are as specified in the Articles.

1.7     Limited Liability.  Except as otherwise provided expressly in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that debt, obligation or liability arises in contract, tort, or otherwise.

1.8     Tax Classification.  The Members intend the Company to be classified as a partnership for federal, and to the maximum extent possible, state income taxes.  This classification for tax purposes shall not create or imply a general partnership, limited partnership or joint venture between the Members for state law or any other purpose.  Instead, the Members acknowledge the Company's status as a limited liability company formed under the Act and no Member shall take any action inconsistent with the express intent of the parties to this Agreement.

1.9     Articles of Organization.  The Articles of Organization of BROADWAY AVENUE INVESTMENTS, LLC, a California limited liability company (the "Articles") were filed with the California Secretary of State on March 22, 2010.

ARTICLE 2
CAPITAL CONTRIBUTIONS

2.1     Additional Capital.  The Members understand that additional capital may be required by the Company from time to time during the term of the Agreement for operating expenses and capital expenditures.  If and to the extent that additional cash contributions are needed for the operations of the Company (a "Cash Call"), then the Manager shall advise the Members of such requirement in writing (a "Cash Call Notice") and shall specify the date when the additional capital contributions are due.  If a Member fails to contribute to the Company its share of the applicable cash contribution, then any contributing Member with the prior written consent of Manager may elect either to make a loan to the Company in the amount that should have been contributed by the non-contributing Member or increase its capital contribution by the amount that was to be contributed by the non-contributing Member.  If the contributing Member elects to characterize its advance as a Member loan to the non-contributing Member, then such loan shall bear interest at the maximum rate permitted by law and the principal amount of the Member loan together with all accrued interest thereon shall be repaid to the contributing Member from available cash proceeds that otherwise would have been distributed to the non-contributing Member.  Each Member shall receive a credit to that Member's Capital Account in the amount of

2

BOBBY-075

any additional capital which that Member contributes to the Company. Immediately following any additional contributions of capital, the Percentage Interests shall be adjusted, and <u>Exhibit A</u> shall be revised to reflect that new relative proportions of the Members' Capital Accounts.

2.3    <u>Capital Accounts</u>. The Company shall establish and maintain an individual capital account ("Capital Account") for each Member in accordance with Regulations section 1.704-1(b) (2) (iv). If a Member Transfers all or a part of that Member's Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations section 1.704-1(b)(2)(iv)(1).

2.4    <u>No Interest</u>. No Member shall have the right to receive interest on any Capital Contribution or Capital Account balance.

2.5    <u>Return of Capital</u>. Except as otherwise specifically provided in this Agreement, no Member shall have the right to demand the return of, or withdraw, any or all of that Member's Capital Contribution prior to the dissolution and winding up of the Company. No Member guarantees the return of another Member's Capital Contribution. No Member is required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

2.6    <u>Member Loan</u>. No Member shall lend or advance money to or for the Company's benefit without the Manager's prior written consent except as otherwise expressly provided herein. The loan shall not be treated as a Capital Contribution by that Member or entitle that Member to an increase in that Member's Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company, the Manager and that Member shall agree. Notwithstanding the foregoing, no Member shall be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

2.7    <u>Manager Loan</u>. The Manager may, in its sole and absolute discretion, lend or advance money to or for the Company's benefit without the Members' consent. The loan shall not be treated as a Capital Contribution by the Manager or entitle the Manager to an increase in its Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company and the Manager shall agree. Notwithstanding the foregoing, the Manager shall not be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

ARTICLE 3
MEMBERS

3.1    <u>Members</u>. The name, address, taxpayer identification number and Percentage Interest of each Member are specified on <u>Exhibit A</u> to this Agreement.

3.2    <u>Additional Members</u>. No additional Members may be admitted to the Company without

3

the consent of the Manager, which consent may be withheld for any reason or for no reason. On the admission of an additional Member pursuant to this Section 3.2, each Member (including the additional Member) shall execute an amendment to this Agreement (a) reflecting the Members' new Percentage Interests, and (b) evidencing the additional Member's consent to be bound by the provisions of this Agreement.

3.3     No Withdrawal. No Member may withdraw, retire or resign from the Company.

ARTICLE 4
MANAGEMENT

4.1     Management. The business of the Company shall be managed by the Manager. The Manager will devote such time and attention to the business of the Company as may be reasonably necessary to carry out its duties hereunder in the conduct of such business. Except for those decisions defined below as Major Decisions, the management and control of the Company and its business affairs shall rest exclusively with the Manager. Subject to all the terms and conditions hereof, the Manager shall have all the rights and powers which may be possessed by a manager pursuant to the Act and such additional rights and powers otherwise conferred or permissible by law or necessary, advisable or convenient to the discharge of its duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing, the Manager shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company:

(i)     To invest the capital of the Company for the benefit of the Company and/or in the exercise of any rights or powers possessed by the Manager hereunder and/or to repay advances of the Company, if any;

(ii)     To open, maintain and close bank accounts and to draw checks and other orders for the payment of money;

(iii)     To employ, on behalf of the Company, legal, financial, accounting, technical and/or operational agents, consultants, employees and other persons as the Manager deems necessary or advisable to carry out the Business of the Company;

(iv)     To execute, sign and deliver in furtherance of any or all purposes of the Company, any and all agreements, contracts, documents, certifications, subscriptions and other instruments necessary, advisable or convenient in connection with the business and affairs of the Company; all of which may contain such terms, provisions and conditions as the Manager, in its sole and absolute discretion, shall deem appropriate;

(v)     To execute, acknowledge and file or deliver all articles of limited liability company, amended articles, instruments or other documents and counterparts thereof and make all filings and recordings and perform all other acts as may be necessary to comply with the laws of the State of California for the formation of the Company, thereafter for the continued good standing of the Company, and, when appropriate, for the termination of the Company;

4

(vi)    To execute such articles, amended articles, certificates, amended certificates, operating agreements and any modifications thereof, and other documents conforming hereto and do such filing, recording, publishing and other acts as may be appropriate to comply with the requirements of law for the formation, reformation, qualification and/or operation of a limited liability company in all jurisdictions where the Company may wish to do business, which shall be accomplished prior to doing business in any such jurisdiction if deemed necessary by the Manager;

(vii)    To execute listing agreements, offers and counteroffers, escrow instructions, deeds and other instruments of transfer and conveyance in connection with the sale of the Property and to cause the Company to borrow funds to finance the acquisition of the Property and the refinance of any indebtedness which is encumbered by the Property from time to time during the term of this Agreement and in connection therewith to execute and deliver loan applications, loan commitments, promissory notes, deeds of trust, other security agreements, financing statements, certificates and resolutions.

(viii)    To borrow money from such banking, lending institutions or other persons or entities (including itself) on behalf of, and in the name of, the Company at such rates of interest as the Manager shall determine to be necessary for any proper Company purpose and to give as collateral therefore all or any part of any Company property;

(ix)    To pay or reimburse any and all costs incurred by the Manager on behalf of the Company;

(x)    To make distributions to the Members at such time and in such manner as it deems appropriate, in the sole exercise of its discretion;

(xi)    To pay or reimburse those out-of-pocket costs and expenses incurred by any Member, including the Manager, on behalf of the Company in connection with providing strategic advice and assistance to the Company;

(xii)    To purchase, at the expense of the Company, liability, errors and omissions and other insurance to protect the Company property and its business as such insurance may be deemed appropriate by the Manager to personally insure the Company and the Manager and any affiliates against liability or losses for such actions taken on behalf of or by the Company, including personal liability and property damage insurance; provided, however, that Manager in its discretion may elect to not procure terrorism or earthquake insurance unless required to do so by a lender;

(xiii)    To employ from time to time, at the expense of the Company, persons (who may include affiliates of the Manager) to render services to the Company including, but not limited to, property management agents or leasing agents, architects, engineers, planners, contractors, accountants and attorneys, including attorneys and accountants who may also act as attorneys and

BOBBY-078

accountants for the Manager, on such terms and for such compensation as is determined by the Manager;

    (xiv)    To perform such other acts as the Manager may deem necessary, appropriate or desirable for the furtherance of the purposes of the Company which are not otherwise prohibited by this Agreement or applicable law.

    (xv)    To act as "Tax Matters Partner" (as defined in Code section 6231) for all purposes under Internal Revenue Code Section 6231 and to make all tax decisions and elections in respect thereof not mandated by statute, including without limitation the following: (a) the accounting basis of the Company (cash or accrual basis), selecting or varying depreciation and accounting methods and making other decisions with respect to treatment and various transactions for accounting, bookkeeping or tax purposes; (b) the fiscal year of the Company (calendar year or otherwise); (c) whether and when any tax election shall be taken including the election afforded by Internal Revenue Code Section 754; (d) such amendments to this Agreement as the Manager deems necessary to conform to or benefit from interpretations of present and future interpretations of tax laws and regulations by the judiciary and the U.S. Treasury/Internal Revenue Service and amendments to such laws and regulations; and (e) the determination of the amount of the Company's taxable income and the allocation thereof amongst the Members. The Manager may amend this Agreement without the vote of the Members from time to time upon the advice of tax and accounting professionals to conform this Agreement to federal and state tax law and to the intent of the Members expressed hereby that the tax implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which allocate taxable profit and loss) be consistent with (to the extent possible) the economic implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which provide for distributions of cash and payment of preferred returns or yields to Members).

4.2    <u>Major Decisions</u>. The following events constitute Major Decisions requiring the affirmative vote or consent of a majority of the members: (i) to merge the Company with any other limited liability company, limited partnership, general partnership, limited liability partnership, or corporation (ii) the dissolution of the Company (iii) to sell the Property and (iv) the acquisition of any real property other than the Property or the guaranty by this Company of any debt which is unrelated to the acquisition, operation or improvement of the Property.

4.3    <u>Member Meetings and Approval</u>. No annual or regular meetings of the Members are required. If meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. Any action required or permitted to be taken by the Members may be taken by the written consent of Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted.

4.4    <u>Indemnification</u>. The Company shall indemnify, defend, and hold harmless the Manager from and against any and all liabilities of every kind, arising from or relating to the Company's

BOBBY-079

business, except as to those matters arising from such Manager's fraud, gross negligence, willful misconduct, or breach of fiduciary duty.

4.5     Special and Limited Power of Attorney.

(i)     The Manager shall, at all times during the existence of the Company, have a special and limited power of attorney as the attorney-in-fact for each Member, with power and authority to act in the name and on the behalf of each such Member to execute, acknowledge, file, record and swear to in the execution, acknowledgment, filing and recording of documents, which shall include but not be limited to: (a) this Agreement, any separate certificates of limited liability company, as well as any amendments to the foregoing which, under the laws of the State of California or the laws of any other state, are required to be filed or which the Manager deems it advisable to file; (b) any other instrument or document which may be required to be filed by the Company  under the laws of any state or by any governmental agency or which the Manager deems it advisable to file; and (c) any instrument or document which may be required to effect the continuation of the Company , the admission of additional or substituted Members, or the dissolution and termination of the Company  (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any reductions in amount of contributions of Members.

(ii)     This special and limited power of attorney:  (a)  is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of the granting Member, and is limited to those matters herein set forth; (b) may be exercised by the Manager for each of the Members by the signature of the Manager acting as attorney-in-fact for all of the Members, together with a list of all Members executing such instrument by their attorney-in-fact; and (c) shall survive an assignment by a Member of all or any portion of his or her Interests except that, where the assignee of Interests owned by a Member has been approved by the Manager for admission to the Company  as a substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Member to execute, acknowledge and file any instrument or document necessary to affect such substitution.

ARTICLE 5
DISTRIBUTIONS

5.1     Distributions of Available Cash.  Not less frequently than quarterly, the Manager shall cause the Company to distribute to the Members all Available Cash of the Company, whether derived from operations or capital transactions.  As used herein, "Available Cash" means the amount of cash which the Manager deems available for distribution to the Members, after taking into account (a) the Company's current financial obligations, (b) anticipated Company expenditures, and (c) those amounts the Manager deems commercially reasonable and necessary to withhold as reserves for the Company's usual and customary expenses.  Available cash shall be distributed to the Members *pro rata* according to their respective Percentage Interests.

5.2     Tax Withholding.  If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of net profits, or with respect to distributions, the Company shall withhold from distributions or other amounts

7

then due to such Member (or shall pay to the relevant taxing authority with respect to amounts allocable to such Member) an amount necessary to satisfy the withholding responsibility. In each such case, the Member for whom the Company has paid the withholding tax shall be deemed to have received the withholding distribution or other amount so paid, and to have paid the withholding tax directly.

ARTICLE 6
TAX ALLOCATIONS

6.1    Tax Allocations.  All items of Company income, gain, loss or deduction shall be allocated for federal, state and local income tax purposes to the Members, pro rata, in accordance with their respective Percentage Interests.

