Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
David B. Zolkin (State Bar No. 155410)
dzolkin@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone: (424) 500-8552

Counsel to Broadway Avenue Investments, LLC

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In re:

SEATON INVESTMENTS, LLC, *et al.*,

     Debtors and Debtors In Possession.

---

☐ Affects All Debtors.

☐ Affects Seaton Investments, LLC

☐ Affects Colyton Investments, LLC

☒ Affects Broadway Avenue Investments, LLC

☐ Affects SLA Investments, LLC

☐ Affects Negev Investments, LLC

☐ Affects Alan Gomperts

☐ Affects Daniel Halevy

☐ Affects Susan Halevy

Lead Case No. 2:24-bk-12079-VZ

Jointly Administered with Case Nos.:
2:24-bk-12080-VZ; 2:24-bk-12081-VZ;
2:24-bk-12082-VZ; 2:24-bk-12091-VZ;
2:24-bk-12074-VZ; 2:24-bk-12075-VZ and
2:24-bk-12076-VZ

Chapter 11

**DECLARATION OF MARCUS NAULIN IN SUPPORT OF MOTION OF DEBTOR AND DEBTOR IN POSSESSION BROADWAY AVENUE INVESTMENTS, LLC FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTION 364**

Hearing:
Date:       December 12, 2024
Time:      11:00 a.m.
Courtroom:  1368
           255 E. Temple Street
           Los Angeles, CA 90012

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

## DECLARATION OF MARCUS NAULIN

I, Marcus Naulin, hereby declare as follows:

1.    I make this declaration in support of the Debtor's *Motion for Order Authorizing Debtor to Obtain Post-Petition Financing* (the "Motion").  Terms not defined herein shall have the same meanings ascribed to them in the Motion.

2.    I am a principal with New Millennia Group ("New Millennia"). New Millennia has agreed to make a $4 million loan to Broadway Avenue Investments, LLC on the material terms set forth in the Loan Agreement attached hereto as Exhibit 1 (the "DIP Loan"). If approved by the Bankruptcy Court, New Millennia is prepared to execute a final form of loan agreement and fund the DIP Loan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 21, 2024, at ___City, State_____.

DocuSigned by:

*Marcus Naulin*

─────────────────────────────
MARCUS NAULIN

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**
*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* Derrick Talerico _____ , declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
   a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
   b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.*, that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR- Explanation why no verification is provided |
|---|---|---|---|
| 1. | Marcus Naulin | 11/21/2024 | ☐ See explanation below. |
| 2. | | | ☐ See explanation below. |
| 3. | | | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:



☐ see attached continuation sheet

*<u>Verification must be oral</u>. For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures. *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/21/2024 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT 1

# Loan Agreement

**EXHIBIT 1 - Page 4**

# LOAN AGREEMENT

**THIS LOAN AGREEMENT,** dated as of November ___, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between New Millennia Group having an address at 2945 Townsgate Road #200, Westlake Village, CA 91361 (together with its successors and assigns, "**Lender**"), and BROADWAY AVENUE INVESTMENTS, LLC a California limited liability company having its principal place of business at 737 Broadway Avenue, Los Angeles, CA 90013 ("**Borrower**").

## W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain a loan in the principal amount of FOUR MILLION DOLLARS ($4,000,000.00) (the "Loan") from Lender, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### ARTICLE I
### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

1.1    <u>Definitions</u>.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent, the terms set forth on <u>Exhibit A</u> shall have the meanings set forth in <u>Exhibit A</u>.

### ARTICLE II
### GENERAL TERMS

2.1    <u>Loan Commitment; Disbursement to Borrower</u>.

(a)    <u>Agreement to Lend and Borrow</u>.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to borrow the Loan.

(b)    <u>Payment of Loan with Interest</u>.  Borrower promises to pay the principal sum of the Loan, or so much thereof as may be disbursed by the Lender, with interest from the date of initial disbursement of all or any part of the principal of the Loan (the "Disbursement Date") on unpaid principal at the Interest Rate.

(c)    <u>Use of Proceeds</u>.  Borrower shall use the proceeds of the Loan as set forth on the Closing Statement.

(d)    <u>No Reborrowing of Amounts Repaid</u>.  Any amount borrowed and repaid in respect of the Loan may not be reborrowed.

(e)    <u>The Note, this Agreement, and Loan Documents</u>.  The Loan shall be evidenced by the Note and this Agreement and secured by the Security Agreement.

1

EXHIBIT 1 - Page 5

(f)    Security Interest. The Loan shall be secured by: (i) the proceeds of any and all grants, subsidies, and other government and NGO incentives that may be applied for in connection with the provision of medical and social services at the Property and (ii) any personal property acquired by Borrower with proceeds of the Loan (the "**Collateral**").

(g)    "***Maturity Date***" shall mean  (Origination date until December 31, 2025.).

(h)    "***Debtor In Possession ("DIP")***" Borrower is the debtor in the following chapter 11 bankruptcy filing: **U.S. Bankruptcy Court Central District of California Los Angeles Division (the "BK Court") Bankruptcy Petition#: 2:24-bk-12081-VZ** *Assigned to:* Vincent P. Zurzolo; *Date filed:* 2024-03-19 (the "BK Case").

(i)    *"**Debtor-In-Possession Financing ("DIP LOAN")***" shall mean the herein referenced Loan as approved by order of  the Bankruptcy Court in the BK Case.


2.2    Interest Rate; Fees.

(a)    Interest Generally.  Interest on the outstanding principal balance of the Loan shall accrue from the Disbursement Date to the Maturity Date at the Interest Rate.  The term "Interest Rate" shall mean a fixed rate of twelve  percent (12%) per annum.

(b)    Interest Reserve. Lender shall retain a 4-month interest reserve from the Loan proceeds to be applied to the first four months of interest payments due on the Note.

(c)    Loan Fees. On the Closing Date Borrower shall pay to Lender a loan fee in the amount of Two Hundred and Forty Thousand ($240,000.00).

(d)    Maximum Interest Rate.  Notwithstanding anything to the contrary contained in this Section 2.2, and except as otherwise provided in Section 2.2(e) below, there shall be no change to the Interest Rate to the extent that such change would result in an increase in the Interest Rate to a rate which is above the maximum rate of interest which Borrower is permitted by Applicable Law to contract or agree to pay (the "Maximum Legal Rate").

(e)    Interest Calculation.  Notwithstanding anything to the contrary contained in this Agreement or the Note (including any references in this Agreement or the Note to amortized payments or the calculation of monthly principal and interest payments over the Amortization Period, interest at the Interest Rate provided for in this Agreement shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days during which the principal balance of the Loan is outstanding.  Borrower acknowledges and agrees that the calculation of interest on such basis may result in the accrual and payment of interest in amounts greater than those which would be payable if interest were calculated on the basis of a three hundred sixty-five (365) day year.  If any payment of interest is not made when due, at the option of the Lender, such interest payment shall bear interest at the same rate as principal from and after the due date of the interest payment.

(f)    Default Rate.  During the existence of an Event of Default, Borrower shall pay interest on the entire unpaid principal sum and any other amounts due under the Loan Documents at the Default Rate.  The Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of a sum of money determined by Lender to be sufficient to cure the Event of Default.  Amounts of interest accrued at the Default Rate shall constitute a portion of the Debt and shall be deemed secured by

2

EXHIBIT 1 - Page 6

the Loan Documents.  This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

(g)    Usury Savings.  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.3    Loan Payment.

(a)    Payments Generally.  If any payment hereunder or under any of the Loan Documents becomes due and payable on a day other than a Business Day, such payment shall be payable on the immediately succeeding Business Day.  All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

(b)    Principal and Interest Payments.

(i)    Initial Interest Payment.  A single installment payment of interest only at the Interest Rate in effect for the First Interest Accrual Period shall be due and payable on the Disbursement Date.  If the Disbursement Date is the first (1st) day of a calendar month, then no interest only installment payment shall be payable under this Section

(ii)    Interest Only Payments.  Commencing on the first Payment Date, and on each Payment Date thereafter through and including the Payment Date occurring on [_____], Borrower shall pay to Lender the interest only at the Interest Rate on the outstanding principal balance of the Loan.

(iii)    Payment on Maturity Date.  The entire unpaid principal balance of the Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

(iv)    Payments made by Borrower under this Agreement shall be made free and clear of, and without reduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (such non-excluded taxes being called "Additional Taxes").  If any Additional Taxes are required to be withheld from any amounts payable to Lender hereunder or under any of the other Loan Documents, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Additional Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.

3

EXHIBIT 1 - Page 7

(v)      As used herein, the term "Monthly Payment Amount" shall mean for any Payment Date the amount of _____ Dollars ($_____).

(c)      <u>Late Payment Charge</u>.  If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower by the date which is five (5) days after the date on which it is due (without regard to any applicable cure and/or notice period), Borrower shall pay to Lender upon demand an amount equal to the lesser of ten percent (10%) of such unpaid sum or the maximum amount permitted by applicable law (the "Late Payment Charge") in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.

(d)      <u>Method and Place of Payment</u>.  Payments shall be paid by Borrower, without set-off or counterclaim, in accordance with Section 2.4 below, by such method and/or to such address as Lender may specify to Borrower from time to time, in federal or other immediately available funds in lawful money of the United States of America, not later than 12:00 noon, California time, on each Payment Date.  If the date for any payments of principal is extended on account of the foregoing or on account of operation of law or otherwise, interest thereon shall be payable at the then applicable rate during such extension.

