1  Derrick Talerico (State Bar No. 223763)
   dtalerico@wztslaw.com
2  David B. Zolkin (State Bar No. 155410)
   dzolkin@wztslaw.com
3  WEINTRAUB ZOLKIN TALERICO & SELTH LLP
   11766 Wilshire Boulevard, Suite 730
4  Los Angeles, CA 90025
   Telephone: (424) 500-8552
5
6
   Counsel to Debtor Seaton Investments, LLC
7
8
9          **UNITED STATES BANKRUPTCY COURT**
10  **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**
11

| | |
|---|---|
| In re: | Lead Case No. 2:24-bk-12079-VZ |
| SEATON INVESTMENTS, LLC, *et al.*, | Jointly Administered with Case Nos.: 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; 2:24-bk-12082-VZ; 2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ and 2:24-bk-12076-VZ |
| Debtors and Debtors In Possession. | |
| ☐ Affects All Debtors. | Chapter 11 |
| ☒ Affects Seaton Investments, LLC | |
| ☐ Affects Colyton Investments, LLC | **MOTION OF DEBTOR AND DEBTOR IN POSSESSION SEATON INVESTMENTS, LLC FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO POST-PETITION LEASE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| ☐ Affects Broadway Avenue Investments, LLC | |
| ☐ Affects SLA Investments, LLC | |
| ☐ Affects Negev Investments, LLC | |
| ☐ Affects Alan Gomperts | |
| ☐ Affects Daniel Halevy | Hearing: |
| ☐ Affects Susan Halevy | Date:  December 12, 2024 |
| | Time:  11:00 a.m. |
| | Crtrm:  1368 |
| | 255 E. Temple Street |
| | Los Angeles, CA 90012 |

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Debtor, Seaton Investments, LLC ("Seaton") hereby files this *Motion of Debtor and Debtor In Possession for Order Authorizing the Debtor To Enter into Post-Petition Lease Pursuant to 11 U.S.C. § 363* ("Motion").  In support of the Motion, the Debtor represents as follows:

## I.    GENERAL BACKGROUND

On March 18, 2024 (the "Individual Petition Date") and on March 19, 2024 (the "Corporate Petition Date"), each of the above-captioned jointly administered debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors continue to operate and manage their affairs as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court entered an order on April 1, 2024 for the Debtors' cases to be jointly administered [Dkt. 16]. No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in the Bankruptcy Cases.

On April 1, 2024, the Court entered an order; (1) setting July 16, 2024 as the claims bar date; (2) setting September 20, 2024 as the last date for a hearing to be held on objections to claims; and (3) setting December 12, 2024 as the date for a hearing on a motion for approval of adequacy of disclosure statement.

## II.    STATEMENT OF FACTS

### A.    Jurisdiction and Venue

This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article Ill of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

### B.    The Cases and the Debtor

The Individual Debtors are family and operate a family business together. Debtor Susan Halevy is mother to debtor Daniel Halevy and three other non-debtor children, including Sharon Gomperts, wife of debtor Alan Gomperts.

1    Susan's husband, David Halevy (deceased), together with Daniel and Alan, and on occasion

2    non-debtor Simon Harkham, invest in and operate real estate properties, including debtors Seaton,

3    Broadway and SLA. Upon David Halevy's passing in 2023, his interests, to the extent they were

4    not community property, passed to Susan via the Halevy Trust (defined below). As such, Susan

5    Halevy is now the owner – direct, beneficial, equitable, or otherwise – of all interests in the various

6    Debtors previously owned by David Halevy.

7    These Bankruptcy Cases present two real estate investments that require a restructuring to

8    address defaults on their senior loans: (1) the buildings at 440 Seaton Street, Los Angeles, CA,

9    90013 (the "Seaton Building"), and 421 Colyton Street, Los Angeles, CA, 90013 (the "Colyton

10    Building"), which together are operated as an economic unit (the "Seaton/Colyton Buildings") and

11    are owned by Debtors Seaton and Colyton, respectively; and (2) the building at 737 S. Broadway,

12    Los Angeles, CA, 90014 (the "Broadway Building"), owned by Debtor Broadway.

13    The Individual Debtors have each jointly and severally guaranteed (1) certain debt owed to

14    KDM California LLC ("KDM") on account of KDM's $37.1 million in principal amount loaned

15    jointly to Seaton and Colyton and secured by the Seaton/Colyton Buildings, and (2) approximately

16    $19.1 million of loans made by Archway Capital ("Archway") on account of the Broadway

17    Building (the "Broadway Loans"). The Individual Debtors' guaranty liability to Archway is

18    bifurcated into secured and unsecured tranches. Approximately $15 million of Archway's

19    Broadway Loans are made directly to Broadway and guaranteed by the Individual Debtors without

20    collateral. Approximately $4 million of Archway's Broadway Loans are made pursuant to three

21    loans to related entities or groups and are secured by pledges of various real properties owned by

22    the Individual Debtors, 1040 S. Los Angeles Street, Los Angeles, CA (owned and pledged by SLA),

23    and 12800 Foxdale Drive, Desert Hot Springs, CA (owned and pledged by Negev).

24    Seaton was formed in March 2010 for the purpose of acquiring, developing, and operating

25    the Seaton Building. Seaton's membership consists of: (1) the Halevy Family Trust dated

26    September 6, 2010 (the "Halevy Trust," Susan Halevy, beneficial owner); (2) the Gomperts and

27    Halevy Family Trust (the "G&H Trust," Alan Gomperts and Sharon Gomperts, beneficial owners

28    of community property); (3) Daniel Halevy; and (4) Simon Harkham.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

1      Colyton was formed in June 2011 for the purpose of acquiring, developing, and operating

2  the Colyton Building. Colyton is owned 100% by Susan Halevy as the beneficiary of the Halevy

3  Trust. The Seaton/Colyton Buildings are adjacent to each other and together form a jigsaw of

4  structures that are operated by Seaton and Colyton as a single economic unit. They also share

5  overhead costs and are held out to the market as a common opportunity for the lease of commercial

6  space.

7      In or about 2018, Seaton's members determined the Seaton Building needed a full structural

8  upgrade in order to compete for top-of-the-market tenants in the burgeoning downtown arts district.

9  Seaton took out a series of construction and bridge loans to finance a full modernization of the

10 Seaton Building. The Seaton Building upgrade and development was a many years undertaking

11 requiring careful and intensive coordination with the City of Los Angeles to preserve historical

12 structures and to benefit from programs designed to reward historical preservation.

13     The investment in the Seaton Building attracted a multi-decade letter-of-intent from

14 WeWork to lease an entire structure (100%) of the Seaton Building. Unfortunately, when WeWork

15 experienced financial difficulties in 2019, the WeWork LOI was withdrawn, and Seaton was in the

16 unenviable position of looking for a major anchor tenant to replace WeWork (or multiple smaller

17 tenants) as the country entered the COVID lockdown. Having invested over $20 million into the

18 Seaton Building, Seaton pushed forward with completion of the Seaton Building upgrades.

19     In or about April 2021, Seaton refinanced its outstanding loans with KDM. KDM, Seaton,

20 and Colyton entered into a $35.1 million loan that consolidated all of their then outstanding loans

21 and that provided additional working capital for Seaton and Colyton (the "KDM First Loan") to

22 complete the Seaton Building remodel. KDM required the KDM First Loan to be a joint obligation

23 of both Seaton and Colyton, reflecting their operation as a single economic unit. As part of its

24 diligence, KDM obtained a third-party valuation of the Seaton/Colyton Buildings by Bowery that

25 valued the Seaton/Colyton Buildings as a single economic unit and concluded their current

26 combined projected value to be $64.4 million as of February 17, 2021 (upon completion of

27 upgrades) and $70.2 million as of August 17, 2021 (stabilized).

