1  Michael Gerard Fletcher (State Bar No. 070849)
   mfletcher@frandzel.com
2  Gerrick M. Warrington (State Bar No. 294890)
   gwarrington@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
4  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Secured Creditor
   ARCHWAY BROADWAY LOAN SPE, LLC

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11  In re                              Lead Case No. 2:24-bk-12079-VZ

12  SEATON INVESTMENTS, LLC, *et al.*,   Jointly Administered with Case Nos.:

13          Debtors and Debtors-in-      2:24-bk-12080-VZ; 2:24-bk-12081-VZ;
            Possession.                  2:24-bk-12082-VZ; 2:24-bk-12091-VZ;
14                                       2:24-bk-12074-VZ; 2:24-bk-12075-VZ; and
                                         2:24-bk-12076-VZ
15
    Affects:                             Chapter 11
16
    ☐ All Debtors                        **OMNIBUS DECLARATION OF BOBBY**
17  ☐ Seaton Investments, LLC            **KHORSHIDI IN SUPPORT OF**
    ☐ Colyton Investments, LLC           **ARCHWAY BROADWAY LOAN SPE,**
18  ☒ Broadway Avenue Investments, LLC   **LLC'S OPPOSITION TO:  (1) RENEWED**
    ☐ SLA Investments, LLC               **MOTION OF DEBTOR AND DEBTOR IN**
19  ☐ Negev Investments, LLC             **POSSESSION BROADWAY AVENUE**
    ☐ Alan Gomperts                      **INVESTMENTS, LLC FOR ORDER**
20  ☐ Daniel Halevy                      **AUTHORIZING DEBTOR TO ENTER**
    ☐ Susan Halevy                       **INTO POST-PETITION LEASE; AND**
21                                       **(2) RENEWED MOTION OF DEBTOR**
                                         **AND DEBTOR IN POSSESSION**
22                                       **BROADWAY AVENUE INVESTMENTS,**
                                         **LLC FOR ORDER AUTHORIZING**
23                                       **DEBTOR TO OBTAIN POST-PETITION**
                                         **FINANCING PURSUANT TO 11 U.S.C.**
24                                       **§ 364**

25                                       Date:      December 12, 2024
                                         Time:      11:00 a.m.
26                                       Crtrm.:    1368
                                                    255 E. Temple Street
27                                                  Los Angeles, CA 90012

28                                       Hon. Vincent P. Zurzolo

─────────────────────────────────────────────
                        1

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

I, Bobby Khorshidi, declare:

1.     I am a director of Archway Real Estate Income Fund I REIT, LLC fka Archway Real Estate Income Fund I SPE I, LLC, a Delaware limited liability company, who is a manager of secured creditor, Archway Broadway Loan SPE, LLC, a Delaware limited liability company ("Archway").

2.     If called as a witness, I could and would competently testify to all facts within my personal knowledge, except where stated upon information and belief.

3.     This declaration is submitted in support of Archway's Oppositions to the *Renewed Motion of Debtor and Debtor in Possession Broadway Avenue Investments, LLC for Order Authorizing Debtor to Enter into Post-Petition Lease* ("Lease Motion") (Dkt. 310) and the Renewed Motion of Debtor and Debtor in Possession Broadway Avenue Investments, LLC for Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364 ("Loan Motion") (Dkt. 307) filed in the lead case of those jointly-administered debtors, Seaton Investments, LLC ("Seaton"), Colyton Investments, LLC ("Colyton"), Broadway Avenue Investments, LLC ("Broadway"), SLA Investments, LLC ("SLA"), and Negev Investments, LLC ("Negev" and collectively with Seaton, Colyton, Broadway and SLA, the "Corporate Debtors") and Alan Gomperts ("Mr. Gomperts"), Daniel Halevy ("Mr. Halevy"), and Susan Halevy ("Ms. Halevy" and collectively with Mr. Gomperts and Mr. Halevy, the "Individual Debtors" and collectively with the Corporate Debtors, the "Debtors").

**Archway makes a $17 million loan to Broadway.**

4.     On July 21, 2021, Archway made a business loan to Broadway in the principal amount of $16,942,500.00 ("Broadway Loan"). The Broadway Loan is evidenced, in part, by a Promissory Note ("Broadway Note") whereby Broadway promised, among other things, to pay Archway the principal amount of $16,942,500.00, plus interest, costs, fees, and other charges as set forth therein. A true and correct copy of the Broadway Note is attached hereto as **Exhibit 1.**

5.     In connection with the Broadway Loan, Broadway executed and delivered to Archway that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Deed of Trust"), whereby Broadway granted Archway a first-position lien on the

property as described therein, which includes that certain real property located at 737 South Broadway, Los Angeles, CA 90014 ("Property"). Archway caused the Deed of Trust to be recorded in the Los Angeles County Recorder's Office on July 26, 2021, which recording was assigned document number 20211142009. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit 2.** Broadway also executed and delivered an Assignment of Rents and Leases ("AOR") dated July 23, 2021, which Archway caused to be recorded in the Los Angeles County Recorder's Office on July 26, 2021, which recording was assigned document number 20211142010. A true and correct copy of the AOR is attached hereto as **Exhibit 3.**

6.      Archway perfected its interests in such collateral and proceeds by filing UCC-1 financing statement on July 29, 2021, with the California Secretary of State, which filing was assigned filing number U210071454128. A true and correct copy of that UCC-1 is attached hereto as **Exhibit 4.**

**Broadway and the guarantors default under the Broadway Loan.**

7.      Later, Broadway and the Broadway Loan guarantors defaulted under the terms of the Broadway Loan Documents, including, without limitation, failing to obtain a certificate of occupancy by January 21, 2022, for the Property, as required by Section 5.1(o) of the Broadway Loan Agreement, and by failing to pay the Broadway Loan obligation in full as of the scheduled maturity date, August 1, 2022 (collectively, "Existing Defaults").

**The parties restructure the Broadway Loan.**

8.      In connection with the Existing Defaults, and at Broadway's request, Broadway, the Broadway Loan guarantors, and Archway entered into that certain Settlement and Loan Modification Agreement on April 19, 2023 ("Settlement Agreement"). Among other things, the Settlement Agreement extended the maturity date of the Broadway Loan to December 1, 2023, at which time the entire principal under the Broadway Loan plus all accrued and unpaid interest and other amounts would be due and payable as provided under the Settlement Agreement. The Existing Defaults otherwise remained uncured.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**Archway makes three new loans as part of the restructure.**

9.      As part of the restructure, Archway made three additional loans—(1) a loan in the principal amount of $1,300,000.00 to Negev ("Negev Loan"), (2) a loan in the principal amount of $125,000.00 to SLA (guarantied by Mr. Gomperts, Ms. Halevy, and Mr. Halevy, among others) ("SLA Loan"), and (3) a loan in the principal amount of $2,575,000.00 to Ms. Halevy's self-settled inter-vivos revocable trust, the Halevy Family Trust, dated September 8, 2010 ("Halevy Trust"), Mr. Gomperts's self-settled inter-vivos revocable trust, the Gomperts and Halevy Family Trust ("G&H Trust"), and to Mr. Halevy ("Guarantor Loan" and collectively with the Negev and SLA Loans, the "New Loans"). Each of the New Loans are evidenced by loan documents and collateral pledges. Such collateral pledges cross-collateralize the Broadway Loan as, among other thigs, third-party accommodation pledges in support of the Broadway Loan as well as each of the other New Loans.

**Broadway's members, including Mr. Gomperts, Ms. Halevy, and Mr. Halevy, provide verified personal financial statements to Archway reflecting significant net worths.**

10.     In or around August 21, 2023, Mr. Gomperts, Ms. Halevy, and Mr. Halevy provided Archway with verified personal financial statements reflecting over $60 million in combined net worths. True and correct copies of these financial statements are attached hereto collectively as **Exhibit 5.**

**The Archway loan obligations mature.**

11.     On December 1, 2023, the Broadway Loan, as well as the three other New Loans described in the Settlement Agreement, matured without being paid in full, which constituted, among other things, a maturity default under the applicable Broadway Loan Documents.

**The Debtors file chapter 11 petitions.**

12.     On March 18, 2024, the Individual Debtors filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Central District of California, commencing three of the instant bankruptcy cases.

13.     The next day, on March 19, 2024, Broadway and the other Corporate Debtors filed chapter 11 petitions, commencing the relevant corporate bankruptcy cases.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**Archway's files proofs of claim.**

14.     On July 15, 2024, Archway filed its proofs of claim in the respective bankruptcy cases of the debtor-obligors. Each proof of claim for the New Loans reflects the cross-collateralization aspects of that claim, including the cross-collateralization of the Broadway Loan.

15.     Broadway now owes Archway over $18 million, and it has not received any payments from the Debtors since well before the Loans matured in December of 2023.

**Mr. Gomperts is required to make a capital call on Broadway's members.**

16.     Mr. Gomperts is the manager and a 33.33% owner of Broadway. *See* SOFA 2:24 bk 12081-VZ Dkt. 22 at 19. Ms. Halevy and Mr. Halevy are the other two 33.33% owners of Broadway. *See id.* Broadway's Operating Agreement ("Operating Agreement") contains a mandatory capital call provision, providing that the manager of Broadway must make a capital call on Broadway's members, including himself, if Broadway needs additional cash for its operations or capital expenditures. *See* Operating Agreement at § 2.1. A true and correct copy of the Operating Agreement is attached hereto as **Exhibit 6.**

17.     Broadway is, and has been, insolvent since well before April of last year.

### Custodian of Records

18.     I am one of the custodians of the books, records, and files of Archway as to those books, records, and files that pertain to loans and extensions of credit given to the Debtors as set forth in this Declaration and in these jointly-administered bankruptcy cases.

19.     I have personally worked on such books, records, and files, and as to the facts set forth in this Declaration, I know such facts to be true of my own knowledge or I have gained knowledge of them from the business records of Archway on behalf of Archway, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Archway's business at or near the time of the acts, conditions, or events to which they relate.

20.     Any such document was prepared in the ordinary course of business of Archway by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such acts, conditions, or events.

[Signature on Following Page]

1   I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct and that this Declaration was executed on this 25th day of November,

3   2024, at Los Angeles, California.

Bobby Khorshidi

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

6

# EXHIBIT 1

BOBBY-007

# PROMISSORY NOTE

$16,942,500.00                                                          As of July 21, 2021

FOR VALUE RECEIVED, **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100  Dollars ($16,942,500.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be

construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.** **TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

EXECUTED as of the date first written above.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By
Name: Alan Gomperts
Title: Manager

## ALLONGE

FOR VALUE RECEIVED, the undersigned, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Archway*"), the original payee under that certain Promissory Note, dated as of July 21, 2021, in the original principal amount of $16,942,500.00, made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), and payable to the order of Archway (the "*Note*"), to which this endorsement is affixed, absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company ("("*Archway Broadway*"), its successors and assigns, the Note, without recourse, representation or warranty of any kind, except as and to the extent set forth in the Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Archway to Archway Broadway, dated on or about the hereof. This assignment includes the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: September 30, 2024

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC, formerly known as ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent

# EXHIBIT 2

BOBBY-012



**This page is part of your document - DO NOT DISCARD**



# 20211142009



**Pages:
0022**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**07/26/21 AT 08:00AM**

| | |
|---|---|
| FEES: | 147.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 372.00 |



**L E A D S H E E T**



**202107261000021**

**00020896342**



**012479545**

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



0621014460

BOBBY-013

Recording Requested By
Old Republic Title

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 440-4100
Email: jmogin@raineslaw.com

---

*(space above this line for recorder's use only)*

**BROADWAY AVENUE INVESTMENTS LLC**, as grantor
(Borrower)

to

**OLD REPUBLIC TITLE**, as trustee
(Trustee)

for the benefit of

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, as beneficiary

(collectively, Lender)

---

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

Dated:        July **23** 2021

Address:    737 S. Broadway
            Los Angeles, CA 90014

THIS INSTRUMENT IS TO BE INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING FILED AS A FINANCING STATEMENT.

THIS INSTRUMENT CONSTITUTES A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE. TO THE EXTENT THE GOODS ARE FIXTURES UNDER THE LAWS OF THE STATE OF CALIFORNIA, THE FIXTURES ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY LOCATED IN LOS ANGELES COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED ON <u>EXHIBIT A</u> ATTACHED TO THIS SECURITY INSTRUMENT.

BOBBY-014

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY
AGREEMENT AND FIXTURE FILING**

This Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing is executed as of July **23**, 2021, by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company (*"**Borrower**"*) to **OLD REPUBLIC TITLE** (*"**Trustee**"*), for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company, as beneficiary (*"**Lender**"*).

This instrument is made in connection with a loan in the amount of $16,942,500.00 as evidenced by the Loan Agreement.

## W I T N E S S E T H:

In order to secure payment of the Indebtedness and performance of Borrower's obligations under the Loan Documents, Borrower hereby irrevocably grants, bargains, sells and conveys to Trustee IN TRUST, WITH POWER OF SALE, the following property and rights, whether now owned or held or hereafter acquired and Borrower further grants to Trustee a first priority security interest in the Property.

### GRANTING CLAUSE ONE

All of Borrower's right, title and interest in and to the Land.

### GRANTING CLAUSE TWO

All of Borrower's right, title and interest in and to the Additional Land.

### GRANTING CLAUSE THREE

All of Borrower's right, title and interest in and to the Improvements.

### GRANTING CLAUSE FOUR

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy, property, possession, claim and demand whatsoever, both in law and in equity, of Borrower in, of and to the Real Property and every part and parcel thereof, with the appurtenances thereto.

### GRANTING CLAUSE FIVE

All right, title and interest in and to the Equipment and the right, title and interest of Borrower in and to any of the Equipment which may be subject to any Security Agreements (as defined in the Uniform Commercial Code) superior, inferior or pari passu in lien to the lien of this Security Instrument. In connection with Equipment which is leased to Borrower or which is subject to a lien or security interest which is superior to the lien of this Security Instrument, this Security Instrument shall also cover all right, title and interest of each Borrower in and to all deposits and the benefit of all payments now or hereafter made with respect to such Equipment.

1

### GRANTING CLAUSE SIX

All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property or any part thereof, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade or for any other injury to or decrease in the value of the Real Property.

### GRANTING CLAUSE SEVEN

All leases and subleases (including, without limitation, all guarantees thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or any part thereof, now or hereafter entered into (including any use or occupancy arrangements created pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including, but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

### GRANTING CLAUSE EIGHT

All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

### GRANTING CLAUSE NINE

All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

### GRANTING CLAUSE TEN

The right, in the name of and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Lender in the Real Property or any part thereof and all awards and/or judgments received by Borrower from any source whatsoever.

