1  David B. Shemano (State Bar No. 176020)
   dshemano@shemanolaw.com
2  SHEMANOLAW
   1801 Century Park East, Suite 2500
3  Los Angeles, CA  90067
   Telephone:    (310) 492-5033
4
5  Counsel for AIRE Ancient Baths Los Angeles, LLC

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **LOS ANGELES DIVISION**

11

| | |
|---|---|
| 12  In re: | Case No. 2:24-bk-12079-VZ |
| 13  SEATON INVESTMENTS, LLC, *et al.*, | Jointly Administered with Case Nos.: 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; 2:24-bk-12082-VZ; 2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ and 2:24-bk-12076-VZ |
| 14 | |
| 15  Debtors and Debtors In Possession. | |

16  ☐ Affects All Debtors
17  ☒ Affects Seaton Investments, LLC            Chapter 11
   ☐ Affects Colyton Investments, LLC
18  ☐ Affects Broadway Avenue Investments, LLC   **OPPOSITION OF AIRE ANCIENT
19  ☐ Affects SLA Investments, LLC               BATHS LOS ANGELES, LLC TO
                                                  MOTION OF DEBTOR SEATON
20  ☐ Affects Negev Investments, LLC             INVESTMENTS, LLC, FOR ORDER
                                                  AUTHORIZING DEBTOR TO
21  ☐ Affects Alan Gomperts                      ENTER INTO POSTPETITION
   ☐ Affects Daniel Halevy                       LEASE; DECLARATION OF
22  ☐ Affects Susan Halevy                       AMADEO SERRA SOLANA**

23                                               Hearing:
                                                 Date:      December 12, 2024
24                                               Time:      11:00 a.m.
                                                 Place:     Courtroom 1368
25                                                          255 E. Temple Street
                                                            Los Angeles, CA 90012
26

27

28

1    AIRE Ancient Baths Los Angeles, LLC ("AIRE") hereby submits its opposition to the

2    motion of Debtor Seaton Investments, LLC ("Seaton") for an order authoring Seaton to enter into

3    a postpetition lease (the "Motion") [Doc 314].[1]

4

5    **THE MOTION SHOULD BE DENIED BECAUSE PROPOSED
     LEASE LIKELY WILL VIOLATE THE TERMS OF AIRE'S LEASE**

6    AIRE, as tenant, and Seaton, as landlord, are parties to a lease dated September 7, 2023

7    (the "Lease"), for the premises located at 433-441 Colyton St. and 440 Seaton St., Los Angeles,

8    CA 90013 (the "Premises").  AIRE is a tenant of approximately 24,577 square feet at the

9    Premises.  A copy of the Lease is attached as Exhibit A.  The sole permitted use of the Premises

10   by AIRE is the "[o]peration of a high-end spa offering wellness services and access to thermal

11   pools and customarily related uses ancillary thereto, along with an ancillary retail area

12   substantially like Tenant's first-class locations in New York and Chicago."  Ex. A, page 8,

13   Section 1.12.

14   Because of the unique nature and clientele of AIRE's business, AIRE negotiated a Lease

15   provision that requires Seaton to maintain the Premises consistent with the specific needs of

16   AIRE's business and prohibits Seaton from leasing any portion of the Premises to any party that

17   will be operating a business that will interfere with AIRE's specific needs:

18           m) <u>Business Interruption</u>. Landlord acknowledges that Tenant's
             Permitted Use involves the cultivation of a calm and quiet
19           environment that emphasizes relaxation to its patrons and therefore
             requires that Tenant keep the Premises reasonably free of outside
20           vibrations, noises, and sounds and that the Premises be easily
             accessible for its employees, customers, and invitees. Accordingly,
21           throughout the Term, as extended, Landlord, at Landlord's sole
             expense, shall take such steps as may be necessary with other
22           tenants of the building, to (i) keep the Project and/or Premises free
             of vibrations, noise and sounds, including, but not limited to: music,
23           loudspeakers, television or radio; from the operation of any
             instrument, apparatus, equipment, radio, television or amplification
24           system; or from any construction and/or construction equipment
             which may be annoying or objectionable to Tenant or invitees of
25           the Premises and (ii) keep all paths of travel to and from the

26   ────────────────────

27   [1] AIRE received the Motion by regular mail on December 2, 2024, almost a week after the
     objection deadline.  Accordingly, AIRE requests that the Court consider the Opposition

28   notwithstanding it is being filed after the objection deadline.

SHEMANOLAW
LOS ANGELES

Premises unobstructed and available for use by Tenant's employees, customers, and invitees. *Landlord further agrees, during the Term, as extended, that Landlord will not enter into a lease for or permit the use of other space in the Project or adjacent buildings under Landlord's control which authorizes or permits the operation of a business that produces annoying or objectionable vibrations, noises, or sounds (including, but not limited to, for use as a music recording studio, nightclub, or restaurant facing the Premises).*

Ex. A, page 40, Section 27.2(m) (emphasis added) (the "Use Covenant"). If Seaton violates the Use Covenant and does not promptly remedy the violation, the rent payable by AIRE under the Lease is abated until Seaton remedies the violation of the Use Covenant. Ex. A, pages 40-41, Section 27.2(m).

Pursuant to the Motion, Seaton requests approval to enter into a lease with Levav Group LLC ("Levav"); and DMB Fund, a California non-profit d/b/a Broadway Community Care Centers ("DMB," together with Levav, the "Proposed Lessees"), for approximately 52,000 square feet at the Premises. As described in the Motion, the Proposed Lessees intend to "provide medical and social services to the Los Angeles homeless and transient population" at the Premises. Motion, page 5, lines 26-27. Section 4.05. The proposed lease provides:

**Section 4.05 Use of Premises** – Lessee shall occupy and use the Property comprising of approximately 51,000 useable square feet for "Behavioral Health Treatment" of adolescents and adults including without limitation, unhoused people, Skid Row population, veterans and all those in need of mental and behavioral services for both outpatient and inpatient services.

Motion, Ex. A, page 13.

AIRE has no specific familiarity with the Proposed Lessees and their business operations. However, AIRE has reviewed the (1) Objection filed by Korth Direct Mortgage, Inc. [Doc 333] and (2) Opposition filed by Archway Broadway Loan SPE, LLC [Doc 330], to the companion motion filed by Broadway Avenue Investments, LLC, and AIRE is concerned about the arguments that have been raised in the Objection and Opposition. But more fundamentally, the proposed use of the Premises appears to be in direct violation of the Use Covenant. AIRE files this Opposition to make it very explicit that it is in no way waiving any right or remedy it may have under the Lease, including the right to enforce the Use Covenant and be entitled to a rent abatement as set forth in the Lease. In view of the likelihood that the lease to the Proposed

2

1    Lessees will almost certainly result in the abatement of rent under AIRE's lease, it is doubtful that

2    that approval of the proposed lease is in the best interests of the estate.  Accordingly, AIRE, as a

3    creditor and interested party, requests that the Court deny the Motion.

4    DATED:  December 9, 2024                **SHEMANOLAW**

5

6                                           By:____/s/ David B. Shemano_____
                                                  David B. Shemano

7
                                           Counsel for AIRE Ancient Baths Los Angeles,
8                                          LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHEMANOLAW
LOS ANGELES

3

## DECLARATION OF AMADEO SERRA SOLANA

I, Amadeo Serra Solana, declare and state as follows:

1.      I am the Chief Executive Officer of AIRE Ancient Baths Los Angeles, LLC ("AIRE").  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would competently testify thereto.

2.      On December 2, 2024, AIRE received by regular mail a copy of the motion of Seaton Investments, LLC, to enter into a new lease.

3.      Attached as Exhibit A is copy of the Retail Lease dated September 7, 2023, entered into between Seaton Investments, LLC, as Landlord, and AIRE, as tenant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 9th day of December, 2024, at New York, New York.

_____
Amadeo Serra Solana

SHEMANOLAW
LOS ANGELES

4

**Retail Lease**

SEATON INVESTMENTS, LLC,
Landlord

and

AIRE Ancient Baths Los Angeles, LLC,
Tenant

Premises: 433-441 Colyton St. and 440 Seaton St., Los Angeles, CA 90013

Date: September 7, 2023

**TABLE OF CONTENTS**

Page

Article 1.        Basic Terms and Definitions ...................................................................... 1

Article 2.        Demise; Rent ........................................................................................... 3

Article 3.        Tenant Operations; Signs ....................................................................... 7

Article 4.        Condition of the Premises; Landlord's Work ......................................... 7

Article 5.        Alterations ............................................................................................... 8

Article 6.        Common Areas ........................................................................................ 9

Article 7.        Tax Payments ......................................................................................... 12

Article 8.        Utilities; Services ................................................................................... 13

Article 9.        Repairs and Maintenance ....................................................................... 15

Article 10.       Applicable Requirements; Hazardous Substances; Licenses and Permits........... 16

Article 11.       Subordination; Estoppel Certificates ..................................................... 18

Article 12.       Insurance ................................................................................................ 19

Article 13.       Casualty .................................................................................................. 20

Article 14.       Condemnation ........................................................................................ 21

Article 15.       Assignment and Subletting .................................................................... 22

Article 16.       Access; Changes in Building and Real Property .................................... 23

Article 17.       Default .................................................................................................... 24

Article 18.       Remedies ................................................................................................ 25

Article 19.       Landlord Default .................................................................................... 25

Article 20.       Force Majeure ........................................................................................ 26

Article 21.       Broker ..................................................................................................... 26

Article 22.       Notices; Consents and Approvals .......................................................... 27

Article 23.       No Representations; Liability; Tenant Indemnity.................................. 28

Article 24.       Security Deposit ..................................................................................... 29

Article 25.       End of Term ............................................................................................ 30

Article 26.       Extension Option(s) ............................................................................... 30

Article 27.       Miscellaneous ........................................................................................ 32

Exhibit A, page 6

## Retail Lease

**THIS LEASE** dated for reference purposes only September 7, 2023 (the "**Effective Date**"), is made by and between Seaton Investments, LLC, a California limited liability company ("**Landlord**"), and AIRE Ancient Baths Los Angeles, LLC ("**Tenant**"), (collectively the "**Parties**" or individually, a "**Party**").

**Article 1.**  **Basic Terms and Definitions**

**Section 1.1**  Additional Rent. All sums, other than the Base Rent, payable by Tenant to Landlord under this Lease, including the payment of deficiencies and increases in the Security Deposit, if any.

**Section 1.2**  Applicable Requirements. All applicable building codes, laws, statutes, ordinances, rules, orders, regulations, codes, or other legal requirements of federal, state, or local governments, conditions, covenants or restrictions of record, permits, and easements.

**Section 1.3**  Base Rent. The Base Rent is shown in Section 2.5 of this Lease.

**Section 1.4**  Broker. Landlord and Tenant acknowledge that there are no other licensed brokers associated with this transaction other than Lorena Tomb of Urbanlime Real Estate.

**Section 1.5**  Building. The building and improvements located at 433-441 Colyton St. and 440 Seaton St., Los Angeles, CA 90013.

**Section 1.6**  Expiration Date. The date that is One Hundred Eighty (180) months following February 19, 2023, provided that if the Expiration Date is not the last day of the calendar month, then the Expiration Date shall be extended to be the last day of the calendar month that contains the Expiration Date.

**Section 1.7**  Extension Option. Two (2) five year extension options. Tenant shall provide Landlord with notice of its intent to exercise said options not more than nine (9) months nor less than six (6) months prior to the expiration of the then-current Lease Term.

**Section 1.8**  Guarantor. Acqua Ancien Bath, Inc. (See Exhibit A) *

**Section 1.9**  Landlord's Work. The work to be performed by Landlord described in Exhibit B to this Lease.

**Section 1.10**  Lease Commencement Date. Upon the mutual execution of this Lease.

- 1 -

_AG_
AG
Landlord

| _AS_
AS
Tenant

Exhibit A, page 7

**Section 1.11**  <u>Notice Address</u>.

(a)  <u>Landlord</u>.

264 S Oakhurst Drive
Beverly Hills, CA 90212

(b)  <u>Tenant</u>.

Acqua Ancien Bath, Inc
88 Franklin St.
New York, NY 10013

With a copy to:

VZN Law
5619 North Figueroa Street, Suite 207
Los Angeles, CA 90042
Attn: Ali Vazn

**Section 1.12**  <u>Permitted Use</u>. Operation of a high-end spa offering wellness services and access to thermal pools and customarily related uses ancillary thereto, along with an ancillary retail area substantially like Tenant's first-class locations in New York and Chicago.

**Section 1.13**  <u>Premises</u>. The portion of the Building shown on <u>Exhibit C</u> to this Lease, including space on the ground floor space comprising of approximately 24,577 square feet of space as of the Delivery Date. In the event that Tenant adds square footage to the Premises through improvements to the Premises (i.e., mezzanine square footage), the rentable square footage of the Premises shall not be increased, Tenant's Proportionate Share shall not be increased, and no additional Common Area Operating Expenses shall be allocated to the Tenant. Tenant shall have the non-exclusive right to use and access of the corridor connecting the Premises and the parking lot, as depicted in <u>Exhibit C</u>, including for use as an emergency exit (the placement of which shall be determined by the governmental authorities having jurisdiction over the Premises and mutually agreed upon by Landlord and Tenant).

**Section 1.14**  <u>Proportionate Share</u>. Twenty-Nine and Forty-One Hundredths Percent (29.41%) Percentage to be based on the square footage of the Premises as of the Delivery Date as it relates to the Building only. For the avoidance of doubt, Tenant's Proportionate Share shall not include any additional square footage that results from Tenant's Initial Buildout Work or Tenant's Alterations in the Premises.

**Section 1.15**  <u>Real Property</u>. The Premises, Building, and Common Areas (defined herein), the land upon which they are located, along with all other buildings and improvements thereon, if any (also referred to herein as the "**Property**" or "**Project**").

**Section 1.16**  <u>Rent</u>. All monetary obligations of Tenant to Landlord under the terms of this Lease (except for the Security Deposit) are deemed to be Rent.

- 2 -

Landlord    Tenant

Exhibit A, page 8

**Section 1.17**  <u>Rent Commencement Date</u>. The date which is Twenty (20) months after February 19, 2023.

**Section 1.18**  <u>Security Deposit</u>. Three Hundred Thirteen Thousand Three Hundred Fifty-Six Dollars and Seventy-Five Cents ($313,356.75). See <u>Article 24</u>.

**Section 1.19**  <u>Term</u>. The period commencing on February 19,2023 and ending on the Expiration Date, subject to earlier termination or extension of this Lease pursuant to the terms hereof.

**Section 1.20**  <u>Certain Definitions</u>. Any reference in this Lease to (a) "<u>legal action</u>", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "<u>person</u>" includes any individual or entity, (c) "<u>this Lease</u>" includes the Rules and the other Exhibits to this Lease, and (d) "<u>including</u>" means "including without limitation."

**Article 2.**       **<u>Demise; Rent</u>**

**Section 2.1**  <u>Demise</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, for the Term, on the terms and the conditions hereinafter provided.

**Section 2.2**  <u>Delivery Date</u>. If for any reason Landlord is unable to deliver vacant possession of the Premises with Landlord's Work, with the exception of the Roof and Skylight work listed in Paragraph 6 of Exhibit B (the "**Roof Work**"), Complete (as defined herein), in compliance with the terms of Article 4 and Exhibit B, on or before October 15, 2023 the ("**Scheduled Delivery Date**"), this Lease shall not be void or voidable nor shall Landlord be liable to Tenant therefor, monetarily or otherwise, but the Rent Commencement Date shall be subject to a day-for-day extension for each day that the Delivery Date is delayed beyond the Scheduled Delivery Date and Tenant shall receive a rent credit equal to two (2) days of Rent for each day that the Delivery Date is delayed beyond the Scheduled Delivery Date. Notwithstanding anything to the contrary contained herein, if Landlord is unable to deliver vacant possession of the Premises with Landlord's Work Complete on or before the date which is one hundred eight (180) days after the Lease Commencement Date (the "**Outside Delivery Date**"), Tenant may, at its option, by notice to Landlord, in writing, terminate this Lease. In the event Tenant terminates this Lease for Landlord's failure to deliver possession of the Premises in the condition required herein by the Outside Delivery Date, then, within ten (10) business days after such termination by Tenant, Landlord shall return to Tenant all security deposits, pre-paid rent, and other amounts then held by Landlord and reimburse Tenant for all reasonable, documented, out-of-pocket costs incurred in preparing this Lease and performing under this Lease, including, but not limited to, legal fees, architect fees, permitting costs, and construction fees (collectively, the "**Lease Expenses**"), which shall be paid to Tenant upon receipt of Tenant's invoices evidencing such Lease Expenses. If Tenant exercises this right to terminate and Landlord delivers possession of the Premises to Tenant prior to such effective termination date, then the termination shall be deemed rescinded and delivery shall be considered timely made. For the avoidance of doubt, Landlord shall not have any right to terminate this Lease in the event that the Landlord has not delivered possession of the Premises as required hereunder to Tenant prior to the Outside Delivery Date. As used herein, the term "**Delivery Date**" means the date that the following conditions have been satisfied: (1)

- 3 -



Exhibit A, page 9

physical possession of the Premises has been delivered to Tenant with all of Landlord's Work (as described in **Exhibit B**) Complete (as used herein, "**Complete**" shall mean that (i) Landlord Work, with the exception of the Roof Work, has been fully completed and (ii) Tenant has full access to the Premises), and all violations of record have been cleared and Tenant can commence work; (2) Landlord has unconditionally delivered to Tenant a fully executed original of this Lease; (3) all Building systems, including without limitation mechanical, electrical, plumbing, HVAC, fire and life safety, are in good working order, and in compliance with all Applicable Requirements; (4) the Premises is in the condition required under Section 4.1, and (5) no other circumstances or conditions exist under Landlord's control that would prevent Tenant from commencing the Tenant's Initial Buildout Work and operating in the Premises for the Permitted Use. Following delivery of the Premises to Tenant, Tenant shall be entitled to perform all work necessary in order to prepare the same for Tenant's intended use ("**Tenant's Initial Buildout Work**"). Landlord shall deliver written notice to Tenant of its intention to deliver the Premises to Tenant no later than five (5) business days prior to the Delivery Date.

Notwithstanding anything to the contrary contained herein, Landlord shall complete the Roof Work on or before the date which is six (6) months following the mutual execution of this Lease.

**Section 2.3**    Rent Commencement Date. If a Rent Commencement Date is specified in Article 1 of this Lease: (a) Tenant is not required to pay Base Rent until the Rent Commencement Date; and (b) if the Rent Commencement Date is not the first day of a month, the Base Rent for the month in which the Rent Commencement Date occurs shall be apportioned according to the number of calendar days in that month and shall be due and payable when invoiced. Notwithstanding the foregoing or anything to the contrary contained herein, the Rent Commencement Date shall be subject to a day-for-day extension for any Landlord Delay or for any Force Majeure Delay (as such terms are defined herein). As used herein, (x) a "**Landlord Delay**" shall mean any delay in Tenant's Initial Buildout Work and/or ability to open the Premises for business to the public, as a result of (i) Landlord's breach of its obligations under this Lease, (ii) any violations, stop work orders, open permit applications, or other legal non-compliance by Landlord affecting the Premises or the Project which delays or prevents the performance of Tenant's Initial Buildout Work or Tenant's ability to open for business in the Premises, or (iii) any delays caused by Landlord or Landlord's contractor(s) acts or omissions; and (y) a "**Force Majeure Delay**" shall mean any actual delay in Tenant's ability to open the Premises for business to the public as a result of a Force Majeure (as defined in Article 20) event.

