1   Derrick Talerico (State Bar No. 223763)
    dtalerico@wztslaw.com
2   David B. Zolkin (State Bar No. 155410
    dzolkin@wztslaw.com
3   WEINTRAUB ZOLKIN TALERICO & SELTH LLP
    11766 Wilshire Boulevard, Suite 730
4   Los Angeles, CA 90025
    Telephone: (424) 500-8552
5

6

7   Counsel to Debtor Broadway Avenue
    Investments, LLC; Seaton Investments, LLC

8

9

10              **UNITED STATES BANKRUPTCY COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

12

13  In re:                              | Lead Case No. 2:24-bk-12079-VZ

14  SEATON INVESTMENTS, LLC, *et al.*,  | Jointly Administered with Case Nos.:
                                         | 2:24-bk-12080-VZ; 2:24-bk-12081-VZ;
15          Debtors and Debtors In Possession. | 2:24-bk-12082-VZ; 2:24-bk-12091-VZ;
                                         | 2:24-bk-12074-VZ; 2:24-bk-12075-VZ and
16  ──────────────────────────────      | 2:24-bk-12076-VZ

17  ☐ Affects All Debtors.              | Chapter 11

18  ☒ Affects Seaton Investments, LLC

19  ☐ Affects Colyton Investments, LLC  | **REPLY TO:**
                                         | **(I) ARCHWAY BROADWAY LOAN**
20  ☒ Affects Broadway Avenue Investments, LLC | **SPE, LLCS OPPOSITION TO DEBTOR**
                                         | **IN POSSESSION BROADWAY AVENUE**
21  ☐ Affects SLA Investments, LLC      | **INVESTMENTS, LLCS MOTION FOR**
                                         | **ORDER AUTHORIZING DEBTOR TO**
22  ☐ Affects Negev Investments, LLC    | **ENTER INTO POST-PETITION LEASE**
                                         | **[Dkt. 330];**
23  ☐ Affects Alan Gomperts            | **(II) ARCHWAY BROADWAY LOAN**
                                         | **SPE, LLCS OPPOSITION TO DEBTOR**
24  ☐ Affects Daniel Halevy            | **IN POSSESSION BROADWAY AVENUE**
                                         | **INVESTMENTS, LLCS MOTION FOR**
25  ☐ Affects Susan Halevy             | **ORDER AUTHORIZING DEBTOR TO**
                                         | **ENTER INTO POST-PETITION**
26                                       | **FINANCING [Dkt. 331]; AND**
                                         | **(III) KORTH DIRECT MORTGAGES**
27                                       | **OBJECTION TO DEBTOR SEATON**

28

*(left margin, vertical text)* WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**INVESTMENT, LLCS MOTION TO ENTER INTO POST-PETITION LEASE AND MOTION TO ENTER INTO POST-PETITION FINANCING [Dkt. 333]**

Hearing:
Date:          December 12, 2024
Time:         11:00 a.m.
Crtrm:        1368
                    255 E. Temple Street
                    Los Angeles, CA 90012

Debtors, Broadway Avenue Investments, LLC ("Broadway") and Seaton Investments, LLC ("Seaton") hereby file this *Reply* (the "Reply") to the:

(i) *Opposition of Archway Broadway Loan SPE, LLC* ("Archway") [Dkt. 330] to the *Motion of Debtor and Debtor in Possession Broadway Avenue Investments, LLC for Order Authorizing Debtor to Enter into Post-Petition Lease Pursuant to 11 U.S.C. § 363* ("Broadway Lease Motion") [Dkt. 310] ;

*(ii)* Archway's *Opposition* [Dkt. 331] to the *Motion of Debtor and Debtor in Possession Broadway Avenue Investments, LLC for Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364* [Dkt. 307] ("Broadway Financing Motion"); and

*(iii) Objection* ("KDM Opposition") *of Korth Direct Mortgage Inc.* ("KDM") [Dkt. 333] to the *Motion of Debtor and Debtor in Possession Seaton Investments, LLC for Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364* ("Seaton Financing Motion") [Dkt. 312] and *Motion of Debtor and Debtor in Possession Seaton Investments, LLC for Order Authorizing Debtor to Enter into Post-Petition Lease Pursuant to 11 U.S.C. § 363* ("Seaton Lease Motion") [Dkt. 314].

Archway misleads the Court. The Opposition reads like a gossip rag, misrepresenting facts and circumstances and suggesting half-baked conspiracies. Although much of what Archway wants the Court to focus on is irrelevant or ancillary to the Debtor, Broadway will address these issues to the extent needed to clear the air. The KDM Opposition raises fair concerns. The bottom line is that entering into the Broadway Lease and the Seaton Lease is well within the respective debtors'

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

1    business judgment, doing so is in the best interest of the estates and their creditors, and Archway's

2    and KDM's interests in the Broadway and Seaton Properties are adequately protected.

3

4    **LEGAL STANDARD TO APPROVE ARCHWAY LEASE AND SEATON LEASE**

5    Archway has launched a scorched-earth assault on the Debtor's efforts to reorganize.

6    Archway surely knows that the standard under Section 363(b)(1) is whether entering into the Lease

7    is within the Debtor's business judgment. So Archway seeks to elevate the Debtor's burden to

8    require findings of good faith, the best interest of the estate, fairness, and sweeping disclosure.

9    That's not to say that these heightened standards are irrelevant in approving the Lease – but they

10   are not the Debtor's specific burden on approval of its Motion.

11   Indeed, it may be that Archway reviewed the Collier's discussion on the business judgment

12   standard for Section 363(b)(1), that describes the history of the 363 standard to approve a <u>sale</u>

13   outside of the ordinary course of business and decided that standard more favorable for its purposes

14   here. "Some earlier decisions describe the standard as one of 'good faith' or of whether the

15   transaction is 'fair and equitable.' *See, e.g., In re Phoenix Steel Corp.*, 82 B.R. 334 (Bankr. D. Del.

16   1987)." 3 Collier on Bankruptcy P 363.02. But Collier provides the current state of the law as

17   follows:

18           However, the more recent cases tend to focus on whether a sale is supported
             by a sound business reason and is based on a sound exercise of business
19           judgment…[where] the bankruptcy court reviews the trustee's (or debtor in
             possession's) business judgment to determine independently whether the
20           judgment is a reasonable one. The court should determine only whether the
             trustee's judgment was reasonable and whether a sound business
21           justification exists supporting the sale and its terms." *Id.* (citations omitted).

22

23   This is not to say that heightened and more specific standards are not relevant if Archway can

24   establish a lack of good faith, fairness, disclosure, etc., but these standards are not the Debtor's

25   burden to meet. The Lease is not an insider transaction that calls for heightened scrutiny and is

26   appropriately judged on the Debtor's exercise of its sound business judgment.

27   KDM also does not get the 363(b)(1) standard quite right for approval of a lease. As did

28   Archway, KDM cites to cases specific to approval of an asset sale where courts have held that a

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

sale to which creditors object should be found to provide "optimal value" for the estate and its creditors. Judging "optimal" value on a sale, that would typically result in a fixed amount of money coming into the estate versus a long-term lease that is the backbone of continued operations as a going concern and plan payments, is a different prospect. KDM suggests "optimal value" may be a higher standard then business judgment. But here, the proposed leases must be judged in their context – joint debtors proposing to pay Archway and KDM in full on the backs of valuable long-term leases that have evaded the debtors for years.

Nevertheless, the Leases are all of these things. It's what they need to be – an exercise of sound business judgment; and what Archway proposes it to be – proposed in good faith, on fair terms, in the interest of the estate, and made with adequate disclosure; and what KDM proposes it to be – providing optimal value for creditors.

Ever since The GAP terminated its lease in March of 2020 as COVID swept the world, the Broadway Debtor has employed extreme diligence to locate a replacement tenant and other tenants to lease-up the Broadway Property. Broadway has searched for quality tenants for years and engaged several brokerage firms looking for tenants of all sorts: large, small, commercial, industrial, professional and everything in between. COVID and changing times have destroyed the once burgeoning market for alternative and shared-work and large commercial tenants that were once prime tenants for the Broadway and Seaton properties. Nothing has landed, until now.

Broadway first began exploring and diligencing a long-term lease with a healthcare provider close to a year ago. Those efforts significantly advanced around the time these cases commenced and since then Broadway has spent countless hours negotiating and fine-tuning an engagement with a healthcare provider that makes business sense and will transform a property on the verge of economic irrelevance into a sound business operation.

Seaton has employed similar efforts to locate tenants since WeWork abandoned its plans to lease out the space now proposed for Levav. Seaton/Colyton also employed several brokers including Urban Lime – the broker who placed AireSpa at the Colyton property. Seaton is now the fortunate beneficiary of the work and effort Broadway put into diligence, development, and negotiations for its healthcare facility. With high demand for its services in the downtown Los

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

Angeles area, Levav is confident it will be equally successful with operating a healthcare facility at Seaton as it will at Broadway.

As demonstrated by the maps and drawings attached as Exhibit 1 to the Gomperts Declaration, the building access points for Levav and AireSpa are on opposite sides of a city block. There is a shared employee-only parking lot from which employees will enter their respective buildings from a shared employee-only atrium. Furthermore, the architect Tima Bell (also a tenant at Colyton), who is likely to be engaged by Levav for facility build-out, has examined the buildings and determined that the proposed use by Levav would not interfere with AireSpa's quiet use of its facility considering the separate walls and other barriers between the buildings. AireSpa is the most important tenant at the Seaton/Colyton properties. Colyton has invested significant time and money working with AireSpa to deliver on its lease obligations and to ensure AireSpa has the facilities tenant experience it expects. Making sure AireSpa will have "quiet enjoyment" of its premises was a primary concern for the Seaton/Colyton debtors when considering whether it would make sense for Levav to rent at the properties. Once satisfied that Levav could operate at the Seaton/Colyton properties without disturbing AireSpa did Seaton move forward with leasing plans with Levav. Nothing in the AireSpa lease prevents Seaton from leasing to Levav. Nevertheless, the debtors actively engaged with AireSpa to inform them of the possibility of leasing to Levav to provide them insight on the Levav lease and the opportunity to satisfy any concerns they might have.

Archway also argues that it is not afforded adequate protection of its interest in the Property to allow for the Broadway Lease to be approved. To the contrary, adequate protection is overwhelming. The Broadway Lease provides Archway with adequate protection in the following forms: (1) it is accompanies by a DIP Loan that commits at least $2 million (and potentially more as needed) directly into the Broadway Property in various improvements; (2) the 15 year Broadway Lease establishes a property value based upon a full-building lease; and (3) the Broadway Lease is the basis for plan payments to Archway. If the Broadway Lease is approved, the value of the Broadway Property will increase dramatically. The value of the Broadway Property with the Broadway Lease can be calculated based upon an annual 8-cap multiple of rent, which Broadway estimates would equate to a value of $30 million once stabilized. Broadway estimates the Broadway

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Property may not be worth more than $7 - $8 million. With the Broadway Lease in place, the value of Broadway Property would at least triple in value.