6.2    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution that results in a deficit balance in such Member's Capital Account, there shall be allocated to that Member items of Company income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

ARTICLE 7
ACCOUNTING AND BANKING

7.1    Books and Records.  The Manager shall cause the Company to keep proper and complete books of account of the Company's business ("Records").  The Records shall be kept at the Company's principal place of business and shall be open to inspection by any of the Members or their authorized representatives at any reasonable time during business hours.  The accounting records shall be maintained in accordance with generally accepted bookkeeping practices for the Company's type of business.  The Company shall maintain at its principal office all records required to be maintained by the Company pursuant to the Act.

7.2    Bank Accounts.  The Manager shall cause the Company's funds to be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Members or any other Person.  Checks or drafts drawn on the Company's accounts shall require the signature of Manager.

7.3    Tax Returns.  The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' federal and state income tax returns.  The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) a copy of the Company's federal, state, and local income tax or information returns for that year.

BOBBY-081

## ARTICLE 8
### TRANSFER OF MEMBERSHIP INTERESTS

8.1    General Prohibition.  The Members do not want any Membership Interest to be made generally available to persons or entities other than the present Members.  Accordingly, except for Permitted Transfers (defined below) no Member may Transfer all or any part of his Membership Interest except with the prior approval of the Manager, which approval may be given or withheld in the sole discretion of the Manager.  Transfers in violation of this Section 8.1 shall be void ab initio.  After the consummation of any permitted Transfer of any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the provisions of this Agreement and any further Transfers shall be required to comply with all of the provisions of this Agreement.  Each Member acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.

8.2    Permitted Transfers.  A Member may Transfer all or any part of that Member's Membership Interest in trust for the benefit of that Member, or that Member's spouse, children, grandchildren, siblings or in-laws, or any combination thereof, provided (a) the Member is a trustee or co-trustee of the trust, and (b) such Member, as trustee or co-trustee, agrees in writing to be bound by the provisions of this Agreement ("Permitted Transfer").

8.3    Transferee as a Member.  An Assignee of a Membership Interest shall have the right to become a substitute Member only if (i) the Manager consented to the Assignee's admission to the Company as a Member, (ii) the Assignee executes an instrument satisfactory to the Members accepting and adopting the provisions of this Agreement, and (iii) the Assignee pays any reasonable expenses in connection with his admission as a new Member.  The admission of an Assignee as a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

8.4    Transfers In Violation Of Agreement.  Upon any Transfer of a Membership Interest in violation of this Article 8, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest (defined below) would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the Company's legal counsel, a Transfer in violation of this Article 8 would cause the tax termination of the Company under Code section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee.

## ARTICLE 9
### OPTIONAL PURCHASE EVENTS

9.1    Optional Purchase Event Defined.  An "Optional Purchase Event" means, with respect to any Member, any one or more of the following: (a) the death, Disability or Bankruptcy of a Member; (b) the withdrawal, retirement or resignation of a Member in violation of Section 3.3 of

BOBBY-082

this Agreement; (c) the Member becomes a terminated Member; (d) the occurrence of any event that is, or would cause, a Transfer in contravention of this Agreement; or (e) the Member files an action seeking a decree of judicial dissolution pursuant to Act section 17351.

9.2    Purchase Option.  Upon the occurrence of an Optional Purchase Event with respect to any Member (the "Selling Member"), the other Members ("Purchasing Members") shall have the option to purchase the Selling Member's Membership Interest ("Selling Member's Interest").  If such option is exercised, the Selling Member, or such Selling Member's legal representative shall sell the Selling Member's Interest as provided in this Article 9.  Each Member who causes an Optional Purchase Event or to whom an Optional Purchase Event occurs, shall provide prompt notice of the Optional Purchase Event to the other Members.

9.3    Purchase Price.  The purchase price for the Selling Member's Interest shall be the fair market value of the Selling Member's Membership Interest as determined by an independent appraiser jointly selected by the Selling Member (or the Selling Member's legal representative) and the Purchasing Member.

If the Selling Member (or the Selling Member's legal representative) and the Purchasing Member are unable to agree on the selection of an appraiser within thirty (30) days after the Optional Purchase Event, each shall select an independent appraiser within twenty (20) days after expiration of the thirty (30) day period.  The two appraisers so selected shall each independently appraise the Selling Members Interest and, as long as the difference in the two appraisals does not exceed five percent (5%) of the lower of the two appraisals, the fair market value shall be conclusively deemed to equal the average of the two appraisals.  The determination of such appraisers shall be binding on the parties. If either party fails to select an independent appraiser within the time required by this Section 9.3, the fair market value of the Selling Member's Interest shall be conclusively deemed to equal the appraisal of the independent appraiser timely selected by the other.

If the difference between the two appraisals referred to above exceeds five percent (5%) of the lower of the two appraisals, the two appraisers selected shall select a third appraiser who shall also independently appraise the Selling Member's Membership Interest.  In such case the fair market value of the Selling Member's Membership Interest shall be the average of the two closest appraisals.  The determination of such appraisers shall be binding on the parties and not subject to judicial review or review by arbitration.  The Company and the Selling Member shall each pay one-half of the cost of the third appraisal.

In determining the fair market value, the appraisers appointed under this Agreement shall consider all opinions and relevant evidence submitted to them by the parties, or otherwise obtained by them, and shall set forth their determination in writing together with their opinions and the considerations on which the opinions are based, with a signed counterpart to be delivered to each party, within sixty (60) days after commencing the appraisal.

BOBBY-083

Notwithstanding the foregoing, if the Optional Purchase Event results from a breach of this Agreement by the Selling Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Purchasing Member as a result of such breach.

9.4    Notice of Intent to Purchase. Within five (5) business days after the Selling Member receives the appraisals from which the purchase price of the Selling Member's Interest can be determined, the Selling Member shall notify the Purchasing Member of such price. Within thirty (30) days after the Selling Member has notified the Purchasing Member of the purchase price of the Selling Member's Interest, the Purchasing Member shall notify the Member in writing of the Purchasing Member's desire to purchase the Selling Member's Interest. The failure of the Purchasing Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Selling Member's Interest. The Purchasing Member may assign to the Company or any other Person that Member's right to purchase the Selling Member's Interest. For convenience, the party or parties purchasing the Selling Member's Interest hereunder shall be referred to collectively as the "Purchasers" and individually as a "Purchaser."

9.5    Election to Purchase Less Than All of the Selling Member's Interest. If the Purchasers do not elect to purchase all of the Selling Member's Interest, the portion of the interest not purchased shall be an Economic Interest only.

9.6    Payment of Purchase Price. The purchase price shall be paid by the Purchasers by either of the following methods, each of which may be selected separately by each Purchaser:

9.6.1    At the Closing (defined below), each Purchaser shall pay in cash the total purchase price for the Selling Member's Interest; or

9.6.2    Except as otherwise provided in Section 9.6.3, at the Closing (defined below), each Purchaser shall pay one-fifth (1/5) of the purchase price in cash ("Down Payment") and the balance of the purchase price (the "Loan") shall be paid in arrears in equal monthly installments over a four-year period, based on a forty-eight (48) month schedule, plus accrued interest at the Prime Rate. The Loan shall be evidenced by separate promissory notes (each, a "Note") executed by each Purchaser, as applicable. Each Note shall be in an original principal amount equal to the portion owed by the Purchaser. The Purchaser shall have the right to prepay the Note in full or in part at any time without penalty. The Note shall contain customary terms, including a provision for the payment of attorneys' fees if litigation is commenced to enforce the Note. Any Note made by a Purchaser shall be secured by a pledge of that portion of the Selling Member's Interest purchased by the Purchaser; and, if the Purchaser is not a natural person, then the beneficial owners of the Purchaser shall guarantee personally the Purchaser's payment obligations under the Note.

9.6.3    Notwithstanding anything to the contrary in Section 9.6.2, if the event giving rise to the purchase of a Selling Member's Interest is the death of the Selling Member, the Down Payment shall be increased to the amount of insurance proceeds actually received by the Company from life insurance policies owned by the Company insuring that Selling Member's

BOBBY-084

life; provided, however, at no time shall the Down Payment exceed the purchase price determined pursuant to Section 9.3.

9.7     Closing of Purchase of Selling Member's Interest.  Unless Court approval is required, the closing ("Closing") for the sale of a Selling Member's Interest pursuant to this Article 9 shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the Closing date falls on a Saturday, Sunday, or legal holiday, then the closing shall be held on the next succeeding business day. If Court approval is required, (a) the Closing of the sale of a Selling Member's Interest shall occur not later than five (5) business days after entry of the order approving such sale, (b) the Company shall file the application seeking Court approval within thirty (30) days following the determination of the purchase price, and (c) the parties to the Court proceeding shall make every effort to obtain the Court's approval in an expeditious manner.

At the Closing, the Selling Member shall deliver to each Purchaser an instrument of transfer (containing warranties of title and no encumbrances) conveying the Selling Member's Interest.  The Selling Member and each Purchaser shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

ARTICLE 10
DISSOLUTION AND "WINDING UP"

10.1     Company Dissolution.  The Company shall be dissolved, its assets disposed of, and its affairs wound up on the first to occur of the following (each, a "Dissolution Event"): (a) the vote of all of the Members; (b) the happening of any event that makes it unlawful or impossible to carry on the business of the Company; or (c) the sale of all or substantially all of the assets of the Company. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event.

10.2     Winding Up.  On the Company's dissolution, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

10.3     Liquidating Distributions.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the Company shall distribute its remaining assets to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.  Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or if later, within (90) days after the date of such liquidation.

10.4     Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of that Member's positive Capital Account balance and shall have no

12

BOBBY-085

recourse for such Member's Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against any other Member.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1    Preexisting Relationship Or Experience. (i) The Member has a preexisting personal or business relationship with the Company or one or more of its officers or control persons, or (ii) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

11.2    No Advertising. The Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3    Investment Intent. The Member is acquiring the Membership Interest for investment purposes for the Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

## ARTICLE 12
## MISCELLANEOUS

12.1    Complete Agreement. This Agreement and the Articles constitute the complete and exclusive agreement of the parties regarding the subject matter of this Agreement, and replace and supersede all prior written and oral agreements or statements by and among the Members. No representation, statement, condition or warranty not contained in this Agreement shall be binding on the Members or have any force or effect whatsoever. To the extent that any provisions of the Articles conflict with any provision of this Agreement, the Articles shall control. All amendments to this Agreement shall be in writing and signed by all of the Members.

12.2    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors and assigns.

12.3    Parties In Interest. Except as expressly provided in the Act, nothing in this Agreement shall (a) confer any rights or remedies under or by reason of this Agreement on any Persons other

BOBBY-086

than the Members and such Members' respective successors and assigns, (b) relieve or discharge the obligation or liability of any third person to any party to this Agreement, or (c) give any third person any right of subrogation or action over or against any party to this Agreement.

12.4    Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.5    Interpretation. If any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied because this Agreement was prepared by or at the request of a particular Member or that Member's counsel.

12.6    Governing Law. This Agreement is governed by and shall be construed in accordance with the laws of the state of California, excluding any conflicts-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.

12.7    Severability. If any provision of this Agreement or its application to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances is not affected and such provision shall be enforced to the greatest extent permitted by law.

12.8    Specific Performance. The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any damages available at law for a breach of this Agreement would not be an adequate remedy. Therefore, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, .by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity.

12.9    Further Assurances. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.10    Notices. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested, U.S. mail, postage prepaid. Notices may also be given by transmittal over electronic transmitting devices such as facsimile or telecopy machine, if the party to whom the notice is being sent has such a device in its office, and provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received

14

at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 1.3 of this Agreement, and to a Member at the addresses shown on Exhibit A: provided that a Member may change such Member's address for notice by giving written Notice to all other Members in accordance with this Section 11.10.

12.11   No Interest In Company Property: Waiver Of Action For Partition.  No Member or Assignee has any interest in specific property of the Company: Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that such Member or Assignee may have to maintain any action for partition with respect to the property of the Company.

12.12   Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

12.13   Attorney's Fees.  If any dispute between the Company and the Members or among the Members results in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party.

12.14   Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.15   Consent Of Spouse.  Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form of Exhibit B attached to this Agreement.

ARTICLE 13
DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in Act section 17001 (such terms are equally applicable to both the singular and plural derivations of the terms defined):

"Affiliate" means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

15

BOBBY-088

"Assignee" means the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Section 8.3.

"Bankruptcy" means: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of section 303(h)(l) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

"Economic Interest" mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include arty other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided in Act section 17106, any right to information concerning the business and affairs of the Company.

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

"Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

"Percentage Interest" shall mean the percentage set forth next to a Member's name on Exhibit A.

"Person" means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

"Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

"Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with

BOBBY-089

or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest.