(e)      <u>Application of Payments</u>.

(i)      Except while an Event of Default exists, all proceeds of any repayment, including prepayments, of the Loan (a "Payment") shall be applied to pay:  (1) first, any costs and expenses of Lender required to be reimbursed under the terms of the Loan Documents; (2) second, to any Late Payment Charges and accrued and unpaid interest payable at the Default Rate; (3) third, accrued and unpaid interest payable at the Interest Rate; (4) fourth, any other amounts then due and owing under the Loan Documents; and (5) fifth, to the outstanding principal amount of the Loan.  After the occurrence and during the continuation of an Event of Default, all proceeds of repayment, including any payment or recovery on the collateral securing the Loan, shall be applied in such order and in such manner as Lender shall elect in Lender's sole and absolute discretion.

(ii)      To the extent that Borrower makes a Payment or Lender receives any Payment or proceeds for Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any Bankruptcy Law, common law or equitable cause, then, to such extent, the obligations of Borrower hereunder intended to be satisfied shall be revived and continue as if such Payment or proceeds had not been received by Lender.

**ARTICLE III**
**REPRESENTATIONS, WARRANTIES OF BORROWER**

For the purpose of inducing Lender to make the Loan and for the protection of the security of the Loan Documents, Borrower makes the representations and warranties as set forth in <u>Section 3.1</u> below.

3.1      <u>Representations and Warranties of Borrower</u>.  Borrower, for itself and its successors and assigns, does hereby represent and warrant to Lender that:

(a)      <u>Organization and Existence</u>.  Borrower is duly organized and validly existing as a limited liability company in good standing under the laws of the state of California and is qualified to do business in all other jurisdictions in which Borrower is transacting business.

EXHIBIT 1 - Page 8

(b)      Authorization.  Subject to approval of the Loan by the BK Court, Borrower has the power and authority to execute, deliver and perform the obligations imposed on it under the Loan Documents and to consummate the transactions contemplated by the Loan Documents and has taken all necessary actions in furtherance thereof including, without limitation, that those partners or members of Borrower whose approval is required by the terms of Borrower's organizational documents have duly approved the transactions contemplated by the Loan Documents and have authorized execution and delivery thereof by the respective signatories.  To the best of Borrower's knowledge, no other consent by any local, state or federal agency is required in connection with the execution and delivery of the Loan Documents. same as above

(c)      Valid Execution and Delivery.  All of the Loan Documents requiring execution by Borrower have been duly and validly executed and delivered by Borrower. same as above

(d)      Enforceability.  All of the Loan Documents constitute valid, legal and binding obligations of Borrower and are fully enforceable against Borrower in accordance with their terms, subject only to Bankruptcy Laws and general principles of equity.

(e)      No Defenses.  This Agreement, the Note, the Security Agreement and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense, nor would the operation of any of the terms of this Agreement, the Note, \the Security Agreement or any of the other Loan Documents, or the exercise of any right thereunder, render this Agreement, the Note, the Security Agreement or any of the other Loan Documents unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury. same as above

(f)      Defense of Usury.  Borrower knows of no facts that would support a claim of usury to defeat or avoid its obligation to repay the principal of, interest on, and other sums or amounts due and payable under, the Loan Documents.

(g)      No Conflict/Violation of Law.  The execution, delivery and performance of the Loan Documents by Borrower will not cause or constitute a default under or conflict with the organizational documents of Borrower, any Guarantor or any Constituent Entity of either of them.  The execution, delivery and performance of the obligations imposed on Borrower under the Loan Documents will not cause Borrower or any Guarantor or any Constituent Entity of either of them to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Borrower or any Guarantor or any Constituent Entity of either of them is a party or by which Borrower or any Guarantor or any Constituent Entity of either of them is bound.

(h)      Compliance with Applicable Laws and Regulations.  To Borrower's knowledge, all of the Improvements and the use of each Property by Borrower comply with all applicable statutes, rules, regulations and private covenants now relating to the ownership, construction, use or operation of the Property, including all applicable health, fire and building codes, and all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use (collectively, "Applicable Laws").  There is no evidence of any illegal activities relating to controlled substances on the Property that Borrower is aware of.  To Borrower's knowledge, all certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property for the use currently being made thereof have been obtained and are in full force and effect. To Borrower's knowledge, all of the Improvements comply with all requirements of any applicable zoning and subdivision laws and ordinances.

5

EXHIBIT 1 - Page 9

(i)    Consents Obtained.  Subject to approval of the Loan by the BK Court, all consents, approvals, authorizations, orders or filings with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Borrower have been obtained or made.

(j)    No Litigation.  There are no pending actions, suits or proceedings, arbitrations or governmental investigations against the Property, Borrower, any Guarantor or any Constituent Entity of Borrower or any Guarantor, whether pursuant to the Loan Documents or otherwise, an adverse outcome of which would materially affect Borrower's performance under this Agreement, the Note, or any of the other Loan Documents.

(k)    DIP Loan.  Pursuant to an order to be entered by the BK Court and the filing of UCC-1 financing statements or amendments thereto (as authorized to be filed by the BK Court but not required), the Lender shall have a priority lien in all personal property encumbered at the Property acquired with proceeds from the Loan. In addition, Lender has a priority lien all sums received by Borrower or its managers or affiliates from any and all federal, state, county or city agency including but not limited  to Los Angeles Housing Department, Los Angeles County Development Authority, Los Angeles Homeless Authority, or U.S. Department of Housing and Urban Development, all collectively "Governmental Agencies" in reimbursement of fees, costs and out of pocket expenses related to the improvements or use of the Property.

(l)    ERISA.  Borrower has made and shall continue to make all required contributions to all employee benefit plans and multi-employer plans, if any, and Borrower has no knowledge of any material liability which has been incurred by Borrower which remains unsatisfied for any taxes or penalties with respect to any employee benefit plan or any multi-employer plan, and each such plan has been administered in compliance with its terms and the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and any other federal or state law and shall continue to be qualified and tax-exempt to the greatest extent permitted thereunder.  Other than with respect to any such plans, Borrower is not an entity subject to regulation or restriction under ERISA, and no assets of Borrower are "plan assets" (as defined in ERISA).

(m)    Financial Statements; No Contingent Liabilities.  The financial statements of Borrower (or any predecessor-in-interest to Borrower as owner of a Property, if applicable, that is an Affiliate of Borrower), of any Affiliate of Borrower, and of Guarantor that were furnished to Lender (whether in connection with Lender's consideration to make the Loan, pursuant to the Loan Documents, or otherwise) are (in each case) complete and correct and fairly present the financial condition of the subject thereof (including, without limitation, assets, liabilities and liquidity) as at the date set forth thereon, and the results of operations of such Person for the periods covered by such statements (if applicable).  No material adverse change in the financial condition of any such Person has occurred since the respective dates of the most recent financial statements that were furnished to Lender (whether in connection with Lender's consideration to make the Loan, pursuant to the Loan Documents, or otherwise) relating to such Persons.  Neither Borrower nor any Guarantor has any known material contingent liabilities, except for contingent liabilities of any Guarantor explicitly set forth on the financial statements of such Guarantor that were delivered to Lender in connection with the Loan.

(n)    Fraudulent Conveyance.  Borrower (i) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (ii) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become

6

EXHIBIT 1 - Page 10

absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

(o)    Investment Company Act. Neither Borrower nor any Guarantor is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(p)    Access/Utilities. The Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. All public utilities necessary to the continued use and enjoyment of each Property as presently used and enjoyed are located in the public right-of-way abutting the Property, or enter the Property via permanent easements not subject to termination except with the consent of Borrower, and all such utilities are connected so as to serve each Property without passing over other property. All roads, and access to such roads, necessary for the full utilization of each Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Property without any further condition or cost to Borrower.

(q)    Taxes Paid. Borrower has filed all federal, state, county and municipal tax returns required to have been filed by Borrower, and has paid, or will pay per the terms of a plan confirmed by the BK Court, all taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessment with respect to such taxes. Further, each Property is free from delinquent Taxes and Other Charges.

(r)    Special Assessments. Except as disclosed in a Title Insurance Policy, there are no pending or, to the knowledge of Borrower, proposed special or other assessments for public improvements or otherwise affecting any Property, nor, to the knowledge of Borrower, are there any contemplated improvements to the Property that may result in such special or other assessments.

(s)    Misstatements of Fact. No certification, representation or statement of fact made in the Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower, any Guarantor or any Constituent Entity of Borrower or any Guarantor which has not been disclosed which adversely affects, or in the judgment of a reasonable person might adversely affect, the business, operations or condition (financial or otherwise) of the representing party. Further, and in clarification of the foregoing, all reports, certificates, affidavits, representations, statements and other data furnished by or on behalf of Borrower, Guarantor and each Constituent Entity of each of them to Lender, or their respective agents, in connection with the Loan are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein misleading.