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

1    In January 2022, behind on both the completion of their remodel and lease-up due to the

2    impact of the extended COVID shutdown, Seaton and Colyton closed on a supplementary $2

3    million loan from KDM (the "KDM Second Loan") for additional capital needed to complete work

4    required for the issuance of a certificate of occupancy by the City of Los Angeles. In connection

5    with the KDM Second Loan, David Halevy (now deceased, and therefore as to Susan Halevy only

6    an in rem obligation against community assets now owned by Susan Halevy via the Halevy Trust),

7    Daniel Halevy, and Alan Gomperts provided personal guarantees to KDM (together, the "KDM

8    Guarantors").

9    Unfortunately, the KDM Second Loan was not sufficient to allow Seaton and Colyton to

10    avoid defaults caused by the COVID pandemic. Because of prolonged COVID-19 related

11    shutdowns and work-at-home orders, and, in particular, the closure of the Los Angeles Department

12    of Building and Safety (the "LADBS") and the remote work-only status of all of its plan checkers

13    for a protracted period, LADBS building plan approvals were severely slowed and took far longer

14    than anticipated. This, and a stagnant leasing market, led to Seaton's and Colyton's defaults on the

15    KDM First Loan and the KDM Second Loan in 2023.

16    Seaton did eventually obtain a certificate of occupancy on the remodeled structure in

17    January 2024. As of the Petition Date, 47% of the Seaton/Colyton Buildings are leased and

18    negotiations are in-process for leases on the remaining 53% of the Seaton/Colyton Buildings. After

19    hitting a market low in the fourth quarter of 2023, commercial real estate has experienced a modest

20    recovery and the Debtors expect the market to continue to strengthen over the coming months and

21    years. As of the Petition Date, the outstanding debt owed to KDM totals $36,240,750 on account

22    of the KDM First Loan and $2,091,840 on account of the KDM Second Loan.

23    **C.    The Bankruptcy**

24    Seaton's pre-petition efforts to lease-up the Property continued post-petition. On or around

25    the time of the Petition Date, Broadway began exploring an opportunity to lease it's entire building

26    to a health and mental wellness group that would provide medical and social services to the Los

27    Angeles homeless and transient population, in-line with directives from the City to address the

28    issues and needs of this popoulation (the "Broadway Project"). What began as a possibility quickly

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

developed into a full-on effort to put together the people, providers, and structure needed to make the Broadway Project a reality.

Broadway introduced the team working on the Broadway Project to Seaton and the Broadway team deterined it could successfully run a project similar to the Broadway Project at the Seaton Property (the "Seaton Project").

Seaton has now assembled a team that is ready to immediately execute on the Seaton Project and have medical and social services up and running at the Property in a matter of months. To this end, Seaton has obtained a commitment from New Millennia Group to provide a $4 million DIP loan (the "<u>DIP Loan</u>") to Seaton to fund the Seaton Project and an executed 15-year lease from the operators and managers of the Seaton Project. With the approval of the motions for the proposed DIP loan and whole-building lease, Seaton's ability to confirm a plan of reorganization will be assured.

### D.   <u>The Lease</u>

Seaton seeks court authority to enter into the Lease with two primary obligors and co-lessees: Levav Group LLC ("Levav"); and DMB Fund, a California non-profit d/b/a Broadway Community Care Centers ("DMB," together with Levav, the "Lessees"). A copy of the Lease is attached to this Motion as **Exhibit 1**. Declarations have been contemporaneously submitted by authorized representatives of each of the Lessees, acknowledging the Lease and their commitment to commence the Lease.

The Lease is a huge win for Seaton. The Property – currently with significant vacancy – will be nearly fully leased, and the rent generated by the Lease will allow Seaton to propose a plan to pay its creditors. The material terms of the Lease are summarized as follows:

      i.  Term: 15 years;

     ii.  Extension: 1 5-year option;

   iii.  Rent: Schedule set forth on Exhibit C to the Lease;

   iv.  Security Deposit: 2 months of Base Rent

    v.  Rent abatement: 6 months

III. **LEGAL ARGUMENT**

"Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). In connection with decisions related to the use of leases to maximize value of the estate, courts show deference to a debtor's sound business decisions. In re Ernst Home Ctr., Inc., 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). SCI and PropCo each exercised proper business judgment in entering into the Master Lease Compromise Agreement." *In re Station Casinos, Inc.*, 2010 Bankr. LEXIS 5447, *7-8.

The Lease and the DIP Loan will allow Seaton to propose a plan to pay its creditors. Entering into the Lease is an exercise of Seaton's business judgment. Through efforts on the Broadway Project, over the prior 6 months, Seaton has been able to put together the Seaton Project in very short order. These efforts have culminated in a 15-year, whole-building Lease and a DIP loan commitment of $4 million requiring security only in assets acquired post-petition which are not subject to an existing lien by any secured creditors. Seaton is confident that the Lessees are committed to and able to perform on the Lease and are ready to take possession and begin the on-site requirements for the Project immediately.

IV. **CONCLUSION**

For the reasons set forth herein, Seaton respectfully requests that the Court enter an order:

1.      Granting the Motion in its entirety;

2.      Authorizing the Debtor to enter into the Lease with the Lessees;

3.      Granting such other and further relief as this Court deems just and proper under the circumstances.

DEBTOR'S MOTION TO APPROVE LEASE

1

2    Dated: November 21, 2024         **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

3

4                                      By: _/s/ Derrick Talerico_
                                          Derrick Talerico
5                                      Counsel to Debtor Seaton Investments, LLC,

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEBTOR'S MOTION TO APPROVE LEASE

# EXHIBIT A

# Lease

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of _____, 2024 (the "Effective Date"), by and among **Seaton Investments, LLC, a California limited liability company** ("Lessor"), whose address is 440 Seaton Street, Los Angeles, Ca 90013 and The DMB Fund, a California not for profit corporation d/b/a Broadway Community Care Centers ("BCCC") and Levav Group LLC, a California Limited Liability Company ("Levav," together with BCCC, the "Lessee"), whose address is 9854 National Boulevard, Los Angeles, CA 90034. Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements herein contained, Lessor and Lessee hereby covenant and agree as follows:

## ARTICLE I

## SUMMARY OF BASIC LEASE TERMS

**Section 1.01.  Property**.  The street address of the improved real property is 440 Seaton Street, Los Angeles, Ca 90013 and its legal description is set forth on Exhibit B attached hereto and incorporated herein (the "Property").

**Section 1.02.  Initial Term –** The Initial Term of Lease commences on the Effective Date and expires on January 31, 2040.

**Section 1.03.  Extension Option –** The Initial Term of the Lease may be extended for five (5) years through January 31, 2045 if on or before June 30, 2039, Lessee notifies Lessor in writing that Lessee desires to extend the Lease for an additional five (5) year term commencing February 1, 2040 and expiring on January 31, 2045.