### GRANTING CLAUSE ELEVEN

All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Borrower now has or may hereafter acquire in the Real Property or any part thereof.

737 S Broadway – Security Instrument

BOBBY-016

## GRANTING CLAUSE TWELVE

All rights which Borrower now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

## GRANTING CLAUSE THIRTEEN

All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

## GRANTING CLAUSE FOURTEEN

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

WITH RESPECT to any portion of the Property which is not real estate under the laws of the State of California, Borrower hereby grants, bargains, sells and conveys the same to Lender for the purposes set forth hereunder and the references above to Trustee shall be deemed to be to Lender with respect to such portion of the Property and Lender shall be vested with all rights, power and authority granted hereunder or by law to Trustee with respect thereto.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns for the benefit of Lender and the successors and assigns of Lender forever.

IN TRUST, WITH POWER OF SALE, to secure the payment to Lender of the Indebtedness at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition, if Borrower shall well and truly pay to Lender the Indebtedness at the time and in the manner provided in the Note and this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void;

AND Borrower represents and warrants to and covenants and agrees with Lender and Trustee as follows:

Borrower warrants to Trustee for the benefit of Lender, and agrees to defend title to the Property against the claims of any Person or Governmental Authority, subject to the Permitted Encumbrances. This Security Instrument will have no further force or effect on the Termination Date. Trustee on behalf of Lender will (unless otherwise required by Applicable Law) release this Security Instrument within 30 days after the Termination Date, at Borrower's expense.

Borrower acknowledges receiving good and valuable consideration, including the Indebtedness, to execute and deliver this Security Instrument.

BOBBY-017

AND Borrower represents and warrants to and covenants and agrees with Lender and Trustee as follows:

## ARTICLE I.
## Definitions and Loan Documents

1.1    Loan Documents. All representations, covenants and other terms (including those terms that apply to all Loan Documents) of the other Loan Documents are, by reference, fully incorporated in this Security Instrument. All covenants in the Loan Documents are covenants running with the Land.

1.2    Definitions. Capitalized terms not otherwise defined below will have the meanings set forth in the Loan Agreement. Each of the below capitalized terms has the following meaning:

"*Additional Land*" means all additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental Deed of Trust or otherwise, be expressly made subject to the lien thereof.

"*Collateral*" means the Property and all of Borrower's other assets, whether now owned or hereafter acquired, including the Leases, and all proceeds from Borrower's assets.

"*Equipment*" means all machinery, equipment, fixtures, goods which are or are to become fixtures, furnishings, inventory and other property of every kind and nature whatsoever owned by Borrower or in which Borrower has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto and usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Borrower or in which Borrower has or shall have an interest (to the extent of such interest) now or hereafter located upon the Real Property or appurtenant thereto or usable in connection with the present or future operation and occupancy of the Real Property, including but not limited to all heating, ventilating, air conditioning, plumbing, lighting, communications and elevator machinery, equipment and fixtures.

"*Foreclosure Statute*" has the meaning set forth in Section 4.2 below.

"*Improvements*" means any and all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Land or any part thereof.

"*Land*" the real property or properties described on *Exhibit A* attached hereto.

"*Loan Agreement*" means the Loan Agreement, dated as of the date hereof, between Lender and Borrower.

"*Payment Notice*" means Lender's notice to Tenant of an Event of Default Period.

"*Personal Property*" means all (i) Awards, (ii) Leases, (iii) all of Borrower's accounts (as defined in the UCC), goods (as defined in the UCC), fixtures, accessions (as defined in the UCC), general intangibles (as defined in the UCC), chattel paper (as defined in the UCC), investment property (as defined in the UCC) and deposits accounts (as defined in the UCC) (including any accounts opened in connection with cash management), which are ever situated on, derived from or used in connection with the Property, (iv) Additional Collateral, (v) all insurance policies covering the Property, the other Personal Property and the liability of any Borrower, Trustee or Lender, and all insurance proceeds from any of the policies, (vi) amounts deposited in the Tax and Insurance Escrow Account, and (vii) all proceeds of the Personal Property described in (i) – (vi).

"*Property*" means the Real Property and the Personal Property.

BOBBY-018

"*Real Property*" means, collectively, (i) the Land (as legally described in *Exhibit A* annexed to this Security Instrument), (ii) the Improvements, (iii) Leases, Rents and Awards, (iv) all fixtures, accessions and appurtenances to the Land or Improvements, (v) all easements and rights of way now or hereafter benefiting the Land, (vi) all of Borrower's interest in any lands adjoining the Land, (vii) all water and all of Borrower's water rights benefiting the Land, and (viii) all rights, estates and privileges appurtenant or incident to the foregoing.

"*Security Instrument*" means this Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, as amended, modified, restated and extended.

"*Termination Date*" means day on which Borrower fully pays the Indebtedness and performance all of Borrower's obligations under the Loan Documents.

"*Transferee*" means any Person, including Lender, who takes title to any Collateral after a Transfer Event.

"*Trustee*" means Old Republic Title, and the successors and substitutes Lender designates.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code of the State of California, as amended.

1.3     Terms Generally; References and Titles.    References in this Security Instrument to "Articles," "Sections," "Exhibits" or "Schedules" will be to the Articles, Sections, Exhibits or Schedules of this Agreement unless otherwise specifically provided. All Exhibits and Schedules annexed to this Security Instrument are incorporated in, and are a part of, this Security Instrument for the purposes set forth in this Security Instrument. Any term defined in this Security Instrument may be used in the singular or plural. Words of any gender include all other genders. The terms "include," "includes," and "including" are followed by "without limitation". Except as otherwise specified or limited in this Security Instrument, a reference to any Person includes the successors and assigns of the Person. Unless otherwise specified all references "from" or "through" any date mean "from and including" or "through and including" the date. References to any statute or act include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, refer to federal statutes and acts of the United States. References to any agreement, instrument or document includes all schedules, exhibits, annexes and other attachments to the agreement, instrument or document.

1.4     Prepayment Premium.    Unless Lender specifically waives the Prepayment Premium (as defined in the Loan Agreement) in any purported payoff statement, the Prepayment Premium is due and payable as provided in the Loan Agreement.

ARTICLE II.
**Assignment of Leases and Rents**

2.1     Assignment.    For the Indebtedness and other good and valuable consideration, Borrower absolutely and unconditionally assigns and transfers to Lender (a) the Leases, (b) the Rents, and (c) any and all guaranties of payment of the Rent. Borrower does hereby absolutely and unconditionally assign to Lender its right, title and interest in all current and future Leases and Rents and all proceeds from the sale, cancellation, surrender or other disposition of the Leases, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise to impose any obligation upon Lender. Borrower agrees to execute and deliver to Lender such additional instruments in form and substance satisfactory to Lender, as may hereafter be requested by Lender to further evidence and confirm such assignment. Nevertheless, subject to the terms of this Section 2.1, Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents. Borrower shall hold the Rents, or a

5

BOBBY-019

portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums. During an Event of Default Period, the license granted to Borrower herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property. Lender is hereby granted and assigned by Borrower the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its reasonable discretion shall deem proper. It is further the intent of Borrower and Lender that the Rents hereby absolutely assigned are no longer, during the term of this Security Instrument, property of Borrower or property of any estate of Borrower as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Borrower.

2.2     Application of Rent.

(a)     Each Tenant may, until Lender delivers a Payment Notice, pay Rent directly to Borrower (or its designee). Borrower shall hold all Rent it (or its designee) receives in trust for the benefit of Lender and the Loan. Unless Lender otherwise agrees, Borrower must first only use the Rent to satisfy obligations arising under the Loan Documents, including payment of all Real Estate Taxes, insurance premiums, maintenance and repair costs, for the Property.

(b)     After a Tenant receives a Payment Notice, Tenant shall pay directly to Lender all Rent thereafter accruing. Tenant is relieved of its obligations to pay Borrower under any Lease to the extent of all Rent Tenant pays to Lender.

(c)     Lender may use any Rent it receives for (in the priority and amounts as Lender determines in its discretion): (i) (1) the expenses to operate, maintain and manage the Property, and (2) the expenses incident to taking and retaining possession of the Property and collecting Rent; and (ii) the Indebtedness. The assignment in Section 2.1 above does not reduce the Indebtedness unless Lender actually receives Rent and applies it to the Indebtedness.

(d)     Lender may, at its option and without impairing its rights under the assignment in this Section 2.1, release any Rent Lender receives to Borrower.

(e)     As between Borrower, Lender and any other Person, except a Tenant who has not received a Payment Notice, the assignment in Section 2.1 above is absolute, unconditional and presently effective. Lender's delivery of a Payment Notice is solely for the benefit and protection of each Tenant and does not otherwise benefit or affect Borrower or any Person claiming through or under Borrower.

(f)     Lender is not required to institute legal proceedings to enforce the terms of this Section.

2.3     No Third Party Beneficiary.  The assignment in Section 2.1 above is not made for the benefit of any Person other than Lender.

2.4     Release and Termination.  The assignment in Section 2.1 above terminates upon Lender's release of this Security Instrument.

ARTICLE III.
**Leases**

3.1     Intentionally Omitted.

3.2     Approval.  Except as set forth below and in the Loan Agreement, no Lease (including any Lease amendments) will be effective unless approved by Lender.

3.3     Terms.  Notwithstanding the terms of any Lease made on or after the Closing Date, each Lease is subordinate to this Security Instrument and each Tenant shall, if Lender elects, execute an instrument (in form and substance acceptable to Lender in its sole discretion) subordinating the Tenant's

6

BOBBY-020

leasehold interest to Lender's liens and security interests. Unless Lender specifically agrees in writing, no Leases may impose obligations upon Lender or any Transferee prior to or following a Transfer Event.

3.4      Lender's Preapproval. Notwithstanding Section 3.2 above and subject to Sections **Error! Reference source not found.** and 3.3 above, Borrower may enter into and modify, but not terminate, Leases (except ground or master Leases) that:

(a)        are with Tenants who are not affiliated with Borrower;

(b)        do not grant Tenant's more than 1 month of free rent for each year of the lease or renewal term or any reduced Rents, except as permitted pursuant to clause (d) hereof;

(c)        do not afford Tenants any termination rights;

(d)        are an arm's length transaction on economic terms conforming to current market conditions;

(e)        have a market rental rate; and

(f)        do not contain any rights of first refusal or options to purchase.

## ARTICLE IV.
### Remedies

4.1      Possession. During an Event of Default Period, Lender may (a) enter upon and take possession of the Property and (b) exercise, without Borrower's interference, any rights which Borrower has with respect to the managing, possessing, operating, leasing, protecting or preserving the Property. If Lender rents any of the Property, Lender will do so for the account of Borrower, and Lender may deduct from the Rents all expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property. Lender may apply any remaining Rents to the Indebtedness in any manner Lender chooses. All costs, expenses and liabilities Lender incurs in collecting the Rents and in managing, operating, maintaining, protecting or preserving the Property, which exceed the Rents Lender actually collects from Tenants will be Additional Costs. If Lender elects to take possession of the Property, then Borrower will quietly surrender possession of the Property. If Borrower fails to quietly surrender possession of the Property, then Lender may invoke all legal remedies to dispossess Borrower.

4.2      Foreclosure. Borrower grants Trustee on behalf of Lender a power of sale. During an Event of Default Period, Trustee, if Lender directs, on behalf of Lender may exercise the power of sale and foreclose the liens and security interests created by this Security Instrument in any manner provided at law or in equity (as amended, replaced or re-codified, the "*Foreclosure Statute*"). If the Foreclosure Statute is no longer in force or effect, then, in addition to Lender's other rights at law or in equity, Lender may foreclose pursuant to the rules set forth in the last effective Foreclosure Statute. In addition to the power of sale and non-judicial foreclosure rights granted to Trustee on behalf of Lender, if Trustee on behalf of Lender desires, then Trustee on behalf of Lender may file suit on the Indebtedness and for the foreclosure of the liens and security interests created by this Security Instrument.

4.3      Receiver. In addition to all other remedies in the Loan Documents, at law or in equity, during an Event of Default Period, (a) without notice to any Borrower Party, (b) whether or not Borrower is solvent, (c) whether or not a Borrower Party commits fraud or mismanages the Property, (d) even if the Property is sufficient to repay the Indebtedness, or (e) without filing any proceeding other than a proceeding seeking the appointment of a receiver, Lender will be entitled to the appointment of a receiver or receivers for the Property and the Rents. Borrower irrevocably consents to the appointment of a receiver and waives all defenses to any Lender application for a receiver. During a receivership for the Property, Borrower irrevocably consents to (i) Lender commencing any additional proceeding to enforce any other right or remedy under the Loan Documents, at law or in equity, and (ii) Trustee on behalf of Lender conducting a non-judicial sale of the Collateral pursuant to the Foreclosure Statute. Any money Lender advances in

connection with a receivership will be Additional Costs. This **Section** is an express condition upon which the Loan is made.

    4.4    <u>Proceeds of Sale</u>. The proceeds of any Trustee's or receiver's sale of the Property in foreclosure of the liens evidenced by this Security Instrument will be:

> **FIRST**, applied to the payment of all costs of the sale, and a reasonable fee, to Trustee acting under <u>Section 4.2</u> above; **SECOND**, applied to the Indebtedness, in the order Lender elects, until the Indebtedness is paid in full; and **THIRD**, the remainder, if any, paid to any Person (including Borrower) as required by Applicable Law.

    4.5    <u>Lender as Purchaser</u>. Lender may purchase the Property at any foreclosure sale. In connection with any foreclosure sale, Lender may credit bid in an amount up to the Indebtedness then owed to Lender.

    4.6    <u>Uniform Commercial Code</u>. During an Event of Default Period, Lender may exercise its rights of enforcement with respect to the Collateral under the UCC. In addition to or in substitution for Lender's UCC rights and remedies:

    (a)    Lender may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable, subject to the rights of any Tenants;

    (b)    Lender may require Borrower to assemble the Collateral and make it available at the Property or any place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Collateral;

    (c)    Lender may mail written notice to Borrower as provided in the Loan Agreement ten (10) days prior to the date of any sale of the Collateral, and such notice will constitute reasonable notice under the UCC;

    (d)    Lender need not take possession of the Collateral prior to any Transfer Event; and

    (e)    prior to applying Transfer Event proceeds to the Indebtedness, Lender may apply the proceeds to the reasonable expenses (including Lender's legal expenses and reasonable attorneys' fees, including allocated in-house counsel expenses) incurred to collect the Indebtedness, enforce the Loan Documents or to take possession of, hold or prepare the Collateral for transfer.