**Section 2.4**    Base Rent. Tenant hereby covenants and agrees to pay to Landlord certain sums, which shall be in the form of "**Base Rent**" as hereinafter provided. The Base Rent payable by Tenant hereunder for any fractional month in which the Rent Commencement Date occurs or at the end of the Term shall be prorated on a daily basis. The payment of Base Rent shall commence on the Rent Commencement Date and shall be paid thereafter in advance, on or before the fifth day of each calendar month of the Term. Tenant shall pay Landlord the Base Rent, without notice, abatement, deduction or offset (except as expressly provided in this Lease), in lawful money of the United States of America, at Landlord's Notice Address or to such other persons or place as Landlord may designate from time to time by notice to Tenant, and as provided in this Lease. Rent shall be pro-rated for any partial month according to the number of days in the month occurring

- 4 -

during the Term. Landlord's delay in rendering, or failure to render, any statement required to be rendered by Landlord for any Rent for any period shall not waive Landlord's right to render a statement or to collect that Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

**Section 2.5**    Base Rent Adjustments. Commencing on the Rent Commencement Date, Tenant agrees to pay Landlord as Base Rent during the Term the following amounts:

| Year of Lease Term | Annual Base Rent | Rent PSF Per Year | Monthly Installment of Base Rent | Rent PSF Per Month |
|---|---|---|---|---|
| 1 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2* | $393,232.00 | $48.00 | $98,308.00 | $4.00 |
| 3-4** | $1,179,696.00 | $48.00 | $98,308.00 | $4.00 |
| 5-9 | $1,253,427.00 | $51.00 | $104,452.25 | $4.25 |
| 10-14 | $1,474,620.00 | $60.00 | $122,885.00 | $5.00 |
| 15 | $1,548,351.00 | $63.00 | $129,029.25 | $5.25 |

*The Rent Commencement Date shall be the date which is Twenty (20) months after February 19, 2023.

**Tenant shall be entitled to Base Rent abatement in the amount of Forty-Nine Thousand One Hundred Fifty-Four ($49,154) per month during the Twenty-Eighth (28th), Twenty-Ninth (29th), Thirtieth (30th), and Thirty-First (31st) months of the Lease Term.

**Section 2.6**    Commencement Date Letter. Upon Landlord or Tenant's request, Landlord and Tenant shall execute an agreement setting forth the Lease Commencement Date, the Rent Commencement Date, and the Expiration Date in the form attached hereto as Exhibit D.

**Section 2.7**    Lease Termination Right. Notwithstanding anything contained herein to the contrary, commencing on the first (1st) day of the seventy-second (72nd) month of the Term, Tenant will have the option to terminate this Lease (the "**Early Termination Option**") by providing written notice of the exercise of such Early Termination Option to Landlord (the "**Early Termination Notice**"), which Early Termination Notice shall be provided to Landlord no later than six (6) months following the expiration of the seventh (7th) year of the Term. The Early Termination Notice shall specify the effective date of such termination (such date to be at least six (6) months following the date of such notice, hereafter the "**Early Termination Date**"). Within thirty (30) days following the Early Termination Date, Tenant shall deliver to Landlord a termination fee equal to (i) the unamortized Rent abatement and Landlord's leasing commission paid (amortized on a straight-line basis over the initial Term of the Lease) and (ii) an additional six (6) months of the then-current Base Rent and Common Area Operating Expenses. Tenant shall

- 5 -

be required to return the Premises in accordance with the terms of <u>Section 25.1</u>. In the event of exercise of this Early Termination Right, such termination shall be effective on the Early Termination Date with the same force and effect as if this Lease had originally provided for the expiration of the Term as of that date.

   **Section 2.8** <u>Short-Term Rentals</u>. Notwithstanding the foregoing, until the earlier of (i) the Rent Commencement Date or (ii) the date upon which Tenant commences construction of Tenant's Initial Buildout Work in the Premises, Landlord shall manage the Premises and perform any repairs or maintenance reasonably necessary to lease the Premises to third parties under short-term rental agreements (such agreement, a **"Short-Term Rental Agreement"**; the renting party under such Short-Term Rental Agreement, a **"Temporary Subtenant"**). Landlord covenants that it will not enter into a Short-Term Rental Agreement with a Temporary Subtenant without the prior written consent of Tenant. Each request for consent to a Short-Term Rental Agreement shall be in writing and accompanied by (a) information relevant to Tenant's determination as to the responsibility and appropriateness of the proposed Temporary Subtenant and (b) a detailed description of the proposed Temporary Subtenant and Short-Term Renal Agreement (including, without limitation, information detailing the proposed Temporary Subtenant's financial and background information, the proposed use of the Premises under the applicable Short-Term Rental Agreement, and the length of the proposed Short-Term Rental Agreement). Landlord shall not extend the length or term of any Short-Term Rental Agreement(s) without the prior written consent of Tenant.

   In the event that Tenant approves of the proposed Short-Term Rental Agreement, Landlord shall provide Tenant with written notice of the commencement of the Short-Term Rental Agreement at least fifteen (15) days before the Temporary Subtenant takes possession of all or part of the Premises. In the event that Landlord enters into a Short-Term Rental Agreement, Tenant shall be named as an additional insured on the Temporary Subtenant's policy of insurance that will be required under the Short-Term Rental Agreement. Tenant shall continue to have access to the Premises at all times during any Short-Term Rental Agreement. Tenant shall be immediately notified by Landlord of any breach or default by a Temporary Subtenant under a Short-Term Rental Agreement. Temporary Subtenant(s) has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of a Short-Term Rental Agreement. At or prior to the expiration or termination of a Short-Term Rental Agreement, the applicable Temporary Subtenant shall deliver exclusive possession of the Premises to Landlord. In the event that the Temporary Subtenant does not deliver exclusive possession to Landlord as specified above, then Landlord shall take all steps necessary to enforce the terms of such Short-Term Rental Agreement such that the Temporary Subtenant vacates from the Premises.

   If Tenant consents to a Short-Term Rental Agreement, as a condition thereto, which Landlord and Tenant hereby agree is reasonable, Landlord shall pay to Tenant forty percent (40%) of any Rent Premium (as defined below) received by Landlord from the Temporary Subtenant. **"Rent Premium"** shall mean all rent, additional rent, or other consideration payable by such Temporary Subtenant less the sum of costs and expenses reasonably incurred or paid by Landlord in connection with the renting and operation of the Premises (including, but not limited to, broker's commissions, if any).

                       *AG*   |  *AS*
                        Landlord  Tenant

Exhibit A, page 12

**Article 3.**                    **Tenant Operations; Signs**

**Section 3.1**    <u>No Continuous Operations</u>. Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated to continuously operate at the Premises. Tenant's failure to continuously conduct its business in the Premises shall not in any way be deemed an event of default under this Lease nor shall such a failure otherwise entitle Landlord to commence or to maintain any action, suit, or proceeding, whether in law or in equity, relating in any way to its business in the Premises, provided that Tenant shall otherwise perform and obey the other covenants and agreements contained in this Lease on the part of Tenant to be performed, including the payment of Base Rent and other charges due hereunder.

**Section 3.2**    <u>Signage</u>. Tenant shall be permitted to erect the maximum allowed signage permitted in compliance with the Applicable Requirements on the exterior of the Building (including without limitation blade signs and flagpoles) and the windows or interior of the Premises, provided that with respect to such exterior signs Tenant shall obtain at Tenant's expense all required licenses and permits for such signs, and shall maintain at its expense all such licenses and permits for so long as such licenses and permits are required, and provided that: (a) the provision, installation and maintenance of any such signs shall be at Tenant's sole cost and expense; and (b) such signs shall conform to all Applicable Requirements of governmental agencies having jurisdiction thereover. Tenant's signage may also be referred to herein as "**Signs**."

**Article 4.**                    **Condition of the Premises; Landlord's Work**

**Section 4.1**    <u>Condition</u>. Subject to Landlord's maintenance obligations contained in Section 9.1, Landlord performing Landlord's Work, and the requirements set forth above with respect to the Delivery Date and the requirements set forth in Rider No. 1, Landlord shall deliver that portion of the Premises contained within the Building to Tenant vacant, broom clean and free of debris and watertight, with Landlord's Work Substantially Complete on the Scheduled Delivery Date, and with the following specs in place: (a) Minimum electrical: 1000 Amps, 277/480 volt (or equivalent 225A at 120/208 volt if 277/480 volt is not available); (b) Gas: minimum 2949 mbh; and (c) Water: 2 ½" service connection. Landlord warrants that the existing electrical, plumbing, lighting, heating, ventilating and air conditioning systems ("**HVAC Units**"), building systems, loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Tenant, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls, exterior walls, façade, Party Wall, and foundation of the Premises shall be in good condition and free of material defects, and that the Premises does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Delivery Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Landlord shall promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Landlord's expense. The warranty periods shall be as follows: (i) twelve (12) months as to the HVAC Units, and (ii) twelve (12) months as to the remaining systems and other elements of the Premises. Landlord also warrants, that unless otherwise specified in writing, Landlord is unaware of (i) any recorded notices of default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.



Landlord        Tenant

**Exhibit A, page 13**

**Section 4.2**    <u>Compliance</u>. Landlord warrants that to the best of its actual knowledge the improvements on the Premises comply with the Applicable Requirements that were in effect at the time that each improvement, or portion thereof, was constructed. If the Premises do not comply with said warranty, Landlord shall, except as otherwise provided, promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, rectify the same at Landlord's expense. Landlord shall be responsible for any structural remediation of the Building required by any governmental authorities having jurisdiction over the Premises or under any Applicable Requirements not required solely due to Tenant's Initial Buildout Work or solely due to Tenant's Permitted Use.

**Section 4.3**    <u>Landlord's Work</u>. If any Landlord's Work is specified in <u>Article 1</u> and the Exhibit referred to therein, Landlord shall, at its expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this Lease. Tenant shall not unreasonably impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work.

**Article 5.**    **<u>Alterations</u>**

**Section 5.1**    <u>Alterations</u>. Except as may be expressly provided in this Lease, and other than the completion of Tenant's Initial Buildout Work, which shall be exempt from the terms of this <u>Article 5</u>) Tenant shall not replace any fixtures in the Premises or make any changes, improvements, alterations or additions (collectively, "**Alterations**"), to the structural portions of the Building without Landlord's prior consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Tenant shall provide Landlord with at least ten (10) days prior notice before commencing any Alterations. Alterations shall be performed, at Tenant's expense, with diligence when started so as to promptly complete such Alterations in a good and workmanlike manner using new materials of first class quality and in compliance with this Lease, all Applicable Requirements and Tenant's Plans (as defined in <u>Section 5.2</u>), if required. Alterations shall be deemed, upon installation, to be improvements and betterments that become the property of Landlord at installation and shall remain upon and be surrendered with the Premises at the expiration of the Term (or the sooner termination of this Lease in accordance with its provisions) unless Tenant elects to remove the same at the expiration or earlier termination of the Lease. Tenant shall be liable for any damage caused to any part of the Building, including its fixtures and equipment, arising from, or as a result of, Alterations and/or its installation and/or removal of its Signs. Notwithstanding anything to the contrary contained herein, in the event Applicable Requirements require Tenant to construct any Alterations outside of the Premises, Landlord shall permit the construction of such Alterations and reasonably cooperate with and support Tenant in Tenant's construction of such Alterations, which cooperation obligation of Landlord shall include timely and reasonably responding to any notices from Tenant and requests for access to areas of the Project outside of the Premises. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to install solar panels on the roof of the Premises without such consent, but upon notice to Landlord. Landlord shall cooperate with Tenant and reasonably support Tenant in Tenant's efforts to install such solar panels. In the event that any damage to the roof is caused by the installation of such solar panels, Tenant shall be responsible, at Tenant's cost and expense, for the repair thereof.

- 8 -



Landlord    Tenant

Exhibit A, page 14

**Section 5.2**    Tenant's Plans. Prior to commencing any Alterations, Tenant shall, at Tenant's expense, deliver to Landlord plans and specifications, for Alterations, in form reasonably satisfactory to Landlord (such plans and specifications together with revisions thereto, collectively, "**Tenant's Plans**"), and obtain Landlord's approval of Tenant's Plans, which approval shall not be unreasonably withheld, conditioned, or delayed.

**Section 5.3**    Authorizations. At Tenant's request, Landlord shall promptly join in any applications for any authorizations required from any governmental authority in connection with Alterations to which Landlord has consented, and otherwise cooperate with Tenant in connection with Alterations, but Landlord shall not be obligated to incur any expense or obligation in connection with any such applications or cooperation.

**Section 5.4**    Ownership; Removal. On or before the Expiration Date or sooner termination of this Lease, if applicable, if so elected by Tenant, Tenant shall, at Tenant's expense, remove Tenant's trade fixtures, equipment, personal property, and elements fixed in the interior and exterior walls ("**Tenant's Property**"). Any Tenant's Property or Alterations that Tenant elects not to remove by the Expiration Date or sooner termination of this Lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Landlord's expense.

### Article 6.        Common Areas

**Section 6.1**    Definition. The "**Common Areas**" are those areas and facilities which may be furnished by Landlord within the exterior boundary line of the Project for the non-exclusive common use of tenants and other occupants of the Project, their employees, customers, and invitees, including, but not limited to, parking areas, access areas (other than public streets), driveways, loading docks and loading areas, sidewalks, lighting facilities, and other similar common areas, facilities, or improvements.

**Section 6.2**    Common Area Maintenance. Landlord will operate and maintain, or shall cause to be operated and maintained, the Common Areas in a first-class manner, consistent with and appropriate for the Project and location where the Project is located. Landlord agrees throughout the Term to properly maintain and repair and if necessary replace all Common Areas and to keep same in good order and condition and properly lighted and cleaned. Without limiting the generality of the foregoing, Landlord agrees, at its own expense, to perform the following (subject to Landlord's right to recover certain of the costs associated with the performance of the following to the extent provided in Section 6.4): (i) operate, manage, maintain, equip and insure all of the Common Areas and keep the Common Areas secure and in a safe condition, free of obstructions, clean, swept and in good repair; (ii) repair, maintain and replace any portion of the Common Areas; (iii) keep the Common Areas adequately lighted during hours of darkness when the Premises is open for business and for at least sixty (60) minutes after the Premises is closed for business; (iv) keep the parking lot and driveways properly striped to assist in the orderly parking of cars; and (v) provide all of the Common Areas for use at all times, except during reasonable periods of time required to perform any necessary maintenance, repairs, or replacements. Landlord further agrees that all maintenance and repairs shall be performed as quickly as reasonably possible and at such times and in such manner as shall minimize any inconvenience to Tenant and its customers.



Landlord          Tenant

Exhibit A, page 15

**Section 6.3**    <u>Common Area Changes</u>. Landlord shall not have the right (i) to enter into, modify, and terminate any easement and other agreements pertaining to the use and maintenance of the Common Areas; (ii) to close all or any portion of the Common Areas unless, in the reasonable and good faith opinion of Landlord, it is necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (iii) to close any or all portions of the Common Areas without Tenant approval, which approval shall not be unreasonably withheld. Notwithstanding anything contained herein to the contrary, in connection with the exercise by Landlord of any of its rights hereunder, Landlord shall use exercise such rights in a manner that does not interfere with Tenant's access to, visibility of, or use of the Premises.

**Section 6.4**    <u>Common Area Operating Expenses</u>. Tenant agrees to pay to Landlord as Additional Rent Tenant's Proportionate Share (29.41%) of the costs to perform the maintenance described in <u>Section 6.2</u> above (subject to the terms of <u>Section 6.6</u> below), Tenant's Proportionate Share of Real Property Taxes (as defined in <u>Section 7.1</u>), and Tenant's Proportionate Share of the cost of premiums for the insurance maintained by Landlord pursuant to this Lease (collectively, the "**Common Area Operating Expenses**").

**Section 6.5**    <u>Common Area Operating Expenses; Estimate</u>. From and after the Rent Commencement Date, Tenant shall pay to Landlord Six Thousand One Hundred Forty-Four Dollars and Twenty-Five Cents ($6,144.25) per month as the estimated monthly amount of Tenant's Proportionate Share of Common Area Operating Expenses as estimated by Landlord (the "**Estimate**"), which amount Tenant shall pay to Landlord concurrent with the payment of each monthly installment of Base Rent. For the first Lease year of the Original Term, and each Lease year thereafter, Landlord shall give Tenant a yearly Estimate Statement ("**Estimate Statement**"), setting forth Landlord's reasonable Estimate of the total amount of monthly Common Area Operating Expenses for the then-current Lease year thirty (30) days prior the yearly Estimate being charged to the Tenant. Landlord's Estimate Statement shall include sufficient information evidencing any change in the Estimate. Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of such Estimate to Landlord for such Lease year. The parties further agree that, notwithstanding the foregoing, Tenant's Proportionate Share of Common Area Operating Expenses shall be initially adjusted on a for a property tax reassessment and shall not in the aggregate exceed Eleven Thousand Fifty-Nine Dollars and Sixty-Five Cents ($11,059.65) per month as the estimated amount set forth herein. Until Landlord has delivered the Estimate Statement to Tenant, Tenant shall pay Tenant's Proportionate Share of Common Area Operating Expenses which were paid each month during the previous Lease year. Notwithstanding anything herein to the contrary, in no event shall Tenant's Proportionate Share of Common Area Operating Expenses increase by more than three percent (3%) per annum.

Notwithstanding anything to the contrary contained herein, in the event that Landlord receives a second property tax reassessment of the Property due solely to Tenant's Initial Buildout Work, then Tenant shall be responsible for the payment of the increases to the Real Property Taxes for the Building caused solely by the Tenant's Initial Buildout Work. Thereafter, unless as otherwise specified in this Section 6.5, in no event shall Tenant's Proportionate Share of Common Area Operating Expenses increase by more than three percent (3%) per Lease year.

Notwithstanding anything to the contrary contained herein, in the event that Landlord sells the Building to a third-party during the first four (4) Lease years of the Term, Tenant shall not be

- 10 -

<u>AG</u>
Landlord

<u>AS</u>
Tenant

responsible for any payment of Tenant's Proportionate Share of Common Area Operating Expenses above the three percent (3%) annual increase until the fifth (5th) Lease year of the Term. Commencing on the first day of the fifth (5th) Lease year of the Term and continuing through the ninth (9th) Lease year of the Term, Tenant shall be responsible for the payment of Real Property Taxes resulting from such sale as follows: (i) Tenant shall be responsible for twenty percent (20%) of Tenant's Proportionate Share (29.41%) of any increase to Real Property Taxes resulting from such sale during the fifth (5th) year of the Term; (ii) Tenant shall be responsible for forty percent (40%) of Tenant's Proportionate Share (29.41%) of any increase to Real Property Taxes resulting from such sale during the sixth (6th) year of the Term; (iii) Tenant shall be responsible for sixty percent (60%) of Tenant's Proportionate Share (29.41%) of any increase to Real Property Taxes resulting from such sale during the seventh (7th) year of the Term; (iv) Tenant shall be responsible for eighty percent (80%) of Tenant's Proportionate Share (29.41%) of any increase to Real Property Taxes resulting from such sale during the eighth (8th) year of the Term; (v) Tenant shall be responsible for one hundred percent (100%) of Tenant's Proportionate Share (29.41%) of any increase to Real Property Taxes resulting from such sale during the ninth (9th) year of the Term; Thereafter, unless as otherwise specified in this Section 6.5, in no event shall Tenant's Proportionate Share of Common Area Operating Expenses increase by more than three percent (3%) per each subsequent Lease year.

Notwithstanding anything to the contrary contained herein, in the event that Landlord sells the Building to a third-party at any time after the fourth (4th) Lease year of the Term, then Tenant shall only be responsible for payment of twenty percent (20%) of Tenant's Proportionate Share (29.41%) of any increase to the Real Property Taxes per each Lease year resulting from such sale per Lease year for a period of five (5) Lease years. Thereafter, in no event shall Tenant's Proportionate Share of Common Area Operating Expenses increase by more than three percent (3%) per Lease year.