## OTHER LEASE ISSUES

### I. Zoning and Use

Zoning is not an issue. The proposed healthcare facilities are appropriately zoned for out-patient use. The Seaton building has a full certificate of occupancy. The first floor of the Broadway building can be occupied by Levav immediately. The operations management team is working with Los Angeles City officials to ensure all occupancy and use requirements are compliant and approved.

KDM has questioned whether the proposed healthcare facility is incompatible with the mix of tenants at the Seaton and Colyton properties, fearing that servicing homeless clients or those with mental health issues could devalue the properties and risk defaulting with other tenants. AireSpa, an anchor tenant in the Seaton/Colyton properties has also filed an opposition the Seaton Lease, expressing concerns as raised by KDM and Archway. As demonstrated by the maps and drawings attached to the Gomperts Declaration, the building access points for Levav and AireSpa are on opposite sides of a city block. There is a shared employee-only parking lot from which employees will enter their respective buildings from a shared employee-only atrium. Furthermore, the architect Tima Bell (also a tenant as Colyton), who is likely to be engaged by Levav for facility build-out, has examined the buildings and determined that the proposed use by Levav would not interfere with AireSpa's quiet use of its facility considering the separate walls and other barriers between the buildings.

### II. Appropriate Expertise

The three healthcare facilities operated by Levav establish the expertise needed to successfully operate the facilities planned for Broadway and Seaton. Bellflower Post Acute, El Rancho Vista Healthcare Center, and Long Beach Post Acute are not "nursing homes" as may be commonly understood to mean elder care. None of these facilities are described as a "nursing home." They are behavioral health facilities that provide post-acute nursing care and behavioral

health care, and in the case of Long Beach, also treat substance abuse. Post-acute nursing care can include elder care. Bellflower and El Rancho Vista are about evenly split between elder care and non-elder behavioral health care. Long Beach focuses its operations more on behavioral health and substance abuse. Ari Stock is also a part-owner of Action Family Counseling, Inc., which operates an alcohol and drug treatment program. Levav's and Ari Stock's experience demonstrate their capability to organize and operate the proposed healthcare facilities at the Broadway and Seaton properties.

III.  No Requirement for Specialized Government Subsidies

The Debtors and Levav have discussed how certain available government grants and other subsidies would be available to the Debtor for reimbursement on certain facility build-out and to Levav for certain care and treatment provided. This is reference to specialized programs that can increase the profitability of Levav's operations. This does not refer to customary medical receivables from Medicare or Medical or from private insurance companies. Levav will be dependent upon customary payment from these sources for the services provided

IV.  David Schwarcz

David's role in the healthcare project that would operate at the Broadway and Seaton properties has always been that of a broker/promoter putting together the people and entities needed to execute on a healthcare facility offering the right mix of services to benefit the community in which it operates, operate profitably, and qualify for government subsidies and other incentives. As part of assembling these projects, David offered DMB, a non-profit which David formed in 2007 in which he held a position as CEO, to serve as the qualified non-profit needed for Levav to apply for government incentives. In diligencing the project and the related contracts and obligations of the debtors, Alan Gomperts learned of David's disbarment and other legal proceedings. He addressed them directly with David. After hearing David's explanation of these circumstances, he determined that these past occurrences would not interfere or negatively impact David's role as a broker/promoter of the healthcare facility. As to David's role as CEO of DMB, Alan understood that David had no active role with DMB and received no income or other compensation from DMB (nor would he as a result of the healthcare operations). Months ago, Alan asked David if he could

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

1    remove himself as an officer of DMB to avoid any perceived distraction that might result from his

2    direct involvement with DMB. David readily agreed. Although David gave up his executive title, a

3    filing with the Secretary of State to reflect this change (although not required to effectuate this

4    change) was not filed until recently.

5        V.  Levav and Arohn (Ari) Stock

6        Ari Stock is a respected businessman and operator of three successfully healthcare facilities.

7    Archway seeks to impugn his character by harping on an $11,000 default judgment that may or

8    may not be against him and litigation brought by a prior and separate business of his (Wells

9    Advance) to enforce its contracts. As set forth in his attached declaration, Ari was not aware of this

10   years-old default judgment until it was brough to him attention as a result of Archway's accusations.

11   He doubts this default judgment is in fact against him, as it appears to be held by JPMorgan Chase,

12   with whom he has an active and significant banking relationship to this day. Wells Advance was a

13   merchant cash advance provider that sued to collect on a personal guaranty, which was met with an

14   aggressive and baseless countersuit that was favorably settled for Wells Advance.

15       Archway goes on in its "sleuthing" to connect Ari with David (suggesting a nefarious

16   relationship) through David's cousin Eli Schwarcz. As chance would have it, Ari and Eli (also a

17   healthcare professional) explored a business opportunity together in 2021 and to that end formed a

18   company together – Tipul Group. That opportunity never got off the ground and Ari and Eli are not

19   in business together. In fact, until last week, Ari and David were not aware that Ari and Eli even

20   knew each other and the same is true for Ari and Eli having no knowledge of Ari and David knowing

21   each other.

22       Ari Stock and Levav have been in the healthcare industry for well over a decade. Under

23   Ari's guidance, Levav operates three healthcare facilities that makes them proven operators for the

24   facility proposed for Broadway and Seaton. Ari and Levav stand ready to execute on a sophisticated

25   and professional healthcare facility that will result in fifteen years or more of stable tenancy for

26   both Broadway and Seaton. Archway's mud-slinging is nothing more than an aggressive and

27   irresponsible tactic to improve its negotiating leverage on plan terms with Broadway.

28   / / /

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

VI.  Zenith and Steve Bombola

Steve Bombola is the managing member of Zenith Healthcare Management, LLC ("Zenith"). Zenith is in the business of providing management services to healthcare providers. Zenith will manage the medical and social services to be provided by Levav, handling all financial aspects of the operations including on-site management of personnel, reimbursements from state and federal insurance or other sources of reimbursement for the services to be provided by Levav (collectively, the "Services"). Levav will engage Zenith to provide the Services.

Initially, Zenith did not contemplate being a lessee on the lease with Levav. Broadway requested Zenith be a responsible party on the Lease to demonstrate to Archway the commitment of the parties involved in the success of the healthcare facility. Zenith agreed at first to be a guarantor on the Lease and then later to be a direct lessee. After learning that Archway did not want Zenith to be a lessee, Zenith agreed to be removed, as it was only ever proposed to be a lessee for Archway's benefit. Zenith otherwise has no direct relationship with Broadway. Zenith and Bombola nevertheless explain their involvement with a receivership litigation in Oklahoma which Archway casts as cause to reject the Lease.

**DIP LOAN ISSUES**

I. Origination Fee.

Archway and KDM query where the payment for the respective $240,000 origination fees will be paid. They will be paid from the proceeds of their respective loans.

II. Priming Archway's Lien on Rents

Archway declares that it holds a lien on reimbursements received by Broadway on account of improvements made to the Broadway Property because such reimbursements derive from the property itself. But any such reimbursements derive not from the property per se as they do Levav's proposed use of the property. Without Levav's qualifying use for the property, there is no reimbursement. Archway has not established that the DIP Loan would prime its lien on rents. But if the proposed lien for the DIP lender does prime Archway, the issue is easily avoided as Levav and the DIP lender are amenable to removing the reimbursement term from the Broadway Lease and assigning any such reimbursement directly to Levav (to pay to the DIP lender on the DIP Loan

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

balance) or directly to the DIP lender. Alternatively, Broadway would seek to prime Archway as to the expense reimbursement funds only, which would have no negative impact on Archway's collateral, as without the DIP Loan, the expense reimbursement funding does not exist.

III. Representations Regarding Leases

The proposed DIP lender has agreed the representation on a right of first refusal and free and clear ownership of personal property may be eliminated from the loan agreement.

IV. Repaying the DIP Loans at Maturity

The Debtors anticipate repaying the DIP Loans with proceeds from government reimbursement, payment by Levav to the extent government reimbursement fails, unused loan proceeds (if any), or rent proceeds in excess of plan needs. To the extent the balance of either of the DIP Loans cannot be repaid from these sources, the DIP lender has agreed to extend the term of the DIP Loans upon request or the Debtor's will refinance the balance of DIP Loans.

## NOTICE AND SERVICE

Notice and service of the lease and DIP motions were appropriate. Every party that was entitled to notice received notice.

## CONCLUSION

Entering into the Broadway Lease and the KDM Lease are well within the respective debtor's business judgment. The concerns raised by Archway and KDM are either non-issues, misunderstandings, or have otherwise been addressed. The Leases should be approved. The DIP Loans are favorable loans that will put millions of dollars into the Broadway and Seaton properties and support their successful reorganizations. The DIP Loans should be approved.

Dated:  December 9, 2024          **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

By: _/s/ Derrick Talerico_
          Derrick Talerico
          Counsel to Debtor Broadway Avenue Investments, LLC,
          and Seaton Investments, LLC

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DEBTORS REPLY RE MOTIONS TO APPROVE LEASE AND OBTAIN FINANCING

**ALAN GOMPERTS DECLARATION**

1

## DECLARATION OF ALAN D. GOMPERTS

2
I, Alan D. Gomperts, hereby declare as follows:

3
1.      I am a manager of Broadway Avenue Investments, LLC ("Broadway") and I am the

4
managing member of Seaton Investments, LLC ("Seaton"), debtors and debtors in possession in

5
these jointly administered Chapter 11 cases.

6
2.      I have been intimately involved in business investment and ventures with my brother-

7
in-law Daniel Halevy, mother-in-law Susan Halevy, and now deceased father-in-law David Halevy

8
for decades, including all of the corporate Debtors.  As such, I am familiar with the management,

9
operations, finances, and books and records of the corporate Debtors.

10
3.      Ever since The GAP terminated its lease in March of 2020 as COVID swept the

11
world, the Broadway Debtor has employed extreme diligence to locate a replacement tenant and

12
other tenants to lease-up the Broadway Property. Broadway has searched for quality tenants for years

13
and engaged several brokerage firms looking for tenants of all sorts: large, small, commercial,

14
industrial, professional and everything in between. COVID and changing times have destroyed the

15
once burgeoning market for alternative and shared-work and large commercial tenants that were

16
once prime tenants for the Broadway and Seaton properties. Nothing has landed, until now.