Without limiting the generality of the foregoing, the sale or exchange of at least fifty percent (50%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of at least fifty percent (50%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partner or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfer, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

[Signatures Begin On The Next Page]

BOBBY-090

**IN WITNESS WHEREOF**, the Members have executed this Agreement on the day and year first above written.

**"MANAGER"**

_____
Alan Gomperts, Manager


**"MEMBERS"**

_____
David Halevy

_____
Alan Gomperts

_____
Daniel Halevy

18

**EXHIBIT A**
to
**Operating Agreement**

| Name | Address | Capital Contribution | Percentage Interest |
|---|---|---|---|
| David and Sue Halevy | ▉ Linden Drive Beverly Hills, CA ▉ | $158,333.00 | 33.33% |
| Alan and Sharon Gomperts | ▉ Oakhurst Drive Beverly Hills, CA ▉ | $158,333.00 | 33.33% |
| Daniel Halevy | ▉ Palm Drive Beverly Hills, CA ▉ | $158,333.00 | 33.33% |
| | | | |
| | **Total** | **$475,000.00** | **100%** |

BOBBY-092

# Exhibit 7

# Exhibit 7

BOBBY-093

 

**This page is part of your document - DO NOT DISCARD**



## 20230646027



**Pages: 0003**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**09/26/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 27.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 102.00 |



**L E A D S H E E T**



202309260110018

00023806620



014293751

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

2135805

E442318

BOBBY-094

**RECORDING REQUESTED BY:**
Stewart Title of California, Inc.

**WHEN RECORDED MAIL DOCUMENT AND
TAX STATEMENTS TO:**

341 South Cannon LLC
257 S. Linden Drive
Beverly Hills, CA  90212

THIS SPACE FOR RECORDER'S USE ONLY:

| **Title Order No.:** 2135805 | | **Escrow No.:** 02-040468-AC |
|---|---|---|
| **AP#:** 4331-005-011 | **GRANT DEED** | |

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

"This conveyance transfers an interest into or out of a Living Trust,  R & T 11930."

## DOCUMENTARY TRANSFER TAX is $0.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X] City of Beverly Hills **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Sue Halevy, as Surviving Trustee of the Halevy Family Trust, dated September 8, 2010**

hereby GRANT(s) to:

**341 South Cannon LLC, a California limited liability company**

the real property in the City of Beverly Hills, County of Los Angeles, State of California, described as:

Lot 1887 of Tract No. 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

**Also Known as:**  341 S. Canon Dr., Beverly Hills, CA  90212

**DATED: September 20, 2023**

**Signature Page attached hereto
and made a part hereof**

MAIL TAX STATEMENTS AS DIRECTED ABOVE:

BOBBY-095

Title Order No.: 2135805                Escrow No.: 02-040468-AC              AP#: 4331-005-011

## SIGNATURE PAGE

**Title of Document:  GRANT DEED**

**Date of Document:  September 20, 2023**

○ Sue Halevy, as Surviving Trustee of the Halevy Family
   Trust, dated September 8, 2010

By: _____
      Sue Halevy, Surviving Trustee

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Los Angeles_
On _Sept. 21 2023_
before me, _Jackie Padilla_,
A Notary Public personally appeared
_Sue Halevy_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Signature _Jackie Padilla_                    (Seal)

JACKIE PADILLA
Notary Public - California
Los Angeles County
Commission # 2421859
My Comm. Expires Oct 17, 2026

Exhibit 8

Exhibit 8

BOBBY-097



## California Secretary of State
Electronic Filing



## LLC Registration – Articles of Organization

| Entity Name: | 341 South Cannon  LLC |
| --- | --- |

| | |
| --- | --- |
| Entity (File) Number: | 202130910155 |
| File Date: | 11/03/2021 |
| Entity Type: | Domestic LLC |
| Jurisdiction: | California |

Detailed Filing Information

1. Entity Name:

    341 South Cannon  LLC

2. Business Addresses:

    a. Initial Street Address of
       Designated Office in California:

    257 S. Linden Drive
    Beverly Hills, California 90212
    United States

    b. Initial Mailing Address:

    257 S. Linden Drive
    Beverly Hills, California 90212
    United States

3. Agent for Service of Process:

    Craig Berman
    20750 Ventura Blvd., Ste. 201
    Woodland Hills California 91364
    United States

4. Management Structure:

    More than One Manager

5. Purpose Statement:

    The purpose of the limited liability
    company is to engage in any lawful act
    or activity for which a limited liability
    company may be organized under the
    California Revised Uniform Limited
    Liability Company Act.

Electronic Signature:

The organizer affirms the information contained herein is true and correct.

Organizer:

    Craig Berman

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*





## STATE OF CALIFORNIA
*Office of the Secretary of State*
## STATEMENT OF INFORMATION
## LIMITED LIABILITY COMPANY

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

# -FILED-

File No.: BA20231403266

Date Filed: 9/5/2023

---

**Entity Details**

| | |
|---|---|
| Limited Liability Company Name | 341 SOUTH CANNON LLC |
| Entity No. | 202130910155 |
| Formed In | CALIFORNIA |

**Street Address of Principal Office of LLC**

| | |
|---|---|
| Principal Address | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |

**Mailing Address of LLC**

| | |
|---|---|
| Mailing Address | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |
| Attention | |

**Street Address of California Office of LLC**

| | |
|---|---|
| Street Address of California Office | None |

**Manager(s) or Member(s)**

| Manager or Member Name | Manager or Member Address |
|---|---|
| ⊞ Sue Halevy | 257 S. LINDEN DRIVE<br>BEVERLY HILLS, CA 90212 |

**Agent for Service of Process**

| | |
|---|---|
| Agent Name | CRAIG BERMAN |
| Agent Address | 20750 VENTURA BLVD., STE. 201<br>WOODLAND HILLS, CA 91364 |

**Type of Business**

| | |
|---|---|
| Type of Business | Real Estate |

**Email Notifications**

| | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

**Chief Executive Officer (CEO)**

| CEO Name | CEO Address |
|---|---|
| None Entered | |

---

**Labor Judgment**

No Manager or Member, as further defined by California Corporations Code section 17702.09(a)(8), has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal is pending, for the violation of any wage order or provision of the Labor Code.

**Electronic Signature**

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Alan Gomperts*

*09/05/2023*

Signature _____   Date _____

# Exhibit 9

# Exhibit 9

BOBBY-100



**This page is part of your document - DO NOT DISCARD**

# 20230646028





**Pages:**
**0025**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**09/26/23 AT 08:00AM**

| | |
|---|---|
| FEES: | 164.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 150.00 |
| PAID: | 314.00 |



**L E A D S H E E T**



202309260110018

00023806621



014293751

**SEQ:**
**02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

2135805

*E442318*

BOBBY-101

RECORDING REQUESTED BY:
STEWART TITLE OF CALIFORNIA INC

AND WHEN RECORDED MAIL TO:

**VIG PRIVATE LENDING**

8383 WILSHIRE BLVD SUITE 430

BEVERLY HILLS, CA 90211

SPACE ABOVE THIS LINE FOR RECORDER'S USE

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, FIXTURE FILINGS

AND SECURITY AGREEMENT ; REQUEST FOR NOTICE

Exempt from fee per GC27388.1;
Fee cap of $225 reached

*This page is added to provide adequate space for recording information.*

**WHEN RECORDED, RETURN TO:**

VIG Private Lending, Inc.
8383 Wilshire Blvd, Ste 430
Beverly Hills, CA 90211

Property ID No.: 4331-005-011

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, FIXTURE FILINGS, AND SECURITY AGREEMENT

~~Exempt from fee per GG27388.1;~~
~~Fee cap of $225 reached~~

| | |
|---|---|
| **Note Amount:** | **$1,300,000.00** |
| **Property Address:** | **341 S Canon Drive, Beverly Hills, CA 90212** |

THIS DOCUMENT CONSTITUTES A FIXTURE FILING IN ACCORDANCE WITH THE
CALIFORNIA UNIFORM COMMERCIAL CODE.

This Deed of Trust, Assignment of Leases and Rents, Fixture Filings, and Security Agreement (the "Security Instrument" or "Deed of Trust") is made as of September 20, 2023, among 341 South Cannon LLC, a California limited liability company ("Borrower"), whose address is 257 South Linden Drive, Beverly Hills, CA 90212; Stewart Title of California, Inc., as trustee ("Trustee"); and Eastern Financial Mortgage Corporation, a Florida Corporation as to an undivided 650,000.00/1,300,000.00 interest; and Yarden Consulting LLC, a Delaware limited liability company as to an undivided 650,000.00/1,300,000.00 interest as beneficiary (collectively, "Lender"), whose address is c/o VIG Private Lending, Inc, 8383 Wilshire Blvd, Ste 430, Beverly Hills, CA 90211.

## TRANSFER OF RIGHTS IN THE PROPERTY

To secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower GRANTS, BARGAINS, SELLS, AND CONVEYS to Trustee the Mortgaged Property, with power of sale and right of entry, subject only to the Permitted Encumbrances, to have and to hold the Mortgaged Property to Trustee, its successors in trust, and the Trustee's assigns forever, and Borrower does hereby bind itself, its successors, and its assigns to warrant and forever defend the title to the Mortgaged Property to Trustee against anyone lawfully claiming it or any part of it; provided, however, that if the Indebtedness is paid in full as and when it becomes due and payable and the Obligations are performed on or before the date they are to be performed and discharged, then the liens, security interests, estates, and rights granted by the Loan Documents shall terminate; otherwise, they shall remain in full force and effect. As additional security for the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations, Borrower grants to Lender a security interest in the Personalty, Fixtures, Leases, and Rents under Article Nine of the Uniform Commercial Code in effect in the state where the Mortgaged Property is located. Borrower further grants, bargains, conveys, assigns, transfers, and sets over to Trustee, acting as both a trustee and an agent for Lender under this Security Instrument, a security interest in and to all of Borrower's right, title, and interest in, to, and under the Personalty, Fixtures, Leases, Rents, and Mortgaged Property (to the extent characterized as personal property) to secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the Obligations.

Borrower agrees to execute and deliver, from time to time, such further instruments, including, but not limited to, security agreements, assignments, and UCC financing statements, as may be requested by Lender to confirm the lien of this Security Instrument on any of the Mortgaged Property. Borrower further

Deed of Trust

Borrower's Initials: ___

irrevocably grants, transfers, and assigns to Lender the Rents. This assignment of Rents is to be effective to create a present security interest in existing and future Rents of the Mortgaged Property.

TO MAINTAIN AND PROTECT THE SECURITY OF THIS SECURITY INSTRUMENT, TO SECURE THE FULL AND TIMELY PERFORMANCE BY BORROWER OF EACH AND EVERY OBLIGATION, COVENANT, AND AGREEMENT OF BORROWER UNDER THE LOAN DOCUMENTS, AND AS ADDITIONAL CONSIDERATION FOR THE INDEBTEDNESS AND OBLIGATIONS EVIDENCED BY THE LOAN DOCUMENTS, BORROWER HEREBY COVENANTS, REPRESENTS, AND AGREES AS FOLLOWS:

## DEFINITIONS.

**1.     Definitions.** For purposes of this Security Instrument, each of the following terms shall have the following respective meanings:

**1.1     "Attorney Fees."** Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender in protecting its interests in the Mortgaged Property, including, but not limited to, any action for waste, and enforcing its rights under this Security Instrument.

**1.2     "Borrower."**

1.2.1.    The named Borrower in this Security Instrument;

1.2.2.    The obligor under the Note, whether or not named as Borrower in this Security Instrument; and

1.2.3.    Subject to any limitations of assignment as provided for in the Loan Documents, the heirs, legatees, devisees, administrators, executors, successors in interest to the Mortgaged Property, and the assigns of any such person.

All references to Borrower in the remainder of the Loan Documents shall mean the obligor under the Note.

**1.3     "Event of Default."** An Event of Default as defined in the Loan Agreement.

**1.4     "Fixtures."** All right, title, and interest of Borrower in and to all materials, supplies, equipment, apparatus, and other items now or later attached to, installed on or in the Land or the Improvements, or that in some fashion are deemed to be fixtures to the Land or Improvements under the laws of the state where the Mortgaged Property is located, including the Uniform Commercial Code. "Fixtures" includes, without limitation, all items of Personalty to the extent that they may be deemed Fixtures under Governmental Requirements.

**1.5     "Governmental Authority."** Any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.6     "Governmental Requirements."** Any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

**1.7     "Impositions."** All real estate and personal property taxes, water, gas, sewer, electricity, and other utility rates and charges; charges imposed under any subdivision, planned unit development, or condominium declaration or restrictions; charges for any easement, license, or agreement maintained for the benefit of the Mortgaged Property, and all other taxes, charges, and assessments and any interest, costs, or penalties of any kind and nature that at any time before or after the execution of this Security Instrument may be assessed, levied, or imposed on the Mortgaged Property or on its ownership, use, occupancy, or enjoyment.