(t)    No Insolvency or Judgment. Other than the BK Case, neither Borrower, nor any Guarantor, nor any Constituent Entity of Borrower or any Guarantor, (i) has been or is currently the subject of or a party to any completed or pending bankruptcy, reorganization or insolvency proceeding; or (ii) is currently the subject of any judgment unsatisfied of record or docketed in any court of the state in which each Property is located or in any other court located in the United States. The proposed Loan will not render Borrower or any general partner or member of Borrower insolvent. As used in this Agreement, the term "insolvent" means that the sum total of all of a Person's liabilities (whether secured or unsecured, contingent or fixed,

EXHIBIT 1 - Page 11

or liquidated or unliquidated) is in excess of the value of all such Person's non-exempt assets, i.e., all of the assets of the Person that are available to satisfy claims of creditors.

(u)      No Purchase Options.  No tenant, party, firm, corporation or other Person has an option, right of first offer, or right of first refusal, to purchase any Property, any portion thereof or any interest therein.

(v)      Leases. There are no leases on the Property other than the lease for which Borrower will seek approval from the BK Court.

(w)      No Broker.  No financial advisors, brokers, underwriters, placement agents, agents or finders have been dealt with by Borrower in connection with the Loan, except for any broker whose full commission was paid out of the proceeds of the Loan and is set forth in the Closing Statement.

(x)      Conviction of Criminal Acts.  Each of Borrower, any Guarantor, and any Constituent Entity of Borrower or any Guarantor, has never been convicted of a crime (which shall not include traffic violations) and is not currently the subject of any pending or threatened criminal investigation or proceeding.  Borrower has disclosed to Lender in writing any civil action (whether or not such action resulted in a judgment) and regulatory or enforcement proceeding to which Borrower and any Guarantor was a defendant or respondent in which it was alleged that Borrower or such Guarantor engaged in fraud, deception or misrepresentation, or with respect to which Borrower or any Guarantor was ordered or agreed not to engage in the banking or securities industry.

(y)      Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws.  None of Borrower, Guarantor, any "Controlling" Entity (which for the purposes of this subsection (gg) has the meanings assigned to such terms in Rule 405 under the Securities Act of 1933, as amended), or any Person who owns any direct equity interest in or controls any of the foregoing, is or has previously been (i) identified on the OFAC List or otherwise qualified as a Prohibited Person, or (ii) in violation of any applicable laws relating to anti-money laundering or anti-terrorism, including, without limitation, any applicable laws related to transacting business with Prohibited Persons or the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56, and the related regulations issued thereunder, including temporary regulations, all as amended from time to time, or (iii) in violation of other requirements of Governmental Authority (including, without limitation, requirements applicable to Lender of which Borrower has notice) with respect to anti-money laundering, "know your customer" regulations, and similar matters.  Borrower will implement (and maintain in effect until satisfaction of the Loan) procedures, approved by Borrower's Controlling Entity, to ensure that no Equity Holder (and no Person who, after the date hereof, becomes an Equity Holder) causes the foregoing representations not to be true, correct and complete.

(z)      Personal Property.  Borrower (or its affiliate, as applicable)  is the owner, free and clear of all liens and encumbrances, of all personal property owned by Borrower that is used in, and is reasonably necessary to, the operation of the Property.

<div style="text-align:center">

**ARTICLE IV**
COVENANTS OF BORROWER

</div>

For the purpose of inducing Lender to make the Loan and for the protection of the security of the Loan Documents, for so long as the Debt or any part thereof remains unpaid, Borrower covenants and agrees as set forth as follows:

4.1      Compliance with Applicable Laws and Regulations.  All of the Improvements and the use of each Property by Borrower shall remain in compliance with all applicable statutes, rules, regulations and private

<div style="text-align:center">8</div>

EXHIBIT 1 - Page 12

covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including all Applicable Laws.

4.2    <u>Defense of Title</u>.  If the title to any Property or the interest of Lender therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached directly or indirectly, or endangered, clouded or adversely affected in any manner, Borrower, at Borrower's expense, shall take all necessary and proper steps for the defense of said title or interest, including the employment of counsel approved by Lender (it being agreed that Lender shall not unreasonably withhold its consent to counsel appointed pursuant to the Title Insurance Policy for such purposes), the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest.  Notwithstanding the foregoing, in the event that Lender determines that Borrower is not adequately performing its obligations under this Section 4.2, Lender may, without limiting or waiving any other rights or remedies of Lender hereunder, take such steps with respect thereto as Lender shall deem necessary or proper; any and all costs and expenses incurred by Lender in connection therewith, together with interest thereon at the Default Rate, shall be immediately paid by Borrower on demand.

4.3    <u>Performance of Obligations</u>.  Borrower shall pay when due the principal of and the interest on and other amounts evidenced by the Note.  Borrower shall also pay and perform all of the Debt as and when due.

4.4    <u>Insurance</u>.  Borrower shall, at Borrower's expense, maintain in force and effect on each Property at all times the following insurance policies (the "Policies"):

(a)    During the period of any construction or repair on any Property, or renovation or alteration of the Improvements, (i) workmen's compensation insurance (including employer's liability insurance, if requested by Lender) for all employees of Borrower engaged on or with respect to any Property, in such amounts as is reasonably satisfactory to Lender, or if such limits are established by law, in the amounts so established; and (ii) builder's "complete value" insurance against "all risks of physical loss," including collapse and transit coverage, in nonreporting form, covering the total value of work performed and equipment, supplies and materials furnished, containing the "permission to occupy upon completion of work or occupancy" endorsement, and covering Lender's interest in each Property, as it may appear. If the Loan is for construction of any Improvements, then (x) the Policy described in clause (a) above must be a course of construction or builders' all risk policy of insurance, including coverage for all building materials and supplies at the jobsite; (y) prior to the date hereof, Borrower shall provide the Lender with evidence that Borrower's general contractor, if any, has obtained commercial general liability insurance for bodily injury and property damage for an amount, in a form, and from an insurer acceptable to the Lender, naming both the Lender and Borrower as additional insureds.

(b)    The Policy shall include loss of rents coverage in an amount equal to at least twelve (12) months gross rental income from each Property, including operating expenses that are payable or reimbursable by tenants occupying space in the Improvements, together with an extended period of indemnity of not less than 180 days, and covers the actual loss sustained during restoration.  If Borrower is an occupant of the Improvements, Borrower shall maintain business interruption insurance in an amount satisfactory to the Lender.

(c)    Such other insurance, in such form and such amounts, may from time to time be required by Lender against similar or other hazards.

(d)    Each Policy shall (i) be fully prepaid, (ii) be issued by an insurer which has an A.M. Best's Key Rating of A/V or better in the latest edition of "Best's Insurance Guide" must be licensed to do business in the state in which the respective Property is located, and that is licensed to transact the lines of insurance

9

EXHIBIT 1 - Page 13

required in this transaction, (iii) be in an amount acceptable to Lender, (iv) contain an endorsement or agreement by the insurer that (A) any loss shall be payable in accordance with the terms of such policy, notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance, and (B) waiving all rights of setoff, counterclaim or deductions against Borrower; (v) have attached thereto a lender's loss payable endorsement for the benefit of Lender, in a form satisfactory to Lender, (vi) be for a term of not less than one (1) year from the Closing Date, (vii) provide that no assessment may be made against the Lender or its assigns, (viii) contain a provision stating that it will not be canceled or materially amended (which term shall include any reduction in the scope or limits of coverage) without at least thirty (30) days prior written notice to Lender.

(e)     Upon request of Lender, Borrower shall furnish Lender with an original or copy of each Policy, and Borrower, within at least thirty (30) days prior to the expiration of the Policies then in effect, shall furnish Lender with evidence satisfactory to Lender of the payment of premium and the reissuance of a Policy continuing insurance in force as required by this Agreement.

(f)     If Lender consents to Borrower providing any of the required insurance through blanket policies carried by Borrower and covering more than one location, Borrower shall furnish Lender with a certificate of insurance for each such Policy, setting forth the same information as is required above for Policies obtained solely for the Property and a schedule of coverage for the Improvements must be shown in the Policy.

(g)     If Borrower fails to provide, maintain, keep in force or deliver and furnish to Lender the policies of insurance required by this paragraph, Lender may procure such insurance (or single-interest insurance for such risks, covering Lender's interest), and Borrower will pay all premiums therefor promptly upon demand by Lender, and until such payment is made by Borrower, the amount of all such premiums so paid by Lender, together with interest thereon at the interest rate stated in the Note. In this case, both the insurer and reinsurer must execute an assumption of liability agreement or a similar endorsement providing for 100% reinsurance of the insurer's policy and requiring the reinsurer to give the Borrower, the Lender and the insurer ninety (90) days written notice before canceling or otherwise terminating the reinsurance. Insurance coverage must be maintained on a continuous basis for the entire term of the Loan.

(h)     All Policies, endorsements, invoices, and correspondence must refer to the Lender's Loan number. The Loan number is to be ascertained by insurers and their agents through communication with the Borrower.

(i)     All mid-term substitution policies must be accompanied by a signed paid receipt, a $25.00 substitution fee, and Borrower's signed authorization (when changing agents) in addition to meeting all criteria contained herein.

(j)     Unless required by applicable law, Lender shall not accept a binder.

(k)     The Lender requires a renewal policy or proof of continued coverage in advance of the annual renewal date.  If not received within fifteen (15) days prior to renewal date, the Lender reserves the right to force-place coverage in accordance with the Loan Documents.