**Section 1.04.  Base Monthly Rental - $** $44,668 monthly base rent, plus escalation are set forth in Exhibit "C" attached hereto and incorporated herein by this reference.

**Section 1.05.  Rental Adjustment –  Three percent (**3%) per annum or 90% of the fair market rental value for the location of the Premises, whichever is greater.

**Section 1.06.  Adjustment Date** –  Every February 1 throughout the Lease Term commencing February 1, 2026.

**Section 1.07.  Guarantor** –  N/A

**Section 1.08.  Letter of Credit** – No.

**Section 1.09.  Lessor Tax Identification No**. 46-3312843

**Section 1.10.  Tenant Improvements** – Except as set forth in Article IV, Section 4.06, Lessee at its sole expense shall be responsible for all agreed upon tenant improvements.

Lessee shall not make any tenant improvements, alterations or utility installations to the Property without Lessor's prior written consent.  Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any alterations or utility installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's:  (i) acquiring all applicable governmental permits,  (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and all other requirements of applicable Governmental Authority, in a prompt and expeditious manner.  Any alterations or utility installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion, furnish Lessor with as-built plans and specifications

Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Property, which claims are or may be secured by any mechanic's or materialmen's lien against the Property or any interest therein.  Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in, or about the Property, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expenses defend and protect itself, Lessor and the Property against the same and shall pay and satisfy any such adverse judgment that may be rendered thereof before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to one hundred fifty percent (150%) of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

**Section 1.11.**    Ownership Removal; Surrender or Restoration.

(a)    Ownership.  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises.  Lessor may, at any time, elect in writing to be the owner of all or any specified part of the lessee owned alterations and utility installations.  Unless otherwise instructed, all Lessee owned alterations and utility installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)    Removal.  By delivery to Lessee written notice from Lessor not earlier than ninety (90) and not later than thirty (30) days prior to the end of the term of this Lease, Lessor may require that any and all of Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

**Section 1.13    Rental Abatement** - Lessor hereby agrees to abate base monthly rental at month 1 through and including month 6 of the first year of the Lease. Lessee shall begin payment of Rental on the first (1st) calendar day of the seventh (7th) month of the Lease. Thereafter, Rental shall be due on or before the first (1st) of each month.

2

**Section 1.14** - Security Deposit. Lessee shall deposit two (2) months of Base Rent as a security deposit with the Landlord.

## ARTICLE II
## LEASE OF PROPERTY

**Section 2.01.  Lease**.   In consideration of Lessee's payment of all Monetary Obligations and Lessee's performance of all other obligations hereunder, Lessor hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and   "WHERE IS" and with all faults without any representation or warranty by Lessor, and subject to the existing state of title, the parties in possession, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

## ARTICLE III

## LEASE TERM; EXTENSION

**Section 3.01.  Initial Term**.  The initial term of this Lease ("Initial Term") shall commence as of the Effective Date and shall expire at midnight on January 31, 2040, unless terminated sooner as provided in this Lease and as may be extended as provided herein.  The time period during which this Lease shall actually be in effect, including any Extension Term, is referred to as the "Lease Term."

**Section 3.02.  Extension**.  Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (an "Extension Option") to extend the Initial Term for the Property for one (1) additional successive period of five (5) years (the "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**.  Lessee may only exercise the Extension Option by giving written notice thereof to Lessor of its election to do so no later than June 30, 2039.  If written notice of the exercise of the Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall terminate automatically and without notice on the last day of the Initial Term or, if applicable, the last day of the Extension Term.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with Section 3.02. In order to exercise any Option under this Lease, Lessee shall be in good standing under all provisions of this Lease.

**Section 3.04.  Removal of Personal Property**.  At any time, Lessee may remove from the Property any personal property belonging to Lessee.  Lessee shall repair any damage caused by such removal.  Lessee shall, at the expiration of the Lease Term, leave the Property in broom clean condition and all fixtures and utility systems in good working order and the building in good repair.  Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall be deemed abandoned by Lessee and, at Lessor's option, be disposed of by Lessor in accordance with all Legal Requirements.

3

**ARTICLE IV**

**RENTAL, OTHER MONETARY OBLIGATIONS; IMPROVEMENTS**

**Section 4.01.  Base Monthly Rental**.  During the Lease Term, on or before the first day of each calendar month, Lessee shall pay in advance the Base Monthly Rental then in effect for the upcoming month.

**Section 4.02.  Adjustments**.  During the Lease Term, on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment which shall be an annual increase of three (3%) per cent of the Base Rent or ninety per cent (90%) of the market rent for said location whichever is greater; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.**  Deleted.

**Section 4.04.  Rentals to be Net to Lessor**.  The Base Annual Rental payable hereunder shall be net to Lessor, so that this Lease shall yield to Lessor the Rentals specified during the Lease Term, and all costs and obligations of every kind and nature whatsoever relating to the Property as required in this Lease shall be performed and paid by Lessee. Specifically, Lessee shall pay or reimburse Lessor all Property Taxes, Lessor's insurance premiums, equipment maintenance, building, roof, structural, and utility repair and maintenance costs and all utilities on the Property. Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Base Monthly Rental and all other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement (except as expressly set forth in this Lease), deferment, deduction or counterclaim whatsoever.

**Section 4.05.  Use of Premises** – Lessee shall occupy and use the Property comprising of approximately 51,000 useable square feet for "Behavioral Health Treatment" of adolescents and adults including without limitation, unhoused people, Skid Row population, veterans and all those in need of mental and behavioral services for both outpatient and inpatient services.

**Section 4.06.  Lessor's Work**.

4.06.1    Lessor, subject to reimbursement of all LW Expenses as herein defined shall perform the work to floors of the building on the Property designated Ground Floor, second floor, and third floor per the plans/schematics prepared by Jila Kohan, Architect, and attached hereto as Exhibit E and incorporated herein by this reference.

4.06.2    For purposes of this Lease, "LW Expenses" shall include and not be limited to any and all expenses incurred directly or indirectly by Lessor in the furtherance of Landlord's Work and the proposed Use by Lessee, including but not limited to labor, labor overhead, materials, supplies, contractor's profit, sub-contractors costs, construction management fees and insurance, permits and regulatory licensing fees, loan fees, escrow,  title insurance costs, interest,

4

attorneys', architects and accountants' fees which shall not exceed four million Dollars ($4,000,000)

4.06.3   Lessee shall reimburse Landlord all LW Expenses, as follows:

(A)      On the first (1st) and fifteenth (15th) day of each calendar month, Lessor shall submit to Lessee invoices setting forth in reasonable detail LW Expenses incurred by Lessor during the prior invoice period.

(B)      Within three (3) business days of receipt thereof, BCCC shall submit the invoice for payment to the relevant "Governmental Agency" as herein defined below.

(C)      Immediately upon receipt by Lessee, Lessee shall remit to Lessor any and all sums received by Lessee, or it's managers or affliates from any and all federal, state, county or city agency including but not limited to Los Angeles Housing Department, Los Angeles County Development Authority, Los Angeles Homeless Authority, or U.S. Department of Housing and Urban Development, all collectively "Governmental Agencies" in reimbursement of LW Expenses, the improvements or use of the Property.

(D)      In the event Lessee does not receive any grants from any of the Governmental Agencies referred to in Section 4.06.3 (C), above, all sums due and owing to Lessor as LW Expenses shall be due and payable by lessee as Additional Rental, on or before the twelfth (12th) month of the Term of the Lease.