    4.7    <u>Delivery of Possession After Foreclosure</u>. Immediately after a Transfer Event, Borrower and any Person claiming any Collateral interest by, through or under Borrower, who is occupying or using the Property or other Collateral, will become the tenant or lessee of the Transferee. Subject to the terms of the applicable Lease and to any non-disturbance and attornment agreement between Lender and a Tenant, the post-Transfer Event tenancy will be a tenancy at will, terminable at the will of either Transferee or the tenant, at a daily fair market rental. If a Tenant fails to surrender possession of the Collateral to Transferee after Transferee's demand, then Transferee may institute and maintain an action for forcible entry and detainer of the Property.

ARTICLE V.
**Miscellaneous**

    5.1    <u>Successor Trustee</u>. Lender may remove Trustee, or Trustee may resign, at any time with or without cause. If Trustee dies, resigns or is removed, then Lender may, in writing, appoint a successor or substitute trustee. Lender may exercise its right to remove any Trustee or appoint any number of successor or substitute trustees as often as Lender desires until the Termination Date. Lender may appoint a single or multiple substitute trustees to act instead of the original trustee. If multiple substitute trustees are appointed, then each may act alone without the other substitute trustees. Immediately after a successor or substitute trustee is appointed, (i) all of the Trustee's estate in and title to the Collateral vests in the

8

successor or substitute trustee(s), (ii) the successor or substitute trustee(s) will succeed to all rights, powers, privileges and immunities conferred upon Trustee, and (iii) the prior Trustee(s) shall assign, transfer and deliver to the successor or substitute Trustee(s) all of the Collateral the prior Trustee holds. Upon the written request of Lender or of the successor or substitute Trustee(s), the prior Trustee shall execute and deliver an instrument transferring to the successor or substitute Trustee(s) all of the estate in and title to the Collateral.

5.2    Authorization to File Financing Statement. Borrower authorizes Lender to file in any jurisdiction a reproduction of this Security Instrument or financing statements covering the Collateral. If Lender desires, Lender may describe the Collateral in any financing statement as "*all assets*" of Borrower or words of similar effect.

5.3    Fixture Filing. This Security Instrument is a financing statement filed as a fixture filing. For purposes of this Security Instrument being a financing statement: Borrower is the debtor, Lender is the secured party, and the collateral is the Personal Property, including fixtures.

5.4    Dealing with Successor. If Borrower no longer owns the Collateral, then Lender may, without notice to Borrower, deal with Borrower's successor in interest concerning this Security Instrument and the Indebtedness in the same manner as with Borrower, without in any way vitiating or discharging Borrower's liability under the Loan Documents or for the Indebtedness. Notwithstanding the foregoing, Lender does not consent to any transfer of the Collateral, except as expressly set forth in the Loan Documents or as Lender hereafter agrees in writing.

5.5    Subrogation. If Loan proceeds pay indebtedness secured by any outstanding lien, security interest or prior encumbrance against the Collateral, then Lender has advanced the proceeds at Borrower's request and Lender is subrogated to all rights, security interests and liens held by the holder of the outstanding liens, security interests or encumbrances, irrespective of whether the liens, security interests or encumbrances are released. However, the terms and provisions of the Loan Documents will govern the rights and remedies of Lender and supersede the terms, provisions, rights and remedies under and pursuant to the instruments creating the original lien, security interest or encumbrance.

5.6    Application of Indebtedness. If this Security Instrument or any of the Collateral cannot lawfully secure any of the Indebtedness or if the liens or security interests created by this Security Instrument are invalid or unenforceable as to any of the Indebtedness or any of the Collateral, then all payments made on the Indebtedness will be applied first to all of the Indebtedness which is not secured by this Security Instrument or the Collateral.

5.7    Agents. Lender or Trustee may appoint one or more Persons as agent to perform any act necessary or incidental to any sale of the Collateral, in the name and on behalf of Lender or Trustee.

5.8    Transfer Recitals. All statements of fact in any instrument evidencing a Transfer Event concerning (i) nonpayment of the Indebtedness, (ii) any Event of Default, (iii) acceleration of the Indebtedness, or (iv) any other matter, are prima facie evidence of the truth of the recited fact.

5.9    Notices. Any notice required or permitted to be given under this Security Instrument shall be in writing and either (a) shall be mailed by certified mail, postage prepaid, return receipt requested, or (b) sent by overnight air courier service, or (c) personally delivered to a representative of the receiving party, or (d) sent by facsimile or email. All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

To Lender:    Archway Real Estate Income Fund I SPE I, LLC
16 N. Marengo Avenue, Suite 212
Pasadena, California 91101
Attention: Chuck Ng
Phone: (310) 779-6505

737 S Broadway – Security Instrument    BOBBY-023

|  | Email: cng@oakhurstfunds.com |
|---|---|
| with a copy to: | Raines Feldman LLP<br>1800 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067<br>Attention: Joshua Mogin<br>Phone: (310) 440-4100<br>Email: jmogin@raineslaw.com |
| To Borrower: | Broadway Avenue Investments LLC<br>264 S. Oakhurst Drive<br>Beverly Hills CA 90212<br>Attention: Alan Gomperts<br>Phone: (310) 621-5350<br>Email: alangomperts@hotmail.com |
| with a copy to | Feldman Berman Schwartz LLP<br>20750 Ventura Blvd., Ste. 201<br>Woodland Hills, CA 91364<br>(818) 707-1465 ext. 3<br>Attention: Craig Berman<br>cberman@fbsllp.com |
| Trustee: | Old Republic Title<br>8060 Santa Teresa Blvd. Ste 100<br>Gilroy, CA 95020<br>Attention: Jamie Buchanan<br>Phone: (408) 847-1505<br>Email: jbuchanan@ortc.com |

Any notice so addressed and sent by United States mail or overnight courier shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee. Any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, Lender or Indemnitor, as the case may be. Notices transmitted by facsimile or email shall be deemed received on the date of transmission, provided that a confirming copy of such notice is also sent by mail, overnight courier or personal delivery, as provided above. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

## ARTICLE VI.
## Concerning the Trustee

6.1    Trustee's Fees. Borrower shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

10

6.2     Substitute Trustee.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Lender may remove Trustee at any time or from time to time and select a successor trustee by filing the appropriate instrument in the office where this Security Instrument is recorded.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, with full power of substitution to file, execute and record any document required to appoint such substitute trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.  Borrower agrees to the foregoing for itself, its successors and assigns.

6.3     Power of Sale.

(a)     Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Lender, shall sell or offer for sale the Property in such portions, order and parcels as Lender may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located.  Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any Personal Property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Borrower obligated to pay the Note and other secured indebtedness secured by this Security Instrument according to the records of Lender in accordance with applicable law.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

(b)     At any such public sale, Trustee may execute and deliver in the name of Borrower to the purchaser a conveyance of the Property or any part of the Property in fee simple.  In the event of any sale under this Security Instrument by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Lender in its sole discretion may elect, and if Lender so elects, Trustee may sell the Personal Property covered by this Security Instrument at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted shall not extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full.  If the Note and other secured indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts or guaranty, assignments of lease, or other security instruments, Lender at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Lender may determine.

11

BOBBY_025

(c)     Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(d)     In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including, without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Lender), to payment of the outstanding principal balance of the Indebtedness, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Borrower, or to the person or entity lawfully entitled thereto.

(e)     In case Trustee shall have proceeded to enforce any right or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every case, Borrower, Lender and Trustee shall be restored to their former positions and the rights, powers and remedies of Lender and Trustee herein provided or arising, or existing otherwise as herein set forth shall continue as if no such proceeding had been taken.

6.4     Acceptance by Trustee. Trustee accepts the Property when this Security Instrument, duly executed and acknowledged, becomes a public record as provided by law. Trustee shall not be obligated to perform any act required hereunder unless the performance of such act is requested in writing and Trustee is reasonably indemnified against loss, cost, liability and expense.

6.5     Acts of Trustee. From time to time, upon written request of Lender and without affecting the liability of any person for payment of any indebtedness or performance of the obligations secured hereby, Trustee may, without liability therefor and without notice reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof. Trustee may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trust hereunder and the enforcement of the rights and remedies available hereunder, and Trustee may obtain orders or decrees directing or confirming or approving acts in the execution of said trust and the enforcement of said remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Security Instrument.

6.6     No Liability of Trustee. The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except due to the Trustee's gross negligence, breach of agreement, fraud or willful misconduct. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by them hereunder, believed by the Trustee in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law or under the Loan Documents), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

6.7     Trustee Powers. Trustee may exercise any of its powers through appointment of attorney-in-fact or agents. Trustee may select and employ legal counsel at the expense of Borrower.

6.8     Priority. All amounts advanced by either of Lender or Trustee hereunder shall be secured by this Security Instrument with priority dating back to the date of the grant of this Security Instrument.

6.9     Ratification.  Borrower hereby ratifies and confirms every act that Trustee and its successors may lawfully do at the Property by virtue of powers granted to Trustee hereunder.

## ARTICLE VII.
## State Law Provisions

7.1     Conflicts.  This Article VII will control any conflict between the terms of this Article VII and the other provisions of this Security Instrument and the other Loan Documents.

7.2     Full Reconveyance.  Upon written request of Lender stating that all sums secured hereby have been paid, upon surrender to Trustee of the Note and the original or a certified copy of this Security Instrument for cancellation and retention, and upon payment of its fees, Trustee shall fully reconvey, without warranty, the entire remaining Property then held hereunder.  The recitals in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof.  The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

7.3     Dwellings.  No portion of the proceeds of the Loan shall be used by Borrower to finance the purchase or construction of real property containing four (4) or fewer residential units or on which four (4) or fewer residential units are to be constructed.  No portion of the Property is or will be a "dwelling" within the meaning of Section 10240.1 or Section 10240.2 of the California Business and Professions Code.

7.4     Civil Code.  Borrower represents, warrants and acknowledges that the Loan is not subject to the provisions of Chapter 3, Title IV, Part 4, Division Third of the Civil Code of the State of California (Civil Code Sections 1912 et seq.) other than Section 1916.1 thereof.

7.5     Indemnity; Expenses.  Borrower will pay or reimburse the Trustee and the Lender for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, action, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Indebtedness, this Security Instrument or the interest created herein, or the Property, or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Lender, activities related to protection of Lender's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Borrower, and any such amounts paid or incurred by the Trustee or the Lender shall be added to the Indebtedness and shall be secured by this Security Instrument. The agreements of this subsection shall expressly survive in perpetuity satisfaction of this Security Instrument and repayment of the Indebtedness, any release, reconveyance, discharge of foreclosure of this Security Instrument, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by trustee's conveyance of the Property.  Notwithstanding the forgoing, Borrower shall have no liability under this Section for any fees, costs or expenses arising solely from the gross negligence, fraud, or willful misconduct of Lender.

7.6     Supplemental Environmental Provisions.  In the event that any portion of the Property is determined to be "environmentally impaired" (as "environmentally impaired" is defined in California Code of Civil Procedure Section 726.5(e)(3)) or to be an "affected parcel" (as "affected parcel" is defined in California Code of Civil Procedure Section 726.5(e)(1)), then, without otherwise limiting or in any way affecting Lender's or Trustee's rights and remedies under this Security Instrument, Lender may elect to exercise its right under California Code of Civil Procedure Section 726.5(a) to (i) waive its lien on such environmentally impaired or affected portion of the Property, and (ii) exercise the rights and remedies of an unsecured creditor, including reduction of its claim against Borrower to judgment and any other rights and remedies permitted by law. Lender shall have the right under Section 7.1 of this Security Instrument to allocate amounts recovered on the Indebtedness first to those portions thereof other than damages and

other amounts recoverable under California Code of Civil Procedure Section 736, and thereafter to damages and other amounts recoverable under said Section.

7.7    Foreclosure By Power of Sale.

(i) Should Lender elect to foreclose by exercise of the power of sale herein contained, Lender shall deliver to Trustee a written declaration of default and demand for sale, and shall deposit with Trustee this Security Instrument and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(a)    Upon receipt of notice from Lender, Trustee shall cause to be recorded, published and delivered to Borrower such notice of default and election to sell as is then required by law. Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Lender may direct Trustee so to do, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matter or fact shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers.

(b)    Subject to applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

7.8    Separate Sales. The Property may be sold in one or more parcels and in such manner and order as Lender, in its sole discretion, may direct Trustee so to do. A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein, and subsequent sales may be made hereunder until all obligations secured hereby have been satisfied, or the entire Property sold, without defect or irregularity.

7.9    Release of and Resort to Collateral. Lender may release, regardless of consideration and without the necessity for any notice to a consent by the holder of any subordinate lien on the Property, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests created in or evidenced by the Loan Documents or their stature as a first and prior lien and security interest in and to the Property. For payment of the Indebtedness, Lender may resort to any other security in such order and manner as Lender may elect.

7.10    Waiver of Redemption, Notice and Marshalling of Assets. To the fullest extent permitted by law, Borrower hereby irrevocably and unconditionally waives and releases (i) all benefit that might accrue to Borrower by virtue of any present or future statute of limitations or law or judicial decision exempting the Property from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment, (ii) all notices of any Event of Default or of Trustee's election to exercise or his actual exercise of any right, remedy or recourse provided for under the Loan Documents, and (iii) any right to a marshalling of assets or a sale in inverse order of alienation.

7.11    Discontinuance of Proceedings. If Lender shall have proceeded to invoke any right, remedy or recourse permitted under the Loan Documents and shall thereafter elect to discontinue or abandon it for any reason, Lender shall have the unqualified right to do so and, in such an event, Borrower

14

and Lender shall be restored to their former positions with respect to the Indebtedness, the Loan Documents, the Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if the right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Lender thereafter to exercise any right, remedy or recourse under the Loan Documents for such Event of Default.

7.12    No Mortgagee in Possession. Neither the enforcement of any of the remedies under this Security Instrument nor any other remedies afforded to Lender under the Loan Documents, at law or in equity, shall cause Lender or Trustee to be deemed or construed to be a mortgagee in possession of the Property, to obligate Lender or Trustee to lease the Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

7.13    Concerning the Trustee. With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ and consult with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution and interpretation of the Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his or her agents or attorneys, (iii) to select and employ, in and about the execution of his or her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee (and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence, bad faith, fraud or willful misconduct), and (iv) any and all other lawful action that Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered. Borrower will, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save and hold Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of Trustee's duties.

7.14    Retention of Money. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, and shall be segregated from any other moneys of Trustee.