**Section 6.6** <u>Common Area Operating Expenses; Exclusions</u>. Common Area Operating Expenses shall be based on competitive charges for similar services and materials in the vicinity of the Project and shall exclude (without implying that they would be otherwise included): (i) the costs of replacement for equipment or capital components such as the roof, foundations, Party Wall (as defined in Rider No. 1 attached hereto), columns, beams, bearing walls, and exterior walls, or a Common Area capital improvement (expressly excluding parking lot paving and striping, which shall be amortized over the IRS useful life and included as a Common Area Operating Expense), elevators, and fences; (ii) costs of special services rendered to individual tenants (including Tenant) for which a separate reimbursement is received; (iii) interest and principal payments, points and fees, bad debt expenses, late fees, prepayment fees or other charges on loans or indebtedness secured by the Building or the Project, or any costs associated with any purchase, sale or refinancing of the Building or the Project; (iv) rental payments under any ground or underlying lease or leases; (v) costs of improvements for Tenant or other tenants of the Building; (vi) costs of services or other benefits of a type which are not available to Tenant or its customers, but which are available to other tenants or occupants, and costs for which Landlord is reimbursed by other tenants of the Building other than through payment of tenants' shares of increases in Common Area Operating Expenses and Real Property Taxes; (vii) depreciation or amortization, other than as specifically enumerated in the definition of Common Area Operating Expenses above; (viii) management fees in excess of three percent (3%) of the rental collections at the

- 11 -

<u>AG</u>
Landlord

| <u>AS</u>
Tenant

Project; (ix) costs, fines, or penalties incurred due to Landlord's violation of any Applicable Requirements; (x) costs incurred by Landlord to remove Hazardous Substances from the Building or Property, which removal is required to be performed by Landlord pursuant to the terms of this Lease; (xi) marketing costs, advertising expenses, lease buy-outs, leasing commissions, finders' fees, attorney's fees, costs, letters of intent, deal memos, space planning costs and disbursements and other expenses incurred in connection with leasing space in the Building or in connection with any sublease or assignment of leases at the Building; (xii) costs incurred due to violation by Landlord or any tenant or other occupant of the terms and conditions of any Lease or other rental arrangement covering space in the Building; (xiii) costs of repairs resulting from the intentional acts or willful misconduct of Landlord, its agents or employees; (xiv) all items and services for which Tenant pays third parties directly; (xv) the costs of any leasing or marketing office in the Building or Project; (xvi) bad debt loss, rent loss or reserves for bad debts or future improvements, repairs or additions; (xvii) expenses paid by any tenant directly to third parties, or as to which Landlord is otherwise reimbursed by any third party, other tenant, or by insurance proceeds; (xviii) costs relating to or arising from the Party Wall (including, but not limited to, the repair and maintenance of same); or (xix) costs incurred by Landlord to cause the Project, Building, or Premises to comply with Applicable Requirements in effect as of the Commencement Date of this Lease (as opposed to Applicable Requirements coming into effect after the Commencement Date). Landlord shall not (a) make a profit by charging items to Common Area Operating Expenses that are otherwise also charged separately to others and (b) collect Common Area Operating Expenses from Tenant and all other tenants in the Project in an amount in excess of what Landlord incurs for the items included in the Common Area Operating Expenses.

**Section 6.7**    Tenant Audit Rights. Within ninety (90) days after Tenant receives Landlord's annual reconciliation of Common Area Operating Expenses for a calendar year, Tenant or an accountant employed by Tenant (but not on a commission basis), shall have the right during normal business hours to examine, review and audit Landlord's books and records relating to items included in Common Area Operating Expenses at Landlord's offices or in such location where such records are maintained by Landlord; provided, however, unless Tenant shall complete said audit within ninety (90) days from the date of receipt of the annual reconciliation, Tenant shall forfeit its right to claim any adjustment to Tenant's Proportionate Share of the Common Area Operating Expenses. In the event that Tenant's review demonstrates any inaccuracy in Landlord's annual reconciliation, then, as applicable, Landlord shall pay amounts owing to Tenant or Tenant shall pay amounts owing to Landlord within thirty (30) days of the completion of Tenant's review. If there is a discrepancy in favor of Tenant of more than five percent (5%) of Common Area Operating Expenses, Landlord shall reimburse Tenant for the reasonable cost of such audit. In all other cases, Tenant shall bear all costs incurred with respect to such audit. The rights of Tenant under this paragraph, and the obligation of the parties to make any applicable payment, shall survive the expiration or earlier termination of this Lease.

**Article 7.**        **Tax Payments**

**Section 7.1**    As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Landlord in the Project, Landlord's

- 12 -

right to other income therefrom, and/or Landlord's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. Real Property Taxes shall also include any tax, fee, levy, assessment, or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Landlord to Tenant pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate Tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and Tax year have in common. Notwithstanding anything to the contrary in this Lease, Real Property Taxes shall exclude: (i) penalties or interest on Real Property Taxes; (ii) income, franchise, gross receipts, corporation, capital levy, excess profits, devolution, or payroll tax, personal property, or other taxes personal to Landlord, including, without limitation, inheritance, estate, succession, transfer or gift taxes; (iii) substitute taxes, unless imposed only on real property owners; (iv) real estate taxes on outparcels or other tenant spaces that are separately assessed; (v) taxes and assessments not payable over the longest period permitted by law; (vi) tax increases resulting from construction by other tenants; (vii) assessments for the costs of environmental remediation; (viii) taxes measured by the net income of Landlord, including, but not limited to, Los Angeles City Business Tax (ix) taxes allocable to premises occupied by tenants who do not pay their pro-rata share of taxes; (x) any costs of contesting real estate taxes unless savings greater than such costs are obtained; and (xi) taxes which are imposed under any other Article of this Lease.

Section 7.2    The term "**Tax Year**" means each twelve (12) month period, whether fiscal or calendar, established by the applicable taxing authority(ies) for the Real Property Taxes imposed by such governmental authority.

Section 7.3    Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the taxable property. Landlord is under no obligation to institute such proceedings. If, after Tenant has paid Tenant's Proportionate Share of Real Property Taxes, Landlord shall receive a refund of any portion of the Real Property Taxes paid with respect to the Tax Year for which Tenant made such payment, Landlord shall promptly after receiving such refund pay Tenant its Proportionate Share of the net amount of such refund after deducting from such refund all expenses incurred by Landlord in obtaining such refund. Alternatively, Landlord may, at Landlord's option, credit Tenant's Proportionate Share of such net refund against the next succeeding installment(s) of Rent coming due.

Article 8.        <u>Utilities; Services</u>

Section 8.1    <u>Utilities</u>. Landlord shall be responsible for providing separately metered utility service to the Premises adequate for Tenant's intended use in accordance with the terms of the Landlord Work Letter attached hereto as Exhibit B. Tenant shall be solely responsible for and shall promptly pay to the utility company, as and when the same become due and payable, all charges for water, sewer, electricity, gas, telephone, cable service, internet service, steam, and any other utility or other communication device used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm, or entity supplying same. Without

- 13 -

Landlord          Tenant

limiting the foregoing, Landlord is not responsible for providing heat, electric, water, gas, air conditioning, steam, sewer service, cleaning service, trash collection, extermination, cable or internet service, or ventilation to the Premises. Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

Section 8.2    Additional Utility Facilities. Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor, which approval shall not be unreasonably withheld, conditioned, or delayed. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, as Additional Rent, the cost for providing such additional utility facilities.

Section 8.3    Interruptions. If any utility or other service (a) becomes unavailable from any public utility company, public authority or any other person or entity supplying or distributing same (including Landlord), or (b) is interrupted by reason of Applicable Requirements, the making of any repairs or improvements, or measures taken to secure the safety of the Real Property, or the safety and welfare of its tenants or occupants, or the public, or by reason of any cause beyond Landlord's reasonable control, (1) Landlord shall not be liable to Tenant in damages or otherwise, (2) Rent may not abate Rent or be relieved of any of its obligations under this Lease, and (3) such lack of availability or interruption shall not constitute an actual or constructive eviction, or a disturbance of Tenant's use of the Premises. Notwithstanding anything contained herein to the contrary, if Tenant is unable to use all or a portion of the Premises for a period of three (3) consecutive business days or ten (10) business days in any twelve (12) month period (the "**Eligibility Period**") as a result of failure in any service or system of the Building, the Rent shall be reduced and abated after the expiration of the Eligibility Period for such time as the Premises or such portion thereof remains untenantable in the proportion that the rentable area of the Premises rendered untenantable bears to the total rentable area of the Premises; provided, however, that there shall be no abatement of Rent if the damage or failure of Building systems is caused by the negligence or willful acts or omissions of Tenant. Notwithstanding the foregoing, if: (i) any utility service is interrupted because of the acts or omissions of Landlord, its employees, agents or contractors, and (ii) Tenant notifies Landlord of such interruption in writing (the "**Interruption Notice**"), then, twenty-four (24) hours following the date Tenant provides Landlord with an Interruption Notice, the Rent payable hereunder shall be abated on a per diem basis for each day after such twenty-four (24) hour period that such interruption continues, and such abatement shall continue until such interruption is resolved and the applicable utility is restored.

Section 8.4    Trash. Tenant shall enter into, and maintain at all times during the Term, a contract for the removal of Tenant's trash from the Building, with the carter selected by Tenant.

- 14 -

AG
Landlord

AS
Tenant

**Article 9.**              **Repairs and Maintenance**

      **Section 9.1**    <u>Landlord Obligations</u>. Landlord shall, at Landlord's expense, make all structural repairs needed to the exterior walls, structural columns, roof, roof membrane, structural roof and skylights (including the frame and glass), structural foundations, beams, floor slabs, exterior walls, Party Wall, and bearing walls that enclose the Premises (storefront repairs or replacements shall only be performed by Landlord if required as a consequence of structural issues or failures), as well as make all maintenance, repairs and replacements necessary to maintain (i) all building systems located outside of the Premises or servicing more than one tenant in the Building in good working order (including, as applicable all mechanical systems, control panels, HVAC, electrical, plumbing, fire and life safety systems), (ii) the exterior portions of the Building and Real Property in first-class condition, and (iii) all Common Areas in first class condition, as specified in <u>Section 6.2</u> above, and (iv) the Party Wall as detailed in Rider No. 1. Landlord shall also be responsible for any maintenance, repairs or replacements caused by Landlord's or Landlord's agents gross negligence or willful misconduct. Any such maintenance, repairs, and/or replacements (including, but not limited to the roof) shall conform with the current aesthetic and architectural characteristics of the Building and be performed using new materials of first-class quality. Notwithstanding anything to the contrary contained herein, in the event that any damage to the roof is caused by the installation of solar panels, Tenant shall be responsible, at Tenant's cost and expense, for the repair thereof.

      **Section 9.2**    <u>Tenant Obligations; Sprinklers</u>. If the Premises are sprinklered, Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Applicable Requirements, those elements of the sprinkler system within the Premises, including the repair and replacement of the sprinkler heads and pipes. If the Premises are not sprinklered and a sprinkler system in the Premises is required under Applicable Requirements for Tenant's Permitted Use or manner of use of the Premises, or the construction of Alterations requires the installation of a sprinkler system in the Premises, Tenant shall install such system as part of Alterations, at Tenant's expense. Landlord shall not be responsible for maintenance, repairs, or replacement of any element of the sprinkler system within the Premises; provided, however, that Landlord shall be solely responsible for delivering the water tanks and pumping systems for the sprinkler system to the Premises in good condition and repair and for the costs, if any, associated with the replacement or upgrade of any such tanks or pumping systems during the Term of the Lease. Landlord shall diligently comply with any reasonable requests from Tenant with respect to the design, permitting, and installation of sprinklers in the Building.

      **Section 9.3**    <u>Tenant Obligations; In General</u>. Subject to <u>Article 13</u> and <u>Section 9.1</u>: Tenant shall make, at Tenant's sole expense, all repairs and replacements needed to maintain in good condition and order the Premises and all installations, equipment and facilities therein, and all repairs and replacements needed to any plumbing, water, waste, HVAC Units, and electric conduits, lines and equipment located inside the Premises that exclusively serve the Premises. In the event that Tenant's use of the Premises requires the installation of a new Tenant-dedicated fire and life safety system within the Premises, Tenant shall, at its cost, install and make, at Tenant's sole expense, all repairs and replacements needed to maintain in good condition and order such new fire and life safety system. Without limiting the foregoing, but subject to <u>Article 13</u> and <u>Section 9.1</u>, Tenant shall make all repairs and replacements required with respect to the HVAC

- 15 -

Units, electrical and plumbing systems within the Premises and any rooftop or exterior air conditioning equipment or HVAC Units serving only the Premises, any plumbing fixtures within the Premises (including sinks and toilets), and the plumbing lines, valves, and pipes connected to or running from such fixtures to the point at which such lines, valves and pipes connect with the Building's common plumbing lines, including such plumbing lines or ducts connecting any roof-top or exterior equipment or HVAC Units or other utility or service to the Premises. All such repairs and replacements shall be made in compliance with the provisions of this Lease.

**Article 10.        Applicable Requirements; Hazardous Substances; Licenses and Permits**

**Section 10.1**   Hazardous Substances. Tenant shall not introduce into the Premises or the Real Property, use in the Premises or the Real Property or cause to be released from the Premises or the Real Property any Hazardous Substances in violation of any Applicable Requirements. "**Hazardous Substances**" mean any flammable or otherwise hazardous material, any explosive and/or radioactive material, hazardous waste, hazardous or toxic substance or related material, asbestos and any material containing asbestos, petroleum and any petroleum derivative, pollutants, contaminants and any other substance or material which is defined as, determined to be, or identified as, a hazardous or toxic material or substance pursuant to any Applicable Requirements.

**Section 10.2**   Hazardous Substances; Tenant Indemnification. Tenant shall indemnify, defend and hold harmless Landlord, its managing agent, its superior landlord, if any, its Mortgagee, if any, and their respective members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any violation by Tenant of its obligations with respect to Hazardous Substances under this Lease. For the avoidance of doubt, Tenant shall have no liability under this Lease with respect to Hazardous Substances present in, on, under, or about the Premises prior to Tenant taking possession of or the underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Tenant.

**Section 10.3**   Hazardous Substances; Landlord Indemnification. Landlord and its successors and assigns shall indemnify, defend, reimburse and hold Tenant, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Tenant taking possession or which are caused by any act or omissions of Landlord, its agents or employees, or relative to any breach by Landlord of the above representation. Landlord's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. Landlord shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Tenant taking possession, unless such remediation measure is required as a result of Tenant's use of the Premises, in which event Tenant shall be responsible for such payment. Tenant shall cooperate fully in any such activities at the request of Landlord, including allowing Landlord and Landlord's agents to

- 16 -

AG
Landlord

AS
Tenant

Exhibit A, page 22

have reasonable access to the Premises at reasonable times in order to carry out Landlord's investigative and remedial responsibilities.

      **Section 10.4**   <u>Licenses and Permits</u>. Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Applicable Requirements relating to the operation of its business. Landlord does not covenant, warrant or make any representation that any governmental authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this Lease. If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this Lease, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any Applicable Requirements in connection therewith. If, despite the use of diligent and commercially reasonable best efforts, Tenant has not obtained, or determines that it is not able or will not be able to obtain the permit(s) required for the construction of Tenant's initial improvements and/or Tenant's operation in the Premises for the Permitted Use within six (6) months after the date Tenant submits final plans to the governing authority having jurisdiction over the Premises in connection with Tenant's attempt to obtain such permit(s), then Tenant shall have the right to terminate this Lease (the "**Building Permit Termination Option**") upon written notice to Landlord. In the event Tenant is unable to obtain the permit(s) required for construction due to delays by governmental authorities having jurisdiction over the Premises, Tenant shall have six (6) months after the date Tenant submits final plans to submit the Building Permit Termination Option; provided, however, that such six (6) month period shall be subject to a day-for-day extension in the event that the issuance of the permits are delayed by any agency of the state of California, the United States Government, or any local governmental authority. If this Lease is terminated pursuant to this Section 10.4, then, on or prior to the early termination date set forth in the Building Permit Termination Notice, Tenant shall vacate and surrender possession of the Premises to Landlord in accordance with the surrender provisions of this Lease and, from after such termination date, promptly following such vacation by Tenant, Landlord shall return to Tenant all Security Deposits and pre-paid rent and neither party shall have any further liability or obligations to the other under this Lease, other than those that accrued under this Lease on or prior to such termination date or that expressly survive termination of this Lease.

      **Section 10.5**   <u>Compliance Challenge</u>. Subject to the provisions of this Section, provided that Tenant is not in Default, Tenant, at Tenant's expense, may contest, by appropriate proceedings prosecuted diligently and in good faith, the legality or applicability of any Applicable Requirements affecting the Premises for which Tenant is responsible hereunder (any such proceedings instituted by Tenant, a "**Compliance Challenge**"), provided however, that Tenant's delay in compliance shall not cause (a) Landlord or Tenant to be subject to imprisonment or prosecution for a crime, (b) the Real Property or any part thereof to be condemned or vacated, (c) the certificate of occupancy for the Building or any part thereof to be suspended or cancelled, and/or (d) the use and enjoyment of its space by another lessee or licensee at the Real Property to

- 17 -

**Exhibit A, page 23**

be adversely affected. Tenant must give Landlord at least ten (10) business days notice before Tenant initiates a Compliance Challenge, and shall not initiate it if Landlord reasonably objects.

### Article 11.        Subordination; Estoppel Certificates

**Section 11.1**   Subordination. This Lease and any Extension Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof, but only upon Tenant's receipt from the holder of the Security Device (the "**Secured Lender**") of an executed and acknowledged non-disturbance agreement from such Secured Lender with respect to each and every Security Device in the form of the Subordination Non-Disturbance and Attornment Agreement attached hereto as Exhibit F, and which shall specifically include language which provides that Tenant's right to possession, use, and occupancy of the Premises shall not be disturbed, upon a foreclosure of a Security Device, so long as Tenant shall not be in default under any of the terms and conditions of the Lease (the "**Required SNDA**"). Within thirty (30) days of the execution of this Lease, Landlord shall provide a commercially reasonable subordination, non-disturbance, and attornment agreement from the Secured Lender(s) of any Security Devices encumbering the Project and/or the Premises.

**Section 11.2**   Attornment. In the event that Landlord transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated in accordance with the Required SNDA (i) Tenant shall, subject to the non-disturbance provisions of Section 11.1, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Tenant and such new owner, for the remainder of the term hereof and (ii) Landlord shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Landlord's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Tenant might have against any prior lessor; (c) be bound by prepayment of more than one month's rent; or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

**Section 11.3**   Non-Disturbance. With respect to Security Devices entered into by Landlord after the execution of this Lease, Tenant's subordination of this Lease shall only occur upon Tenant's receipt of the Secured Lender's execution and acknowledgment of the Required SNDA, which, as set forth above, shall provide that Tenant's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Tenant is not in Breach hereof and attorns to the record owner of the Premises. Notwithstanding anything contained herein to the contrary, provided this Lease is then in full force and effect and that Tenant is not then in default hereunder beyond any applicable grace periods, Landlord agrees, on behalf of its successors, assigns, mortgagees, lenders, ground lessor, and any other party with any ownership interest in the Premises by or through Landlord, as well as any party whose interest this Lease is subordinated to pursuant to Section 11.1 above (each, a "**Subsequent Landlord**") that such Subsequent Landlord shall not disturb or impair Tenant's use, possession or enjoyment of the

- 18 -

Premises or interfere with any other rights of Tenant under the Lease, subject to Tenant not being in default continuing beyond any applicable grace period for the balance of the term of the Sublease and, if applicable, Tenant's attornment to such Subsequent Landlord. Furthermore, as a condition to the Delivery Date occurring, Landlord agrees to obtain an agreement providing for the Tenant's non-disturbance rights set forth herein from any such Subsequent Landlord and Secured Lender, as applicable.

      **Section 11.4**   Estoppel Certificate. Landlord and Tenant shall, at any time and from time to time, within fifteen (15) days following its receipt of a request from the other party, sign, acknowledge and deliver to the requesting party or any other person designated by that party a certification (a) that this Lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications), (b) stating the date to which the Rent has been paid, (c) stating whether or not, to its actual knowledge, the other party is in default of its obligations under this Lease and if so, describing the default, including any event that has occurred which, with the serving of notice or the passage of time, or both, would give rise to a default, and (d) stating to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any certification delivered pursuant to this Section may be relied upon by the third party for whom the certification is requested.

      **Article 12.**      **Insurance**

      **Section 12.1**   Tenant's Insurance. Tenant shall, at Tenant's expense, maintain at all times during the Term and at all times when Tenant is in possession of the Premises such insurance as shall be reasonably required by Landlord, including: (a) commercial general liability insurance (or successor form of insurance designated by Landlord) in respect of the Premises, on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than two million ($2,000,000) dollars naming as additional insureds Landlord and any other person reasonably designated by Landlord, (b) property insurance covering Alterations (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises (the "**Tenant's Insured Property**"), against fire and other risks included in the standard California form of property insurance, including business interruption insurance covering a period of twelve (12) months, (c) workers' compensation and employer's liability insurance providing statutory benefits for Tenant's employees at the Premises, (d) such other insurance as Landlord may reasonably require. Such liability insurance policy shall include contractual liability, fire and legal liability coverage. Landlord shall have the right at any time and from time to time, but not more frequently than once every two (2) years, to require Tenant to increase the amount of the commercial general liability insurance required to be maintained by Tenant under this Lease provided the amount shall not exceed the amount then generally required of tenants entering into leases for similar Permitted Uses in similar buildings in the general vicinity of the Real Property. Tenant shall not do or permit to be done any act which shall invalidate or be in conflict with Landlord's insurance policies or increase the rates of insurance applicable to the Real Property, provided however that the foregoing shall not be construed as preventing Tenant from using the Premises for the Permitted Use.