17
4.      Broadway first began exploring and diligencing a long-term lease with a healthcare

18
provider close to a year ago. Those efforts significantly advanced around the time these cases

19
commenced and since then Broadway has spent countless hours negotiating and fine-tuning an

20
engagement with a healthcare provider that makes business sense and will transform a property on

21
the verge of economic irrelevance into a sound business operation.

22
5.      If the Broadway Lease is approved, the value of the Broadway Property will increase

23
dramatically. The value of the Broadway Property with the Broadway Lease can be calculated based

24
upon an annual 8-cap multiple of rent, which Broadway estimates would equate to a value of $30

25
million once stabilized. I believe that with the current market conditions, and the empty Broadway

26
building, the Broadway Property may not be worth more than $7 - $8 million. With the Broadway

27
Lease in place, the value of Broadway Property would at least triple in value.

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

6.      Seaton has employed similar efforts to locate tenants since WeWork abandoned its plans to lease out the space now proposed for Levav. Seaton/Colyton also employed several brokers including Urban Lime – the broker who placed AireSpa at the Colyton property. Seaton is now the fortunate beneficiary of the work and effort Broadway put into diligence, development, and negotiations for its healthcare facility.

7.      As demonstrated by the maps and drawings attached as <u>Exhibit 1</u>, the building access points for Levav and AireSpa are on opposite sides of a city block. There is a shared employee-only parking lot from which employees will enter their respective buildings from a shared employee-only atrium. Furthermore, the architect Tima Bell (also a tenant at Colyton), who is likely to be engaged by Levav for facility build-out, has examined the buildings and determined that the proposed use by Levav would not interfere with AireSpa's quiet use of its facility considering the separate walls and other barriers between the buildings. AireSpa is the most important tenant at the Seaton/Colyton properties. Colyton has invested significant time and money working with AireSpa to deliver on its lease obligations and to ensure AireSpa has the facilities tenant experience it expects. Making sure AireSpa will have "quiet enjoyment" of its premises was a primary concern for me when considering whether it would make sense for Levav to rent at the properties. Only after satisfying myself that Levav could operate at the Seaton/Colyton without disturbing AireSpa did we move forward with leasing plans with Levav. After reviewing our lease with AireSpa, I did not identify any provision that prevents Seaton from leasing to Levav. Nevertheless, we have actively engaged with AireSpa to inform them of the possibility of leasing to Levav to provide them insight on the Levav lease and the opportunity to satisfy any concerns they might have. I am hopeful AireSpa will ultimately support the Levav lease and the stability it will bring to the Seaton/Colyton properties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of December, 2024, at Los Angeles, California.

ALAN D. GOMPERTS

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**EXHIBIT 1**



PROPOSED 1ST FLOOR PLAN
SCALE: 1/16" = 1'-0"

||||  Common area access
for Aire Spa Employees

||||  Aire Spa Main Entrance
Colyton Street

||||  LeVav Group entrance
Seaton Street

Levav Goup



Aire Spa

# TIMA BELL DECLARATION

**DECLARATION OF TIMA BELL**

I, Tima Bell, hereby declare as follows:

1.      I make this declaration in support of Broadway Avenue Investments LLC's *Reply to Archway Broadway Loan SPE, LLC's Opposition to the Motion for Order Authorizing Debtor to Enter into Post-Petition Lease*.

2.      I am the principal and founder of the Architecture firm Bell Design Group (BDG), which is a tenant at 421 Colyton St.

3.      Our office has reviewed a preliminary plan to propose interior modifications to be done to the proposed Levav space at the adjacent Seaton/Colyton properties, and we (BDG) hope to be engaged by Levav as the architect for this project. We are the architect for Aire Spa project and have discussed with them how utilize the architecture to remove all direct impact of the proposed use of the space by Levav. For consistency, we are also very familiar with 737 Broadway and  also propose to be engaged by Levav there as well.

4.      BDG is an award-winning international firm with a diverse portfolio filled with projects from boutique hospitality to multi-family permanent supportive housing.  We believe there are architectural solutions for many of the perceived conditions relating to these, seemingly disparate, uses, as we have encountered similar situations in previous projects.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 5, 2024, at _____5:48PM, PST_____.


_____

TIMA BELL,

Principal/Founder Bell Design Group

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# DAVID SCHWARCZ DECLARATION

## DECLARATION OF DAVID SCHWARCZ

I, David Schwarcz, hereby declare as follows:

1.      I make this declaration in support of Broadway Avenue Investments LLC's *Reply to Archway Broadway Loan SPE, LLC's Opposition to the Motion for Order Authorizing Debtor to Enter into Post-Petition Lease*.

2.      I am an entrepreneur and frequently operate in the healthcare space. I have been working over the past year to provide solutions to the City of Los Angeles' drive to address its homelessness issues by bringing together service providers, facility owners, non-profits, lenders, grant writers, counsel, and others needed to create privately run facilities that can meet the City's needs but also stand on their own without relying upon City grants and subsidies to operate. It is not an easy task to coordinate so many components.

3.      If the project at Broadway is successful in receiving City grants or other government funds, DMB, as the qualified non-profit who will apply for those funds will pay me a commission within the guidelines set forth by the City or other government entities regarding the payment of such fees.

4.      Eli Schwarcz is my nephew. I do not have any business dealings with my nephew. I do not speak with him regularly and prior to yesterday it has been probably 3 months since we last spoke.

5.      When I spoke to my nephew Eli yesterday, we discovered that we both know Ahron Stock. Neither of us were aware we had a common connection to Ahron Stock until yesterday.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 5, 2024, at Los Angeles, Ca.


DAVID SCHWARCZ

# ELI SCHWARCZ DECLARATION

## DECLARATION OF ELI SCHWARCZ

I, Eli Schwarcz, hereby declare as follows:

1.      I make this declaration in support of Broadway Avenue Investments LLC's *Reply to Archway Broadway Loan SPE, LLC's Opposition to the Motion for Order Authorizing Debtor to Enter into Post-Petition Lease.*

2.      I am a healthcare professional. I operate behavioral health facilities in several states primarily under the Regard Recovery umbrella.

3.      David Schwarcz is my uncle. I do not have any business dealings with my uncle. I do not speak with regularly and prior to yesterday it has been probably 3 months since we last spoke.

4.      Around 2018 I explored a business transaction with Ahron Stock, a healthcare professional on the east coast. We explored working together on a project in California. We formed an entity toward that end but the project never got off the ground.

5.      When I spoke to my uncle David yesterday, we discovered that we both know Ahron Stock. Neither of us were aware we had a common connection to Ahron Stock until yesterday.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed on December 5, 2024, at New York, NY.


_____
ELI SCHWARCZ

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# ARI STOCK DECLARATION

<div align="center">

**DECLARATION OF ARI STOCK**

</div>

I, Ari Stock, hereby declare as follows:

1.      I am the managing member of Levav Group, LLC ("Levav"). Levav is in the healthcare business providing operational support for behavior health facilities. I have been in this business for 14 years.

2.      My legal name is Ahron Stock. I go by both Ahron Stock and Ari Stock.

3.      To clarify my previous declaration, if the Lease is approved by the Bankruptcy Court, Levav will *in part* provide services to the Los Angeles homeless and transient community from the Property. However, the services to be provided at the facility are not geared solely to homeless clients. Levav will operate a facility that will provide comprehensive behavior health services to the community at large.

4.      I reviewed the default judgment submitted with the Opposition. It appears to be a default judgment in the amount of $11,447 against "Ahron Stock" in a 2021 lawsuit brought by JPMorgan Chase Bank, N.A. Although this default judgment may be against me, I was not made aware of this lawsuit or the default judgment until recently via this bankruptcy case. I do a significant amount of banking with JPMorgan Chase and I cannot imagine that JPMorgan Chase would continue to bank with me without making me aware of an outstanding judgment.

5.      Around 2018 I explored a business transaction with Eli Schwarcz, a healthcare professional on the east coast. We explored working together on a project in California. We formed an entity toward that end but the project never got off the ground. I did not know David Schwarcz and Eli Schwarcz were related until just yesterday.

6.      I was a member of Wells Advance, LLC ("Wells"), a merchant cash advance provider. One of the advances Wells made was to Tracer Roofing ("Tracer"), a company owned by Nicole Carpenter. Carpenter guaranteed Tracer's obligations to Wells. Tracer defaulted on its obligations. Wells sued Carpenter on her guaranty in 2022. Carpenter filed a counterclaim alleging she should not have to perform on her obligation to Wells for various reasons. Wells negotiated terms with Carpenter to settle her guaranty obligation. The lawsuit was settled and the

<div style="text-align: left; writing-mode: vertical-rl;">

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

</div>

Docusign Envelope ID: F22E22F6-19C0-45AB-9C0B-CEC97CDDA2BF

1    counterclaims were discontinued with prejudice.

2        7.    The financials attached as Exhibit B to my previous declaration are for three rehab

3    facilities (Bellflower Post Acute, El Rancho Vista Healthcare Center, and Long Beach Post Acute)

4    which I manage through Levav. These facilities are not "nursing homes" as may be commonly

5    understood to mean elder care. None of these facilities are described as a "nursing home." They are

6    behavioral health facilities that provide post-acute nursing care and behavioral health care, and in

7    the case of Long Beach, also treat substance abuse. Post-acute nursing care can include elder care.

8    Bellflower and El Rancho Vista are about evenly split between elder care and non-elder behavioral

9    health care. Long Beach focuses its operations more on behavioral health and substance abuse. I

10   am also a part-owner of Action Family Counseling, Inc., which operates an alcohol and drug

11   treatment program. My experience with these facilities, in addition to my years in the healthcare

12   industry make Levav and myself qualified and capable to organize and operate the proposed

13   healthcare facilities at the Broadway and Seaton properties.

14       8.    Levav is a successful operator of behavioral health facilities. Levav is experienced

15   in starting-up healthcare facilities similar to those that would operate at the Broadway and Seaton

16   properties. Levav sources capital from at least half a dozen regular funding partners for facility

17   build-out and start-up costs for operation. Levav oversees the deployment of capital for these

18   purposes and then operates the facilities once they are off the ground. Once operating, the facilities

19   maintain their own working capital and fund ongoing operations from the revenue they generate.

20       9.    The Broadway and Seaton facilities are not dependent upon government grants,

21   subsidies or other funding to operate profitably. These facilities will seek payments from Medicare

22   and Medical as appropriate and customary for the patients treated.