**1.8     "Improvements."** Any and all buildings, structures, improvements, fixtures, and appurtenances now and later placed on the Mortgaged Property, including, without limitation, all apparatus and equipment, whether or not physically affixed to the land or any building, which is used to provide or

Deed of Trust

Borrower's Initials: _____

supply air cooling, air conditioning, heat, gas, water, light, power, refrigeration, ventilation, laundry, drying, dish washing, garbage disposal, or other services; and all elevators, escalators, and related machinery and equipment, fire prevention and extinguishing apparatus, security and access control apparatus, partitions, ducts, compressors, plumbing, ovens, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains, curtain rods, mirrors, cabinets, paneling, rugs, attached floor coverings, furniture, pictures, antennas, pools, spas, pool and spa operation and maintenance equipment and apparatus, and trees and plants located on the Mortgaged Property, all of which, including replacements and additions, shall conclusively be deemed to be affixed to and be part of the Mortgaged Property conveyed to Trustee under this Security Instrument.

      **1.9**    **"Indebtedness."** The principal of, interest on, and all other amounts and payments due under or evidenced by the following:

      1.9.1.   The Note (including, without limitation, the prepayment premium, late payment, and other charges payable under the Note);

      1.9.2.   The Loan Agreement;

      1.9.3.   This Security Instrument and all other Loan Documents;

      1.9.4.   All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

      1.9.5.   Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Obligations evidenced by such document are secured by the terms of this Security Instrument, including, but not limited to, funds advanced to protect the security or priority of the Security Instrument; and

      1.9.6.   Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

      **1.10**   **"Land."** The real estate or any interest in it described in Exhibit "A" attached to this Security Instrument and made a part of it, together with all Improvements and Fixtures and all rights, titles, and interests appurtenant to it.

      **1.11**   **"Leases."** Any and all leases, subleases, licenses, concessions, or other agreements (written or verbal, now or later in effect) that grant a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Mortgaged Property, and all other agreements, including, but not limited to, utility contracts, maintenance agreements, and service contracts that in any way relate to the use, occupancy, operation, maintenance, enjoyment, or ownership of the Mortgaged Property, except any and all leases, subleases, or other agreements under which Borrower is granted a possessory interest in the Land.

      **1.12**   **"Lender."** The named Lender in this Security Instrument and the owner and holder (including a pledgee) of any Note, Indebtedness, or Obligations secured by this Security Instrument, whether or not named as Lender in this Security Instrument, and the heirs, legatees, devisees, administrators, executors, successors, and assigns of any such person.

      **1.13**   **"Loan."** The extension of credit made by Lender to Borrower under the terms of the Loan Documents.

      **1.14**   **"Loan Agreement."** The Loan and Security Agreement given by Borrower evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments thereto.

      **1.15**   **"Loan Documents."** Collectively, this Security Instrument, the Note, and all other instruments and agreements required to be executed by Borrower or any guarantor in connection with the Loan.

      **1.16**   **"Mortgaged Property."** The Land, Improvements, Fixtures, Personalty, Leases, and Rents that is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF,

commonly known as:    **341 S Canon Drive, Beverly Hills, CA 90212**

Deed of Trust

Borrower's Initials:

**Property ID No.: 4331-005-011**

together with:

1.16.1. All right, title, and interest (including any claim or demand or demand in law or equity) that Borrower now has or may later acquire in or to such Mortgaged Property; all easements, rights, privileges, tenements, hereditaments, and appurtenances belonging or in any way appertaining to the Mortgaged Property; all of the estate, right, title, interest, claim, demand, reversion, or remainder of Borrower in or to the Mortgaged Property, either at law or in equity, in possession or expectancy, now or later acquired; all crops growing or to be grown on the Mortgaged Property; all development rights or credits and air rights; all water and water rights (whether or not appurtenant to the Mortgaged Property) and shares of stock pertaining to such water or water rights, ownership of which affects the Mortgaged Property; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Mortgaged Property and all royalties and profits from any such rights or shares of stock; all right, title, and interest of Borrower in and to any streets, ways, alleys, strips, or gores of land adjoining the Land or any part of it that Borrower now owns or at any time later acquires and all adjacent lands within enclosures or occupied by buildings partly situated on the Mortgaged Property;

1.16.2. All intangible Mortgaged Property and rights relating to the Mortgaged Property or its operation or used in connection with it, including, without limitation, permits, licenses, plans, specifications, construction contracts, subcontracts, bids, deposits for utility services, installations, refunds due Borrower, trade names, trademarks, and service marks;

1.16.3. All of the right, title, and interest of Borrower in and to the land lying in the bed of any street, road, highway, or avenue in front of or adjoining the Land;

1.16.4. Any and all awards previously made or later to be made by any Governmental Authority to the present and all subsequent owners of the Mortgaged Property that may be made with respect to the Mortgaged Property as a result of the exercise of the right of eminent domain, the alteration of the grade of any street, or any other injury to or decrease of value of the Mortgaged Property, which award or awards are assigned to Lender and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of any such award or awards from the authorities making them and to give proper receipts and acquittances for them;

1.16.5. All certificates of deposit of Borrower in Lender's possession and all bank accounts of Borrower with Lender and their proceeds, and all deposits of Borrower with any Governmental Authority and/or public utility company that relate to the ownership of the Mortgaged Property;

1.16.6. All Leases of the Mortgaged Property or any part of it now or later entered into and all right, title, and interest of Borrower under such Leases, including cash or securities deposited by the tenants to secure performance of their obligations under such Leases (whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately before the expiration of such terms), all rights to all insurance proceeds and unearned insurance premiums arising from or relating to the Mortgaged Property, all other rights and easements of Borrower now or later existing pertaining to the use and enjoyment of the Mortgaged Property, and all right, title, and interest of Borrower in and to all declarations of covenants, conditions, and restrictions as may affect or otherwise relate to the Mortgaged Property;

1.16.7. Any and all proceeds of any insurance policies covering the Mortgaged Property, whether or not such insurance policies were required by Lender as a condition of making the loan secured by this Security Instrument or are required to be maintained by Borrower as provided below in this Security Instrument; which proceeds are assigned to Lender, and Lender, at its option, is authorized, directed, and empowered to collect and receive the proceeds of such insurance policies from the insurers issuing the same and to give proper receipts and acquittances for such policies, and to apply the same as provided below;

1.16.8. If the Mortgaged Property includes a leasehold estate, all of Borrower's right, title, and interest in and to the lease, more particularly described in Exhibit "A" attached to this Security

Deed of Trust

Borrower's Initials: _BH_

Instrument (the Leasehold) including, without limitation, the right to surrender, terminate, cancel, waive, change, supplement, grant subleases of, alter, or amend the Leasehold;

1.16.9.  All plans and specifications for the Improvements; all contracts and subcontracts relating to the Improvements; all deposits (including tenants' security deposits; provided, however, that if Lender acquires possession or control of tenants' security deposits Lender shall use the tenants' security deposits only for such purposes as Governmental Requirements permit), funds, accounts, contract rights, instruments, documents, general intangibles, and notes or chattel paper arising from or in connection with the Mortgaged Property; all permits, licenses, certificates, and other rights and privileges obtained in connection with the Mortgaged Property; all soils reports, engineering reports, land planning maps, drawings, construction contracts, notes, drafts, documents, engineering and architectural drawings, letters of credit, bonds, surety bonds, any other intangible rights relating to the Land and Improvements, surveys, and other reports, exhibits, or plans used or to be used in connection with the construction, planning, operation, or maintenance of the Land and Improvements and all amendments and modifications; all proceeds arising from or by virtue of the sale, lease, grant of option, or other disposition of all or any part of the Mortgaged Property (consent to same is not granted or implied); and all proceeds (including premium refunds) payable or to be payable under each insurance policy relating to the Mortgaged Property;

1.16.10.  All trade names, trademarks, symbols, service marks, and goodwill associated with the Mortgaged Property and any and all state and federal applications and registrations now or later used in connection with the use or operation of the Mortgaged Property;

1.16.11.  All tax refunds, bills, notes, inventories, accounts and charges receivable, credits, claims, securities, and documents of all kinds, and all instruments, contract rights, general intangibles, bonds and deposits, and all proceeds and products of the Mortgaged Property;

1.16.12.  All money or other personal property of Borrower (including, without limitation, any instrument, deposit account, general intangible, or chattel paper, as defined in the Uniform Commercial Code) previously or later delivered to, deposited with, or that otherwise comes into Lender's possession;

1.16.13.  All accounts, contract rights, chattel paper, documents, instruments, books, records, claims against third parties, money, securities, drafts, notes, proceeds, and other items relating to the Mortgaged Property;

1.16.14.  All construction, supply, engineering, and architectural contracts executed and to be executed by Borrower for the construction of the Improvements; and

1.16.15.  All proceeds of any of the foregoing.

As used in this Security Instrument, "Mortgaged Property" is expressly defined as meaning all or, when the context permits or requires, any portion of it and all or, when the context permits or requires, any interest in it.

**1.17**    **"Note."** The Secured Note payable by Borrower to the order of Lender in the principal amount of **One Million Three Hundred Thousand and 00/100 Dollars ($1,300,000.00), which matures on October 1, 2024,** evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Secured Note.

**1.18**    **"Obligations."** Any and all of the covenants, warranties, representations, and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower to Lender or Trustee as set forth in the Loan Documents; any lease, sublease, or other agreement under which Borrower is granted a possessory interest in the Land; each obligation, covenant, and agreement of Borrower in the Loan Documents or in any other document executed by Borrower in connection with the loan(s) secured by this Security Instrument whether set forth in or incorporated into the Loan Documents by reference; each and every monetary provision of all covenants, conditions, and restrictions, if any, pertaining to the Mortgaged Property and on Lender's written request, the enforcement by Borrower of any covenant by third parties to pay maintenance or other charges, if they have not been paid, or valid legal steps taken to enforce such payment within 90 days after such written request is made; if the Mortgaged Property consists of or includes a leasehold estate, each obligation, covenant, and agreement of Borrower arising under, or contained in, the

Deed of Trust

Borrower's Initials: _____

instrument(s) creating any such leasehold; all agreements of Borrower to pay fees and charges to Lender whether or not set forth in this Security Instrument; and charges, as allowed by law, when they are made for any statement regarding the obligations secured by this Security Instrument.

The Obligations specifically exclude the Environmental Indemnity Agreement dated the date of this Security Instrument, executed by Borrower and any guarantor of the Loan, which is not secured by this Security Instrument.

**1.19    "Permitted Encumbrances."** At any particular time, (a) liens for taxes, assessments, or governmental charges not then due and payable or not then delinquent; (b) liens, easements, encumbrances, and restrictions on the Mortgaged Property that are allowed by Lender to appear in Schedule B, with Parts I and II of an ALTA title policy to be issued to Lender following recordation of the Security Instrument; and (c) liens in favor of or consented to in writing by Lender.

**1.20    "Person."** Natural persons, corporations, partnerships, unincorporated associations, joint ventures, and any other form of legal entity.

**1.21    "Personalty."** All of the right, title, and interest of Borrower in and to all tangible and intangible personal property, whether now owned or later acquired by Borrower, including, but not limited to, water rights (to the extent they may constitute personal property), all equipment, inventory, goods, consumer goods, accounts, chattel paper, instruments, money, general intangibles, letter-of-credit rights, deposit accounts, investment property, documents, minerals, crops, and timber (as those terms are defined in the Uniform Commercial Code) and that are now or at any later time located on, attached to, installed, placed, used on, in connection with, or are required for such attachment, installation, placement, or use on the Land, the Improvements, Fixtures, or on other goods located on the Land or Improvements, together with all additions, accessions, accessories, amendments, modifications to the Land or Improvements, extensions, renewals, and enlargements and proceeds of the Land or Improvements, substitutions for, and income and profits from, the Land or Improvements. The Personalty includes, but is not limited to, all goods, machinery, tools, equipment (including fire sprinklers and alarm systems); building materials, air conditioning, heating, refrigerating, electronic monitoring, entertainment, recreational, maintenance, extermination of vermin or insects, dust removal, refuse and garbage equipment; vehicle maintenance and repair equipment; office furniture (including tables, chairs, planters, desks, sofas, shelves, lockers, and cabinets); safes, furnishings, appliances (including ice-making machines, refrigerators, fans, water heaters, and incinerators); rugs, carpets, other floor coverings, draperies, drapery rods and brackets, awnings, window shades, venetian blinds, curtains, other window coverings; lamps, chandeliers, other lighting fixtures; office maintenance and other supplies; loan commitments, financing arrangements, bonds, construction contracts, leases, tenants' security deposits, licenses, permits, sales contracts, option contracts, lease contracts, insurance policies, proceeds from policies, plans, specifications, surveys, books, records, funds, bank deposits; and all other intangible personal property. Personalty also includes any other portion or items of the Mortgaged Property that constitute personal property under the Uniform Commercial Code.

**1.22    "Rents."** All rents, issues, revenues, income, proceeds, royalties, profits, license fees, prepaid municipal and utility fees, bonds, and other benefits to which Borrower or the record title owner of the Mortgaged Property may now or later be entitled from or which are derived from the Mortgaged Property, including, without limitation, sale proceeds of the Mortgaged Property; any room or space sales or rentals from the Mortgaged Property; and other benefits paid or payable for using, leasing, licensing, possessing, operating from or in, residing in, selling, mining, extracting, or otherwise enjoying or using the Mortgaged Property.