4.5     Payment of Taxes.  (a) Except to the extent funds are held in the Escrow Fund therefor pursuant to Section 4.6 of this Agreement when the same become due and payable, Borrower shall pay or cause to be paid all taxes, assessments, water rents, sewer rents, governmental impositions and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against, or which are or may become a lien upon, each Property ("Taxes"), and all ground rents, maintenance charges and similar charges, now or

10

EXHIBIT 1 - Page 14

hereafter levied or assessed or imposed against each Property or any part thereof (the "Other Charges"), and (b) Borrower shall furnish Lender with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such Taxes and Other Charges at least fifteen (15) days prior to the applicable delinquency date therefor.  Notwithstanding the foregoing, Borrower may in good faith, by appropriate proceedings and upon notice to Lender, contest the validity, applicability or amount of any asserted Taxes or Other Charges so long as (x) such contest is diligently pursued, (y) Lender determines, in its subjective opinion, that such contest suspends the obligation to pay the Taxes or Other Charges and that nonpayment of such Taxes or Other Charges will not result in the sale, loss, forfeiture or diminution of a Property or any part thereof or any interest of Lender therein, and (z) prior to the earlier of the commencement of such contest or the delinquency date of the asserted Taxes or Other Charges, Borrower deposits in the Escrow Fund an amount determined by Lender to be adequate to cover the payment of such Taxes or Other Charges and a reasonable additional sum to cover possible interest, costs and penalties;  provided, however, that Borrower shall promptly cause to be paid any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided, further, that in any event each such contest shall be concluded, the Taxes or Other Charges, as the case may be, together with any applicable interest, costs and penalties, shall be paid prior to the date any writ or order is issued under which a Property may be sold, lost or forfeited.

4.6     Access Privileges and Inspections.  Lender and the agents, representatives and employees of Lender shall, subject to the rights of Tenants, have full and free access to the Property and the Improvements and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Borrower relating to the Property.   Borrower shall lend assistance to all such agents, representatives and employees of Lender.

4.7     Waste; Alteration of Improvements.  Borrower shall not commit, suffer or permit any waste on the Property nor take any actions that might invalidate any insurance carried on the Property.  Borrower shall maintain the Property in good condition and repair.  No part of the Improvements may be removed, demolished or materially altered, in each case, without the prior written consent of Lender, except as required pursuant to Applicable Laws or to cause the Property not to be in violation of any Lease approved or deemed approved pursuant to Section 4.10.  Without the prior written consent of Lender in each case, Borrower shall not commence construction of any improvements on the Property other than the improvements required for the maintenance or repair of the Property.

4.8     Zoning.  Without the prior written consent of Lender in each case, Borrower shall not (a) change the use of the Property or (b) seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Property or the Improvements.  If, under applicable zoning provisions, the use of all or any part of the Property or the Improvements is or becomes a nonconforming use, Borrower shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Lender.  Without Lender's prior written consent, Borrower shall not file or subject any part of the Property or the Improvements to any declaration of condominium or co-operative or convert any part of the Property or the Improvements to a condominium, co-operative or other form of multiple ownership and governance.

4.9     Financial Statements; Books and Records; Informational Reporting.  Borrower shall keep accurate books and records of account of the Property and its own financial affairs sufficient to permit the preparation of financial statements therefrom in accordance with generally accepted accounting principles.  Lender and its duly authorized representatives shall have the right to examine, copy and audit Borrower's records and books of account at all reasonable times.  So long as all or any portion of the Loan is outstanding, Borrower shall provide to Lender, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the following financial statements and information, all of which must be certified

11

EXHIBIT 1 - Page 15

to Lender as being true and correct by Borrower or the Person to which they pertain, as applicable, be prepared in accordance with generally accepted accounting principles consistently applied and be in form and substance acceptable to Lender:

(a)    at Lender's request, quarterly operating statements for the Property, within thirty (30) days after the end of each calendar quarter;

(b)    at Lender's request, an annual certified rent roll signed and dated by Borrower detailing the names of all tenants of the Improvements, the portion of the Improvements occupied by each tenant, the rent and any other charges payable under each lease, and the term of each lease;

(c)    at Lender's request, annual financial statements for Borrower (setting forth Borrower's balance sheet, and operating statements and an annual balance sheet for the Property) and [each] Guarantor, certified by Borrower or Guarantor, as applicable, within ninety (90) days after the end of each calendar year;

(d)    at Lender's request, copies of all tax returns filed by Borrower and [each] Guarantor, within thirty (30) days after the date of filing; and

(e)    such other information with respect to the Property, Borrower, the principals in Borrower and [each] Guarantor which may reasonably be requested from time to time by Lender, within a reasonable time after the applicable request.

4.10    <u>Further Documentation</u>.  Borrower shall, on the request of Lender and at the expense of Borrower, promptly:  (a) correct any defect, error or omission which may be discovered in the contents of this Agreement or in the contents of any of the other Loan Documents; (b) execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further security deeds, security agreements, financing statements) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement and the other Loan Documents and to subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby, including specifically, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to the Property; (c) execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed advisable by Lender to protect, continue or perfect the liens or the security interests hereunder against the rights or interests of third Persons; and (d) furnish to Lender, upon Lender's request, a duly acknowledged written statement and estoppel certificate addressed to such party or parties as directed by Lender and in form and substance supplied by Lender, setting forth all amounts due under the Note, stating whether any Event of Default exists, stating whether any offsets or defenses exist against the Debt, affirming that the Loan Documents are legal, valid and binding obligations of Borrower, and containing such other matters as Lender may reasonably require.

4.11    <u>Security Interest and Security Agreement</u>.  Borrower acknowledges and agrees that this Loan Agreement is a security agreement under the Uniform Commercial Code for the Collateral.

4.12    <u>Compliance with Laws</u>.  Borrower shall at all times comply with all Applicable Laws, even if such compliance shall require structural changes to the Property.  Borrower may, upon providing Lender with security satisfactory to Lender, proceed diligently and in good faith to contest the validity or applicability of any Applicable Law so long as the Property shall not be subject to any lien, charge, fine or other liability, and shall not be in danger of being forfeited, lost or closed, during or as a result of such contest.  Borrower shall not alter the Property in any manner that would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior approval of Lender.  Borrower shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any Lease or any Applicable

12

EXHIBIT 1 - Page 16

Law or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Borrower shall, from time to time, upon Lender's request, provide Lender with evidence that it is reasonably satisfactory to Lender that the Property complies with all Applicable Laws.

4.13    Borrower's Waivers.

(a)    Except as may be specifically provided in the Loan Documents, Borrower waives presentment and demand for payment, notice of intent to accelerate maturity, notice of acceleration of maturity, protest and notice of protest and non-payment, all applicable exemption rights, valuation and appraisement, notice of demand, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of the Note and this Agreement and the bringing of suit and diligence in taking any action to collect any sums owing under the Note or hereunder or in proceeding against any of the rights and collateral securing payment hereof. Borrower agrees (i) that the time for any payments under the Note or hereunder may be extended from time to time without notice and consent, (ii) to the acceptance by Lender of further collateral, (iii) the release by Lender of any existing collateral for the payment of the Note or the payments due under this Agreement or any of the other Loan Documents, (iv) to any and all renewals, waivers or modifications that may be granted by Lender with respect to the payment or other provisions of the Note, this Agreement or any of the other Loan Documents, and/or (v) that additional Persons may become parties hereto or the other Loan Documents all without notice to Borrower and without in any manner affecting Borrower's obligations or liabilities under or with respect to the Note, this Agreement or any of the other Loan Documents. No extension of time for the payment of the Note or the payments due under this Agreement or any of the other Loan Documents or any installment thereof or hereof shall affect the obligations or liabilities of Borrower under the Note, this Agreement or any of the other Loan Documents even if Borrower is not a party to such agreement.

(b)    Failure of Lender to exercise any of the options or remedies granted herein to Lender upon the happening of one or more of the events giving rise to such options or remedies shall not constitute a waiver of the right to exercise the same or any other option or remedy at any subsequent time in respect to the same or any other event. The acceptance by Lender of any payment hereunder or under any of the other Loan Documents that is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the options or remedies granted herein or under any of the other Loan Documents to Lender at that time or at any subsequent time or nullify any prior exercise of any such option or remedy without the express written acknowledgment of the Lender.

4.14    Management.

(a)    The management of the Property shall be performed by either (i) Borrower or an Affiliate approved by Lender for so long as Borrower or said Affiliate is managing the Property in a first class manner; or (ii) a professional property management company approved by Lender, and in either case pursuant to the Property Management Agreement approved by Lender. In no event shall any Property Manager be removed, replaced or retained, or any Property Management Agreement entered into, modified or amended, in each case without the prior written consent of Lender, which shall not unreasonably be withheld. After a default by the manager under any Property Management Agreement then in effect, which default is not cured within any applicable grace or cure period, or during the continuance of any Event of Default, Lender shall have the right to terminate, or to direct Borrower to terminate, such Property Management Agreement upon thirty (30) days' notice and to retain, or to direct Borrower to retain, a new Property Manager approved by Lender. It shall be a condition of Lender's consent to any Property Management Agreement, whether with an Affiliate or an unrelated party, that such manager enter into an agreement with Lender whereby the manager acknowledges and agrees to the aforesaid rights of Lender, and as to such other matters as Lender may require.