**Section 4.07   Wire Transfer**. Payments of the Base Monthly Rental and all other Monetary Obligations payable to Lessor hereunder shall be paid in immediately available funds to the account identified on <u>Exhibit C</u> attached hereto, or to any other account as Lessor may from time to time designate to Lessee.  Each such payment shall be made by Lessee by wire or other electronic transfer of funds, or automatic debit from an account designated by Lessee if so, elected by Lessee.  Lessee shall continue to pay all Rental and other Monetary Obligations in such a manner unless otherwise directed by Lessor. Notwithstanding the foregoing, in the event that Lessee fails, more than twice during any calendar year, to pay the Base Monthly Rental or any monetary obligation by wire or other electronic transfer of funds when due and such failure continues for three (3) Business Days after such amounts were due, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form provided by Lessor together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental and any Monetary obligations are transferred by Automated Clearing House Debit initiated by Lessor.

**Section 4.08.   Late Charges; Default Interest**. Any delinquent payment that is not paid within five (5) days of the date it was due shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the

5

payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest rate higher than the maximum legal rate then in effect.

**Section 4.09.    Holdover**. If Lessee remains in possession of the Property after the termination of the lease or the expiration of the Term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant at will and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided (prorated for partial months), except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over. Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF LESSEE

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties. Each Lessee represents and warrants to Lessor as follows:

**Section 5.01.  Organization, Authority and Status of Lessee**. Lessee has been duly organized or formed, is validly existing and in good standing under the laws of its state of formation and is qualified as a foreign corporation to do business in the state in which the Property is located. All necessary and appropriate action has been taken to authorize the execution, delivery and performance by Lessee of this Lease and of the other documents, instruments and agreements provided for herein.  Lessee is not, and if Lessee is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder.  The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02. Enforceability**. This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms, except as such enforcement may be limited by final non-appealable judgment in bankruptcy, insolvency, reorganization, arrangement, moratorium or other applicable laws relating to or affecting the rights of creditors generally.

**Section 5.03. Litigation**.  There are no suits, actions, proceedings or investigations pending against or involving Lessee or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 5.04.  Absence of Breaches or Defaults**.  To Lessee's knowledge, Lessee is not in material default under any document, instrument or agreement by which Lessee or the Property is subject or bound, which has had, or could reasonably be expected to result in, a Material

6

Adverse Effect.  To Lessee's knowledge, the authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee or the Property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect.  References to "Lessee's knowledge" and phrases of similar import shall refer only to the current actual (not constructive) knowledge of Lessee, with a reasonable duty of inquiry and shall not be construed, by imputation or otherwise, to refer to the knowledge of any other officer, agent, manager, representative or employee of Lessee or any affiliate thereof. Lessee hereby represents and warrants to Lessor that the foregoing person is the officer or employee of Lessee most likely to have personal knowledge of the matters covered by the representations and warranties set forth in this Lease.

Section 5.05.  **Compliance with OFAC Laws**.  Lessee is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

Section 5.06.  **Solvency**.  There are no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.

## ARTICLE VI

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

Section 6.01.  **Taxes**.

(a)    Lessee shall pay to the Lessor, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property.

Section 6.02.  **Utilities**.  Lessee shall contract, in its own name at its sole expense, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use, fire and other safety systems and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

(a)    **Coverage**.  Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance:

(i)    Insurance against loss or damage to personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form   Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision; provided, however, Lessee shall have until one (1) Business Day after the Effective Date to procure the insurance.  Such policy shall have a waiver of subrogation in favor of Lessee and Lessor.

(ii)    Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of the Property or adjoining ways, streets, parking lots or sidewalks.  Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $2,000,000 per occurrence for bodily injury and property damage, and $2,000,000 general aggregate per location, and shall be of form and substance satisfactory to Lessor.  Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)    Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)    Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months.  Such insurance is to follow the form of the real property "all risk" or "special form" coverage and is not to contain a co-insurance clause.  Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)    To the extent Lessee has had an increase in hazard at the Property or a change of operations, such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with

8

respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)    **Insurance Provisions**.  All insurance policies, where reasonably available in the marketplace, shall:

(i)    provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents under the commercial general liability, auto liability, umbrella and worker's compensation policies;

(ii)    be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor under the commercial general liability, auto liability, umbrella and worker's compensation policies;

(iii)    contain deductibles not to exceed $150,000 (except for flood and earthquake);

(iv)    contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)    provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor (ten (10) days for nonpayment) and to any Lender covered by any standard mortgagee clause or endorsement;

(vi)    be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii)    except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

(viii)    be issued by insurance companies licensed to do business in the states where the Property is located, and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    **Additional Obligations**.  It is expressly understood and agreed that (i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance

9

or, upon Lessor's request, duplicate originals of any property insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    **Blanket Policies**.  Notwithstanding anything to the contrary in this Section 6.03, any insurance which Lessee is required to obtain pursuant to this Section 6.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.  In addition, the limits of liability set forth above may be met with an umbrella policy.

**Section 6.04.  Tax Impound**.  Lessee to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all Real Estate taxes for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor.  Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion.  In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business Days of such notice, provide funds to Lessor in the amount of such deficiency.  Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve).  Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid.  Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor.  Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor.  Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee.  Promptly after any Event of Default has been cured, Lessor will release any unapplied Reserve funds to Lessee.

## ARTICLE VII

## MAINTENANCE; ALTERATIONS

**Section 7.01. Condition of Property; Maintenance**.    Lessee hereby accepts the Property or its suitability for its business use as set forth in Section 4.04 A "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof.  Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements existing or erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty as described in Article XI; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating the Property in accordance with Legal Requirements; (e) (i) using commercially reasonable efforts to ensure that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting to the extent desired by Lessee any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business. Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect.

**Section 7.02.  Alterations and Improvements**.  During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the prior written consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, upon fifteen business days prior written notice to the Lessor, Lessee may undertake nonstructural alterations to the Property, individually, costing less than $5,000 without Lessor's prior written consent.  If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed insured contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require.  Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements.  Upon completion of any alterations individually costing $5,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations.  Additionally, upon completion of any such alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor.  Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. For any work of improvement initiated by Lessee, Lessee shall execute and file or record timely, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations.  Any addition to or alteration of the Property shall be deemed a part of the

11

Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require evidencing the ownership by Lessor of such addition or alteration.

**Section 7.03. Encumbrances**. During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property. Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property. Lessee shall not grant any easements on, over, under or above the Property, without Lessor's prior written consent which may be withheld in Lesor's sole and absolute discretion.

## ARTICLE VIII

## USE OF THE PROPERTY; COMPLIANCE

**Section 8.01.  Use**.

(a) *Use*. Except for the Permitted Subleases (defined and described in Section 14.04 below), during the Lease Term, the Property shall be used solely for the use herein provided.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), and except for the Permitted Subleases, Lessee shall at all times during the Lease Term occupy the Properties and shall diligently operate its business on the Properties.

**Section 8.02. Compliance**. Lessee's use and occupation of the Property, and the condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect.  Subject to the foregoing, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect.  Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property.  Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Article V and this Section 8.02 remain true and correct and have not been breached.  Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached.  In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and,  shall, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event.  Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license or approvals from Governmental Authorities, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as

12

a result thereof.  Notwithstanding anything to the contrary in this Lease, Lessee shall not be required to perform alterations to the Property with respect to conditions that have been "grandfathered".  Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03.  Environmental**.