7.15    Successor Trustees. Trustee may resign by the giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting in the execution of this trust, or if, for any reason, Lender, in Lender's sole discretion and with or without cause, shall prefer to appoint a substitute trustee or multiple substitute trustees, or successive substitute trustees or successive multiple substitute trustees, to act instead of the aforenamed Trustee, Lender shall have full power to appoint a substitute trustee (or, if preferred, multiple substitute trustees) in succession who shall succeed (and if multiple substitute trustees are appointed, each of such multiple substitute trustees shall succeed) to all the estates, rights, powers and duties of the aforenamed Trustee. Such appointment may be executed by any authorized agent of Lender, and if such Lender be a corporation and such appointment be executed on its behalf by any officer of such corporation, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any

superior officer of the corporation. Borrower hereby ratifies and confirms any and all acts which the aforenamed Trustee, or his or her successor or successors in this trust, shall do lawfully by virtue hereof. If multiple substitute trustees are appointed, each of such multiple substitute trustees shall be empowered and authorized to act alone without the necessity of the joinder of the other multiple substitute trustees, whenever any action or undertaking of such substitute trustees is requested or required under or pursuant to this Security Instrument or applicable law. Any prior election to act jointly or severally shall not prevent either or both of such multiple substitute Trustees from subsequently executing, jointly or severally, any or all of the provisions hereof.

7.16    Perfection of Appointment. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

7.17    Succession Instruments. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its, his or her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in such Trustee's place.

7.18    No Representation by Trustee or Lender. By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Trustee or Lender pursuant to the Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, neither Trustee nor Lender shall be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or affirmation with respect thereto by Trustee or Lender.

7.19    Border Zone. To Borrower's knowledge, Borrower represents to Lender that, as of the date hereof, the Property has not been designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be designated as Border Zone Property.

## [REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Borrower has executed this Security Instrument on the date of the below acknowledgement, but to be effective on the Closing Date.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By: _____
Name: Alan Gomperts
Title: Manager

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

BOBBY-031

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *Los Angeles*

On *July* 13 , 2021, before me, *REGINA BULAONG BENETUA* (a notary public), personally appeared *Alan Gomperts* , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

REGINA BULAONG BENETUA
Notary Public - California
Los Angeles County
Commission # 2357355
My Comm. Expires May 12, 2025

SIGNATURE/NOTARY PAGE
TO
SECURITY INSTRUMENT

# ILLEGIBLE NOTARY SEAL CERTIFICATION

### (Government Code 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary : _Regina Bulaong Benetua_

Commission Number : _2357355_

Vendor No. : _NNA1_

County/State where
Bond is filed : _Los Angeles County, CA_

Commission Exp. Date : _May 12, 2025_

Executed in the City of ____San Jose____ , State of California

eRecording Partners Network

_07/22/2021_

**Date**

By: _____

**Signature of Declarant**

_Lauren Montana_

**Type or Print Name**

███████  ███  █████

BOBBY-033

## EXHIBIT A

LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

# EXHIBIT 3

BOBBY-035



**This page is part of your document - DO NOT DISCARD**





## 20211142010



**Pages:
0013**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**07/26/21 AT 08:00AM**

| | |
|---|---|
| FEES: | 73.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 73.00 |



**L E A D S H E E T**

202107261000021

00020896343

012479545

**SEQ:
02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E527982

0621014460

BOBBY-036

RECORDING REQUESTED BY

*Old Republic Title Company*

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME *Raines Feldman LLP*

STREET ADDRESS *1800 Avenue of the Stars, 12th Floor*

CITY, STATE &
ZIP CODE *Los Angeles, CA 90067*

**SPACE ABOVE FOR RECORDER'S USE ONLY**

*Assignment of Leases and Rents*

**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☑ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

BOBBY-037

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attention: Joshua Mogin
Phone: (310) 440-4100
Email: jmogin@raineslaw.com

---

*(space above this line for recorder's use only)*

**BROADWAY AVENUE INVESTMENTS LLC**, as assignor

(Borrower)

to

**ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, as assignee

(Lender)

---

**ASSIGNMENT OF LEASES AND RENTS**

---

Dated:            July **23**, 2021

Address:         737 S. Broadway
                 Los Angeles, CA 90014

BOBBY-038

### ASSIGNMENT OF LEASES AND RENTS

This Assignment of Leases and Rents (this "**Agreement**") is executed as of July **23**, 2021, by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("**Borrower**"), as assignor, whose address for notice is 264 S. Oakhurst Drive, Beverly Hills CA 90212, Attention: Alan Gomperts, to **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("**Lender**"), as assignee, whose address for notice is 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng.

### RECITALS:

A.    This Agreement is made in connection with a loan in the principal sum of $16,942,500.00 ✳ (the "**Loan**") made by Lender to Borrower pursuant to that certain loan agreement, dated as of the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower to Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.    The Note is secured by that certain Deed of Trust, Assignment of Leases and Rents, ✳ Security Agreement and Fixture Filing, dated the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Security Instrument**") made by Borrower for the benefit of Lender.    ✳ **Recorded concurrently herewith**

C.    Borrower desires to further secure the payment of the Indebtedness and the performance of all of its Obligations under the Note, the Security Instrument, the Loan Agreement and the other Loan Documents.

D.    This Assignment is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents is secured hereby, and each and every term and provision of the Loan Agreement, the Note and the Security Instrument, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Assignment.

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement:

### AGREEMENT:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

1.    <u>Assignment</u>. Borrower unconditionally assigns to Lender all of Borrower's right, title and interest in and to: (a) all rents, revenues, liquidated damages following defaults under the Leases, issues, profits, income and proceeds due or to become due from tenants of the project located on the real property described on <u>Exhibit A</u> attached to this Agreement (the real property and project, collectively, the "**Property**"), including rentals and all other payments of any kind under the Leases for using, leasing, licensing, possessing, operating from, rendering in, selling or otherwise enjoying the Property (collectively, the "**Rents**"); (b) all of Borrower's claims and rights (the "**Bankruptcy Claims**") to the

payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code; and (c) any and all other rights of Borrower in and to the items set forth in subsections (a) through (b) above, and all amendments, modifications, replacements, renewals, proceeds and substitutions thereof. This Agreement is an absolute assignment to Lender and not an assignment as security for the performance of the obligations under the Loan Documents (defined below), or any other indebtedness, and such absolute assignment is presently and immediately effective. Notwithstanding the foregoing, the absolute assignment contained herein shall not itself reduce the obligations owing to Lender under the Loan Documents unless and until Lender actually receives the Rents and such Rents are applied by Lender to such obligations pursuant to Section 4 below. For purposes of this Agreement, "*Leases*" means all leases, subleases, occupancy agreements, licenses, concessions, rental contracts and other agreements (written or oral) now or hereafter existing relating to the use or occupancy of the Property, together with all guarantees, letters of credit and other credit support, modifications, extensions and renewals thereof (whether before or after the filing by or against Borrower of any petition of relief under the Bankruptcy Code) and all related security and other deposits. Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums. During an Event of Default Period (as defined in the Loan Agreement), the license granted to Borrower herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property. Lender is hereby granted and assigned by Borrower the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its discretion shall deem proper. It is further the intent of Borrower and Lender that the Rents hereby absolutely assigned are no longer, during the term of the Security Instrument, property of Borrower or property of any estate of Borrower as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Borrower.

2.      Rights of Lender. During an Event of Default (as defined in the Loan Agreement), Lender shall have the right, power and authority to: (a) notify any person that all Rents are to be paid directly to Lender, whether or not Lender has commenced or completed foreclosure or taken possession of the Property; (b) settle, compromise, release, extend the time of payment of, and make allowances, adjustments and discounts of any Rents; (c) enforce payment of Rents, prosecute any action or proceeding, and defend against any claim with respect to Rents; (d) enter upon, take possession of and operate the Property; (e) lease all or any part of the Property; and/or (f) perform any and all obligations of Borrower under the Leases and exercise any and all rights of Borrower therein contained to the full extent of Borrower's rights and obligations thereunder, with or without the bringing of any action or the appointment of a receiver. At Lender's request during an Event of Default, Borrower shall deliver a copy of this Agreement to each tenant under a Lease and to each manager and managing agent or operator of the Property. Borrower irrevocably directs any tenant, manager, managing agent, or operator of the Property, without any requirement for notice to or consent by Borrower, to comply with all demands of Lender under this Agreement and to turn over to Lender on demand all Rents which it receives. Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Indebtedness, in trust for the benefit of Lender for use in the payment of such sums. During an Event of Default Period, the license granted to Borrower herein shall be automatically revoked and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Property. If the Event of Default is cured, as determined by Lender in its sole and absolute discretion, the license granted to Borrower shall be reinstated. Lender is hereby granted and assigned by Borrower the right, at its option, upon the revocation of the license granted herein to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the

3

revocation of the license herein granted may be applied toward payment of the Indebtedness in such priority and proportion as Lender in its discretion shall deem proper. It is further the intent of Borrower and Lender that the Rents hereby absolutely assigned are no longer, during the term of the Security Instrument, property of Borrower or property of any estate of Borrower as defined in Section 541 of the Bankruptcy Code and shall not constitute collateral, cash or otherwise, of Borrower.

3.      No Obligation or Liability. Notwithstanding Lender's rights hereunder, Lender shall not be obligated to perform, and Lender does not undertake to perform, any obligation, duty or liability with respect to the Leases, Rents or Property on account of this Agreement. Lender shall have no responsibility on account of this Agreement for the control, care, maintenance or repair of the Property, for any waste committed on the Property, for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property, except to the extent caused by the gross negligence, intentional or willful misconduct, fraud, by Lender. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default (other than for gross negligence, intentional or willful misconduct, or fraud by Lender its employees and agents). Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. Neither the acceptance by Lender of this Agreement, nor the granting of any other right, power, privilege or authority in this Assignment, nor the exercise of any of the aforesaid, will at any time thereafter, obligate Lender (a) to appear in or defend any action or proceeding relating to the Leases, the Rents or the remainder of the Property, (b) to take any action hereunder, (c) to expend any money or incur any expenses or perform or discharge any obligation, duty or liability with respect to any Lease, (d) to assume any obligation or responsibility for any deposits which are not physically delivered to Lender or (e) to assume any obligation or responsibility for any injury or damage to person or property sustained in or about the Property. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

4.      Right to Apply Rents. At any time an Event of Default by Borrower exists, Lender shall have the right, but not the obligation, to use and apply any Rents received by Lender pursuant to the terms hereof in such order and such manner as Lender may determine for:

        (a)      Enforcement or Defense. The payment of costs and expenses of enforcing or defending the terms of this Agreement or the rights of Lender hereunder, and collecting any Rents;

        (b)      Loan Payments. Interest, principal or other amounts payable pursuant to (i) the Loan Agreement; (ii) the Note in the original principal amount of $16,942,500.00; (iii) the Security Instrument (as defined in the Loan Agreement); (iv) all other documents and instruments evidencing, governing and securing the loan evidenced by the Note and (v) any and all modifications, amendments or extensions thereof or replacements or substitutions therefor (the Loan Agreement, the Note, the Security Instrument, such other documents and instruments, and such modifications, amendments, extensions, replacements, and substitutions thereof being herein collectively called the "*Loan Documents*"); and

        (c)      Operating Expenses. Payment of costs and expenses of the operation and maintenance of the Property, including (i) rentals and other charges payable by Borrower under any ground lease or other agreement affecting the Property; (ii) electricity, telephone, water and other utility costs, taxes, assessments, water charges and sewer rents and other utility and governmental charges levied, assessed or imposed against the Property; (iii) insurance premiums; (iv) costs and expenses with respect to any litigation affecting the Property, the Leases or the

Rents; (v) wages and salaries of employees, commissions of agents and attorneys' fees and expenses; and (vi) all other carrying costs, fees, charges, reserves, and expenses whatsoever relating to the Property.

After the payment of all such costs and expenses and after Lender has established such reserves as it, in its sole and absolute discretion, deems necessary for the proper management of the Property, Lender shall apply all remaining Rents received by it to the reduction of the Loan.

5.     No Waiver. The exercise or nonexercise by Lender of the rights granted in this Agreement or the collection and application of Rents by Lender or its agent shall not be a waiver of any default by Borrower under this Agreement or any other Loan Document. No action or failure to act by Lender with respect to any obligations of Borrower under the Loan Documents, or any security or guaranty given for the payment or performance thereof, shall in any manner affect, impair or prejudice any of Lender's rights and privileges under this Agreement, or discharge, release or modify any of Borrower's duties or obligations hereunder.

6.     Term. This Agreement shall continue in full force and effect until (a) all amounts due under the Loan Documents are paid in full, and (b) all other obligations of Borrower under the Loan Documents are fully satisfied.

7.     Appointment. Borrower irrevocably appoints Lender its true and lawful attorney-in-fact, which appointment is coupled with an interest, to exercise any or all of the rights or powers described herein with the same force and effect as if exercised by Borrower, and Borrower ratifies and confirms any and all acts done or omitted to be done by Lender, its agents, servants, employees or attorneys in, to or about the Property.

8.     Liability of Lender. Lender shall not in any way be liable to Borrower for any action or inaction of Lender, its employees or agents under this Agreement (other than for gross negligence, intentional or willful misconduct, or fraud by Lender, its employees and agents).

9.     Indemnification. Borrower shall indemnify, defend and hold harmless Lender from and against all liability, loss, damage, cost or expense which it may incur under this Agreement or under any of the Leases, including any claim against Lender by reason of any alleged obligation, undertaking, action, or inaction on its part to perform or discharge any terms, covenants or conditions of the Leases or with respect to Rents, and including reasonable attorneys' fees and expenses, **INCLUDING LIABILITY, LOSS, DAMAGE, COST OR EXPENSE ARISING OR ALLEGED TO HAVE ARISEN FROM LENDER'S NEGLIGENCE OR STRICT LIABILITY,** but excluding any claim arising from Lender's gross negligence, intentional or willful misconduct, or fraud. Any amount covered by this indemnity shall be payable on demand, and shall bear interest from the date of demand until the same is paid by Borrower to Lender at a rate equal to the Default Rate (as defined in the Loan Agreement).

10.     Modification. This Agreement may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of such change is sought.

11.     Bankruptcy.

(a)     Upon or at any time after the occurrence of a Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions,

5

applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

12.    <u>Authority</u>. Borrower represents and warrants that it has full power and authority to execute and deliver this Agreement and the execution and delivery of this Agreement has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting Borrower or the Property.

13.    <u>Liability</u>. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.