      **Section 12.2**   Evidence of Insurance. Tenant shall deliver to Landlord and each additional insured (a) certificates in form reasonably acceptable to Landlord evidencing the

- 19 -

*AG*
AG
Landlord

*AS*
AS
Tenant

insurance required by this Lease to be maintained by Tenant before the Lease Commencement Date, and at least thirty (30) days before the expiration of any such insurance, and (b) upon request, a copy of each insurance policy. All required insurance shall be primary and non-contributory (as shown on endorsement), issued by companies reasonably satisfactory to Landlord and contain a provision whereby it cannot be canceled unless Landlord and any additional insureds are given at least thirty (30) days' prior written notice of the cancellation. Tenant may carry any required insurance under a blanket policy if that policy complies with the requirements of this Lease and provides that Tenant's insurance for the Premises is on a "per location basis."

Section 12.3    Landlord's Insurance. Landlord shall, prior to the commencement of Landlord's Work and at all times during the Term, maintain insurance covering (i) Landlord's liability with respect to any construction that Landlord may perform in connection with the Premises or the Project and (ii) Landlord's liability for ownership, maintenance and use of the Common Areas including, without limitation, liability arising from any act or omission of Landlord, its agents or contractors relating to the Common Areas or by other tenants in the Project. Such insurance shall provide limits on a "per location" basis of not less than (a) $1,000,000 with respect to injury to any one person, $2,000,000 with respect to any one occurrence, or (b) $5,000,000 combined single limit coverage. Landlord shall also maintain "all risk" or "special form" property insurance covering the Premises and the remainder of the Project against loss or damage resulting from fire and other causes typically covered under a "Causes of Loss – Special Form" policy (or any commercially reasonably successor form of policy), which shall be in amounts equal to the full replacement cost, no less than $16,600,000, with code upgrade of all such included insurable items (subject to customary deductibles and exclusions from coverage). Landlord shall, upon request, deliver to Tenant a certificate or certificates of such insurance with respect to the policies described above

Section 12.4    Waiver of Subrogation. Provided its right of full recovery under its insurance policy is not adversely affected, Landlord and Tenant each hereby releases the other (and the other's agents and employees) with respect to any claim (including a claim for negligence) it may have against the other for damage or loss covered by its property insurance (including business interruption and loss of rent). Landlord and Tenant shall, to the extent obtainable, each procure a clause in, or endorsement on, any property insurance carried by it, pursuant to which the insurance company waives its right of subrogation against the other party to this Lease and its agents and employees or consents to a waiver of the right of recovery against the other party to this Lease and its agents and employees. If an additional premium is required for the waiver or consent, the other party shall be advised of that amount and may, but is not obligated to, pay the same. If that party elects not to pay the additional premium, the waiver or consent shall not be required in favor of that party.

Section 12.5    Any subtenant or other occupant of the Premises shall be obligated to comply with the provisions of this Article.

Article 13.    **Casualty**

Section 13.1    Partial Damage. If (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) is damaged by fire or other casualty so that Tenant is deprived of reasonable access to the Premises or so that the Premises or any part

- 20 -

of the Premises is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises, Tenant shall give prompt notice to Landlord. Subject to the provisions of this Article (i) Landlord shall, at Landlord's expense, repair the damage to the Building, excluding the damage to Tenant's Insured Property and (ii) Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent required by Landlord in connection with Landlord's repair of the damage and shall promptly after Landlord's substantial completion of the repair to the Building, commence to diligently repair Alterations and Tenant's Property in order to resume its normal business in the Premises. Until the repairs to be performed by Landlord are substantially completed, the Rent shall be reduced in proportion to the area of the Premises which is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises and which Tenant does not actually use.

      **Section 13.2**  <u>Total Destruction; Uninsured Loss; Damage Near End of Term</u>. If (a) the Premises are rendered destroyed, or (b) the cost of repairing any damage to the Building by fire or other casualty exceeds seventy-five percent (75%) of the replacement cost thereof, as reasonably estimated by a reputable contractor, architect or engineer selected by Landlord, Landlord or Tenant shall have the right, by notice given to the other within sixty (60) days following the date of the damage, to terminate this Lease. If this Lease is terminated pursuant to this Section, the Term shall expire on the thirtieth (30th) day after the notice is given as fully and completely as if such date were the stated Expiration Date. In the event Landlord elects to terminate this Lease, Tenant shall have the right within forty-five (45) days after receipt of the termination notice to give written notice to Landlord of Tenant's commitment to pay for the repair of such damage without reimbursement from Landlord; provided, Landlord shall assign any insurance proceeds made available to Landlord in accordance with the insurance policies required under Section 12.3. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within thirty (30) days after making such commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Tenant does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice. The rent payable hereunder shall abate by a pro rata reduction equivalent to the percentage of destruction.

      **Article 14.**      <u>**Condemnation**</u>

      **Section 14.1**  If as the result of a taking by condemnation or similar legal action of a governmental authority or a taking by a governmental authority effected in any other manner (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant, is taken, (b) Tenant no longer has reasonable access to or use of the Premises, (c) all or substantially all of the Building is taken, (d) a portion of the Building is taken resulting in Landlord's determination to demolish the Building, (e) the number of parking spaces in or serving the Real Property are reduced by such taking below the number of spaces required by any Applicable Requirements, or (f) the visibility of the Premises from the adjacent streets and sidewalks or the access to the Premises is altered and such reduction materially and adversely impacts the use of the Premises, Tenant may, upon thirty (30) days' notice to Landlord of such taking or similar legal action, terminate this Lease. If a taking does not result in the termination of this Lease (i) Landlord shall, at Landlord's expense, as soon as practicable, restore that part of the Building or the Real Property not taken to the extent reasonably practicable, so that the Building is usable, and (ii) from

- 21 -

and after the date of the vesting of title, the Rent shall be reduced in the same proportion as the area of the Premises, if any, which was taken. If, during the term of this Lease, Landlord receives notice from any public authority that the whole or any part of the Premises is being considered for taking by any public authority under the power of eminent domain, Landlord shall immediately provide Tenant with written notice of such action, including a copy of said notice. If, during the term of this Lease, a portion of the demised Premises shall be taken by any public authority for any public use, or, any conveyance in lieu of such condemnation, and Tenant does not exercise the option to terminate this Lease granted in this section, then Landlord and Tenant agree that the rights, duties, and obligations of the parties hereunder, including obligations to pay rent under this Lease shall then be modified as shall fairly and equitably adjust the rights, duties, and obligations of the parties hereto under such changed circumstances.

### Article 15.        Assignment and Subletting

**Section 15.1**    Assignment and Subletting. Except as provided in this Article, Tenant shall not, without Landlord's prior consent (such consent not to be unreasonably withheld, conditioned, or delayed), assign, encumber or otherwise transfer this Lease or any interest in this Lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article.

**Section 15.2**    Permitted Transfer. Notwithstanding anything to the contrary contained in this Lease, Tenant may assign the Lease or sublease all or any portion of the Leased Premises, upon written notice to Landlord, but without the requirement of Landlord's consent, to (a) a person or entity that controls, is under common control with, or is controlled by Tenant (in which "control" means a direct or indirect ownership interest of 25% or greater) or a parent, subsidiary, affiliate, franchisee, licensee, or similarly related entity; (b) a successor to Tenant by merger, reincorporation, reorganization, acquisition, or consolidation; or (c) a successor to Tenant by purchase of all or substantially all of Tenant's assets or capital stock (such entity, a **Permitted Transferee**", and such transaction, a "**Permitted Transfer**"). In addition, any sale or transfer shall be a Permitted Transfer if (i) such sale or transfer occurs in connection with any financing or capitalization for the benefit of Tenant, or (ii) Tenant is, or in connection with the proposed transfer becomes, a publicly traded entity.

**Section 15.3**    Consent Request. In connection with a request for an assignment (other than a Permitted Transfer), Tenant shall deliver to Landlord a written request (the "**Consent Request**") for Landlord's consent which shall include (i) the name and address of the proposed subtenant or assignee, (ii) the nature and character of the business of the proposed subtenant or assignee, (iii) current bank, financial and other credit information on the proposed subtenant or assignee, and (iv) a copy of the proposed assignment or sublease, which assignment or sublease shall be in compliance with the requirements of this Article. Tenant shall promptly supply Landlord with such additional information as Landlord may reasonably request.

**Section 15.4**    Tenant and Guarantor Liability. Provided that Tenant has not been in Default under the terms of Section 17.1(a) more than three times during the Term, the Guaranty

- 22 -

shall terminate upon the expiration of the initial Term of the Lease and Guarantor shall be relieved of any liability under the Lease and Guaranty upon such date.

Section 15.5    No Waiver. The acceptance by Landlord of Rent following any assignment, sublease, encumbrance, license, occupancy, or other transaction in violation of this Article, shall not be deemed a consent by Landlord to such transaction, nor a waiver of any right or remedy of Landlord hereunder.

### Article 16.    Access; Changes in Building and Real Property

Section 16.1    Reservations; Landlord's Access. Landlord reserves the right to (enter the Premises at reasonable times upon at least seventy-two (72) hours prior notice, which notice may be provided via email to the applicable Tenant representative (provided that prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others or to perform any work or make any improvement Landlord deems necessary or desirable to the Premises or the Building or for the purpose of complying with Applicable Requirements.

Section 16.2    Landlord Renovations. Landlord shall have the right from time to time to (a) make changes or revisions to the parking lot, and (b) construct improvements in the parking lot; provided, however, that only upon receipt of Tenant's written consent shall Landlord have the right to (x) make any changes or revisions to the Premises, the corridor connecting the Premises to the parking lot, and/or the paths of travel to the Premises or parking lot or (y) construct any buildings, or pursue the development of any buildings above the roof of the Premises (collectively, "**Renovations**"). In performing such Renovations, Landlord and Landlord's agents, employees, officers, representatives and/or contractors, shall use commercially reasonable efforts to not interfere with Tenant's use of the Premises for the Permitted Use and for all such parties to act in a timely manner. Landlord's exercise of its rights pursuant to this Section shall not reduce the number of parking spaces serving the Real Property below that required by any Applicable Requirements. Landlord shall use commercially reasonable efforts to minimize the number of times during the Term that scaffolding, sidewalk bridges and/or other obfuscation of the Premises (collectively, "**Obfuscation**") or any projections, vertical or horizontal, shall be erected that would block the exterior of the Premises and/or Tenant's signs. If, (i) as a result of the performance of any such Renovations in the Real Property, a material portion of the Premises is rendered untenantable or Tenant is deprived of access and Tenant cannot and does not use such material portion of the Premises for the conduct of its business, Tenant shall be entitled to one (1) day of Rent abatement for each day that the Premises cannot be used as fully intended until such work is completed or Tenant recommences use of such portion of the Premises or (ii) Landlord's Obfuscation blocks the exterior of the Premises and/or Tenant's signs for more than two (2) days after written notice to Landlord by Tenant, then Tenant's obligation to pay any Rent hereunder shall be abated from and after the second (2nd) day after the giving of such notice until such Obfuscation is removed. In the event Landlord installs an Obfuscation for a period of two (2) or more consecutive days, Landlord shall pay for and install lighting on such scaffolding and shall pay for and install signs for Tenant on such scaffolding.

Section 16.3    Interference with Tenant's Business. Landlord shall exercise Landlord's rights under this Article in a manner which commercially reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises,

- 23 -

Alterations and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense). In the event that Tenant's access to or use of the Premises is materially adversely impacted as a result of Landlord's exercise of its rights under this Article, Tenant shall receive Tenant shall be entitled to one (1) day of Rent abatement for each day that (a)Tenant's Initial Buildout Work is delayed as a result thereof or (b) that Tenant's customer's experience is materially or adversely impacted as a result thereof. Further, Landlord shall provide Tenant with at least seventy-two (72) hours advance notice (except in emergencies) prior to entering the Premises, and shall abide by all of Tenant's procedures and protocols when doing so. Prior to performing any work in the Premises or outside of the Premises that may impact the Premises, Landlord shall provide Tenant with at least thirty (30) days advance notice, except in the case of an emergency. Whenever an emergency exempts Landlord from notice requirements as set forth herein, Landlord shall nevertheless notify Tenant as soon as reasonably practicable under the circumstances.

**Article 17.**      **Default**

**Section 17.1**   Default; Breach. A "**Default**" is defined as a failure by the Tenant to comply with or perform any of the terms, covenants, or conditions under this Lease. A "**Breach**" is defined as the occurrence of one or more of the following Defaults and the failure of Tenant to cure such Default within any applicable grace period:

(a)      Tenant fails to pay when due any Rent and the failure continues for ten (10) days following Landlord's written notice.

(b)      Tenant fails to comply with any other term of this Lease and the failure continues for thirty (30) days following Landlord's written notice. If, however, compliance cannot, with diligence, reasonably be fully accomplished within that thirty (30) day period, Tenant shall have an additional period equal to the length of time necessary to effectuate the cure, provided Tenant notifies Landlord of its intention to comply (with reasonably detailed steps to be taken) and commences compliance within that thirty (30) day period and thereafter pursues compliance to completion with diligence.

(c)      A third party institutes against Tenant or Guarantor, if any, any legal action seeking any relief from its debts under any applicable bankruptcy or insolvency Applicable Requirements which is not dismissed within ninety (90) days, or Tenant or Guarantor, if any, institutes any legal action seeking such relief, and/or a receiver, trustee, custodian or other similar official is appointed for Tenant or Guarantor, if any, or for all or a substantial portion of its assets, or Tenant or Guarantor, if any, commits any other act indicating insolvency such as making an assignment for the benefit of its creditors.

**Section 17.2**   If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit.

AG

Landlord

AS

Tenant

### Article 18.                     Remedies

**Section 18.1**   Remedies. Upon the occurrence of a Breach, Landlord may, at its option elect either to (a) in the case of any non-monetary Breach, cure such default and any reasonable amount paid by Landlord or reasonable expense incurred in making such a cure shall be immediately due and owing to Landlord by Tenant; (b) continue this Lease in full force and effect notwithstanding the occurrence of such Breach; (c) continue this Lease and retake possession of the Premises pursuant to legal process and relet the Premises for Tenant's account; or (d) terminate this Lease, whereupon Tenant shall quit and surrender the Premises. Tenant shall not be liable for any consequential damages, except in connection to Tenant's holdover of the Premises, if any, pursuant to Section 25.2. Landlord shall use commercially reasonable efforts to mitigate its damages.

**Section 18.2**   Waivers. The failure of Landlord to seek redress for a Default, or of Landlord or Tenant to insist upon the strict performance of any term of this Lease, shall not prevent Landlord from redressing a subsequent Default or Landlord or Tenant from thereafter insisting on strict performance. The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this Lease shall not be deemed a waiver of the Default or failure. No term of this Lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same. No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

### Article 19.                     Landlord Default

**Section 19.1**   Landlord Default. Landlord shall be in default under this Lease in the event of a breach of any of the material covenants or conditions herein contained on the part of Landlord and such default shall continue for ten (10) days after written notice thereof shall have been received by Landlord, or immediately, in the event of an emergency.

**Section 19.2**   Performance on Behalf of Landlord. If Landlord shall fail to perform any act of its part to be performed hereunder, and such failure shall continue for ten (10) days after written notice thereof by Tenant, and provided that Tenant then gives Landlord written notice that Tenant intends to exercise self-help and Landlord does not cure or commence to cure within said ten (10) day period, Tenant may, but shall not be obligated to, cure such default, without waiving or releasing Landlord from any other default by Landlord under this Lease. All reasonable, documented, out of pocket sums so paid by Tenant in curing default for which proper prior notice has been provided to Landlord shall be payable to Tenant within thirty (30) days of Landlord's receipt of a written demand therefor, or at Tenant's written election may be offset against future Rent. Tenant's right to invoke the remedies set forth herein are cumulative and shall not preclude Tenant from invoking any other remedy allowed at law or in equity.

- 25 -

*AG*
Landlord

*AS*
Tenant

Exhibit A, page 31

**Article 20.**                 **Force Majeure**

    **Section 20.1**    If either party hereto is delayed or hindered in or prevented from the performance of any obligation required hereunder by Force Majeure, the time for performance of such obligation shall be extended for the period of the delay, provided that Force Majeure shall not excuse prompt and timely payments when due under this Lease except when: the Rent Commencement Date is delayed by reason of Force Majeure, or such payment is excused pursuant to other provisions of this Lease, including, without limitation, other provisions of this Section. However, no delay shall be excused by this Section unless the delayed party notifies the other party in writing of the delay within ten (10) business days of the event giving rise to such delay (unless the reason for the delay is generally known), the delayed party has exhausted all other resources available at reasonable costs to avoid such delay, and the delayed party diligently pursues completion of the activity which was delayed.

"**Force Majeure**" means any prevention, delay or stoppage due to strikes; lock-outs; labor troubles or labor shortages; inability to procure materials; failure of power; governmental moratorium or other governmental action or inaction; governmental restrictions, regulations, or controls; judicial orders; enemy or hostile governmental action; civil commotion; injunction or court order; riots; insurrection; war; terrorism; bioterrorism; fire; earthquake; virus, disease, epidemic, pandemic, quarantine or similar threats to the health or safety of Tenant's employees or customers or acts of government or authority resulting therefrom (a "**Contagion Event**"); widespread public health emergencies; acts of God as declared by a cognizant governmental agency; or other reason of a like nature not the fault of the party delayed or prevented from performing work or doing acts required under the terms of this Lease.

Further, if a Contagion Event poses a threat to the health or safety of Tenant's employees or customers or the general public in the surrounding area of the Premises, or if any Contagion Event affects, in full or in part, the construction or the use of the Premises, then Tenant may at its sole discretion amend the regular business hours (up to and including the closure) of the Premises, and shall not be responsible for any consequences or liabilities under this Lease as a result thereof; and if the business hours of the Premises are reduced (up to and including full closure) due to a Contagion Event, then the Rent and other charges under this Lease shall be proportionately reduced to the same extent that the reduced business hours compare to the regular business hours.

Notwithstanding anything to the contrary contained herein, in the event that a Force Majeure event or its effects continue to be present beyond a period of three (3) months, Tenant may terminate this Lease with immediate effect by written notice to Landlord.

**Article 21.**                 **Broker**

    **Section 21.1**    Tenant represents to Landlord that it has dealt with no broker in connection with this Lease other than the Broker. Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant in connection with this Lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord shall

- 26 -

_AG_
AG
Landlord

| _AS_
AS
Tenant

indemnify, defend and hold harmless Tenant from and against all claims, costs, expenses, liabilities and damages including reasonable attorneys' fees and expenses (a) arising from Landlord's failure to comply with its obligation in the preceding sentence and (b) any claims for any brokerage commissions or other compensation by any broker (other than the Broker) with whom Landlord, but not Tenant, has had dealings in connection with this Lease. Notwithstanding anything to the contrary contained in this Lease, including but not limited to, the provisions contained in Section 21.1 above, Landlord and Tenant hereby acknowledge and agree that pursuant to that certain Leasing Agreement dated May 9, 2023 between Landlord and Broker (the "**Leasing Agreement**"), Landlord is obligated to pay Broker (a) fifty percent (50%) of Broker's commission upon mutual execution of this Lease by Landlord and Tenant and removal of any contingencies, and (b) the remaining fifty percent (50%) of Broker's commission upon Tenant's opening for business in the Premises and paying Rent to Landlord. If at any time Landlord shall fail to pay Broker any portion of Broker's commission due under the Leasing Agreement at the time such payment is due under the Leasing Agreement, then Broker shall notify Tenant and Landlord in writing of such failure. If Tenant and Broker have not received evidence of payment of Broker commission within ten (10) days following Broker's notice of non-payment, then Tenant shall pay to Broker, the full amount of Broker's commission that Landlord has failed to pay to Broker (the "**Deficiency Payment**") upon the Rent Commencement Date and pursuant to the terms of this Section 21.1 and in equal installments beginning on the next rent payment date and extending over a period of no more than four (4) months. Tenant shall be permitted to deduct the amount of the Deficiency Payment from Rent due to Landlord under this Lease until such Deficiency Payment has been fully applied by Tenant. Broker is an intended third party beneficiary of this Article 21. For the avoidance of doubt, in no event shall Tenant be required to pay any amount of the Deficiency Payment prior to the Rent Commencement Date. Notwithstanding anything herein to the contrary, Tenant may require a court or arbitrator order, judgment or decree instructing Tenant to pay the Deficiency Payment in order for Tenant to pay any or all of the Broker's commission and/or Deficiency Payment.