23       10.    From my years of experience and familiarity with the healthcare market, I am

24   confident Levav will operate profitable healthcare facilities in both the Broadway and Seaton

25   locations. These operations will enhance their communities and Levav will be a reliable lessee for

26   its lessors.

27

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

-25-

Docusign Envelope ID: 4E2E22F6-19C0-45AB-BC0B-CEC979DDA2BF

1         I declare under penalty of perjury under the laws of the State of California that the foregoing

2  is true and correct.

3        Executed on December 9, 2024, at Los Angeles, California.

ARI STOCK

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**

*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* <u>Derrick Talerico</u>, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
    a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
    b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.*, that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR-   Explanation why no verification is provided |
|---|---|---|---|
| 1. | Ari Stock | 12/09/2024 | ☐ See explanation below. |
| 2. | | | ☐ See explanation below. |
| 3. | | | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:




☐ see attached continuation sheet

    *\*Verification must be oral.*  For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures.  *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/09/2024 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# STEVE BOMBOLA DECLARATION

Docusign Envelope ID: A3AF8F25-3759-478D-978E-44EBCE875FEC

## DECLARATION OF STEVE BOMBOLA

I, Steve Bombola, hereby declare as follows:

1.      I am the managing member of Zenith Healthcare Management, LLC ("Zenith"). Zenith is in the business of providing management services to healthcare providers. I have been in the business of providing management services for four years. If the Levav Lease is approved by the Bankruptcy Court, Zenith will manage the medical and social services to be provided at the Property, handling all financial aspects of the operations (provided by Levav Group, LLC) including on-site management of personnel, reimbursements from state and federal insurance or other sources of reimbursement for the services to be provided by Levav Group at the Property (collectively, the "Services"). Levav will engage Zenith to provide the Services. To this end, I am currently working with Los Angeles City officials to ensure all occupancy and use requirements are compliant and approved.

2.      Initially, Zenith did not contemplate being a lessee on the lease with Levav. Broadway requested Zenith be a responsible party on the Lease to demonstrate to Archway the commitment of the parties involved in the success of the healthcare facility. Zenith agreed at first to be a guarantor on the Lease and then later to be a direct lessee. After learning that Archway did not want Zenith to be a lessee, Zenith agreed to be removed, as it was only ever proposed to be a lessee for Archway's benefit. Zenith otherwise has no direct relationship with Broadway.

3.      Archway makes much of my involvement in a receivership action in Oklahoma, Case 23-CV-196-DES. I was a minority owner of CSR Worldwide OK, Inc. ("CSR"). CSR became undercapitalized when the UDSA underfunded a loan to the company. This undercapitalization ultimately lead to the receivership action by Bank of Hays. Another owner in CSR, Troy Burgess, in an attempt to save CSR's operations, transferred funds into CSR, that ultimately became the subject of the receivership action. During the time of the receivership and the alleged contempt in particular, I was afflicted with near-death cancer and post-op complications and blood clots and was therefore absent from the business, which was run by Troy Burgess in my absence. Although I had no involvement with the alleged contempt, the court help me liable due to my minority interest

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

1    in CSR. There is currently nothing happening with the receivership action, the company, or the

2    contempt order. I have no assets to return to the company (I never took any), and the receiver is not

3    taking any action as the CSR requires funding in order to continue as a going concern.

4          I declare under penalty of perjury under the laws of the State of California that the foregoing

5    is true and correct.

6          Executed on December 9, 2024, at \_\_\_\_\_newport beach, ca_____.

7

8    DocuSigned by:

    *steve bombola*

9    3D564ABDA7E744D...

    STEVE BOMBOLA

10

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**
*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* Derrick Talerico _____, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
    a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
    b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.,* that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR-   Explanation why no verification is provided |
|---|---|---|---|
| 1. | Steve Bombola | 12/09/2024 | ☐ See explanation below. |
| 2. | | | ☐ See explanation below. |
| 3. | | | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:

☐ see attached continuation sheet

    *<u>Verification must be oral</u>.* For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures. *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/09/2024 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*October 2024*          Page 1          **F 9011-1.SIGNATURE.VERIF.DEC**

-31-

# ETHAN KOBRE DECLARATION

Docusign Envelope ID: 75202235-D668-4B89-BA36-8F74372E70EB

## DECLARATION OF ETHAN KOBRE

I, Ethan Kobre, hereby declare as follows:

1.      I make this declaration in support of Broadway Avenue Investments LLC's *Reply to Archway Broadway Loan SPE, LLC's Opposition to the Motion for Order Authorizing Debtor to Enter into Post-Petition Lease*.

2.      I was counsel to Well Advance, LLC ("Wells") in the lawsuit brought by Wells against Nicole Carpenter, Case No. 22-cv-09997-JLR and Carpenter's counterclaim against Wells and Ahron Stock. Wells was a merchant cash advance provider. One of the advances Wells made was to Tracer Roofing ("Tracer"), a company owned by Nicole Carpenter. Carpenter guaranteed Tracer's obligation to Wells. Tracer defaulted on its payment obligation and if I recall correctly may have filed for bankruptcy. Wells sued Carpenter on her guaranty. Carpenter's counsel filed an aggressive counterclaim by which it was alleged that the Wells advance was usurious and on that basis triggered liability under RICO statutes. I viewed the entire counterclaim and the RICO claims as meritless posturing for settlement leverage. Wells negotiated terms with Carpenter to settle her guaranty obligation. The lawsuit was settled and the counterclaims were discontinued with prejudice. The counterclaim and the order for dismissal are attached as Exhibits 1 and 2 respectively.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed on December 5, 2024, at ___New York, New York_____.

Signed by:

ETHAN KOBRE

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**

*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* Derrick Talerico_____, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
    a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
    b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.,* that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR-   Explanation why no verification is provided |
|---|---|---|---|
| 1. | Ethan Kobre | 12/05/2024 | ☐ See explanation below. |
| 2. | | | ☐ See explanation below. |
| 3. | | | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:



☐ see attached continuation sheet

    *<u>Verification must be oral</u>.* For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures. *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/09/2024 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT 1

# Counterclaim

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WELLS ADVANCE LLC,<br><br>                              *Plaintiff*,<br><br>        -against-<br><br>NICOLE L. CARPENTER<br><br>                              *Defendant*. | Civ. A. No.: 1:22-cv-09997-JLR<br><br><br>**AMENDED ANSWER AND<br>COUNTERCLAIMS** |

| |
|---|
| NICOLE L. CARPENTER,<br>                              *Counterclaimant*<br><br>       - against-<br><br>WELLS ADVANCE, LLC, and AHRON STOCK<br>a/k/a ARON SLOVIN, ASHER EHRMAN<br>                              *Counterclaim-Defendants* |

## <u>AMENDED ANSWER AND COUNTERCLAIMS</u>

Defendant Nicole L. Carpenter ("Ms. Carpenter" or "Defendant"), by and through her

attorneys, White and Williams LLP, hereby files this Amended Answer to the Complaint by Wells

Advance, LLC ("Wells Advance" or "Plaintiff"), as follows:

1.      Denied. The allegations contained in paragraph 1 constitute legal conclusions to

which no response is required. To the extent a response is required, Defendant denies those

allegations. Moreover, Defendant submits that the Agreement at issue is part of a criminally

usurious series of transactions.

2.      Denied. Defendant admits that Plaintiff and Tracer entered into an agreement. The

remaining allegations contained in paragraph 2 constitute legal conclusions to which no response

is required. To the extent a response is required, Defendant denies those allegations.  To the extent

**KOBRE DECL. - EXHIBIT 1 - Page 3**

the allegations attempt to misconstrue the contents of the Agreement, Defendant refers the Court

to the Agreement, which speaks for itself. Answering further, the Agreement was a criminally

usurious loan, not a sale of receivables.

3.      Denied. The allegations contained in paragraph 3 constitute legal conclusions to

which no response is required. To the extent a response is required, Defendant denies those

allegations. Moreover, Defendant submits that the transaction contemplated by the agreement is a

usurious loan.

4.      Denied. The allegations contained in paragraph 4 constitute legal conclusions to

which no response is required. To the extent a response is required, Defendant denies those

allegations. Answering further, Defendant states that the transaction contemplated by the

agreement is a usurious loan.

5.      Denied. The allegations contained in paragraph 5 constitute legal conclusions to

which no response is required. To the extent a response is required, Defendant denies those

allegations.

## THE PARTIES

6.      Denied. Plaintiff has admitted that it is a limited liability company registered with

the state of Nevada.

7.      Denied. Defendant is an individual residing in the state of Arizona.

## FACTS COMMON TO ALL CLAIMS

8.      Denied as stated. Defendant admits only that on or about August 18, 2021, Plaintiff

and Tracer entered into an agreement titled "Standard Merchant Cash Advance Agreement" (the

"Agreement"). The remaining allegations contained in paragraph 8, constitute legal conclusions to

which no response is required. To the extent the allegations attempt to misconstrue the contents of

-2-

the Agreement, Defendants refer the Court to the Agreement, which speaks for itself. Moreover, Defendant submits that the Agreement at issue is part of a criminally usurious series of transactions. Defendant was an unwitting pawn used in the overall scheme; thus, the Agreement is void *ab initio*.

9. Admitted in part, denied in part. Defendant admits that Plaintiff required Tracer Roofing, LLC to make 85 fixed daily payments of $4,408.12. Defendant denies that the agreement is a sale of receivables, but rather a criminally usurious loan, which is void *ab initio*.

10. Admitted in part, denied in part. Defendant admits only that Plaintiff required Defendant to personally guarantee that Tracer Roofing, LLC made all 85 fixed daily payments of $4,408.12 regardless of whether Tracer Roofing generated receipts or filed for bankruptcy. Defendant denies that the agreement is a sale of receivables, but rather a criminally usurious loan, which is void *ab initio*.

11. Admitted in part, denied in part. Defendant admits only that Plaintiff required Defendant to personally guarantee that Tracer Roofing, LLC made all 85 fixed daily payments of $4,408.12 regardless of whether Tracer Roofing generated receipts or filed for bankruptcy. Defendant denies that the agreement is a sale of receivables, but rather a criminally usurious loan, which is void *ab initio*.

12. Denied. The allegations contained in paragraph 12 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Guaranty is a usurious loan.

13. Denied. The allegations contained in paragraph 13 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those

-3-

allegations. Moreover, Defendant submits that the Agreement at issue is part of a criminally usurious series of transactions. Defendant was an unwitting pawn used in the overall scheme; thus, the Agreement is void *ab initio*.

14.     Denied.  Defendant respectfully submits this allegation is false and that Plaintiff has no good-faith basis for the assertion.