**1.23    "Uniform Commercial Code."** The uniform commercial code as found in the statutes of the state in which the Mortgaged Property is located.

**1.24    "Water Rights."** All water rights of whatever kind or character, surface or underground, appropriative, decreed, or vested, that are appurtenant to the Mortgaged Property or otherwise used or useful in connection with the intended development of the Mortgaged Property.

Any terms not otherwise defined in this Security Instrument shall have the meaning given them in the Loan Agreement and Note, dated of even date herewith between Borrower and Lender.

Deed of Trust

Borrower's Initials: _____

**UNIFORM COVENANTS**

**2.**      **Repair and Maintenance of Mortgaged Property.** Borrower shall (a) keep the Mortgaged Property in good condition and repair; (b) not substantially alter, remove, or demolish the Mortgaged Property or any of the Improvements except when incident to the replacement of Fixtures, equipment, machinery, or appliances with items of like kind; (c) restore and repair to the equivalent of its original condition all or any part of the Mortgaged Property that may be damaged or destroyed, including, but not limited to, damage from termites and dry rot, soil subsidence, and construction defects, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under this Security Instrument; (d) pay when due all claims for labor performed and materials furnished in connection with the Mortgaged Property and not permit any mechanics' or materialman's lien to arise against the Mortgaged Property or furnish a loss or liability bond against such mechanics' or materialman's lien claims; (e) comply with all laws affecting the Mortgaged Property or requiring that any alterations, repairs, replacements, or improvements be made on it; (f) not commit or permit waste on or to the Mortgaged Property, or commit, suffer, or permit any act or violation of law to occur on it; (g) not abandon the Mortgaged Property; (h) cultivate, irrigate, fertilize, fumigate, and prune in accordance with prudent agricultural practices; (i) if required by Lender, provide for management satisfactory to Lender under a management contract approved by Lender; (j) notify Lender in writing of any condition at or on the Mortgaged Property that may have a significant and measurable effect on its market value; (k) if the Mortgaged Property is rental property, generally operate and maintain it in such manner as to realize its maximum rental potential; and (l) do all other things that the character or use of the Mortgaged Property may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Security Instrument.

**3.**      **Use of Mortgaged Property.** Unless otherwise required by Governmental Requirements or unless Lender otherwise provides prior written consent, Borrower shall not change, nor allow changes in, the use of the Mortgaged Property from the current use of the Mortgaged Property as of the date of this Security Instrument. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Mortgaged Property without Lender's prior written consent.

**4.**      **Condemnation and Insurance Proceeds.**

    **4.1**      **Assignment to Lender.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of or damage or injury to the Mortgaged Property, or any part of it, or for conveyance in lieu of condemnation, are assigned to and shall be paid to Lender, regardless of whether Lender's security is impaired. All causes of action, whether accrued before or after the date of this Security Instrument, of all types for damages or injury to the Mortgaged Property or any part of it, or in connection with any transaction financed by funds lent to Borrower by Lender and secured by this Security Instrument, or in connection with or affecting the Mortgaged Property or any part of it, including, without limitation, causes of action arising in tort or contract or in equity, are assigned to Lender as additional security, and the proceeds shall be paid to Lender. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement of such action. Borrower shall notify Lender in writing immediately on obtaining knowledge of any casualty damage to the Mortgaged Property or damage in any other manner in excess of $2,000.00 or knowledge of the institution of any proceeding relating to condemnation or other taking of or damage or injury to all or any portion of the Mortgaged Property. Lender, in its sole and absolute discretion, may participate in any such proceedings and may join Borrower in adjusting any loss covered by insurance. Borrower covenants and agrees with Lender, at Lender's request, to make, execute, and deliver, at Borrower's expense, any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid award or awards, causes of action, or claims

Deed of Trust

Borrower's Initials: ___

of damages or proceeds to Lender free, clear, and discharged of any and all encumbrances of any kind or nature.

**4.2** **Insurance Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Lender may become entitled with respect to the Mortgaged Property if any damage or injury occurs to the Mortgaged Property, other than by a partial condemnation or other partial taking of the Mortgaged Property, shall be paid over to Lender and shall be applied first toward reimbursement of all costs and expenses of Lender in connection with their recovery and disbursement, and shall then be applied as follows:

**4.2.1.** Lender shall consent to the application of such payments to the restoration of the Mortgaged Property so damaged only if Borrower has met all the following conditions (a breach of any one of which shall constitute a default under this Security Instrument, the Loan Agreement, the Note, and any Loan Documents): (a) Borrower is not in default under any of the terms, covenants, and conditions of the Loan Documents; (b) all then-existing Leases affected in any way by such damage will continue in full force and effect; (c) Lender is satisfied that the insurance or award proceeds, plus any sums added by Borrower, shall be sufficient to fully restore and rebuild the Mortgaged Property under then current Governmental Requirements; (d) within 60 days after the damage to the Mortgaged Property, Borrower presents to Lender a restoration plan satisfactory to Lender and any local planning department, which includes cost estimates and schedules; (e) construction and completion of restoration and rebuilding of the Mortgaged Property shall be completed in accordance with plans and specifications and drawings submitted to Lender within 30 days after receipt by Lender of the restoration plan and thereafter approved by Lender, which plans, specifications, and drawings shall not be substantially modified, changed, or revised without Lender's prior written consent; (f) within 3 months after such damage, Borrower and a licensed contractor satisfactory to Lender enter into a fixed price or guaranteed maximum price contract satisfactory to Lender, providing for complete restoration in accordance with such restoration plan for an amount not to exceed the amount of funds held or to be held by Lender; (g) all restoration of the Improvements so damaged or destroyed shall be made with reasonable promptness and shall be of a value at least equal to the value of the Improvements so damaged or destroyed before such damage or destruction; (h) Lender reasonably determines that there is an identified source (whether from income from the Mortgaged Property, rental loss insurance, or another source) sufficient to pay all debt service and operating expenses of the Mortgaged Property during its restoration as required above; and (i) any and all funds that are made available for restoration and rebuilding under this Section shall be disbursed, at Lender's sole and absolute discretion to Lender, through Lender, the Trustee, or a title insurance or trust company satisfactory to Lender, in accordance with standard construction lending practices, including a reasonable fee payable to Lender from such funds and, if Lender requests, mechanics' lien waivers and title insurance date-downs, and the provision of payment and performance bonds by Borrower, or in any other manner approved by Lender in Lender's sole and absolute discretion; or

**4.2.2.** If fewer than all conditions (a) through (i) above are satisfied, then such payments shall be applied in the sole and absolute discretion of Lender (a) to the payment or prepayment, with any applicable prepayment premium, of any Indebtedness secured by this Security Instrument in such order as Lender may determine, or (b) to the reimbursement of Borrower's expenses incurred in the rebuilding and restoration of the Mortgaged Property. If Lender elects under this Section to make any funds available to restore the Mortgaged Property, then all of conditions (a) through (i) above shall apply, except for such conditions that Lender, in its sole and absolute discretion, may waive.

**4.3** **Material Loss Not Covered.** If any material part of the Mortgaged Property is damaged or destroyed and the loss, measured by the replacement cost of the Improvements according to then current Governmental Requirements, is not adequately covered by insurance proceeds collected or in the process of collection, Borrower shall deposit with Lender, within 30 days after Lender's request, the amount of the loss not so covered.

**4.4** **Total Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments that Borrower may receive or to which Borrower may

Deed of Trust

Borrower's Initials: ___

become entitled with respect to the Mortgaged Property in the event of a total condemnation or other total taking of the Mortgaged Property shall be paid over to Lender and shall be applied first to reimbursement of all Lender's costs and expenses in connection with their recovery, and shall then be applied to the payment of any Indebtedness secured by this Security Instrument in such order as Lender may determine, until the Indebtedness secured by this Security Instrument has been paid and satisfied in full. Any surplus remaining after payment and satisfaction of the Indebtedness secured by this Security Instrument shall be paid to Borrower as its interest may then appear.

    **4.5**    **Partial Condemnation Payments.** All compensation, awards, proceeds, damages, claims, insurance recoveries, rights of action, and payments ("funds") that Borrower may receive or to which Borrower may become entitled with respect to the Mortgaged Property in the event of a partial condemnation or other partial taking of the Mortgaged Property, unless Borrower and Lender otherwise agree in writing, shall be divided into two portions, one equal to the principal balance of the Note at the time of receipt of such funds and the other equal to the amount by which such funds exceed the principal balance of the Note at the time of receipt of such funds. The first such portion shall be applied to the sums secured by this Security Instrument, whether or not then due, including but not limited to principal, accrued interest, and advances, and in such order or combination as Lender may determine, with the balance of the funds paid to Borrower.

    **4.6**    **Cure of Waiver of Default.** Any application of such amounts or any portion of it to any Indebtedness secured by this Security Instrument shall not be construed to cure or waive any default or notice of default under this Security Instrument or invalidate any act done under any such default or notice.

**5.**    **Taxes and Other Sums Due.** Borrower shall promptly pay, satisfy, and discharge: (a) all Impositions affecting the Mortgaged Property before they become delinquent; (b) such other amounts, chargeable against Borrower or the Mortgaged Property, as Lender reasonably deems necessary to protect and preserve the Mortgaged Property, this Security Instrument, or Lender's security for the performance of the Obligations; (c) all encumbrances, charges, and liens on the Mortgaged Property. with interest, which in Lender's judgment are, or appear to be, prior or superior to the lien of this Security Instrument or all costs necessary to obtain protection against such lien or charge by title insurance endorsement or surety company bond; (d) such other charges as Lender deems reasonable for services rendered by Lender at Borrower's request; and (e) all costs, fees, and expenses incurred by Lender in connection with this Security Instrument, whether or not specified in this Security Instrument.

On Lender's request, Borrower shall promptly furnish Lender with all notices of sums due for any amounts specified in the preceding clauses 5(a) through (e), and, on payment, with written evidence of such payment. If Borrower fails to promptly make any payment required under this Section, Lender may (but is not obligated to) make such payment. Borrower shall notify Lender immediately on receipt by Borrower of notice of any increase in the assessed value of the Mortgaged Property and agrees that Lender, in Borrower's name, may (but is not obligated to) contest by appropriate proceedings such increase in assessment. Without Lender's prior written consent, Borrower shall not allow any lien inferior to the lien of this Security Instrument to be perfected against the Mortgaged Property and shall not permit any improvement bond for any unpaid special assessment to issue.

**6.**    **Leases of Mortgaged Property by Borrower.** At Lender's request, Borrower shall furnish Lender with executed copies of all Leases of the Mortgaged Property or any portion of it then in force. If Lender so requires, all Leases later entered into by Borrower are subject to Lender's prior review and approval and must be acceptable to Lender in form and content. Each Lease must specifically provide, inter alia, that (a) it is subordinate to the lien of this Security Instrument; (b) the tenant attorns to Lender (and Borrower consents to any such attornment), such attornment to be effective on Lender's acquisition of title to the Mortgaged Property; (c) the tenant agrees to execute such further evidence of attornment as Lender may from time to time request; (d) the tenant's attornment shall not be terminated by foreclosure; and (e) Lender, at Lender's option, may accept or reject such attornment. If Borrower learns that any tenant proposes to do, or is doing, any act that may give rise to any right of setoff against rent, Borrower shall immediately (i) take measures reasonably calculated to prevent the accrual of any such right of setoff; (ii) notify Lender of

Deed of Trust

all measures so taken and of the amount of any setoff claimed by any such tenant; and (iii) within 10 days after the accrual of any right of setoff against rent, reimburse any tenant who has acquired such right, in full, or take other measures that will effectively discharge such setoff and ensure that rents subsequently due shall continue to be payable without claim of setoff or deduction.

At Lender's request, Borrower shall assign to Lender, by written instrument satisfactory to Lender, all Leases of the Mortgaged Property, and all security deposits made by tenants in connection with such Leases. On assignment to Lender of any such Lease, Lender shall succeed to all rights and powers of Borrower with respect to such Lease, and Lender, in Lender's sole and absolute discretion, shall have the right to modify, extend, or terminate such Lease and to execute other further leases with respect to the Mortgaged Property that is the subject of such assigned Lease.

Neither Borrower, tenant nor any other occupant of the Mortgaged Property shall use the Mortgaged Property, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations; nor shall Borrower, tenant or any other occupant cause the Mortgaged Property to become subject to any use that is not in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations.