13

EXHIBIT 1 - Page 17

(b)      Without limiting the restrictions set forth in Section 4.24(a) pertaining to the Property Management Agreement, Borrower may not terminate any other Contract that is material to the operation of the Property, or enter into any amendment thereto that makes the terms thereof less favorable to Borrower, in each case without the prior written consent of Lender, which shall not unreasonably be withheld; provided, however, that if the other party to such Contract is in default thereunder, and Borrower can replace the goods or services provided on terms not materially disadvantageous to Borrower, then the prior written consent of Lender shall not be required to terminate such Contract.  Borrower shall perform its obligations under each Contract and each of the General Intangibles, except where Borrower's failure to do so would not have a material adverse effect on Borrower or the Property.  Borrower represents that its interest under each Contract, and each General Intangible, is not subject to any claim, setoff, lien, deduction or encumbrance of any nature, other than that created by the Loan Documents.  At any time during the continuance of an Event of Default, Lender may (but shall not be obligated) take such action as Lender may determine to be reasonably necessary to protect the rights of Borrower under any or all of the Contracts and/or the General Intangibles.  Should Lender, or Lender's designee, acquire the Property (whether pursuant to exercise of Lender's remedies hereunder or by transfer in lieu thereof), Lender may elect to assume Borrower's interests under any or all of the Contracts or General Intangibles as Lender shall determine, and Borrower shall cause to be terminated, without obligation to Lender or the successor owner of the Property, such other Contracts and/or General Intangibles as Lender may direct.

4.15    Indemnification; Subrogation.

(a)      Borrower shall indemnify, defend and hold Lender harmless against:  (i) any and all claims for brokerage, leasing, finders or similar fees which may be made relating to the Property or the Debt, and (ii) any and all liability, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses (including Lender's reasonable attorneys' fees, together with reasonable appellate counsel fees, if any) of whatever kind or nature which may be asserted against, imposed on or incurred by Lender in connection with the Debt, this Agreement, the other Loan Documents, the Property, or any part thereof, or the exercise by Lender of any rights or remedies granted to it under this Agreement; provided, however, that nothing herein shall be construed to obligate Borrower to indemnify, defend and hold harmless Lender from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses enacted against, imposed on or incurred by Lender by reason of Lender's willful misconduct or gross negligence.

(b)      If Lender is made a party defendant to any litigation or any claim is threatened or brought against Lender concerning the Debt, this Agreement, the other Loan Documents, the Property, or any part thereof, or any interest therein, or the construction, maintenance, operation or occupancy or use thereof, then Borrower shall indemnify, defend and hold Lender harmless from and against all liability by reason of said litigation or claims, including reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses incurred by Lender in any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment.  If Lender commences an action against Borrower to enforce any of the terms of the Loan Documents or to prosecute any Event of Default, or to recover any of the Debt, Borrower shall pay to Lender its reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses.  The right to such attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses shall be deemed to have accrued on the commencement of such action and shall be enforceable whether or not such action is prosecuted to judgment.  If Borrower breaches any term of this Agreement, Lender may engage the services of an attorney or attorneys to protect its rights hereunder, and in the event of such engagement following any breach by Borrower, Borrower shall pay Lender reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses incurred by Lender, whether or not an action is actually commenced against Borrower by reason of such breach.  All references to "attorneys" in this Section 4.26 and elsewhere in this Agreement shall include without limitation any attorney or law firm engaged by Lender and Lender's in-house counsel, and all references to "fees and

14

EXHIBIT 1 - Page 18

expenses" in this <u>Section 4.26</u> and elsewhere in this Agreement shall include without limitation any fees of such attorney or law firm and any allocation charges and allocation costs of Lender's in-house counsel. The rights of Lender under this section shall inure to the benefit of all current and future holders of all or any portion of the Loan from time to time, and shall continue to inure to the benefit of any such holder even after any such holder transfers its interest in the Loan (it being acknowledged, for purposes of clarification, that in connection with any transfer of a holder's interest in the Loan, that such rights shall continue to inure to the benefit of both the transferor and transferee of such interest in the Loan).

(c)     A waiver of subrogation shall be obtained by Borrower from its insurance carrier and, consequently, Borrower waives any and all right to claim or recover against Lender, its officers, employees, agents and representatives, for loss of or damage to Borrower, the Property, Borrower's property or the property of others under Borrower's control from any cause insured against or required to be insured against by the provisions of this Agreement.

4.16     <u>Single-Purpose Entity Covenants</u>.  Borrower hereby represents, warrants and covenants, as of the date hereof and until such time as the Debt is paid in full, that without, in each case, the prior written consent of Lender (which may be withheld or conditioned by Lender in its sole and absolute discretion for any reason or for no reason):

(a)      the sole purpose of Borrower has been, is and will be, to acquire, own, hold, maintain, and operate the Property, together with such other activities as may be necessary or advisable in connection with the ownership and operation of the Property.  Borrower has not engaged, and does not and shall not engage, in any business, and it has and shall have no purpose, unrelated to the Property.  Borrower has not owned, does not own and shall not acquire, any real property or own assets other than those related to the Property and/or otherwise in furtherance of the limited purposes of Borrower.

(b)     Borrower shall not:

(i)     make any loans to any Affiliate, any Equity Holder or any Affiliate of any Equity Holder;

(ii)     except as expressly permitted by Lender in writing (including, without limitation, as contemplated by <u>Section 4.11</u> of this Agreement), sell, encumber (except with respect to Lender) or otherwise transfer or dispose of all or substantially all of its properties (a sale or disposition will be deemed to be "all or substantially all of its properties" if the sale or disposition includes the Property or if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is sixty six and two thirds percent (66-2/3%) or more in value of its total assets as of the end of the most recently completed fiscal year);

(iii)     to the fullest extent permitted by law, dissolve, wind-up, or liquidate, or merge or consolidate with, or acquire all or substantially all of the assets of, any other person or entity (whether or not an Affiliate);

(iv)     change the nature of the business conducted by it;

(v)     perform, nor shall any Controlling Entity of Borrower have the authority to cause Borrower to perform, any act in respect of Borrower in violation of any (a) applicable laws or regulations or (b) any agreement between Borrower and Lender (including, without limitation, this Agreement and the other Loan Documents); or

(vi)     except as permitted by Lender in writing, amend, modify or otherwise change its Organizational Documents.

<div align="center">15</div>

EXHIBIT 1 - Page 19

(c)        Without the prior written affirmative vote of one hundred percent (100%) of the members, partners or stockholders of Borrower, Borrower shall not undertake a Bankruptcy Action.

(d)        The provisions of this Section 4.27(f) shall apply at all times when Borrower is a limited liability company or a partnership.  A Bankruptcy Action by or against any partner or member of Borrower, as applicable, shall not cause such partner or member of Borrower, as applicable, to cease to be a partner or member of Borrower and upon the occurrence of a Bankruptcy Action, Borrower shall continue without dissolution.  Additionally, to the fullest extent permitted by law, if any partner or member of Borrower, as applicable, ceases to be a partner or member of Borrower, as applicable, such event shall not terminate Borrower and Borrower shall continue without dissolution.

(e)        Borrower shall at all times observe the applicable legal requirements for the recognition of Borrower as a legal entity separate from any Equity Holder or Affiliates of Borrower or of any Equity Holder, including, without limitation, as follows:

(i)        It shall either (A) maintain its principal executive office and telephone and facsimile numbers separate from that of any Affiliate or of any Equity Holder and shall conspicuously identify such office and numbers as its own, or (B) shall allocate by written agreement fairly and reasonably any rent, overhead and expenses for shared office space.  Additionally, it shall use its own separate stationery, invoices and checks which reflect its name, address, telephone number and facsimile number.

(ii)        It shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate or any Equity Holder or any other person or entity. It shall prepare unaudited quarterly and annual financial statements, and its financial statements shall substantially comply with generally accepted accounting principles.

(iii)        It shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

(iv)        It shall file or cause to be filed its own separate tax returns, if required to file tax returns.

(v)        It shall hold itself out to the public (including any of its Affiliates' creditors) under its own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate or any Equity Holder.

(vi)        It shall observe all customary formalities regarding its existence, including holding meetings and maintaining current and accurate entity record books separate from those of any Affiliate or any Equity Holder.

(vii)        It shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents.  No Affiliate or Equity Holder shall be appointed or act as its agent (except that, with respect to Borrower, an Affiliate or Equity Holder may serve as Property Manager with respect to the Property if in accordance with Section 4.24 hereof).

(viii)        Investments shall be made in its name directly by it or on its behalf by brokers engaged and paid by it.

(ix)        Except as required by Lender, it shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Equity Holder or any Affiliate, nor shall it make any loan, except as permitted in the Loan Documents.

16

EXHIBIT 1 - Page 20

(x)     Its assets shall be separately identified, maintained and segregated.  Its assets shall at all times be held by or on behalf of it and, if held on its behalf by another entity, shall at all times be kept identifiable (in accordance with customary usages) as its assets owned by it.  This restriction requires, among other things, that (A) funds shall be deposited or invested in its name, (B) funds shall not be commingled with the funds of any Affiliate or any Equity Holder, (C) it shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate or any Equity Holder, and (D) its funds shall be used only for its business.

(xi)    It shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any Equity Holder.

(xii)   It shall pay or cause it to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets.