(a)    ***Covenants***.

(i)    Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(B)    There shall be no Releases in, on, under or from the Property.

(C)    There shall be no Hazardous Materials or Regulated Substances in, on or under the Property.

(D)    Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(E)    Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially increases a risk to human health or the environment, (2)  poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property; *provided, however*, nothing herein shall prohibit Lessee from using Hazardous Materials in the normal course of its business in accordance with Environmental Laws.

(F)    Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.03, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

13

(b)    ***Notification Requirements***.   Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation on the Property; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof, at or on the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.  Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c)    ***Remediation***. Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required of it by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed required of it by any Governmental Authority for protection of human health or the environment.  Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee.  Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d)    ***Indemnification***. Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters in violation of this Lease concerning the Property.  It is expressly understood and agreed that Lessee's obligations under this Section that arose during the Lease Term shall survive the expiration or earlier termination of this Lease for any reason.

(e)    ***Right of Entry***. In the event that Lessor has a reasonable basis to believe that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Lessee shall cooperate with and provide access to Lessor and any other Person

14

designated by Lessor. Any such assessment or investigation shall be at Lessee's sole cost and expense. Such an entry shall be subject to the terms of Section 9.02 hereof.

(f)    *Survival*. The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 that arose during the Lease Term shall survive the termination, expiration and/or release of this Lease.

# ARTICLE IX

## ADDITIONAL COVENANTS

**Section 9.01.  Performance at Lessee's Expense**. Lessee acknowledges and confirms that Lessor may collect its attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee, (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease following Lessor's reasonable belief of a breach under this Lease.

**Section 9.02.  Inspection**. Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same. Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such an entry in accordance with this section, but, subject to Section 10.01. Any entry by Lessor and Lessor's agents shall not impair the operations on the Property more than reasonably necessary and shall comply with all reasonable security measures of the occupants of the Property.

**Section 9.03.  Financial Information**.

(a)    ***Financial Statements***.  Within thirty (30) days after the end of each fiscal quarter and within sixty (60) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property; and (iii) the supplemental financial information set forth on Schedule 9.03.  All such financial statements shall be prepared in accordance with GAAP and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity.  In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits

15

and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03.  The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)    ***Other Information***.  Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority.  Lessor shall hold all of the information described in this Section 9.03 confidentially.

**Section 9.04.  OFAC Laws**.  Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if Lessee is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05.  Estoppel Certificate**.  At any time, and from time to time, each shall, promptly and in no event later than ten (10) business days after a request from the other party or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to the other or such Lender or mortgagee, as the case may be, a certificate in the reasonable form supplied by the other party, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether, to the actual knowledge, without inquiry, of the certifying party, there are then any existing defaults by the other party in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by it of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of the certifying party; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by the requesting party or any Lender or mortgagee, as the case may be.

16

## ARTICLE X

## RELEASE AND INDEMNIFICATION

**Section 10.01.  RELEASE AND INDEMNIFICATION**.  LESSEE AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LESSOR AND LENDER AND THEIR RESPECTIVE AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW.  LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF THE LESSEE OR ANY OTHER PERSON.  LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR LENDER NOR LESSOR'S OR LENDER'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF.  LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S NEGLIGENCE OR WILLFUL MISCONDUCT, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR CONTRACTORS.   IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION AS TO LIABILITY THAT AROSE DURING THE LEASE TERM SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

## ARTICLE XI

## CONDEMNATION AND CASUALTY

**Section 11.01.  Notification**. Lessee shall promptly give Lessor written notice of its actual knowledge of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations, or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations, or Casualty.

**Section 11.02. Total Condemnation**.   In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such dedicated road and no alternate arrangement that complies with Legal Requirements and is acceptable to Lessee is reached; or (ii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for its use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate

17

executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a)    *Termination of Lease*. On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.  If the date of such Total Condemnation is other than the first day of a month, the Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)    *Net Award*. Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 11.03. Partial Condemnation or Casualty**. In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)    *Net Awards*.  All Net Awards shall be paid to Lessor.

(b)    *Continuance of Lease*. This Lease shall continue in full force and effect upon the following terms:

(i)    All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii)    Lessee shall promptly commence and diligently prosecute the restoration of the Property to the same condition, as nearly as practicable, as prior to the Partial Condemnation or Casualty as approved by Lessor.  Subject to the terms and provisions of the Mortgage and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments within thirty (30) days of Lessee's request, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty.  Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence reasonably satisfactory to Lessor of Lessee's incurring restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty.  Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

18

(c)    ***Lessee Election To Terminate Lease***. Notwithstanding the foregoing, in the event of a Casualty during the final two (2) years of the Lease Term and Lessee reasonably determines that it shall take longer than one hundred and eighty (180) days to fully repair the Property and such determination is supported by a written certificate from Lessee's contractor, architect or engineer, then Lessee shall have the option of terminating this Lease by providing written notice thereof to Lessor within thirty (30) days of the date of such determination, but in any event, no more than sixty (60) days from the date of the Casualty.  Upon Lessee's election to terminate this Lease, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.

**Section 11.04.  Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder.  Except as provided below, Lessor shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration.  At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property.  If a taking is estimated to last longer than the lesser of twelve (12) months and the remainder of the Lease Term (as it may be extended by Lessee), the taking shall be considered as a Partial Condemnation or Total Condemnation, as applicable, rather than a Temporary Taking.

**Section 11.05.  Adjustment of Losses**.  Any loss under any property damage insurance required to be maintained by Lessee with respect to the real property shall be paid to Lessor.  Any Net Award relating to a Total Condemnation, or a Partial Condemnation shall be paid to Lessor.  Notwithstanding the foregoing or any other provisions of this Section 11.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

**Section 11.06. Lessee Obligation in Event of Casualty**. During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 11.07.  Lessee Awards and Payments**. Notwithstanding any provision contained in this Article XI, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee,

19

any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and relocation expenses (subject, however, to the provisions of Section 6.03(a)(iv) above).

## ARTICLE XII

### DEFAULT, CONDITIONAL LIMITATIONS,
### REMEDIES AND MEASURE OF DAMAGES

**Section 12.01.  Event of Default**. Each of the following shall be an event of default by Lessee under this Lease (each, an "Event of Default"):

(a)  if any representation or warranty of Lessee set forth in this Lease is intentionally false in any material respect when made, or if Lessee renders any intentionally materially false statement or account when made;

(b)  if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any delay in the payment of Rental as a result of a technical error in the ACH Method of Payment process shall not constitute an Event of Default hereunder so long as the same is corrected within two (2) Business Days of the date that Lessee receives notice thereof; and *provided, further*, that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder;

(c)  if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, if such failure continues for more than five (5) days past delinquency; *provided, however*, Lessor shall only be required to provide such cure period twice in any twelve (12) month period;

(d)  except as set forth in Section 8.01, if Lessee vacates or abandons the Property;

(e)  if there is an Insolvency Event affecting Lessee;