14.    <u>Headings, Etc</u>. The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15.    <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be (a) in writing, (b) sent in the manner set forth in the Loan Agreement, and (c) effective in accordance with the terms of the Loan Agreement.

16.    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of Lender and its successors and assigns and shall be binding on Borrower and its successors and assigns.

17.    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State where the Property is located and the applicable laws of the United States of America.

18.    <u>Conflict</u>. If any conflict or inconsistency exists between the absolute assignment of the Rents and the Leases in this Agreement and the assignment of the Rents and Leases as security in the Security Instrument, the terms of this Agreement shall control.

19.    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

20.    **<u>NO ORAL AGREEMENTS</u>. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

6

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

737 S Broadway - Assignment of Leases and Rents

BOBBY-044

EXECUTED as of the date first written above.


**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By:
Name: Alan Gomperts
Title: Manager

## ACKNOWLEDGEMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF *Los Angeles*:

On _*July 13*_ , 20*24*, before me, *REGINA BULAONG BENETUA* (a notary public), personally appeared __*Alan Gomperts*__ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

REGINA BULAONG BENETUA
Notary Public - California
Los Angeles County
Commission # 2357355
My Comm. Expires May 12, 2025

NOTARY PAGE TO
ASSIGNMENT OF LEASES AND RENTS

# ILLEGIBLE NOTARY SEAL CERTIFICATION

(Government Code 27361.7)

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary : _Regina Bulaong Beretua_

Commission Number : _2357355_

Vendor No. : _NNA 1_

County/State where
Bond is filed : _Los Angeles County, CA_

Commission Exp. Date : _May 12, 2025_

Executed in the City of _San Jose_, State of California

eRecording Partners Network

_07/22/2021_

Date

By: _____

Signature of Declarant

_Lauren Montana_

Type or Print Name

_408-847-1505_

BOBBY-047

## EXHIBIT A

### LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

BOBBY-048

# EXHIBIT 4

BOBBY-049

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

B0415-1972 07/29/2021 5:00 PM Received by California Secretary of State

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210071454128 |
| Date Filed: 7/29/2021 |

A. NAME & PHONE OF CONTACT AT FILER (optional)
Joshua Mogin  (424) 239-2514

B. E-MAIL CONTACT AT FILER (optional)
jmogin@raineslaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Joshua Mogin
Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| BROADWAY AVENUE INVESTMENTS LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 264 S. Oakhurst Drive | Beverly Hills | CA | 90212 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 16 N. Marengo Avenue, Suite 212 | Pasadena | CA | 91101 | USA |

4. COLLATERAL: This financing statement covers the following collateral
See Schedule I attached.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: 6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Los Angeles County, California

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

BOBBY-050

B0415-1973 07/29/2021 5:00 PM Received by California Secretary of State

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
**BROADWAY AVENUE INVESTMENTS LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)　　SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)　　SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☑ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**See Exhibit A attached.**

**17. MISCELLANEOUS:**

**Los Angeles County, California**

B0415-1974 07/29/2021 5:00 PM Received by California Secretary of State

# FINANCING STATEMENT
## SCHEDULE I

This financing statement covers the following types (or items) of property (the "*Collateral Property*"):

    1)    **Land**. All of Debtor's right, title and interest in and to the Land.

    2)    **Additional Land**. All of Debtor's right, title and interest in and to the Additional Land.

    3)    **Improvements**. All of Debtor's right, title and interest in and to the Improvements.

    4)    **Easements**. All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, oil, gas and mineral rights, air rights and development rights, zoning rights, tax credits or benefits and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever in any way now or hereafter belonging, relating or pertaining to the Real Property or any part thereof and the reversion and reversions, remainder and remainders and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or any part thereof to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy, property, possession, claim and demand whatsoever, both in law and in equity, of Debtor in, of and to the Real Property and every part and parcel thereof, with the appurtenances thereto.

    5)    **Equipment**. All right, title and interest in and to the Equipment and the right, title and interest of Debtor in and to any of the Equipment which may be subject to any Security Agreements (as defined in the Uniform Commercial Code) superior, inferior or pari passu in lien to the lien of this Security Instrument. In connection with Equipment which is leased to Debtor or which is subject to a lien or security interest which is superior to the lien of this Security Instrument, this Security Instrument shall also cover all right, title and interest of each Debtor in and to all deposits and the benefit of all payments now or hereafter made with respect to such Equipment.

    6)    **Awards**. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property or any part thereof, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of said right), or for a change of grade or for any other injury to or decrease in the value of the Real Property.

    7)    **Leases**. All leases and subleases (including, without limitation, all guarantees thereof) and other agreements affecting the use, enjoyment and/or occupancy of the Real Property or any part thereof, now or hereafter entered into (including any use or occupancy arrangements created pursuant to Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property) and all income, rents, issues, profits, revenues and proceeds including, but not limited to, all oil and gas or other mineral royalties and bonuses from the Real Property (including any payments received pursuant to Section 502(b) of the Bankruptcy Code or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or similar proceedings or any assignment for the benefit of creditors in respect of any tenant or occupant of any portion of the Real Property and all claims as a

1

BOBBY-052

creditor in connection with any of the foregoing) and all proceeds from the sale, cancellation, surrender or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Indebtedness.

8) **Insurance Proceeds**. All proceeds of and any unearned premiums on any insurance policies covering the Real Property or any part thereof including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Real Property or any part thereof.

9) **Tax Awards**. All tax refunds, including interest thereon, tax credits and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Real Property.

10) **Right to Appear**. The right, in the name of and on behalf of Debtor, to appear in and defend any action or proceeding brought with respect to the Real Property or any part thereof and to commence any action or proceeding to protect the interest of Secured Party in the Real Property or any part thereof and all awards and/or judgments received by Debtor from any source whatsoever.

11) **Accounts**. All cash on hand, bank accounts, accounts receivable, security deposits, utility or other deposits, intangibles, contract rights, interests, estates or other claims, both in law and in equity, which Debtor now has or may hereafter acquire in the Real Property or any part thereof.

12) **Indemnification**. All rights which Debtor now has or may hereafter acquire to be indemnified and/or held harmless from any liability, loss, damage, cost or expense (including, without limitation, attorneys' fees and disbursements) relating to the Real Property or any part thereof.

13) **Plans**. All plans and specifications, maps, surveys, studies, reports, contracts, subcontracts, service contracts, management contracts, franchise agreements and other agreements, franchises, trade names, trademarks, symbols, service marks, approvals, consents, permits, special permits, licenses and rights, whether governmental or otherwise, respecting the use, occupation, development, construction and/or operation of the Real Property or any part thereof or the activities conducted thereon or therein, or otherwise pertaining to the Real Property or any part thereof.

14) **Proceeds**. All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Capitalized terms not defined herein are as defined in Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Debtor in favor of Secured Party.

Schedule 1 to UCC – 737 S. Broadway

BOBBY-053

## EXHIBIT A

LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

B0415-1976 07/29/2021 5:00 PM Received by California Secretary of State

Schedule I to UCC – 737 S. Broadway

BOBBY-054

# EXHIBIT 5

BOBBY-055

**PERSONAL FINANCIAL STATEMENT**   **CONFIDENTIAL**

IMPORTANT: Please do not leave any questions unanswered. Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Alan Gomperts | Name: | |
| Address: | 264 S. Oakhurst Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | Chief Financial Officer | Position/Occupation: | |
| Business Name: | agron, inc. | Business Name: | |
| Business Address: | 2440 S. Sepulveda Blvd. #201 | Business Address: | |
| City, State, Zip: | Los Angeles, CA 90212 | City, State, Zip: | |
| Home Telephone: | [redacted]   Bus No.: | Home Telephone: | Bus No.: |
| DOB: [redacted]   Relationship: [redacted] | | D.O.B: | Relationship: |

### PERSONAL INFORMATION (Applicant)

| | | | |
|---|---|---|---|
| Do you have a will? ☑ Yes ☐ No | If so, name of executor: Philip Gomperts | | |
| Are you partner or officer in any other venture?  If so, describe: No | | Income Tax Settled Through (Date): | |
| | | Personal bank accounts carried at: Wells Fargo Bank | |
| Are you delegated to pay alimony, child support or separate maintenance payments? If so, describe: No | | Are you a defendant in any suits or legal actions?  If so, describe: No | |
| Are any assets pledged other than as described on schedules.  If so, describe: No | | Have you ever declared bankruptcy?  If so, describe: No | |

### STATEMENT OF FINANCIAL CONDITION
### As of (Date): June 30, 2023

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $ 831,000 | Notes Payable to Banks  (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | 995,000 | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax   ☐ Fed   ☐ State | |
| Real Estate Owned (Schedule D) | 24,055,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | 82,000 | Real Estate Mortgages Payable (Schedule D) | 16,163,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | 18,852,000 | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | | |
| | | | |
| | | TOTAL LIABILITIES | $ 16,163,000 |
| | | NET WORTH | $ 28,652,000 |
| TOTAL ASSETS | $ 44,815,000 | TOTAL LIABILITIES and NET WORTH | $ 44,815,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $ 700,000 | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 50,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | | | |
| | | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $ 750,000 | Amount of Contested Income Tax Liens | |

Initials   Initials

Page 1 of 3

BOBBY-056

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

### SCHEDULE A - Cash on Hand in Banks

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| Wells Fargo Bank | Checking and Savings | Personal | 111,000.00 |
| Chase Bank | Checking | Shal Investments, LLC | 470,000.00 |
| PNC Bank | Savings | Personal | 250,000.00 |
| | | *Carry Over from Additional Attached Pages* | |
| | | TOTALS $ | 831,000.00 |

### SCHEDULE B - U.S. Government and Marketable Securities

| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|---|
| | T-Bills | Alan Gomperts | | | 281000 | | | ☐ Yes ☑ No | |
| | T-Bills | Shal Investments, LL | | | 714000 | | | ☐ Yes ☑ No | |
| | | | | | | | | ☐ Yes ☐ No | |
| | | | *Carry Over from Additional Attached Pages* | | | | | | |
| | | | TOTALS $ | | 995,000.00 | $ - | $ - | | |

### SCHEDULE C - Non-Marketable Securities

| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ Yes ☐ No | |
| | | | | | | | ☐ Yes ☐ No | |
| | | | | | | | ☐ Yes ☐ No | |
| | | | | *Carry Over from Additional Attached Pages* | | | | |
| | | | | | | TOTALS $ - | | |

### SCHEDULE D - Real Estate Owned

| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable Balance Due | Monthly Payment | Maturity | Payable to Whom |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | *Carry Over from Additional Attached Pages* | | | | | | |
| | | | | | | TOTALS $ - | $ - | | | |

### SCHEDULE E - Insurance
(List only those policies that you own)

| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
|---|---|---|---|---|---|---|
| Northwestern Mutual | Alan Gomperts | 150,000.00 | 68,000.00 | 0 | 0 | Sharon Gomperts |
| | | | | | | |
| | | | | | | |
| | | | *Carry Over from Additional Attached Pages* | | | |
| | | TOTALS $ | | - | $ - | |

### SCHEDULE F - Notes and Accounts Receivables
(Money Payable or Owed to you Individually- indicate by √ if others have an Ownership Interest)

| Maker/ Debtor | V | When Due | Original Amount | Monthly Payment | Balance Due | Security |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | *Carry Over from Additional Attached Pages* | | | | |
| | | | TOTALS $ | - | $ - | |

| SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained | | | | | | |
|---|---|---|---|---|---|---|
| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  | *Carry Over from Additional Attached Pages* |  |  |
|  |  |  |  | TOTALS | $                    - |  |

| SCHEDULE H - Notes, Accounts and Bills Payable | | | | | |
|---|---|---|---|---|---|
| *(Other than banks, Mortgage and Insurance Company Loans)* | | | | | |
| Payable to | Other Obligors    (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| *Carry Over from Additional Attached Pages* | | | | | |
|  |  | TOTALS | $                    - | $                    - |  |

| Signature (Applicant) | 21-Aug-23 | Signature (Joint Applicant) | Date: |
|---|---|---|---|
| Alan Gomperts | ████ | Print Name (Joint Applicant) | Social Security No. |

Alan Gomperts - SREO as of 06/30/2023

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Outstanding | Lender | Maturity Date | Interest Rate | Payment | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 Seaton Steet Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lenore Halevy, 9% Simon Harkham) | 25% | $37,000,000 | $9,250,000 | $28,700,000 | $7,175,000 | KDM Financial | 2023 | 6.50% | $155,458 | |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2022 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | |
| 264 S. Oakhurst Dr. Beverly Hills, CA 90212 | 2008 | $1,777,000 | 2,321 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $3,250,000 | $3,250,000 | $1,250,000 | $1,250,000 | Wells Fargo | 2035 | 3.13% | $3,250 | |
| 3558 Greenfield Ave. Los Angeles, Ca 90034 | 1998 | $332,000 | 1,152 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $1,600,000 | $1,600,000 | $188,000 | $188,000 | Wells Fargo | 2035 | 6.00% | $1,416 | $2,575,000 Second with Archway |
| 2247 S. Canfield Ave., Los Angeles, Ca 90034 | 2003 | $730,000 | 1,858 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $2,200,000 | $2,200,000 | $573,000 | $573,000 | Wells Fargo | 2047 | 4.13% | $2,050 | |
| 2220 Bagely Ave., Los Angeles, Ca 90034 | 2004 | $1,400,000 | 1,963 SF - SFR | 100% - Alan Gomperts, Sharon Halevy | 100% | $2,350,000 | $2,350,000 | $746,000 | $746,000 | Wells Fargo | 2047 | 4.50% | $4,195 | |
| TOTAL | | | | | | $14,655,000 | | $16,163,000 | | | | | | |

BOBBY-059

**IMPORTANT:** Please do not leave any questions unanswered.  Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Sue Halevy | Name: | |
| Address: | 247 S. Linden Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | | Position/Occupation: | |
| Business Name: | | Business Name: | |
| Business Address: | | Business Address: | |
| City, State, Zip: | | City, State, Zip: | |
| Home Telephone: | ▮▮▮ | Bus No.: | Home Telephone : ▮ Bus No.: |
| D.O.B.: ▮▮ | Relationship: ▮▮ | D.O.B.: | Relationship: |

### PERSONAL INFORMATION (Applicant)

| | |
|---|---|
| Do you have a will? ☑ Yes ☐ No | If so, name of executor: Efrem Harkham |
| Are you partner or officer in any other venture?  If so, describe: No | Income Tax Settled Through (Date): |
| | Personal bank accounts carried at: Bank of America |
| Are you delegated to pay alimony, child support or separate maintenance payments?  If so, describe: No | Are you a defendant in any suits or legal actions?  If so, describe: No |
| Are any assets pledged other than as described on schedules.  If so, describe: No | Have you ever declared bankruptcy?  If so, describe: No |