The parties agree to resolve any and all claims, disputes or disagreements arising from or in relation to payment of the Broker's commission or Deficiency Payment by and through arbitration as provided in Section 27.3 of the Lease and irrevocably waive any and all rights to the contrary. Landlord hereby agrees to indemnify and hold harmless Tenant from and against any and all claims, actions, damages, liability and expense including, but not limited to reasonable attorneys' fees, that arise from or in connection with Landlord's default under the terms of this Section 21.1. Tenant shall not be liable for any damages arising out of or relating to Landlord's failure to make timely payment of the Broker's commission, including, but not limited to Tenant's compliance with court orders or judgments instructing Tenant to pay the Deficiency Payment, and Landlord and Broker hereby waive any and all claims against Tenant for such damage.

### Article 22.    Notices; Consents and Approvals

**Section 22.1**   Notices. Except as may be provided in this Lease, all notices and other communications under this Lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its Notice Address. Either party may, by notice given in accordance with this Article, designate a different Notice Address, which address change shall become effective

- 27 -

Landlord    Tenant

Exhibit A, page 33

upon receipt, the date rejected or the date of attempted delivery (if the receiving party is not present).

       **Section 22.2**   Date of Notice. Any notice or other communication sent as provided in this Article shall be effective (a) on the date received, the date rejected, or the date of attempted delivery (if the receiving party is not present) if sent by overnight courier service, or (b) three (3) business days after mailing by registered or certified mail.

       **Article 23.**       **No Representations; Liability; Tenant Indemnity**

       **Section 23.1**   Entire Agreement. This Lease and attached Exhibits and Riders contain the entire agreement between Landlord and Tenant with respect to the subject matter of this Lease, and any previous agreements between Landlord and Tenant are merged in this Lease, which alone expresses their agreement. Tenant is entering into this Lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this Lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this Lease.

       **Section 23.2**   Exemption of Landlord and it Agents from Liability. Neither Landlord, Landlord's manager or members, nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant, Tenant's Property, Alterations, Tenant's business or to any other person or property resulting from any cause, except to the extent caused by the gross negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Section 12.4.

       **Section 23.3**   Landlord Transfer. In the event of a transfer or lease of the entire Building, Landlord shall deliver to the transferee or assignee any unused Security Deposit held by Landlord and (a) the transferor or lessor shall be and hereby is relieved of all obligations and liabilities of Landlord under this Lease accruing after the effective date of the transfer or lease, and (b) the transferee or lessee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer or lease.

       **Section 23.4**   Indemnification. Tenant hereby agrees to indemnify and hold harmless Landlord from and against any and all claims, actions, damages, liability and expense, including but not limited to reasonable attorneys' fees, that arise from or in connection with Tenant's possession, use, occupation, management, repair, maintenance or control of the Premises, or any portion thereof. Tenant shall, at its own cost and expense, defend, with counsel reasonably acceptable to Landlord and its insurance company, against any and all actions that may be brought against Landlord with respect to the foregoing. Tenant shall pay, satisfy and discharge any and all judgments, orders and decrees that may be recovered against Landlord in connection with the foregoing. Notwithstanding anything herein to the contrary, Tenant's obligation to indemnify and hold Landlord harmless shall not apply to claims, actions, damages, liabilities, or expenses resulting from the gross negligent or wrongful acts of Landlord, its agents, contractors, employees, servants, lessees, or concessionaires or to any claim arising from events occurring outside of the Premises except to the extent resulting from the negligent or wrongful acts of Tenant, its agents, contractors, employees, servants, lessees, or concessionaires. Landlord hereby agrees to indemnify and hold harmless Tenant from and against any and all claims, actions, damages, liability and

- 28 -

Landlord       Tenant

expense including, but not limited to reasonable attorneys' fees, that arise from or in connection with (i) any of the Landlord's representations set forth herein being false, (ii) Landlord's default under the terms of this Lease, or (iii) the gross negligence or willful misconduct of Landlord or its agents, employees or contractors. Landlord shall, at its own cost and expense, defend against any and all actions that may be brought against Tenant with respect to the foregoing. Landlord shall pay, satisfy and discharge any and all judgments, orders and decrees that may be recovered against Tenant in connection with the foregoing. Notwithstanding anything herein to the contrary, Landlord's obligation to indemnify and hold Tenant harmless shall not apply to claims, actions, damages, liabilities, or expenses resulting from the negligent or wrongful acts of Tenant, its agents, contractors, employees, servants, lessees, or concessionaires.

**Article 24.**          **Security Deposit**

**Section 24.1**   Tenant shall deposit with Landlord upon the execution hereof the Security Deposit as security for Tenant's faithful performance of its obligations under this Lease. If Tenant fails to pay Rent, or otherwise Defaults under this Lease, Landlord may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due to Landlord, for Rents which will be due in the future, and/or to reimburse or compensate Landlord for any liability, expense, loss or damage which Landlord may suffer or incur by reason thereof. If Landlord uses or applies all or any portion of the Security Deposit, Tenant shall within ten (10) days after written request therefor deposit monies with Landlord sufficient to restore said Security Deposit to the full amount required by this Lease. Landlord shall not be required to keep the Security Deposit separate from its general accounts. Within ninety (90) days after the expiration or termination of this Lease, Landlord shall return that portion of the Security Deposit not used or applied by Landlord. Landlord shall upon written request provide Tenant with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall bear interest or be considered prepayment for any monies to be paid by Tenant under this Lease.

The Security Deposit shall be applied to Tenant's payment of Rent in accordance with the following schedule. Notwithstanding the foregoing, the Security Deposit shall not be applied to Rent during the months set forth in the following schedule if, as of such month of the Term, Tenant has been in Default under the terms of Section 17.1(a) three (3) or more times in the twelve (12) month period immediately preceding the applicable month of the Term. Landlord shall maintain the remainder of the Security Deposit for the remainder of the Term.

| Month | Amount Applied to Rent | Remaining Security Deposit |
|---|---|---|
| 61st Month of the Term | $104,452.25 | $208,904.50 |
| 121st Month of the Term | $122,885.00 | $86,019.50 |

*AG*
AG
Landlord

*AS*
AS
Tenant

### Article 25.      End of Term

**Section 25.1**    <u>Surrender</u>. On the Expiration Date, Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises broom clean, but otherwise in its then as-is condition, provided that Tenant may, at its election, remove any Tenant's Property and Alterations, and if Tenant does so elect, shall restore any portions of the Premises damaged by said removal.

**Section 25.2**    <u>No Right to Holdover</u>. Tenant has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. At or prior to the expiration or termination of this Lease Tenant shall deliver exclusive possession of the Premises to Landlord. For purposes of this provision, exclusive possession shall mean that Tenant shall have vacated the Premises and that the Premises have been returned in the condition specified in this Lease. In the event that Tenant does not deliver exclusive possession to Landlord as specified above, then Landlord's damages during any holdover period shall be computed at the amount of the Rent due during the last full month before the expiration or termination of this Lease (disregarding any temporary abatement of Rent that may have been in effect), but with Base Rent being 150% of the Base Rent payable during such last full month. Nothing contained herein shall be construed as consent by Landlord to any holding over by Tenant.

**Section 25.3**    <u>Survival</u>. Unless otherwise specifically provided: (a) any obligation of Landlord or Tenant under this Lease which by its nature or under the circumstances can only be, or by the terms of this Lease may be, performed after the Expiration Date; (b) any liability for a payment with respect to any period ending on or before the Expiration Date; and, (c) all indemnity and hold harmless provisions in this Lease, shall survive the Expiration Date.

### Article 26.      Extension Option(s)

**Section 26.1**    <u>Option Rights</u>. Tenant shall be entitled to two (2) Extension Options of five (5) years each (each, an **"Option Term"**). In order to exercise an Extension Option, Tenant must deliver written notice to Landlord at least nine (9) months but no less than six (6) months prior to the expiration of the then-current Term (the **"Exercise Notice"**).

**Section 26.2**    <u>Option Rent</u>. The annual Base Rent payable by Tenant during the Option Terms (**"Option Rent"**) shall be adjusted to eighty-five percent (85%) of the Fair Market Rental Rate on the first day of each Option Term, but in no event shall such Option Rent be less than one hundred three percent (103%) of the Base Rent payable on the last month of the Lease Term or Option Term, as applicable. As used herein, the "**Fair Market Rental Rate**" shall mean the annual base rent at which lessees, as of the commencement of such applicable Option Term and during the twenty (20) months prior, will be leasing non-sublease warehouse space comparable in size (20,000-30,000 square feet), location and quality to the Premises for a comparable term, which comparable warehouse space is located in the Project and in other comparable projects located in the Subject Neighborhood of Los Angeles, California and is delivered in a condition similar to the delivery conditions required hereunder (collectively, the "**Comparable Transactions**"). "**Subject Neighborhood**" shall be defined as the Arts District neighborhood in Los Angeles, CA. In any determination of Comparable Transactions appropriate consideration shall be given to the annual rental rates per rentable square foot, rent increases, common area

- 30 -

expenses pass-throughs, the extent of Tenant's liability under the lease, abatement provisions reflecting free rent, brokerage commissions, tenant improvement allowances, if any, and other generally applicable conditions of tenancy for such Comparable Transactions. The intent is that Tenant will obtain the same rent and other economic benefits that Landlord would otherwise give in Comparable Transactions and that Landlord will make and receive the same economic payments and concessions that Landlord would otherwise make in Comparable Transactions.

**Section 26.3**   Determination of Option Rent. If Tenant objects in writing with respect to the Fair Market Rental Rate for the Premises for the applicable Option Term initially determined by Landlord in Landlord's applicable reasonable judgment pursuant to Section 26.2 above, then Landlord and Tenant shall attempt to agree upon the applicable Fair Market Rental Rate for the applicable Option Term using their best good-faith efforts. If Landlord and Tenant fail to reach agreement by the date which is thirty (30) days following Tenant's delivery of the applicable Exercise Notice with respect to the applicable Option Term (the "**Outside Agreement Date**"), then each party shall submit to the other party a separate written determination of the applicable Fair Market Rental Rate for the applicable Option Term within ten (10) business days after the applicable Outside Agreement Date, and such determinations shall be submitted to arbitration in accordance with the provisions below. The failure of Tenant or Landlord to submit a written determination of the Fair Market Rental Rate for the applicable Option Term within such ten (10) business day period shall conclusively be deemed to be such party's approval of the Fair Market Rental Rate for the applicable Option Term submitted within such ten (10) business day period by the other party.

(a)     Landlord and Tenant shall each appoint one (1) arbitrator who shall by profession be a commercial/industrial real estate leasing broker who shall have been active over the three (3) year period ending on the date of such appointment in the leasing of Comparable Transactions. The determination of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's submitted applicable Fair Market Rental Rate for the applicable Option Term is the closer to the actual applicable Fair Market Rental Rate for the applicable Option Term as determined by the arbitrators, taking into account the requirements with respect thereto set forth in Section 26.2 above. Each such arbitrator shall be appointed within fifteen (15) days after the Outside Agreement Date.

(b)     The two (2) arbitrators so appointed shall, within fifteen (15) days of the date of the appointment of the last appointed arbitrator, agree upon and appoint a third arbitrator who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two (2) arbitrators.

(c)     The three (3) arbitrators shall, within thirty (30) days of the appointment of the third arbitrator, reach a decision as to which of Landlord's or Tenant's submitted applicable Fair Market Rental Rate for the applicable Option Term is closer to the actual applicable Fair Market Rental Rate for the applicable Option Term and shall select such closer determination as the applicable Fair Market Rental Rate for the applicable Option Term and notify Landlord and Tenant thereof.

(d)     The decision of the majority of the three (3) arbitrators shall be binding upon Landlord and Tenant.

- 31 -

Landlord    Tenant

Exhibit A, page 37

(e)     If either Landlord or Tenant fails to appoint an arbitrator within the time period specified in Section 26.3(a) hereinabove, the arbitrator appointed by one of them shall reach the decision described in Section 26.3(c) above, notify Landlord and Tenant thereof, and such arbitrator's decision shall be binding upon Landlord and Tenant.

(f)     If the two (2) arbitrators fail to agree upon and appoint a third arbitrator, a third arbitrator shall be appointed by the Superior Court in and for Los Angeles County, California.

(g)     Each party shall pay the fees and expenses of the arbitrator appointed by or on behalf of it, and each shall pay one-half (1/2) of the fees and expenses of the third arbitrator, if any.

### Article 27.        Miscellaneous

**Section 27.1**   Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE REAL PROPERTY OR ARISING OUT OF THIS LEASE.

**Section 27.2**   General.

(a)     Binding Effect. Subject to the provisions of this Lease, this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns. No person is intended to be a third party beneficiary of this Lease.

(b)     Amendments. This Lease may not be changed or terminated, in whole or in part, except in writing signed by Landlord and Tenant.

(c)     Transmittal of Lease. Notwithstanding any actions to the contrary, the transmittal of this Lease and any discussion thereof by the parties shall not constitute any binding legal agreement. Notwithstanding any provision of this Lease, or any Applicable Requirements, to the contrary, or the execution of this Lease by Tenant, this Lease shall not bind or benefit Landlord or Tenant, unless and until this Lease is signed and delivered by both Landlord and Tenant.

(d)     Captions, Terms, Headings. The captions and headings in this Lease are for reference only and do not define the scope of this Lease or the intent of any term. All Article and Section references in this Lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease. The parties hereto acknowledge and agree that each has participated in the negotiation and drafting of this Lease; therefore, in the event of an ambiguity in, or dispute regarding the interpretation of, this Lease, the interpretation of this Lease shall not be resolved by any rule of interpretation providing for interpretation against the party who caused the uncertainty to exist or against the draftsman.

(e)     Severability. If any provision of this Lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision

- 32 -

_AG_
AG
Landlord      _AS_
AS
Tenant

Exhibit A, page 38

hereof shall remain valid and enforceable to the fullest extent permitted by all Applicable Requirements.

(f)    Quiet Enjoyment. If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this Lease.

(g)    Law to Govern. This Lease shall be governed by, and construed in accordance with, the laws of the State of California.

(h)    Counterparts; Electronic Signature. This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Scanned or e-mailed signatures shall be effective for and against each party hereto, and if one party requests of the other originally-executed signature pages, each party shall provide to the other party an originally-executed signature page of this Lease.

(i)    Landlord Representations. Landlord is the owner of the Premises and (a) Landlord has full power, authority and legal right to execute, deliver, perform and observe the provisions of the Lease; (b) Landlord's execution, delivery, performance and observance of the provisions of the Lease will not result in breach or violation of any (i) governmental law, rule or regulation, (ii) any provision of Landlord's organizational documents, (iii) any court order, judgment or decree, or (iv) any material agreement or instrument to which Landlord is a party; and (c) no additional consent, approval or authorization is required for Landlord to enter into, deliver or perform its obligations under the Lease.

(j)    CASp; ADA Compliance. A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards Additionally, Tenant shall have no obligation to comply with ADA except and only to the extent of that which is applicable to the interior of the Premises and the use Tenant shall make of the Premises; it being intended that Landlord shall be solely responsible for ADA compliance within the Common Areas or other areas of the Project outside of the Premises (including, but not limited to, the non-exclusive corridor, paths of travel to and from the Premises, the parking lot, and the sidewalks adjacent to the Premises) (except for repairs to the Common Area required as a result of Tenant's Initial Buildout Work). Landlord shall be solely responsible for and shall indemnify and hold Tenant harmless from and against all damages, claims, liabilities, actions, and/or proceedings relative to ADA compliance within the Common Areas or other areas of the Project outside the Premises (including, but not limited to, the non-exclusive corridor, paths of travel to and from the Premises, the parking lot, and the sidewalks adjacent to the Premises), expressly excluding repairs or upgrades to the Common Areas required in conjunction with Tenant's Initial Buildout Work.

- 33 -

Landlord    Tenant

(k)     <u>Confidentiality</u>. Landlord acknowledges that the content of this Lease and any related documents are confidential information. Landlord shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Landlord's financial, legal, and space planning consultants.

(l)     <u>Attorneys' Fees</u>. If any party hereto or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party or Broker of its claim or defense.

(m)     <u>Business Interruption</u>. Landlord acknowledges that Tenant's Permitted Use involves the cultivation of a calm and quiet environment that emphasizes relaxation to its patrons and therefore requires that Tenant keep the Premises reasonably free of outside vibrations, noises, and sounds and that the Premises be easily accessible for its employees, customers, and invitees. Accordingly, throughout the Term, as extended, Landlord, at Landlord's sole expense, shall take such steps as may be necessary with other tenants of the building, to (i) keep the Project and/or Premises free of vibrations, noise and sounds, including, but not limited to: music, loudspeakers, television or radio; from the operation of any instrument, apparatus, equipment, radio, television or amplification system; or from any construction and/or construction equipment which may be annoying or objectionable to Tenant or invitees of the Premises and (ii) keep all paths of travel to and from the Premises unobstructed and available for use by Tenant's employees, customers, and invitees. Landlord further agrees, during the Term, as extended, that Landlord will not enter into a lease for or permit the use of other space in the Project or adjacent buildings under Landlord's control which authorizes or permits the operation of a business that produces annoying or objectionable vibrations, noises, or sounds (including, but not limited to, for use as a music recording studio, nightclub, or restaurant facing the Premises).

In the event that Landlord (i) willfully enters into a lease for or permits the use of other space in the Project or adjacent buildings under Landlord's control that produces annoying or objectionable vibrations, noises, or sounds, (ii) causes the paths of travel to or from the Premises to become obstructed or causes the use of the same by Tenant's employees, customers, and invitees to become materially and adversely impacted, or (iii) commences construction on the Real Property during Tenant's business hours (each, a **"Business Interruption"**), then Tenant shall notify Landlord (the "**Business Interruption Notice**"). The date the Landlord receives the Business Interruption Notice shall be the **"Business Interruption Notification Date"**. Landlord shall, at Landlord's sole cost and expense, take such steps as may be necessary to immediately remedy such Business Interruption. Notwithstanding the foregoing, if Landlord fails to remedy such Business Interruption to Tenant's reasonable satisfaction within five (5) business days after the Business Interruption Notification Date, Tenant may, in addition to Tenant's other remedies for breach of Landlord's obligations hereunder, take such action it deems appropriate to cure such Business Interruption, and all expenses actually and reasonably incurred by Tenant to perform such Landlord obligations in a first-class manner, consistent with Tenant's Premises, shall be paid

- 34 -

Landlord    Tenant

by Landlord to Tenant within thirty (30) days after written demand by Tenant. In the event that Landlord fails to cure such Business Interruption within five (5) business days after the Business Interruption Notification Date, the Rent payable hereunder shall be abated on a per diem basis for each day after such five (5) business day period that such Business Interruption continues, and such abatement shall continue until such Business Interruption is resolved.

In the event that a Project tenant or a tenant in an adjacent Building under Landlord's control causes a Business Interruption or commences a use in violation of the terms of this Section 27.2(m) (hereinafter, a "**Rogue Tenant**"), Landlord shall, within five (5) days after notice of such violation, use commercially reasonable efforts to enforce the terms of this Lease, such that the violating use shall cease, and shall continue to take such commercially reasonable action to enforce the terms of this Lease.

(n)     Access. Landlord shall provide Tenant with access to the Premises, corridor connecting the Premises to the parking lot, and employee parking spaces twenty-four (24) hours per day, three hundred sixty-five (365) days per year.