15.     Admitted in part, denied in part. Defendant admits only that Plaintiff required Tracer Roofing and Defendant to pay Plaintiff's attorney's fees in the event that Tracer Roofing could not make the mandatory fixed daily payments required under the agreement.  Moreover, the transaction is a criminally usurious loan and is void ab initio.

## FIRST CAUSE OF ACTION
### *(Breach of Contract)*

16.     No response is required to paragraph 16 of the complaint because it merely purports to reiterate Plaintiff's previous paragraphs. To the extent a response is deemed to be required, Defendant denies the truth of any allegations to the contrary.

17.     Denied. The allegations contained in paragraph 17 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Guaranty is a usurious loan. Answering further, the transaction is a criminally usurious loan and is therefore void *ab initio*.

18.     Denied. The allegations contained in paragraph 18 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Guaranty is a usurious loan. Answering further, the transaction is a criminally usurious loan and is therefore void *ab initio*.

-4-

19.     Denied. The allegations contained in paragraph 19 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Guaranty is a usurious loan. Answering further, the transaction is a criminally usurious loan and is therefore void *ab initio*.

20.     Denied. The allegations contained in paragraph 20 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Agreement is a usurious loan. Answering further, the transaction is a criminally usurious loan and is therefore void *ab initio*.

21.     Admitted in part, denied in part. It is admitted only that Tracer Roofing did not remit all fixed daily payments required due to the failure to generate sufficient receipts and the filing of bankruptcy. Defendant further admits that Defendant has not personally made the fixed daily payments required by Plaintiff.  Defendant denies that the agreement is a sale of receivables, but rather a criminally usurious loan, which is void ab initio.

22.     Denied. The allegations contained in paragraph 21 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations. Moreover, Defendant submits that the transaction contemplated by the Guaranty is a usurious loan. Answering further, the transaction is a criminally usurious loan and is therefore void *ab initio*.

23.     Admitted in part, denied in part.  Defendant admits that Plaintiff required Defendant to personally guarantee that Tracer Roofing, LLC made all 85 fixed daily payments of $4,408.12 regardless of whether Tracer Roofing generated receipts or filed for bankruptcy.  Defendant denies

-5-

that the agreement is a sale of receivables, but rather a criminally usurious loan, which is void *ab initio*.

24.      Denied. The allegations contained in paragraph 24 constitute legal conclusions to which no response is required. To the extent a response is required, Defendant denies those allegations.

<div align="center">

**SECOND CAUSE OF ACTION**
***(Contractual Costs, Expenses, and Attorneys' Fees)***

</div>

25.      No response is required to paragraph 25 of the complaint because it merely purports to reiterate Plaintiff's previous paragraphs. To the extent a response is deemed to be required, Defendants denies the truth of any allegations to the contrary.

26.      . Admitted in part, denied in part. Defendant admits only that Plaintiff required Tracer Roofing and Defendant to pay Plaintiff's attorney's fees in the event that Tracer Roofing could not make the mandatory fixed daily payments required under the agreement. However, the transaction is a criminally usurious loan and is void *ab initio*.

27.      Admitted in part, denied in part. Defendant admits only that Plaintiff required Tracer Roofing and Defendant to pay Plaintiff's attorney's fees in the event that Tracer Roofing could not make the mandatory fixed daily payments required under the agreement. However, the transaction is a criminally usurious loan and is void *ab initio*.

28.      Denied. The allegations contained in paragraph 28 constitute legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

**WHEREFORE**, Defendant Nicole Lynn Carpenter demands judgment dismissing Plaintiff's Summons and Complaint, together with costs, expenses, disbursements, and attorney's

<div align="center">

-6-

</div>

**KOBRE DECL. - EXHIBIT 1 - Page 8**

fees incurred in the defense of this action, and such other and further relief as this Court deems just and proper.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses and reserve the right to assert others that may emerge as the case proceeds:

## GENERAL BACKGROUND

1.      Plaintiff's sham form of merchant cash advance agreements (the "MCA Agreements"), including the one entered into by the Defendant or (the "Merchant"), are unconscionable contracts of adhesion that are *not* negotiated at arms-length.

2.      Rather, the MCA Agreements contains one-sided terms that prey upon the desperation of small businesses and their individual owners and help conceal the fact that the transactions, including the one involving the Plaintiff, are absolutely repayable payment obligations or, in other words, a loan.

3.      Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, (2) moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) an assignment of lease of merchant's premises in favor of the MCA company, (11) the right to direct all credit

-7-

KOBRE DECL. - EXHIBIT 1 - Page 9

card processing payments to the MCA company, and (12) a power of attorney authorizing the MCA company to take any action or execute any instrument or document to settle all obligations due….The MCA Agreements are also unconscionable because they are designed to fail.  Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales because of the sham reconciliation provision.

29.      In order to evade state usury laws, Plaintiff includes a sham reconciliation provision in the MCA Agreements to give the appearance that the loans do not have a definite term.

30.      Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

31.      For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

32.      In order to ensure that a merchant can never use their sham reconciliation provision, however, Plaintiff falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, Plaintiff ensures that if sales decrease, the required fixed daily payments remain the same.

33.      For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, Plaintiff falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

KOBRE DECL. - EXHIBIT 1 - Page 10

34.     On information and belief, Plaintiff does not have a reconciliation department, and does not perform reconciliations.

35.     Plaintiff also intentionally disguised the true nature of its transactions.

36.     Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

    i.      The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state and federal usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

    ii.     The default and remedy provisions purported to hold the merchant absolutely liable for repayment of the purchased amount.  The loan sought to obligate the merchant to ensure sufficient funds were maintained in a designated account to make the daily payments and, if insufficient funds were maintained in the account, the merchant was in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

    iii.    While the MCA Agreement purported to "assign" all of the merchant's future account receivables to Plaintiff until the purchased amount was paid, the merchant retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, Plaintiff merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

    iv.     Unlike true receivable purchase transactions, Plaintiff's transactions were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

    v.      The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by Plaintiff based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, Plaintiff did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

    vi.     The amount of the daily payments was determined based upon when Plaintiff wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

KOBRE DECL. - EXHIBIT 1 - Page 11

vii.  Plaintiff required the merchant to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected Plaintiff from any risk of loss resulting from the merchant's failure to generate and collect receivables.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred as they arise out of fraudulent activity.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred under the N.Y. Penal Law §190.40.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

The Agreement is unenforceable on the grounds of unconscionability because, among other things and without limitation, Plaintiff knowingly preyed upon a financially distressed company, the Agreement charges a usurious rate of interest, and conceals the true nature of the transaction. Moreover, the purported reconciliation provision contained in the contract is illusory, impossible to comply with and intentionally inserted by Plaintiff to further conceal the true nature of the transaction.

**WHEREFORE**, Defendant respectfully requests that this Court enter judgment in her favor and against Plaintiff Wells Advance, LLC as follows:

i.    That Plaintiff's complaint be dismissed in its entirety;

ii.   That Defendant be awarded her costs of litigation

iii.  That Defendant be awarded attorney's fees to the extent permitted by law;

iv.   That if Defendant is found liable for any damages, that such liability be offset against any damages awarded to Defendant; and

-10-

v.    That Defendant be awarded such other and further relief as this Court deems just

and proper, including but not limited to all of Defendant's recoverable costs and

expenses and prejudgment interest.

## COUNTERCLAIMS

Counterclaimant Nicole L. Carpenter ("Ms. Carpenter" or "Counterclaimant"), by and

through her attorneys White and Williams LLP, as and for her Counterclaims, against

Counterclaim-Defendants Wells Advance, LLP ("Wells Advance" or "MCA Company"), and

Ahron Stock a/k/a Aron Slovin ("Stock"), Asher Ehrman ("Ehrman") (Wells Advance, Stock, and

Ehrman collectively, the "Counterclaim-Defendants" or the "Enterprise"), states as follows:

## NATURE OF THE ACTION

1.    This is a RICO action against a merchant cash advance ("MCA") company that is

controlled and manipulated by its members and managers Stock and Ehrman to carry out a long-

running scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from

Counterclaimant. Wells Advance entered the so-called "Merchant Agreement" with Tracer

Roofing LLC ("Tracer") pursuant to which it purportedly paid lump sums to purchase Tracer's

future receipts at a discount, and Tracer agreed to repay the face value of its receipts through daily

payments. While couched as the purchase and sale of future receipts, the agreements' terms,

conditions, and actions of the Principal demonstrate that despite the form of the agreement (the

"MCA Agreement"), no sale of receipts ever took place.

2.    Ms. Carpenter fell victim to the Counterclaim-Defendants fraudulent actions, as

Wells Advance entered into a guarantee with Ms. Carpenter in conjunction with the MCA

Agreement and the usurious loan provided by Counterclaim-Defendants to Tracer.

3.    The MCA Agreement was a loan for which Counterclaim-Defendants negotiated

and demanded repayment within a fixed time period—119 days for the usurious loan. The payment

-11-

term and interest charged are the metrics that the Counterclaim-Defendants use to dictate the terms

of the transactions.  And under New York law, intent is the touchstone of whether a transaction is

a loan, regardless of what the face of the contract purports it to be. Acknowledging the transaction

as the true loan that it is, the loan charged an interest rate that exceeded **153%**, multiple times

greater than the maximum 25% permitted under New York Penal Law.

4.    The Counterclaim-Defendants are not alone. Numerous other MCA companies use

the same sham MCA agreements as a cover for their loansharking activities.

5.    For instance, the sham nature of Yellowstone Capital LLC's ("Yellowstone") form

agreement recently drew scrutiny by New York's highest court. In answering certified questions

from this Circuit concerning the procedural remedies available to redress Yellowstone's (also

known as CMS) *unlawful* collection activities, a dissenting member of the Court questioned the

underlying premise of the questions presented, i.,e., that the underlying judgment was presumed

to be a lawful one:

> Although the GTR and CMS agreements are described as 'factoring' agreements,
> they do not bear several of the hallmarks of traditional factoring arrangements, in
> that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and
> CMS did not collect any receivables; GTR and CMS received fixed daily
> withdrawals from FutureNet's bank account regardless of whether or how much
> FutureNet collected from or billed to its clients; and GTR and CMS did not bear
> the risk of nonpayment by any specific customer of FutureNet. The arrangements
> FutureNet entered with GTR and CMS appear less like factoring agreements and
> more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC
> v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY

Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

6.    New York's highest court is not alone. The Attorneys General of both New York

and New Jersey each filed separate actions against others using the same sham form of MCA

<p align="center">-12-</p>

agreement, alleging that the transactions are disguised loans subject to this state's usury laws.  *See* **Exs. 1-2.**

7.     The New Jersey Attorney General's Office ("NJ AG") and the Federal Trade Commission (the "FTC") each filed separate actions against Yellowstone and others, alleging that for years they have engaged in deceptive conduct to conceal the true nature of their transactions with merchants, including the very conduct underlying this action.  *See* **Exs. 2-3**, which factual allegations are incorporated herein by reference.