If Borrower suspects any tenant or other occupant of the Mortgaged Property is using the Mortgaged Property in a manner that is not in compliance with any Governmental Requirement to which Borrower, tenant, or any other occupant of the Mortgaged Property is subject, Borrower shall immediately take appropriate action to remedy the violation, and shall notify Lender of any potential violation within one (1) day of discovery of any such potential violation. Any potential violation by a tenant or any other occupant of the Mortgaged Property of any Governmental Requirement is an Event of Default under the terms of the Loan Agreement, the Note and this Security Instrument, then Lender, at Lender's option, may, without prior notice, declare all sums secured by this Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**7.    Right to Collect and Receive Rents.** Despite any other provision of this Security Instrument, Lender grants permission to Borrower to collect and retain the Rents of the Mortgaged Property as they become due and payable; however, such permission to Borrower shall be automatically revoked on default by Borrower in payment of any Indebtedness secured by this Security Instrument or in the performance of any of the Obligations, and Lender shall have the rights set forth in the laws and regulations where the Mortgaged Property is located regardless of whether declaration of default has been delivered, and without regard to the adequacy of the security for the Indebtedness secured by this Security Instrument. Failure of or discontinuance by Lender at any time, or from time to time, to collect any such Rents shall not in any manner affect the subsequent enforcement by Lender at any time, or from time to time, of the right, power, and authority to collect these Rents. The receipt and application by Lender of all such Rents under this Security Instrument, after execution and delivery of declaration of default and demand for sale as provided in this Security Instrument or during the pendency of trustee's sale proceedings under this Security Instrument or judicial foreclosure, shall neither cure such breach or default nor affect such sale proceedings, or any sale made under them, but such Rents, less all costs of operation, maintenance, collection, and Attorney Fees, when received by Lender, may be applied in reduction of the entire Indebtedness from time to time secured by this Security Instrument, in such order as Lender may decide. Nothing in this Security Instrument, nor the exercise of Lender's right to collect, nor an assumption by Lender of any tenancy, lease, or option, nor an assumption of liability under, nor a subordination of the lien or charge of this Security Instrument to, any such tenancy, lease, or option, shall be, or be construed to be, an affirmation by Lender of any tenancy, lease, or option.

If the Rents of the Mortgaged Property are not sufficient to meet the costs, if any, of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an Indebtedness of Borrower to Lender secured by this Security Instrument. Unless Lender and Borrower agree in writing to other terms of payment, such amounts shall be payable on notice from Lender to Borrower requesting such payment and shall bear interest from the date of disbursement at the rate stated in the Note unless payment of interest at such rate would be contrary to Governmental

Deed of Trust

Borrower's Initials. _____

Requirements, in which event the amounts shall bear interest at the highest rate that may be collected from Borrower under Governmental Requirements.

Borrower expressly understands and agrees that Lender will have no liability to Borrower or any other person for Lender's failure or inability to collect Rents from the Mortgaged Property or for failing to collect such Rents in an amount that is equal to the fair market rental value of the Mortgaged Property. Borrower understands and agrees that neither the assignment of Rents to Lender nor the exercise by Lender of any of its rights or remedies under this Security Instrument shall be deemed to make Lender a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it, unless and until Lender, in person or by agent, assumes actual possession of it. Nor shall appointment of a receiver for the Mortgaged Property by any court at the request of Lender or by agreement with Borrower, or the entering into possession of the Mortgaged Property or any part of it by such receiver be deemed to make Lender a mortgagee-in-possession or otherwise responsible or liable in any manner with respect to the Mortgaged Property or the use, occupancy, enjoyment, or operation of all or any portion of it.

During an Event of Default, any and all Rents collected or received by Borrower shall be accepted and held for Lender in trust and shall not be commingled with Borrower's funds and property, but shall be promptly paid over to Lender.

**8.      Assignment of Causes of Action, Awards, and Damages.** All causes of action, and all sums due or payable to Borrower for injury or damage to the Mortgaged Property, or as damages incurred in connection with the transactions in which the Loan secured by this Security Instrument was made, including, without limitation, causes of action and damages for breach of contract, fraud, concealment, construction defects, or other torts, or compensation for any conveyance in lieu of condemnation, are assigned to Lender, and all proceeds from such causes of action and all such sums shall be paid to Lender for credit against the Indebtedness secured by this Security Instrument. Borrower shall notify Lender immediately on receipt by Borrower of notice that any such sums have become due or payable and, immediately on receipt of any such sums, shall promptly remit such sums to Lender.

After deducting all expenses, including Attorney Fees, incurred by Lender in recovering or collecting any sums under this Section, Lender may apply or release the balance of any funds received by it under this Section, or any part of such balance, as it elects. Lender, at its option, may appear in and prosecute in its own name any action or proceeding to enforce any cause of action assigned to it under this Section and may make any compromise or settlement in such action whatsoever. Borrower covenants that it shall execute and deliver to Lender such further assignments of any such compensation awards, damages, or causes of action as Lender may request from time to time. If Lender fails or does not elect to prosecute any such action or proceeding and Borrower elects to do so, Borrower may conduct the action or proceeding at its own expense and risk.

**9.      Defense of Security Instrument; Litigation.** Borrower represents and warrants that this Security Instrument creates a second position lien and security interest against the Mortgaged Property. Borrower shall give Lender immediate written notice of any action or proceeding (including, without limitation, any judicial, whether civil, criminal, or probate, or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Security Instrument, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender under the Loan Documents. Despite any other provision of this Security Instrument, Borrower agrees that Lender or Trustee may (but is not obligated to) commence, appear in, prosecute, defend, compromise, and settle, in Lender's or Borrower's name, and as attorney-in-fact for Borrower, and incur necessary costs and expenses, including Attorney Fees in so doing, any action or proceeding, whether a civil, criminal, or probate judicial matter, nonjudicial proceeding, arbitration, or other alternative dispute resolution procedure, reasonably necessary to preserve or protect, or affecting or purporting to affect, the Mortgaged Property, this Security Instrument, Lender's security for performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Documents, and that if Lender and Trustee elect not to do so, Borrower shall commence, appear in,

Deed of Trust

Borrower's Initials: 𝐵 𝐻

prosecute, and defend any such action or proceeding. Borrower shall pay all costs and expenses of Lender and Trustee, including costs of evidence of title and Attorney Fees, in any such action or proceeding in which Lender or Trustee may appear or for which legal counsel is sought, whether by virtue of being made a party defendant or otherwise, and whether or not the interest of Lender or Trustee in the Mortgaged Property is directly questioned in such action or proceeding, including, without limitation, any action for the condemnation or partition of all or any portion of the Mortgaged Property and any action brought by Lender to foreclose this Security Instrument or to enforce any of its terms or provisions.

**10.      Borrower's Failure to Comply With Security Instrument.** If Borrower fails to make any payment or do any act required by this Security Instrument, or if there is any action or proceeding (including, without limitation, any judicial or nonjudicial proceeding to foreclose the lien of a junior or senior mortgage or deed of trust) affecting or purporting to affect the Mortgaged Property, this Security Instrument, Lender's security for the performance of the Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Agreement, the Note or this Security Instrument, Lender or Trustee may (but is not obligated to) (a) make any such payment or do any such act in such manner and to such extent as either deems necessary to preserve or protect the Mortgaged Property, this Security Instrument, or Lender's security for the performance of Borrower's Obligations and payment of the Indebtedness, or the rights or powers of Lender or Trustee under the Loan Documents, Lender and Trustee being authorized to enter on the Mortgaged Property for any such purpose; and (b) in exercising any such power, pay necessary expenses, retain attorneys, and pay Attorney Fees incurred in connection with such action, without notice to or demand on Borrower and without releasing Borrower from any Obligations or Indebtedness.

**11.      Sums Advanced to Bear Interest and to Be Secured by Security Instrument.** At Lender's request, Borrower shall immediately pay any sums advanced or paid by Lender or Trustee under any provision of this Security Instrument or the other Loan Documents. Until so repaid, all such sums and all other sums payable to Lender and Trustee shall be added to, and become a part of, the Indebtedness secured by this Security Instrument and bear interest from the date of advancement or payment by Lender or Trustee at the same rate as provided in the Note, unless payment of interest at such rate would be contrary to Governmental Requirements. All sums advanced by Lender under this Security Instrument or the other Loan Documents, whether or not required to be advanced by Lender under the terms of this Security Instrument or the other Loan Documents, shall conclusively be deemed to be mandatory advances required to preserve and protect this Security Instrument and Lender's security for the performance of the Obligations and payment of the Indebtedness, and shall be secured by this Security Instrument to the same extent and with the same priority as the principal and interest payable under the Note.

**12.      Inspection of Mortgaged Property.** In addition to any rights Lender may have under the laws and regulations where the Mortgaged Property is located, Lender may make, or authorize other persons, including, but not limited to, appraisers and prospective purchasers at any foreclosure sale commenced by Lender, to enter on or inspect the Mortgaged Property at reasonable times and for reasonable durations. Borrower shall permit all such entries and inspections to be made as long as Lender has given Borrower written notice of such inspection at least 24 hours before the entry and inspection.

**13.      Uniform Commercial Code Security Agreement.** This Security Instrument is intended to be and shall constitute a security agreement under the Uniform Commercial Code for any of the Personalty specified as part of the Mortgaged Property that, under Governmental Requirements, may be subject to a security interest under the Uniform Commercial Code, and Borrower grants to Lender a security interest in those items. Borrower authorizes Lender to file financing statements in all states, counties, and other jurisdictions as Lender may elect, without Borrower's signature if permitted by law. Borrower agrees that Lender may file this Security Instrument, or a copy of it, in the real estate records or other appropriate index or in the Office of the Secretary of State and such other states as the Lender may elect, as a financing statement for any of the items specified above as part of the Mortgaged Property. Any reproduction of this Security Instrument or executed duplicate original of this Security Instrument, or a copy certified by a County Recorder in the state where the Mortgaged Property is located, or of any other security agreement

Deed of Trust

Borrower's Initials: _DH_

or financing statement, shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender, at Lender's request, any UCC financing statements, as well as any extensions, renewals, and amendments, and copies of this Security Instrument in such form as Lender may require to perfect a security interest with respect to the Personalty. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Lender may reasonably require. Without the prior written consent of Lender, Borrower shall not create or suffer to be created any other security interest in the items, including any replacements and additions.

On any Event of Default, Lender shall have the remedies of a secured party under the Uniform Commercial Code and, at Lender's option, may also invoke the remedies provided in the Non-Uniform Covenants section of this Security Instrument as to such items. In exercising any of these remedies, Lender may proceed against the items of Mortgaged Property and any items of Personalty separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Uniform Commercial Code or of the remedies provided in the Non-Uniform Covenants section of this Security Instrument.

**14.     Fixture Filing.** This Security Instrument constitutes a financing statement filed as a fixture filing under Uniform Commercial Code, as amended or recodified from time to time, covering any portion of the Mortgaged Property that now is or later may become a fixture attached to the Mortgaged Property or to any Improvement.

**15.     Waiver of Statute of Limitations.** Borrower waives the right to assert any statute of limitations as a defense to the Loan Documents and the Obligations secured by this Security Instrument, to the fullest extent permitted by Governmental Requirements.

**16.     Default.** Any Event of Default, as defined in the Loan Agreement, shall constitute an "Event of Default" as that term is used in this Security Instrument (and the term "Default" shall mean any event which, with any required lapse of time or notice, may constitute an Event of Default, whether or not any such requirement for notice or lapse of time has been satisfied).

**17.     Acceleration on Transfer or Encumbrance.**

**17.1     Acceleration on Transfer or Encumbrance of Mortgaged Property.** If Borrower sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance), transfers possession, or alienates all or any portion of the Mortgaged Property, or any of Borrower's interest in the Mortgaged Property, or suffers its title to, or any interest in, the Mortgaged Property to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Mortgaged Property, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Mortgaged Property; or if title to such Mortgaged Property becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent, then Lender, at Lender's option, may, without prior notice, declare all sums secured by this Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**17.2     Replacement Personalty.** Notwithstanding anything to the contrary herein, Borrower may from time to time replace Personalty constituting a part of the Mortgaged Property, as long as (a) the replacements for such Personalty are of equivalent value and quality; (b) Borrower has good and clear title to such replacement Personalty free and clear of any and all liens, encumbrances, security interests, ownership interests, claims of title (contingent or otherwise), or charges of any kind, or the rights of any conditional sellers, vendors, or any other third parties in or to such replacement Personalty have been expressly subordinated to the lien of the Security Instrument in a manner satisfactory to Lender and at no cost to Lender; and (c) at Lender's option, Borrower provides at no cost to Lender satisfactory evidence that the Security Instrument constitutes a valid and subsisting lien on and security interest in such

Deed of Trust

Borrower's Initials: _DH_

replacement Personalty of the same priority as this Security Instrument has on the Mortgaged Property and is not subject to being subordinated or its priority affected under any Governmental Requirements.

**17.3**    **Permitted Encumbrances.** If Lender consents in writing, which consent may not be unreasonably withheld, the due-on-encumbrance prohibition shall not apply to a junior voluntary deed of trust or mortgage lien in favor of another lender encumbering the Mortgaged Property (the principal balance of any such junior encumbrance shall be added to the principal balance of the Indebtedness for purposes of determining compliance with the financial covenants of the Loan Agreement and the Note); as long as Borrower gives Lender at least 30 days written notice of the further encumbrance and reimburses Lender for all out-of-pocket costs and expenses incurred in connection with such encumbrance.