(xiii)  It shall at all times be adequately capitalized to engage in the transactions contemplated at its formation and will not make any distribution or dividend if doing so would cause it not to be adequately capitalized.

(xiv)   It shall not do any act which would make it impossible to carry on its ordinary business.

(xv)    All data and records (including computer records) used by it or any Affiliate in the collection and administration of any loan shall reflect its ownership interest therein.

(xvi)   None of its funds shall be invested in securities issued by, nor shall it acquire the indebtedness or obligation of, any Affiliate or any Equity Holder.

(xvii)  It shall maintain an arm's length relationship with each of its Affiliates and Equity Holders, and may enter into contracts or transact business with its Affiliates or Equity Holders only on commercially reasonable terms that are no less favorable to it than is obtainable in the market from a person or entity that is not an Affiliate or Equity Holder.

(xviii) It shall correct any misunderstanding that is known to it regarding its name or separate identity.

(f)     Any indemnification obligation of Borrower to any Equity Holder shall (i) be fully subordinated to the Loan, and (ii) not constitute a claim against Borrower or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

(g)     Borrower shall cause the Organizational Documents of Borrower to include, at all times, substantially all of the requirements of this Section 4.27, in a manner satisfactory to Lender.

4.17   Contracts.  Borrower will comply with all of its obligations under all Contracts which are material to the operation of the Property in accordance with Borrower's current practice, and with all material obligations under all other Contracts.

## ARTICLE V
EVENTS OF DEFAULT

5.1   Events of Default.  The occurrence of any of the following shall be an "Event of Default" hereunder:

(a)     Borrower fails to punctually pay when due any money to Lender (including, without limitation, the failure of Borrower to repay the entire outstanding principal balance of the Note in full on the Maturity

EXHIBIT 1 - Page 21

Date), and (i) in the case of any monthly payment due under the Note or this Agreement or any payment to any Reserve required under this Agreement, such failure continues beyond the applicable ten (10) day grace period set forth in the Note or this Agreement with respect to such monthly payment, (ii) in the case of the outstanding principal balance of the Note due on the Maturity Date, same is not repaid in full on the Maturity Date, (iii) in the case of any other amount due from Borrower to Lender, such failure continues for the applicable period set forth therein or, if no period is set forth, for five (5) days after such payment becomes due or, if due on demand, is demanded.

(b)    Borrower (i) fails to provide insurance as required by Section 4.4 hereof or (ii) fails to perform any covenant, agreement, obligation, term or condition set forth in Section 4.5 hereof, and the continuance of such failure or default for ten (10) days after written notice thereof from Lender to Borrower.

(c)    Borrower fails to perform any other covenant, agreement, obligation, term or condition set forth herein other than those otherwise described in this Section 5.1 and, to the extent such failure or default is susceptible of being cured, the continuance of such failure or default for thirty (30) days after written notice thereof from Lender to Borrower;  provided, however, that if such default is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Borrower commences to cure such default promptly after receipt of notice thereof from Lender (but in any event within thirty (30) days of such notice), and thereafter continuously and diligently prosecutes the curing of such default, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence.

(d)    Any representation or warranty made herein, in or in connection with any loan commitment issued by Lender relating to the Loan, or in any of the other Loan Documents to Lender, by Borrower, by any Guarantor or by any Constituent Entity of Borrower or any Guarantor, is determined by Lender to have been false or misleading in any material respect at the time made.

(e)    A default occurs under any of the other Loan Documents which has not been cured within any applicable grace or cure period therein provided.

(f)    The Property or any part thereof shall be taken on execution or other process of law (other than by eminent domain) in any action against Borrower.

(g)    Borrower abandons all or a portion (other than a de minimis portion) of the Property.

(h)    Any dissolution, termination, partial or complete liquidation, merger or consolidation of Borrower, Guarantor or any Constituent Entity of Borrower or Guarantor, without the prior written consent of Lender.

**ARTICLE VI**
REMEDIES

6.1    Remedies.

(a)    Acceleration.  During the continuance of an Event of Default (other than an Event of Default described in paragraph (g) or (h) of Section 5.1) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in paragraph (g) or (h) of Section 5.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges and any other amounts owing by

18

EXHIBIT 1 - Page 22

Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

(b)    Remedies Cumulative.  During the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action or "election of remedies law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies or the Debt have been paid in full.

(c)    Severance.  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.  The rights under this Section 6.1(c) are in addition to, and shall not limit or be deemed to limit, the rights of Lender under Sections 8.24 through 8.26 hereof.

(d)    Delay.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Event of Default shall not be construed to be a waiver of any subsequent Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim to the extent necessary to foreclose on any collateral.

(e)    Lender's Right to Perform.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

EXHIBIT 1 - Page 23

6.2     Payment of Expenses.  Borrower shall pay on demand all of Lender's expenses incurred in any efforts to enforce any terms of this Agreement, or any of the other Loan Documents, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Lender until actually paid by Borrower at the Default Rate.  Furthermore, Borrower shall, and does hereby, indemnify Lender for, and hold Lender harmless from, any and all losses, costs, expenses, claims, actions, demands liabilities, loss or damage which may or might be incurred by Lender under this Agreement, or any of the other Loan Documents or by the exercise of rights or remedies hereunder, and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on Lender's part with respect to the Property except as expressly set forth in the Loan Documents, other than those finally determined to have resulted solely from the gross negligence or willful misconduct of Lender.  Should Lender incur any such liability, the amount thereof, including, without limitation, costs, expenses and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender from Borrower on demand.

## ARTICLE VII
RESERVED

## ARTICLE VIII
MISCELLANEOUS TERMS AND CONDITIONS

8.1     Time of Essence.  Time is of the essence with respect to all provisions of the Loan Documents.

8.2     Certain Rights of Lender.  Without affecting Borrower's liability for the payment of any of the Debt, Lender may from time to time and without notice to Borrower:  (a) release any Person liable for the payment of the Debt; (b) extend or modify the terms of payment of the Debt; or (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the Debt.

8.3     Waiver of Certain Defenses.  No action for the enforcement of the lien or of any provision thereof shall be subject to any defense which would not be good and available to the party interposing the same in an action at law upon the Note or any of the other Loan Documents.

8.4     Notices.  All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of the same in person to the intended addressee, or by depositing the same with Federal Express or another reputable private courier service for next business day delivery, with all charges prepaid, or by depositing the same in the United States mail, postage prepaid, certified mail, return receipt requested, in any event addressed to the intended addressee at its address set forth below or at such other address as may be designated by such party as herein provided.  All notices, demands and requests shall be effective upon such personal delivery, or one (1) business day after being deposited with the private courier service, or three (3) business days after being deposited in the United States mail as required above.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, demand or request sent.  By giving to the other party hereto at least fifteen (15) days' prior written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.  All notices, demands, requests or other communications shall be addressed as follows:

EXHIBIT 1 - Page 24

If to Lender:

NEW MILLENNIA GROUP
2945 Townsgate Road #200
Westlake Village,
CA 91361

With a copy to:

If to Borrower:

BROADWAY AVENUE INVESTMENTS, LLC
737 Broadway
Los Angeles, CA 90014

8.5     Successors and Assigns.  The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Borrower and the successors and assigns of Borrower, including all successors in interest of Borrower in and to all or any part of the Property, and shall inure to the benefit of Lender, its successors and assigns, and shall constitute covenants running with the land.  All indemnities in this Agreement for the benefit of Lender shall inure to the benefit of Lender and each of its directors, officers, shareholders, partners, members, managers, employees and agents, and pledgees and participants of the Debt, and their respective successors and assigns.  All references in this Agreement to Borrower or Lender shall be deemed to include each such party's successors and assigns.  If Borrower consists of more than one Person, each will be jointly and severally liable to perform the obligations of Borrower.

8.6     Severability.  A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Agreement to any Person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other Persons or circumstances.

8.7     Interpretation.  Within this Agreement, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.  The headings of the sections and paragraphs of this Agreement are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.  In the event of any inconsistency between the provisions hereof and the provisions in any of the other Loan Documents, it is intended that the provisions of this Agreement shall be controlling.

8.8     Waiver: Discontinuance of Proceedings.  Lender may waive any single Event of Default by Borrower hereunder without waiving any other prior or subsequent Event of Default.  Lender may remedy any Event of Default by Borrower hereunder without waiving the Event of Default remedied.  Neither the failure by Lender to exercise, nor the delay by Lender in exercising, any right, power or remedy upon any Event of Default by Borrower hereunder shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right, power or remedy at a later date.  No single or partial exercise by Lender of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or

21

EXHIBIT 1 - Page 25

further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.  No modification or waiver of any provision hereof nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.  No notice to nor demand on Borrower in any case shall of itself entitle Borrower to any other or further notice or demand in similar or other circumstances.  Acceptance by Lender of any payment in an amount less than the amount then due on any of the Debt shall be deemed an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder.  In case Lender shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under the other Loan Documents and shall thereafter elect to discontinue or abandon the same for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower and Lender shall be restored to their former positions with respect to the Debt, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the same had never been invoked.

8.9     <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of California, provided that to the extent any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling.

8.10    <u>Counting of Days</u>.  The term "days" when used herein shall mean calendar days.  If any time period ends on a Saturday, Sunday or holiday officially recognized by the state within which the Property is located, the period shall be deemed to end on the next succeeding Business Day.