(f)  if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then

20

Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period.  If Lessee fail to correct or cure such failure within such period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)    if a final, non-appealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h)    if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)    if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)    if there is an "Event of Default" or other breach or default by Lessee under any of the other Transaction Documents, after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 12.02.  Remedies**.  Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)    to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)    in accordance with applicable Law, upon five  (5) Business Days' notice to Lessee setting forth (x) Lessor's intent to re-enter and take possession of the Property and expel Lessee and those claiming under or through Lessee, and (y) Lessee's concurrent opportunity to cure, and following a termination of this Lease, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action.  No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states.  If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease.  Lessor reserves the right

21

following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)    to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, and upon a termination of this Lease, dispose of any personal property and fixtures in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom in compliance with all Legal Requirements;

(d)    except to the extent prohibited by applicable law, to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses,  alteration, remodeling and repair costs and expenses of preparing for such reletting.  Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability.  Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)    except to the extent prohibited by applicable Law, upon a termination of this Lease, to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term, subject to the terms of California Civil Code 1951.2;

(f)    to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced, subject to Section 1951.2 of the California Civil Code;

(g)    to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein.  Any sum or sums so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.  Any such acts by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

22

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by *ex parte* motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 12.03.  Cumulative Remedies**. All powers and remedies given by Section 12.02 to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

**Section 12.04.  Lessee Waiver**. Except as otherwise set forth herein, Lessee hereby expressly waives, for itself and all Persons claiming by, through and under Lessee, including creditors of all kinds, (a) intentionally deleted; (b) the benefits of any present or future Legal Requirement that exempts property from liability for debt or for distress for rent; (c) any present or future Legal Requirement relating to notice or delay in levy of execution in case of eviction of a tenant for nonpayment of rent; and (d) any lien rights which may arise pursuant to any present or future Legal Requirement.

## ARTICLE XIII

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 13.01.  No Liens**. Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor.  NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE

23

PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 13.02. Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further reasonable instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that this Lease shall continue and Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of such Mortgages, so long as no Event of Default shall have occurred and be continuing. Notwithstanding the foregoing, (a) on the Effective Date, Lessor, Lessee and any lenders of the Property shall enter into a subordination and non-disturbance agreement in form approved by such lender and reasonably satisfactory to Lessee providing for recognition of Lessee's interests under this Lease in the event of a foreclosure of the Mortgage and memorializing the subordination of this Lease to the lien of such Mortgage and (b) the subordination of this Lease to a future Mortgage shall be conditioned upon Lessee's receipt from any such lender of such a recognition agreement.

**Section 13.03. Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 13.04. Execution of Additional Documents**. Although the provisions in this Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 13.05. Notice to Lender**. Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been provided written notice of any breach or default by Lessor of any of its obligations under this Lease before exercising its remedies hereunder and give such Lender at least thirty (30) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

**ARTICLE XIV**

**ASSIGNMENT**

**Section 14.01. Assignment by Lessor**. As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time

24

and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions.  Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT.  In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment).  At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations or decrease the rights of Lessee hereunder.  Provided the assignee assumes the same in writing, Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 14.02.  No Assignment by Lessee**.

(a)     Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease.  Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor, which shall not be unreasonably withheld.  At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee accruing thereafter under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor.  Such assignment of this Lease pursuant to Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor.  Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole option of Lessor.  Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)     Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided further that any assignee agrees to assume all of Lessee's obligations under this Lease accruing thereafter, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to (i) an Affiliate of Lessee, (ii) a successor to Lessee by merger or any entity which purchases or otherwise acquires all or substantially all of the assets or equity interests of Lessee in a bona fide sale for fair market value, or (iii) a Qualified Operator (each, a "Permitted Transfer").  A "Qualified Operator" shall mean a Person who, following the consummation of the assignment contemplated herein, for two (2) consecutive years immediately prior to the date of assignment or transfer, (A) has

25

a CFCCR (defined below) of at least 2.5x; (B) generates EBITDAR (defined below) of at least $7,280,000, and (C) has a Lease Adjusted Leverage (defined below) of no more than 5.0x; *provided, however*, that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02(b).  In the event that Lessee effects a Permitted Transfer pursuant to clause (iii), Lessee shall be released from any liability arising under this Lease from and after the date of such assignment.  In the event that Lessee effects a Permitted Transfer pursuant to clauses (i) or (ii), Lessee shall not be released from liability under this Lease.

For purposes hereof:

"*CFCCR*" means, with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of Capital Leases, dividends paid in cash and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.  The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person.  In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below, obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

26

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued, or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total Debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 14.03.  No Sale of Assets**.  Except for a transaction that includes an assignment as set forth in Section 14.02(b), without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets.  Any sale of Lessee's assets in violation of Section 14.03, shall be voidable at the sole option of Lessor.  Any consent to the sale of Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 14.04.  Subletting**.

(a)    Lessee shall not sublet any or all of the Property without the prior written consent of Lessor, which may be withheld by Lessor in its sole and absolute discretion and any such purported subletting shall be void

(b)    Lessee covenants and agrees that: (1) Lessee shall observe and timely perform all of its obligations as the landlord or sublandlord under each Permitted Sublease in compliance with the terms thereof; (2) Lessee shall promptly provide Lessor with any notice of material default received by Lessee from any Subtenant or any notice of material

27

default sent by Lessee to any Subtenant; (3) upon Lessor's request, Lessee shall furnish Lessor with any and all information requested by Lessor reasonably necessary for a determination of the status of any Permitted Sublease; and (4) upon Lessor's request, Lessee shall provide Lessor with copies of any and all Permitted Subleases and/or amendments thereto.

## ARTICLE XV

## NOTICES

**Section 15.01.  Notices**.  All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; or (c) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; or (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested.  Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

> If to Lessee: Broadway Community Care Centers and
> 9854 National Boulevard,
> Los Angeles, Ca 90034
>
> With a copy to:  George Shohet, Esq.
> 269 South Beverly Drive
> Beverly Hills, Ca 90212
>
> If to Lessor:    Seaton Investments, LLC
> 264 S Oakhurst Drive
> Beverly Hills, Ca 90212
> ATTN: Alan Gomperts
>
> With a copy to:

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above.

## ARTICLE XVI

## INTENTIONALLY OMITTED

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01. Force Majeure**.   Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty

28

beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder and provided that Lessee's termination rights shall not be delayed as a result of any Force Majeure Event.

Section 17.02.  No Merger.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

Section 17.03.  Interpretation.  Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

Section 17.04.  Intentionally Omitted.

Section 17.05.  Disclosures.

(a)    *Securities Act or Exchange Act*.  The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)    *Lessor Advertising and Related Publications*.  Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, pictures of the Property, and basic Transaction information, but expressly excluding Lessee's confidential information, solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.

(c)    *Public Disclosures.*  Except as required by Law, neither Lessor nor Lessee shall make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of the other party, except that any party may disclose such information to its accountants, lawyers, advisors and current and prospective investors, lenders and business partners and as required in litigation between the parties.

29

**Section 17.06.  Attorneys' Fees**.   In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled.  In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 17.07.  Memorandum of Lease**.  Concurrently with the execution of this Lease, Lessor and Lessee are executing a memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor and Lessee may not desire to disclose to the public; provided, however, neither party will record the memorandum without the consent of the other party.  Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term.

**Section 17.08.  No Brokerage**.  Lessor and Lessee represent and warrant to each other that they have not engaged any broker concerning the leasing of the Property.  Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.09.  Waiver of Jury Trial and Certain Damages**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.10.  Securitizations**. As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests

in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization").  Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease and such information is held confidentially, except as required to be disclosed by Law.