### STATEMENT OF FINANCIAL CONDITION
### As of (Date):June 30, 2023(Required Field)

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $ 198,000 | Notes Payable to Banks  (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax  ☐ Fed  ☐ State | |
| Real Estate Owned (Schedule D) | 58,200,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | | Real Estate Mortgages Payable (Schedule D) | 31,370,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | | |
| | | TOTAL LIABILITIES | $ 31,370,000 |
| | | NET WORTH | $ 27,028,000 |
| TOTAL ASSETS | $ 58,398,000 | TOTAL LIABILITIES and NET WORTH | $ 58,398,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $ | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 75,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | 55,000 | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $ 130,000 | Amount of Contested Income Tax Liens | |

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

### SCHEDULE A - Cash on Hand in Banks

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| Bank of America | Checking | Personal | 173,000 |
| Wells Fargo Bank | Checking | Personal | 25,000 |
| | | *Carry Over from Additional Attached Pages* | |
| | | TOTALS $ | 198,000.00 |

### SCHEDULE B - U.S. Government and Marketable Securities

| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| *Carry Over from Additional Attached Pages* | | | | | | | | | |
| | | | TOTALS | $ - | $ - | $ - | | | |

### SCHEDULE C -Non-Marketable Securities

| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | *Carry Over from Additional Attached Pages* | | | | |
| | | | | TOTALS | $ - | | | |

### SCHEDULE D - Real Estate Owned

| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Balance Due | Monthly Payment | Maturity | Payable to Whom |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | *Carry Over from Additional Attached Pages* | | | | | | |
| | | | | TOTALS | $ - | $ - | | | | |

### SCHEDULE E - Insurance
(List only those policies that you own)

| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| *Carry Over from Additional Attached Pages* | | | | | | |
| | | | TOTALS | $ - | $ - | |

### SCHEDULE F - Notes and Accounts Receivables
(Money Payable or Owed to you Individually- Indicate by v if others have an Ownership Interest)

| Maker/ Debtor | V | When Due | Original Amount | Monthly Payment | Balance Due | Security |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| *Carry Over from Additional Attached Pages* | | | | | | |
| | | TOTALS | $ - | $ - | | |

_____  _____
*Initials*  *Initials*

BOBBY-061

## SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained

| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | *Carry Over from Additional Attached Pages* | | |
| | | | | TOTALS | $        - | |

## SCHEDULE H - Notes, Accounts and Bills Payable
### (Other than banks, Mortgage and Insurance Company Loans)

| Payable to | Other Obligors    (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| *Carry Over from Additional Attached Pages* | | | | | |
| | | TOTALS | $        - | $        - | |

| Signature (Applicant) | Date: 08/20/2023 | Signature (Joint Applicant) | Date: |
|---|---|---|---|
| Sue Halevy | ███████ | Print Name (Joint Applicant) | Social Security No. |

*Sue Halevy - SREO as of 06/30/2023*

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Oustanding | Lender | Maturity Date | Interest Rate | Payment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 421 Colyton St. Los Angeles, CA 90013 | 7/7/2011 | $2,500,000 | 31,000 SF - Commercial Building - Warehouse and Light Industrial | Colyton Investments, LLC - Single Member, LLC (100% David Halevy) | 100% | $15,000,000 | $15,000,000 | $9,000,000 | $9,000,000 | KDM Financial | 2024 | 6.50% | $48,750 | Cross Collateralized with Seaton Investments, LLC |
| 422 Seaton Street Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lemore Halevy, 9% Simon Harkham) | 41% | $37,000,000 | $15,170,000 | $28,700,000 | $11,767,000 | KDM Financial | 2024 | 6.50% | $155,458 | Cross Collateralized with Colyton Investments, LLC |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2023 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | $125,000 second loan with Archway at 9% |
| 257 S. Linden Ave. Beverly Hills, CA 90212 | 1/16/2008 | $2,190,000 | 2,093 SF - SFR | 100% - David and Sue Halevy | 100% | $4,250,000 | $4,250,000 | $1,357,000 | $1,357,000 | Wells Fargo | 2035 | 5.00% | $7,933 | |
| 341 S. Canon Dr. Beverly Hills, CA 90212 | 11/28/2000 | $660,000 | 1,384 SF - SFR | 100% - David and Sue Halevy | 100% | $2,500,000 | $2,500,000 | $535,000 | $535,000 | Wells Fargo | 2035 | 3.50% | $2,678 | |
| 133 S. Palm Dr. Beverly Hills, CA 90212 | 8/8/1995 | $670,000 | 6 unit - apartment building | 100% - David and Sue Halevy | 100% | $5,500,000 | $5,500,000 | $1,500,000 | $1,500,000 | First Foundation | 2049 | 3.00% | $5,211 | $2,575,000 Second with Archway |
| 600 East New York Ave, Brooklyn, NY | 6/22/1905 | $110,000 | Land | 100% - David and Sue Halevy | 100% | $3,500,000 | $3,500,000 | $275,000 | $275,000 | ASC | 2030 | 4.00% | $1,452 | |
| 12800 Foxdale Drive, Desert Hot Springs, CA 92240 | 5/15/2014 | $1,100,000 | 24 Unit Hotel | 100% - David and Sue Halevy | 100% | $3,500,000 | $3,500,000 | $- | $0 | | | | | $1,300,000 Loan with Archway at 9% |
| 140 S. Roxbury Dr. Beverly Hills, CA 90212 | 1989 | $750,000 | 16 unit apartment building | 50% - David and Sue Halevy, 50% - Haskell Muhtar (non-related party) | 50% | $6,750,000 | $3,375,000 | $1,410,000 | $705,000 | Chase | 2024 | 5.00% | $8,243 | |
| TOTAL | | | | | | | $58,200,000 | | $31,370,000 | | | | | |

**PERSONAL FINANCIAL STATEMENT**                                                                                                    **CONFIDENTIAL**

IMPORTANT: Please do not leave any questions unanswered. Use "No" or "None" when necessary.

| APPLICANT | | JOINT APPLICANT | |
|---|---|---|---|
| Name: | Daniel Halevy | Name: | |
| Address: | ___. Palm Drive | Address: | |
| City, State, Zip: | Beverly Hills, CA 90212 | City, State, Zip: | |
| Position/Occupation: | Owner/Founder | Position/Occupation: | |
| Business Name: | Commune Events, Inc. | Business Name: | |
| Business Address: | 802 Mateo Street | Business Address: | |
| City, State, Zip: | Los Angeles, CA 90021 | City, State, Zip: | |
| Home Telephone: | ___ Bus No.: | Home Telephone : | Bus No.: |
| D.O.B: | Relationship: | D.O.B: | Relationship: |

| PERSONAL INFORMATION (Applicant) | |
|---|---|
| Do you have a will? ☐ Yes ☑ No | If so, name of executor: |
| Are you partner or officer in any other venture? If so, describe: No | Income Tax Settled Through (Date): |
| | Personal bank accounts carried at: Chase Bank |
| Are you delegated to pay alimony, child support or separate maintenance payments? If so, describe: No | Are you a defendant in any suits or legal actions? If so, describe: No |
| Are any assets pledged other than as described on schedules. If so, describe: No | Have you ever declared bankruptcy? If so, describe: No |

## STATEMENT OF FINANCIAL CONDITION
### As of (Date): June 30, 2023

| ASSETS (Do not include Assets of Doubtful Value) | In Dollars (Omit cents) | LIABILITIES | In Dollars (Omit cents) |
|---|---|---|---|
| Cash on Hand and in Banks (Schedule A) | $ 8,000 | Notes Payable to Banks (Schedule G) | $ |
| U.S. Govt. (Schedule B) | | Due to brokers | |
| Marketable Securities (Schedule B) | | Notes Payable to Others (Schedule H) | |
| Restricted or Controlled Stocks (Schedule B) | | Accounts and Bills Payable | |
| Non-Marketable Securities (Schedule C) | | Unpaid Income Tax ☐ Fed ☐ State | |
| Real Estate Owned (Schedule D) | 21,755,000 | Other Unpaid Taxes and Interest | |
| Cash Value - Life Insurance (Schedule E) | | Real Estate Mortgages Payable (Schedule D) | 17,186,000 |
| Personal Property | | Loans on Life Insurance Policies (Schedule E) | |
| IRA | | Other Debts- Itemize | |
| Notes and Accounts Receivables (Schedule F) | | | |
| Other Assets: Itemize | | | |
| | | | |
| | | TOTAL LIABILITIES | $ 17,186,000 |
| | | NET WORTH | $ 4,577,000 |
| TOTAL ASSETS | $ 21,763,000 | TOTAL LIABILITIES and NET WORTH | $ 21,763,000 |

| ANNUAL INCOME | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses & Commissions | $ 115,000 | Do you have any contingent liabilities? If so, describe: No | |
| Dividends and Interest | | | |
| Real Estate Income | 30,000 | | |
| Other Income (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | | As Endorser, Co-maker or Guarantor? | $ |
| | | On Leases or Contracts? | |
| | | Legal Claims | |
| | | Other Special Debt | |
| TOTAL | $ 145,000 | Amount of Contested Income Tax Liens | |

___ ___
Initials  Initials

BOBBY-064

**IF SCHEDULES BELOW DO NOT PROVIDE SUFFICIENT SPACE, ATTACH SEPARATE SHEETS AS NEEDED**

### SCHEDULE A - Cash on Hand in Banks

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| Chase Bank | Checking | Personal | 5,000 |
| Wells Fargo Bank | Checking | Personal | 3,000 |
| | | | |
| | | Carry Over from Additional Attached Pages | |
| | | TOTALS $ | 8,000.00 |

### SCHEDULE B - U.S. Government and Marketable Securities

| # Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Market Value U.S. Gov't Sec. | Market Value M'ktable Sec. | Market Value Restricted & Controlled Stock | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | | ☐ Yes  ☐ No | |
| | Carry Over from Additional Attached Pages | | | | | | | | |
| | | | | TOTALS $ - | $ - | $ - | | | |

### SCHEDULE C - Non-Marketable Securities

| No. of Shares or Face Value (Bonds) | Description | In Name of | Type of Ownership | Cost | Source Value | Market Value | Are these pledged? | Amount Pledged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | | | | | ☐ Yes  ☐ No | |
| | | | Carry Over from Additional Attached Pages | | | | | |
| | | | | | TOTALS $ - | | | |

### SCHEDULE D - Real Estate Owned

| Title in Name of | % of Own. | Description of Property Covered | Date Acquired | Original Cost | Assessed Value | Present Value | Mortgage or Contract Payable Balance Due | Monthly Payment | Maturity | Payable to Whom |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | Carry Over from Additional Attached Pages | | | | | | | |
| | | | | | TOTALS $ - | $ - | | | | |

### SCHEDULE E - Insurance
(List only those policies that you own)

| Name of Insurance Company | Owner of Policy | Face Amount | Cash Surrender Value | Policy Loans from Insurance Company | Other Loans Policy as collateral | Beneficiary |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | Carry Over from Additional Attached Pages | | | | |
| | | | TOTALS $ - | $ - | $ - | |

### SCHEDULE F - Notes and Accounts Receivables
(Money Payable or Owed to you Individually- Indicate by √ If others have an Ownership Interest)

| Maker/ Debtor | V | When Due | Original Amount | Monthly Payment | Balance Due | Security |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | Carry Over from Additional Attached Pages | | | | |
| | | | TOTALS $ - | $ - | | |

## SCHEDULE G - Banks or Finance Companies Where Credit Has Been Obtained

| Name of Lender | Credit in Name of | Secured or Unsecured | Original Date | High Credit | Current Balance | Monthly Payment |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | Carry Over from Additional Attached Pages | | | |
| | | | | TOTALS | $             - | |

## SCHEDULE H - Notes, Accounts and Bills Payable
### (Other than banks, Mortgage and Insurance Company Loans)

| Payable to | Other Obligors    (If any) | When Due | Notes Payable to Others | Accounts and Bills Payable | Collateral (If any) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| Carry Over from Additional Attached Pages | | | | | |
| | | TOTALS | $             - | $             - | |

| Signature (Applicant) | Date: 08/20/2023 | Signature (Joint Applicant) | Date: |
|---|---|---|---|
| Daniel Halevy | ███████ | Print Name (Joint Applicant) | Social Security No. |

*Daniel Halevy - SREO as of 06/30/2023*

| Property Address | Purchase Date | Purchase Price | Property Type | Ownership Structure | Ownership % | Estimated Market Value | % Owned Market Value | Mortgage Outstanding | % Owned Mortgage Oustanding | Lender | Maturity Date | Interest Rate | Payment | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 Seaton Street Los Angeles, CA 90015 | 6/4/2010 | $5,250,000 | 78,250 SF - Commercial Building - Warehouse and Light Industrial + Two (2) 7,500 SF Parking Lots | Seaton Investments, LLC (25% Alan and Sharon Gomperts, 41% David and Sue Halevy, 25% Daniel and Lemore Halevy, 9% Simon Harkham) | 25% | $37,000,000 | $9,250,000 | $28,700,000 | $7,175,000 | KDM Financial | 2023 | 6.50% | $155,458 | |
| 737 S. Broadway Los Angeles, CA 90014 | 8/29/2013 | $4,600,000 | 80,000 SF - Commercial Building - Retail Ground Floor - 6 Floors of Office | Broadway Avenue Investments, LLC (33% David and Sue Halevy, 33% Daniel Halevy, 33% Alan Gomperts) | 33% | $13,500,000 | $4,455,000 | $17,500,000 | $5,775,000 | Archway Capital | 2022 | 9.50% | $138,542 | |
| 1040 S. Los Angeles St. Los Angeles, CA 90015 | 1/20/2010 | $1,550,000 | 4,860 SF - 18 Retail Units - Newly Constructed | SLA Investments, LLC (25% Alan and Sharon Gomperts, 25% David and Sue Halevy, 25% Daniel Halevy, 19% Simon Harkham) | 25% | $3,800,000 | $950,000 | $1,824,000 | $456,000 | Harvest Small Business Finance | 2042 | 11.00% | $18,886 | |
| 802 Mateo Street, Los Angeles, Ca 90021 | 2015 | $3,500,000 | 5,000 SF - Industrial Building | 802 Mateo St, LLC | 100% | $5,000,000 | $5,000,000 | $3,000,000 | $3,000,000 | Harvest Small Business Finance | 2045 | 6.00% | $19,329 | |
| 8561 Horner Street, Los Angeles, CA 90035 | 2016 | $1,157,500 | 2,851 SF - Duplex | Daniel Halevy | 100% | $2,100,000 | $2,100,000 | $780,000 | $780,000 | Athas Capital | 2025 | 7.00% | $5,513 | $2,575,000 Second with Archway |
| TOTAL | | | | | | | $21,755,000 | | $17,186,000 | | | | | |

# EXHIBIT 6

BOBBY-068

**OPERATING AGREEMENT**
**OF**
**BROADWAY AVENUE INVESTMENTS, LLC**
**a California limited liability company**

THIS OPERATING AGREEMENT (the "Agreement") of **BROADWAY AVENUE INVESTMENTS, LLC** (the "Company") is entered into and effective as of July 30, 2013, (the "Effective Date") by and among the individuals identified on Exhibit A attached hereto each a "Member" and collectively, the "Members"). Unless otherwise indicated, capitalized words used in this Agreement shall have the meanings specified in Article 13 of this Agreement.