**Section 27.3    Arbitration.**

(a)     Arbitration of Disputes. Except as provided in Section 27.3(b) below, the parties agree to resolve any and all claims, disputes or disagreements arising under this Lease, including, but not limited to any matter relating to Landlord's failure to approve an assignment, sublease or other transfer of Tenant's interest in the Lease, any other defaults by Landlord, or any defaults by Tenant by and through arbitration as provided below and irrevocably waive any and all rights to the contrary. The parties agree to at all times conduct themselves in strict, full, complete and timely accordance with the terms hereof and that any attempt to circumvent the terms of this Section 27.3 shall be absolutely null and void and of no force or effect whatsoever.

(b)     Disputes Excluded from Arbitration. The following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: (i) disputes for which a different resolution determination is specifically set forth in this Lease, (ii) all claims by either party which (a) seek anything other than enforcement or determination of rights under this Lease, or (b) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages, (iii) claims relating to (a) Landlord's exercise of any unlawful detainer rights pursuant to applicable law or (b) rights or remedies used by Landlord to gain possession of the Premises or terminate Tenant's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable law, and (iv) any claim or dispute that is within the jurisdiction of the Small Claims Court.

(c)     Appointment of an Arbitrator. All disputes subject to this Section 27.3, shall be determined by binding arbitration before: a retired judge of the applicable court of jurisdiction (the Superior Court of the State of California) affiliated with Judicial Arbitration & Mediation Services, Inc. ("JAMS"), (the "**Arbitrator**"). In the event that the parties elect to use an arbitrator other than one affiliated with JAMS then such arbitrator shall be obligated to comply with the Code of Ethics for Arbitrators in Commercial Disputes. Such arbitration shall be initiated

- 35 -

Landlord    Tenant

by the parties, or either of them, within ten (10) days after either party sends written notice (the "**Arbitration Notice**") of a demand to arbitrate by registered or certified mail to the other party and to the Arbitrator. The Arbitration Notice shall contain a description of the subject matter of the arbitration, the dispute with respect thereto, the amount involved, if any, and the remedy or determination sought. If the parties have agreed to use JAMS they may agree on a retired judge from the JAMS panel. If they are unable to agree within ten days, JAMS will provide a list of three available judges and each party may strike one. The remaining judge (or if there are two, the one selected by JAMS) will serve as the Arbitrator. In the event the Arbitrator is not selected as provided for above for any reason, the party initiating arbitration shall apply to the appropriate Court for the appointment of a qualified retired judge to act as the Arbitrator.

        (d)     <u>Arbitration Procedure</u>.

        (i)     <u>Pre-Hearing Actions</u>. The Arbitrator shall schedule a pre-hearing conference to resolve procedural matters, arrange for the exchange of information, obtain stipulations, and narrow the issues. The parties will submit proposed discovery schedules to the Arbitrator at the pre-hearing conference. The scope and duration of discovery will be within the sole discretion of the Arbitrator. The Arbitrator shall have the discretion to order a pre-hearing exchange of information by the parties, including, without limitation, production of requested documents, exchange of summaries of testimony of proposed witnesses, and examination by deposition of parties and third-party witnesses. This discretion shall be exercised in favor of discovery reasonable under the circumstances. The Arbitrator shall issue subpoenas and subpoenas duces tecum as provided for in the applicable statutory or case law (in California Code of Civil Procedure Section 1282.6).

        (ii)     <u>The Decision</u>. The arbitration shall be conducted in the city or county within which the Premises are located at a reasonably convenient site. Any party may be represented by counsel or other authorized representative. In rendering a decision(s), the Arbitrator shall determine the rights and obligations of the parties according to the substantive laws and the terms and provisions of this Lease. The Arbitrator's decision shall be based on the evidence introduced at the hearing, including all logical and reasonable inferences therefrom. The Arbitrator may make any determination and/or grant any remedy or relief that is just and equitable. The decision must be based on, and accompanied by, a written statement of decision explaining the factual and legal basis for the decision as to each of the principal controverted issues. The decision shall be conclusive and binding, and it may thereafter be confirmed as a judgment by the court of applicable jurisdiction, subject only to challenge on the grounds set forth in the applicable statutory or case law (in California Code of Civil Procedure Section 1286.2). The validity and enforceability of the Arbitrator's decision is to be determined exclusively by the court of appropriate jurisdiction pursuant to the provisions of this Lease. The Arbitrator may award costs, including without limitation, Arbitrator's fees and costs, attorneys' fees, and expert and witness costs, to the prevailing party, if any, as determined by the Arbitrator in his discretion.

        (e)     Whenever a matter which has been submitted to arbitration involves a dispute as to whether or not a particular act or omission (other than a failure to pay money) constitutes a Default, the time to commence or cease such action shall be tolled from the date that

- 36 -

Landlord        Tenant

the Notice of Arbitration is served through and until the date the Arbitrator renders his or her decision. Provided, however, that this provision shall NOT apply in the event that the Arbitrator determines that the Arbitration Notice was prepared in bad faith.

(f)    Whenever a dispute arises between the parties concerning whether or not the failure to make a payment of money constitutes a default, the service of an Arbitration Notice shall NOT toll the time period in which to pay the money. The party allegedly obligated to pay the money may, however, elect to pay the money "under protest" by accompanying said payment with a written statement setting forth the reasons for such protest. If thereafter, the Arbitrator determines that the party who received said money was not entitled to such payment, said money shall be promptly returned to the party who paid such money under protest together with interest thereon.

**Section 27.4**    <u>Parking</u>. Tenant and Tenant's employees, clients, and invitees shall have the non-exclusive right to use of Landlord's parking lot as depicted on <u>Exhibit C</u> attached hereto. Landlord shall provide ten (10) stacked parking spaces for Tenant's employees, clients, and invitees in the parking lot located adjacent to the building (the "**Parking Requirement**") for the Term of the Lease, as extended by any Option Terms. Subject to the availability of additional parking spaces at the time of such request, Tenant may reduce or increase the number of parking spaces provided under the Parking Requirement at any time by providing at least ten (10) days' advance written notice to Landlord. Tenant may elect to provide valet service or a valet assist program (similar to a valet program utilizing a parking attendant or car stacking) (collectively known as "**Valet Services**") for their customers at Tenant's sole cost and expense. Tenant shall have the right to use and access of the corridor connecting the Premises and the parking lot 365 days per year, as depicted in <u>Exhibit C</u>. Landlord shall provide fixed parking rates (for guest and employee use of the parking lot) prior to the date Tenant opens for business to the public for Tenant review. Such fixed parking rates shall be based on fair market prices offered in the Arts District neighborhood and differentiate between employee and guest parking rates.

**Section 27.5**    <u>Right of First Refusal</u>. Landlord shall not, at any time prior to the expiration of the term of this Lease, or any extension thereof, sell the Property, or any portion thereof or interest therein, without first giving prior written notice thereof to Tenant in accordance with this Section 27.5, which notice is hereinafter referred to as "**Notice of Sale**." The Notice of Sale shall include the exact and complete terms of the proposed sale and shall have attached thereto a copy of the bona fide offer and counteroffer, if any, duly executed by both Landlord and the prospective purchaser. For a period of thirty (30) calendar days after receipt by Tenant of the Notice of Sale, Tenant shall have the right to give written notice to Landlord of Tenant's exercise of Tenant's right to purchase the Premises, the interest therein proposed to be sold, or the property of which the Premises are a part, on the same terms, price and conditions as set forth in the Notice of Sale. In the event that Landlord does not receive written notice of Tenant's exercise of the right herein granted within said thirty (30) day period, there shall be a conclusive presumption that Tenant has elected NOT to exercise Tenant's right hereunder, and Landlord may complete the sale to the prospective purchaser, on the same terms set forth in the Notice of Sale. Notwithstanding the foregoing, a sale and lease back by Landlord for the purposes of financing the existing loans secured by the Real Property shall not be deemed a sale, transfer, or conveyance for purposes of the Tenant's right of first refusal hereunder; provided, however, such sale and lease back shall not

- 37 -

Landlord    Tenant

result in any parties other than the current Landlord or the immediate owner of the Landlord being the parties to such transaction.

In the event that Tenant declines to exercise its right of first refusal after receipt of the Notice of Sale, and, thereafter, Landlord and the prospective purchaser modify by more than five percent (5%), (i) the sales price, or (ii) the amount of down payment, or if there is a material change in any seller financing offered, or in the event that the sale is not consummated within one hundred eighty (180) days of the date of the Notice of Sale, then Tenant's right of first refusal shall reapply to said transaction. In the event that Tenant declines to exercise its right of first refusal after receipt of the Notice of Sale, and, thereafter, the proposed transfer or sale is not consummated, the Tenant's right of first refusal shall apply to any subsequent transaction. If, however, said transfer or sale is, in fact, completed, then said right shall be extinguished and shall not apply to any subsequent transactions.

**Section 27.6**    Occupancy. Within ninety (90) days after the Lease Commencement Date, Landlord shall submit all documentation required to reduce the maximum assembly occupancy in all areas of the Building outside of the Premises to one hundred fifty (150) in the aggregate and change the occupancy classification from Assembly Group A to Assembly Group M. Following such change, Tenant shall be entitled to a maximum assembly occupancy within the Premises of one hundred fifty (150). Notwithstanding anything to the contrary contained herein, if Landlord fails to change the assembly occupancy as required herein on or before the date which is one hundred twenty (120) days after the Lease Commencement Date, Tenant may, at its option, by notice to Landlord, in writing, terminate this Lease. In the event Tenant terminates this Lease in accordance with this Section 27.6 due to (i) Landlord's unilateral decision to not move forward with the change in occupancy or (ii) Landlord's failure to timely submit all documentation or respond to requests for documentation required to reduce the assembly occupancy as required herein, then, within ten (10) business days after such termination by Tenant, Landlord shall return to Tenant all security deposits, pre-paid rent, and other amounts then held by Landlord and Landlord shall reimburse Tenant for all Lease Expenses (as defined in Section 2.2). In the event that Tenant terminates this Lease in accordance with this Section 27.6 because the reduction in assembly occupancy as required herein is delayed by any agency of the state of California, the United States Government, or any local governmental authority, or for any other reason, then, within ten (10) business days after such termination by Tenant, Landlord shall return to Tenant all security deposits, pre-paid rent, and other amounts then held by Landlord.

Only upon receipt of Tenant's written consent shall Landlord have the right to make changes to the assembly occupancy limit in the areas of the Building outside of the Premises during the Term of the Lease. Landlord shall cooperate with Tenant and support Tenant in Tenant's efforts to obtain any and all necessary approvals and permits to use the Premises for the Permitted Use and for Tenant's Initial Buildout Work, which cooperation obligation of Landlord shall include timely responding to any requests for review, information, or signatures received by Landlord.

- 38 -

AG
AG
Landlord

AS
AS
Tenant

**In Witness Whereof**, Landlord and Tenant have executed this Lease on the date of this Lease.

Landlord:                                          Tenant:

Seaton Investments, LLC                    AIRE Ancient Baths Los Angeles, LLC

By: _ADGomperts_____          By: _____
ADGomperts (Sep 8, 2023 12:01 PDT)        Amadeo Serra Solana (Sep 8, 2023 14:00 GMT+2)
Name: Alan Gomperts                        Name: Amadeo Serra Solana
Title: Manager                             Title: CEO

- 39 -

AG          AS
AG          AS
Landlord    Tenant

Exhibit A, page 45

## EXHIBIT A

## Guaranty of Lease

     This Guaranty (this "**Guaranty**"), dated as of  September 7  , 2023 (the "**Effective Date**"), is signed by Acqua Ancien Bath, Inc. ("**Guarantor**"), as consideration for and in order to induce Seaton Investments, LLC ("**Landlord**") to enter into that certain Lease dated  September 7  , 2023 (the "**Lease**") of the property located at 433-441 Colyton St. and 440 Seaton St., Los Angeles, CA 90013 (the "**Premises**") with AIRE Ancient Baths Los Angeles, LLC ("**Tenant**"), and Guarantor hereby agrees as follows:

     1.    **Obligations**. Guarantor guarantees unconditionally to Landlord the punctual payment, performance, and observance of all monetary (including the payment of all rent, additional rent, and any other payments due and payable under the Lease) and non-monetary obligations, covenants, conditions, and agreements required to be observed and performed or paid or reimbursed by Tenant pursuant to the Lease (collectively, the "**Obligations**").

     2.    **Unconditional Guaranty**. The Obligations are unconditional. Except as expressly provided to the contrary herein, the Obligations, and this Guaranty, will remain in full force and effect without regard to any circumstances or conditions, including:

     (a)    Any defense or set-off, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of the Lease or otherwise or the failure of Landlord to assert any claim or demand, or to enforce the Lease or any right or remedy available to Landlord under the Lease, against Tenant under the Lease or any other agreement.

     (b)    Any rescission, waiver, amendment, or modification of the Lease or any other agreement.

     (c)    The release of any security held by Landlord under the Lease.

     (d)    Any transfer by Landlord or Tenant in respect of the Lease or any interest in the Premises, including without limitation any assignment of the Lease by Tenant or any sublease of all, or a portion of, the Premises whether or not Guarantor receives notice and or has consented to such assignment or sublet.

     (e)    Any transfer by Guarantor of any interest in or control of Tenant.

     (f)    Any bankruptcy or similar proceeding involving Landlord or Tenant.

     (g)    Failure of Landlord to exercise any right or remedy against any other guarantor of the Lease.

     3.    **Waiver**. Guarantor agrees that this Guaranty constitutes a guaranty of payment and performance when due and not just of collection. Guarantor waives presentment and demand for



Landlord       Tenant

*Exhibit A*

Exhibit A, page 46

payment, notice of non-payment or non-performance, and any other notice or demand to which Guarantor might otherwise be entitled to receive. Guarantor also waives trial by jury of all issues arising in any action to which Landlord and Guarantor may be parties in connection with this Guaranty. Landlord shall not be required to resort to any other person or entity or to any security for payment or performance of any part of the Lease or to any advance rent, or to any deposit, account, credit, or offset on the books of Landlord in favor of Tenant.

4.    **Joint and Several Liability**. Landlord may, at Landlord's option, proceed against Guarantor and Tenant, jointly and severally, or against Guarantor only without having obtained a judgment against Tenant. Landlord shall not be required to use any security deposit provided to Landlord in accordance with the terms of the Lease before proceeding against or collecting any sums from Guarantor. The security held by Landlord pursuant to the terms of the Lease will not be applied to any Obligations paid or performed by Guarantor. If there is more than one Guarantor under this Guaranty, Guarantor's obligations and liabilities under this Guaranty are joint and several.

Upon payment by Guarantor of any sums to Landlord hereunder, all rights of Guarantor against Tenant arising as a result thereof by way of right of subrogation, indemnification, or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full of all obligations under the Lease.

5.    **Further Assurances and Severability**.

(a)    Guarantor will execute, acknowledge, and deliver, at its own expense, all instruments and take all action as Landlord from time to time may reasonably request for ensuring Landlord the full benefits of this Guaranty.

(b)    If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty will not be affected thereby, and each provision of this Guaranty will be valid and enforceable to the fullest extent permitted by law. Landlord's delay in exercising, or the failure to exercise, any right under this Guaranty will not waive such right or any other right of Landlord. All remedies of Landlord by reason of this Guaranty are separate and cumulative and no single remedy, whether or not exercised by Landlord, will exclude any other remedy of Landlord or limit or prejudice any other legal or equitable remedy which Landlord may have.

6.    **Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing and addressed to the parties at the addresses set forth on the first page of this Guaranty (or to such other address that may be designated by the receiving party from time to time in accordance with this Section 6). All Notices shall be delivered by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered U.S. Mail, signature required and postage prepaid, whereby delivery is deemed to



Landlord        Tenant

*Exhibit A*

Exhibit A, page 47

have occurred on the third (3rd) business day following deposit with the U.S. Postal Service; or (d) electronic transmission (facsimile or email) provided that the transmission is completed no later than 4:00 p.m. PST on a business day and the original also is sent via overnight courier or U.S. Mail, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

7.     **Term**. This Guaranty shall remain in full force and effect until Tenant has satisfied all of its obligations under the Lease.

8.     **Miscellaneous**.

(a)     If judgment is entered against Guarantor in any action to enforce this Guaranty, Guarantor will reimburse Landlord for all reasonable expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and disbursements.

(b)     This Guaranty may not be changed or terminated orally or in any manner other than by a written agreement signed by Guarantor and Landlord.

(c)     Each reference herein to Landlord shall be deemed to include its heirs, successors, and assigns, in whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include its heirs, successors, and assigns, all of whom shall be bound by the provisions of this Guaranty.

(d)     This Guaranty will be governed by the laws of the State of California. Any litigation concerning this Guaranty shall be initiated in a state court of competent jurisdiction in the county in which the Premises are located and the Guarantors consent to the jurisdiction of such court.

(e)     All capitalized terms not defined herein shall have the meaning accorded them in the Lease, a true and correct copy of which Guarantor hereby acknowledges receipt.

(f)     The Paragraph headings appearing herein are for purposes of convenience only and are not deemed to be part of this Guaranty.

(g)     If there is more than one Guarantor, this Guaranty may be executed in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

|  AG  |  |  AS  |
| :---: | :---: | :---: |
| AG | | AS |
| Landlord | | Tenant |

*Exhibit A*

**IN WITNESS WHEREOF**, Guarantor has caused this Guaranty to be executed as of the Effective Date.

GUARANTOR:

Acqua Ancien Bath, Inc.

By: _____
Amadeo Serra Solana (Sep 8, 2023 14:00 GMT+2)

Name: Amadeo Serra Solana

Title: CEO

## EXHIBIT B

## Landlord Work Letter

Landlord, at Landlord's sole cost, shall complete only the following work described in this Exhibit B and expressly designated in this exhibit to be completed by the Landlord (collectively, the "**Landlord Work**"). Such Landlord's Work shall be performed by Landlord, at Landlord's sole cost and expense, in a good and workmanlike manner, utilizing first quality new materials and qualified contractors, in accordance with all Applicable Requirements (including compliance with the requirements of the Americans With Disabilities Act):

1. Electrical: 1000 Amps, 277/408 volt (or equivalent 225A at 120/208 volt if 277/408 volt is not available) to the Premises. 433-441 Colyton building has 400 amps 120/208. Landlord to accommodate the remainder of the amperage at the electrical box located at the NW corner of the Premises.

2. Gas: A minimum 2949 mbh Gas service to Premises. Located at the NW corner of the Premises. Tenant to supply Gas Company with equipment demand for the meter installation.

3. Water: A minimum 2 ½" water service connection to the Premises at the existing location within the Premises.

4. Building Systems: Landlord represents that all systems, including, but not limited to, plumbing, electrical, water, and gas will be in good working order upon delivery of possession.

5. Common Area & Structural Elements: Landlord shall deliver the exterior Common Areas and the structural elements of the Building (including, but not limited to, the roof, bearing walls, beams, columns, façade and foundation) in good condition, free of defects, in good working condition, and in compliance with all Applicable Requirements. In the event that a governmental authority (i.e., LADBS, Los Angeles, Health Department) requires a structural and/or seismic upgrade to the Building due to the existing use as a warehouse, Landlord, at its sole cost and expense, shall perform such required seismic and/or structural upgrades.

6. Roof & Skylights: Roof and skylights to be delivered in with the structural, architectural, and aesthetic properties of the Building in good condition, free of defects. Any repairs and/or substitutions to the roof shall conform with the current aesthetic characteristics and architectural characteristics of the Building, Premises, and roof. Such roof and skylight work shall be completed on or before the

date which is six (6) months following the mutual execution of this Lease.

AG
Landlord

AS
Tenant

*Exhibit B*

Exhibit A, page 51

# EXHIBIT C

## Site Plan



| PREMISES | | CORRIDOR |



Landlord      Tenant

*Exhibit C*

Exhibit A, page 52

## **EXHIBIT D**

## **Commencement Date Agreement**

DATE:

RE:    Retail Lease ("Lease") dated [_____], for referenced purposes only between [_____] ("Landlord"), and [_____] ("Tenant"), [Address].

Ladies and Gentlemen:

In accordance with the Lease, Landlord wishes to advise and/or confirm the following matters related to the Lease, and such confirmation shall control over any conflict or inconsistency in the Lease:

1.    That the Premises have been accepted herewith by the Tenant in accordance with the Lease and that there is no deficiency in construction.