8.     Tracer filed for bankruptcy protection on February 3, 2022, in the United States Bankruptcy Court for the Southern District of Texas, Case No. 22-30314; *In re. Tracer Roofing, LLC* ("Bankruptcy Matter").

9.     Wells Advance elected not to present a claim in the Bankruptcy proceeding where the bankruptcy trustee would have had the opportunity to fully investigate the merits of any claim.

10.     Instead, Wells Advance filed a lawsuit solely against Ms. Carpenter on October 24, 2022. The lawsuit seeks to collect on a "breach of contract" against Ms. Carpenter for the Guarantee (as defined below) entered into with Ms. Carpenter in conjunction with the sham MCA Agreement and the usurious loan provided to Tracer.

11.     In filing this lawsuit, Wells Advance falsely and without any basis whatsoever alleges that Ms. Carpenter breached the personal guarantee because she supposedly "stacked," i.e., entered into additional MCA agreements after entering into the Wells Advance agreement.  The allegation is categorically false and is made without any factual basis whatsoever.  Rather, the allegation is made simply to extort money from Ms. Carpenter, who just lost her business and has no money to defend against the baseless claims asserted by Wells Advance and its owners.

12.     It is against this backdrop that Ms. Carpenter asserts her counterclaims.

<div align="center">-13-</div>

## THE PARTIES

13.     Counterclaimant Nicole L. Carpenter is an individual adult citizen residing in the State of Arizona.

14.     Counterclaim-Defendant Wells Advance LLC is a Nevada limited liability company duly organized under the laws of Nevada, and is registered with the New York Division of Corporations as having a principal place of business in New York at 38 N. Myrtle Avenue, 201, Spring Valley, New York 10977. *See* **Ex. 4**.

37.     Wells Advance LLC has two individuals as members – one resides in California and the other member resides in New York. *See* **Ex. 5**.

38.     Counterclaim-Defendant Ahron Stock a/k/a Aron Slovin is an individual, and one of the members of Wells Advance, who upon information and belief resides in New York.

39.      Counterclaim-Defendant Asher Ehrman is an individual, and one of the members of Wells Advance, who upon information and belief resides in California.

## JURISDICTION AND VENUE

40.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1331 based on Counterclaimant's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U. S. C. §§ 1961–68.

41.     Subject matter jurisdiction also exists because complete diversity exists and the amount in controversy exceeds $75,000.

42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

43.     Each Counterclaim-Defendant is subject to the personal jurisdiction of this Court because each Counterclaim-Defendant has voluntarily subjected itself/himself/herself to the

-14-

**KOBRE DECL. - EXHIBIT 1 - Page 16**

jurisdiction of this Court; regularly transacts business within the State of New York, and/or has

purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## **FACTUAL ALLEGATIONS**

44.     As Bloomberg News has reported, the MCA industry is "essentially payday lending

for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than

a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider

trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the

"industry is absolutely crazy. … There's lots of people who've been banned from brokerage.

There's no license you need to file for.  It's pretty much unregulated."[3]

45.     The National Consumer Law Center also recognized that these lending practices

are predatory because they are underwritten based on the ability to collect, rather than the ability

of the borrower to repay without going out of business.[4]

46.     This is because MCA companies "receive the bulk of their revenues from the

origination process rather than from performance of the loan [and thus] may have weaker

incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.*

("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to

prospective borrowers who simply cannot afford the credit on the terms being offered. Typically,

such credit is underwritten predominantly on the basis of liquidation value of the collateral, without

regard to the borrower's ability to service and repay the loan according to its terms absent resorting

to that collateral.").

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*
[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

47.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The Wells Advance Umbrella**

48.     Numerous actions filed by Wells Advance in the New York Supreme Court evidence that it represents a place of business address in New York at 38 N. Myrtle Avenue, 201, Spring Valley, New York 10977. *See* **Ex. 6.**

49.     Ehrmer is listed as a managing member on the corporate filings filed for Wells Advance with the Nevada Secretary of State. *See* **Ex. 4.**

50.     Stock is also listed as a managing member on the corporate filings filed for Wells Advance with the Nevada Secretary of State. *See* **Ex. 4.**

51.     Stock has signed affirmations in numerous actions filed by Wells Advance with the Supreme Court of the State of New York, against various other businesses, seeking to collect on fraudulent confessions of judgments. *See* **Ex. 7.**

52.     In those affirmations, Stock holds himself out as having authority on behalf of Wells Advance as an "authorized officer" and also "case manager" of Wells Advance. *Id.*

**C.     The MCA Agreement is Substantively and Procedurally Unconscionable**

53.     The MCA Agreement entered into is an unconscionable contract of adhesion that was not negotiated at arms-length.

54.     Instead, it contains one-sided terms that prey upon the desperation of the small businesses and their individual owners and help conceal the fact that the transactions, including this one involving Tracer, are really loans.

55.     Among these one-sided terms, the MCA Agreement includes: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank

-16-

accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) a right of access to the merchant's premises and operations in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney with full authority "to take any action or execute any instrument or document or to bring any action necessary to settle all obligations due to WA, or, if WA considers an Event of Default to have taken place under Section 34, to settle all obligations due to WA from each merchant…"

56.     The MCA Agreement is also unconscionable because it contains numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant Underwriting Fee and Origination Fee.

57.     The MCA Agreement is also unconscionable because it is designed to fail.  Among other things, the MCA Agreement is designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the

KOBRE DECL. - EXHIBIT 1 - Page 19

month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

58.     The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreement (1) requires the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses fixed daily payments.

**D.     The Intent of the Counterclaim-Defendants is to Issue Fixed-Term Loans Using a Sham Reconciliation Provisions to Disguise the Loans.**

59.     In order to evade state usury laws, the Counterclaim-Defendants include a sham reconciliation provision to give the appearance that the loans do not have a definite term.

60.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

61.     For example, if a MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

62.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a

-18-

**KOBRE DECL. - EXHIBIT 1 - Page 20**

good-faith estimate of the percentage of receivables purchased. By doing so, the Enterprise

ensures that if sales decrease, the required fixed daily payments remain the same.

63.     For example, if 25% of a merchant's actual monthly receivables would result in a

daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500

per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the

reconciliation provision.

64.     In fact, the daily payment is calculated by dividing the payback amount by the

intended duration of the loan.

65.     On information and belief, the Enterprise does not have a reconciliation

department, does not perform reconciliations, and has never refunded a merchant money as

required under their sham reconciliation provision.

**G.     The Enterprise Intentionally Disguised the True Nature of the Transaction.**

66.     Despite the documented form, the transaction is, in economic reality, a loan that is

absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere
subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased
Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely
liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants
to ensure sufficient funds were maintained in the Account to make the Daily/Weekly
Payments and, after a certain number of instances of insufficient funds being maintained
in the Account, the merchants were in default and, upon default, the outstanding balance
of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account
receivables to the Enterprise until the Purchased Amount was paid, the merchants retained
all the indicia and benefits of ownership of the account receivables including the right to
collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables,
the Enterprise merely acquired a security interest in the merchant's accounts to secure
payment of the Purchased Amount;

-19-

KOBRE DECL. - EXHIBIT 1 - Page 21

(d)    The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)    The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)    The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)    The Enterprise assumed no risk of loss if an account debtor failed to pay an allegedly purchased receivable because the daily payments would be deducted from the next merchant that paid a merchant.

(i)    The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(j)    The Enterprise required that the merchant obtain business interruption insurance and name the Enterprise as both an additional insured and a loss payee under the policy.

(k)    The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

(l)    Bankruptcy was an event of default under the agreements.

(m)    The Enterprise required that the merchant's owners guarantee the representations, covenants, and warranties under the agreements and the owners guaranteed obligations were triggered upon the filing of bankruptcy.

67.    But most important is intent: New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned

-20-

KOBRE DECL. - EXHIBIT 1 - Page 22

from internal negotiations, practices, and underwriting practices of the Counterclaim-Defendants, which determine the payback based on the number of days in which the Counterclaim-Defendants want to be paid back. The number of days for payback has no relation to the timing of the percentage of receivables that the Counterclaim-Defendants and the MCA Company was purporting to purchase.

68.     Instead of providing reconciliation, troubled merchants, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many thousandths percent range.

69.     Upon information and belief, the Counterclaim-Defendants systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

70.     The Counterclaim-Defendants also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

71.     The Counterclaim-Defendants also show in their underwriting practices that their agreements are loans. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing. When underwriting new transactions, the Counterclaim-Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all—yet they still charge hundreds of thousands for their so-called underwriting.

-21-

KOBRE DECL. - EXHIBIT 1 - Page 23

72.     When the Counterclaim-Defendants go to collect upon their agreements, they treat them just like loans. For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the MCA Company in substantially all of the merchant's assets to ensure that the daily payments are made.

73.     They also require that the merchants execute confessions of judgment that the MCA Company could file if the merchant fails to make as few as two daily payments under their agreements. In other words, the Counterclaim-Defendants structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

74.     The Counterclaim-Defendants also engage in other unscrupulous behavior toward their merchants. Among other things, the Counterclaim-Defendants often fail to advance merchants the full amounts provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

### THE UNDERLYING TRANSACTION

**A.     The Loan Transaction.**

75.     Tracer entered into a loan transaction with the Counterclaim-Defendants ("Loan Transaction") on August 18, 2021.

76.     The terms of the Loan Transaction exclusively benefited Wells Advance.

77.     Tracer executed that certain agreement entitled Standard Merchant Cash Advance Agreement (the "**Loan Agreement**").

78.     Ms. Carpenter executed that certain document entitled Guarantee (the "**Guarantee**") in conjunction with the Loan Agreement (collectively the Loan Agreement, and the Guarantee, the "**Loan Documents**"). *See* **Ex. 8**.

-22-

**KOBRE DECL. - EXHIBIT 1 - Page 24**

79.     Notably, the Guarantee states that the "Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to WA in the Agreement, inclusive of all addenda…"

80.     The Loan Agreement entered into with Wells Advance by Tracer was a criminally usurious loan and void under the law.

81.     On the face of the Loan Agreement, Wells Advance was to advance $250,000, which was disguised as the "Purchase Price."