**18.**    **Waiver of Marshaling.** Despite the existence of interests in the Mortgaged Property other than that created by this Security Instrument, and despite any other provision of this Security Instrument, if Borrower defaults in paying the Indebtedness or in performing any Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Mortgaged Property will be subjected to the remedies provided in this Security Instrument and to establish the order in which all or any part of the Indebtedness secured by this Security Instrument is satisfied from the proceeds realized on the exercise of the remedies provided in this Security Instrument. Borrower and any person who now has or later acquires any interest in the Mortgaged Property with actual or constructive notice of this Security Instrument waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Security Instrument or otherwise provided by Governmental Requirements.

**19.**    **Consents and Modifications; Borrower and Lien Not Released.** Despite Borrower's default in the payment of any Indebtedness secured by this Security Instrument or in the performance of any Obligations under this Security Instrument or Borrower's breach of any obligation, covenant, or agreement in the Loan Documents, Lender, at Lender's option, without notice to or consent from Borrower, any guarantor of the Indebtedness and of Borrower's Obligations under the Loan Documents, or any holder or claimant of a lien or interest in the Mortgaged Property that is junior to the lien of this Security Instrument, and without incurring liability to Borrower or any other person by so doing, may from time to time (a) extend the time for payment of all or any portion of Borrower's Indebtedness under the Loan Documents; (b) accept a renewal note or notes, or release any person from liability, for all or any portion of such Indebtedness; (c) agree with Borrower to modify the terms and conditions of payment under the Loan Documents; (d) reduce the amount of the monthly installments due under the Note; (e) reconvey or release other or additional security for the repayment of Borrower's Indebtedness under the Loan Documents; (f) approve the preparation or filing of any map or plat with respect to the Mortgaged Property; (g) enter into any extension or subordination agreement affecting the Mortgaged Property or the lien of this Security Instrument; and (h) agree with Borrower to modify the term, the rate of interest, or the period of amortization of the Note or alter the amount of the monthly installments payable under the Note. No action taken by Lender under this Section shall be effective unless it is in writing, subscribed by Lender, and, except as expressly stated in such writing, no such action will impair or affect (i) Borrower's obligation to pay the Indebtedness secured by this Security Instrument and to observe all Obligations of Borrower contained in the Loan Documents; (ii) the guaranty of any Person of the payment of the Indebtedness secured by this Security Instrument; or (iii) the lien or priority of the lien of this Security Instrument. At Lender's request, Borrower shall promptly pay Lender a reasonable service charge, together with all insurance premiums and Attorney Fees as Lender may have advanced, for any action taken by Lender under this Section.

Whenever Lender's consent or approval is specified as a condition of any provision of this Security Instrument, such consent or approval shall not be effective unless such consent or approval is in writing, signed by two authorized officers of Lender.

**20.**    **Future Advances.** On request by Borrower, Lender, at Lender's option, may make future advances to Borrower. All such future advances, with interest, shall be added to and become a part of the

Deed of Trust

Borrower's Initials: _DH_

Indebtedness secured by this Security Instrument when evidenced by promissory notes reciting that such note(s) are secured by this Security Instrument.

**21.     Prepayment.** If the Loan Documents provide for a fee or charge as consideration for the acceptance of prepayment of principal, Borrower agrees to pay said fee or charge if the Indebtedness or any part of it shall be paid, whether voluntarily or involuntarily, before the due date stated in the Note, even if Borrower has defaulted in payment or in the performance of any agreement under the Loan Documents and Lender has declared all sums secured by this Security Instrument immediately due and payable.

**22.     Governing Law; Consent to Jurisdiction and Venue.** This Security Instrument is made by Lender and accepted by Borrower in the State of California except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Mortgaged Property under the Loan Documents shall be governed by and construed according to the laws of the state in which the Mortgage Property is situated. To the fullest extent permitted by the law of the state in which the Mortgaged Property is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which the Mortgaged Property is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Mortgaged Property, shall be Los Angeles County, California, or the applicable federal district court that covers said County, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _BH_

**23.     Taxation of Security Instrument.** In the event of the enactment of any law deducting from the value of the Mortgaged Property any mortgage lien on it, or imposing on Lender the payment of all or part of the taxes, charges, or assessments previously paid by Borrower under this Security Instrument, or changing the law relating to the taxation of mortgages, debts secured by mortgages, or Lender's interest in the Mortgaged Property so as to impose new incidents of tax on Lender, then Borrower shall pay such taxes or assessments or shall reimburse Lender for them; provided, however, that if in the opinion of Lender's counsel such payment cannot lawfully be made by Borrower, then Lender may, at Lender's option, declare all sums secured by this Security Instrument to be immediately due and payable without notice to Borrower. Lender may invoke any remedies permitted by this Security Instrument.

**24.     Mechanic's Liens.** Borrower shall pay from time to time when due, all lawful claims and demands of mechanics, materialmen, laborers, and others that, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part of it, or on the Rents arising therefrom, and in general shall do or cause to be done everything necessary so that the lien and security interest of this Security Instrument shall be fully preserved, at Borrower's expense, without expense to Lender; provided, however, that if Governmental Requirements empower Borrower to discharge of record any mechanic's, laborer's, materialman's, or other lien against the Mortgaged Property by the posting of a bond or other security, Borrower shall not have to make such payment if Borrower posts such bond or other security on the earlier of (a) 10 days after the filing or recording of same or (b) within the time prescribed by law, so as not to place the Mortgaged Property in jeopardy of a lien or forfeiture.

**25.     Liability for Acts or Omissions.** Lender shall not be liable or responsible for its acts or omissions under this Security Instrument, except for Lender's own gross negligence or willful misconduct, or be liable or responsible for any acts or omissions of any agent, attorney, or employee of Lender, if selected with reasonable care.

**26.     Notices.** Except for any notice required by Governmental Requirements to be given in another manner, any notice required to be provided in this Security Instrument shall be given in accordance with the Loan Agreement.

Deed of Trust

Borrower's Initials: _BH_

**27.     Statement of Obligations.** Except as otherwise provided by Governmental Requirements, at Lender's request, Borrower shall promptly pay to Lender such fee as may then be provided by law as the maximum charge for each statement of obligations, Lender's statement, Lender's demand, payoff statement, or other statement on the condition of, or balance owed, under the Note or secured by this Security Instrument.

**28.     Remedies Are Cumulative.** Each remedy in this Security Instrument is separate and distinct and is cumulative to all other rights and remedies provided by this Security Instrument or by Governmental Requirements, and each may be exercised concurrently, independently, or successively, in any order whatsoever.

**29.     Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Security Instrument shall be the joint and several obligations of each such Person.

**30.     Delegation of Authority.** Whenever this Security Instrument provides that Borrower authorizes and appoints Lender as Borrower's attorney-in-fact to perform any act for or on behalf of Borrower or in the name, place, and stead of Borrower, Borrower expressly understands and agrees that this authority shall be deemed a power coupled with an interest and such power shall be irrevocable.

**31.     Funds for Taxes and Insurance.** If Borrower is in default under this Security Instrument or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the obligations of Borrower under the Note and this Security Instrument as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Obligations under the Loan Documents in such order or priority as Lender shall determine. If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Security Instrument in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand. If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this Section shall be deemed to affect any right or remedy of Lender under any other provision of this Security Instrument or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by this Security Instrument. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this Section is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this Section. Notwithstanding the preceding, Borrower and Lender may agree to impounds of taxes and insurance which impounds shall be identified in the Note.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by this Security Instrument. Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under this Security Instrument, apply such amounts or any portion of it to any Indebtedness secured by this Security Instrument, and such application shall not be construed to cure or waive any default or notice of default under this Security Instrument.

If Lender requires deposits to be made under this Section, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns this Security Instrument, Lender shall have the right to transfer all amounts deposited under this Section to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Security Instrument for the application of such deposits,

Deed of Trust

Borrower's Initials:

and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**32.   General Provisions.**

   **32.1   Successors and Assigns.** Except as otherwise expressly provided herein, this Security Instrument applies to, inures to the benefit of, and binds, the respective heirs, legatees, devisees, administrators, executors, successors, and assigns of each party to this Security Instrument.

   **32.2   Meaning of Certain Terms.** As used in this Security Instrument and unless the context otherwise provides, the words "herein," "hereunder" and "hereof" mean and include this Security Instrument as a whole, rather than any particular provision of it.

   **32.3   Authorized Agents.** In exercising any right or remedy, or taking any action provided in this Security Instrument, Lender may act through its employees, agents, or independent contractors, as Lender expressly authorizes.

   **32.4   Gender and Number.** Wherever the context so requires in this Security Instrument, the masculine gender includes the feminine and neuter, the singular number includes the plural, and vice versa.

   **32.5   Captions.** Captions and section headings used in this Security Instrument are for convenience of reference only, are not a part of this Security Instrument, and shall not be used in construing it.

**33.   Dispute Resolution; Waiver of Right to Jury Trial.**

   **33.1   ARBITRATION.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO ARBITRATE ANY DISPUTES TO RESOLVE ANY CLAIMS (AS DEFINED IN THE ARBITRATION AGREEMENT).

   **33.2   WAIVER OF RIGHT TO JURY TRIAL.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO JURY TRIAL WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM (AS DEFINED IN THE ARBITRATION AGREEMENT) OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN.

BORROWER'S INITIALS: _____

   **33.3   PROVISIONAL REMEDIES; FORECLOSURE AND INJUNCTIVE RELIEF.** Nothing in the Section above, shall be deemed to apply to or limit the right of Lender to: (a) exercise self-help remedies, (b) foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (c) obtain from a court provisional or ancillary remedies (including, but not limited to, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver), or (d) pursue rights against Borrower or any other party in a third party proceeding in any action brought against Lender (including, but not limited to, actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during, or after the pendency of any proceeding referred to in the Section above. Neither the exercise of self-help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies or the opposition to any such provisional remedies shall constitute a waiver of the right of any Borrower, Lender or any other party, including, but not limited to, the claimant in any such action, to require submission of the dispute, claim or controversy occasioning resort to such remedies to any proceeding referred to in the Section above.

   **33.4   Contractual Right to Appoint a Receiver Upon Default.** Upon an Event of Default under this Security Instrument or a breach of any clause of any agreement signed in connection with the loan to Borrower, Borrower agrees that Lender may appoint a receiver to control the Mortgaged Property within seven (7) days of any default. Borrower agrees to cooperate with the receiver and turn over all control to said receiver and otherwise cooperate with the receiver appointed by Lender.

Deed of Trust

Borrower's Initials: _____

**33.5    Loan Agreement.** This Security Instrument is subject to the provisions of the Loan Agreement. As specifically provided in the Loan Agreement, if Borrower defaults under this Security Instrument, Lender has the right and option to foreclose against any Collateral provided under the Loan Agreement.

## NON-UNIFORM COVENANTS.

Notwithstanding anything to the contrary elsewhere in this Security Instrument, Borrower and Lender further covenant and agree as follows:

**34.    Acceleration and Sale on Default.** If an Event of Default occurs, Lender, at its option, in addition to other remedies provided at law, may declare all sums secured by this Security Instrument immediately due and payable by delivering to Trustee a written affidavit or declaration of default and demand for sale, executed by Lender and reciting facts demonstrating such default by Borrower, together with a written notice of default and election to sell the Mortgaged Property. Lender shall also deposit with Trustee the Note, this Security Instrument, and documents evidencing any additional advances or expenditures secured by this Security Instrument. On receipt by Trustee of such affidavit or declaration of default and such notice of default and election to sell, Trustee shall accept such election to sell as true and conclusive of all facts and statements in such affidavit or declaration of default and shall cause such notice of default and election to sell to be recorded as required by Governmental Requirements. On the expiration of such period as may then be required by Governmental Requirements following recordation of such notice of default, and after notice of sale has been given in the manner and for the period required by Governmental Requirement, Trustee, without demand on Borrower, shall sell the Mortgaged Property at the time and place fixed in such notice of sale, either in whole or in separate parcels, and in such order as Trustee may determine or Lender may direct (Borrower waives any right it may have under Governmental Requirements to direct the order of sale), at public auction to the highest bidder for cash in lawful money of the United States, payable at the time of sale; provided, however, that Lender may offset its bid at such sale to the extent of the full amount owed to Lender under the Loan Documents, including, without limitation, Trustee's fees, expenses of sale, and costs, expenses, and Attorney Fees incurred by or on behalf of Lender in connection with collecting, litigating, or otherwise enforcing any right under the Loan Documents. Trustee may postpone the sale of all or any portion of the Mortgaged Property by public announcement made at the initial time and place of sale, and from time to time later by public announcement made at the time and place of sale fixed by the preceding postponement. Trustee shall deliver to the purchaser at such public auction its deed conveying the Mortgaged Property sold, but without any covenant or warranty, express or implied. The recital in such deed of any matter of fact concerning notices shall be conclusive proof of its truthfulness. Any person, including Borrower, Trustee, or Lender, may purchase at such sale.