8.11    <u>Relationship of the Parties</u>.  The relationship between Borrower and Lender is that of a borrower and a lender only and neither of those parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

8.12    <u>Application of the Proceeds of the Note</u>.  To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Lender at Borrower's request and Lender shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

8.13    <u>Recourse</u>. Lender shall have recourse to Borrower and all guarantors to the fullest extent provided by law upon any action to enforce the obligations of Borrower under the Note, this Agreement, and the other Loan Documents.

8.14    <u>No Representation</u>.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Lender pursuant to the Loan Documents, including, but not limited to, any officer's certificates, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, and/or by conducting its own underwriting, due diligence and investigations into Borrower, Guarantor, the Property and related matters, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Lender.

8.15    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of

EXHIBIT 1 - Page 26

this Agreement identical in form hereto but having attached to it one or more additional signature pages. Each Loan Document other than this Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties thereto had signed the same signature page. Any signature page of any such Loan Document may be detached from any counterpart of such Loan Document without impairing the legal effect of any signatures thereon and may be attached to another counterpart of such Loan Document identical in form thereto but having attached to it one or more additional signature pages.

8.16    Recording and Filing.  Borrower will cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Lender shall request, and will pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges.  Borrower shall reimburse for the costs incurred in obtaining a tax service company to verify the status of payment of Taxes and Other Charges on the Property.

8.17    Entire Agreement and Modification.  This Agreement and the other Loan Documents contain the entire agreements between the parties relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  This Agreement and the other Loan Documents may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.  Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

8.18    Meetings with Lender.  Upon reasonable notice to Borrower, Borrower shall make principals and executives of Borrower available at reasonable times to meet with Lender to review and discuss the status of the Loan and the Property.

8.19    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)     BORROWER, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN LOS ANGELES COUNTY, CALIFORNIA FOR ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THE NOTE, THIS AGREEMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION OVER LOS ANGELES COUNTY, CALIFORNIA, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).  BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 8.5, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).  For any court proceeding the venue will be los angeles county

EXHIBIT 1 - Page 27

(b)      LENDER AND BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE DEBT OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

EXHIBIT 1 - Page 28

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the day and year first above written.

BORROWER ("DIP"):
**BROADWAY AVENE INVESTMENTS, LLC**

By:_____
Name: Alan Gomparts
Title: Managing Member

GUARANTORS:

[SIGNATURE APPEARS ON FOLLOWING PAGE]

EXHIBIT 1 - Page 29

LENDER: NEW MILLENNIA GROUP


By:_____

Name:  Marcus Naulin

Title:    Authorized Signatory

EXHIBIT 1 - Page 30

<u>EXHIBIT A</u>

Definitions


[IF APPLICABLE:  "ACM O&M Plan" shall have the meaning set forth in <u>Section 4.25</u> hereof.]

"ACMs" shall mean asbestos-containing materials.

"Additional Taxes" shall have the meaning set forth in <u>Section 2.3(b)</u> hereof.

"Affiliate" shall mean any Person which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified Person.  For purposes of the definition of "Affiliate", the terms "control", "controlled", or "controlling" with respect to a specified Person shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (1) the outstanding shares of any class of voting securities or (2) beneficial interests, of any such Person, as the case may be, directly or indirectly, or acting through one or more Persons, (ii) the control in any manner over the general partner(s) or manager or managing member or the election of more than one director or trustee (or Persons exercising similar functions) of such Person, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such Person.

"Amortization Period" means a period of 360 months.

"Applicable Laws" shall have the meaning set forth in <u>Section 3.1(h)</u> hereof.

"Assignment of Leases" shall mean that certain Assignment of Leases and Rents, dated as of the date hereof, from Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Bankruptcy Action" shall mean that a Person shall have undertaken, or been the subject of, any of the following: (i) the institution of proceedings to be adjudicated bankrupt or insolvent; (ii) consent to the institution of bankruptcy or insolvency proceedings against it; (iii) the filing of a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy; (iv) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property; (v) the making of any assignment for the benefit of creditors; (vi) the admission in writing of its inability to pay its debts generally as they become due or declare or effect a moratorium on its debts; or (vii) take any action in furtherance of any such action.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended from time to time and any successor statute thereto.

"Bankruptcy Law" shall mean the Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

**"Borrower"** shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"Business Day" or "business day" shall mean any day other than (a) a Saturday or Sunday, or (b) a day on which banking and savings and loan institutions in the State of California are authorized or obligated by law or executive order to be closed.

3

**EXHIBIT 1 - Page 31**

"Closing Date" shall mean the date of this Agreement.

"Closing Statement" shall mean the loan closing statement prepared by Lender and executed by Borrower and delivered to Lender in connection with the closing of the Loan.

"Constituent Entity" shall mean, with respect to any Person, (i) with respect to any limited partnership, (1) any general partner of such limited partnership and (ii) any limited partner of such partnership which owns (or is owned by any Person owning, holding or controlling, directly or indirectly) the right to receive 50% or more of the income, distributable funds or losses of such partnership; (B) with respect to any general partnership or joint venture, any partner or venturer in such general partnership or joint venturer; (iii) with respect to any corporation, (1) any officer or director of such corporation, and (2) any Person which owns or controls 50% or more of any class of stock of such corporation; (iv) with respect to any limited liability company, (1) any manager of such limited liability company, (2) any managing member of such limited liability company, or the sole member of any limited liability company having only one (1) member, and (3) any non-managing member of such limited liability company which owns (or is owned by any Person owning, holding or controlling, directly or indirectly) the right to receive 50% or more of the income, distributable funds or losses of such limited liability company; (v) any Person which controls any Person described in any of foregoing clauses (i) through (iv) of this definition; and (vi) any Person which is a "Constituent Entity" with respect to an Person which is a "Constituent Entity" of the subject Person.  For the purposes of clause (v) of this definition, if "B" is a Constituent Entity of "A", then any Constituent Entity of "B" shall be deemed to be a Constituent Entity of any Person of which "A" is a Constituent Entity.

"Control" (and "Controlled by" or "under common Control with") shall (unless otherwise indicated) have the meanings assigned to such terms in Rule 405 under the Securities Act of 1933, as amended.

"Controlling Entity" shall manage, govern, or have power to influence or direct a Person's operations or course of events.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, the Note and this Agreement together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, and the other Loan Documents.

"Default Rate" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) eight percent (8%) above the Interest Rate in effect at the time of the occurrence of the related Event of Default.

"Disbursement Date" shall have the meaning set forth in Section 2.1(b).

"Equity Holder" shall mean any holder of any Equity Interest.

"Equity Interest" shall mean any direct or indirect equity interest in Borrower.

"ERISA" shall have the meaning set forth in Section 3.1(n) hereof.

"**Escrow Fund**" shall have the meaning set forth in Section 4.6 hereof.

"Event of Default" shall have the meaning set forth in Section 5.1 hereof.

4

EXHIBIT 1 - Page 32

"First Interest Accrual Period" shall mean the period commencing on the Disbursement Date and ending on, but excluding, the first (1st) day of the first (1st) calendar month following the month in which the Disbursement Date occurs.

"Governmental Authority" shall mean, with respect to any Person, any federal or state government or other political subdivision thereof and any Person, including any regulatory or administrative authority or court, exercising executive, legislative, judicial, regulatory or administrative or quasi-administrative functions of or pertaining to government, and any arbitration board or tribunal in each case, having jurisdiction over such applicable Person or such Person's property and any stock exchange on which shares of capital stock of such Person are listed or admitted for trading.

"Governmental Requirements" shall mean and federal, state or local statues, laws, ordinances, rules or regulations promulgated or issued by any Governmental Authority.

"Guaranty" shall mean the Guaranty, dated of even date herewith, executed by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Guarantor" shall mean Zenith Management, LLC.

"Hazardous Substances Indemnity Agreement" shall mean that certain Joint and Several Agreement of Guaranty, Undertaking and Indemnity, dated as of the date hereof, from Borrower and Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Insurance Premiums" shall mean the premiums on the insurance required to be maintained with respect to Borrower and the Property pursuant to this Agreement.

"Interest Rate" shall have the meaning set forth in Section 2.2(a) hereof.

"Investor" shall mean any actual or potential purchaser, transferee, assignee, servicer, participant or investor in a Secondary Market Transaction.

"Late Payment Charge" shall have the meaning set forth in Section 2.3(c) hereof.

"**Lease**" shall mean any lease (including, without limitation, any oil, gas and mineral lease), sublease or subsublease, letting, license, concession, occupancy or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and (i) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and (ii) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Lender" shall have the meaning set forth in the introductory paragraph hereof.

"**Loan**" shall have the meaning set forth in the recitals to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Guaranty, and all other documents executed and/or delivered in connection with the Loan, together with any and all renewals, amendments, extensions and modifications thereof.

5

EXHIBIT 1 - Page 33

"Loan Year" means (i) the period from the Disbursement Date to the first day of the first (1st) calendar month after the month in which the Disbursement Date occurs together with the consecutive twelve (12) calendar month period following such first day; and (ii) each consecutive twelve (12) calendar month period thereafter commencing on the anniversary of such first day.