      **Section 17.11.**  Intentionally omitted.

      **Section 17.12.  Time is of the Essence; Computation**.  Time is of the essence with respect to each and every provision of this Lease.  If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day that is a Business Day.

      **Section 17.13.  Waiver and Amendment**.  No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought.  Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.  No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

      **Section 17.14.  Successors Bound**.  Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

      **Section 17.15.  Captions**.  Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

      **Section 17.16.  Other Documents**.  Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

      **Section 17.17.  Entire Agreement**.  This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject

31

matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 17.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**.  For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the county and state where the Property is located.  Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law.  Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.  This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

**Section 17.19.  Counterparts**.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original.  Furthermore, the undersigned agrees that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

**Section 17.20.  Reasonable Consents and Costs**.  Whenever this Lease requires an approval, consent, determination or judgment by either Lessor or Lessee, unless another standard is expressly set forth, such approval, consent, determination or judgment and any conditions imposed thereby shall be reasonable and shall not be unreasonably withheld or delayed.  Any expenditure by a party permitted or required under this Lease, for which such party demands reimbursement from the other party, shall be limited to the fair market value of the goods and services involved, shall be reasonably incurred, and shall be substantiated by documentary evidence available for inspection and review by the other party.

## ARTICLE XVIII (DELETED)

## ARTICLE XIX
SECONDARY "RIGHT OF FIRST REFUSAL"

Section 19.01. Secondary "Right of First Refusal"

(a) All rights accorded Lessee hereunder are secondary and subordinate to the rights accorded the tenant and its successors and assigns ("Seaton Tenant") pursuant to Article 27.5 Right of First Refusal as contained in the certain Retail Lease, dated September 7, 2023 by and between Seaton Investments, LLC, Landlord and AIRE Ancient Baths Los Angeles, LLC, Tenant ("Seaton Lease")

(b) At such time as the Seaton Tenant elects to purchase the Property pursuant to its rights under the Seaton Lease, this secondary right of first refusal shall terminate and be of no further force and effect.

32

(c) Lessee's reply hereunder shall only accrue and be exercisable as such time as Lessor gives Lessee written notice of the Seaton Tenant's election not to purchase the Property.

(d) Should Lessee elect to purchase the Property the Purchase Closing Date as hereunder defined  shall be twenty (20) business days from the date the Lessee receives the written notice of Seaton Tenant's election not to purchase the Property.

(e) If the lessee elects not to purchase the Property pursuant to this Article XIX, all rights of the Lessee pursuant to Article XIX shall terminate and be of no further force and effect.

Section 19.02  Offer. Subject to the terms and conditions set forth in this Article XIX, if Lessor desires to sell any Property and receives a bona fide written offer from a third party which offer is in all respects acceptable to Lessor, Lessor shall deliver a complete copy of such bona fide third party offer to Lessee ("Third Party Offer").  Within fifteen (15) days of Lessee's receipt of such Third Party Offer from Lessor, and a written statement of Lessor's desire to sell the Property in accordance with such Third Party Offer, Lessee shall have the right to deliver an offer to Lessor ("Purchase Offer") to purchase Lessor's interest in any such Property for the amount of and on the same terms as the bona fide third party offer to purchase such Property (the "Subject Purchase Price").  Lessor and Lessee shall complete such purchase, subject to the satisfaction of each of the terms and conditions set forth in Section 19.03 below.  Except as set forth in Sections 19.03, 19.04 and 19.07below, Lessor shall not sell the Property to a third party without providing a Third Party Offer to Lessee.

Section 19.03  Conditions Precedent

(a)      The purchase of Lessor's interest in a Property pursuant to this Article XIX shall be subject to the fulfillment of all of the following terms and conditions: (1) The Seaton Tenant has elected not to exercise its rights pursuant to Sections 27.5 of the Seaton Lease; (2)no Event of Default shall have occurred and be continuing under this Lease at the time Lessee delivers the Purchase Offer; (3)Lessee shall have paid to Lessor the Subject Purchase Price, together with all Rental and other Monetary Obligations then due and payable under this Lease as of the date of the closing of such purchase; (4)in addition to payment of the Subject Purchase Price, Lessee shall have satisfied its obligations under Section 19.04 below; and the date of the closing of such purchase shall occur on the next scheduled Base Monthly Rental payment date that is ninety (90) days following Lessor's receipt of the Purchase Offer.

(b)      On the date of the closing of the purchase of a Property pursuant to this Section (the "Purchase Closing Date"), subject to satisfaction of the foregoing conditions: (1) this Lease shall be deemed terminated; provided, however, such termination shall not limit Lessee's obligations to Lessor under any indemnification provisions of this Lease and Lessee's obligations to pay any Rental or Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the Purchase Closing Date shall survive the termination of this Lease; and (2) Lessor shall convey such Property to Lessee "as is" by grant deed, free and clear of all liens and encumbrances except as provided in Section 18.02, and without representation or warranty.

Section19.04 Costs.  If Lessee delivers a Purchase Offer, Lessee shall be solely responsible for the payment of all Costs resulting from any proposed purchase pursuant to this Article XIX, regardless of whether the purchase is consummated, including, without limitation, to the extent applicable, the cost of title insurance and endorsements, including, survey charges, stamp taxes, mortgage taxes, transfer taxes and fees, escrow and recording fees, taxes imposed on Lessor as

33

a result of such purchase, the attorneys' fees of Lessee and the reasonable attorneys' fees and expenses of counsel to Lessor.

Section19.05 Termination of Right.  NOTWITHSTANDING ANYTHING TO THE CONTRARY, LESSEE'S RIGHTS UNDER THIS ARTICLE XIX SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT (a) WITH RESPECT TO THE THIRD PARTY OFFER IN QUESTION, IF LESSEE FAILS TO EXERCISE THE RIGHT GRANTED PURSUANT TO THIS ARTICLE, AND THE SALE TO THE THIRD PARTY PURCHASER IS CONSUMMATED ON THE SUBSTANTIALLY THE SAME TERMS AS PROVIDED IN THE THIRD PARTY OFFER PROVIDED TO LESSEE; (b) IF THIS LEASE TERMINATES OR THE LEASE TERM EXPIRES; (c) IF THE PROPERTY IS SOLD OR TRANSFERRED PURSUANT TO THE EXERCISE OF A PRIVATE POWER OF SALE OR JUDICIAL FORECLOSURE OR ACCEPTANCE OF A DEED IN LIEU THEREOF; OR (d) WITH RESPECT TO THE THIRD PARTY OFFER IN QUESTION, IF ANY EVENT OF DEFAULT SHALL HAVE OCCURRED AND BE CONTINUING UNDER THE LEASE AT THE TIME LESSEE DELIVERS THE PURCHASE OFFER.  IN ANY SUCH EVENT, LESSEE SHALL EXECUTE A QUITCLAIM DEED OR SUCH OTHER DOCUMENTS AS LESSOR SHALL REASONABLY REQUEST EVIDENCING THE TERMINATION OF ITS RIGHT UNDER THIS ARTICLE XIX.  IF LESSEE DOES NOT PROVIDE A PURCHASE OFFER AND LESSOR DESIRES TO SELL THE PROPERTY ON TERMS MATERIALLY MORE FAVORABLE (TO THE PROSPECTIVE PURCHASER) THAN THOSE SET FORTH IN THE THIRD PARTY OFFER PROVIDED TO LESSEE, THE TERMS OF THIS ARTICLE XIX SHALL AGAIN APPLY AND LESSOR SHALL PROVIDE LESSEE WITH A THIRD PARTY OFFER WITH SUCH TERMS THAT ARE MORE FAVORABLE TO THE PROSPECTIVE PURCHASER.  SUBJECT TO THE TERMINATION PROVISIONS ABOVE, LESSEE'S RIGHTS UNDER THIS ARTICLE XIX SHALL BE CONTINUING THROUGHOUT THE LEASE TERM.