RECITALS:

The Members desire to enter into this Agreement to delineate their rights and liabilities as members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Beverly-Killea Limited Liability Company Act (the "Act").

AGREEMENT

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS AND UNDERTAKINGS HEREIN SPECIFIED AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, WITH THE INTENT TO BE OBLIGATED LEGALLY AND EQUITABLY, THE PARTIES HERETO AGREE AS FOLLOWS:

ARTICLE 1
ORGANIZATION

1.1     Formation. The Members have formed a California limited liability company pursuant to the Act. Except as expressly provided in this Agreement to the contrary, the Members' rights and obligations and the Company's administration and termination shall be governed by the Act.

1.2     Name. The Company's name is "BROADWAY AVENUE INVESTMENTS, LLC".

1.3     Manager. The Company shall be managed by Alan Gomperts (the "Manager").

1.4     Purpose. Notwithstanding anything to the contrary in the Articles (as defined below), the Company is organized to (i) purchase, own, finance, manage, maintain, improve, operate, sell,

1

BOBBY-069

exchange, dispose of or otherwise deal with that certain real property located at **737 Broadway Avenue, Los Angeles, CA 90014** (the "Property"), and (ii) engage in and carry on any lawful business purpose or activity which is required to conduct the Business that is not prohibited by the Act or other applicable law.

1.5     Term.  The Company's existence shall continue until dissolved and liquidated pursuant to the provisions of Article 10.

1.6     Office and Registered Agent.  The Company's principal place of business shall be unless changed by mutual consent of the Members.  The name and address of the Company's registered agent for service of process are as specified in the Articles.

1.7     Limited Liability.  Except as otherwise provided expressly in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that debt, obligation or liability arises in contract, tort, or otherwise.

1.8     Tax Classification.  The Members intend the Company to be classified as a partnership for federal, and to the maximum extent possible, state income taxes.  This classification for tax purposes shall not create or imply a general partnership, limited partnership or joint venture between the Members for state law or any other purpose.  Instead, the Members acknowledge the Company's status as a limited liability company formed under the Act and no Member shall take any action inconsistent with the express intent of the parties to this Agreement.

1.9     Articles of Organization.  The Articles of Organization of BROADWAY AVENUE INVESTMENTS, LLC, a California limited liability company (the "Articles") were filed with the California Secretary of State on March 22, 2010.

ARTICLE 2
CAPITAL CONTRIBUTIONS

2.1     Additional Capital.  The Members understand that additional capital may be required by the Company from time to time during the term of the Agreement for operating expenses and capital expenditures.  If and to the extent that additional cash contributions are needed for the operations of the Company (a "Cash Call"), then the Manager shall advise the Members of such requirement in writing (a "Cash Call Notice") and shall specify the date when the additional capital contributions are due.  If a Member fails to contribute to the Company its share of the applicable cash contribution, then any contributing Member with the prior written consent of Manager may elect either to make a loan to the Company in the amount that should have been contributed by the non-contributing Member or increase its capital contribution by the amount that was to be contributed by the non-contributing Member.  If the contributing Member elects to characterize its advance as a Member loan to the non-contributing Member, then such loan shall bear interest at the maximum rate permitted by law and the principal amount of the Member loan together with all accrued interest thereon shall be repaid to the contributing Member from available cash proceeds that otherwise would have been distributed to the non-contributing Member.  Each Member shall receive a credit to that Member's Capital Account in the amount of

2

BOBBY-070

any additional capital which that Member contributes to the Company.  Immediately following any additional contributions of capital, the Percentage Interests shall be adjusted, and Exhibit A shall be revised to reflect that new relative proportions of the Members' Capital Accounts.

2.3     Capital Accounts.  The Company shall establish and maintain an individual capital account ("Capital Account") for each Member in accordance with Regulations section 1.704-1(b) (2) (iv).  If a Member Transfers all or a part of that Member's Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations section 1.704-1(b)(2)(iv)(1).

2.4     No Interest.  No Member shall have the right to receive interest on any Capital Contribution or Capital Account balance.

2.5     Return of Capital.  Except as otherwise specifically provided in this Agreement, no Member shall have the right to demand the return of, or withdraw, any or all of that Member's Capital Contribution prior to the dissolution and winding up of the Company.  No Member guarantees the return of another Member's Capital Contribution.  No Member is required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

2.6     Member Loan.  No Member shall lend or advance money to or for the Company's benefit without the Manager's prior written consent except as otherwise expressly provided herein.  The loan shall not be treated as a Capital Contribution by that Member or entitle that Member to an increase in that Member's Percentage Interest.  The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company, the Manager and that Member shall agree.  Notwithstanding the foregoing, no Member shall be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

2.7     Manager Loan.  The Manager may, in its sole and absolute discretion, lend or advance money to or for the Company's benefit without the Members' consent.  The loan shall not be treated as a Capital Contribution by the Manager or entitle the Manager to an increase in its Percentage Interest.  The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company and the Manager shall agree.  Notwithstanding the foregoing, the Manager shall not be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

ARTICLE 3
MEMBERS

3.1     Members.  The name, address, taxpayer identification number and Percentage Interest of each Member are specified on Exhibit A to this Agreement.

3.2     Additional Members.  No additional Members may be admitted to the Company without

3

the consent of the Manager, which consent may be withheld for any reason or for no reason.  On the admission of an additional Member pursuant to this Section 3.2, each Member (including the additional Member) shall execute an amendment to this Agreement (a) reflecting the Members' new Percentage Interests, and (b) evidencing the additional Member's consent to be bound by the provisions of this Agreement.

3.3    No Withdrawal.  No Member may withdraw, retire or resign from the Company.

ARTICLE 4
MANAGEMENT

4.1    Management.  The business of the Company shall be managed by the Manager.  The Manager will devote such time and attention to the business of the Company as may be reasonably necessary to carry out its duties hereunder in the conduct of such business.  Except for those decisions defined below as Major Decisions, the management and control of the Company and its business affairs shall rest exclusively with the Manager.  Subject to all the terms and conditions hereof, the Manager shall have all the rights and powers which may be possessed by a manager pursuant to the Act and such additional rights and powers otherwise conferred or permissible by law or necessary, advisable or convenient to the discharge of its duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing, the Manager shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company:

(i)    To invest the capital of the Company for the benefit of the Company and/or in the exercise of any rights or powers possessed by the Manager hereunder and/or to repay advances of the Company, if any;

(ii)    To open, maintain and close bank accounts and to draw checks and other orders for the payment of money;

(iii)    To employ, on behalf of the Company, legal, financial, accounting, technical and/or operational agents, consultants, employees and other persons as the Manager deems necessary or advisable to carry out the Business of the Company;

(iv)    To execute, sign and deliver in furtherance of any or all purposes of the Company, any and all agreements, contracts, documents, certifications, subscriptions and other instruments necessary, advisable or convenient in connection with the business and affairs of the Company; all of which may contain such terms, provisions and conditions as the Manager, in its sole and absolute discretion, shall deem appropriate;

(v)    To execute, acknowledge and file or deliver all articles of limited liability company, amended articles, instruments or other documents and counterparts thereof and make all filings and recordings and perform all other acts as may be necessary to comply with the laws of the State of California for the formation of the Company, thereafter for the continued good standing of the Company, and, when appropriate, for the termination of the Company;

4

BOBBY-072

(vi)    To execute such articles, amended articles, certificates, amended certificates, operating agreements and any modifications thereof, and other documents conforming hereto and do such filing, recording, publishing and other acts as may be appropriate to comply with the requirements of law for the formation, reformation, qualification and/or operation of a limited liability company in all jurisdictions where the Company may wish to do business, which shall be accomplished prior to doing business in any such jurisdiction if deemed necessary by the Manager;

(vii)    To execute listing agreements, offers and counteroffers, escrow instructions, deeds and other instruments of transfer and conveyance in connection with the sale of the Property and to cause the Company to borrow funds to finance the acquisition of the Property and the refinance of any indebtedness which is encumbered by the Property from time to time during the term of this Agreement and in connection therewith to execute and deliver loan applications, loan commitments, promissory notes, deeds of trust, other security agreements, financing statements, certificates and resolutions.

(viii)    To borrow money from such banking, lending institutions or other persons or entities (including itself) on behalf of, and in the name of, the Company at such rates of interest as the Manager shall determine to be necessary for any proper Company purpose and to give as collateral therefore all or any part of any Company property;

(ix)    To pay or reimburse any and all costs incurred by the Manager on behalf of the Company;

(x)    To make distributions to the Members at such time and in such manner as it deems appropriate, in the sole exercise of its discretion;

(xi)    To pay or reimburse those out-of-pocket costs and expenses incurred by any Member, including the Manager, on behalf of the Company in connection with providing strategic advice and assistance to the Company;

(xii)    To purchase, at the expense of the Company, liability, errors and omissions and other insurance to protect the Company property and its business as such insurance may be deemed appropriate by the Manager to personally insure the Company and the Manager and any affiliates against liability or losses for such actions taken on behalf of or by the Company, including personal liability and property damage insurance; provided, however, that Manager in its discretion may elect to not procure terrorism or earthquake insurance unless required to do so by a lender;

(xiii)    To employ from time to time, at the expense of the Company, persons (who may include affiliates of the Manager) to render services to the Company including, but not limited to, property management agents or leasing agents, architects, engineers, planners, contractors, accountants and attorneys, including attorneys and accountants who may also act as attorneys and

5

BOBBY-073

accountants for the Manager, on such terms and for such compensation as is determined by the Manager;

(xiv)    To perform such other acts as the Manager may deem necessary, appropriate or desirable for the furtherance of the purposes of the Company which are not otherwise prohibited by this Agreement or applicable law.

(xv)    To act as "Tax Matters Partner" (as defined in Code section 6231) for all purposes under Internal Revenue Code Section 6231 and to make all tax decisions and elections in respect thereof not mandated by statute, including without limitation the following: (a) the accounting basis of the Company (cash or accrual basis), selecting or varying depreciation and accounting methods and making other decisions with respect to treatment and various transactions for accounting, bookkeeping or tax purposes; (b) the fiscal year of the Company (calendar year or otherwise); (c) whether and when any tax election shall be taken including the election afforded by Internal Revenue Code Section 754; (d) such amendments to this Agreement as the Manager deems necessary to conform to or benefit from interpretations of present and future interpretations of tax laws and regulations by the judiciary and the U.S. Treasury/Internal Revenue Service and amendments to such laws and regulations; and (e) the determination of the amount of the Company's taxable income and the allocation thereof amongst the Members. The Manager may amend this Agreement without the vote of the Members from time to time upon the advice of tax and accounting professionals to conform this Agreement to federal and state tax law and to the intent of the Members expressed hereby that the tax implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which allocate taxable profit and loss) be consistent with (to the extent possible) the economic implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which provide for distributions of cash and payment of preferred returns or yields to Members).

4.2    Major Decisions.  The following events constitute Major Decisions requiring the affirmative vote or consent of a majority of the members: (i) to merge the Company with any other limited liability company, limited partnership, general partnership, limited liability partnership, or corporation (ii) the dissolution of the Company (iii) to sell the Property and (iv) the acquisition of any real property other than the Property or the guaranty by this Company of any debt which is unrelated to the acquisition, operation or improvement of the Property.

4.3    Member Meetings and Approval.  No annual or regular meetings of the Members are required.  If meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act.  Any action required or permitted to be taken by the Members may be taken by the written consent of Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted.

4.4    Indemnification.  The Company shall indemnify, defend, and hold harmless the Manager from and against any and all liabilities of every kind, arising from or relating to the Company's

BOBBY-074

business, except as to those matters arising from such Manager's fraud, gross negligence, willful misconduct, or breach of fiduciary duty.

4.5    Special and Limited Power of Attorney.

(i)    The Manager shall, at all times during the existence of the Company, have a special and limited power of attorney as the attorney-in-fact for each Member, with power and authority to act in the name and on the behalf of each such Member to execute, acknowledge, file, record and swear to in the execution, acknowledgment, filing and recording of documents, which shall include but not be limited to: (a) this Agreement, any separate certificates of limited liability company, as well as any amendments to the foregoing which, under the laws of the State of California or the laws of any other state, are required to be filed or which the Manager deems it advisable to file; (b) any other instrument or document which may be required to be filed by the Company   under the laws of any state or by any governmental agency or which the Manager deems it advisable to file; and (c) any instrument or document which may be required to effect the continuation of the Company  , the admission of additional or substituted Members, or the dissolution and termination of the Company   (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any reductions in amount of contributions of Members.

(ii)    This special and limited power of attorney: (a) is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of the granting Member, and is limited to those matters herein set forth; (b) may be exercised by the Manager for each of the Members by the signature of the Manager acting as attorney-in-fact for all of the Members, together with a list of all Members executing such instrument by their attorney-in-fact; and (c) shall survive an assignment by a Member of all or any portion of his or her Interests except that, where the assignee of Interests owned by a Member has been approved by the Manager for admission to the Company   as a substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Member to execute, acknowledge and file any instrument or document necessary to affect such substitution.

ARTICLE 5
DISTRIBUTIONS

5.1    Distributions of Available Cash.  Not less frequently than quarterly, the Manager shall cause the Company to distribute to the Members all Available Cash of the Company, whether derived from operations or capital transactions.  As used herein, "Available Cash" means the amount of cash which the Manager deems available for distribution to the Members, after taking into account (a) the Company's current financial obligations, (b) anticipated Company expenditures, and (c) those amounts the Manager deems commercially reasonable and necessary to withhold as reserves for the Company's usual and customary expenses.  Available cash shall be distributed to the Members *pro rata* according to their respective Percentage Interests.