2.    That the Tenant has taken possession of the Premises. The Delivery Date is [_____].

3.    The Lease Commencement Date is [_____].

4.    The Base Rent commenced to accrue on [_____] ("Rent Commencement Date"). If the Rent Commencement Date of the Lease is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter shall be for the full amount of the monthly installment as provided for in the Lease.

5.    The Term of the Lease is [_____] and the Expiration Date is [_____].

6.    Except as described herein, the Lease is otherwise unmodified and continues in full force and effect without regard to the matters set forth herein. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed thereto in the Lease.

AGREED AND ACCEPTED:

Landlord:                                              Tenant:


Seaton Investments, LLC                      AIRE Ancient Baths Los Angeles, LLC

By: _____          By: _____
Name:_____          Name:_____
Title: _____          Title: _____

*AG*  |  *AS*
AG     AS
Landlord   Tenant

*Exhibit D*

## Exhibit A, page 53

# **EXHIBIT E**

## **[Tenant Work Letter]**

AG | AS

Landlord | Tenant

*Exhibit E*

Exhibit A, page 54

# **EXHIBIT F**

## **Required SNDA**

<u>[PAGES TO FOLLOW]</u>

AG _____     AS _____
Landlord              Tenant

*Exhibit F*

Exhibit A, page 55

Recording Requested By
and When Recorded Return To:

Korth Direct Mortgage Inc.
135 San Lorenzo Avenue, Suite 600
Coral Gables, FL 33146

---

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "**Agreement**") is dated as of the 6th day of September, 2023, between Korth Direct Mortgage Inc., a Florida corporation, as agent for itself (the "**Lender**"), AIRE Ancient Baths Los Angeles a California limited liability company ("**Tenant**") and is consented to by Landlord (as defined below).

### RECITALS

A.    Tenant is the tenant under a certain lease (the "**Lease**") and other documents listed on Exhibit A attached hereto with Seaton Investments, LLC, a California limited liability company (together with all successors-in-interest, "**Landlord**") or its predecessor in interest, of premises described in the Lease (the "**Premises**") located in a certain building located at 433-441 Colyton St. and 440 Seaton St., Los Angeles, CA 90013 and more particularly described in Exhibit B attached hereto and made a part hereof (such building, including the Premises, is hereinafter referred to as the "**Property**").

B.    This Agreement is being entered into in connection with two mortgage loans (the "**Loans**") heretofore made by Lender to Landlord, and secured by, among other things, certain mortgages on and of the Property (the "**Mortgage**"), which was heretofore recorded with the clerk of the county in which the Property is located.

C.    Tenant acknowledges that Lender will rely on this Agreement.

### AGREEMENT

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Tenant agrees that the Lease is and shall be subject and subordinate to the Mortgage and to all present or future advances under the obligations secured thereby and all renewals, amendments, modifications, consolidations, replacements and extensions of the secured obligations and the Mortgage, to the full extent of all amounts secured by the Mortgage from time to time. Said subordination is to have the same force and effect as if the Mortgage and such renewals, modifications, consolidations, replacements and extensions thereof had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2.      Lender agrees that, if the Lender exercises any of its rights under the Mortgage, including an entry by Lender pursuant to the Mortgage or a foreclosure of the Mortgage, (a) Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period of any term, covenant or condition of the Lease, and (b) Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon default under the Mortgage, unless applicable law requires Tenant to be made a party.

3.      Tenant agrees that, in the event of a foreclosure of the Mortgage by Lender or the acceptance of a deed in lieu of foreclosure by Lender or any other succession of Lender to fee ownership, Tenant will attorn to and recognize Lender as its landlord under the Lease for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease, except as provided in this Agreement.

4.      Tenant agrees that, in the event Lender succeeds to the interest of Landlord under the Lease, Lender shall not be:

a.      liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord), except for defaults of a continuing nature which would be susceptible of being cured by Lender, or defaults that expressly result in rent abatements in favor of Tenant,

b.      subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord), except for any offsets or credits against rent that Tenant is entitled to take or receive as expressed specifically in the Lease upon the happening of any event, or

c.      bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord (including, without limitation, the then defaulting Landlord), except for: (i) any overpayments of additional rent paid by Tenant on an estimated basis, or (ii) any security deposit which is to be applied to the payment of rent pursuant to a "burn down" or similar provision, or

d.      bound by any obligation to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any prior Landlord's interest; or

e.      accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender.

5.      Tenant agrees that, notwithstanding any provision hereof to the contrary, the terms of the Mortgage shall continue to govern with respect to the disposition of any insurance proceeds (for policies obtained by Landlord) or eminent domain awards payable to Landlord, and any obligations of Landlord to restore the real estate of which the Premises are a part shall, insofar as they apply to Lender, be limited to insurance proceeds or eminent domain awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards.

6.      So long as the Mortgage remains outstanding and unsatisfied, Tenant shall give to Lender copies, at the address and in the manner hereinbelow provided, of all notices of Landlord default(s) permitted or required to be given to the Landlord by the Tenant under and pursuant to the terms and provisions of the Lease. Lender shall have the right to remedy any Landlord default under the Lease, or to cause any default of Landlord under the Lease to be remedied, and for such purpose Tenant hereby grants Lender, except in the event of an emergency, such additional period of time as may be reasonable to enable Lender to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default, but in no event greater than five (5) days after the expiration of any cure period expressly set forth in the Lease. Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No Landlord default under the Lease shall exist or shall be deemed to exist (i) as long as Lender, in good faith, shall have commenced to cure such default within the above referenced time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have instituted proceedings under the Mortgage the above referenced time period, and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. Lender shall have the right, without Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or to exercise any other remedies under the Mortgage.

7.      Notices. Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing and will be deemed delivered or made upon the earlier of by registered or certified mail, return receipt requested with sufficient, postage affixed, and addressed to the parties as follows:

Lender:
Korth Direct Mortgage Inc.
Attention: General Counsel
135 San Lorenzo Avenue, Suite 600
Coral Gables, FL 33146


Tenant:
As provided for under the lease

With a copy of all notices to Tenant to:

VZN Law
5619 North Figueroa Street, Suite 207
Los Angeles, CA 90042 Attn: Ali Vazin


Such addresses may be changed by notice pursuant to this paragraph. Each party jointly and severally agrees that it will furnish the other parties with copies of all notices relating to the Lease.

8.      Tenant hereby consents to the assignment of leases and rents from Landlord to Lender under the Mortgage in connection with the Loan. Tenant acknowledges that the interest of the Landlord under the Lease is to be assigned to Lender solely as security for the purposes specified in said assignments, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignments or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises. Tenant agrees that upon receipt of a written notice from Lender of a default by Landlord under the Loans, Tenant will thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease.

9.      The term "**Lender**" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loans, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, and the terms "**Tenant**" and "**Landlord**" as used herein include any successor and assign of the named Tenant and Landlord herein, respectively; provided, however, that such reference to Tenant's or Landlord's successors and assigns shall not be construed as Lender's consent to any assignment or other transfer by Tenant or Landlord to the extent Lender's consent to such assignment is required.

10.      If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

11.      Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought. This Agreement may be executed in counterparts. This Agreement shall be construed in accordance with the laws of the state of California. Each person executing this Agreement on behalf of a party is authorized by such party to do so and execution hereof is the binding act of such party enforceable against such party.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

IN WITNESS WHEREOF, Lender and Tenant, intended to be legally bound, have duly executed this Agreement as of the day and year written below.

**LENDER**:

Korth Direct Mortgage Inc., a Florida corporation

By: _____

Name: Keith E Henrich

Title: General Counsel


**TENANT**:

AIRE Ancient Baths Los Angeles a California Limited Liability Company

By: _____
Amadeo Serra Solana (Sep 8, 2023 14:00 GMT+2)

Name: Amadeo Serra Solana

Title: CEO

**LANDLORD:**

Seaton Investments, LLC, a California limited liability company

By: ADGomperts _____
ADGomperts (Sep 8, 2023 12:01 PDT)

Name: Alan Gomperts

Title: Manager

**Exhibit "A"**

**LIST OF LEASE DOCUMENTS**

That Certain Retail Lease  dated September  7 , 2023 between Seaton Investments LLC as
Landlord, and AIRE Ancient Baths Los Angeles, LLC, as Tenant.

Exhibit A, page 61

## EXHIBIT "B"

## DESCRIPTION OF LAND

ALL THAT CERTAIN plot, piece or parcel of land, situate, lying and being in the City of Los Angeles, County of Los Angeles and State of California bounded and described as follows:

**Tract I**

Lot 9 in Block "C" of F.P. Howard and Co's Subdivision of the Bliss Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 12 Page 42 of Miscellaneous Records, in the Office of the County Record of said County.

**Tract II**

Lot 11 and Lots 13 through 18 inclusive in Block "C" of F.P. Howard and Co's Subdivision of the Bliss Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 12 Page 42 of Miscellaneous Records, in the Office of the County Recorder of said County

Note for Information: Being known and designated Assessors Parcel No.: 5163-025-010
Note for Information: Being commonly known as 422 Seaton Street, Los Angeles, California.

## PARTY WALL AND ARTS DISTRICT CENTER

### RIDER NO. 1 TO LEASE

This Rider No. 1 is made and entered into by and between SEATON INVESTMENTS, LLC (**"Landlord"**), and AIRE Ancient Baths Los Angeles, LLC, a California limited liability company (**"Tenant"**), as of the day and year of the Lease between Landlord and Tenant to which this Rider is attached. Landlord and Tenant hereby agree that, notwithstanding anything contained in the Lease to the contrary, the provisions set forth below shall be deemed to be part of the Lease and shall supersede any inconsistent provisions of the Lease. All references in the Lease and in this Rider to the "Lease" shall be construed to mean the Lease (and all Exhibits and Riders attached thereto), as amended and supplemented by this Rider. All capitalized terms not defined in this Rider shall have the same meaning as set forth in the Lease.

1.      The Premises includes a party wall that is shared with Seaton Street Investments, LLC, predecessor in Interest to Landlord and the adjacent Building owner of the adjacent building located at 1101 5th Street, Los Angeles, CA (the "**1101 5th Street Owner**"). The Party Wall is located to the south of the Building, on 5th street (the "**Party Wall**"). Landlord and 1101 5th Street Owner have entered into the Party Wall and Easement Agreement with respect to the Party Wall (the "**Easement Agreement**") attached as Exhibit A to Rider No. 1 and hereby incorporated by reference. The Easement Agreement states that the Party Wall is located on the 1101 5th Street Owner Building. Pursuant to the Easement Agreement, the 1101 5th Street Owner is responsible for maintenance, repair and replacement of the Party Wall. The Easement Agreement is in full force and affect according to the terms thereof.

2.      Landlord shall be prohibited from (i) building a separate wall separate and apart from the Party Wall; (ii) performing any maintenance, repair, or replacement on the Party Wall without Tenant's express consent, which may be withheld or conditioned in Tenant's sole discretion; and (iii) damaging the Party Wall in any way. In the event that the Party Wall requires maintenance, repair or replacement, Landlord, at its sole cost, shall expeditiously provide such maintenance and/or repair while preserving the aesthetic characteristics and structural functionality of the Party Wall. Landlord, at its sole cost, shall be responsible for any and all structural upgrades, including, but not limited to the construction of lateral systems, in connection with the repair, maintenance or replacement of the Party Wall. Landlord shall promptly provide Tenant with a copy of any and all correspondences received from or delivered to 1101 5th Street Owner regarding the Party Wall or the development of the Arts District Center (as defined below).

3.      Landlord shall, upon written request from Tenant, request that the 1101 5th Street Owner name Tenant as an additional insured with respect to any insurance policies, including, but not limited to the replacement cost damages insurance, obtained by 1101 5th Street Owner. Landlord agrees to promptly provide Tenant with any and all copies of written insurance obtained pursuant to the Easement Agreement. If requested by Tenant, Landlord shall, pursuant to Section 2(e) of the Easement Agreement, promptly provide 1101 5th Street Owner with notice regarding any Tenant requested repair and maintenance of the Party Wall. Landlord shall assign to Tenant, to the extent possible, any rights afforded to Landlord pursuant to the Easement Agreement, and if such rights may not be assigned, Landlord shall pursue such rights on Tenant's benefit.

_AG_
AG
Landlord

_AS_
AS
Tenant

1

4.      Landlord shall indemnify and hold harmless Tenant and its partners, members, successors, assigns, agents, representatives, officers, directors and employees from any and all claims, losses, liability, expenses or damage which may raise out of the maintenance, damage, repair, replacement, seismic review, seismic upgrade or removal of the Party Wall required by or related to any Applicable Law or caused by Landlord, 1101 5th Street Owner or any third party.

5.      In the event Tenant's use of the Premises is materially adversely impacted as a result of any repair, maintenance or replacement of the Party Wall, Tenant shall receive an abatement of Rent for every day that the Premises cannot be used substantially or in its entirety.

6.      1101 5th Street Owner is seeking to obtain a demolition permit and intends to demolish 1101 5th Street Owner's existing building and develop a 12-story project to include a 113-room hotel, 129 live/work condos and 72,469 square feet of commercial space and parking for 304 vehicles (the "**Arts District Center**").

7.      Landlord shall indemnify and hold harmless Tenant and its partners, members, successors, assigns, agents, representatives, officers, directors and employees from any and all claims, losses, liability, expenses or damage which may raise out of the 1101 5th Street Owner's demolition and development of the Arts District Center, including, but not limited to Tenant's claims, losses, liability, expenses or damage in connection with structural and aesthetic repairs, noise, vibration, and Tenant's restricted access to Building.

8.      In the event Tenant's access to or use of the Premises is materially adversely impacted and the Premises cannot be used partially or in its entirety as a result of the demolition, shoring, foundation of 1101 5th Street Owner's building and/or the its development of new constructions, Tenant shall be entitled to one (1) day of Rent abatement for each day that the Premises cannot be used substantially or in its entirety.

9.      In the event that Landlord receives any information, notice, technical details, and/or documentation related to any demolition, shoring, foundation or other projects to be completed by the Arts District Center, Landlord shall immediately provide such information, notice, technical details, and/or documentation to Tenant.

10.     In the event that the 1101 5th Street Owner fails to provide drawings or documentation regarding any work relating to the Party Wall, in a form that is satisfactory to Tenant, within ninety (90) days of the mutual execution of the Lease, then Landlord's structural engineer and estimator, which structural engineer and estimator shall be subject to Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed, shall prepare a report summarizing the scope of work for the reinforcement of the Party Wall, at Landlord's sole cost and expense, within sixty (60) days after the end of such ninety (90) day period. In the event that the 1101 5th Street Owner fails to perform or negligently performs the work required by LADBS or any governing authority having jurisdiction over the Building or Premises, then Landlord shall perform all such reinforcement work (including, but not limited to, work relating to seismic and/or structural upgrades) at Landlord's sole cost and expense.

AG | AS
AG          AS

2

Landlord     Tenant

*Rider No. 1*

Exhibit A, page 64

11.      In the event that (i) the 1101 5th Street Owner fails to perform pursuant to the obligations set forth in the Easement Agreement or (ii) if any work performed by 1101 5th Street Owner triggers a required structural reinforcement of the Party Wall (such required work, the "**Structural Reinforcement Work**") and the 1101 5th Street Owner fails to perform the required Structural Reinforcement Work, Landlord agrees to perform all necessary Structural Reinforcement Work (including, but not limited to, work relating to seismic and/or structural upgrades) at Landlord's sole cost and expense. Landlord shall indemnify and hold harmless Tenant and its partners, members, successors, assigns, agents, representatives, officers, directors and employees from any and all claims, losses, liability, lost profits as a consequence of the interruption of Tenant's business, expenses or damage incurred (including, but not limited to, costs incurred in the rebuilding of pools, surge tanks, mechanical equipment, etc.) which may arise out of any Structural Reinforcement Work performed by Landlord. Such Structural Reinforcement Work shall conform with the current aesthetic characteristics of the Party Wall (industrial-vintage) and must be approved in advance by Tenant. If Tenant, in its sole discretion, determines that the solution or Structural Reinforcement Work proposed by Landlord is unsatisfactory, Tenant shall have the right to terminate the Lease no later than the date that is six (6) months after such proposal is presented to Tenant. If Tenant elects to exercise the foregoing termination right, the effective date of termination shall be thirty (30) days after the date Landlord receives Tenant's written notice, and Landlord shall return to Tenant, within five (5) business days of the effective date of termination, all security deposits and pre-paid rent and reimburse Tenant for all Lease Expenses (as defined in Section 2.2), including, but not limited to, legal fees, architect fees, permitting costs and construction fees.

12.      In the event that only (i) Tenant's Initial Buildout Work or (ii) only Tenant's use of the Premises for the Permitted Use triggers a required reinforcement of the Party Wall at any time after the mutual execution of this Lease, subject to the provisions of this Lease, Tenant shall be responsible for performing the necessary Structural Reinforcement Work (including, but not limited to, work relating to seismic and/or structural upgrades of the Party Wall) at Tenant's sole cost and expense.

*AG*

AG

*AS*

AS

Landlord      Tenant

*Rider No. 1*

Exhibit A, page 65

## EXHIBIT "A" TO RIDER NO. 1

**Easement Agreement**

[Pages to follow]

1

Landlord          Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 66

This page is part of your document - DO NOT DISCARD

**06 1756836**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
**08/08/06 AT 08:00am**

# TITLE(S) :

L E A D    S H E E T

FEE 



D.T.T.

CODE
20

CODE
19

CODE
9____

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.

Number of AIN's Shown

THIS FORM IS NOT TO BE DUPLICATED

2

*AG* | *AS*
AG | AS
Landlord | Tenant

**RECORDED BY:**
FIRST AMERICAN TITLE INSURANCE COMPANY
National Commercial Services
WHEN RECORDED MAIL TO:

SEATON STREET INVESTMENTS, LLC
929 EAST SECOND STREET
LOS ANGELES, CALIFORNIA 90012
ATTN: NORMAN SOLOMON

06 1756836

SPACE ABOVE THIS LINE RESERVED FOR RECORDER USE

## PARTY WALL AND EASEMENT AGREEMENT

APN

THIS INSTRUMENT FILED FOR RECORD BY FIRST AMERICAN
TITLE CO. OF L.A. AS AN ACCOMMODATION ONLY, IT HAS NOT
BEEN EXAMINED AS TO ITS EXECUTION OR AS TO ITS
EFFECT UPON TITLE.

**GLN 2518-21**

3

_AG_          _AS_
AG            AS
Landlord      Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 68

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Seaton Street Investments, LLC
929 East Second Street
Los Angeles, California 90012
Attn: Norman Solomon

## PARTY WALL AND EASEMENT AGREEMENT

This Party Wall and Easement Agreement ("**Agreement**") is entered into as of July 1, 2006, by and between Seaton Street Investments, LLC, a California limited liability company (the "**440 Seaton Owner**") on the one hand, and First & Center, LLC a California limited liability company and Orangethorpe Commerce Center, LLC, a California, limited liability company (collectively as tenants-in-common, the "**1101 5th Street Owner**") on the other hand, with reference to the following:

1.    **Recitals**.

1.1    **440 Seaton Property**. The 440 Seaton Owner is the owner of that certain real property commonly known as 440 Seaton Street, Los Angeles, California and described more fully on Exhibit "A"  (the "**440 Seaton Property**"), which is attached hereto and incorporated herein by this reference.

1.2    **1101 5th Street Property**. The 1101 5th Street Owner is the owner of that certain real property commonly known as 1101 East 5th Street, Los Angeles, California, and described more fully on Exhibit "B" (the "**1101 5th Street Property**"), which is attached hereto and incorporated herein by this reference.

1.3    **Party Wall**. The 1101 5th Street Property is located on land immediately adjacent to the 440 Seaton Property, and the respective buildings thereon are separated by and at points connected by an adjoining wall and associated support mechanisms or related items (the "**Party Wall**") extending approximately 250 linear feet, and the buildings are separated by separate adjacent walls for another approximately 50 linear feet. The Party Wall lies upon the 1101 5th Street Property. The Party Wall and the area of 1101 5th Street Property occupied by the Party Wall ("**Party Wall Easement Area**") are depicted on the site plan attached hereto as Exhibit "C," which is incorporated herein by this reference.