82.     The amount to be repaid was $374,750, which was disguised as the "Purchased Amount."

83.     The loan was to be repaid through fixed daily ACH withdrawals in the amount of $12,492 (a "Daily Amount"), which was disguised as a purported good-faith estimate of Tracer's daily receivables. The specified percentage was 28% ("Specified Percentage"). The Daily Payment was a sham and was unilaterally dictated by Wells Advance.

84.     The negotiated term of the loan was approximately 119 business days. On its face, the loan had an interest rate in excess of 153%.

85.     In addition, Tracer was required to pay unconscionable fees, as further consideration for making the loan.

**B.     The Enterprise Operates by using a Form MCA agreement.**

86.     The Loan Transaction and the Loan Documents evidence a primary form template (the "Wells Advance Form") used by the Enterprise.

87.     While there are differences within a specific agreement for the loans entered into by the Enterprise, such as the date, the funding entity, and the amounts funded, these details are

-23-

not material as to whether an MCA agreement is actually a loan. As highlighted below, the Wells Advance Form evidences factors that are indicative of loans.

88.     In *Lateral Recovery, LLC v. Capital Merchant Services LLC,* 21-cv-9336 (LJL) (Sept. 30, 2022), a recent decision issued by the Southern District of New York, the Court underwent a lengthy analysis in assessing similar form agreements and found that several provisions demonstrate that these "merchant cash agreements" were truly indicative of loans. *Id.* The Court noted, amongst other things, that "the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id.* (citing *Fleetwood Services, LLC v. Ram Capital Funding LLC*, 2022 WL 1997207, at *9 (S.D.N.Y June 6, 2022)). Moreover, the Court explained: "Recently, Federal Courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling." *Id.*

### C.      The Wells Advance Form.

89.     The Wells Advance Form demonstrates that the terms of the template agreement used by the Enterprise are indicative of loan terms.

90.     For example, the Reconciliations provision, the Events of Default provision, and the Protections Against Default provision, demonstrate the document was in fact intended to memorialize a loan agreement irrespective of how it is labeled, and that Wells Advance was guaranteed absolute right of repayment in all circumstances.

91.     The "Reconciliations" provision of the Wells Advance Form represents an illusory reconciliation provision. Specifically, the provision states:

4. Reconciliations. Any Merchant may give written notice to WA requesting that WA conduct a reconciliation in order to ensure that the amount that WA has collected equals

-24-

KOBRE DECL. - EXHIBIT 1 - Page 26

the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@wellsadvance.com and such notice will be deemed to have been received if and when WA sends a reply e-mail (but not a read receipt). If such reconciliation determines that WA collected more than it was entitled to, then WA will credit to the Account all amounts to which WA was not entitled within seven days thereafter. If such reconciliation determines that WA collected less than it was entitled to, then WA will debit from the Account all additional amounts to which was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. WA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

92.     Notably, this provision makes clear that the merchant would need to request a reconciliation in order for the "Specific Amount" to be adjusted in the future. In the scenario where a merchant is unable to generate or collect "receivables" to pay the Specific Amount, the reconciliation provision proves meaningless as any reconciliation would occur after-the-fact.

93.     In fact, the circumstances that would permit Wells Advance (as a lender) to call an Event of Default and to require that the merchant pay 100% of the uncollected Purchased Amount will have already taken place long before any reconciliation could take place or requested by a merchant.

94.     Thus, the reconciliation provision is illusory in practice.

95.     The Events of Default provision states in relevant part:

34. Events of Default. An "Event of Default" may be considered to have taken place if any of the following occur: (1) Any Merchant violates any term or covenant in this Agreement; (2) Any representation or warranty by any Merchant in any Agreement with WA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made; (3) Any Merchant fails to provide WA with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement; (4) the sending of notice of termination by any Merchant or Guarantor; (5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business

-25-

KOBRE DECL. - EXHIBIT 1 - Page 27

without the prior written consent of WA other than a bankruptcy filing; (6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of WA; (7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of WA; (8) Any Merchant uses multiple depository accounts without the prior written consent of WA; (9) Any Merchant changes the Account without the prior written consent of WA; (10) WA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant; (11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by WA; (12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement; (13) Any Merchant fails to deposit its Receivables into the Account; (14) Any Merchant causes any ACH debit to the Account by WA to be blocked or stopped without providing any advance written notice to , which notice may be given by e-mail to omfpr@wellsadvance.com; or (15) Any Merchant prevents WA from collecting any part of the Receivables Purchased Amount;

96.      This provision demonstrates that if a merchant fails to make the Daily Amount

payment, the merchant is considered in default. Irrespective of the merchant's ability to pay the

Daily Amount, it would still be liable to Wells Advance to repay the full Purchased Amount.

97.      The Protections Against Default provision states in relevant part:

17. Protections Against Default. The following Protections 1 through 7 may be invoked by WA , immediately and without notice to any Merchant in the event:
(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;
(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to WA;
(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;
(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of WA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to WA ; or
(e) Any Merchant takes any action, fails to take any action, or offers any incentive— economic or otherwise—the result of which will be to induce any customer or customers

-26-

KOBRE DECL. - EXHIBIT 1 - Page 28

to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to WA at law, in equity, or otherwise available pursuant to this Agreement.

(f) WA considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. WA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. WA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. WA may proceed to protect and enforce its rights and remedies by litigation or arbitration. Protection

5. If requested by WA , Merchant shall deliver to WA an executed assignment of lease of each Merchant's premises in favor of WA. Upon breach of any provision in this Section 17, WA may exercise its rights under such assignment of lease.

Protection 6. WA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. WA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to WA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to WA an irrevocable power-of attorney, which power-of-attorney will be coupled with an interest, and hereby appoints WA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to as contemplated by this Section.

98.    As demonstrated above, in the scenario where a merchant fails to make the Daily Amount, it is considered in default and therefore the Purchaser's Remedies on Default provision would further accelerate the full Purchased Amount due and owing, so that Wells Advance can be made whole.

99.    Specifically, the Protections Against Default provision states that "The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately."

-27-

**KOBRE DECL. - EXHIBIT 1 - Page 29**

100.    Similarly, if there are ACH transactions attempted that are rejected by the merchant's bank in any given calendar month (irrespective if the "Purchased Amount" can be paid), the merchant is held to be in default and Wells Advance is entitled to full payment under the acceleration clause of the Protections Against Default provision. In addition, the merchant is responsible for also paying a $10,500 if Wells Advance "considers an event of Default to have taken place" pursuant to the Additional Fees provision.

101.    The Protections Against Default provision evidences that Wells Advance (as a lender) is made whole and is entitled to repayment under all circumstances if any Daily Amount payment is missed or unable to be made by the merchant. There is no transfer of risk.

102.    Stated differently, irrespective of any event of default, Wells Advance (as a lender) would be entitled to absolute repayment.

103.    The effect of the aforementioned provisions is to further confirm that Wells Advance Form is a template agreement that evidences a loan.

104.    The provisions as a whole in the Wells Advance Form eliminate any risk on the part of Wells Advance and gives it full and absolute repayment rights. It even gives them full repayment for any other loan (aka "standard merchant cash advance agreement") that the merchant may have entered into with Wells Advance or any of its d/b/a entities.

105.    The label placed on the Wells Advance Form that it is an "Standard Merchant Cash Advance Agreement" between a merchant and a purchaser is simply an illusory label.

106.    The provisions confirm that a merchant is obligated to pay a fixed amount on a daily basis. And if it fails to do so, it is considered in default and Wells Advance (as a lender) has access to all rights and remedies in the Wells Advance Form agreement.

### FIRST CAUSE OF ACTION
**(RICO:  18 U.S.C. § 1962)**

-28-

KOBRE DECL. - EXHIBIT 1 - Page 30

107.    Counterclaimant repeats and re-alleges the allegations of each of the foregoing paragraphs.

**A.      The Unlawful Activity.**

108.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

109.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

110.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the 'roughing up tactics' used by usurious lenders to enforce payment."

111.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

112.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

113.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

114.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

-29-

115.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

116.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

117.    Counterclaim-Defendants issue usurious loans under the guise of an MCA agreement to borrowers facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

118.    While the MCA agreement here purports to be a purchase of identifiable receivables, their terms actually involve Counterclaim-Defendants' purchase of "Merchant's future accounts receivable , future receivables and rights to receive payment and other compensation from Merchant's customers, clients, third party payors, and other obligors (said amounts being collectively "Receipts")."

119.    While the MCA agreement purports to allow for reconciliation, its actual terms reveal this to be illusory as borrowers are limited to one (1) reconciliation request per calendar month, and since the loan here had a payment term of approximately one month, there is no actual promise to reconcile.

120.    Counterclaim-Defendants structure the MCA agreements to ensure absolute repayment through the aforementioned sham reconciliation provision, which leaves the loan's term definite as a matter of mathematics, and forcing the borrower's principals to personally guaranty the Merchant's entire obligations in the event the Merchant defaults.

-30-

KOBRE DECL. - EXHIBIT 1 - Page 32

**B.     Culpable Person.**

121.    Stock and Ehrman are classified as "person(s)" within the meaning of 18 U.S.C.

§ 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited

liability company capable of holding a legal interest in property.

122.    At all relevant times, Stock and Ehrman were, and are, each a person that exists

separate and distinct from the Enterprise, described below.

123.    Ehrman is an authorized representative of Wells Advance.

124.    Stock is also an authorized representative of Wells Advance.

125.    Stock signs affidavits in support of Wells Advance's improper complaints and

confessions of judgment actions filed with the New York Supreme Court and further represents

himself as the "Case Manager". *See* **Ex. 7**.

126.    During the relevant time period, Stock and Ehrman controlled transactions within

the Enterprise and was an authorized representative of Wells Advance.

127.    Through their operation of Wells Advance, the RICO Persons solicit, underwrite,

fund, service and collect upon lawful debt incurred by small businesses in states that do not

have usury laws.

**C.     The Enterprise.**

128.    Wells Advance, Stock, Ehrman, and the Investors ("Investors") constitute an

Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

129.    Wells Advance, Stock, Ehrman, and the Investors are associated-in-fact and

through relations of ownerships for the common purpose of carrying on an ongoing unlawful

enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and

-31-

KOBRE DECL. - EXHIBIT 1 - Page 33

collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

130.    Since at least 2021 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

131.    Over this period the Enterprise individual members would assume various trade names to do business under. This was intentionally done as part of the Enterprise's hierarchy to ensure that corporate members of the Enterprise were as insulated as possible from liability under the usurious agreements by creating plausible deniability as each specific member's liability and obligations under each specific agreement.

132.    Indeed, through the use of various alter-ego identities for the individual members of the Enterprise, Counterclaim-Defendants intend to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Enterprise is automatically withdrawing monies from borrowers' accounts.