The proceeds or avails of any sale made under or by virtue of this Security Instrument, together with any other sums secured by this Security Instrument, which then may be held by the Trustee or Lender or any other person, shall be applied as follows: (1) To the payment of the costs and expenses of such sale, including Trustee's fees, costs of title evidence, Attorney Fees, and reasonable compensation to Lender and its agents and consultants, and of any judicial proceedings in which the same costs and expenses of sale may be made, and of all expenses, liabilities, and advances made or incurred by the Trustee or Lender under this Security Instrument, together with interest at the rate set forth in the Note on all advances made by the Trustee or Lender and all taxes or assessments, except any taxes, assessments, or other charges subject to which the Mortgaged Property was sold; (2) to the payment of the whole amount then due, owing, or unpaid on the Note for interest and principal, with interest on the unpaid principal at the Default Rate (as defined in the Note), from the due date of any such payment of principal until the same is paid; (3) to the payment of any other Indebtedness required to be paid by Borrower under any provision of this Security Instrument, the Note, or any of the other Loan Documents; and (4) to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive it.

Deed of Trust

Borrower's Initials: _____

**35.** **Trustee.** The Trustee shall be deemed to have accepted the terms of this trust when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law. The Trustee shall not be obligated to notify any party to this Security Instrument of any pending sale under any other Security Instrument or of any action or proceeding in which Borrower, Lender, or Trustee is a party, unless such sale relates to or reasonably might affect the Mortgaged Property, this Security Instrument, Lender's security for the payment of the Indebtedness and the performance of the Obligations, or the rights or powers of Lender or Trustee under the Loan Documents, or unless such action or proceeding has been instituted by Trustee against the Mortgaged Property, Borrower, or Lender.

**36.** **Power of Trustee to Reconvey or Consent.** At any time, without liability and without notice to Borrower, on Lender's written request and presentation of the Note and this Security Instrument to Trustee for endorsement, and without altering or affecting (a) the personal liability of Borrower or any other person for the payment of the Indebtedness secured by this Security Instrument, or (b) the lien of this Security Instrument on the remainder of the Mortgaged Property as security for the repayment of the full amount of the Indebtedness then or later secured by this Security Instrument, (c) or any right or power of Lender or Trustee with respect to the remainder of the Mortgaged Property, Trustee may (i) reconvey or release any part of the Mortgaged Property from the lien of this Security Instrument; (ii) approve the preparation or filing of any map or plat of the Mortgaged Property; (iii) join in the granting of any easement burdening the Mortgaged Property; or (iv) enter into any extension or subordination agreement affecting the Mortgaged Property or the lien of this Security Instrument.

**37.** **Duty to Reconvey.** On Lender's written request reciting that all sums secured hereby have been paid, surrender of the Note and this Security Instrument to Trustee for cancellation and retention by Trustee, and payment by Borrower of any reconveyance fees customarily charged by Trustee, Trustee shall reconvey, without warranty, the Mortgaged Property then held by Trustee under this Security Instrument. The recitals in such reconveyance of any matters of fact shall be conclusive proof of their truthfulness. The grantee in such reconveyance may be described as "the person or persons legally entitled to the Mortgaged Property." Such request and reconveyance shall operate as a reassignment of the Rents assigned to Lender in this Security Instrument.

**38.** **Substitution of Trustee.** Lender, at Lender's option, may from time to time, by written instrument, substitute a successor or successors to any Trustee named in or acting under this Security Instrument, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties in which the Mortgaged Property is located, shall constitute conclusive proof of the proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the predecessor Trustee, succeed to all right, title, estate, powers, and duties of such predecessor Trustee, including, without limitation, the power to reconvey the Mortgaged Property. To be effective, the instrument must contain the names of the original Borrower, Trustee, and Lender under this Security Instrument, the book and page or instrument or document number at which, and the county or counties in which, this Security Instrument is recorded, and the name and address of the substitute Trustee. If any notice of default has been recorded under this Security Instrument, this power of substitution cannot be exercised until all costs, fees, and expenses of the then acting Trustee have been paid. On such payment, the then acting Trustee shall endorse receipt of the payment on the instrument of substitution. The procedure provided in this Section for substitution of Trustees is not exclusive of other provisions for substitution provided by Governmental Requirements.

**39.** **Assignment of Rents.** This assignment of Rents is to be effective to create a present security interest in existing and future Rents of the Mortgaged Property under California Civil Code §2938.

**40.** **Waiver of Right of Offset.** No portion of the Indebtedness secured by this Security Instrument shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender. Borrower hereby waives, to the fullest extent permitted by Governmental Requirements, the benefits of California Code of Civil Procedure section 431.70, which provides:

Deed of Trust

Borrower's Initials. ___

Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this Section shall not exceed the value of the relief granted to the other party. The defense provided by this Section is not available if the cross-demand is barred for failure to assert it in a prior action under Section 426.30. Neither person can be deprived of the benefits of this Section by the assignment or death of the other. For the purposes of this Section, a money judgment is a "demand for money" and, as applied to a money judgment, the demand is barred by the statute of limitations when enforcement of the judgment is barred under Chapter 3 (commencing with Section 683.010) of Division 1 of Title 9.

41.   **California Business & Professions Code § 10238 Notice.** If there are multiple beneficiaries to this Security Instrument, the provisions of California Business & Professions Code Section 10238(i) and California Civil Code Section 2941.9 may control the actions to be taken by the beneficiaries. Section 10238(i) provides "[t]he holders of more than 50 percent of the recorded beneficial interests of the notes or interests may govern the actions to be taken on behalf of all holders in accordance with Section 2941.9 of the Civil Code in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance, or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure."

**[Signatures Follow]**

Deed of Trust

Borrower's Initials: _____

IN WITNESS WHEREOF, Borrower has executed and delivered this Security Instrument as of the date first written above.

**BORROWER:**

**341 SOUTH CANNON LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**

By: _____

      Daniel Halevy, Manager

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of Los Angeles )

On Sept. 21 2023 before me, Jackie Padilla , Notary Public
    Date                                    Here Insert Name of the Officer

Personally Appeared Daniel Halevy
                          Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of CA that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JACKIE PADILLA
Notary Public - California
Los Angeles County
Commission # 2421859
My Comm. Expires Oct 17, 2026

Signature _____
          Signature of Notary Public

Deed of Trust

Borrower's Initials: DH

EXHIBIT "A"
LEGAL PROPERTY DESCRIPTION

Deed of Trust

Borrower's Initials. _____

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.: 2135805
Escrow No.: 2135805

The land referred to herein is situated in the State of California, County of Los Angeles, City of Beverly Hills and described as follows:

Lot 1887 in Tract No. 6380 in the City of Beverly Hills, County of Los Angeles, as per Map recorded in Book 69, Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of Los Angeles County, California.

APN: 4331-005-011

(End of Legal Description)

# Exhibit 10

# Exhibit 10

BOBBY-126

## ASSIGNMENT OF LOAN DOCUMENTS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("***Assignor***"), does hereby sell, transfer and assign to **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited partnership ("***Assignee***"), all of Assignor's right, title and interest in and to the documents, instruments and agreements listed on Exhibit A, attached hereto and incorporated herein by this reference, (collectively, the "***Loan Documents***").  It is the intention of Assignor to transfer and assign to Assignee all of the right, title and interest, benefits and obligations and duties held by Assignor in, to and under the Loan Documents and the loan evidenced thereby.

IN CONNECTION THEREWITH, Assignee hereby accepts the foregoing assignment and hereby assumes all of the duties, obligations and liabilities of Assignor under and with respect to the loan as evidenced by the Loan Documents.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment of Loan Documents to be effective as of the date set forth below.

Date: As of September 30, 2024

**ASSIGNOR:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

**ASSIGNEE:**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
a Delaware limited partnership

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

EXHIBIT A
LOAN DOCUMENTS

1) Assignment of Leases and Rents, dated as of July 21, 2021, made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Broadway*"), as assignor, in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), as assignee, and recorded July 26, 2021, as Document No. 20211142010 in the official records of Los Angeles County, California.

2) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of July 21, 2021, made by Broadway, as borrower, in favor of Lender, as beneficiary, and recorded July 26, 2021, as Document No. 2021142009 in the official records of Los Angeles County, California.

3) Borrower Closing Certificate, dated July 21, 2021, executed by Broadway in favor of Lender.

4) Building Laws Indemnity Agreement, dated July 21, 2021, executed by Broadway in favor of Lender.

5) Continuing Guaranty, dated July 21, 2021, executed by **ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, and **DAVID HALEVY,** an individual ("*Guarantor*"), in favor of Lender.

6) Hazardous Material Indemnity Agreement, dated July 21, 2021, executed by Broadway in favor of Lender.

7) Loan Agreement, dated July 21, 2021, executed by Broadway and Lender.

8) Promissory Note dated July 21, 2021, in the original amount of $16,942,500.00, made by Broadway, and payable to the order of Lender.

9) UCC Financing Statement filed with the California Secretary of State's Office; and

10) All other instruments and agreements executed in connection with any of the foregoing in or under which Lender has any right, title or interest.



**This page is part of your document - DO NOT DISCARD**



## 20240682603



**Pages:**
**0006**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**10/07/24 AT 08:00AM**

| | |
|---|---|
| FEES: | 100.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 325.00 |



**L E A D S H E E T**



202410070210002

00024855318



014929852

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

**ACCOM-PRADA**

*E634519*

BOBBY-130

RECORDING REQUESTED BY AND

WHEN RECORDED MAIL TO:

THOMPSON COBURN LLP
10100 SANTA MONICA BLVD #500
LOS ANGELES, CA 90067
ATTN: JOSHUA MOGIN

APN: 5144-014-030

# ASSIGNMENT OF DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

Thompson Coburn LLP
10100 Santa Monica Blvd., Suite 500
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 282-2520
Email: jmogin@thompsoncoburn.com

*(space above this line for recorder's use only)*

## ASSIGNMENT OF DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING
### and
### ASSIGNMENT OF LOAN DOCUMENTS

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
**Assignor**

**to**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
**Assignee**

| | |
|---|---|
| Dated: | As of September 16, 2024 |
| Address: | 737 S. Broadway |
| | Los Angeles, CA 90014 |

FIDELITY NATIONAL TITLE INSURANCE
COMPANY HAS RECORDED THIS INSTRUMENT
BY REQUEST AS AN ACCOMMODATION ONLY
AND HAS NOT EXAMIINED IT FOR REGULARITY
AND SUFFICIENCY OR AS ITS EFFECT UPON
THE TITLE TO ANY REAL PROPERTY THAT
MAY BE DESCRIBED THEREIN.

**ASSIGNMENT OF DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING and ASSIGNMENT OF LOAN DOCUMENTS**

KNOW THAT, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company, with its principal place of business at 1875 Century Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan (the "*Assignor*"), for good and other valuable consideration, hereby assigns unto the **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company, with its principal place of business at 1875 Century Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan (the "*Assignee*"), without recourse to assignor in any event, the following Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "*Security Instrument*") on the real property described in <u>Schedule A</u> attached hereto:

> Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), in favor of Assignor, in the principal amount of $16,942,500.00, dated July 21, 2021 and recorded on July 26, 2021, in the Official Records of Los Angeles County, California as Instrument # 20211142009.

TOGETHER with the bonds or notes or obligations described in said Security Instrument, and the monies due and to grow due thereon with the interest;

TO HAVE AND TO HOLD the same unto Assignee and to the successors, legal representatives and assigns of Assignee forever.

ADDITIONALLY, Assignor hereby assigns hereby assigns to Assignee, without recourse, all loan documents (collectively, "*Loan Documents*") evidencing that loan made to Borrower on or about July 21, 2021, in the original principal amount of $16,942,500.00 (the "*Loan*").

Assignor represents and warrants to Assignee that it owns the Security Instrument, the Loan Documents and all the indebtedness evidenced and/or secured thereby, that same have not been previously pledged or assigned by it and are owned by it free and clear of liens and encumbrances, that it has the capacity and authority to execute and deliver this assignment and that it has not previously satisfied the Security Instrument or issued a partial release not yet recorded in the public records in respect of the Security Instrument.

IT IS EXPRESSLY UNDERSTOOD AND AGREED that, except as forestated, this Assignment is made without any recourse to, and without any covenant, representation or warranty, express or implied by the Assignor in any event whatsoever.

The word "Assignor" or "Assignee" shall be construed as if it read "Assignors" or "Assignees" whenever the sense of this instrument so requires.

[SIGNATURE PAGE TO FOLLOW]

BOBBY-133

IN WITNESS WHEREOF, the Assignor has delivered this Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Assignment of Loan Documents as of the date hereof.

**Assignor:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _LOS ANGELES_ :

On _SEPTEMBER 18_ , 2024, before me, _ALAN KABAKER_ _____ (a notary public), personally appeared _BOBBY KHORSHIDI aka Babak Khorshidi_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

ALAN KABAKER
COMM. # 2464960
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 28, 2027

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

EXHIBIT B
TO
LOAN AGREEMENT