"Maturity Date" shall mean [_____ __,] 2024, or such earlier date on which the final payment of principal of the Note becomes due and payable as provided in this Agreement or the Note, whether by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall have the meaning set forth in Section 2.2(c) hereof.

"Monthly Payment Amount" shall have the meaning set forth in Section 2.3(b)(vi) hereof.

"**Note**" shall mean that certain Promissory Note, dated as of the date hereof, in the principal amount of the Loan, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented, severed or otherwise modified from time to time, in the form as attached hereto as Exhibit B.

"OFAC List" shall mean the list of specially designated nationals and blocked Persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website www.treas.gov/ofac/t11sdn.pdf, as amended or supplemented from time to time.

"Organizational Documents" shall mean, with respect to any entity, the documents customarily used to form an entity and provide for its governance, as the same may be amended from time to time, including, without limitation, (i) with respect to a corporation, the articles of incorporation or certificate of incorporation or charter, and the by-laws; (ii) with respect to a limited liability company, the articles of organization and the operating agreement; (iii) with respect to a limited partnership, the certificate of limited partnership and the limited partnership agreement; and (iv) with respect to a general partnership, the agreement of partnership.

"Other Charges" shall have the meaning set forth in Section 4.5 hereof.

"Payment" shall have the meaning set forth in Section 2.3(e) hereof.

"Payment Date" shall mean the first (1st) day of the second calendar month after the Disbursement Date and the first day of each month thereafter to and including the first date day of the month immediately preceding the Maturity Date, (or, if the Disbursement Date is the first (1st) day of a calendar month, then the first Payment Date shall be the first (1st) day of the first (1st) calendar month following the month in which the Disbursement Date occurs).

"Permitted Exceptions" shall have the meaning set forth in Section 3.1(k) hereof.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Policies" shall have the meaning set forth in Section 4.4.

6

**EXHIBIT 1 - Page 34**

"Prohibited Person" shall mean any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States or America.

"Prohibited Use" shall mean (i) operation of a dry-cleaning business, except for a dry-cleaning business at which no on-site cleaning operations of any sort are undertaken (i.e., a so-called drop-off station); (ii) operation of a gasoline station or automobile service or maintenance facility; (iii) operation of a car wash; (iv) operation of any other business that, in the ordinary course of operation, would be likely to result in the release of Hazardous Substances; (v) the sale or display of obscene or pornographic material, the conduct of obscene, nude or semi nude live performances, or similar purposes; and (vi) the operation of a cabaret, dance hall or similar venue.

"**Property**" shall mean 737 Broadway, Los Angeles, CA 90014.

"Property Management Agreement" means the agreement(s) between Borrower and Property Manager that are referenced in that certain Manager's Subordination Agreement delivered to Lender in connection with the Loan, together with any future agreement with any future Property Manager entered into by Borrower from time to time in accordance with the provisions of Section 4.24 hereof.

"Property Manager" means Broadway Avenue Investments, LLC, or any successor manager of the Property approved by Lender in accordance with the provisions of Section 4.24 hereof.

"Reserves" shall mean, collectively, all cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Lender pursuant to this Agreement or any other of the Loan Documents, including, without limitation, all funds now or hereafter on deposit in the Escrow Account, and in the reserves required pursuant to Article VII hereof, if any.

"**Restoration**" shall have the meaning set forth in Section 4.7 hereof.

"Secondary Market Transaction" shall mean (1) any sale of this Agreement, Note and other Loan Documents to one or more Investors as a whole loan, (2) a participation of the Debt to one or more Investors, (3) a securitization of the Loan, (4) any other sale or transfer of the Debt or any interest therein to one or more Investors.

"Security Agreement" shall mean the security interest granted herein and that certain security agreement, dated the date hereof, executed and delivered by Borrower as security for the Debt and encumbering the assets described therein, as the same may be amended, restated, replaced, supplemented, severed or otherwise modified from time to time.

"Taxes" shall have the meaning set forth in Section 4.5 hereof.

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease.

"Title Insurance Policy" shall have the meaning set forth in Section 3.1(k) hereof.

**EXHIBIT 1 - Page 35**

# EXHIBIT B

# [FORM OF] PROMISSORY NOTE

**$4,000,000.00.00**                                                                                November   , 2024

   **FOR VALUE RECEIVED**, the undersigned, **Broadway Avenue Investments, LLC**, an California  limited liability company ("***Borrower***"), promises to pay to the order of  New Millennia Group[_____] ("***Lender***"), in lawful money of the United States of America, the principal sum of [Four Million  00/100 Dollars ($4,000,000.00) (the "***Loan***") or such lesser amount as may be advanced herein (this "***Promissory Note***").

   For the purposes of this Promissory Note, unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to such terms in the Loan Agreement (as defined below). The following definitions (some of which are restated from those definitions contained in the Loan Agreement) shall apply to the words and phrases used herein:

   "***Business Day***" shall mean any day other than a Saturday, Sunday or a legal holiday on which banks are authorized or required to be closed for the conduct of commercial banking business in Los Angeles, California.

   "***Default Rate***" shall mean a rate of interest per annum equal to two percent (2%) in excess of the Interest Rate.

    "***Event of Default***" shall mean any of those events set forth in Section 8.1 of the Loan Agreement.

    "***Interest Rate***" shall mean 12%. and an origination fee of 6% of the gross loan amount.

   "***Loan Agreement***" shall mean that certain Loan Agreement, dated as of the date hereof, by and between Lender, as lender, and Borrower, as borrower, as amended, modified or restated from time to time.

   "***Maturity Date***" shall mean [___Origination Date for a 12 month period].

   "***Debtor In Possession***" Borrower is the debtor in the following chapter 11 bankruptcy filing: **U.S. Bankruptcy Court Central District of California (Los Angeles) Bankruptcy Petition#: 2:24-bk-12081-VZ** *Assigned to:* Vincent P. Zurzolo; *Date filed:* 2024-03-19.

    "***Debtor-In-Possession Financing***" shall mean the herein referenced Loan as approved by the BK Court in the BK Case.

8

**EXHIBIT 1 - Page 36**

Subject to the terms and conditions of the Loan Agreement and the Bankruptcy Order, the outstanding principal amount of the Loan shall bear interest at the Interest Rate. In the event that after the date hereof any governmental authority subjects Lender to any new or additional charge, fee, withholding or tax of any kind with respect to any loans hereunder or changes the method of taxation of such loans or changes the reserve or deposit requirements applicable to such loans, Borrower shall pay to Lender such additional amounts as will compensate Lender for such cost of lost income resulting therefrom as reasonably determined by Lender (other than franchise taxes and taxes based upon or measured by the income or profits of Lender).

From and after the date of any Event of Default, interest on funds outstanding hereunder shall accrue at the Default Rate.

In no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto.

The principal amount and accrued interest of this Promissory Note shall be due and payable on the dates and in the manner set forth in the Loan Agreement and as reflected on **Exhibit A** attached hereto and shall be computed on the basis as set forth therein.

The Loan may be prepaid in whole or in part at any time. Borrower acknowledges that this prepayment restriction is derived from Section 45D of the Code and has been specifically bargained for and negotiated. Borrower further acknowledges that Lender would not make the Loan in the absence of such prepayment restriction.

Payments of principal and interest shall be made to Lender by crediting before 12:00 noon, Los Angeles, CA time, on the appropriate due date, at the offices of Lender located at _____, or at such other address and/or in such other manner as Lender may elect from time to time. If any payment is due on a calendar day other than a Business Day, such payment shall be due on the next succeeding Business Day. Failure to make payments on this Promissory Note on the date such amount becomes due and payable shall constitute an Event of Default hereunder.

Time is of the essence with respect to this Promissory Note. To the extent not prohibited by applicable law, Borrower, for itself and its successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, and any and all other notices, demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Promissory Note, and hereby consents to any extensions of time, renewals, releases of any party to or guarantor of this Promissory Note, waivers and any other modifications that may be granted or consented to by Lender from time to time in respect of the time of payment or any other provision of this Promissory Note.

9

EXHIBIT 1 - Page 37

The termination of the Loan Agreement or the occurrence of any Event of Default shall entitle Lender, at its option, to declare the then outstanding principal balance and accrued interest hereof to be, and the same shall thereupon become, immediately due and payable without notice to or demand upon Borrower, all of which Borrower hereby expressly waives.

Wherever possible each provision of this Promissory Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Promissory Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Promissory Note.  No delay or failure on the part of Lender in the exercise of any right or remedy hereunder shall operate as a waiver thereof, nor as acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy. Lender, at its option, may enforce its rights against any collateral securing this Promissory Note without enforcing its rights against Borrower or any other property or indebtedness due or to become due to Borrower. Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute or exchange any collateral securing this Promissory Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Promissory Note.

All of the terms, covenants and agreements of the Loan Agreement and the other Loan Documents are incorporated herein by reference.

This Promissory Note shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California without regard to the choice of law rules of that State, except to the extent that any of such laws may now or hereafter be preempted by Federal law or ay order of the BK Court**.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE FOLLOWS]**

10

**EXHIBIT 1 - Page 38**

**IN WITNESS WHEREOF**, Borrower has caused this Promissory Note to be duly executed as of the day and year first above written.

<div style="margin-left: 40%;">

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC**,
a California limited liability company

By: _____
Name: ALAN GOMPERTS
Title:   Managing Member

</div>

11

EXHIBIT 1 - Page 39