Section19.06  Attornment.  If Lessee does not deliver its Purchase Offer to purchase the Property and the Property is transferred to a third-party purchaser, Lessee will attorn to any third-party purchaser as Lessor so long as such third-party purchaser and Lessor notify Lessee in writing of such transfer.  At the request of Lessor, Lessee will execute such documents confirming the agreement referred to above and such other agreements as Lessor may reasonably request, provided that such agreements do not increase the liabilities and obligations of Lessee hereunder.

Section19.07  Exclusions.  The provisions of this Article XIX shall not apply to or prohibit (i) any mortgages or other hypothecation of Lessor's interest in the Property; (ii) any sale of the Property pursuant to a private power of sale under or judicial foreclosure of any mortgage or other security instrument or device to which Lessor's interest in the Property is now or hereafter subject; (iii) any transfer of Lessor's interest in the Property to a mortgagee or other holder of a security interest therein or their designees by deed in lieu of foreclosure; (iv) any transfer of the Property to any Affiliate of Lessor; (v) any transfers of interests in Lessor by any member, shareholder, partner or other owner to any other member, shareholder, partner or other owner; and (vi) any transfers to any Person to whom Lessor sells all or substantially all of its assets.

ARTICLE XX
TENANT PARKING

34

Section 20.01 **<u>Parking</u>**. Tenant and Tenant's employees, clients, and invitees shall have the non-exclusive right to the use of Landlord's parking lot. Landlord shall provide stacked parking spaces for Tenant employees, clients, and invitees in the parking lot located adjacent to the building for the Lease Term. The number of parking spaces will be subject to the availability of parking spaces at the time of such request. Tenant may reduce the number of parking spaces at any time by providing at least ten (10) days' advance written notice to Landlord. Tenant shall have the right to use and access of the parking lot 365 days per year. Landlord shall provide fixed monthly parking rates (for guest and employee use of the parking lot) prior to the date Tenant opens for business to the public for Tenant review. Such fixed parking rates shall be based on fair market prices offered in the Arts District neighborhood and differentiated between employee and guest parking rates.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

EXHIBIT A - Page 44

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**

**Seaton Investments, LLC**

By:_____

Name: Alan Gomperts

Title: Managing Member

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSEES:**

**The DMB Fund, a California not for profit corporation dba "Broadway Community Care Centers"**

By:_____

Name: Steve Gold

Title:    Secretary

**Levav Group, LLC
a California limited liability company**

By:_____

Name: Ari Stock

Title:   Managing Member

**EXHIBITS**

Exhibit A:                     Defined Terms

Exhibit B:                     Legal Description and Street Address of the Property

Exhibit C:                     Base Rent Escalated

Exhibit E:                     Plans/Schematics prepared by Jila Kohan, Architect.

## EXHIBIT A

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Sections 4.03, 4.04, and 4.06.03

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person.  For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" shall mean twelve (12) times the base monthly rental.

"*Base Monthly Rental*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Santa Barbara, California are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property caused by a force majeure event.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all actual, reasonable, out of pocket costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, expert fees, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

1

"*Default Rate*" means 12% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extension Term*" has the meaning set forth in Section 3.02.

"*Fair Market Value*" has the meaning set forth in Section 18.06.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) petroleum, oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, for which liability or standards of conduct can be imposed pursuant to Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any Environmental Laws, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million;

(c) underground storage tanks; and (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, or lenders or their respective successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 1.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*"  means the Initial term and the additional term pursuant to the extension option set forth in Section 1.03.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property and/or the value of the Property; (b) the contemplated business, condition, worth or operations of Lessee; (c) Lessee's ability to perform its obligations under this Lease; or (d) Lessor's interests in the Property, this Lease or the other Transaction Documents.

"*Monetary Obligations*" means all Rental and any and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

"*Mortgage*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03(a)(i) with respect to real property (but not Lessee's personal property) payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Encumbrances*" shall mean recorded easements, restrictions, liens and encumbrances affecting the Property.

"*Permitted Sublease*" has the meaning set forth in Section 14.04.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency.  In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02.  In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"*Property*" means that parcel or parcels of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.01.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any

inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental, the Additional Rental and Taxes and assessments; pursuant to Section 6.01 utilities; insurance.

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Subtenant*" has the meaning set forth in Section 14.04.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means. The Taking shall be considered to have taken place as of the date actual physical possession is taken by the condemnor.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

"*Transaction Documents*" means this Lease, the Memorandum of Lease, the Letter of Credit and any Subordination, Nondisturbance and Attornment Agreement.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

## EXHIBIT B

## LEGAL DESCRIPTION AND
## STREET ADDRESS OF THE PROPERTY

**Street Address:**       **440 Seaton Street, Los Angeles, CA 90013**

**Legal Description**:

Tract I

Lot 9 in Block "C" of F.P. Howard and Co's Subdivision of the Bliss Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 12 Page 42 of Miscellaneous Records, in the Office of the County Record of said County.

Tract II

Lot 11 and Lots 13 through 18 inclusive in Block "C" of F.P. Howard and Co's Subdivision of the Bliss Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 12 Page 42 of Miscellaneous Records, in the Office of the County Recorder of said County
.
Note for Information: Being known and designated Assessor's Parcel No.: 5163-025-010
Note for Information: Being commonly known as 422 Seaton Street, Los Angeles, California.

Seaton Investments, LLC
Lease Schedule
Exhibit C

| | | Year 1<br>Months 7-12 | Year 2<br>Months 13-24 | Year 3<br>Months 25-36 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Monthly Rental - Ground Floor | 16,243 SF | 44,668 | 44,668 | 46,008 | 47,388 | 48,810 | 50,274 | 51,782 | 53,336 | 54,936 | 56,584 | 58,282 | 60,030 | 61,831 | 63,686 | 65,596 |
| Base Monthly Rental - 2nd Floor | 17,949 SF | | 49,360 | 50,841 | 52,366 | 53,937 | 55,555 | 57,222 | 58,938 | 60,707 | 62,528 | 64,404 | 66,336 | 68,326 | 70,376 | 72,487 |
| Base Monthly Rental - 3rd Floor | 17,963 SF | | 49,398 | 50,880 | 52,406 | 53,979 | 55,598 | 57,266 | 58,984 | 60,753 | 62,576 | 64,453 | 66,387 | 68,378 | 70,430 | 72,543 |
| Total Base Monthly Rental | 52,155 SF | 44,668 | 143,426 | 147,729 | 152,161 | 156,725 | 161,427 | 166,270 | 171,258 | 176,396 | 181,688 | 187,138 | 192,753 | 198,535 | 204,491 | 210,626 |

**EXHIBIT A - Page 55**