5.2    Tax Withholding.  If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of net profits, or with respect to distributions, the Company shall withhold from distributions or other amounts

7

then due to such Member (or shall pay to the relevant taxing authority with respect to amounts allocable to such Member) an amount necessary to satisfy the withholding responsibility. In each such case, the Member for whom the Company has paid the withholding tax shall be deemed to have received the withholding distribution or other amount so paid, and to have paid the withholding tax directly.

## ARTICLE 6
## TAX ALLOCATIONS

6.1    Tax Allocations.  All items of Company income, gain, loss or deduction shall be allocated for federal, state and local income tax purposes to the Members, pro rata, in accordance with their respective Percentage Interests.

6.2    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution that results in a deficit balance in such Member's Capital Account, there shall be allocated to that Member items of Company income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

## ARTICLE 7
## ACCOUNTING AND BANKING

7.1    Books and Records.  The Manager shall cause the Company to keep proper and complete books of account of the Company's business ("Records").  The Records shall be kept at the Company's principal place of business and shall be open to inspection by any of the Members or their authorized representatives at any reasonable time during business hours.  The accounting records shall be maintained in accordance with generally accepted bookkeeping practices for the Company's type of business.  The Company shall maintain at its principal office all records required to be maintained by the Company pursuant to the Act.

7.2    Bank Accounts.  The Manager shall cause the Company's funds to be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Members or any other Person.  Checks or drafts drawn on the Company's accounts shall require the signature of Manager.

7.3    Tax Returns.  The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' federal and state income tax returns.  The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) a copy of the Company's federal, state, and local income tax or information returns for that year.

BOBBY-076

## ARTICLE 8
### TRANSFER OF MEMBERSHIP INTERESTS

8.1     General Prohibition. The Members do not want any Membership Interest to be made generally available to persons or entities other than the present Members. Accordingly, except for Permitted Transfers (defined below) no Member may Transfer all or any part of his Membership Interest except with the prior approval of the Manager, which approval may be given or withheld in the sole discretion of the Manager. Transfers in violation of this Section 8.1 shall be void ab initio. After the consummation of any permitted Transfer of any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the provisions of this Agreement and any further Transfers shall be required to comply with all of the provisions of this Agreement. Each Member acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.

8.2     Permitted Transfers. A Member may Transfer all or any part of that Member's Membership Interest in trust for the benefit of that Member, or that Member's spouse, children, grandchildren, siblings or in-laws, or any combination thereof, provided (a) the Member is a trustee or co-trustee of the trust, and (b) such Member, as trustee or co-trustee, agrees in writing to be bound by the provisions of this Agreement ("Permitted Transfer").

8.3     Transferee as a Member. An Assignee of a Membership Interest shall have the right to become a substitute Member only if (i) the Manager consented to the Assignee's admission to the Company as a Member, (ii) the Assignee executes an instrument satisfactory to the Members accepting and adopting the provisions of this Agreement, and (iii) the Assignee pays any reasonable expenses in connection with his admission as a new Member. The admission of an Assignee as a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

8.4     Transfers In Violation Of Agreement. Upon any Transfer of a Membership Interest in violation of this Article 8, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest (defined below) would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Company's legal counsel, a Transfer in violation of this Article 8 would cause the tax termination of the Company under Code section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee.

## ARTICLE 9
### OPTIONAL PURCHASE EVENTS

9.1     Optional Purchase Event Defined. An "Optional Purchase Event" means, with respect to any Member, any one or more of the following: (a) the death, Disability or Bankruptcy of a Member; (b) the withdrawal, retirement or resignation of a Member in violation of Section 3.3 of

BOBBY-077

this Agreement; (c) the Member becomes a terminated Member; (d) the occurrence of any event that is, or would cause, a Transfer in contravention of this Agreement; or (e) the Member files an action seeking a decree of judicial dissolution pursuant to Act section 17351.

9.2    Purchase Option. Upon the occurrence of an Optional Purchase Event with respect to any Member (the "Selling Member"), the other Members ("Purchasing Members") shall have the option to purchase the Selling Member's Membership Interest ("Selling Member's Interest"). If such option is exercised, the Selling Member, or such Selling Member's legal representative shall sell the Selling Member's Interest as provided in this Article 9. Each Member who causes an Optional Purchase Event or to whom an Optional Purchase Event occurs, shall provide prompt notice of the Optional Purchase Event to the other Members.

9.3    Purchase Price. The purchase price for the Selling Member's Interest shall be the fair market value of the Selling Member's Membership Interest as determined by an independent appraiser jointly selected by the Selling Member (or the Selling Member's legal representative) and the Purchasing Member.

If the Selling Member (or the Selling Member's legal representative) and the Purchasing Member are unable to agree on the selection of an appraiser within thirty (30) days after the Optional Purchase Event, each shall select an independent appraiser within twenty (20) days after expiration of the thirty (30) day period. The two appraisers so selected shall each independently appraise the Selling Members Interest and, as long as the difference in the two appraisals does not exceed five percent (5%) of the lower of the two appraisals, the fair market value shall be conclusively deemed to equal the average of the two appraisals. The determination of such appraisers shall be binding on the parties. If either party fails to select an independent appraiser within the time required by this Section 9.3, the fair market value of the Selling Member's Interest shall be conclusively deemed to equal the appraisal of the independent appraiser timely selected by the other.

If the difference between the two appraisals referred to above exceeds five percent (5%) of the lower of the two appraisals, the two appraisers selected shall select a third appraiser who shall also independently appraise the Selling Member's Membership Interest. In such case the fair market value of the Selling Member's Membership Interest shall be the average of the two closest appraisals. The determination of such appraisers shall be binding on the parties and not subject to judicial review or review by arbitration. The Company and the Selling Member shall each pay one-half of the cost of the third appraisal.

In determining the fair market value, the appraisers appointed under this Agreement shall consider all opinions and relevant evidence submitted to them by the parties, or otherwise obtained by them, and shall set forth their determination in writing together with their opinions and the considerations on which the opinions are based, with a signed counterpart to be delivered to each party, within sixty (60) days after commencing the appraisal.

BOBBY-078

Notwithstanding the foregoing, if the Optional Purchase Event results from a breach of this Agreement by the Selling Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Purchasing Member as a result of such breach.

9.4     Notice of Intent to Purchase.  Within five (5) business days after the Selling Member receives the appraisals from which the purchase price of the Selling Member's Interest can be determined, the Selling Member shall notify the Purchasing Member of such price.  Within thirty (30) days after the Selling Member has notified the Purchasing Member of the purchase price of the Selling Member's Interest, the Purchasing Member shall notify the Member in writing of the Purchasing Member's desire to purchase the Selling Member's Interest.  The failure of the Purchasing Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Selling Member's Interest.  The Purchasing Member may assign to the Company or any other Person that Member's right to purchase the Selling Member's Interest.  For convenience, the party or parties purchasing the Selling Member's Interest hereunder shall be referred to collectively as the "Purchasers" and individually as a "Purchaser."

9.5     Election to Purchase Less Than All of the Selling Member's Interest.  If the Purchasers do not elect to purchase all of the Selling Member's Interest, the portion of the interest not purchased shall be an Economic Interest only.

9.6     Payment of Purchase Price. The purchase price shall be paid by the Purchasers by either of the following methods, each of which may be selected separately by each Purchaser:

9.6.1    At the Closing (defined below), each Purchaser shall pay in cash the total purchase price for the Selling Member's Interest; or

9.6.2    Except as otherwise provided in Section 9.6.3, at the Closing (defined below), each Purchaser shall pay one-fifth (1/5) of the purchase price in cash ("Down Payment") and the balance of the purchase price (the "Loan") shall be paid in arrears in equal monthly installments over a four-year period, based on a forty-eight (48) month schedule, plus accrued interest at the Prime Rate.  The Loan shall be evidenced by separate promissory notes (each, a "Note") executed by each Purchaser, as applicable.  Each Note shall be in an original principal amount equal to the portion owed by the Purchaser.  The Purchaser shall have the right to prepay the Note in full or in part at any time without penalty.  The Note shall contain customary terms, including a provision for the payment of attorneys' fees if litigation is commenced to enforce the Note.  Any Note made by a Purchaser shall be secured by a pledge of that portion of the Selling Member's Interest purchased by the Purchaser; and, if the Purchaser is not a natural person, then the beneficial owners of the Purchaser shall guarantee personally the Purchaser's payment obligations under the Note.

9.6.3    Notwithstanding anything to the contrary in Section 9.6.2, if the event giving rise to the purchase of a Selling Member's Interest is the death of the Selling Member, the Down Payment shall be increased to the amount of insurance proceeds actually received by the Company from life insurance policies owned by the Company insuring that Selling Member's

BOBBY-079

life; provided, however, at no time shall the Down Payment exceed the purchase price determined pursuant to Section 9.3.

9.7     Closing of Purchase of Selling Member's Interest.  Unless Court approval is required, the closing ("Closing") for the sale of a Selling Member's Interest pursuant to this Article 9 shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the Closing date falls on a Saturday, Sunday, or legal holiday, then the closing shall be held on the next succeeding business day. If Court approval is required, (a) the Closing of the sale of a Selling Member's Interest shall occur not later than five (5) business days after entry of the order approving such sale, (b) the Company shall file the application seeking Court approval within thirty (30) days following the determination of the purchase price, and (c) the parties to the Court proceeding shall make every effort to obtain the Court's approval in an expeditious manner.

At the Closing, the Selling Member shall deliver to each Purchaser an instrument of transfer (containing warranties of title and no encumbrances) conveying the Selling Member's Interest.  The Selling Member and each Purchaser shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

ARTICLE 10
DISSOLUTION AND "WINDING UP"

10.1     Company Dissolution.  The Company shall be dissolved, its assets disposed of, and its affairs wound up on the first to occur of the following (each, a "Dissolution Event"): (a) the vote of all of the Members; (b) the happening of any event that makes it unlawful or impossible to carry on the business of the Company; or (c) the sale of all or substantially all of the assets of the Company. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event.

10.2     Winding Up.  On the Company's dissolution, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

10.3     Liquidating Distributions.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the Company shall distribute its remaining assets to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.  Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or if later, within (90) days after the date of such liquidation.

10.4     Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of that Member's positive Capital Account balance and shall have no

BOBBY-080

recourse for such Member's Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against any other Member.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1    Preexisting Relationship Or Experience. (i) The Member has a preexisting personal or business relationship with the Company or one or more of its officers or control persons, or (ii) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

11.2    No Advertising. The Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3    Investment Intent. The Member is acquiring the Membership Interest for investment purposes for the Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

## ARTICLE 12
## MISCELLANEOUS

12.1    Complete Agreement. This Agreement and the Articles constitute the complete and exclusive agreement of the parties regarding the subject matter of this Agreement, and replace and supersede all prior written and oral agreements or statements by and among the Members. No representation, statement, condition or warranty not contained in this Agreement shall be binding on the Members or have any force or effect whatsoever. To the extent that any provisions of the Articles conflict with any provision of this Agreement, the Articles shall control. All amendments to this Agreement shall be in writing and signed by all of the Members.

12.2    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors and assigns.

12.3    Parties In Interest. Except as expressly provided in the Act, nothing in this Agreement shall (a) confer any rights or remedies under or by reason of this Agreement on any Persons other

BOBBY-081

than the Members and such Members' respective successors and assigns, (b) relieve or discharge the obligation or liability of any third person to any party to this Agreement, or (c) give any third person any right of subrogation or action over or against any party to this Agreement.

12.4    Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.5    Interpretation.  If any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied because this Agreement was prepared by or at the request of a particular Member or that Member's counsel.

12.6    Governing Law.  This Agreement is governed by and shall be construed in accordance with the laws of the state of California, excluding any conflicts-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.

12.7    Severability.  If any provision of this Agreement or its application to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances is not affected and such provision shall be enforced to the greatest extent permitted by law.

12.8    Specific Performance.  The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any damages available at law for a breach of this Agreement would not be an adequate remedy. Therefore, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, .by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith.  Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity.

12.9    Further Assurances.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.10   Notices.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested, U.S. mail, postage prepaid.  Notices may also be given by transmittal over electronic transmitting devices such as facsimile or telecopy machine, if the party to whom the notice is being sent has such a device in its office, and provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice.  Notices shall be deemed received

14

BOBBY-082

at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 1.3 of this Agreement, and to a Member at the addresses shown on Exhibit A: provided that a Member may change such Member's address for notice by giving written Notice to all other Members in accordance with this Section 11.10.

12.11  No Interest In Company Property: Waiver Of Action For Partition.  No Member or Assignee has any interest in specific property of the Company: Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that such Member or Assignee may have to maintain any action for partition with respect to the property of the Company.

12.12  Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

12.13  Attorney's Fees.  If any dispute between the Company and the Members or among the Members results in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party.

12.14  Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.15  Consent Of Spouse.  Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form of Exhibit B attached to this Agreement.

## ARTICLE 13
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in Act section 17001 (such terms are equally applicable to both the singular and plural derivations of the terms defined):

"Affiliate" means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

BOBBY-083

"Assignee" means the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Section 8.3.

"Bankruptcy" means: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of section 303(h)(l) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

"Economic Interest" mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include arty other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided in Act section 17106, any right to information concerning the business and affairs of the Company.

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

"Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

"Percentage Interest" shall mean the percentage set forth next to a Member's name on Exhibit A.

"Person" means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

"Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

"Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with

BOBBY-084

or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest.

Without limiting the generality of the foregoing, the sale or exchange of at least fifty percent (50%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of at least fifty percent (50%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partner or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfer, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

[Signatures Begin On The Next Page]

BOBBY-085

## EXHIBIT A
### to
### Operating Agreement

| Name | Address | Capital Contribution | Percentage Interest |
|---|---|---|---|
| David and Sue Halevy | 257 S. Linden Drive Beverly Hills, CA 90211 | $158,333.00 | 33.33% |
| Alan and Sharon Gomperts | 264 S. Oakhurst Drive Beverly Hills, CA 90210 | $158,333.00 | 33.33% |
| Daniel Halevy | 133 S. Palm Drive Beverly Hills, CA 90211 | $158,333.00 | 33.33% |
|  |  |  |  |
|  | **Total** | **$475,000.00** | **100%** |

19

BOBBY-086

**IN WITNESS WHEREOF**, the Members have executed this Agreement on the day and year first above written.

**"MANAGER"**

_____
Alan Gomperts, Manager

**"MEMBERS"**

_____
David Halevy

_____
Alan Gomperts

_____
Daniel Halevy

18

BOBBY-087