1.4    **Party Wall Use and Easement**. The parties hereto desire to enter into this Agreement to establish an easement and shared use agreement for the location, maintenance, repair, use and removal of the Party Wall and for a non-exclusive right of access to, from, over, under and across the Party Wall Easement Area to the Party Wall for the maintenance, repair, use and removal thereof ("**Party Wall Easement**").

[HAH:HAH/132850_2.DOC/070906/3068.022]          -1-          06 1756836

4

Landlord          Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 69

1.5    Subjacent and Lateral Support Easement. The 440 Seaton Owner has requested an easement for subjacent and lateral support relating to the building located on the 440 Seaton Property, and for a non-exclusive right of access across, over and under Party Wall Easement Area for the maintenance, repair, use and removal thereof ("**Subjacent and Lateral Support Easement**"). The 1101 5th Street Owner has agreed to grant the Subjacent and Lateral Support Easement to the 440 Seaton Owner on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and conditions hereafter set forth and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

2.    **Maintenance, Repair and Replacement of Party Wall**.

(a)    The Party Wall shall be used and maintained as a mutual party wall until such time as the 440 Seaton Owner elects to build a separate wall apart from the Party Wall separating and supporting the improvements on the 440 Seaton Street Property, and each party hereto shall, in accordance with the easements granted below, be licensed and permitted to enter upon the land and building of the other party, accompanied by a representative of the other party at all times, to make necessary repairs or replacements to the Party Wall in accordance with the terms of this Agreement, upon reasonable advance notice to the other party.

(b)    The 1101 5th Street Owner shall be responsible for maintaining and repairing in good order and condition, and replacing as needed from time to time, the Party Wall, at the 1101 5th Street Owner's sole cost and expense, except to the extent any damage or destruction of the Party Wall is caused by the gross negligence or willful misconduct of the 440 Seaton Owner, or its contractors, agents or representatives; provided, that the 440 Seaton Owner shall be entitled to use and maintain the side of the Party Wall facing the 440 Seaton Property in its reasonable discretion in connection with its ownership, use and maintenance of the improvements on the 440 Seaton Property.

(c)    The 1101 5th Street Owner shall maintain full replacement cost property damage insurance covering the Party Wall at all times, at the sole cost and expense of the 1101 5th Street Owner, and such insurance policy shall name the 440 Seaton Owner, and its members, partners or shareholders, and their respective successors and assigns, and the 440 Seaton Owner's lenders with interests in the 440 Seaton Property, as additional insureds to such insurance policy(ies). The 1101 5th Street Owner shall provide written evidence of such insurance from time to time upon the reasonable request of the 440 Seaton Owner.

(d)    The 440 Seaton Owner shall have the right, at any time and from time to time, to construct and maintain a separate wall located on its own property, separate and apart from the Party Wall, separating and supporting the improvements on the 440 Seaton Street Property, whereupon all easement or license rights of the 1101 5th Street Owner across, over, under and through the 440 Seaton Property for the purpose of accessing the Party Wall shall be terminated, and the portion of the Party Wall then immediately adjacent to such newly constructed wall on the 440 Seaton Property shall cease to be a Party Wall as defined herein.

[HAH:HAH/132850_2.DOC/070906/3068.022]          -2-          06 1756836

5

*AG*
Landlord

*AS*
Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 70

(e)    In the event that the 1101 5th Street Owner fails to adequately maintain and repair the Party Wall, from time to time, the 440 Seaton Owner shall have the right to provide a factually correct written notice to the 1101 5th Street Owner concerning such failure to adequately maintain or repair the Party Wall, and if the 1101 5th Street Owner does not (i) cure such failure within five (5) business days following the date of such notice, or (ii) commence and diligently prosecute such curative action as is appropriate within such five (5) business-day period, or (iii) object in good faith and with a reasonable basis to the referenced notice from the 440 Seaton Owner within such five (5) business-day period, then following such five (5) business day-period, the 440 Seaton Owner shall have the right to exercise self-help remedies to maintain, repair, and/or replace all or portions of the Party Wall as necessary from time to tome, and the 440 Seaton Owner shall have all necessary rights of access to, from and across the 1101 5th Street Property and the Party Wall Easement Area.  If the 440 Seaton Owner is forced to exercise its self-help rights hereunder, then the 1101 5th Street Owner shall be obligated to pay to and reimburse, the 440 Seaton Owner for all internal and third party costs for contractors, consultants, attorneys' fees, and any other expenses incurred by the 440 Seaton Owner in connection with its exercise of its self-help rights hereunder.  Notwithstanding anything to the contrary in the foregoing, however, the 440 Seaton Owner shall be entitled to immediate self-help rights as provided herein following any good faith attempted notice to the 1101 5th Street Owner in the case of emergencies with respect to the Party Wall.

3.    **Grant of Easement for Party Wall Subjacent Support**.  The 1101 5th Street Owner, as the burdened owner, hereby grants to the 440 Seaton Owner, as the benefited owner, an easement on, over, under and across the 1101 5th Street Property (to the extent reasonably necessary for the 440 Seaton Owner's enjoyment or preservation of its improvements situated upon the 440 Seaton Property) the Subjacent and Lateral Support Easement and the Party Wall Easement, for the installation, construction, restoration, replacement, modification, repair and maintenance of the following: (a) any reasonably necessary separate or common footings, girders, columns, braces, foundations, temporary and permanent tieback systems and other standard support elements as well as the Party Wall, as may be necessary for the structural, subjacent and lateral support of any improvements situated upon the 440 Seaton Property, and (b) the Party Wall as may be necessary for the structural support and enclosure of adjacent improvements on each of the 440 Seaton Property and the 1101 5th Street Property.

4.    **Grant of Reciprocal Easement for Party Wall Maintenance and Repairs**.  Each of the 440 Seaton Owner and the 1101 5th Street Owner hereby grants to the other an easement running with and appurtenant to the other's property, granting the non-exclusive right to use the grantor's property for access to and within the Party Wall Easement Area for the construction, use, maintenance, repair and replacement of the Party Wall, as necessary in accordance with this Agreement, from time to time, upon reasonable prior notice, and so long as any such access across an owner's property is accompanied by a representative of the owner across whose property the easement right is being exercised.

5.    **Indemnity**.  The 1101 5th Street Owner shall indemnify, defend, and hold harmless the 440 Seaton Owner, and its trustees, beneficiaries, partners, members, successors, assigns, agents, representatives, officers, directors and employees from any and all claims, losses, liability, expenses or damage which may arise out of the maintenance, repair, replacement, or removal of the Party Wall in accordance with this agreement, except to the extent caused by the intentional

[HAH:HAH/132850_2.DOC/070906/3068.022]          -3-          06 1756836

6

or willful misconduct of the 440 Seaton Owner. Each of the parties hereto (each an **"Indemnifying Party"**) shall indemnify, defend, and hold harmless the other party, and its trustees, beneficiaries, partners, members, successors, assigns, agents, representatives, officers, directors and employees (collectively, **"Indemnified Party"**) from any and all claims, losses, liability, expenses or damage which arise out of or directly relate to (a) the use by such Indemnifying Party of the Party Wall, and (b) the exercise or use by the Indemnifying Party of the easement rights granted hereunder to and for the benefit of the Indemnifying Party.

6. **General Provisions**.

   6.1  **Successors and Assigns**. This Agreement shall run with the land and be binding on all successors, assigns; provided that each of the 440 Seaton Owner and the 1101 5th Street Owner shall from time to time be relieved of any liability hereunder from and after the date of conveyance or transfer of their interests in their respective properties, as the case may be, except for accrued and unperformed obligations or liabilities existing at the time of such transfer.

   6.2  **Integration**. This Agreement constitutes the entire agreement between parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements with respect to the subject matter hereof.

   6.3  **Authority of Signatories of Agreement**. Each person executing this Agreement represents and warrants that he or she is duly authorized and has the legal capacity to execute and deliver this Agreement on behalf of the parties for which execution is made. Each party represents and warrants to the other that the execution of this Agreement and the performance of such party's obligations hereunder have been duly authorized and that this Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

   6.4  **Notices**. All notices permitted or required hereunder shall be effective upon personal delivery or upon being sent by registered or certified mail, postage fully prepaid, addressed to the respective parties at the respective property addresses set forth below, or as otherwise provided in writing to each party hereto from time to time.

|  |  |
|---|---|
| If to 440 Seaton Owner: | Seaton Street Investments, LLC<br>929 East Second Street<br>Los Angeles, California 90012<br>Attn: Norman Solomon<br>Facsimile: 213-687-3314 |
| If to 1101 5th Street Owner: | First & Center, LLC<br>929 East Second Street<br>Los Angeles, California 90012<br>Attn: Norman Solomon<br>Facsimile: 213-687-3314 |
| With a Copy to: | Orangethorpe Commerce Center, LLC<br>929 East Second Street<br>Los Angeles, California 90012 |

[HAH:HAH/132850_2.DOC/070906/3068.022]            -4-            06 1756836

7

AG ____  |  AS ____
AG        AS
Landlord     Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 72

Attn: Norman Solomon

6.5 **Governing Law**. This Agreement shall be construed according to the laws of the State of California.

6.6 **Further Assurances**. Each of the parties hereto shall execute and deliver at their own cost and expense, any and all additional papers, documents, or instruments, and shall do any and all acts and things reasonably necessary or appropriate in connection with the performance of their respective obligations hereunder in order to carry out the intent and purposes of this Agreement.

6.7 **Attorneys' Fees**. If any action, arbitration or proceeding be commenced (including an appeal thereof) to enforce any of the provisions of this Agreement or to enforce a judgment, whether or not such action is prosecuted to judgment ("**Action**"), (a) the unsuccessful party therein shall pay all costs incurred by the prevailing party therein, including reasonable attorneys' fees and costs, court costs and reimbursements for any other expenses incurred in connection therewith, and (b) as a separate right, severable from any other rights set forth in this Agreement, the prevailing party therein shall be entitled to recover its reasonable attorneys' fees and costs incurred in enforcing any judgment against the unsuccessful party therein, which right to recover post-judgment attorneys' fees and costs shall be included in any such judgment. The right to recover post-judgment attorneys' fees and costs shall (1) not be deemed waived if not included in any judgment, (2) survive the final judgment in any Action, and (3) not be deemed merged into such judgment. The rights and obligations of the parties under this Section 6.7 shall survive the termination of this Agreement.

[Signatures on Following Page]

[HAH:HAH/132850_2.DOC/070906/3068.022]                -5-                **06  1756836**

08 / 03 / 06

8

AG _____   AS _____
Landlord       Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 73

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth hereinabove.

"110l5TH STREET OWNER"

First & Center, LLC,
a California limited liability company

By: _____
Name: ___Norman  Solomon___
Title: _____Manager_____

Orangethorpe Commerce Center, LLC,
a California limited liability company

By: _____
Name: ___Norman  Solomon___
Title: _____Manager_____

"440 SEATON OWNER"

Seaton Street Investments, LLC,
a California limited liability company

By: _____
Name: ___Norman  Solomon___
Title: _____Manager_____

[HAH:HAH/132850_2.DOC/070906/3068.022]                    -6-

06 1756836

9

AG _____    AS _____
Landlord        Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 74

*q*

State of California    )
                       ) ss.
County of Los Angeles  )

On August 7, 2006 (date) before me, ANN PHAM _____ (name and title "Notary Public"), personally appeared NORMAN SOLOMON (name of signer(s)), personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(signature of Notary)

```
ANN PHAM
Commission # 1478506
Notary Public - California
Los Angeles County
My Comm. Expires Mar 23, 2008
```
(seal of Notary)


State of California    )
                       ) ss.
County of Los Angeles  )

On August 7, 2006 (date) before me, ANN PHAM _____ (name and title "Notary Public"), personally appeared NORMAN SOLOMON (name of signer(s)), personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
(signature of Notary)

```
ANN PHAM
Commission # 1478506
Notary Public - California
Los Angeles County
My Comm. Expires Mar 23, 2008
```
(seal of Notary)

[HAH:HAH/132850_2.DOC/070906/3068.022]          .7.          **06 1756836**

AG          AS
—          —
Landlord    Tenant

*Exhibit A to Rider No. 1*

Exhibit A, page 75

10

*10*

State of California        )
                          ) ss.
County of Los Angeles      )

On AUGUST 7, 2006 (date) before me, __ANN PHAM__ (name and title "Notary Public"), personally appeared __NORMAN SOLOMON__ (name of signer(s)), personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

```
ANN PHAM
Commission # 1478506
Notary Public - California
Los Angeles County
My Comm. Expires Mar 23, 2008
```

_____
(signature of Notary)                                    (seal of Notary)

08/08/06

[HAH:HAH/132850_2.DOC/070906/3068.022]        -8-        06 1756836

11

## EXHIBIT "A"

### LEGAL DESCRIPTION OF 440 SEATON OWNER'S PROPERTY

Real property in the City of Los Angeles, County of Los Angeles, State of California,
described as follows:

Lot 11 and Lots 13 though 18 inclusive in Block "C" of F.P. Howard and Co's
Subdivision of the Bliss Tract, in the city of Los Angeles, as per map recorded in Book
12 Page 42 of Miscellaneous Records, in the office of the county recorder of said county.

APN: 5163-025-008 and 5163-025-006

A-1

06 1756836

*AG*    *AS*
AG      AS
Landlord  Tenant

12

*Exhibit A to Rider No. 1*

Exhibit A, page 77

## EXHIBIT "B"

### LEGAL DESCRIPTION OF 1101 5TH STREET PROPERTY

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

Lots 19 through 24 inclusive in Block "C" of F. P. Howard and Co's Subdivision of the Bliss Tract, in the city of Los Angeles, as per map recorded in Book 12 Page 42 of Miscellaneous Records, in the office of the county recorder of said county.

APN: 5163-025-009

B-1

06 1756836

Landlord    Tenant

*Exhibit A to Rider No. 1*

13

Exhibit A, page 78

13

**EXHIBIT "C"**

**PARTY WALL EASEMENT AREA**

[attached]

06 1756836

[HAH:HAH/132850_2.DOC/070906/3068.022]          C-1

*AG*          |  *AS*
AG              AS
Landlord        Tenant

14

*Exhibit A to Rider No. 1*

Exhibit A, page 79



15

*Exhibit A to Rider No. 1*

# Exhibit A, page 80

## ENVIRONMENTAL REMEDIATION

### RIDER NO. 2 TO LEASE

This Rider No. 2 is made and entered into by and between SEATON INVESTMENTS, LLC, ("**Landlord**"), and AIRE Ancient Baths Los Angeles, LLC, a California limited liability company ("**Tenant**"), as of the day and year of the Lease between Landlord and Tenant to which this Rider is attached. Landlord and Tenant hereby agree that, notwithstanding anything contained in the Lease to the contrary, the provisions set forth below shall be deemed to be part of the Lease and shall supersede any inconsistent provisions of the Lease. All references in the Lease and in this Rider to the "Lease" shall be construed to mean the Lease (and all Exhibits and Riders attached thereto), as amended and supplemented by this Rider. All capitalized terms not defined in this Rider shall have the same meaning as set forth in the Lease.

1.      Landlord has provided Tenant with notice that certain Hazardous Substances, i.e., methane, that may exist in and/or under the Premises. In the event that Tenant's Initial Buildout Work requires environmental remediation, the parties agree that Landlord shall, at Landlord's expense, remediate same. Notwithstanding the foregoing, Tenant shall be responsible for any remediation necessary by its excavation of the ground under the Premises for the construction of pools, specifically, any methane remediation.

2.      Landlord and its successors and assigns shall indemnify, defend, reimburse and hold Tenant, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Tenant taking possession or which are caused by any act or omissions of Landlord, its agents or employees, or relative to any breach by Landlord of the above representation. Landlord's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. Landlord shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Tenant taking possession, unless such remediation measure is required as a result of Tenant's use of the Premises, in which event Tenant shall be responsible for such payment.

3.      In the event Tenant's use of the Premises is materially adversely impacted as a result of the presence of any preexisting Hazardous Substances and/or the remediation of any preexisting Hazardous Substances, Tenant shall receive an abatement of Rent for every day that the Premises cannot be used partially or in its entirety.

4.      If Tenant determines that it is not economically feasible to pursue or obtain remediation of any Hazardous Substances or the permit(s) required for such remediation, then Tenant shall have the right to terminate this Lease upon written notice to Landlord. If this Lease is terminated pursuant to this Rider No. 2, then, on or prior to such termination date Tenant shall vacate and surrender possession of the Premises to Landlord in accordance with the surrender provisions of this Lease and, from after such termination date, promptly following such vacation by Tenant, Landlord shall return all Security Deposits and pre-paid rent to Tenant and neither party

Landlord      Tenant

*Rider No. 2*

Exhibit A, page 81

shall have any further liability or obligations to the other under this Lease, other than those that accrued under this Lease on or prior to such termination date or that expressly survive termination of this Lease.

AG
Landlord

AS
Tenant

*Rider No. 2*

Exhibit A, page 82

**<u>NEIGHBORING PROJECTS</u>**

**RIDER NO. 3 TO LEASE**

     This Rider No. 3 is made and entered into by and between SEATON INVESTMENTS, LLC ("**Landlord**"), and AIRE Ancient Baths Los Angeles, LLC, a California limited liability company ("**Tenant**"), as of the day and year of the Lease between Landlord and Tenant to which this Rider is attached. Landlord and Tenant hereby agree that, notwithstanding anything contained in the Lease to the contrary, the provisions set forth below shall be deemed to be part of the Lease and shall supersede any inconsistent provisions of the Lease. All references in the Lease and in this Rider to the "Lease" shall be construed to mean the Lease (and all Exhibits and Riders attached thereto), as amended and supplemented by this Rider. All capitalized terms not defined in this Rider shall have the same meaning as set forth in the Lease.

    1.  In the event that Landlord receives any information, notice, technical details, and/or documentation related to any demolition, shoring, foundation or other projects to be completed by or in any neighboring projects or developments, Landlord shall use best efforts to promptly provide such information, notice, technical details, and/or documentation to Tenant.

*AG*
AG
Landlord

*AS*
AS
Tenant

*Rider No. 3*

Exhibit A, page 83

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is

SHEMANOLAW
1801 Century Park East, Suite 2500
Los Angeles, CA  90067.

A true and correct copy of the foregoing document **OPPOSITION OF AIRE ANCIENT BATHS LOS ANGELES, LLC TO MOTION OF DEBTOR SEATON INVESTMENTS, LLC, FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO POSTPETITION LEASE; DECLARATION OF AMADEO SERRA SOLANA** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 9, 2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email address stated below:

- Scott R Albrecht    salbrecht@gsaattorneys.com, jackie.nguyen@sgsattorneys.com
- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com
- Jacquelyn H Choi    jacquelyn.choi@rimonlaw.com, docketingsupport@rimonlaw.com
- Carol Chow    Carol.Chow@saul.com, hannah.richmond@saul.com,easter.santamaria@saul.com
- Robert F Conte    robert.conte@usdoj.gov, caseview.ecf@usdoj.gov;usacac.tax@usdoj.gov
- Ryan Coy    ryan.coy@saul.com, hannah.richmond@saul.com;Shelly.Guise@saul.com;LitigationDocketing@saul.com
- Christopher Cramer    secured@becket-lee.com
- Turner Falk    turner.falk@saul.com, tnfalk@recap.email
- Michael G Fletcher    mfletcher@frandzel.com, sking@frandzel.com
- Todd S. Garan    ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
- Richard Girgado    rgirgado@counsel.lacounty.gov
- Jacqueline L James    jjames@hrhlaw.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Avi Edward Muhtar    amuhtar@crownandstonelaw.com
- Bruce D Poltrock    bpoltrock@frandzel.com, achase@frandzel.com
- Paige Selina Poupart    ppoupart@frandzel.com, achase@frandzel.com
- Zev Shechtman    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul.com
- David B Shemano    dshemano@shemanolaw.com
- Derrick Talerico    dtalerico@wztslaw.com, maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Garrick Vanderfin    gvanderfin@polsinelli.com, zyoung@Polsinelli.com;ladocketing@polsinelli.com
- Gerrick Warrington    gwarrington@frandzel.com, achase@frandzel.com
- Jennifer C Wong    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**:

On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____,, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 9, 2024 | David B. Shemano | /s David B. Shemano |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.