133.    Upon information and belief, the Enterprise's use of alter-ego names for its members was orchestrated by Stock and Ehrman, as the common thread between all these members and their alter-egos is that they were ultimately controlled and for the benefit of the Counterclaim-Defendants.

134.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it

-32-

violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

135.    Since at least 2021 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

136.    The Enterprise's conduct further constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.      The Roles of the RICO Person in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

137.    The RICO Person, Stock and Ehrman, have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.      Ahron Stock.**

138.    Stock is responsible for the day-to-day operations of the Enterprise, primarily through Wells Advance, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

139.    In his capacity as a member of the Enterprise, Stock is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise

-33-

to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession and Guarantees used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Tracer.

140.    Stock has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

141.    Stock has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to others within the Enterprise.

**ii.    Asher Ehrman.**

142.    Ehrman is responsible for the day-to-day operations of the Enterprise, primarily through Wells Advance, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

143.    In his capacity as a member of the Enterprise, Ehrman is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements

-34-

used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession and Guarantees used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Tracer.

144.    Ehrman has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

145.    Ehrman has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to others within the Enterprise.

**ii.    Wells Advance.**

146.    Wells Advance is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

147.    Through its assumed names, Wells Advance participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the

-35-

**KOBRE DECL. - EXHIBIT 1 - Page 37**

Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

148.    In this case, Wells Advance, through Stock and Ehrman, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Tracer and Counterclaimant.

### iii.    The Investors

149.    The Investors are a group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members.

150.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

151.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.    Interstate Commerce

152.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

-36-

KOBRE DECL. - EXHIBIT 1 - Page 38

153.     Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Texas, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

154.     In the present case, all communications between the members of the Enterprise, Tracer, and Ms. Carpenter, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advances under the agreements and collect the Daily Payments via interstate electronic ACH debits.

155.     In addition, at the direction of Counterclaim-Defendants, the MCA Agreement was executed in Texas, and original copies of the agreement and the applicable Guarantee were sent from Texas to the Enterprise, through Counterclaim-Defendants, at their offices in New York via Federal Express using labels prepared by Counterclaim-Defendants.

**F.    Injury and Causation.**

156.     Counterclaimant has and will continue to be injured in her business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than the attorneys' fees sought to defend this action and set forth this Complaint, the amount of the unlawful debt collected by the Enterprise from Tracer, and the Counterclaimant.

157.     The injuries to the Counterclaimant directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments

-37-

from Tracer, and the unlawful filling of the complaint against Counterclaimant for a sham Guarantee associated with the criminally usurious loan provided to Tracer.

158.    Plaintiff has suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Counterclaim-Defendants Stock's and Ehrman's criminal activities.

159.    Pursuant to 18 U.S.C. § 1964(c), Counterclaimant is entitled to treble damages, plus costs and attorneys' fees from Counterclaim-Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

160.    Counterclaimant repeats and re-alleges the allegations of each of the foregoing paragraphs.

161.    Counterclaim-Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

162.    By and through each of the Counterclaim-Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Counterclaim-Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Counterclaim-Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

163.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts,

-38-

KOBRE DECL. - EXHIBIT 1 - Page 40

including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Counterclaim-Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

164.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

165.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

166.    Counterclaimant has been and will continue to be injured in her business and property by reason of the Counterclaim-Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing, but no less than the attorneys' fees and costs to bring this action and defend against the unlawful action filed against Counterclaimant.

167.    The injuries to the Counterclaimant directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the costs to defend against an action premised on a fraudulent Guarantee, and improperly collected loan payments associated with a criminally usurious loan.

168.    Counterclaimant has suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Counterclaim-Defendants' criminal activities.

169.    Pursuant to 18 U.S.C. § 1964(c), Counterclaimant is entitled to treble damages, plus costs and attorneys' fees from the Counterclaim-Defendants.

## **PRAYER FOR RELIEF**

KOBRE DECL. - EXHIBIT 1 - Page 41

WHEREFORE, Counterclaimant demands judgment in her favor against Counterclaim-

Defendants as follows:

a)  Declaring the Counterclaimant's agreement with Counterclaim-Defendants to be in conjunction with a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

   b)  Against Counterclaim-Defendants Stock and Ehrman on account of the First Cause of Action, in an amount to be determined at trial but no event less than treble damages and attorneys' fees and costs;

   c)  Against and the Counterclaim-Defendants Stock, Ehrman, and Wells Advance, on the Second Cause of Action in an amount to be determined at trial but no event less than treble damages and attorneys' fees and costs;

   d)  Any further relief deemed appropriate by the Court.


Dated:  December 20, 2022

                    **WHITE AND WILLIAMS LLP**


                    By: _____
                    Shane R. Heskin
                    7 Times Square, Suite 2900
                    New York, NY 10036-6524
                    (215) 864-6329
                    heskins@whiteandwilliams.com
                    *Attorney for Defendant/Counterclaimant Nicole L.*
                    *Carpenter*


-40-

KOBRE DECL. - EXHIBIT 1 - Page 42

# EXHIBIT 2

# Order for Dismissal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WELLS ADVANCE LLC,

                Plaintiff,

      -against-

NICOLE L CARPENTER,

                Defendant.

1:22-cv-09997 (JLR) (BCM)

**ORDER OF DISMISSAL**

JENNIFER L. ROCHON, United States District Judge:

The Court having been advised at ECF No. 37 that all claims asserted herein have been settled in principle, it is ORDERED that the above-entitled action be and is hereby DISMISSED and discontinued without costs, and without prejudice to the right to reopen the action **within thirty days** of the date of this Order if the settlement is not consummated.

To be clear, any application to reopen **must** be filed **by the aforementioned deadline**; any application to reopen filed thereafter may be denied solely on that basis.

If the parties wish for the Court to retain jurisdiction for the purposes of enforcing any settlement agreement, they **must** submit the settlement agreement to the Court by the deadline to reopen to be "so ordered" by the Court. Per Paragraph 4(C) of the Court's Individual Rules and Practices for Civil Cases, unless the Court orders otherwise, the Court will not retain jurisdiction to enforce a settlement agreement unless it is made part of the public record.

Any pending motions are moot. All conferences are cancelled. The Clerk of Court is directed to CLOSE the case.

Dated: July 5, 2023
     New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge

KOBRE DECL.- EXHIBIT 2 - Page 44

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*):  **Reply to:  (I) Archway Broadway Loan SPE, LLCs Opposition to Debtor in Possession Broadway Avenue Investments, LLCs Motion for Order Authorizing Debtor to Enter into Post-Petition Lease [Dkt. 330]; (II) Archway Broadway Loan SPE, LLCs Opposition to Debtor in Possession Broadway Avenue Investments, LLCs Motion for Order Authorizing Debtor to Enter Into Post-Petition Financing [Dkt. 331]; and (III) Korth Direct Mortgages Objection to Debtor Seaton Investment, LLCs Motion to Enter into Post-Petition Lease and Motion to Enter into Post-Petition Financing [Dkt. 333]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 10, 2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See attached NEF Service List

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) December 10, 2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Vincent Zurzolo                    (via Messenger
United States Bankruptcy Court
255 E Temple St Suite 1360
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 10, 2024 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Seaton Investments, LLC – Jointly Administered

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- <u>Attorneys for Corporate Debtors Seaton Investment, LLC, Colyton Investments, LLC, Broadway Avenue Investments, LLC, Negev Investments, LLC, SLA Investments, LCC.</u>: **Derrick Talerico**: dtalerico@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- <u>Attorneys for Individual Debtors Alan Gomperts, Daniel Halevy, Susan Haley</u>: **Zev Shechtman, Carol Chow, Turner Falk, Ryan Coy**: zev.shechtman@saul.com; zshechtman@ecf.inforuptcy.com; carol.chow@saul.com; easter.santamaria@saul.com; turner.falk@saul.com; ryan.coy@saul.com
- <u>Attorneys for Creditor First Foundation Bank</u>: **Scott R Albrecht**: scott.albrecht@sgsattorneys.com; jackie.nguyen@sgsattorneys.com
- <u>Attorneys for Creditor Korth Direct Mortgage, Inc.</u>: **Tanya Behnam, Garrick Vanderfin**: tbehnam@polsinelli.com, tanyabehnam@gmail.com; ccripe@polsinelli.com; ladocketing@polsinelli.com; gvanderfin@polsinelli.com, jnava@polsinelli.com; zyoung@polsinelli.com; mschuster@polsinelli.com;
- <u>Attorneys for Creditor Los Angeles County Treasurer and Tax Collector</u>: **Jacquelyn H Choi**: jacquelyn.choi@rimonlaw.com; docketingsupport@rimonlaw.com
- <u>Attorneys for Creditor United States of America on behalf of the Internal Revenue Service</u>: **Robert F Conte**: robert.conte@usdoj.gov; caseview.ecf@usdoj.gov; usacac.tax@usdoj.gov
- <u>Courtesy NEF/Interested Party</u>: **Christopher Cramer**: secured@becket-lee.com
- <u>Attorneys for Creditor Archway Real Estate Income Fund I SPE I, LLC</u>: **Michael G. Fletcher, Bruce D. Poltrock, Paige Selina Poupart, Gerrick Warrington**: mfletcher@frandzel.com; ppoupart@franddzel.com; gwarrington@frandzel.com; bpoltrock@frandzel.com; sking@frandzel.com; achase@frandzel.com
- <u>Attorneys for Creditor Wells Fargo National Bank West</u>: **Todd S Garan**: ch11ecf@aldridgepite.com; TSG@ecf.inforuptcy.com; tgaran@aldridgepite.com
- <u>Attorneys for Creditor Los Angeles County Treasurer and Tax Collector</u>: **Richard Girgado**: rgirgado@counsel.lacounty.gov
- <u>Attorneys for Creditor Harvest Small Business Finance, LLC</u>: **Jacqueline L James**: jjames@hrhlaw.com
- <u>Courtesy NEF/Interested Party Avi Muhtar</u>: **Avi Edward Muhtar**: amuhtar@eaccidents.com
- <u>Attorneys for Creditor AIRE Ancient Baths Los Angeles, LLC</u>: **David B Shemano**: dshemano@shemanolaw.com
- <u>Attorneys for Creditor Wells Fargo Bank, N.A.</u>: **Jennifer C Wong**: bknotice@mccartyholthus.com; jwong@ecf.courtdrive.com
- <u>US Trustee's Office</u>: ustpregion16.la.ecf@usdoj.gov; **Kelly L. Morrison**: Kelly.l.morrison@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                  **F 9013-3.1.PROOF.SERVICE**