# DECLARATION OF
# JACK STEPHENS

Docusign Envelope ID: BE3DB4F8-A1AC-42F4-92FD-42SBB74364BA

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# DECLARATION OF JACK STEPHENS

I, Jack Stephens, hereby declare as follows:

1.      I am the Chief Executive Officer and 75% owner of View Behavioral Health, LLC ("VBH"). VBH wholly owns (i) Collaborative Neuroscience Network LLC dba Oceanview Adult Psychiatric Hospital, (ii) View Behavioral Health Colton, LLC and (iii) View Behavioral Health Colton 2 LLC.

2.      Through its ownership of its subsidiaries, VBH provides medical and social services on both an in-patient and out-patient basis, serving over 1,000 patients per year. VBH and/or its operating subsidiaries have been in business for over 15 years. I have personally worked in the medical services industry for 40 years.

3.      Attached as <u>Exhibit 1</u> is a lease (the "Lease") I have negotiated with Broadway Avenue Investments, LLC for the property located at 737 S. Broadway, Los Angeles, CA, 90014 (the "Property").  VBH (and/or a designated subsidiary) is prepared to enter into a 15-year lease substantially in the form of the Lease on the material terms set forth in the Lease.

4.      The only condition to the obligation to make rent payments detailed in the Lease and Exhibit C thereto is the acquisition of a certificate of occupancy (or temporary certificate of occupancy) as set forth in the Lease. Based upon my extensive time touring the Property and discussions with Daniel Halevy, I anticipate a certificate of occupancy for the entire building at the Property will be in place within the first six months of the lease, resulting in $200,000 monthly lease payment obligations beginning in month seven of the lease.

5.      Last year, VBH was independently valued at over $70 million. This valuation is attached as Exhibit 2. VBH is prepared to commit $2 million of working capital to the operations to be conducted at the Property. VBH understands the financial obligations of the Lease and will be able to fulfil its rent obligations should the court approve the Lease.

Docusign Envelope ID: BE3D84F8-A1AC-42F4-92FD-42SBB74564BA

Case 2:24-bk-12079-VZ    Doc 421-4    Filed 02/04/25    Entered 02/04/25 23:53:01    Desc
Jack Stephens Declaration and Exhibits    Page 3 of 110

1       I declare under penalty of perjury under the laws of the State of California that the foregoing

2   is true and correct.

3       Executed on February 4, 2025, at ___City, State_____.

4

5   _____
    JACK STEPHENS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**

*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* ___Derrick Talerico_____ , declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
      a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
      b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.,* that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR-  Explanation why no verification is provided |
|---|---|---|---|
| 1. | Jack Stephens | 2/5/2025 | ☐ See explanation below. |
| 2. | | | ☐ See explanation below. |
| 3. | | | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:



☐ see attached continuation sheet

    *<u>Verification must be oral</u>.* For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures. *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 02/05/2025 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# STEPHENS DECL. - EXHIBIT 1
# LEASE

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of  February __, 2025 (the "Effective Date"), by and among **Broadway Avenue Investments, LLC, a California limited liability company**, whose address is 737 South Broadway, Los Angeles, California, 90014  ("Lessor"), on the one hand, and **The DMB Fund, a California not for profit corporation d/b/a Broadway Community Care Centers** ("BCCC") and **View Behavioral Health, LLC, a California limited liability company** (or its designee; hereafter, "VBH"), jointly and severally (collectively, the "Lessee"), on the other hand. (The addresses for BCCC and VBH are provided under their respective signatures to this Lease, below.)  Capitalized terms not defined herein shall have the meanings set forth in Exhibit A hereto.

In consideration of the mutual covenants and agreements herein contained, Lessor and Lessee hereby covenant and agree as follows:

## ARTICLE I
## BASIC LEASE TERMS

**Section 1.01.  Property**. The street address of the improved real property is 737 South Broadway, Los Angeles, California, 90014, and its legal description is set forth on Exhibit B attached hereto and incorporated herein (the "Property"). The Property includes a eight (8) story building, a basement, and all other fixtures and improvements thereat. By this Lease, Lessee hereby leases from Lessor the entire Property.

**Section 1.02.  Initial Term Expiration Date**. The term of Lease shall commence on February _____, 2025 and shall continue for a period of fifteen (15) years (to and including February ___, 2040, as set forth under Section 3.01, below; the "Initial Term"), unless the term of this Lease is extended in accordance with Section 1.03 and Section 3.02, below.

**Section 1.03.  Extension Option**. Lessee has the right to extend this Lease for an additional five (5) year term (commencing February ___, 2040 up to including February 28, 2045), as set forth under Section 3.02, below.

**Section 1.04.   Term Expiration Date (if fully extended)**. Upon timely written notice given by Lessee pursuant to Section 3.03, the term of this Lease shall be automatically extended five (5) more years, expiring on February ____, 2045 (the "Extended Term").

**Section 1.05.  Monthly Rent**. Subject to Rent Adjustment and Rent Abatement as set forth under Sections 1.06, 1.13 and such other provisions set forth under Article IV, below, Lessee shall pay Lessor monthly rent at the rate of $25,000.00 per floor for the basement, ground floor/ first floor, and second floor (collectively, the "Lower Floors"), and $125,000 for the third through eighth floors (collectively, the "Upper Floors"), such rent being hereafter referred to as the "Base Monthly Rent."

**Section 1.06.  Rental Adjustment**. Base Monthly Rent shall be increased by three percent (3%) per annum commencing with the second (2nd) year of the Initial Term, as set forth under Section 4.02, below.

**Section 1.07.  Adjustment Date**. The first Adjustment Date (as such term is defined under Section 4.02, below) is February __, 2026, and each subsequent Adjustment Date shall be the one (1) year anniversary of said date throughout the Initial Term and any Extended Term.

**Section 1.08.  Guarantor**. Lessor shall not require any third party guarantor as a condition of this Lease.

**Section 1.09.  Letter of Credit**. Lessee shall not be required to furnish a letter of credit or other form of security or collateral to Lessor as a condition of this Lease.

**Section 1.10.  Lessor Tax Identification No**. Lessor's Federal Tax ID Number is 46-3312843.

**Section 1.11.  Tenant Improvements**. Except as set forth in Section 4.06 and under Article XVII, Lessee at its sole expense shall be responsible for all tenant improvements, as follows:

(a)  Lessor shall be responsible for obtaining a certificate of occupancy ("CO") or temporary certificate of occupancy ("TCO") for the Lower Floors (as set forth under Section 4.03, below); and Lessor shall be responsible for constructing all tenant improvements in the Lower Floors (the Lessor's Work, as set forth under Section 4.06.1), and to bear the cost therefor (the LW Expenses, as set forth under Section 4.06.2).

(b)  Lessor shall be responsible for obtaining a CO for the Upper Floors (as set forth under Section 4.03, below). Additionally, subject to the provisions under Section 4.03(a), tenant improvements shall be constructed on Floors 7 and 8 of the Upper Floors sufficient for such Floors to be used by VBH as a licensed psychiatric health facility ("PHF"). The cost for developing the PHF on Floors 7 and 8 shall be borne by Lessee (subject to reimbursement pursuant to subdivision (c), below).

(c)  VBH shall be entitled to reimbursement of the costs incurred in developing the PHF, up to a maximum sum of $5,700,000.00 (the "PHF Reimbursement"). The PHF Reimbursement shall be paid to VBH either as: (i) a credit toward its purchase of the Property pursuant to VBH's exercise of its Purchase Option (set forth under Article XVII, below); (ii) proceeds disbursed upon any foreclosure or other forced sale of the Property to a third party; or (iii) proceeds disbursed at closing upon Lessor's voluntary sale of the Property to a third party (it being understood and agreed that, by executing this Lease, Lessor covenants and agrees that it shall not transfer or convey the Property to any third party except in a transaction which provides for the PHF Reimbursement to be paid to VBH at closing). Lessor consents to the recording of any and all instruments on title to the Property which VBH reasonably requires in order to establish record notice of its right to the PHF Reimbursement.

(d)  Except as provided under subdivisions (a) through (c), above, Lessee shall not make any tenant improvements, alterations or utility installations to the Property without Lessor's prior written consent, which consent shall not be unreasonably withheld. Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor approved by Lessor (which approval may not be unreasonably withheld). Any alterations or utility installations that Lessee shall desire to make, and which require the consent of the Lessor, shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's:  (i) acquiring all applicable governmental permits,  (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and all other requirements of applicable Governmental Authority, in a prompt and expeditious manner. Any alterations or utility installations shall be performed in a workmanlike manner with good and

2

sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications.

(e)    Except as provided otherwise under subdivisions (a) through (c), above, Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Property, which claims are or may be secured by any mechanic's or materials' lien against the Property or any interest therein. Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in, or about the Property, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense, defend and protect itself, Lessor and the Property against the same and shall pay and satisfy any such adverse judgment that may be rendered thereof before the enforcement thereof. If Lessor shall require, Lessee shall promptly furnish a mechanic's lien release bond in an amount sufficient to cause such contested lien to be released.

**Section 1.12.  Ownership Removal; Surrender or Restoration.**

(a)    **Ownership**. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all alterations and utility installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the lessee owned alterations and utility installations. Unless otherwise instructed, all Lessee owned alterations and utility installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)    **Removal**.  By delivery to Lessee written notice from Lessor not earlier than ninety (90) and not later than thirty (30) days prior to the end of the term of this Lease, Lessor may require that any and all of Lessee-owned alterations or utility installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee-owned alterations or utility installations made without the required consent.

**Section 1.13    Rent Abatement**. Lessee's obligation to pay Lessor Base Monthly Rent and all other Monetary Obligations shall be excused and abated, as follows (Lessee's right to "Rent Abatement"):

(a)    As to the Lower Floors, Lessee shall have a right to Rent Abatement for a period commencing on the Effective Date and ending first six (6) months after Lessor secures a CO or TCO for the Lower Floors (in conformance with Lessor's obligations under Section 4.03, below).

(b)    As to the Upper Floors, Lessee shall have a right to Rent Abatement for a period commencing on the Effective Date and ending first six (6) months after Lessor secures a CO for the Upper Floors (in conformance with Lessor's obligations under Section 4.03, below).

(c)    In the event any period for Rent Abatement ends on a date which is not the first (1st) day of a calendar month, the pro rata sum of Base Monthly Rent otherwise due for the remainder of that month shall be included in Lessee's payment of Base Monthly Rent for the subsequent month.

**Section 1.14    Security Deposit**. Concurrently with executing this Lease, Lessee shall deposit two (2) months of Base Monthly Rent as a security deposit with the Lessor (the "Security

**STEPHENS DECL. - EXHIBIT 1 - Page 24**

Deposit"). In the event this Lease is terminated pursuant to Sections 1.15 or 4.03(a), Lessor shall return the full Security Deposit to Lessee within five (5) business days.

**Section 1.15    Lessee's Right of Early Termination**. Notwithstanding the foregoing provisions or any other provision herein, Lessee shall have the right, in its sole and absolute discretion, to terminate this Lease in the event Lessor fails to secure a CO for the Upper Floors within twelve (12) months of the Effective Date, as set forth under Section 4.03(a), below. If Lessee intends to exercise such right of termination, Lessee shall cause written notice of the same to be delivered to Lessor, receipt of which shall signify termination of this Lease. Any termination pursuant to this Section 1.15 may be exercised by VBH on behalf of Lessee, BCCC hereby granting to VBH the irrevocable right to exercise termination on its behalf, and at VBH's sole and absolute discretion, pursuant to this Section 1.15.

**Section 1.16  Contingent Upon Bankruptcy Court Approval**. Lessor and Lessee acknowledge that this Lease is subject to approval by the U.S. Bankruptcy Court in such legal action affecting Lessor and/or the Property. As such, irrespective of Lessor and Lessee executing this Lease, this Lease shall be null and void unless and until requisite approval by the U.S. Bankruptcy Court is given.

## ARTICLE II
## LEASE OF PROPERTY

**Section 2.01.  Lease**.  In consideration of Lessee's payment of all Monetary Obligations and Lessee's performance of all other obligations hereunder, and subject to Lessee's early termination rights under Section 1.15, above, Lessor hereby leases to Lessee, and Lessee hereby takes and hires, the Property, "AS IS" and "WHERE IS" and with all faults without any representation or warranty by Lessor (other than Lessor warranting to Lessee that, as of the Effective Date, there are no third parties in possession of any portion of the Property and the Property is free and clear of any and all tenants, invitees, licensees, squatters, and others), and subject to the existing state of title, any statement of facts which an accurate survey or physical inspection might reveal, and all Legal Requirements now or hereafter in effect.

## ARTICLE III
## LEASE TERM; EXTENSION

**Section 3.01.  Initial Term**. The Initial Term (as such term is defined under Section 1.02, above) shall commence as of the Effective Date and shall expire at midnight on the date set forth in Section 1.02, unless terminated sooner as provided in this Lease and as may be extended as provided herein. The time period during which this Lease shall actually be in effect, including any Extended Term, is referred to as the "Lease Term."

**Section 3.02.  Extension**. Unless this Lease has expired or has been sooner terminated, or an Event of Default has occurred and is continuing at the time any extension option is exercised, Lessee shall have the right and option (an "Extension Option") to extend the Lease Term for one (1) additional successive period of five (5) years (an Extended Term, as defined under Section 1.04, above), pursuant to the terms and conditions of this Lease then in effect.

**Section 3.03.  Notice of Exercise**. Lessee may only exercise the Extension Options by giving written notice thereof to Lessor of its election to do so no later than eighty (80) days prior to the expiration of the then-current Lease Term. If written notice of the exercise of any Extension Option is not received by Lessor by the applicable dates described above, then this Lease shall

STEPHENS DECL. - EXHIBIT 1 - Page 25

terminate automatically and without notice on the last day of the Initial Term or, if applicable, the last day of the Extended Term then in effect. Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with Section 3.02. In order to exercise any Option under this Lease, Lessee shall be in good standing under all provisions of this Lease.

**Section 3.04.  Removal of Personal Property**. At any time, Lessee may remove from the Property any personal property belonging to Lessee. Lessee shall repair any damage caused by such removal. Lessee shall, at the expiration of the Lease Term, leave the Property in broom clean condition and all fixtures and utility systems in good working order and the building in good repair. Any property of Lessee left on the Property on the tenth day following the expiration of the Lease Term shall be deemed abandoned by Lessee and, at Lessor's option, be disposed of by Lessor in accordance with all Legal Requirements.

**ARTICLE IV**
**RENTAL, OTHER MONETARY OBLIGATIONS; IMPROVEMENTS**

**Section 4.01.  Monthly Rent**. During the Lease Term, on or before the first (1st) day of each calendar month, but subject to Rent Abatement and other provisions herein, Lessee shall pay in advance the Base Monthly Rent then in effect.

**Section 4.02.  Adjustments**. During the Lease Term (including any Extended Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental shall increase by an amount equal to the Rental Adjustment which shall be an annual increase of three (3%) per cent of the Base Annual Rent; *provided, however*, that in no event shall Base Annual Rental be reduced as a result of the application of the Rental Adjustment.

**Section 4.03.  Securing Occupancy and Use of Lower and Upper Floors**. Lessor is responsible for securing a CO or TCO for the Lower Floors, in accordance with Exhibit C attached hereto and incorporated by this reference; and Lessor is responsible for securing a CO for the Upper Floors. Lessor shall exercise all reasonable and diligent efforts to secure such CO's and/or TCO as promptly as possible, subject also to the following provisions:

(a)    **Failure to Secure Certificate of Occupancy**. If, after reasonable and diligent effort, Lessee fails to secure the requisite license(s) to operate a residential behavioral health facility on the Upper Floors, then Lessor and Lessee shall jointly make all efforts to secure a sublease with a suitable sub-tenant, whereby a third party will sublet the Upper Floors from Lessee (revenues therefrom to be used by Lessee toward payment of Base Monthly Rent for the Upper Floors, with any excess to be retained by Lessee in the normal course). Further, Lessor shall, within twelve (12) months of the Effective Date, secure CO's sufficient to permit Lessee's occupancy of both the Lower Floors and the Upper Floors and, if Lessor fails to do so, then Lessee may, at its sole and absolute discretion, terminate the entire Lease without any further obligations. If Lessee intends to exercise such right of termination, Lessee shall cause written notice of the same to be delivered to Lessor, receipt of which shall signify termination of this Lease. Any termination pursuant to this Section 4.03(a) may be exercised by VBH on behalf of Lessee, BCCC hereby granting to VBH the irrevocable right to exercise termination on its behalf, and at VBH's sole and absolute discretion, pursuant to this Section 4.05(a).

(b)    **Acceptance of Lessor Improvements**. The provisions of this Section 4.03 are subject to Lesse's right of acceptance set forth under Section 4.06.4, below.

**Section 4.04. Annual Rent to be Net to Lessor**. The Base Annual Rental payable hereunder shall be net to Lessor, and all costs and obligations of every kind and nature whatsoever relating to the Property as required in this Lease shall be performed and paid by Lessee. Subject to Lessee's right of Rent Abatement, Lessee shall pay or reimburse Lessor all Property Taxes, Lessor's insurance premiums, equipment maintenance, building, roof, structural, and utility repair and maintenance costs and all utilities on the Property (the sum of which Lessor estimates to be approximately $128,000 per year; the actual sum to be based on invoices, receipts and other materials regularly maintained by Lessor and available for inspection by Lessee upon reasonable request). Lessee shall perform all of its obligations under this Lease at its sole cost and expense. All Base Monthly Rent and all other Monetary Obligations which Lessee is required to pay hereunder shall be the unconditional obligation of Lessee and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement (except as expressly set forth in this Lease), deferment, deduction or counterclaim whatsoever.

**Section 4.05  Use of Premises**. Lessee shall occupy and use the Property comprising of approximately 75,000 useable square feet for the treatment of the under-privileged population including without limitation "Behavioral Health Treatment" of adolescents and adults including without limitation the unhoused people, Skid Row population, veterans and all those in need of mental and behavioral and social services for both outpatient and inpatient services.

**Section 4.06   Lessor's Work**.

**Section 4.06.1**   Lessor is responsible for constructing all Lower Floor tenant improvements according to Lessee's plans and specifications ("Lessor's Work"). Lessee shall be responsible for developing the plans, designs and specifications for Lessor's Work at Lessee's sole expense. Lessor shall be responsible for procuring all permits and government approvals, procuring and managing all contractors performing such work, performing all administrative oversight, and any and all other obligations in connection with Lessor's Work at Lessor's sole expense; provided, however, that expenses incurred by Lessor in performance of Lessor's Work shall be subject to reimbursement in accordance with Sections 4.06.2 and 4.06.2, below.

**Section 4.06.2**   For purposes of this Lease, "LW Expenses" shall include and not be limited to any and all expenses incurred directly or indirectly by Lessor in the furtherance of Lessor's Work, the cost for which being hereafter referred to as the "TI Budget" (estimated to be $2,300,000.00, subject to increase or decrease depending on actual costs incurred). Lessor shall be solely responsible to fund the TI Budget and shall also be solely responsible for the repayment of the funds with any accrued interest thereon if such funds were secured by way of a loan or other financing.

**Section 4.06.3**   Lessor shall be entitled to reimbursement of the LW Expenses from federal, state, county or city agency funds received by BCCC, as follows:

(i)      On the first (1st) and fifteenth (15th) day of each calendar month, Lessor shall submit to Lessee invoices setting forth in reasonable detail the LW Expenses incurred by Lessor during the prior invoice period.

(ii)      Within three (3) business days of receipt thereof, BCCC shall submit the invoice for payment to the relevant Governmental Agency (as such term is defined below).

(iii)      Immediately upon receipt by BCCC, BCCC shall remit to Lessor any and all corresponding sums received by Lessee or it's managers or affiliates from any and all federal,

6

state, county or city agency including but not limited  to Los Angeles Housing Department, Los Angeles County Development Authority, Los Angeles Homeless Authority, or U.S. Department of Housing and Urban Development (collectively, "Governmental Agencies") in reimbursement of LW Expenses, the improvements or use of the Property.

(iv)    Notwithstanding the foregoing, Lessor, BCCC and VBH shall adhere to any and all statutes, regulations, ordinance, rules, policies, procedures and all other legal, ethical and administrative requirements (collectively, "Regulatory Provisions") in connection with the matters set forth in this Section 4.06.3. BCCC shall not receive or disburse funds from Governmental Agencies if doing so would violate any Regulatory Provisions; and Lessor shall not be entitled to reimbursement of LW Expenses if doing so would violate Regulatory Provisions. VBH expresses no opinion as to compliance with Regulatory Provisions and relies on the expertise and experience of Lessor and BCCC in their adherence to Regulatory Provisions.

**Section 4.06.4**  Lessee shall have the right to inspect any and all improvements constructed by Lessor pursuant to this Section 4.06 and may reject any or all of said construction if Lessee reasonably determines the construction to be defective or fails to conform with the requirements for Lessee's use. In such event, Lessee shall give Lessor written notice of the same and identify those aspects of Lessor's construction and/or the constructed improvements which are unsatisfactory. Lessor shall be responsible for promptly making all due and reasonable corrections to the same; provided, however, that Lessor shall not be responsible for defects or conditions unrelated to Lessor's Work, and further provided that Lessor shall be granted a reasonable period of time to correct and/or cure any defects or deficient conditions so identified by Lessee. If, following notice by Lessee, Lessor has failed to cure or correct, within a reasonable period of time, any defect(s) or deficient condition(s) which it is responsible for, then Lessee shall be entitled to Rent Abatement in proportion to the area impacted by the defect(s) or deficient condition(s).

**Section 4.07  Wire Transfer**. Payments of the Base Monthly Rent and all other Monetary Obligations payable to Lessor hereunder shall be paid in immediately available funds to the account identified on Exhibit C attached hereto, or to any other account as Lessor may from time to time designate to Lessee. Each such payment shall be made by Lessee by wire or other electronic transfer of funds, or automatic debit from an account designated by Lessee if so, elected by Lessee. Lessee shall continue to pay all Rental and other Monetary Obligations in such a manner unless otherwise directed by Lessor. Notwithstanding the foregoing, in the event that Lessee fails, more than twice during any calendar year, to pay the Base Monthly Rent or any monetary obligation by wire or other electronic transfer of funds when due and such failure continues for three (3) Business Days after such amounts were due, Lessee shall deliver to Lessor a complete Authorization Agreement – Pre-Arranged Payments in the form provided by Lessor together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rent and any Monetary obligations are transferred by Automated Clearing House Debit initiated by Lessor.

**Section 4.08. Late Charges; Default Interest**. Any delinquent payment that is not paid within five (5) days of the date it was due shall, in addition to any other remedy of Lessor, incur a late charge of five percent (5%) (which late charge is intended to compensate Lessor for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Lessee be obligated to pay a sum of late charge and interest rate higher than the maximum legal rate then in effect.

7

**Section 4.09.   Holdover**. If Lessee remains in possession of the Property after the termination of the Lease or the expiration of the Term hereof, Lessee, at Lessor's option and within Lessor's sole discretion, may be deemed a tenant at will and shall continue to pay Rentals and other Monetary Obligations in the amounts herein provided (prorated for partial months), except that the Base Monthly Rent shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rent payable under this Lease, and Lessee shall comply with all the terms of this Lease; *provided that* nothing herein nor the acceptance of Rental by Lessor shall be deemed a consent to such holding over. Lessee shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Lessee's failure to surrender possession upon the expiration of the Lease Term.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF LESSEE**

The representations and warranties of Lessee contained in this Article V are being made to induce Lessor to enter into this Lease, and Lessor has relied, and will continue to rely, upon such representations and warranties. Each Lessee represents and warrants to Lessor as follows:

**Section 5.01.   Organization, Authority and Status of Lessee**. BCCC and VBH have each been duly organized or formed, are validly existing and in good standing under the laws of their state of formation and are qualified to do business in the state in which the Property is located. All necessary and appropriate action has been taken to authorize the execution, delivery and performance by BCCC and VBH of this Lease and of the other documents, instruments and agreements provided for herein. Neither BCCC nor VBH are a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder. The Person who has executed this Lease on behalf of Lessee is duly authorized to do so.

**Section 5.02. Enforceability**. This Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms, except as such enforcement may be limited by final non-appealable judgment in bankruptcy, insolvency, reorganization, arrangement, moratorium or other applicable laws relating to or affecting the rights of creditors generally.

**Section 5.03.   Litigation**. There are no suits, actions, proceedings or investigations pending against or involving Lessee or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 5.04.   Absence of Breaches or Defaults**. To Lessee's knowledge, Lessee is not in material default under any document, instrument or agreement by which Lessee or the Property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. To Lessee's knowledge, the authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Lessee or the Property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. References to "Lessee's knowledge" and phrases of similar import shall refer only to the current actual (not constructive) knowledge of Lessee, with a reasonable duty of inquiry and shall not be construed, by imputation or otherwise, to refer to the knowledge of any other officer, agent, manager, representative or employee of Lessee or any affiliate thereof. Lessee hereby represents and warrants to Lessor that the foregoing person is the officer or

8

employee of Lessee most likely to have personal knowledge of the matters covered by the representations and warranties set forth in this Lease.

**Section 5.05.  Compliance with OFAC Laws**. Lessee is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 5.06.  Solvency**. There are no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Lessee or any Lessee Entity.

## ARTICLE VI
## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 6.01.  Taxes**. Lessee shall pay to the Lessor, prior to the earlier of delinquency or the accrual of interest on the unpaid balance, all taxes and assessments of every type or nature assessed against or imposed upon the Property, Lessee or Lessor during the Lease Term related to or arising out of this Lease and the activities of the parties hereunder, including without limitation, (i) all taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures and improvements located on the Property, whether belonging to Lessor or Lessee, or any tax or charge levied in lieu of such taxes and assessments; (ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Lessee; (iii) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rental or other Monetary Obligations hereunder, the leasehold estate of either party or the activities of either party pursuant to this Lease; and (iv) all franchise, privilege or similar taxes of Lessor calculated on the value of the Property or on the amount of capital apportioned to the Property. Notwithstanding the foregoing, nothing herein shall require Lessee to pay any tax, levy, charge or other sum owed by Lessor for matters unrelated to Lessor's ownership of the Property.

**Section 6.02.  Utilities**. Lessee shall contract, in its own name at its sole expense, for and pay when due all charges for the connection and use of water, gas, electricity, telephone, garbage collection, sewer use, fire and other safety systems and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Lessor be responsible for any interruption of any utility service.

**Section 6.03.  Insurance**.

**6.03.1 Lessor's Insurance**. Lessor shall obtain and maintain the following insurance coverage throughout the Term of the Lease ("Lessor's Insurance"):

(a)     Property insurance "the equivalent of causes of loss – special form" covering the full replacement cost of the building, the parking area (if any), common area improvements and any and all improvements installed in, on or upon the Property and affixed thereto (but excluding Lessee's fixtures, furnishings, equipment, personal property or other elements of Lessee's property), less a commercially reasonable deductible if Lessor so chooses; provided, however, Lessor shall not be obligated to insure any furniture, equipment, trade fixtures, machinery, goods, or supplies which Lessee may keep or maintain in the Property or any alteration, addition, or improvement which Lessee may make upon the Property;

(b)     Fire insurance and extended coverage, with deductibles and the form and

9

endorsements as selected by Lessor, on the building, the parking area (if any), common area improvements and any and all improvements installed in, on or upon the Property and affixed thereto (but excluding Lessee's fixtures, furnishings, equipment, personal property or other elements of Lessee's property);

(c)    Commercial general liability insurance, which shall be in such amount as Lessor so determines and shall be in addition to, and not in lieu of, any insurance required to be maintained by Lessee.

(d)    During any period in which Lessor (or Lessor's contractor(s), agent(s), consultant(s) or others acting on Lessor's behalf) is constructing tenant improvements or engaging in other construction or other renovation in the building or elsewhere on the Property, builder's risk insurance covering against all risks of loss or damage to the building under construction or renovation, with coverage equal to the full estimated construction cost, naming the Lessee as an additional insured with full rights of recovery under the policy. Said policy shall be maintained throughout the construction or renovation period and shall include coverage for perils such as fire, windstorm, vandalism, and theft, subject to standard policy exclusions.

(e)    Lessor may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, flood insurance, earthquake insurance and rent loss insurance, provided, that, maintaining such insurance is consistent with the then-prevailing practices of institutional and prudent owners of first-class properties comparable to the Property in the same general geographical area in which the Property is located.

**6.03.2 Insurance Premiums as Operating Expenses**. The premiums for Lessor's Insurance shall be included as part of Lessor's operating expenses payable by Lessee. Lessee shall also reimburse Lessor for any increased premiums or additional insurance that Lessor reasonably deems necessary as a result of Lessee's use of the Property.

**6.03.3 Waiver of Subrogation**. Lessor waives any and all rights of recovery against Lessee for or arising out of damage to, or destruction of the Property to the extent that Lessor's property insurance policies then in force insure against such damage or destruction and permit such waiver and only to the extent of insurance proceeds actually received by Lessor for such damage or destruction. Lessee waives any and all rights of recovery against Lessor for or arising out of damage to or destruction of any property of Lessee to the extent that Lessee's property insurance policies then in force or the policies required by this Lease, whichever is broader, insure against such damage or destruction.

**6.03.4 Lessee's Insurance**.

(a)    **Coverage**. Throughout the Lease Term, Lessee shall maintain, with respect to the Property, at its sole expense, the following types and amounts of insurance ("Lessee's Insurance"):

(i)    Insurance against loss or damage to personal property under an "all risk" or "special form" insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form   Such insurance shall be in amounts not less than 100% of the full insurable replacement cost values (without deduction for depreciation), with an agreed amount endorsement or without any coinsurance provision; provided, however, Lessee shall have until one (1) Business Day after the Effective Date to procure the insurance. Such policy shall have a waiver of subrogation in favor of Lessee and Lessor.

(ii)  Commercial general liability insurance, including products and completed operation liability, covering Lessor and Lessee against bodily injury liability, property damage liability and personal and advertising injury, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of the Property or adjoining ways, streets, parking lots or sidewalks. Such insurance policy or policies shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Lessee's obligations under Article X hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Lessee or Lessor because of the negligence or other acts of the other, shall be in amounts of not less than $2,000,000 per occurrence for bodily injury and property damage, and $2,000,000 general aggregate per location, and shall be of form and substance satisfactory to Lessor. Such limits of insurance can be acquired through Commercial General liability and Umbrella liability policies.

(iii)  Workers' compensation and Employers Liability insurance with statutorily mandated limits covering all persons employed by Lessee on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Lessor, Lessee or the Property.

(iv)  Business interruption insurance including Rental Value Insurance payable to Lessor at all locations for a period of not less than twelve (12) months. Such insurance is to follow the form of the real property "all risk" or "special form" coverage and is not to contain a co-insurance clause. Such insurance is to have a minimum of 180 days of extended period of indemnity.

(v)  To the extent Lessee has had an increase in hazard at the Property or a change of operations, such additional and/or other insurance and in such amounts as at the time is customarily carried by prudent owners or tenants with respect to improvements and personal property similar in character, location and use and occupancy to the Property.

(b)  **Insurance Provisions**. All policies of Lessee's Insurance shall, where reasonably available in the marketplace:

(i)  provide for a waiver of subrogation by the insurer as to claims against Lessor, its employees and agents under the commercial general liability, auto liability, umbrella and worker's compensation policies;

(ii)  be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Lessor and the insurance policy shall not be brought into contribution with insurance maintained by Lessor under the commercial general liability, auto liability, umbrella and worker's compensation policies;

(iii)  contain deductibles not to exceed $150,000 (except for flood and earthquake);

(iv)  contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Lessor;

(v)  provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Lessor (ten (10) days for nonpayment) and to any Lender covered by any standard mortgagee clause or endorsement;

STEPHENS DECL. - EXHIBIT 1 - Page 32

(vi) be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(vii) except for workers' compensation insurance referred to in Section 6.03(a)(iii) above, name Lessor and any Lessor Affiliate or Lender requested by Lessor, as an "additional insured" with respect to liability insurance, and as an "additional named insured" or "additional insured" with respect to real property and rental value insurance, as appropriate and as their interests may appear;

(viii) be issued by insurance companies licensed to do business in the states where the Property is located, and which are rated no less than A-X by Best's Insurance Guide or are otherwise approved by Lessor.

(c)    **Additional Obligations**. It is expressly understood and agreed that (i) if any policy of Lessee's Insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Lessee, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Lessee shall immediately obtain new or additional insurance reasonably satisfactory to Lessor and any Lender designated by Lessor; (ii) the minimum limits of insurance coverage set forth in this Section 6.03.4 shall not limit the liability of Lessee for its acts or omissions as provided in this Lease; (iii) Lessee shall procure policies for all insurance for periods of not less than one year and shall provide to Lessor and any servicer or Lender of Lessor certificates of insurance or, upon Lessor's request, duplicate originals of any property insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times; (iv) Lessee shall pay as they become due all premiums for the insurance required by this Section 6.03.4; (v) in the event that Lessee fails to comply with any of the requirements set forth in this Section 6.03.4, within ten (10) days of the giving of written notice by Lessor to Lessee, (A) Lessor shall be entitled to procure such insurance; and (B) any sums expended by Lessor in procuring such insurance shall be Additional Rental and shall be repaid by Lessee, together with interest thereon at the Default Rate, from the time of payment by Lessor until fully paid by Lessee immediately upon written demand therefor by Lessor; and (vi) Lessee shall maintain all insurance policies required in this Section 6.03.4 not to be cancelled, invalidated or suspended on account of the conduct of Lessee, its officers, directors, managers, members, employees or agents, or anyone acting for Lessee or any subtenant or other occupant of the Property, and shall comply with all policy conditions and warranties at all times to avoid a forfeiture of all or a part of any insurance payment.

(d)    **Blanket Policies**. Notwithstanding anything to the contrary in this Section 6.03.4, any insurance which Lessee is required to obtain pursuant to this Section 6.03.4 may be carried under a "blanket" policy or policies covering other properties or liabilities of Lessee provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 6.03.4. In addition, the limits of liability set forth above may be met with an umbrella policy.

**Section 6.04.    Tax Impound**. Lessee to pay to Lessor on the first day of each month the amount that Lessor reasonably estimates will be necessary in order to accumulate with Lessor sufficient funds in an impound account (which shall not be deemed a trust fund) (the "Reserve") for Lessor to pay any and all Real Estate taxes for the Property for the ensuing twelve (12) months, or, if due sooner, Lessee shall pay the required amount immediately upon Lessor's demand therefor. Lessor shall, upon prior written request of Lessee, provide Lessee with evidence reasonably satisfactory to Lessee that payment of the Real Estate Taxes was made in a timely fashion. In the event that the Reserve does not contain sufficient funds to timely pay any Real Estate Taxes, upon Lessor's written notification thereof, Lessee shall, within five (5) Business

Days of such notice, provide funds to Lessor in the amount of such deficiency. Lessor shall pay or cause to be paid directly to the applicable taxing authorities any Real Estate Taxes then due and payable for which there are funds in the Reserve; *provided, however,* that in no event shall Lessor be obligated to pay any Real Estate Taxes in excess of the funds held in the Reserve, and Lessee shall remain liable for any and all Real Estate Taxes, including fines, penalties, interest or additional costs imposed by any taxing authority (unless incurred as a result of Lessor's failure to timely pay Real Estate Taxes for which it had funds in the Reserve). Lessee shall cooperate fully with Lessor in assuring that the Real Estate Taxes are timely paid. Lessor may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Lessor. Interest or other gains from such funds, if any, shall be the sole property of Lessor. Upon an Event of Default, in addition to any other remedies, Lessor may apply all impounded funds in the Reserve against any sums due from Lessee to Lessor. Lessor shall give to Lessee an annual accounting showing all credits and debits to and from such impounded funds received from Lessee. Promptly after any Event of Default has been cured, Lessor will release any unapplied Reserve funds to Lessee.

### ARTICLE VII
### MAINTENANCE; ALTERATIONS – LESSEE NEEDS TO INSPECT - AGREED

**Section 7.01.  Condition of Property; Maintenance**. Except as to improvements which Lessor is required to construct pursuant to Section 4.06 and elsewhere, Lessee hereby accepts the Property or its suitability for its business use as set forth in Section 2.01 "AS IS" and "WHERE IS" with no representation or warranty of Lessor as to the condition thereof. Subject to Lessor's obligations under Section 4.06, Lessee shall, at its sole cost and expense, be responsible for (a) keeping all of the building, structures and improvements existing or erected on the Property in good order and repair, free from actual or constructive waste; (b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty as described in Article XI; (c) subject to Section 7.02, making all necessary structural, non-structural, exterior and interior repairs and replacements to any building, structures or improvements erected on the Property; (d) operating the Property in accordance with Legal Requirements; (e) (i) using commercially reasonable efforts to ensure that no party encroaches upon the Property, (ii) protecting, defending, indemnifying, releasing and holding the Indemnified Parties harmless from and against any and all claims and Losses arising out of or in any way relating to any encroachments and/or activities upon the Property caused by any Person; and (iii) prosecuting to the extent desired by Lessee any claims that Lessee seeks to bring against any Person relating to Lessee's use and possession of the Property; and (f) paying all operating costs of the Property in the ordinary course of business. Except as provided otherwise under Section 4.06, and subject to the provisions therein, Lessee waives any right to require Lessor to maintain, repair or rebuild all or any part of the Property or make repairs at the expense of Lessor pursuant to any Legal Requirements at any time in effect. Notwithstanding the foregoing, Lessor warrants to Lessee that it is not aware of, nor is it in possession of any reports, studies or other documents pertaining to (i) the existence of any Hazardous Materials or Regulated Substances in, on or under the Property, or (ii) Releases in, on or under the Property; and (iii) Lessor represents to Lessee that it is not aware of any condition in, on or under the Property which violates Environmental Law.

**Section 7.02.  Alterations and Improvements**. During the Lease Term, Lessee shall not alter the exterior, structural, plumbing or electrical elements of the Property in any manner without the prior written consent of Lessor, which consent shall not be unreasonably withheld or conditioned; *provided, however*, upon fifteen business days prior written notice to the Lessor, Lessee may undertake nonstructural alterations to the Property, individually, costing less than

STEPHENS DECL. - EXHIBIT 1 - Page 34

$5,000 without Lessor's prior written consent. If Lessor's consent is required hereunder and Lessor consents to the making of any such alterations, the same shall be made by Lessee at Lessee's sole expense by a licensed insured contractor and according to plans and specifications approved by Lessor and subject to such other conditions as Lessor shall reasonably require. Any work at any time commenced by Lessee on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $5,000 or more, Lessee shall promptly provide Lessor with evidence of full payment to all laborers and materialmen contributing to the alterations. Additionally, upon completion of any such alterations, Lessee shall promptly provide Lessor with (a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect); (b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and (c) any other documents or information reasonably requested by Lessor. Lessee shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. For any work of improvement initiated by Lessee,  Lessee shall execute and file or record timely, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Lessor is not responsible for the payment of any costs or expenses relating to the additions or alterations. Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Lessor, and Lessee shall execute and deliver to Lessor such instruments as Lessor may require evidencing the ownership by Lessor of such addition or alteration.

**Section 7.03.  Encumbrances**. During the Lease Term, Lessor shall have the right to grant easements on, over, under and above the Property without the prior consent of Lessee, provided that such easements will not materially interfere with Lessee's use of the Property. Lessee shall comply with and perform all obligations of Lessor under all easements, declarations, covenants, restrictions and other items of record now or hereafter encumbering the Property. Lessee shall not grant any easements on, over, under or above the Property, without Lessor's prior written consent which may be withheld in Lesor's sole and absolute discretion

**Section 7.04 Lessor Access; Showing Premises Repairs**. Lessor and Lessor's agents shall have the right to enter the premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the premises as lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the premises. all such activities shall be without abatement of rent or liability to Lessee.

**ARTICLE VIII**
**USE OF THE PROPERTY; COMPLIANCE**

**Section 8.01.  Use**. Except for the Permitted Subleases (defined and described in Section 14.04 below), during the Lease Term, the Property shall be used solely for the use herein provided.  Except during periods when a Property is untenantable due to Casualty or Condemnation (and provided that Lessee continues to strictly comply with the other terms and conditions of this Lease), and except for the Permitted Subleases, Lessee shall at all times during the Lease Term occupy the Properties and shall diligently operate its business on the Properties.

**Section 8.02.  Compliance**. Lessee's use and occupation of the Property, and the

condition thereof, shall, at Lessee's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record, and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property, in either event, the failure with which to comply could have a Material Adverse Effect. Subject to the foregoing, Lessee shall comply with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such act may be amended from time to time, and all regulations promulgated thereunder, as it affects the Property now or hereafter in effect. Lessee shall obtain, maintain and comply with all required licenses and permits, both governmental and private, to use and operate the Property. Upon Lessor's written request from time to time during the Lease Term, Lessee shall certify in writing to Lessor that Lessee's representations, warranties and obligations under Article V and this Section 8.02 remain true and correct and have not been breached. Lessee shall immediately notify Lessor in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Lessee has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Lessee shall comply with all Legal Requirements and directives of Governmental Authorities and,  shall, provide to Lessor copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Lessee shall also reimburse Lessor for all Costs incurred by Lessor in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license or approvals from Governmental Authorities, and in complying with all Legal Requirements applicable to Lessor as the result of the existence of such an event and for any penalties or fines imposed upon Lessor as a result thereof. Notwithstanding anything to the contrary in this Lease, Lessee shall not be required to perform alterations to the Property with respect to conditions that have been "grandfathered". Lessee will use its best efforts to prevent any act or condition to exist on or about the Property that will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Lessee shall pay for such increase. Lessee agrees that it will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Lessee's failure to comply with its obligations under this Section.

**Section 8.03.  Environmental**.

(a)    **Covenants**. Lessee covenants to Lessor during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(i)    All uses and operations on or of the Property, whether by Lessee or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(ii)    There shall be no Releases in, on, under or from the Property.

(iii)    There shall be no Hazardous Materials or Regulated Substances in, on or under the Property.

(iv)    Lessee shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Lessee or any other Person.

(v)    Lessee shall not act or fail to act or allow any other tenant, occupant, guest, customer or other user of the Property to act or fail to act in any way that (1) materially

15

increases a risk to human health or the environment, (2) poses an unreasonable or unacceptable risk of harm to any Person or the environment (whether on or off the Property), (3) has a Material Adverse Effect, (4) is contrary to any material requirement set forth in the insurance policies maintained by Lessee or Lessor, (5) constitutes a public or private nuisance or constitutes waste, (6) violates any covenant, condition, agreement or easement applicable to the Property, or (7) would result in any reopening or reconsideration of any prior investigation or causes a new investigation by a Governmental Authority having jurisdiction over the Property; *provided, however*, nothing herein shall prohibit Lessee from using Hazardous Materials in the normal course of its business in accordance with Environmental Laws.

(vi) Lessee shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 8.03, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(b) **Notification Requirements**. Lessee shall immediately notify Lessor in writing upon Lessee obtaining actual knowledge of (i) any Releases or Threatened Releases in, on, under or from the Property, or migrating towards the Property; (ii) any non-compliance with any Environmental Laws related in any way to the Property; (iii) any actual or potential Environmental Lien or activity use limitation on the Property; (iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and (v) any written or oral notice or other communication of which Lessee becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or above or below ground storage tanks, or Remediation thereof, at or on the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Lessee shall, upon Lessor's written request, deliver to Lessor a certificate stating that Lessee is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(c) **Remediation**. Lessee shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required of it by any Governmental Authority of any condition (including, but not limited to, a Release or Threatened Release) in, on, under or from the Property and take any other reasonable action deemed required of it by any Governmental Authority for protection of human health or the environment. Should Lessee fail to undertake any required Remediation in accordance with the preceding sentence, Lessor, after written notice to Lessee and Lessee's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs incurred in connection therewith shall be paid by Lessee. Any Cost so paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor.

(d) **Indemnification**. Lessee shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses, including, but not limited to, all Costs of Remediation (whether or not performed voluntarily), arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, above or below ground storage tanks, or other environmental matters in violation of this Lease concerning the Property. It is expressly understood and agreed that Lessee's obligations under this Section that arose during the Lease Term shall survive the expiration or earlier termination of this Lease for any reason.

(e) **Right of Entry**. In the event that Lessor has a reasonable basis to believe

16

that a Release or a violation of any Environmental Law has occurred, Lessor and any other Person designated by Lessor, including but not limited to any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lessor's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Lessee shall cooperate with and provide access to Lessor and any other Person designated by Lessor. Any such assessment or investigation shall be at Lessee's sole cost and expense. Such entry shall be subject to the terms of Section 9.02 hereof.

(f)     **Survival**. The obligations of Lessee and the rights and remedies of Lessor under this Section 8.03 that arose during the Lease Term shall survive the termination, expiration and/or release of this Lease.

## ARTICLE IX
## ADDITIONAL COVENANTS

**Section 9.01.  Performance at Lessee's Expense**. Lessee acknowledges and confirms that Lessor may collect its attorneys' fees, costs and expenses in connection with (a) any extension, renewal, modification, amendment and termination of this Lease requested by Lessee, (b) any release or substitution of Property requested by Lessee; (c) the procurement of consents, waivers and approvals with respect to the Property or any matter related to this Lease requested by Lessee; (d) the review of any assignment or sublease or proposed assignment or sublease or the preparation or review of any subordination or non-disturbance agreement requested by Lessee; (e) the collection, maintenance and/or disbursement of reserves created under this Lease or the other Transaction Documents (following an Event of Default); and (f) inspections required to make certain determinations under this Lease following Lessor's reasonable belief of a breach under this Lease.

**Section 9.02.  Inspection**. Lessor and its authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (except in the event of an emergency, in which case no prior notice shall be required), to enter the Property or any part thereof and inspect the same. Lessee hereby waives any claim for damages for any injury or inconvenience to or interference with Lessee's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry in accordance with this section, but, subject to Section 10.01. Any entry by Lessor and Lessor's agents shall not impair the operations on the Property more than reasonably necessary and shall comply with all reasonable security measures of the occupants of the Property.

**Section 9.03.  Financial Information**.

(a)     **Financial Statements**. Within thirty (30) days after the end of the fiscal year and within sixty (60) days after the end of each fiscal year of Lessee and Lessee Reporting Entities, Lessee shall deliver to Lessor (i) complete consolidated financial statements that consolidate Lessee and Lessee Reporting Entities, including a balance sheet, profit and loss statement, statement of stockholders' equity and statement of cash flows and all other related schedules for the fiscal period then ended, such statements to detail separately interest expense, income taxes, non-cash expenses, non-recurring expenses, operating lease expense and current portion of long-term debt – capital leases; (ii) income statements for the business at the Property;

17

and (iii) the supplemental financial information set forth on Schedule 9.03. All such financial statements shall be prepared in accordance with GAAP and shall be certified to be accurate and complete by an officer or director of each Lessee Reporting Entity. In the event that Lessee's business at the Property is ordinarily consolidated with other business for financial statements purposes, a separate profit and loss statement shall be provided showing separately the sales, profits and losses pertaining to the Property with interest expense, income taxes, non-cash expenses, non-recurring expenses and operating lease expense (rent), with the basis for allocation of overhead or other charges being clearly set forth in accordance with Schedule 9.03. The financial statements delivered to Lessor need not be audited, but Lessee shall deliver to Lessor copies of any audited financial statements of the Lessee Reporting Entities which may be prepared, as soon as they are available.

(b)      **Other Information**. Notwithstanding any provision contained herein, upon request at any time, Lessee will provide to Lessor, at no additional cost or expense to Lessee, any and all financial information and/or financial statements of Lessee Reporting Entities (and in the form or forms) as reasonably requested by Lessor including, but not limited to, as requested by Lessor in connection with Lessor's filings with or disclosures to the Securities and Exchange Commission or other Governmental Authority. Lessor shall hold all of the information described in this Section 9.03 confidentially.

**Section 9.04. OFAC Laws**. Upon receipt of notice or upon actual knowledge thereof, Lessee shall immediately notify Lessor in writing if Lessee is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related Laws, or has had funds seized or forfeited in an action under these or related Laws; *provided, however*, that the covenant in this Section 9.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 9.05. Estoppel Certificate**. At any time, and from time to time, each shall, promptly and in no event later than ten (10) business days after a request from the other party or any Lender or mortgagee of Lessor, execute, acknowledge and deliver to the other or such Lender or mortgagee, as the case may be, a certificate in the reasonable form supplied by the other party, certifying: (a) that Lessee has accepted the Property; (b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor; (c) the commencement and expiration dates of the Lease Term; (d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable; (e) whether, to the actual knowledge, without inquiry, of the certifying party, there are then any existing defaults by the other party in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (f) that no notice has been received by it of any default under this Lease which has not been cured, except as to defaults specified in the certificate; (g) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of the certifying party; (h) that neither Lessor nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and (i) any other information reasonably requested by the requesting party or any Lender or mortgagee, as the case may be.

## ARTICLE X
## RELEASE, INDEMNIFICATION, CONDEMNATION AND CASUALTY

**Section 10.01.  Release and Indemnification**.

LESSEE AGREES THAT LESSOR SHALL NOT BE RESPONSIBLE OR LIABLE TO LESSEE OR LESSEE'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF THE LESSEE OR ANY OTHER PERSON. LESSEE AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF LESSEE SHALL BE ACTING AS LESSEE'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LESSOR NOR ITS LENDER NOR LESSOR'S OR LENDER'S AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY CAUSED BY THE NEGLIGENT ACTS, OMISSIONS OR WILLFUL MISCONDUCT OF SUCH PERSONS. LESSEE SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS LESSOR, ITS LENDER, ITS AGENTS, EMPLOYEES AND CONTRACTORS FROM AND AGAINST ANY AND ALL LOSSES CAUSED BY, INCURRED OR RESULTING FROM LESSEE'S NEGLIGENCE OR WILLFUL MISCONDUCT, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY LESSEE, ITS OFFICERS, EMPLOYEES, AGENTS OR CONTRACTORS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LESSEE'S OBLIGATIONS UNDER THIS SECTION AS TO LIABILITY THAT AROSE DURING THE LEASE TERM SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

**Condemnation and Casualty**

**Section 10.02.  Notification**. Lessee shall promptly give Lessor written notice of its actual knowledge of (a) any Condemnation of the Property, (b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property, and (c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations, or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Lessee shall promptly send Lessor copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations, or Casualty.

**Section 10.03. Total Condemnation**. In the event of a Condemnation of all or substantially all of the Property, and if as a result of such Condemnation: (i) access to the Property to and from the publicly dedicated roads adjacent to the Property as of the Effective Date is permanently and materially impaired such that Lessee no longer has access to such dedicated road and no alternate arrangement that complies with Legal Requirements and is acceptable to Lessee is reached; or (ii) the Condemnation includes a portion of the building such that the remaining portion is unsuitable for its use as a Permitted Facility, as determined by Lessee in the exercise of good faith business judgment (and Lessee provides to Lessor an officer's certificate executed by an officer of Lessee certifying to the same) (each such event, a "Total Condemnation"), then, in such event:

(a)    **Termination of Lease**. On the date of the Total Condemnation, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party)

19

accruing under this Lease prior to the date of termination shall survive such termination. If the date of such Total Condemnation is other than the first day of a month, the Rental for the month in which such Total Condemnation occurs shall be apportioned based on the date of the Total Condemnation.

(b)     **Net Award**. Subject to Section 11.07 below, Lessor shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Lessee by this Lease, and Lessee hereby expressly assigns to Lessor all of its right, title and interest in and to every such Net Award and agrees that Lessee shall not be entitled to any Net Award or other payment for the value of Lessee's leasehold interest in this Lease.

**Section 10.04. Partial Condemnation or Casualty**. In the event of a Condemnation which is not a Total Condemnation (each such event, a "Partial Condemnation"), or in the event of a Casualty:

(a)     **Net Awards**. All Net Awards shall be paid to Lessor.

(b)     **Continuance of Lease**. This Lease shall continue in full force and effect upon the following terms:

(i)     All Rental and other Monetary Obligations due under this Lease shall continue unabated; provided, however, that all Base Rent and other amounts due to Lessor under this Lease shall be abated to the extent any Partial Condemnation or Casualty renders the Property partially or entirely unusable or otherwise interferes with Lessee's occupancy. The amount of such abatement shall be in proportion with the area of the Property so impacted, and the period of abatement shall end when such area is no longer impacted (which may be signified by the issuance of certificates of occupancy, clearances, or other authorizations issued by responsible authorities, depending on the circumstances). (*By way of example, in the event fifteen percent (15%) of the Property is rendered uninhabitable due to Casualty, Base Rent and other amounts due to Lessor shall be abated by a factor of fifteen percent (15%) until the condition has been remedied and the corresponding portion of the Property is habitable*.)

(ii)     Lessee shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to the Partial Condemnation or Casualty as approved by Lessor. Subject to the terms and provisions of the Mortgage and upon the written request of Lessee (accompanied by evidence reasonably satisfactory to Lessor that such amount has been paid or is due and payable and is properly part of such costs, and that Lessee has complied with the terms of Section 7.02 in connection with the restoration), Lessor shall promptly make available in installments within thirty (30) days of Lessee's request, subject to reasonable conditions for disbursement imposed by Lessor, an amount up to but not exceeding the amount of any Net Award received by Lessor with respect to such Partial Condemnation or Casualty. Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Lessee shall provide evidence reasonably satisfactory to Lessor of Lessee's incurring restoration expenses by Lessee up to the amount of the insurance deductible applicable to such Casualty. Lessor shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Lessee shall bear all additional Costs of such restoration in excess of the Net Award.

(c)     **Lessee Election To Terminate Lease**. Notwithstanding the foregoing, in the event of a Casualty during the final two (2) years of the Lease Term and Lessee reasonably determines that it shall take longer than one hundred and eighty (180) days to fully repair the

20

Property and such determination is supported by a written certificate from Lessee's contractor, architect or engineer, then Lessee shall have the option of terminating this Lease by providing written notice thereof to Lessor within thirty (30) days of the date of such determination, but in any event, no more than sixty (60) days from the date of the Casualty. Upon Lessee's election to terminate this Lease, all obligations of either party hereunder shall cease; *provided, however*, that Lessee's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Lessee's obligation to pay Rental and all other Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease prior to the date of termination shall survive such termination.

Section 10.05.  **Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect without any reduction of Base Annual Rental, Additional Rental or any other Monetary Obligation payable hereunder. Except as provided below, Lessor shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Lessor and Lessee as of the date of such expiration. At the termination of any such Temporary Taking, Lessee will, at its own cost and expense and pursuant to the provisions of Section 7.02, promptly commence and complete restoration of the Property. If a taking is estimated to last longer than the lesser of twelve (12) months and the remainder of the Lease Term (as it may be extended by Lessee), the taking shall be considered as a Partial Condemnation or Total Condemnation, as applicable, rather than a Temporary Taking.

Section 10.06.  **Adjustment of Losses**. Any loss under any property damage insurance required to be maintained by Lessee with respect to the real property shall be paid to Lessor. Any Net Award relating to a Total Condemnation or a Partial Condemnation shall be paid to Lessor. Notwithstanding the foregoing or any other provisions of this Section 10.05 to the contrary, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Lessor is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Lessee and otherwise, to file and prosecute Lessee's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Lessee to Lessor under this Lease, in such order, priority and proportions as Lessor in its discretion shall deem proper.

Section 10.07.  **Lessee Obligation in Event of Casualty**. During all periods of time following a Casualty, Lessee shall take reasonable steps to ensure that the Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

Section 10.08. **Lessee Awards and Payments**. Notwithstanding any provision contained in this Article X, Lessee shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the taking of any personal property owned by Lessee, any insurance proceeds with respect to any personal property owned by Lessee, the interruption of its business and relocation expenses (subject, however, to the provisions of Section 6.03(a)(iv) above).

**STEPHENS DECL. - EXHIBIT 1 - Page 42**

## ARTICLE XI
## DEFAULT, CONDITIONAL LIMITATIONS,
## REMEDIES AND MEASURE OF DAMAGES

**Section 11.01.  Event of Default**. Each of the following shall be an event of default by Lessor and/or Lessee under this Lease (each, an "Event of Default"):

(a)      if any representation or warranty of Lessor or Lessee set forth in this Lease is intentionally false in any material respect when made, or if Lessor or Lessee renders any intentionally materially false statement or account when made;

(b)      if any Rental or other Monetary Obligation due under this Lease is not paid when due if such failure continues for more than five (5) days after written notice from Lessor; *provided, however*, Lessor shall only be required to provide such notice and cure period twice in any twelve (12) month period; and further provided that any delay in the payment of Rental as a result of a technical error in the ACH Method of Payment process shall not constitute an Event of Default hereunder so long as the same is corrected within two (2) Business Days of the date that Lessee receives notice thereof; and *provided, further*, that any technical error in the ACH Method of Payment process caused by Lessor's bank or servicer shall not constitute an Event of Default hereunder;

(c)      if Lessee fails to pay, prior to delinquency, any taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, if such failure continues for more than five (5) days past delinquency; *provided, however*, Lessor shall only be required to provide such cure period twice in any twelve (12) month period;

(d)      except as set forth in Section 8.01, if Lessee vacates or abandons the Property;

(e)      if there is an Insolvency Event affecting Lessee;

(f)      if Lessee fails to observe or perform any of the other covenants, conditions or obligations of Lessee in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, does not place the Property or any rights or property of Lessor in immediate jeopardy, and is within the reasonable power of Lessee to promptly cure, all as determined by Lessor in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lessor shall have given Lessee notice thereof and a period of thirty (30) days shall have elapsed, during which period Lessee may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Lessor in its reasonable discretion, and Lessee is diligently pursuing a cure of such failure, then Lessee shall have a reasonable period to cure such failure beyond such thirty (30)-day period. If Lessee shall fail to correct or cure such failure within such period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g)      if a final, non-appealable judgment is rendered by a court against Lessee which has a Material Adverse Effect, and is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

22

(h)    if Lessee shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i)    if the estate or interest of Lessee in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j)    if there is an "Event of Default" or other breach or default by Lessee under any of the other Transaction Documents, after the passage of all applicable notice and cure or grace periods; *provided, however*, in the event that this Lease has been the subject of a Securitization has not been the subject of the same Securitization or any series relating to such Securitization, an "Event of Default" under such Other Agreement shall not constitute an Event of Default under this Lease.

**Section 11.02.  Remedies**. Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Lessee, Lessor shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following:

(a)    to terminate this Lease, whereupon Lessee's right to possession of the Property shall cease and this Lease, except as to Lessee's liability, shall be terminated;

(b)    in accordance with applicable Law, upon five  (5) Business Days' notice to Lessee setting forth (x) Lessor's intent to re-enter and take possession of the Property and expel Lessee and those claiming under or through Lessee, and (y) Lessee's concurrent opportunity to cure, and following a termination of this Lease, to (i) re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Lessee upon the Property and, to the extent permissible, permits and other rights or privileges of Lessee pertaining to the use and operation of the Property, and (ii) expel Lessee and those claiming under or through Lessee, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Lessor hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Lessor to terminate this Lease unless such notice specifically so states. If Lessee shall, after default, voluntarily give up possession of the Property to Lessor, deliver to Lessor or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Lessor's rights and the acceptance thereof by Lessor or its agents shall not be deemed to constitute a termination of the Lease. Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate;

(c)    to bring an action against Lessee for any damages sustained by Lessor or any equitable relief available to Lessor and to the extent not prohibited by applicable Law, and upon a termination of this Lease, dispose of any personal property and fixtures in accordance with the Laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Lessee's sole expense, without becoming liable for any loss or damage resulting therefrom in compliance with all Legal Requirements;

(d)    except to the extent prohibited by applicable law, to relet the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease

**STEPHENS DECL. - EXHIBIT 1 - Page 44**

Term), at such rentals and upon such other terms as Lessor, in its sole discretion, may determine, with all proceeds received from such reletting being applied to the Rental and other Monetary Obligations due from Lessee in such order as Lessor may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses,  alteration, remodeling and repair costs and expenses of preparing for such reletting. Except to the extent required by applicable Law, Lessor shall have no obligation to relet the Property or any part thereof and shall in no event be liable for refusal or failure to relet the Property or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Lessee of any liability under this Lease or otherwise to affect any such liability. Lessor reserves the right following any re-entry and/or reletting to exercise its right to terminate this Lease by giving Lessee written notice thereof, in which event this Lease will terminate as specified in said notice;

(e)     except to the extent prohibited by applicable Law, upon a termination of this Lease, to accelerate and recover from Lessee all Rental and other Monetary Obligations due and owing and scheduled to become due and owing under this Lease both before and after the date of such breach for the entire original scheduled Lease Term, subject to the terms of California Civil Code 1951.2;

(f)     to recover from Lessee all Costs paid or incurred by Lessor as a result of such breach, regardless of whether or not legal proceedings are actually commenced, subject to Section 1951.2 of the California Civil Code;

(g)     to immediately or at any time thereafter, and with or without notice, at Lessor's sole option but without any obligation to do so, correct such breach or default and charge Lessee all Costs incurred by Lessor therein. Any sum or sums paid by Lessor, together with interest at the Default Rate, shall be deemed to be Additional Rental hereunder and shall be immediately due from Lessee to Lessor. Any such acts by Lessor in correcting Lessee's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Lessor's right to exercise any or all remedies set forth herein;

(h)     to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Lessee held by Lessor under this Lease against any sum owing by Lessee hereunder;

(i)     Without limiting the generality of the foregoing or limiting in any way the rights of Lessor under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lessor shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction (by *ex parte* motion for appointment without notice) in any action taken by Lessor to enforce its rights and remedies hereunder in order to protect and preserve Lessor's interest under this Lease or in the Property, and in connection therewith, LESSEE HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(j)     to seek any equitable relief available to Lessor, including, without limitation, the right of specific performance.

**Section 11.03.  Cumulative Remedies**. All powers and remedies given by Section 12.02

24

to Lessor, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lessor under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Lessee contained in this Lease, and no delay or omission of Lessor to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Lessor may be exercised from time to time, and as often as may be deemed expedient, by Lessor, subject at all times to Lessor's right in its sole judgment to discontinue any work commenced by Lessor or change any course of action undertaken by Lessor.

### ARTICLE XII
### MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 12.01.  No Liens**. Lessor's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Lessee, and nothing herein contained shall be construed to require such subordination by Lessor. NOTICE IS HEREBY GIVEN THAT LESSEE IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR LESSEE'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID.

**Section 12.02.  Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Lessor, and Lessee covenants and agrees to execute and deliver, upon demand, such further reasonable instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Lessor, or any present or proposed mortgagees under trust deeds, upon the condition that this Lease shall continue and Lessee shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of such Mortgages, so long as no Event of Default shall have occurred and be continuing. Notwithstanding the foregoing, (a) on the Effective Date, Lessor, Lessee and any lenders of the Property shall enter into a subordination and non-disturbance agreement in form approved by such lender and reasonably satisfactory to Lessee providing for recognition of Lessee's interests under this Lease in the event of a foreclosure of the Mortgage and memorializing the subordination of this Lease to the lien of such Mortgage and (b) the subordination of this Lease to a future Mortgage shall be conditioned upon Lessee's receipt from any such lender of such a recognition agreement. Explain the process

**Section 12.03.  Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Lessor as landlord under this Lease, Lessee shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Lessor"), and recognize the Successor Lessor as lessor under this Lease, and, subject to the provisions of this Article XIII, this Lease shall continue in full force and effect as a direct lease between the Successor Lessor and Lessee, provided that the Successor Lessor shall only be liable for any obligations of Lessor under this Lease which accrue after the date that such Successor Lessor acquires title. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 12.04.  Execution of Additional Documents**. Although the provisions in this

**STEPHENS DECL. - EXHIBIT 1 - Page 46**

Article XIII shall be self-operative and no future instrument of subordination shall be required, upon request by Lessor, Lessee shall execute and deliver such additional reasonable instruments as may be reasonably required for such purposes.

**Section 12.05.  Notice to Lender**. Lessee shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Lessee has been provided written notice of any breach or default by Lessor of any of its obligations under this Lease before exercising its remedies hereunder and give such Lender at least thirty (30) days beyond any notice period to which Lessor might be entitled to cure such default before Lessee may exercise any remedy with respect thereto.

**ARTICLE XIII**
**ASSIGNMENT**

**Section 13.01.  Assignment by Lessor**. As a material inducement to Lessor's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Lessee hereby agrees that Lessor may, from time to time and at any time and without the consent of Lessee, engage in all or any combination of the following, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws: (a) the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of the Property, this Lease or any other Transaction Document, Lessor's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing; or (b) a Securitization and related transactions. Without in any way limiting the foregoing, the parties acknowledge and agree that Lessor, in its sole discretion, may assign this Lease or any interest herein to another Person in order to maintain Lessor's or any of its Affiliates' status as a REIT. In the event of any such sale or assignment other than a security assignment, Lessee shall attorn to such purchaser or assignee (so long as Lessor and such purchaser or assignee notify Lessee in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Lessor hereunder from and after the date of such assignment). At the request of Lessor, Lessee will execute such documents confirming the sale, assignment or other transfer and such other agreements as Lessor may reasonably request, provided that the same do not increase the liabilities and obligations or decrease the rights of Lessee hereunder. Provided the assignee assumes the same in writing, Lessor shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Lessor contained herein, except for obligations or liabilities accrued prior to such assignment or sale. Explain

**Section 13.02.  No Assignment by Lessee**.

(a)     Lessee acknowledges that Lessor has relied both on the business experience and creditworthiness of Lessee and upon the particular purposes for which Lessee intends to use the Property in entering into this Lease. Lessee shall not assign, transfer, convey, pledge or mortgage this Lease or any interest herein or any interest in Lessee, whether by operation of Law or otherwise, without the prior written consent of Lessor, which shall not be unreasonably withheld. At the time of any assignment of this Lease which is approved by Lessor, the assignee shall assume all of the obligations of Lessee accruing thereafter under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Lessor. Such assignment of this Lease pursuant to Section 14.02 shall not relieve Lessee of its obligations respecting this Lease unless otherwise agreed to by Lessor. Any assignment, transfer, conveyance, pledge or mortgage in violation of this Section 14.02 shall be voidable at the sole

26

option of Lessor. Any consent to an assignment given by Lessor hereunder shall not be deemed a consent to any subsequent assignment.

(b)    Notwithstanding anything to the contrary contained in this Section 14.02 and provided that no Event of Default has occurred and is continuing at the time of the proposed assignment or other transfer, and provided further that any assignee agrees to assume all of Lessee's obligations under this Lease accruing thereafter, Lessee shall have the right to assign or otherwise transfer all, but not less than all, of its interest in, to and under this Lease without Lessor's consent to (i) an Affiliate of Lessee, (ii) a successor to Lessee by merger or any entity which purchases or otherwise acquires all or substantially all of the assets or equity interests of Lessee in a bona fide sale for fair market value, or (iii) a Qualified Operator (each, a "Permitted Transfer"). A "Qualified Operator" shall mean a Person who, following the consummation of the assignment contemplated herein, for two (2) consecutive years immediately prior to the date of assignment or transfer, (A) has a CFCCR (defined below) of at least 2.5x; (B) generates EBITDAR (defined below) of at least $7,280,000, and (C) has a Lease Adjusted Leverage (defined below) of no more than 5.0x; *provided, however*, that Lessee may satisfy the foregoing conditions of a Qualified Operator by providing, or causing to be provided, a guaranty agreement, in form and substance reasonably acceptable to and approved by Lessor, in writing, which guaranty shall be from an entity that meets the requirements of (A), (B) and (C) set forth in this Section 14.02(b). In the event that Lessee effects a Permitted Transfer pursuant to clause (iii), Lessee shall be released from any liability arising under this Lease from and after the date of such assignment. In the event that Lessee effects a Permitted Transfer pursuant to clauses (i) or (ii), Lessee shall not be released from liability under this Lease.

For purposes hereof:

"*CFCCR*" means, with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (i) the sum of Consolidated Net Income (excluding non-cash income), Depreciation and Amortization, Interest Expense, income taxes, Operating Lease Expense and non-cash expenses to (ii) the sum of Operating Lease Expense (excluding non-cash rent adjustments), scheduled principal payments of long term Debt, scheduled maturities of Capital Leases, dividends paid in cash and Interest Expense (excluding non-cash interest expense and amortization of non-cash financing expenses). For purposes of calculating the CFCCR, the following terms shall be defined as set forth below:

"*Capital Lease*" shall mean all leases of any property, whether real, personal or mixed, by a Person, which leases would, in conformity with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person. The term "Capital Lease" shall not include any operating lease.

"*Consolidated Net Income*" shall mean with respect to the period of determination, the net income or net loss of a Person. In determining the amount of Consolidated Net Income, (i) adjustments shall be made for nonrecurring gains and losses or non-cash items allocable to the period of determination, (ii) deductions shall be made for, among other things, Depreciation and Amortization, Interest Expense, Operating Lease Expense, and (iii) no deductions shall be made for income taxes or charges equivalent to income taxes allocable to the period of determination, as determined in accordance with GAAP.

"*Debt*" shall mean with respect to a Person, and for the period of determination (i) indebtedness for borrowed money, (ii) subject to the limitation set forth in sub item (iv) below,

STEPHENS DECL. - EXHIBIT 1 - Page 48

obligations evidenced by bonds, indentures, notes or similar instruments, (iii) obligations under leases which should be, in accordance with GAAP, recorded as Capital Leases, and (iv) obligations under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, except for guaranty obligations of such Person, which, in conformity with GAAP, are not included on the balance sheet of such Person.

"*Depreciation and Amortization*" shall mean the depreciation and amortization accruing during any period of determination with respect to a Person, as determined in accordance with GAAP.

"*Interest Expense*" shall mean for any period of determination, the sum of all interest accrued, or which should be accrued in respect of all Debt of a Person, as determined in accordance with GAAP.

"*Operating Lease Expense*" shall mean the sum of all payments and expenses incurred by a Person, under any operating leases during the period of determination, as determined in accordance with GAAP.

"*EBITDA*" means for the twelve (12) month period ending on the date of determination, the sum of a Person's net income (loss) for such period plus, in each case to the extent previously deducted in calculating net income (loss): (i) income taxes, (ii) interest payments on all of its debt obligations (including any borrowings under short term credit facilities), (iii) all non-cash charges including depreciation and amortization, and (iv) Non-Recurring Items (defined below).

"*EBITDAR*" means the sum of a Person's EBITDA and its total land and building rent for the twelve (12) month period ending on the date of determination.

"*Lease Adjusted Leverage*" means with respect to a Person, as of any applicable date, the sum of (i) ten (10) times such Person's total land and building rent for the twelve (12) month period ending on the date of determination, and (ii) the total current balance of such Person's total Debt obligations (including any borrowings under short term credit facilities) on such date, divided by EBITDAR.

"*Non-Recurring Items*" shall mean with respect to a Person, items of the sum (whether positive or negative) of revenue minus expenses that, in the judgment of Lessor, are unusual in nature, occur infrequently and are not representative of the ongoing or future earnings or expenses of such Person.

**Section 13.03.  No Sale of Assets**. Except for a transaction that includes an assignment as set forth in Section 14.02(b), without the prior written consent of Lessor, Lessee shall not sell all or substantially all of Lessee's assets. Any sale of Lessee's assets in violation of Section 14.03, shall be voidable at the sole option of Lessor. Any consent to the sale of Lessee's assets given by Lessor hereunder shall not be deemed a consent to any subsequent sale of Lessee's assets.

**Section 13.04.  Subletting**.

(a)    Lessee shall not sublet any or all of the Property without the prior written consent of Lessor, which consent may not be unreasonably withheld by Lessor. Additionally, in

**STEPHENS DECL. - EXHIBIT 1 - Page 49**

the event Lessee fails to secure the requisite license(s) to operate a residential behavioral health facility on the Upper Floors (as set forth under Section 4.03(a), above, then Lessee shall have the absolute right to sublet the Upper Floors to a sub-tenant of its selection.

(b)    Lessee covenants and agrees that: (1) Lessee shall observe and timely perform all of its obligations as the landlord or sublandlord under each Permitted Sublease in compliance with the terms thereof; (2) Lessee shall promptly provide Lessor with any notice of material default received by Lessee from any Subtenant or any notice of material default sent by Lessee to any Subtenant; (3) upon Lessor's request, Lessee shall furnish Lessor with any and all information requested by Lessor reasonably necessary for a determination of the status of any Permitted Sublease; and (4) upon Lessor's request, Lessee shall provide Lessor with copies of any and all Permitted Subleases and/or amendments thereto.

## ARTICLE XIV
## NOTICES

**Section 14.01. Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; or (c) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; or (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested. Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

If to Lessee: Broadway Community Care Centers and
View Behavioral Health, LLC or its Designee
9854 National Boulevard,
Los Angeles, Ca 90034

With a copy to:  George Shohet, Esq.
269 South Beverly Drive
Beverly Hills, Ca 90212

and to:

View Behavioral Health LLC
Attn:  Jack Stephens
2600 Redondo Ave., Suite 500
Long Beach, CA  90806

With a copy to:  Matthew M. Gorman
The Gorman Law Firm
1055 E. Colorado Blvd., Suite 500
Pasadena, CA  91106

If to Lessor:    Broadway Avenue Investments, LLC
264 S Oakhurst Drive
Beverly Hills, Ca 90212
ATTN: Alan Gomperts

29

With a copy to:  N/A

or to such other address or such other person as either party may from time-to-time hereafter specify to the other party in a notice delivered in the manner provided above.

### ARTICLE XV
### INTENTIONALLY OMITTED


### ARTICLE XVI
### MISCELLANEOUS

**Section 16.01. Force Majeure**. Any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire or other casualty beyond the control of the party obligated to perform (each, a "Force Majeure Event") shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, expressly excluding, however, the obligations imposed upon Lessee with respect to Rental and other Monetary Obligations to be paid hereunder and provided that Lessee's termination rights shall not be delayed as a result of any Force Majeure Event.

**Section 16.02.  No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (b) the fee estate or ownership of the Property or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 16.03.  Interpretation**. Lessor and Lessee acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

**Section 16.04.  Intentionally Omitted.**

**Section 16.05.  Disclosures**.

(a)    **Securities Act or Exchange Act**. The parties agree that, notwithstanding any provision contained in this Lease, any party (and each employee, representative or other agent of any party) may disclose to any and all persons, without limitation of any kind, any matter required under the Securities Act or the Exchange Act.

(b)    **Lessor Advertising and Related Publications**. Lessee hereby consents to the use by Lessor of, and Lessor is hereby expressly permitted to use, pictures of the Property,

30

and basic Transaction information, but expressly excluding Lessee's confidential information, solely in connection with Lessor's sales, advertising, and press release materials, including on Lessor's website.

(c)     **Public Disclosures.** Except as required by Law, neither Lessor nor Lessee shall make any public disclosure, including press releases or any form of media release, of this Lease Agreement or any transactions relating hereto without the prior written consent of the other party, except that any party may disclose such information to its accountants, lawyers, advisors and current and prospective investors, lenders and business partners and as required in litigation between the parties.

**Section 16.06. Attorneys' Fees**. In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled. In addition, the prevailing party shall, upon demand, be entitled to all attorneys' fees and all other Costs incurred in the preparation and service of any notice or demand hereunder, whether or not a legal action is subsequently commenced.

**Section 16.07.  Memorandum of Lease**. Concurrently with the execution of this Lease, Lessor and Lessee are executing a memorandum of lease in recordable form, indicating the names and addresses of Lessor and Lessee, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Lessor and Lessee may not desire to disclose to the public; provided, however, neither party will record the memorandum without the consent of the other party. Further, upon Lessor's request, Lessee agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Lessor until the expiration or sooner termination of the Lease Term.

**Section 16.08.  No Brokerage**. Lessor and Lessee represent and warrant to each other that they have not engaged any broker concerning the leasing of the Property. Each of Lessor and Lessee agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 16.09.  Waiver of Jury Trial and Certain Damages**. LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE, LESSEE'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER PARTY AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LESSOR OR LESSEE, AS APPLICABLE, OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR

**STEPHENS DECL. - EXHIBIT 1 - Page 52**

RELATED HERETO. THE WAIVER BY LESSOR AND LESSEE OF ANY RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 16.10. Securitizations**. As a material inducement to Lessor's willingness to enter into the Transactions contemplated by this Lease and the other Transaction Documents, Lessee hereby acknowledges and agrees that Lessor may, from time to time and at any time (i) act or permit another Person to act as sponsor, settler, transferor or depositor of, or a holder of interests in, one or more Persons or other arrangements formed pursuant to a trust agreement, indenture, pooling agreement, participation agreement, sale and servicing agreement, limited liability company agreement, partnership agreement, articles of incorporation or similar agreement or document; and (ii) permit one or more of such Persons or arrangements to offer and sell stock, certificates, bonds, notes, other evidences of indebtedness or securities that are directly or indirectly secured, collateralized or otherwise backed by or represent a direct or indirect interest in whole or in part in any of the assets, rights or properties described in Section 14.01 of this Lease, in one or more Persons or arrangements holding such assets, rights or properties, or any of them (collectively, the "Securities"), whether any such Securities are privately or publicly offered and sold, or rated or unrated (any combination of which actions and transactions described in both clauses (i) and (ii) in this paragraph, whether proposed or completed, are referred to in this Lease as a "Securitization"). Lessee shall cooperate fully with Lessor and any Affected Party with respect to all reasonable requests and due diligence procedures, provided that such cooperation shall be at no additional cost or expense to Lessee so long as Lessee is not otherwise required to provide such information to Lessor pursuant to the other provisions of this Lease and such information is held confidentially, except as required to be disclosed by Law.

**Section 16.11.**  Intentionally omitted.

**Section 16.12. Time is of the Essence; Computation**. Time is of the essence with respect to each and every provision of this Lease. If any deadline provided herein falls on a non-Business Day, such deadline shall be extended to the next day which is a Business Day.

**Section 16.13. Waiver and Amendment**. No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. No acceptance by Lessor of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Lessor's right to collect any unpaid amounts or an accord and satisfaction.

**Section 16.14. Successors Bound**. Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 16.15. Captions**. Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 16.16.  Other Documents**. Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 16.17.  Entire Agreement**. This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided.

**Section 16.18.  Forum Selection; Jurisdiction; Venue; Choice of Law**. For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the county and state where the Property is located. Lessee consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law. Furthermore, Lessee waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding, is improper. This Lease shall be governed by, and construed with, the Laws of the applicable state in which the Property is located, without giving effect to any state's conflict of Laws principles.

**Section 16.19.  Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, the undersigned agrees that transmission of this Lease via e-mail in a ".pdf" or other electronic format shall be deemed transmission of the original Lease for all purposes.

**Section 16.20.  Reasonable Consents and Costs**. Whenever this Lease requires an approval, consent, determination or judgment by either Lessor or Lessee, unless another standard is expressly set forth, such approval, consent, determination or judgment and any conditions imposed thereby shall be reasonable and shall not be unreasonably withheld or delayed. Any expenditure by a party permitted or required under this Lease, for which such party demands reimbursement from the other party, shall be limited to the fair market value of the goods and services involved, shall be reasonably incurred, and shall be substantiated by documentary evidence available for inspection and review by the other party.

### ARTICLE XVII
### VBH OPTION TO PURCHASE

**Section 17.01.  Option to Purchase**. In consideration of the mutual covenants hereinafter set forth, Lessor grants to VBH an option to purchase the Property (the "Purchase Option") on the terms and conditions set forth under this Article XVII.

**Section 17.02.  Duration of Option**. The Purchase Option shall be effective on January 1, 2026 and shall expire upon the termination of this Lease (the "Option Term").

**Section 17.03.  Exercise of Option**. Provided that Lessee is not otherwise in default under any provision of this Lease, VBH may exercise the Purchase Option at any time during the Option Term by causing written notice of the same to be delivered to Lessor. Such written notice shall include a proposed, unsigned purchase-sale agreement, which shall be in the form of the California Association of Realtors Commercial Property Purchase Agreement and Joint Escrow Instructions (C.A.R. Form CAP), or an agreement of like form and type (which Lessor and VBH

hereby consent to for use in coordinating any purchase of the Property by VBH; the "Purchase Agreement"). The date the Purchase Agreement is delivered to Lessor shall be the "Option Exercise Date."

Section 17.04. Terms of Purchase Agreement. VBH shall cause all terms in the Purchase Agreement to be filled out prior to delivery to Lessor; provided, however, that such terms:  (i) shall not provide for an escrow shorter than thirty (30) days; (ii) shall provide that VBH is purchasing the Property "as-is" and "where-is," without representation or warranty by Lessor as to its condition; and (iii) shall not require Lessor to bear escrow, title insurance, closing costs, or other expenses relevant or incidental to the sale. Further, the purchase price stated in the Purchase Agreement as so delivered by VBH to Lessor shall be blank.

Section 17.05.  Purchase Price. Upon delivery of the Purchase Agreement, Lessor and VBH shall thereafter determine the purchase price according to the following procedures:

(a)     Within ten (10) business days of delivery of the Purchase Agreement to Lessor, VBH and Lessor shall jointly select an Appraiser (as defined under Section 17.05, below) to appraise the Property for its highest and best use (as of the Option Exercise Date). Such appraisal shall be completed within thirty (30) calendar days of the date the Appraiser is selected, full and complete copies of which shall be provided by the Appraiser to both Lessor and to VBH. The appraised value stated therein shall be the price which VBH shall pay Lessor for the Property; provided, however, that the purchase price shall not be less than the Price Floor (as such term is defined under subdivision (c), below.

(b)     In the event VBH and Lessor cannot agree on an Appraiser within the ten (10) day period under subdivision (a), above, then within five (5) business days of the expiration of said ten (10) day period, VBH and Lessor shall each designate their own Appraiser to appraise the Property and each shall deliver written notice of its selection to the other. Appraisals by each such Appraiser shall thereafter be completed within thirty (30) calendar days of the date written notice of selection was given; full and complete copies of each such appraisal shall be provided to Lessor and to VBH. The average of the appraised value stated in each such appraisal shall be the price which VBH shall pay Lessor for the Property; provided, however, that the purchase price shall not be less than the Price Floor (as defined under subdivision (c), below). In the event either Lessor or VBH fails to designate an Appraiser within the five (5) day period stated herein, then the sale price for the Property shall be based only on the appraisal competed by the Appraiser which was timely selected. Further, in the event any selected Appraiser fails to compete his/her appraisal with the thirty (30) calendar day period stated herein, the corresponding appraisal shall be disregarded and the sale price for the Property shall be based on the appraisal completed within said thirty (30) day period.

(c)     As used herein, the "Price Floor" is the lowest price which VBH may purchase the Property for pursuant to its exercise of the Purchase Option. The Price Floor shall be equal to one hundred and five percent (105%) of Lessor's total Indebtedness in the Property. "Indebtedness" shall be determined in the following manner:  (i) Lessor shall disclose the balance then due under each promissory note, loan agreement, and/or other debt instrument which is secured by a deed of trust or other security instrument recorded against the Property as of the Option Exercise Date; and (ii) the sum of all such balances shall be Lessor's Indebtedness in the Property. Lessor hereby consents to disclose to VBH any and all deeds of trusts, security instruments, promissory notes, loan agreements, and other debt instruments, along with all related statements and other records retaliating thereto, for the purpose of verifying and/or authenticating Lessor's Indebtedness (provided, however, that all such materials disclosed to

VBH shall maintained by VBH as confidential, and shall not be disclosed by VBH to any third party without Lessor's prior written consent; and further provided that VBH shall cause all such materials to either be returned to Lessor or, at VBH's option, destroyed upon the close of escrow).

(d)    Notwithstanding the provisions under subdivisions (a) and (b), above, Lessor and VBH may elect to set the purchase price for the Property by mutual consent, in which case the mutually selected sale price shall be memorialized in writing signed by Lessor and VBH; provided, however, that neither Lessor nor VBH shall be required to set the purchase price by mutual consent and either may decline to entertain the same (in which event the sale price shall be set through the appraisal procedures under either subdivision (a) or (b), above).

(e)    Upon determining the purchase price according to the foregoing procedures, the same shall be entered into the Purchase Agreement. Lessor and VBH shall thereafter proceed to complete the purchase and sale of the Property according to the terms and provisions stated in the Purchase Agreement.

**Section 17.06.  Qualifications of Appraiser**. For purpose of this Article XVII, "Appraiser" means an appraiser meeting the statutory requirements under Section 170(f)(11)(E) of the Internal Revenue Code and final Treasury Regulations issued on July 27, 2018 (T.D. 9836), or any amended or supplemental version thereof in effect as of the Option Exercise Date.

**Section 17.07. Escrow and Closing**. Lessor and VBH shall utilize an escrow for coordinating purchase and sale of the Property. The Purchase Agreement, with purchase price entered according to the provisions above, shall be deposited with the escrow officer; Lessor and VBH shall execute escrow instructions and execute any and all other documents and other instruments necessary to cause escrow to close, purchase funds to be disbursed, and the Property transferred and conveyed to VBH, in accordance therewith. Lessor and VBH shall likewise instruct the escrow to credit the PHF Reimbursement toward VBH's payment of the purchase price, pursuant to the requirements under Section 1.11(c), above.

**Section 17.08.  Lease Termination and Close of Escrow**. This Lease shall terminate concurrently with the close of escrow. The Security Deposit shall be credited toward VBH's purchase of the Property. Any credits and/or debits relating to owed and/or unpaid Base Rent and other Monetary Obligations shall be processed through such closing; Lessor and VBH shall likewise make such additional deposits to escrow as may be necessary to properly account for the same.

**ARTICLE XVIII
RIGHT OF FIRST REFUSAL**

**Section 18.01.  Offer**. Subject to the terms and conditions set forth in this Article XIX, if Lessor desires to sell any Property and receives a bona fide written offer from Lessee or a third party which offer is in all respects acceptable to Lessor, Lessor shall deliver a complete copy of such bona fide third party offer to Lessee if applicable ("Third Party Offer"). Within fifteen (15) days of Lessee's receipt of such Third Party Offer from Lessor, and a written statement of Lessor's desire to sell the Property in accordance with such Third Party Offer, Lessee shall have the right to deliver an offer to Lessor ("Purchase Offer") to purchase Lessor's interest in any such Property for the amount of and on the same terms as the bona fide third party offer to purchase such Property (the "Subject Purchase Price"). Lessor and Lessee shall complete such purchase, subject to the satisfaction of each of the terms and conditions set forth in Section 19.02 below. Except as set forth in Sections 18.02, 18.04 and 18.06 below, Lessor shall not sell the Property

35

to a third party without providing a Third Party Offer to Lessee.

**Section 18.02.  Conditions Precedent**

(a)    The purchase of Lessor's interest in a Property pursuant to this Article XVIII shall be subject to the fulfillment of all of the following terms and conditions: (1) no Event of Default shall have occurred and be continuing under this Lease at the time Lessee delivers the Purchase Offer; (2) Lessee shall have paid to Lessor the Subject Purchase Price, together with all Rental and other Monetary Obligations then due and payable under this Lease as of the date of the closing of such purchase; (3) in addition to payment of the Subject Purchase Price, Lessee shall have satisfied its obligations under Section 18.03 below; and (4) the date of the closing of such purchase shall occur on the next scheduled Base Monthly Rent payment date that is ninety (90) days following Lessor's receipt of the Purchase Offer.

(b)    On the date of the closing of the purchase of a Property pursuant to this Section (the "Purchase Closing Date"), subject to satisfaction of the foregoing conditions: (1) this Lease shall be deemed terminated; *provided, however*, such termination shall not limit Lessee's obligations to Lessor under any indemnification provisions of this Lease and Lessee's obligations to pay any Rental or Monetary Obligations (whether payable to Lessor or a third party) accruing under this Lease with respect to such Property prior to the Purchase Closing Date shall survive the termination of this Lease; and (2) Lessor shall convey such Property to Lessee "as is" by grant deed, free and clear of all liens and encumbrances except as provided in Section 18.02, and without representation or warranty.

**Section 18.03.  Costs**. If Lessee delivers a Purchase Offer, Lessee shall be solely responsible for the payment of all Costs resulting from any proposed purchase pursuant to this Article XVIII, regardless of whether the purchase is consummated, including, without limitation, to the extent applicable, the cost of title insurance and endorsements, including, survey charges, stamp taxes, mortgage taxes, transfer taxes and fees, escrow and recording fees, taxes imposed on Lessor as a result of such purchase, the attorneys' fees of Lessee and the reasonable attorneys' fees and expenses of counsel to Lessor.

**Section 18.04.  Termination of Right**. NOTWITHSTANDING ANYTHING TO THE CONTRARY, LESSEE'S RIGHTS UNDER THIS ARTICLE XVIII SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT (a) WITH RESPECT TO THE THIRD PARTY OFFER IN QUESTION, IF LESSEE FAILS TO EXERCISE THE RIGHT GRANTED PURSUANT TO THIS ARTICLE, AND THE SALE TO THE THIRD PARTY PURCHASER IS CONSUMMATED ON THE SUBSTANTIALLY THE SAME TERMS AS PROVIDED IN THE THIRD PARTY OFFER PROVIDED TO LESSEE; (b) IF THIS LEASE TERMINATES OR THE LEASE TERM EXPIRES; (c) IF THE PROPERTY IS SOLD OR TRANSFERRED PURSUANT TO THE EXERCISE OF A PRIVATE POWER OF SALE OR JUDICIAL FORECLOSURE OR ACCEPTANCE OF A DEED IN LIEU THEREOF; OR (d) WITH RESPECT TO THE THIRD PARTY OFFER IN QUESTION, IF ANY EVENT OF DEFAULT SHALL HAVE OCCURRED AND BE CONTINUING UNDER THE LEASE AT THE TIME LESSEE DELIVERS THE PURCHASE OFFER. IN ANY SUCH EVENT, LESSEE SHALL EXECUTE A QUITCLAIM DEED OR SUCH OTHER DOCUMENTS AS LESSOR SHALL REASONABLY REQUEST EVIDENCING THE TERMINATION OF ITS RIGHT UNDER THIS ARTICLE XVIII. IF LESSEE DOES NOT PROVIDE A PURCHASE OFFER AND LESSOR DESIRES TO SELL THE PROPERTY ON TERMS MATERIALLY MORE FAVORABLE (TO THE PROSPECTIVE PURCHASER) THAN THOSE SET FORTH IN THE THIRD PARTY OFFER PROVIDED TO LESSEE, THE TERMS OF THIS ARTICLE XVIII SHALL AGAIN APPLY AND LESSOR SHALL

**STEPHENS DECL. - EXHIBIT 1 - Page 57**

PROVIDE LESSEE WITH A THIRD PARTY OFFER WITH SUCH TERMS THAT ARE MORE FAVORABLE TO THE PROSPECTIVE PURCHASER. SUBJECT TO THE TERMINATION PROVISIONS ABOVE, LESSEE'S RIGHTS UNDER THIS ARTICLE XVIII SHALL BE CONTINUING THROUGHOUT THE LEASE TERM.

**Section 18.05.  Attornment**. If Lessee does not deliver its Purchase Offer to purchase the Property and the Property is transferred to a third-party purchaser, Lessee will attorn to any third-party purchaser as Lessor so long as such third-party purchaser and Lessor notify Lessee in writing of such transfer. At the request of Lessor, Lessee will execute such documents confirming the agreement referred to above and such other agreements as Lessor may reasonably request, provided that such agreements do not increase the liabilities and obligations of Lessee hereunder.

**Section 18.06.  Exclusions.** The provisions of this Article XVIII shall not apply to or prohibit (i) any mortgages or other hypothecation of Lessor's interest in the Property; (ii) any sale of the Property pursuant to a private power of sale under or judicial foreclosure of any mortgage or other security instrument or device to which Lessor's interest in the Property is now or hereafter subject; (iii) any transfer of Lessor's interest in the Property to a mortgagee or other holder of a security interest therein or their designees by deed in lieu of foreclosure; (iv) any transfer of the Property to any Affiliate of Lessor; (v) any transfers of interests in Lessor by any member, shareholder, partner or other owner to any other member, shareholder, partner or other owner; and (vi) any transfers to any Person to whom Lessor sells all or substantially all of its assets.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

**STEPHENS DECL. - EXHIBIT 1 - Page 58**

**IN WITNESS WHEREOF**, Lessor and Lessee have entered into this Lease as of the date first above written.

**LESSOR:**
**Broadway Avenue Investments, LLC**


By:_____
Name: Alan Gomperts
Title: Managing Member


**LESSEES:**

**The DMB Fund, a California not for profit corporation dba "Broadway Community Care Centers"**


By:_____
Name: Steve Gold
Title:   Secretary
Address:  9854 National Boulevard
                Los Angeles, CA 90034


**View Behavioral Health, LLC**
**a California limited liability company**


By:_____
Name: Jack Stephens
Title:  CEO
Address:  2600 Redondo Ave., Suite 500
                Long Beach, CA  90806

**EXHIBITS**

Exhibit A:                    Defined Terms

Exhibit B:                    Legal Description and Street Address of the Property

Exhibit C:                    Base Rent Escalated and Supplemental Rental Fees

**EXHIBIT A**

**DEFINED TERMS**

The following terms shall have the following meanings for all purposes of this Lease:

"*Additional Rental*" has the meaning set forth in Sections 4.03, 4.04, and 4.06.03

"*Adjustment Date*" has the meaning set forth in Section 1.07.

"*Affected Party*" means each direct or indirect participant or investor in a proposed or completed Securitization, including, without limitation, any prospective owner, any rating agency or any party to any agreement executed in connection with the Securitization.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable Laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Base Annual Rental*" shall mean twelve (12) times the base monthly rental.

"*Base Monthly Rent*" means an amount equal to 1/12 of the applicable Base Annual Rental.

"*Business Day*" means a day on which banks located in Santa Barbara, California are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property caused by a force majeure event.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all actual, reasonable, out of pocket costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, expert fees, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 12% per annum or the highest rate permitted by Law, whichever is

1

less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Laws*" means federal, state and local Laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of Law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, USTs, and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Lessee and/or the Property.

"*Environmental Liens*" means any liens and other encumbrances imposed pursuant to any Environmental Law.

"*Event of Default*" has the meaning set forth in Section 12.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extension Option*" has the meaning set forth in Section 3.02.

"*Extened Term*" has the meaning set forth in Section 3.02.

"*Fair Market Value*" has the meaning set forth in Section 18.06.

"*Force Majeure Event*" has the meaning set forth in Section 17.01.

"*GAAP*" means generally accepted accounting principles, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local Laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) petroleum, oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants, for which liability or standards of conduct can be imposed pursuant to Environmental Law, or are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "contaminants," "pollutants," or words of similar import under any Environmental Laws, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 5101, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901, et seq.; and (iv) regulations adopted pursuant to the aforesaid Laws; (b) asbestos in any form which is friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; (c) underground storage tanks; and (d) any other chemical, material or substance, exposure to

which is prohibited, limited or regulated by any Governmental Authority.

"*Indemnified Parties*" means Lessor, its members, managers, officers, directors, shareholders, partners, employees, affiliates, subsidiaries, or lenders or their respective successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lessor.

"*Initial Term*" has the meaning set forth in Section 1.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*"  means the Initial term and the additional term pursuant to the extension option set forth in Section 1.03.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Lessee or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Property.

"*Lender*" means any lender in connection with any loan secured by Lessor's interest in the Property, and any servicer of any loan secured by Lessor's interest in the Property.

"*Lessee Entity*" or "*Lessee Entities*" means individually or collectively, as the context may require, Lessee and all Affiliates thereof.

"*Lessee Reporting Entities*" means Lessee.

"*Lessor Entity*" or "*Lessor Entities*" means individually or collectively, as the context may require, Lessor and all Affiliates of Lessor.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including without limitation, the operation of the Property and/or the value of the Property; (b) the contemplated business, condition, worth or operations of Lessee; (c) Lessee's ability to perform its obligations under this Lease; or (d) Lessor's interests in the Property, this Lease or the other Transaction Documents.

"*Monetary Obligations*" means all Rental and any and all other sums payable or reimbursable by Lessee under this Lease to Lessor, to any third party on behalf of Lessor, or to any Indemnified Party.

"*Mortgage*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings executed by Lessor for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to a Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 6.03(a)(i) with respect to real property (but not Lessee's personal property) payable with respect to a Property, as the case may be, and in either case, less any Costs incurred by Lessor in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local Laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar Laws, ordinances, regulations, policies or requirements of other states or localities.

"*Partial Condemnation*" has the meaning set forth in Section 11.03.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Encumbrances*" shall mean recorded easements, restrictions, liens and encumbrances affecting the Property.

"*Permitted Sublease*" has the meaning set forth in Section 14.04.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" means any and all "goods" (excluding "inventory," and including, without limitation, all "equipment," "fixtures," appliances and furniture (as "goods," "inventory," "equipment" and "fixtures" are defined in the applicable Uniform Commercial Code then in effect in the applicable jurisdiction)) from time to time situated on or used in connection with the Property, whether now owned or held or hereafter arising or acquired, together with all replacements and substitutions therefore and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith.

"*Price Index*" means the Consumer Price Index which is designated for the applicable month of determination as the United States City Average for All Urban Consumers, All Items, Not Seasonally Adjusted, with a base period equaling 100 in 1982 - 1984, as published by the United States Department of Labor's Bureau of Labor Statistics or any successor agency. In the event that the Price Index ceases to be published, its successor index measuring cost of living as published by the same Governmental Authority which published the Price Index shall be substituted and any necessary reasonable adjustments shall be made by Lessor and Lessee in order to carry out the intent of Section 4.02. In the event there is no successor index measuring cost of living, Lessor shall reasonably select an alternative price index measuring cost of living that will constitute a reasonable substitute for the Price Index.

"*Property*" means that parcel or parcels of real estate legally described on <u>Exhibit B</u> attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate).

"*Real Estate Taxes*" has the meaning set forth in Section 6.01.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local Laws applicable to or regulating USTs.

"*REIT*" means a real estate investment trust as defined under Section 856 of the Code.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs or any Threatened Release.

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any

inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rental*" means, collectively, the Base Annual Rental, the Additional Rental and Taxes and assessments; pursuant to Section 6.01 utilities; insurance..

"*Rental Adjustment*" means an amount equal to the lesser of (a) 2% of the Base Annual Rental in effect immediately prior to the applicable Adjustment Date, or (b) 1.25 multiplied by the product of (i) the percentage change between the Price Index for the month which is two months prior to the Effective Date or the Price Index used for the immediately preceding Adjustment Date, as applicable, and the Price Index for the month which is two months prior to the applicable Adjustment Date; and (ii) the then current Base Annual Rental.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning in Section 6.04.

"*Securities*" has the meaning set forth in Section 17.10.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securitization*" has the meaning set forth in Section 17.10.

"*Subtenant*" has the meaning set forth in Section 14.04.

"*Successor Lessor*" has the meaning set forth in Section 13.03.

"*Taking*" means any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means. The Taking shall be considered to have taken place as of the date actual physical possession is taken by the condemnor.

"*Temporary Taking*" has the meaning set forth in Section 11.04.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" has the meaning set forth in Section 11.02.

"*Transaction*" has the meaning set forth in Section 14.01.

"*Transaction Documents*" means this Lease, the Memorandum of Lease, the Letter of

Credit and any Subordination, Nondisturbance and Attornment Agreement.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly-owned subsidiary of such an entity.

"*USTs*" means any one or combination of tanks and associated product piping systems used in connection with storage, dispensing and general use of Regulated Substances.

**EXHIBIT B**

**LEGAL DESCRIPTION AND
STREET ADDRESS OF THE PROPERTY**

**Street Address:** **737 S Broadway, Los Angeles, CA 90014**

**Legal Description**:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2 PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568 PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37 DEGREES 48 MINUTES EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25 HUBER TRACT, RECORDED IN BOOK 5 PAGE 12 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37 DEGREES

48 MINUTES EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF THE HUBER TRACT; THENCE NORTH 52 DEGREES 12 MINUTES WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37 DEGREES 48 MINUTES WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52 DEGREES 12 MINUTES EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

**737 S. Broadway**

**Lease Schedule**

**Exhibit C**

| | Year 1 Months 7-12 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Monthly Rental Income** | 200,000 | 206,000 | 212,180 | 218,545 | 225,102 | 231,855 | 238,810 | 245,975 | 253,354 | 260,955 | 268,783 | 276,847 | 285,152 | 293,707 | 302,518 |

# STEPHENS DECL. - EXHIBIT 2
# VBH VALUATION

# Valuation of

# the Total Equity

# of

# View Behavioral Health, LLC

as of

May 15, 2024

**SIMON FINANCIAL, INC.**

**12100 Wilshire Blvd. Suite 800, Los Angeles, CA 90025  (310) 612-2400   www.simon-financial.com**

# SIMON FINANCIAL, INC.

**12100 Wilshire Blvd, Suite 800 Los Angeles, CA 90025 (310) 612-2400 www.simon-financial.com**

June 9, 2024

Mr. Conrad Nilo
Chief Financial Officer
View Behavioral Health, LLC
2600 Redondo Avenue, 5th Floor
Long Beach, CA 90806

Dear Mr. Nilo:

You have retained Simon Financial, Inc. ("Simon") as an independent financial advisor, to provide an opinion (the "Opinion") of the fair market value of the total equity of View Behavioral Health, LLC ("View Behavioral", "VBH" or the "Company"), as of May 15, 2024 (the "Valuation Date").

It is our understanding that that VBH is a holding company which owns 100 percent of each of (i) Collaborative Neuroscience Network LLC dba Oceanview Adult Psychiatric Hospital ("CNN"), (ii) View Behavioral Health Colton, LLC and (iii) View Behavioral Health Colton 2 LLC and Jack Stephens owns 75% of VBH and outside investors own the remaining 25%. We further understand that CNN received approval to expand from 39 beds to 80 beds which will be completed in Q3 2024 and that the Company also received approval for an expansion facility in Colton. Lastly, we understand that in order to support this growth, the Company is seeking to raise additional capital ("Financing"). We understand that this Opinion will serve as a valuation basis for assisting VBH's management with the Financing. Our Opinion is valid for this purpose only; no other purpose is intended or should be inferred. The analyses and opinions concluded by Simon and set forth in this financial valuation report are subject to the Opinion Letter and adjoining limiting factors and assumptions. It is expressly understood that this is not a fairness opinion.

For purposes of this analysis, the term "fair market value" is defined as the amount at which the capital stock would change hands between a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under any compulsion to act, with equity to both.

No representation is made herein, or directly or indirectly by the Opinion, as to any legal matter or as to the sufficiency of the above definition for any purpose other than setting forth the scope of Simon's Opinion hereunder.  Furthermore, it is our understanding, upon which Simon is relying, that VBH, its shareholders and any other recipient of the

Mr. Conrad Nilo
View Behavioral Health, LLC
June 9, 2024

Opinion will consult with and rely solely upon their own legal counsel with respect to said definition.

In our analysis of the Company, we have assumed the Company's existing business to be a going-concern, meaning that the underlying assets of the Company as acquired are presumed to attain their highest values as an integral part of a business entity in continued operation and liquidation of the Company's assets would likely diminish the value of the whole to the shareholders and creditors of the Company.

In connection with this Opinion, we have relied upon and assumed, without independent verification, that all information provided to us, including financial forecasts, were reasonably prepared and fairly represent the results of operations and financial position of the Company.   We have not independently verified the accuracy of the information supplied to us with respect to the Company, and do not assume any responsibility with respect to it.

**Conclusions**

Based upon our due diligence and analysis, and relying upon the accuracy and completeness of all information provided to us by the Company, it is our opinion that, as of the Valuation Date, the fair market value of the total enterprise value of the Company is reasonably stated in the amount of **SEVENTY MILLION FIVE HUNDRED THOUSAND DOLLARS ($70,500,000)** and the total equity of the Company is reasonably stated in the amount of **SIXTY MILLION DOLLARS ($60,000,000)**.

This Opinion and the accompanying report are intended solely for the use of View Behavioral Health, LLC, for the purpose stated herein and may not be used, in whole or in part, for any other purpose without written consent.

Respectfully,

/s/ Simon Financial, Inc.

**SIMON FINANCIAL, INC.**

**STATEMENT OF LIMITING FACTORS AND OTHER ASSUMPTIONS**

The analysis and opinions concluded by Simon Financial, Inc. (hereinafter referred to as "Simon") and set forth in this financial valuation report, dated May 15, 2024 for View Behavioral Health, LLC, are subject to the following limiting factors and assumptions :

In accordance with recognized professional ethics, the professional fee for this service is not contingent upon Simon's conclusion of value, and neither Simon nor any of its employees, contractors nor agents has a present or intended financial interest in the Company. We have no personal interest or bias with respect to the subject matter of this report nor the parties involved.

The opinion of value expressed herein is valid only for the stated purpose and date of the Opinion.

This letter and the conclusions arrived herein are for the exclusive use of the Company. Furthermore, the letter and conclusions are not intended by the author, and should not be construed by the reader, to be investment advice in any manner whatsoever.  The conclusions reached herein represent the considered opinion of Simon based on the information furnished to it by the Company and other sources.  The extent to which the conclusions and valuations arrived at herein should be relied upon, should be governed and weighted accordingly.

No investigation of legal fee or title to the business or its assets has been made and the ownership claim to the business and its assets is assumed valid. No consideration has been given to liens or encumbrances which may be in place against the business or assets, except as specifically stated in the report. Furthermore, we assume there are no hidden or unexpected conditions of either real or personal property utilized by the business enterprise which would materially and adversely affect value and that the Company is in compliance with all laws and regulations of any government or agency significant and relevant to its operations.

All value conclusions are presented as the considered opinion of Simon based on the facts noted within this report. We assume no responsibility for changes in values or market condition nor for the inability of the owner to locate a purchaser at the estimated value. Furthermore, we assume no responsibility for economic and physical factors which may affect the opinions herein stated which may occur at some date after the date of this appraisal report. The value conclusions derived were for the specific purpose set forth herein and may be invalid if used for any other purpose. This is not a fairness or solvency opinion and may not be used out of the context as presented herein nor used to solicit potential buyers.

We assume no responsibility for any financial reporting judgements which are appropriately those of management. Management accepts the responsibility for any related financial reporting with respect to the assets or properties encompassed by this appraisal.

No consideration has been given in this appraisal to the underlying market value of the real and personal property, such as furniture, fixtures, machinery and equipment located on the premises, unless otherwise identified in this report.

With regard to any intangible assets (patents, trademarks, service marks, tradenames, copyrights, trade secrets, customer lists, etc.), either valued separately and distinctly from the business or which may contribute to the value of the business enterprise but not be separately valued as part of this valuation engagement, Simon expresses no opinion regarding, nor shall it have any responsibility in connection with, any of the following matters :

    a.    verifying the ownership of the asset;

    b.    determining whether the owner of such asset has granted to other parties any licenses, options or security interest therein, or made any commitment to license or assign rights in such asset; or whether such asset has liens or other encumbrances against it;

    c.    whether there has been litigation relating to such intangible assets and the results of any adjudication or settlement of such litigation, particularly with respect to issues of validity, enforceability and scope of protection afforded.

If the appraisal report or any part thereof is disseminated to anyone other than the client, the client shall make such party or parties aware of all limiting conditions and assumptions affecting the appraisal assignment.

# SIMON FINANCIAL, INC.

# Table of Contents

Page

**ENGAGEMENT OVERVIEW** ......................................................................... 1

**COMPANY OVERVIEW** ................................................................................ 2

**ECONOMIC OVERVIEW** ............................................................................. 5

**VALUATION METHODOLOGY** .................................................................. 15

**WEIGHTED AVERAGE COST OF CAPITAL** ....................................... 18

**VALUATION SUMMARY** ............................................................................ 20

      **Market Approach**
      **Transaction Approach**
      **Income Approach**

**OTHER CONSIDERATIONS / DISCOUNTS** ........................................... 25

**FAIR MARKET VALUATION CONCLUSIONS** ..................................... 26

**EXHIBITS**

      **Subject Company Income Statement** ................................................. 1.A
      **Subject Company Representative Levels** .......................................... 1.B
      **Subject Company Balance Sheet** ........................................................ 2

      **Market Approach**
            **Market Approach Summary** ............................................................ 3
            **Market Multiples** ................................................................................ 4
            **Comparative Risk Analysis with Comparable Public Companies** ................. 5

      **Transaction Analysis**
            **Transaction Approach Summary** ................................................... 6
            **Transaction Multiples** ....................................................................... 7

      **Income Approach**
            **Discounted Cash Flow Analysis** ................................................... 8
            **Weighted Average Cost of Capital** ................................................ 9

**APPENDIX :**

    **Closed End Fund - Control Premium Study**
    **Synopsis of Publicly Traded Comparable Companies**
    **Resume**

Case 2:24-bk-12079-VZ    Doc 421-4    Filed 02/04/25    Entered 02/04/25 23:53:01    Desc
Jack Stephens Declaration and Exhibits    Page 61 of 110

*View Behavioral Health, LLC*

# Engagement Summary

## Scope of Engagement

We understand that View Behavioral Health, LLC ("VBH" or the "Company") is a holding company which owns 100 percent of each of (i) Collaborative Neuroscience Network LLC dba Oceanview Adult Psychiatric Hospital ("CNN"), (ii) View Behavioral Health Colton, LLC and (iii) View Behavioral Health Colton 2 LLC. Jack Stephens own 75% of VBH, and outside investors own the remaining 25%. We further understand that CNN received approval to expand from 39 beds to 120 beds, which will be completed in Q3 2024, and that the Company also received approval for an expansion facility in Colton. Lastly, we understand that in order to support this growth, the Company is seeking to raise additional capital ("Financing"). In connection with this Financing, the Company has requested that Simon Financial, Inc. prepare certain analyses expressing its conclusions, as of May 15, 2024 ("Valuation Date"), regarding the fair market value of the Company.

The analyses and opinions concluded by Simon Financial and set forth in this financial valuation report are subject to the Opinion Letter and adjoining limiting factors and assumptions. It is expressly understood that this is not a fairness opinion.

## Valuation Date

May 15, 2024

## Due Diligence

In connection with this analysis, we have relied upon and assumed, without independent verification, that all information provided to us, including financial forecasts, were reasonably prepared and fairly represent the results of operations and financial position of the Company.  We have not independently verified the accuracy of the information supplied to us with respect to the Company, and do not assume any responsibility with respect to it.  The due diligence activities undertaken as part of the valuation analysis include the following :

- Held discussions with certain members of the management team of the Company to discuss the operations, strategy, financial condition, future prospects and projected operations and performance of the Company as of the Valuation Date;

- Reviewed internally prepared financial statements for the fiscal years ended December 31, 2022 and 2023 and year-to-date as of March 31, 2023 and 2024, which were the most recent financial statement available;

- Reviewed projected income statement for fiscal years ending December 31, 2024 through 2026;

- Reviewed a View Behavioral Health Executive Summary presentation as of May 2024;

- Reviewed the View Behavioral Health, LLC Operating Agreement, dated August 7, 2023 (Final);

- Reviewed certain other publicly available financial data for certain companies that we deem comparable to the Company; and

- Conducted such other studies, analyses and inquiries as deemed appropriate.

**STEPHENS DECL. - EXHIBIT 2 - Page 77**

*View Behavioral Health, LLC*

# Company Overview

## History and Nature of Business

Founded in 2015, Collaborative Neuroscience Network, LLC dba Oceanview Adult Psychiatric Hospital ("CNN") is an Acute Psychiatric Hospital ("APH") currently operating 39 beds licensed by the California Department of Health and Human Services and accredited by the Joint Commission and certified by Medicare.

Patient referrals are received from the county, commercial payors, and Medicaid administrators. While over 50% of patient referrals require Lanterman-Petris-Short ("LPS") designation (involuntary admissions), CNN has historically only admitted voluntary patients.

During the second quarter of 2022, CNN received community support for LPS-designation as well as an increase from 39 beds to 120 beds.

The APH provides a unique option for adults experiencing acute psychiatric symptoms and in need of quality psychiatric care in a secure voluntary setting with private rooms that are essential to providing optimum care.

Private rooms for the treatment of psychiatric illness and behavioral disorders in adults are an essential part of the patient experience, and they provide an atmosphere that promotes healing and recovery.

As of the Valuation Date, the Company also received approval from the County of San Bernadino to develop an additional acute psychiatric hospital in Colton (Colton I). This location will house a locked psychiatric facility with 74 bed capacity. The Colton facility is expected to be licensed and operational by October 2024 to include a LPS designation.  The building was purchased by a group of investors and the renovation costs is funded by the EB-5 program of the USCIS.

Additionally , as of the Valuation Date, the Company received approval from the County of San Bernadino to develop an adjoining facility for adolescents (Colton II), with 50 beds and 40 patients daily for intensive outpatient care. This facility is expected to be operational in June 2025. As of the Valuation Date, both facilities have been acquired by investors through the EB-5 program.

### Facilities

The Long Beach hospital is leased from a third party at a market rent. The buildings for Colton 1 and 2 were acquired by the investors. The Company is paying a market rate of rent.

### Personnel

As of the Valuation Date, the Company employed 78 full time, 2 interns, 14 part time and 46 per diem.

Page 2

*View Behavioral Health, LLC*

# Company Overview

## Financial Review

The determination of the fair market value of a company requires a complete financial analysis, including a review of historical operating results and financial conditions, as well as an estimate of near terms profits. Our investigation included a review of the consolidated financial statements for the Company, for fiscal years ended December 31, 2022 and 2023, and the latest 12 months ended March 31, 2024 ("LTM"). No financial information was available prior to 2022 since the Company was acquired in the fourth quarter of 2021. The financial statements and projections have been accepted, without independent verification, as correctly reflecting the results of the operations and financial condition of the Company, in accordance with generally accepted accounting principles, applied on a consistent basis.

### *Comparative Financial Statement Analysis*

Selected information has been extracted from these statements and appended hereto for review as Exhibit 1 for the Income Statement and Adjusted Income Statement; and Exhibit 2 for the Balance Sheet.

Exhibits 1.A and 1.B reflect the Company's consolidated operating results for fiscal years ended December 31, 2022 and 2023, and the LTM period ended March 31, 2024, which were the most recent financial statements available. Total revenue increased 5.7 percent in FY2023, from $11.797 million to $12.475 million. Between the quarters ended March 31, 2023 and March 31, 2024, revenue increased 28.6 percent. The Company's operating profit after normalization adjustments was -$1.276 million in FY2022, -$3.711 million in FY2023, and -$3.691 million as of the LTM period.

Exhibit 2 reflects View Behavioral's balance sheet as of December 31, 2022, 2023, and March 31, 2024, which was the most recent available financial statement according to management. As of March 31, 2024, View Behavioral had total cash and cash equivalents of $1.394 million. Total current assets as of March 31, 2024 were $6.712 million, total assets were $17.291 million, and net shareholders' equity was $4.186 million. The Company's largest asset as of March 31, 2024 was property and equipment. View Behavioral's debt totaled $10,731,594 as of March 31, 2024, and included:

| | |
|---|---|
| FF&E Loans | $412,263 |
| Convertible Note – Insight Capital | $3,000,000 |
| Green Energy Solutions Note | $1,500,000 |
| Diamond Partners Group Note | $1,000,000 |
| Loan From Jack Stephens | $4,819,000 (1) |

    *(1)   After $5 million of debt was reclassified to equity*

Based on information provided by management, the income statement was adjusted to exclude all non-recurring expenses. These adjustments are discussed further in this report and can be reviewed in Market Approach – Representative Levels in Exhibit 1.B.

*View Behavioral Health, LLC*

# Company Overview

## Financial Review (continued)

*Projections*

Based on management provided projections for fiscal years ending December 31, 2024 through 2026, revenue is expected to increase to $26.532 million in fiscal 2024 due to the expansion of the Long Beach facility from 39 beds to 120 beds and development of Colton 1, which will have 74 beds. Revenue is projected to increase to $89.330 million in fiscal 2025 as Colton 2 begins operations and Long Beach expansion and Colton 1 have a full year of results. In fiscal 2026, revenue increases 23.6 percent to $110.428 million as Colton 1 and Colton 2 stabilize. Based on discussions with management, revenue growth will normalize to approximately 5 percent in fiscal 2027. Operating income, adjusted for non-recurring expenses is estimated to be $831,000 in fiscal 2024, $15.379 million in fiscal 2025 and $19.901 million in fiscal 2026. Fiscal 2027 operating margin of 18 percent is expected to be the same as fiscal 2026.

Specific milestones and developments, as of the Valuation Date, that support the projections are as follows :

1. Approval and permits for the expansion of the Long Beach facility were received as of the Valuation Date;
2. Construction of the Long Beach expansion is approximately 90 percent compete, as of the Valuation Date;
3. Received approval for Colton facilities from County of San Bernadino and signed a formal agreement;
4. Buildings for both Colton 1 and Colton 2 were acquired by Company's investors, using EB-5 financing
5. Executed an agreement with UC Riverside to provide medical staff to Colton and utilize Colton for their resident program

*View Behavioral Health, LLC*

# General Economic Overview as of 1st Quarter 2024[1]

*In this analysis, we have examined the general economic climate that existed at the end of March 2024. This summary provides an overview of some selected economic factors that prevailed in the first quarter of 2024, as well as a discussion of the factors that are crucial over an extended period of time. Topics addressed include general economic conditions, gross domestic product, consumer prices and inflation rates, energy prices, interest rates, unemployment, consumer spending, the stock and bond markets, construction, manufacturing, real estate markets, and the future economic outlook.*

## A.    Economic Update at a Glance

The U.S. economy—as indicated by GDP—increased at an annual rate of 1.6% in the first quarter of 2024 after rising at an annual rate of 3.4% in the fourth quarter of 2023. In 2023, GDP grew 2.5%.

The first-quarter GDP increase reflected increases in consumer spending, residential fixed investment, nonresidential fixed investment, and state and local government spending. A decline in private inventory investment partially offset these increases. Imports, which are a subtraction in the calculation of GDP, increased.

The U.S. Leading Economic Index (LEI) decreased 0.3% in March, to 102.4, following a 0.2% increase in February. The LEI is now down 2.2% over the six-month period between September 2023 and March 2024, a smaller decrease compared to its 3.4% contraction over the previous six-month period from March 2023 to September 2023. The Conference Board interpreted the data to indicate that, after February's short-lived increase, the index pointed to a fragile outlook for the U.S. economy. The Conference Board anticipated that real GDP growth would moderate over the second and third quarters of 2024.

The Federal Reserve Bank of Chicago, in its most recent release, reported that the Chicago Fed National Activity Index (CFNAI) increased to 0.15 in March from 0.09 in February. Two of the four broad categories of indicators increased in March, and two out of four categories made positive contributions to the index. The CFNAI's three-month moving average moved up to -0.19 in March from -0.28 in February.

The four-week average of initial claims for unemployment insurance in the last week of March was 222,000. The total number of continued weeks claimed for benefits in all programs for the week ending March 30 was 1,953,031. This is a decrease of 12,519 from the previous week. The number of weekly claims filed for benefits in all programs was 1,821,910 in the comparable week in 2023.

Hourly wages increased by 12 cents in March, to $34.69. Average hourly earnings have increased by 4.1% over the 12-month period ending March 2023.

In the first quarter of 2024, the Federal Open Market Committee (FOMC) held two meetings: on January 30-31 and on March 19-20. At its January meeting, the FOMC decided to maintain the target for the federal funds rate in a range of 5.25% to 5.50%. At its March meeting, the FOMC decided to

---

[1] The contents of the economic outlook section of this valuation report are quoted from the Economic Outlook Update™ 1Q 2024 published by Business Valuation Resources, LLC, © 2024, reprinted with permission. The editors and Business Valuation Resources, LLC, while considering the contents to be accurate as of the date of publication of the Update, take no responsibility for the information contained therein.  Relation of this information to this valuation engagement is the sole responsibility of the author of this valuation report.

*View Behavioral Health, LLC*

continue to maintain the federal funds rate within a target range of 5.25% to 5.50%. The committee seeks to achieve maximum employment and inflation at the rate of 2.0% over the long run.

The Consumer Confidence Index was essentially unchanged in March. The index was 104.7 in March and 104.8 in February. Consumers' assessment of current business and labor-market conditions increased, and their short-term outlook for income, business, and labor conditions declined.

MetLife and the U.S. Chamber of Commerce published their first-quarter 2024 survey, which showed that the Small Business Index reading indicated a stable business climate. The index now stands at 62.3, an increase of 1.0 percentage point from last quarter's reading of 61.3. The survey reported that more small businesses see an improving economy, driving the headline score up. Concurrently, small businesses' concerns about inflation remain consistently high.

The survey highlighted four key findings for the quarter:

1. A majority (52.0%) of small-business owners stated that inflation is their biggest challenge. This is the seventh consecutive quarter where 50.0% of business owners or more have reported that inflation is the major challenge in running their business. Concerns over inflation have been consistent across regions, business sizes, and sectors.

2. More than half of small businesses (60.0%) reported that cybersecurity threats (phishing, malware, and ransomware) are their top concern. The small businesses most concerned about cybersecurity threats are businesses with 20 to 500 employees (74%) and businesses in the professional services industry (71%). Supply-chain breakdowns (58%) and fear of another pandemic occurring in the future (54%) are two other top concerns for small businesses.

3. Seventy-one percent reported that they are adequately prepared for future threats. However, one in four, or 27.0%, of small businesses stated that they are one disaster away from shutting down. This mostly affects businesses millennials and Gen Zers own and businesses that have been in operation for 10 years or less. Retailers (34.0%) are most likely to shut down compared to the services sector (22.0%).

4. Sixty-two percent of small businesses indicated that they have contributed to, or established, a rainy-day fund to help with unexpected expenses in the past year. This is an eight-point increase since 2018 when 53.0% of businesses felt comfortable with their rainy-day fund. However, in the first quarter, 10.0% of small businesses stated that they did not have a rainy-day fund, compared to 33.0% in 2018.

The RSM U.S. Middle Market Business Index edged down in the first quarter of 2024, dropping 1.5 points, to a reading of 130.8 from 132.3 in the fourth quarter of 2023. The report stated that the decrease was not enough to change their view that a sustained expansion will continue throughout this year amid improving productivity. Sixty-two percent of respondents anticipated an improvement in economic conditions over the next six months, and 67.0% expected improved net earnings and revenues over the same period of time.

The Institute for Supply Management's Manufacturing PMI index increased 2.5 percentage points in March, to 50.3%. The March increase was the first expansion following 16 months of contractions. A Manufacturing PMI above 50.0% indicates that the manufacturing sector is generally expanding, while a reading below 50.0% indicates that it is generally contracting. Additionally, a manufacturing PMI

Page 6

STEPHENS DECL. - EXHIBIT 2 - Page 82

*View Behavioral Health, LLC*

above 42.5%, over a period of time, generally indicates an expansion of the overall economy. Therefore, March's Manufacturing PMI signified growth in the overall economy for 47 consecutive months after a single month of contraction in April 2020.

The Federal Reserve reported that total industrial production increased 0.4% in March, the same rate of growth there was in February. The index for total industrial production was at 102.7% of its 2017 average but declined at an annual rate of 1.8% in the first quarter.

The Institute for Supply Management's Services PMI index decreased by 1.2 percentage points in March, to 51.4%. March's Services PMI reading indicated expansion in both the services sector and the overall economy for the 15th consecutive month after a single month of contraction in December 2022, which was the first contraction since May 2020, when the index came in at 45.4%. Over the past 12 months, the Services PMI has averaged 52.5%. Two of the four subindexes that directly factor into the Services PMI—Business Activity and New Orders—recorded growth in March. A Services PMI reading above 50% indicates the services-sector economy is generally expanding, while a reading below 50% indicates it is generally contracting. A Services PMI reading above 49.0%, over time, generally indicates an expansion of the overall economy.

The major U.S. equity indexes posted solid gains in March for the second consecutive month. The S&P 500 index has continued its upward trajectory since late October 2023, with few interruptions. The S&P 500 rose 3.2% in March on a total return basis, while the Dow Jones Industrial Average increased 2.2% and the Russell MidCap went up 4.3%. In March, market volatility was low and essentially unchanged when compared to February, with the Chicago Board Options Exchange Volatility Index (VIX) reaching a high of 15.2. The average VIX reading in March was 13.8.

Housing starts decreased 14.7% in March, to an annual rate of 1.321 million, compared to the revised February rate of 1.549 million. The March rate was 4.3% below the March 2023 rate of 1.380 million. Single-family housing starts also decreased in March, by 12.4%, to an annual rate of 1.022 million, while multifamily starts dipped by 20.8%, to an annual rate of 290,000.

The number of building permit authorizations for privately owned housing units, considered a leading indicator of demand for new homes, fell 4.3% in March, to an annual rate of 1.458 million. The number of building permits authorized was up 1.5% from one year ago.

The National Association of Realtors (NAR) reported that the number of existing-home sales decreased by 4.3% in March, to a seasonally adjusted annual rate of 4.190 million. Over the last 12 months, the number of existing-home sales, which account for the majority of all home sales, has dropped 3.7% from 4.350 million in March 2023. The national median existing-home price for all housing types was up 4.8% in March from a year ago, to $393,500. The median home price increase in March was the ninth consecutive month of year-over-year price increases.

The NAHB/Wells Fargo Housing Marking Index (HMI) increased 3.0 points in March, to 51.0, the index's fourth consecutive monthly gain. March marked HMI's highest level since July 2023 and was the first time since then that the index exceeded a reading of 50.0, a key level measuring sentiment. The report noted that a prolonged lack of existing inventory contributed to the recent HMI increases, along with the prospect of future rate cuts by the Federal Reserve and strong pent-up demand. However, the NAHB chief economist stated, "Even though there is strong pent-up demand, builders continue to face several supply-side challenges, including a scarcity of buildable lots and skilled labor, and new restrictive codes that continue to increase the cost of building homes."

Page 7

*View Behavioral Health, LLC*

NAR's most recent "Commercial Market Insights Report" analyzed the trends in the commercial market in the first quarter of 2024. The report concluded that the U.S. economy started to slow down after previously exceeding expectations. Nonetheless, consumers continue spending, which helps keep the economy resilient. The commercial real estate market's performance during the first quarter of 2024 has seen a few changes such as rising vacancy rates and decelerating rent growth across all market sectors. The office sector has undeniably experienced the most severe and persistent challenges compared with any other commercial real estate category and has dropped further in the first quarter. With hybrid work arrangements becoming more prevalent, the office vacancy rate rose further, to 13.7%—hitting a decade high. Following the downward trend, the industrial sector has slowed down in the first quarter of 2024, with net absorption falling beneath levels not seen in over a decade.

On the other hand, the multifamily sector remains strong. The multifamily sector wrapped up the first quarter of 2024 with a robust 141.0% year-over-year increase in absorption of 356,984 units. High mortgage rates hovering around 7.0% have created demand for apartment housing; however, vacancy rates rose to a 10-year peak of 7.8% as the influx of new housing supply has prevented vacancy rates from falling. In the first quarter, the demand for retail spaces fell below pre-pandemic levels. Within the last year, net absorption has significantly declined, dropping approximately 30.0 percentage points. However, the limited availability of retail spaces has kept vacancy rates low, at around 4.0%, the lowest rate among all sectors in the commercial real estate market.

## Gross Domestic Product

The Bureau of Economic Analysis (BEA) reported that the nation's economy—as indicated by GDP—increased at an annual rate of 1.6% in the first quarter of 2024, indicating that the U.S. economy expanded after increasing at an annual rate of 3.4% in the fourth quarter of 2023. In 2023, real GDP increased 2.5%, compared to an increase of 1.9% in 2022.

The first-quarter GDP increase reflected increases in consumer spending, residential fixed investment, nonresidential fixed investment, and state and local government spending. These increases were partially offset by a decline in private inventory investment. Imports, which are a subtraction in the calculation of GDP, increased.

Current-dollar GDP increased at an annual rate of 4.8% in the first quarter, or $327.5 billion, to $28.3 trillion. This followed the fourth-quarter increase of 5.1%, or $346.9 billion. In 2023, the current-dollar GDP increased 6.3%.

## Consumer Spending

Consumer spending increased at an annual rate of 2.5% in the first quarter of 2024, after rising at a rate of 3.3% in the prior quarter. The increase in consumer spending reflected an increase in spending on services, while consumer spending on goods decreased. Consumer spending contributed 1.68 points to the first-quarter GDP figure. In 2023, consumer spending increased 2.2%. Consumer spending, also referred to as "personal consumption," accounts for approximately 70% of the U.S. GDP.

Consumer spending on nondurable goods—items such as food and gasoline—was unchanged in the first quarter after increasing at a rate of 2.9% in the previous quarter. Overall, consumer spending on nondurable goods made no contribution to the first-quarter GDP rate.

Page 8

*View Behavioral Health, LLC*

Services expenditures grew at an annual rate of 4.0% in the first quarter of 2024, after rising at a rate of 3.4% in the previous quarter. Spending on services contributed 1.78 points to the first-quarter GDP figure.

In March, consumer spending increased as the U.S. Census Bureau reported that total retail and food services sales rose by 0.7%, to $709.6 billion, from February's revised reading of $704.5 billion. Retail sales were up 4.0% from one year ago. Economists view retail sales as a key economic indicator since consumer spending accounts for nearly two-thirds of the U.S. economy.

The "Advance Monthly Retail Trade Report," which highlights sales figures across most retail categories, reported that eight of the 13 major categories saw an increase in sales in March, while five decreased. Sales at nonstore retailers had the largest increases, with a 2.7% gain, followed by sales at miscellaneous store retailers and gasoline stations, each with a 2.1% increase. Sales at general merchandise stores saw an increase of 1.1%, while other categories that rose reported increases of less than 1.0%. The largest decrease was found in sporting goods, hobby, musical instrument, and bookstores, with a 1.8% decline, followed by clothing and clothing accessories stores, with a 1.6% drop in sales. Sales at electronics and appliance stores fell by 1.2%, while sales at motor vehicle and parts dealers dropped by 0.7%. Sales at furniture and home furnishing stores posted a 0.3% decline in March.

Eight out of 13 retail categories saw an increase in spending over the past 12 months, and five decreased. The categories with the biggest 12-month increase in spending were nonstore retailers, where sales rose 11.3%, followed by food services and drinking places, with a 6.5% increase, and miscellaneous store retailers, with a 6.1% rise in sales. Sales at general merchandise stores saw a 5.7% rise for the 12 months ending in March, while motor vehicle and parts dealers saw an increase of 2.8%. The largest 12-month sales decline in March was seen in furniture and home furnishing stores, dropping 6.1%, followed by sales at sporting goods, hobby, musical instrument, and bookstores, with a 3.9% decrease. Sales at gasoline stations fell 0.7% for the 12 months ending in March.

Core retail sales increased by 1.0% in March and rose 4.9% over the past 12 months. The core retail sales figure excludes sales of automobiles, gasoline, building materials, and food services and corresponds most closely with the consumer-spending component of gross domestic product.

**Government Spending**

Total government spending increased at an annual rate of 1.2% in the first quarter of 2024, after increasing at a rate of 4.6% in the prior quarter. In 2023, total government spending increased 4.1%. Government spending added 0.21 percentage point to the first-quarter GDP rate.

Federal government spending decreased at an annual rate of 0.2% in the first quarter of 2024 after rising at a 2.4% rate in the fourth quarter of 2023. Federal government spending increased 4.2% in 2023. Federal government spending subtracted 0.01 percentage point from the GDP rate for the first quarter of 2023.

National defense spending decreased at an annual rate of 0.6% in the first quarter of 2024, after rising at a rate of 0.5% in the prior quarter. Federal nondefense spending increased at a rate of 0.3% in the first quarter of 2024 after rising at a rate of 4.8% in the prior quarter. In 2023, national defense spending increased 3.4%, while federal nondefense rose 5.2%.

Page 9

*View Behavioral Health, LLC*

State and local government spending increased at a rate of 2.0% in the first quarter of 2024. In 2023, state and local government spending increased 4.0%. State and local government spending contributed 0.22 percentage point to the first-quarter GDP rate.

**Fixed Investment**

Business investment, also referred to as "nonresidential fixed investment," increased at an annual rate of 2.9% in the first quarter of 2024 after rising at a rate of 3.7% in the fourth quarter. The first-quarter increase resulted from greater spending on intellectual property products and equipment. In 2023, business investment increased by 4.5%. Business investment contributed 0.39 percentage point to the first-quarter GDP rate.

Business spending on structures decreased at an annual rate of 0.1% in the first quarter of 2024, after growing at a 10.9% rate in the prior quarter. In 2023, business spending on structures increased at an annual rate of 13.2%. Business spending on equipment increased at an annual rate of 2.1% in the first quarter after decreasing at a rate of 1.1% in the fourth quarter. In 2023, business spending on equipment was down 0.3%. Business spending on intellectual property products rose at an annual rate of 5.4% in the first quarter, marking the 15th consecutive quarterly increase in spending on intellectual property. In 2023, business spending on intellectual property products increased 4.5%.

Residential fixed investment, often considered a proxy for the housing market, rose at an annual rate of 13.9% in the first quarter of 2024. Residential fixed investment decreased 10.6% in 2023. The increase in residential fixed investment contributed 0.52 point to the first-quarter GDP rate.

**Business Inventories**

Businesses' inventory investments decreased in the first quarter of 2024, reflecting declines in wholesale trade and manufacturing industries. In the first quarter, private inventories investment subtracted 0.35 percentage point from the GDP rate, after making a 0.47-percentage-point subtraction to the fourth-quarter GDP rate. Business inventory investment subtracted 0.34 percentage point from the 2023 GDP rate.

**Exports and Imports**

The Bureau of Economic Analysis reported that America's goods and services deficit decreased at the end of the first quarter of 2024 by 0.1%. The trade deficit at the end of March was $69.4 billion, compared with the revised rate of $69.5 billion at the end of February and $64.2 billion by the end of the fourth quarter of 2023. Year to date, the goods and services deficit increased $6.5 billion, or 3.2%, from the same period in 2023.

Exports increased at an annual rate of 0.9% in the first quarter of 2024, after increasing at a rate of 5.1% in the fourth quarter. In 2023, exports increased 2.6%. Exported goods increased at an annual rate of 0.9% in the first quarter after rising at a rate of 6.2% in the previous quarter. Exported services rose at an annual rate of 1.0% in the first quarter after increasing at a rate of 2.8% in the previous quarter. The first-quarter increase in exports added 0.10 percentage point to the first-quarter GDP rate.

Imports, which subtracted 0.96 percentage point from the first-quarter calculation of GDP, increased at an annual rate of 7.2% in the first quarter of 2024, after increasing at a rate of 2.2% in the fourth

**STEPHENS DECL. - EXHIBIT 2 - Page 86**

quarter. In 2023, imports decreased 1.7%, compared with an increase of 8.6% in 2022. Imported goods increased at an annual rate of 6.8% in the first quarter of 2024, and imported services rose at an annual rate of 9.0%.

Net exports (the value of exports minus the value of imports) subtracted 0.86 percentage point from the first-quarter GDP rate after contributing 0.25 percentage point in the previous quarter.

**B.        Economic Outlook**

Consensus Economics Inc., the publisher of *Consensus Forecasts—USA,* reports that the consensus of U.S. forecasters believe that real GDP will rise at an annual rate of 1.0% in the second quarter of 2024 and rise at that same rate in the third quarter of 2024. Every month, Consensus Economics surveys a panel of prominent U.S. economic and financial forecasters for their predictions on a range of variables, including future growth, inflation, current account and budget balances, and interest rates. The forecasters expect GDP to increase by 2.2% in 2024 and increase by 1.6% in 2025.

They forecast that consumer spending will increase at an annual rate of 1.3% in the second quarter of 2024 and rise at the rate of 1.2% in the third quarter of 2024. They expect consumer spending to increase 2.0% in 2024 and to rise 1.7% in 2025.

The forecasters believe unemployment will average 3.9% in the second quarter of 2024 and 4.1% in the third quarter of 2024. They predict that unemployment will average 4.0% in 2024 and 4.2% in 2025.

The forecasters believe that the three-month Treasury bill rate will be 5.1% at the end of the second quarter of 2024 and 4.7% at the end of the third quarter of 2024. They believe the three-month Treasury bill rate will be 4.4% at the end of 2024 and 3.4% at the end of 2025. The forecasters predict the 10-year Treasury bond yield will be 4.0% at the end of the second quarter of 2023 and will be 3.9% at the end of the third quarter of 2024. They expect the 10-year Treasury Bond yield will be 3.8% at the end of 2024 and 3.7% at the end of 2025.

The forecasters also believe consumer prices will rise at an annual rate of 2.6% in the second quarter of 2024 and increase at the rate of 2.3% in the third quarter of 2024. They expect consumer prices to increase by 2.8% in 2024 and rise by 2.2% in 2025. They forecast producer prices to rise 1.6% in the second quarter of 2024 before increasing at an annual rate of 1.5% in the third quarter of 2024. The forecasters anticipate producer prices will rise 0.7% in 2024 and rise further, by 1.5%, in 2025.

The forecasters expect real disposable personal income will rise at an annual rate of 2.1% in the second quarter of 2024 before increasing at an annual rate of 1.8% in the third quarter of 2024. They believe real disposable personal income will increase by 2.1% in 2024 and 2.2% in 2025.

The forecasters expect industrial production to increase at an annual rate of 0.4% in the second quarter of 2024 before rising at an annual rate of 0.3% in the third quarter of 2024. They forecast that industrial production will rise 0.2% in 2024 and will increase further, by 1.3%, in 2025.

They expect nominal pretax corporate profits to increase by 2.9% in 2024 before increasing further, by 3.1%, in 2025. Housing starts are projected to be 1,400,000 in 2024 and 1,460,000 in 2025.

*View Behavioral Health, LLC*

The most recent release of The Livingston Survey (the Survey) in December predicts GDP annualized growth of 3.1% for the second half of 2023, which is an upward revision from 0.7% in the previous survey. The Survey, conducted by the Federal Reserve Bank of Philadelphia, is the oldest continuous survey of economists' expectations. The Survey summarizes the forecasts of economists from industry, government, banking, and academia.

The Survey forecasts moderate economic conditions in 2024 as the participants project 1.0% annualized growth over the first half of 2024 and 1.2% for the second half of 2024. The Survey forecasts a lower employment rate than previously predicted, with an expected unemployment rate of 3.9% in December 2023. However, the Survey then expects the rate to increase to 4.2% in June 2024 and stay at the same rate of 4.2% in December 2024. The forecasters believe CPI inflation will rise 4.1% in 2023 before declining to 2.5% in 2024. Both predictions were unchanged from the June 2023 survey. CPI inflation is then expected to fall to 2.2% in 2025. PPI inflation for finished goods is expected to reach an annual average rate of 1.7% for 2023, a downward revision from the 2.3% in the previous survey. PPI inflation is predicted to decline to 2.1% in 2024 and 1.9% in 2025.

The Congressional Budget Office (CBO) provided its baseline economic forecast that is used as the basis for updating its budget projections for 2024 to 2034. CBO published its budget projection in February 2024 and periodically updates its economic forecast to ensure that its projections reflect recent economic development and current law.

In the report, the CBO expects economic growth to slow in 2024 partly as a result of tight monetary policy. The CBO projects that the Federal Reserve will respond to weaker economic conditions in 2024 by lowering interest rates starting in the middle of the year. As a result, real (inflation-adjusted) gross domestic product (GDP) growth will accelerate in 2025 and then moderate in later years. Real GDP is projected to slow down to 1.5% in 2024 after increasing by 3.1% in 2023 but will increase by 2.2% in 2025. The unemployment rate is projected to reach 4.2% by the end of 2024 and rise to 4.4% by the end of 2025. In 2023, the unemployment rate was 3.6%.

Inflation continues to decline gradually as the price index for PCE decreases from 2.7% in 2023 to 2.1% in 2024 and slightly rises by 2.2% in 2025. One key factor in the projection that inflation will be lower than in recent years is the easing of upward pressures on the prices of food, energy, and other goods. Another key factor is weaker growth in the prices of shelter services due to elevated interest in 2024. The Federal Reserve continues to increase the target range for the federal funds rate in mid-2023 and is expected to reduce the target range in mid-2024 as inflation cools down.

The report projected that the federal budget deficit will total $1.6 trillion for 2024, which is $0.1 trillion smaller than projected in May 2023. It forecasts the figure for the average annual deficit to continue to increase, to $1.8 trillion in 2025, and then return to $1.6 trillion in 2027, before reaching $2.6 trillion in 2034. The cumulative total deficit over the 2024-to-2033 period is projected to be $18.9 trillion, $1.4 trillion less than projected in May 2023. The factor that contributed to the lowered projection was the reduction in projected discretionary outlays stemming from the Fiscal Responsibility Act and the Further Continuing Appropriations and Other Extensions Act, 2024. These decreases are partially offset by technical changes that reduce projected revenues and increase projected outlays for Medicare, Social Security, and clean vehicle and energy-related tax credits.

The Federal Reserve published its summary of economic projections, which was released with the FOMC meeting minutes on March 20, 2024. For 2024, the Federal Reserve forecasts real GDP to increase by 1.8%, which is higher than its prior forecast for growth of 1.4%. Real GDP is forecasted to grow by 2.0% in 2025 and 2026. The unemployment rate is projected to be 4.0% in 2024, which is

Page 12

*View Behavioral Health, LLC*

lower than its earlier projection of 4.1%. The unemployment rate is expected to be 4.1% in 2025 and 4.0% in 2026. The Federal Reserve forecasts PCE inflation to be at 2.4% in 2024, identical to the previous projection in December, and is then expected to moderate to 2.2% in 2025 and 2.0% in 2026. Core PCE inflation is forecasted to be 2.6% in 2024, higher than the originally projected rate of 2.4%, and is projected to decrease to 2.2% in 2025 and 2.0% in 2026.

The most recent three-year outlook from the Urban Land Institute (ULI) and Ernst & Young (EY), published in April 2024, concluded that real estate economists' outlook on the U.S. economy has improved over the past six months since the previous report was released in fall 2023. Responses suggested a soft landing for the economy as economic data remain strong and the long-predicted economic slowdown has failed to materialize. The forecast further predicted employment growth to increase to 1.8 million in 2024 but will decrease in 2025 to 1.5 million jobs. In 2026, employment growth will pick up to 1.75 million jobs. The *ULI/EY Real Estate Consensus Forecast,* a semiannual publication, is based on a survey of 39 of the industry's top economists and analysts representing 34 of the country's leading real estate investment, advisory, and research firms and organizations. They provide their three-year forecasts of 27 economic and real estate indicators. The forecast for each indicator is the median forecast from the survey respondents.

The key findings from the *Real Estate Consensus Forecast* include:

- U.S. commercial real estate transaction volumes are predicted to rise in 2024, to $413.0 billion, compared to $378.0 billion in 2023. They are forecasted to rise higher in 2025, to $550.0 billion. Transaction volume is predicted to grow even stronger in 2026, to $610.0 billion.

- Consumer Price Index increases in 2024 are predicted to be 2.8%, down from 3.4% in 2023 but still higher than the 20-year average of 2.6%. Prices are predicted to decline further in 2025 and 2026, retreating to 2.4% and 2.3%, respectively, below the long-term average.

- Single-family housing starts are predicted to increase in 2024, to 970,000, compared to 1,944,500 in 2023. Single-family housing starts are forecasted to rise in 2025, to 1,010,000, then rise higher, to 1,100,000, in 2026. The forecasted figures are above the 20-year annual average of 889,160.

- Total returns for institutional-quality direct real estate investments, as measured by the National Council of Real Estate Investment Fiduciaries (NCREIF), dipped by 7.9% in 2023 and are forecasted to decrease 3.8% in 2024. Total returns are predicted to rise 4.1% in 2025 before increasing 7.6% in 2026. The forecasted range for total returns in 2024 by property type was from -10.0% for office to 2.4% for retail. In 2025, returns are projected to range from neutral for office to 5.1% for the retail sector.

- In 2024, the vacancy rates for apartments are expected to rise to 5.4%, exceeding the long-term average of 5.1%. The vacancy rate for apartments will rise to 5.8% in 2025 and 5.4% in 2026. Industrial/warehouse availability rates are projected to increase to 7.6% in 2024 from 7.1% in 2023. Office vacancy, which is already at elevated rates, is expected to rise to 19.9% in 2024 from 18.6% in 2023. Office vacancy rates are expected to be 20.1% and 20.0% in 2024 and 2025, respectively.

Page 13

**STEPHENS DECL. - EXHIBIT 2 - Page 89**

*View Behavioral Health, LLC*

- Commercial property rent growth differs widely by property type. Industrial rent growth is expected to rise 3.5% in 2024, compared to 6.5% in 2023, and stay at a moderate level of 3.7% growth in 2025 and 4.0% in 2026. Apartment rent growth is forecasted to be 0.5% in 2024 before rising 2.4% in 2025 and 3.2% in 2026, down substantially from the growth of 13.3% in 2021 and 6.7% in 2022. Annual retail rent growth is expected to rise 2.5% in 2024 and rise further, to 2.7% and 2.1%, in both 2025 and 2026. Rent growth for office space is predicted to deteriorate 2.6% in 2024, before declining 0.7% in 2025 and neutral in 2026.

Page 14

*View Behavioral Health, LLC*

# Valuation Methodology

## Valuation Overview

To ascertain the fair market value of the Company, we undertook the following general steps :

1.    Value the Company's total debt and equity (enterprise value); and
2.    Value the Company's total equity by subtracting debt from enterprise value.

## General Principals

The fundamental premise on which all investment decisions are based is that value to a potential investor is equal to the present worth of future benefits.  This basic concept can be applied to the valuation of an entire company, a reporting unit of a company as well as particular securities, which comprise the capital structure of that entity.  In each instance, it is a matter of identifying the future returns to the investor that the entity can be reasonably expected to generate and determining their present value in the context of the uncertainty associated with realizing these returns.

There are two bases on which to determine the value of a company : going concern and liquidation.  In the case of a company that is expected to continue operating well into the future, the prospective investor will evaluate the risks and expected returns of the investment on a going-concern basis.  Their primary concern is not with the individual values of enterprise assets, but with their ability to generate the returns he expects in the future.  Only secondarily is he interested in individual asset values, and this from the standpoint of security or collateral for his investment if for any reason the company should choose to liquidate.  In such a case, liquidation values for the assets, as well as all costs associated with liquidation, would prevail.

When determining the value of a business enterprise, there are three general approaches available to the appraiser : the market approach, the income approach, and the asset approach, sometimes referred to as the adjusted book value approach.  The choice of which approach to use in a particular situation will depend upon the specific facts and circumstances associated with the company, as well as the purpose for which the valuation analysis is being conducted.

## Market Approach

The market approach is a useful method of determining the fair market value of a company that is currently profitable and is expected to remain profitable in the future or, at a minimum, is generating revenues and cash flow and is expected to become profitable in the near term. It is particularly applicable in the event that the subject company is a closely held company or a reporting unit of a company because it can be used to determine what the entity or the particular security would be worth in the public market.

The approach is one of determining a level of revenues, cash, or earnings that is considered to be representative of the future performance of the company and capitalizing this figure by an appropriate risk-adjusted rate.  This approach provides an indication of value for the security or securities that correspond with the particular earnings figure being capitalized (for example, capitalizing net earnings available to common stockholders would yield an indication of value for the equity while capitalizing

**STEPHENS DECL. - EXHIBIT 2 - Page 91**

*View Behavioral Health, LLC*

revenues or earnings before interest and taxes would yield and indication of value for debt and equity).

# Valuation Methodology

## Market Approach (Continued)

There are several different forms of "earnings" used in the market approach because each form isolates particular nuances of the company's operating performance. Hence, the various "earnings" figures used throughout this report, which include earnings before interest, taxes, depreciation and amortization ("EBITDA"), earnings before interest and taxes ("EBIT"), cash flow ("CF"), and earnings, are all just variations of the conventional net income figures determined according to generally accepted accounting principles.

The capitalization rate is an expression of what investors believe to be the fair and reasonable rate of return for the particular security, given the inherent risks of ownership. It incorporates expectations of growth and rests on the implicit assumption that some level of earnings will be generated by the enterprise into perpetuity. The most common means of obtaining capitalization rates is through the market comparison method, whereby companies with their stock traded in the public market ("Comparables") are selected for comparison purposes and used as a basis for choosing reasonable capitalization rates for the subject company. Capitalization rates obtained in this manner are generally expressed as ratios of the various earnings figures and are referred to as "market multiples". Another common method of obtaining such multiples, referred to as the Transaction method, involves examining companies that have recently been sold in the public marketplace. For this method, the total price paid for the company is related to earnings figures to yield implied transaction multiples. The acquired company is compared with the subject company on the basis of risk and expected return, and its transaction multiples are used as a basis for selecting appropriate multiples for the subject company.

## Income Approach

The discounted cash flow model (DCF) is based on the theory that the current value of an investment is based on the expected return from future economic benefits. When reasonably prepared long-term projections for a company are available, a discounted cash flow analysis can provide a useful indication of value, which is developed by discounting projected debt-free net cash flows to their present value at a discount rate that reflects both market based return requirements and the risks inherent in the specific entity. The two primary components to value in the DCF is (i) the present value of the interim cash flows and (ii) the present value of the terminal value, which is the value of the company as a going concern beyond the last year incorporated in the Company's projections.

Page 16

*View Behavioral Health, LLC*

# Valuation Methodology

## Asset Approach

The Asset Approach is a general way of determining a valuation indication of a business, business ownership interest or security by using one of more methods based on the assets of the business, net of liabilities.  The Asset Approach can be used to provide a valuation indication in connection with a going concern business enterprise as well as part of a forced or orderly liquidation.  The theoretical underpinning of this method is that the value of a business enterprise is the value of the business assets (both tangible and intangible) less the value of the business liabilities (both recorded and contingent).  This method recognizes that all the economic value of a business comes from - and can be identified with – the productive assets of the business.  The Asset Approach provides an indication of the value of the business enterprise by developing a fair market value balance sheet, such that all the assets and liabilities of the business are restated from their historical cost basis to the appropriate standard of value.

## Selection of Valuation Approach

In our analysis of View Behavioral, we have taken into consideration the income and cash-generating capability of the Company.  Typically, an investor contemplating an investment in a company with the income and cash-generating capability similar to View Behavioral, as well as an asset base similar to View Behavioral, will evaluate the risks and returns of the investment on a going-concern basis.  Specifically, because the Company is not in a position to consider liquidation, and is not capital intensive, the Asset Approach was considered, but not utilized. Accordingly, we have considered the going-concern valuation approaches outlined above and weighed each one in light of the specific circumstances of the Company as of the Valuation Date.

Page 17

*View Behavioral Health, LLC*

# Weighted Average Cost of Capital

When applying the Income Approach, the expected cash flows are discounted to their present value using a rate of return that reflects the relative risk of the investment, as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest bearing debt). This return, known as the weighted average rate of return on invested capital or the weighted average cost of capital ("WACC"), is calculated by weighing the required returns on interest bearing debt, and common equity capital in proportion to their estimated percentages in an expected capital structure. The following is a general discussion of the methods used in our derivation of the WACC.

The formula for calculating the WACC is :

WACC          =          K(d) * (debt%) + K(e) * (equity%)

    Where :

| | | |
|---|---|---|
| WACC | = | Weighted average cost of capital required on invested capital |
| Total Invested Capital | = | Interest bearing debt plus preferred and common equity capital |
| K(d) | = | After-tax rate of return on debt capital |
| Debt% | = | Debt capital as a percentage of Total Invested Capital |
| K(e) | = | Rate of return on equity capital |
| Equity% | = | Common equity capital as a percentage of Total Invested Capital |

## Rates of Return of Debt

The rate of return of debt capital is the rate a prudent investor would require on interest bearing debt. The rate of return of debt capital was determined based on an analysis of the Comparables' actual cost of debt as stated in their respective SEC Form 10K and 10Qs. Since the interest on debt capital is deductible for income tax purposes, we used the after tax interest rate in our calculation.  The effective tax rate is the federal income tax rate plus the effective state income tax rate (adjusted for federal income tax deductibility), estimated as 27.0 percent in this analysis.

## Required Rate of Return on Equity – Capital Asset Pricing Model

The most common methodology for calculating the required rate of return on equity is the Capital Asset Pricing Model ("CAPM").  CAPM estimates the rate of return on common equity as the current risk free rate of return on United States Treasury bonds, plus a market risk premium expected over the risk free rate of return, multiplied by the "beta" for a stock. Beta is a risk measure that reflects the sensitivity of a company's stock price to the movements of the stock market as a whole.

*View Behavioral Health, LLC*

# Weighted Average Cost of Capital

The formula for calculating the CAPM rate of return on equity is :

K(e)            =            R(f) + β * (R(m) – R(f))  +  Size premium

    Where :

| | | |
|---|---|---|
| K(e) | = | Rate of return on equity capital |
| R(f) | = | Risk free rate of return, as defined by the 20 year Treasury bond Yield |
| β | = | Beta or systematic risk for such type of equity investment |
| R(m) – R(f) | = | Market Risk Premium; large company stock total returns minus the risk free rate |
| Size Premium | = | Expected risk premium for equities due to size differentials |

Practical application of the CAPM is based upon an analysis of publicly traded companies that have similar economic, business and risk characteristics as the Company. Exhibit 9 analyzes comparable publicly traded companies in order to derive the expected capital structure, rates of return on debt for comparable companies and relevant measures of the Company's Beta. Brief synopses of these comparable publicly traded companies can be found in the Appendix, as excerpted from Yahoo Finance.

Kroll suggests that the risk free rate should be a yield on the 20-year treasury security if yield is greater than 3.5 percent. As of May 15, 2024, the 20-year treasury security was 4.61%. The Equity Risk Premium was calculated to be 5.50 percent and was derived from data published in the 2024 Kroll (formerly Duff and Phelps) Cost of Capital Navigator, long-horizon expected equity risk premium (conditional).  This premium is based upon a model and uses fundamental information such as earnings, dividends or overall economic productivity to measure the expected equity risk premium. The Size Premium was derived from data published in the 2024 Kroll (formerly Duff and Phelps) Cost of Capital Navigator. This premium is based upon the expected return in excess of that predicted by CAPM based on historical differences in returns between large capitalization companies and small capitalization companies. A Company risk premium of 7.0 percent was also added to account for high growth and risk in achieving projections, key man risk and lack of geographic concentration relative to the comparable companies. See Exhibit 9.B

Applying the estimated after-tax costs of equity and after-tax costs of debt to the estimated capital structures resulted in an after-tax WACC based on the CAPM method for View Behavioral of 18.1 percent.

**Concluded Weighted Average Cost of Capital**

Based on the analyses above, we determined that the appropriate cost of capital for View Behavioral is 18.1 percent.

**STEPHENS DECL. - EXHIBIT 2 - Page 95**

*View Behavioral Health, LLC*

# Valuation Summary

## Market Approach

As described in the Valuation Methodology, the market approach is particularly applicable in the event that the subject company is closely held, because it yields an indication of value which is considered to be a market consensus, based both on comparable publicly traded companies, and publicly announced transactions.

There are five steps involved in using the market approach, as follows:

- The determination of earnings and cash flow levels considered to be representative for the subject company.

- The selection of comparable public companies to be used for comparison purposes.

- A comparative risk analysis between the subject company and the selected comparable public companies.

- The selection of appropriate market multiples for the subject company based on the comparative risk analysis and analysis of the comparable public company market multiples.

- The determination of value for the subject company's enterprise value.

Additional adjustments to the concluded value of the subject company's enterprise value (for example, to account for non-operating assets, interest bearing debt, cash and any appropriate premium for control) would have to be made in some instances. The Other Considerations section of this report addresses these issues in more detail.

### *Determination of Representative Earnings*

As part of the analysis of any business, it is customary to remove the effects of extraordinary, non-operating, unusual or non-recurring items in its historical financial statements. This process, typically known as normalizing, allows the analyst to compare a business' financial statements with industry trends and other companies on a similar basis. Furthermore, normalizing historical statements is essential to estimating expected financial performance by removing items which are unlikely to occur in the future on a regular basis.

In the case of View Behavioral, we interviewed the Company's management and reviewed historical financial results and management's projections for fiscal years 2024 through 2027. We capitalized the fiscal year 2025 ("NFY+1") revenue, EBITDA and EBIT in our analysis, which is considered most representative of the Company going forward, since fiscal 2025 includes the expansion of Long Beach as well as development of Colton 1 and 2. Where appropriate, the financial statements have been adjusted to reflect the true revenue and earnings capacity of the Company on a normalized basis. Accordingly, adjustments to earnings typically fall into one of three categories: (i) adjustments to exclude non-recurring and discretionary income and expenses; (ii) adjustments to exclude income and expense items associated with non-operating assets and liabilities; or (iii) adjustments to reflect more normalized operating results.

*View Behavioral Health, LLC*

# Valuation Summary

### Determination of Representative Earnings (Continued)

In the case of View Behavioral, based on discussions with management, adjustments included:

|  | 2023 | LTM | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| Non-recurring Equip Rental | $3,000 | $3,000 | $0 | $0 | $0 |
| Non-recurring Charitable Don. | $22,000 | $16,000 | $1,100 | $0 | $0 |
| Non-recurring Bonus in COGS | $11,000 | $6,000 | $0 | $0 | $0 |
| Adjust CEO Salary to Market (1) | ($100K) | ($100K) | ($100K) | ($100K) | ($100K) |
| Non-recurring Referral Bonus | $14,400 | $8,650 | $0 | $0 | $0 |
| Non-recurring Contract Labor (2) | $145,000 | $149,000 | $40,000 | $0 | $0 |
| Non-recurring ADP Implement. | $25,000 | $25,000 | $0 | $0 | $0 |
| **Total** | **$120,000** | **$108,000** | **($59,000)** | **($100K)** | **($100K)** |

(1)   The CEO's salary of $350K is considered under market. Market salary is considered to be $450K.
(2)   Refers to laundry contract with CNS before split was not renewed. Adjusted for the actual contracted number of items.

The representative levels are included for review in Exhibit 1.B.

### Selection of Comparable Public Companies

When employing the market approach, it is important to obtain a representative list of publicly owned or recently acquired companies that are similar to the subject company in those respects carrying the greatest weight with the investing public.  In some cases, companies may be quite similar from an investment standpoint, even though they appear to be engaged in somewhat different lines of business. Primarily they should offer operational and economic comparability in the areas of major importance to the investing public.

For View Behavioral, our search included an initial review of companies that met the following criteria:

- Engaged in the in-patient mental health facility industry;
- The company's common stock had to be outstanding in the hands of the public; and
- The company had to make its financial information public.

After reviewing numerous companies that fit the general criteria described above, we selected the following seven companies (the "Comparables") for comparison purposes. Brief synopses of these companies can be found in the Appendix, as excerpted from Yahoo Finance.

- Acadia Healthcare Company, Inc.
- Community Health Systems, Inc.
- Encompass Health Corporation
- Evolent Health, Inc.
- LifeStance Health Group, Inc.
- National HealthCare Corporation
- Universal Health Services, Inc.

Page 21

*View Behavioral Health, LLC*

# Valuation Summary

Before drawing any conclusions from the Comparables' market multiples, it is necessary to complete a comparative analysis. Such an analysis compares the Company with the Comparables to determine the Company's risk/return profile relative to that of the Comparables. The analysis focused on both quantitative and qualitative considerations, including size, liquidity, leverage, profitability, growth, and diversification. A summary of this comparison is shown in Exhibit 5.

In summary, View Behavioral is smaller than all of the Comparables in terms of revenue and total assets. No financial information was available prior to 2022 since the Company was acquired in Q4 2021. Historical one-year revenue growth between the first quarters of 2023 and 2024 was stronger than most of the Comparables. Growth between 2022 and 2023 was weaker. Projected one-year revenue growth is very strong given the Company is in a growth stage. Historical EBITDA margins are weaker than the Comparables; however, based on projected 2025 margins, the Company is relatively strong. View Behavioral is more liquid and is less leveraged relative to the Comparables.

Lastly, the Comparables have more diversified service product offerings, as well as a larger geographic presence.

### Determination of Market Multiples

The market multiples for the Comparables are presented in Exhibit 4.  As indicated in Exhibit 4, market multiples vary, reflecting differing investor sentiment toward each of the Comparables. Based on our analysis, we concluded that View Behavioral represents a higher risk relative to the Comparables when taken as a group.

Typically, an analysis of the Comparables' EBITDA margins relative to their revenue multiples reveals that the higher the margin, the higher the multiple.  Because View Behavioral's historical EBITDA margins are below the Comparables, we selected revenue and EBITDA multiples below the mean and median of the Comparables' multiples.

Management indicated that the Company requires a $10 million infusion of capital in order to achieve the projections. This infusion is expected to be in place by July 2024. Therefore, $10 million was deducted from the indicated enterprise value. The selected enterprise value range of $88.2 million to $93.0 million as of fiscal 2025 was discounted back to the Valuation Date using the WACC of 18.1 percent as explained above.

Based on these indications, the enterprise value for View Behavioral as determined by the Market Approach, is reasonably stated as follows :

**Market Approach :     $74,100,000 - $78,200,000**

The above stated enterprise value conclusions are expressed on a controlling interest basis, before giving consideration to cash, non-operating assets and liabilities, and interest bearing debt. Although market multiples are, by definition, based upon a minority interest, a premium for control was not applied to derive an indication of the enterprise value, as due to the control nature of the projections, forecasted fiscal 2025 results are considered control.

Page 22

*View Behavioral Health, LLC*

# Valuation Summary

## Market Approach – Transactions

The comparable transaction approach identifies relevant transactions in the market. In the case of View Behavioral, we have analyzed announced and completed transactions involving the acquisition of companies in View Behavioral's industry.

Our search for comparable transactions was based on a review of the Pitchbook database, Capital IQ, DealStats (Business Valuation Resources), investment research reports, press releases and SEC Form 10K's, 10Q's and 8Ks for the Comparables. A select listing of comparable transactions is provided in Exhibit 7.

We then capitalized fiscal 2025 revenue and EBITDA, which is more representative of the Company going forward, as it includes expansion of Long Beach as well as development of Colton 1 and 2. Typically, forward projections for target companies are not made publicly available and thus we are able to only derive multiples for the latest twelve months. Selected multiples can be found in Exhibit 6 and a summary of the comparable transactions can be found in Exhibit 7.

Furthermore, because transaction multiples are, by definition, based on a control transaction, a premium for control is implicitly included in the indication of the enterprise value.

Management indicated that the Company requires a $10 million infusion of capital in order to the achieve the projections. This infusion is expected to be in place by July 2024. Therefore, $10 million was deducted from the indicated enterprise value. The selected enterprise value range of $76.5 million to $85.0 million as of fiscal 2025 was discounted back to the Valuation Date using the WACC of 18.1 percent as explained above.

Based on our analysis, the enterprise value of View Behavioral, as determined by the Market Transaction Approach, is reasonably stated as follows :

**Market Transactions  :    $64,300,000 - $71,500,000**

The above stated enterprise value conclusion is expressed before giving consideration to cash, non-operating assets and liabilities, interest bearing debt.

The selected multiples and resulting valuation conclusions are shown in Exhibit 6.

## Income Approach

There are four basic steps involved in using the Income Approach, as follows:

- The determination of the appropriate cash flows to discount, based upon projected income statements of the subject company;
- The selection of an appropriate discount rate, based upon the analysis of alternative investments, including public company discount rates;
- The determination of a terminal value for the subject company; and
- The determination of the subject company's total enterprise value.

Page 23

*View Behavioral Health, LLC*

# Valuation Summary

**Income Approach (Continued)**

In the case of View Behavioral, we utilized the Company's projections for fiscal 2024 through 2026. Based on discussions with management, we extended the projections through fiscal 2027.

We determined that the appropriate discount rate for the Company was 18.1 percent.  As discussed above in the Weighted Average Cost of Capital section, this is based on an analysis of the cost of equity and the weighted average cost of capital for the Comparables as well as a qualitative and quantitative comparison of the Company to the respective Comparables. Based on discussions with the Company's management and industry data, we selected a perpetual growth rate of 4.0 percent to 5.0 percent.  In addition, management indicated that the Company requires a $10 million infusion of capital in order to the achieve the projections. This infusion is expected to be in place by July 2024. Therefore, $10 million was deducted from fiscal 2024 cash flows.

Based on these assumptions, the enterprise value of View Behavioral, is reasonably stated as follows :

    **Income Approach :        $64,800,000 - $70,400,000**

A summary of this analysis can be found in Exhibit 8. The Weighted Average Cost of Capital analysis can be found in Exhibit 9. The above stated enterprise value conclusions are expressed on a controlling interest basis, before giving consideration to cash, non-operating assets and liabilities and interest bearing debt.

STEPHENS DECL. - EXHIBIT 2 - Page 100

*View Behavioral Health, LLC*

# Other Considerations

## Control Premium

In our analysis, we considered the application of a control premium, since the Market Approach utilized in this analysis indicates a value on a marketable, minority interest basis.

However, a control premium was not utilized in this analysis since the projected 2025 results were considered to be on a control basis.

Historically the courts have supported the determination of discounts by looking at the discounts from net asset values of closed-end publicly traded investment companies and REITs. In our investigations related to general equity closed end funds as of March 31, 2024, we have found the low discount to be a premium of 2.4 percent to the highest discount 22.8 percent, a mean and median discount from net asset value of approximately 11.3 percent for a sample of general closed-end stock funds. See the Appendix for more detail.

A minority interest discount is the inverse of the control premium calculated as follows:

$$D = 1 - 1/(1+C)$$

where: D = Lack of Control Discount
C = Control Premium

Based on our analysis of the data and consideration of the relevant qualitative factors, including the nature of the projections, no control premium was applied.

## Non-Operating Assets

Additional adjustments to the concluded value of the subject company's enterprise value are necessary if a company has any non-operating assets, which are not captured in the valuation of the operations of the enterprise.

In the case of View Behavioral, the Company indicated there are no non-operating assets.

We added the Company's cash and subtracted the Company's debt to arrive at our valuation conclusion. As of the Company's March 31, 2024 balance sheet, which was the latest available according to management, the Company had $1.394 million of cash; however all cash is required for operations and the projected expansion, and thus there was no excess cash and no cash was added back to the analysis.

*View Behavioral Health, LLC*

# Valuation Conclusions

The purpose of this analysis was to express an opinion on the fair market value of the Company. As detailed previously, we have developed value indications for the Company's enterprise value, which then require additional adjustments for the value of interest bearing debt, cash and non-operating assets and liabilities. The valuation methodologies used yielded the following conclusions :

| Enterprise Value Indications from Operations : | | | |
|---|---|---|---|
| **Market Approach** | **$74,100,000** | **-** | **$78,200,000** |
| **Transaction Approach – Third Party Transactions** | **$64,300,000** | **-** | **$71,500,000** |
| **Income Approach** | **$64,800,000** | **-** | **$70,400,000** |
| **Concluded Enterprise Value from Operations** | | | **$70,300,000** |
| Less : Interest-Bearing Debt (1) | | | 10,732,000 |
| Add : Cash and Cash Equivalents balance (2) | | | 0 |
| Add : Non-operating Assets | | | 0 |
| **Concluded Equity Value, on Marketable, Controlling Interest Basis (rounded)** | | | **$60,000,000** |

(1)  Per March 31, 2024 balance sheet. Excludes $5.0 million of shareholder debt which was reclassified to equity.
(2)  All cash is required for operations and expansion, thus no excess cash is added.

Page 26

# Exhibits

*View Behavioral Health, LLC*
*Exhibit 1.A*

# Consolidated Historical and Projected Statements of Operations

*(figures in millions)*

| | Fiscal Year Ended December 31, | | LTM | | Projected Fiscal Year Ending | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 | 2023 | 3/31/2024 | 2024 | 2025 | 2026 |
| CNN-Long Beach | $11.797 | $12.475 | $13.290 | $20.986 | $48.597 | $55.473 |
| Colton 1 | | | 0.000 | 5.546 | 30.180 | 32.973 |
| Colton 2 | | | 0.000 | 0.000 | 10.554 | 21.982 |
| Total Revenue | $11.797 | $12.475 | $13.290 | $26.532 | $89.330 | $110.428 |
| % Growth | | 5.7% | 6.5% | 112.7% | 236.7% | 23.6% |
| Cost of Sales | 6.147 | 7.741 | 7.887 | 15.092 | 49.125 | 60.580 |
| Gross Profit | 5.650 | 4.734 | 5.403 | 11.440 | 40.205 | 49.848 |
| Operating Expenses: | | | | | | |
| General & Administrative - Salaries | 2.809 | 3.391 | 3.701 | 3.749 | 9.912 | 12.229 |
| General & Administrative - Other | 1.975 | 2.410 | | 2.940 | 8.250 | 10.291 |
| Selling | 0.191 | 0.127 | | 0.272 | 0.673 | 0.800 |
| Facility Rent | 0.471 | 0.730 | | 2.217 | 3.590 | 3.955 |
| Depreciation Expense | 0.121 | 0.116 | | 0.120 | 0.435 | 0.540 |
| Amortization Expense | 0.917 | 0.738 | | 0.900 | 0.900 | 0.900 |
| Other Expenses (incl Development Costs) | 0.123 | 0.966 | | 0.000 | 0.000 | 0.000 |
| Bad debt | 0.319 | 0.086 | | 0.352 | 0.967 | 1.132 |
| Total Operating Expenses | 6.926 | 8.565 | 9.203 | 10.550 | 24.727 | 29.847 |
| Operating Income | (1.276) | (3.831) | (3.799) | 0.890 | 15.479 | 20.001 |
| Interest Expense | 0.083 | 0.219 | 0.361 | 0.575 | 0.575 | 0.575 |
| Other Expenses (Income) | (0.600) | (0.123) | 0.383 | 0.000 | 0.000 | 0.000 |
| Pretax Income (Loss) | (0.759) | (3.928) | (4.543) | 0.315 | 14.904 | 19.426 |
| Income Taxes (Credit) | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Net Income (Loss) | ($0.759) | ($3.928) | ($4.543) | $0.315 | $14.904 | $19.426 |
| Depreciation | $0.121 | $0.116 | $0.117 | $0.120 | $0.435 | $0.540 |
| Amortization | $0.917 | $0.738 | $0.734 | $0.900 | $0.900 | $0.900 |
| Capital Expenditures | $0.748 | $2.046 | | $5.084 | $3.200 | $0.000 |
| EBITDA | ($0.238) | ($2.977) | ($2.948) | $1.910 | $16.814 | $21.441 |
| EBIT | ($1.276) | ($3.831) | ($3.799) | $0.890 | $15.479 | $20.001 |

Footnotes:
Note: EBIT and EBITDA may include non-recurring income / (expense). See Representative Levels analysis.
Source : Internally prepared consolidated VBH LLC financial statements ("VBH Growth Projection 2022-2026").

*Simon Financial, Inc.*

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Exhibit 1.A*

# Comparative Consolidated Statement of Operations

| | Fiscal Year Ended December 31, | | LTM | Projected Fiscal Year Ending | | |
|---|---|---|---|---|---|---|
| | 2022 | 2023 | 3/31/2024 | 2024 | 2025 | 2026 |
| CNN-Long Beach | 100.0% | 100.0% | 100.0% | 79.1% | 54.4% | 50.2% |
| Colton 1 | 0.0% | 0.0% | 0.0% | 20.9% | 33.8% | 29.9% |
| Colton 2 | 0.0% | 0.0% | 0.0% | 0.0% | 11.8% | 19.9% |
| Total Revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| % Growth | | | | | | |
| Cost of Sales | 52.1% | 62.1% | 59.3% | 56.9% | 55.0% | 54.9% |
| Gross Profit | 47.9% | 37.9% | 40.7% | 43.1% | 45.0% | 45.1% |
| Operating Expenses: | | | | | | |
| General & Administrative - Salaries | 23.8% | 27.2% | 27.8% | 14.1% | 11.1% | 11.1% |
| General & Administrative - Other | 16.7% | 19.3% | 0.0% | 11.1% | 9.2% | 9.3% |
| Selling | 1.6% | 1.0% | 0.0% | 1.0% | 0.8% | 0.7% |
| Facility Rent | 4.0% | 5.9% | 0.0% | 8.4% | 4.0% | 3.6% |
| Depreciation Expense | 1.0% | 0.9% | 0.0% | 0.5% | 0.5% | 0.5% |
| Amortization Expense | 7.8% | 5.9% | 0.0% | 3.4% | 1.0% | 0.8% |
| Other Expenses (incl Development Costs) | 1.0% | 7.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bad debt | 2.7% | 0.7% | 0.0% | 1.3% | 1.1% | 1.0% |
| Total Operating Expenses | 58.7% | 68.7% | 69.2% | 39.8% | 27.7% | 27.0% |
| Operating Income | -10.8% | -30.7% | -28.6% | 3.4% | 17.3% | 18.1% |
| Interest Expense | 0.7% | 1.8% | 2.7% | 2.2% | 0.6% | 0.5% |
| Other Expenses (Income) | -5.1% | -1.0% | 2.9% | 0.0% | 0.0% | 0.0% |
| Pretax Income (Loss) | -6.4% | -31.5% | -34.2% | 1.2% | 16.7% | 17.6% |
| Income Taxes (Credit) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Net Income (Loss) | -6.4% | -31.5% | -34.2% | 1.2% | 16.7% | 17.6% |
| Depreciation | 1.0% | 0.9% | 0.9% | 0.5% | 0.5% | 0.5% |
| Amortization | 7.8% | 5.9% | 5.5% | 3.4% | 1.0% | 0.8% |
| Capital Expenditures | 6.3% | 16.4% | 0.0% | 19.2% | 3.6% | 0.0% |
| EBITDA | -2.0% | -23.9% | -22.2% | 7.2% | 18.8% | 19.4% |
| EBIT | -10.8% | -30.7% | -28.6% | 3.4% | 17.3% | 18.1% |

Footnotes:
Note: EBIT and EBITDA may include non-recurring income / (expense). See Representative Levels analysis.

*View Behavioral Health, LLC*
*Exhibit 1.B*

# Market Approach – Representative Levels (1)

*(figures in millions)*

| | Fiscal Year Ended December 31, | | LTM | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 | 2023 | 3/31/2024 | NFY (2024) (2) | NFY + 1 (2025) (2) | NFY + 2 (2026) (2) |
| **Reported Revenue** | **$11,797** | **$12,475** | **$13,290** | **$26,532** | **$89,330** | **$110,428** |
| *% Growth* | | *5.7%* | *6.5%* | *112.7%* | *236.7%* | *23.6%* |
| Less: Cost of Goods Sold | $6,147 | $7,741 | $7,887 | $15,092 | $49,125 | $60,580 |
| Gross Profit | $5,650 | $4,734 | $5,403 | $11,440 | $40,205 | $49,848 |
| Less: Operating Expenses | 6,926 | 8,565 | 9,203 | 10,550 | 24,727 | 29,847 |
| Add: Depreciation & Amortization | 1,038 | 0.854 | 0.851 | 1,020 | 1.335 | 1.440 |
| Add: Adjustments (3) | 0.000 | 0.120 | 0.108 | (0.059) | (0.100) | (0.100) |
| **Adjusted EBITDA** | **($0,238)** | **($2,887)** | **($2,839)** | **$1,851** | **$16,714** | **$21,341** |
| *% Margin* | *-2.0%* | *-22.9%* | *-21.4%* | *7.0%* | *18.7%* | *19.3%* |
| Less: Depreciation & Amortization | 1,038 | 0.854 | 0.851 | 1,020 | 1.335 | 1.440 |
| **Adjusted EBIT** | **($1,276)** | **($3,711)** | **($3,691)** | **$0,831** | **$15,379** | **$19,901** |
| *% Margin* | *-10.8%* | *-29.7%* | *-27.8%* | *3.1%* | *17.2%* | *18.0%* |
| Less: Interest Expense | 0.083 | 0.219 | 0.361 | 0.000 | 0.000 | 0.000 |
| Adjusted Pre-tax Income | ($1,359) | ($3,930) | ($4,052) | $0,831 | $15,379 | $19,901 |
| Less: Taxes @ 27.0% (4) | (0.367) | (1.061) | (1.094) | 0.224 | 4.152 | 5.373 |
| **Adjusted Net Income** | **($0,992)** | **($2,869)** | **($2,958)** | **$0,607** | **$11,226** | **$14,528** |
| Add: Depreciation and Amortization | 1,038 | 0.854 | 0.851 | 1,020 | 1.335 | 1.440 |
| **Adjusted Cash Flow** | **$0,046** | **($2,015)** | **($2,106)** | **$1,627** | **$12,561** | **$15,968** |
| | | | | | | |
| **Total Assets (excluding Cash)** | **$11,770** | **$15,011** | **$15,897** | | | |

Footnotes:
Source : Internally prepared consolidated VBH LLC financial statements ("VBH Growth Projection 2022-2026"). No financial information prior to FY2022 was available since the Company was acquired in Q4 2021
(2) Per consolidated VBH LLC historical and projected financial statements ("VBH Growth Projection 2022-2026").
(3) Adjustments:

| | 2022 | 2023 | LTM 3/31/2024 | NFY (2024) | NFY + 1 | NFY + 2 |
| --- | --- | --- | --- | --- | --- | --- |
| Non-recurring expense - Equipment Rental | | 0.003 | 0.003 | 0.000 | 0.000 | 0.000 |
| Non-recurring - Charitable Donations | | 0.022 | 0.016 | 0.001 | 0.000 | 0.000 |
| Non-recurring - Bonus in COGS (5) | | 0.011 | 0.006 | 0.000 | 0.000 | 0.000 |
| Non-recurring - Adjust CEO salary to Market (6) | | (0.100) | (0.100) | (0.100) | (0.100) | (0.100) |
| Non-recurring - Referral Bonus in Expenses | | 0.014 | 0.009 | 0.000 | 0.000 | 0.000 |
| Non-recurring - Contract Labor (Laundry) (7) | | 0.145 | 0.149 | 0.040 | 0.000 | 0.000 |
| Non-recurring - ADP implementation | | 0.025 | 0.025 | 0.000 | 0.000 | 0.000 |
| **Total Adjustments** | **$0.000** | **$0.120** | **$0.108** | **($0.059)** | **($0.100)** | **($0.100)** |

(4) Based of effective tax rates, not actual.
(5) Estimated increase in payroll that is related to the ramp-up and infrastructure build-up in preparation for more beds and having the LPS designation. The facility will not need the additional manpower both for administration and clinical if it will just be operating a 39 bed voluntary admission.
(6) The CEO's salary of $350K is considered under market. Market salary is considered to be $450K
(7) Refers to contract with CNS split was not renewed. Invoiced at the contracted number of items.

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Exhibit 2*

# Consolidated Balance Sheet

*(figures in millions)*

| | Fiscal Year Ended December 31, | | 3/31/2024 |
|---|---|---|---|
| | 2022 | 2023 | |
| **Assets** | | | |
| Current Assets: | | | |
| Cash & Equivalents | $ 2.308 | $ 1.810 | $ 1.394 |
| Accounts Receivable | 3.307 | 4.738 | 3.669 |
| Prepaid Assets and Other Current Assets | 0.350 | 0.678 | 1.650 |
| Other Current Assets | - | - | - |
| Total Current Assets | $ 5.966 | $ 7.225 | $ 6.712 |
| | | | |
| Property & Equipment, net | $ 0.919 | $ 2.849 | $ 4.006 |
| Deposits and Prepayments | 0.040 | 0.127 | 0.127 |
| Employee Advances / Loans | - | - | - |
| Loan Fees | - | - | - |
| Goodwill | 7.154 | 6.620 | 6.445 |
| Other Assets | - | - | - |
| Total Assets | $ 14.079 | $ 16.821 | $ 17.291 |
| | | | |
| **Liabilities & Stockholders' Equity** | | | |
| Current Liabilities: | | | |
| Accounts Payable and Accrued Expenses | $ 0.670 | $ 1.572 | $ 2.373 |
| FF&E Loans - Current | - | 0.097 | 0.097 |
| Other Current Liabilities | 0.189 | 0.242 | - |
| Total Current Liabilities | $ 0.859 | $ 1.911 | $ 2.469 |
| | | | |
| FF&E Loans - Long-Term | - | 0.342 | 0.316 |
| Mike Xu - Convertible Note | 3.946 | 3.000 | 3.000 |
| Green Energy Solutions 2 year Note | - | 1.500 | 1.500 |
| Diamond Partners Group I LLC 2 year Note | - | - | 1.000 |
| Jack Stephens (1) | - | 4.819 | 4.819 |
| Other Liabilities | - | - | - |
| Total Liabilities | $ 4.805 | $ 11.572 | $ 13.104 |
| | | | |
| Net Stockholders' Equity | $ 9.273 | $ 5.249 | $ 4.186 |
| Total Liabilities & Stockholders' Equity | $ 14.079 | $ 16.821 | $ 17.291 |
| | | | |
| **Working Capital** | | | |
| Net | $ 2.80 | $ 3.50 | $ 2.85 |
| Total | $ 5.11 | $ 5.31 | $ 4.24 |
| Net Working Capital as a % of Revenue | 23.7% | 28.1% | 21.4% |
| | | Selected (2) | 24% |

Source : Internally prepared consolidated VBH LLC financial statements. FY2023 and March 31, 2024 debt is per Company provided debt schedule.
(1) Per management, $5 million of Jack Stephens' shareholder loan is reclassified as equity.
(2) Based on analysis of the Company's historical working capital requirements.

*View Behavioral Health, LLC*
*Exhibit 3*

**Simon Financial, Inc.**

STEPHENS DECL. - EXHIBIT 2 - Page 108

# Market Approach – Summary

*(figures in millions)*

| | Representative Level | Selected Multiple | | Less: Required Capital (1) | Indicated Enterprise Value | |
|---|---|---|---|---|---|---|
| **NFY +1 (2025)** | | | | | | |
| Revenue | $89.330 | 1.00 x -- | 1.10 x | $10.00 | $79.330 -- | $88.260 |
| EBITDA | $16.714 | 6.0 x -- | 6.25 x | $10.00 | $90.280 -- | $94.460 |
| EBIT | $15.379 | 6.5 x -- | 6.75 x | $10.00 | $89.960 -- | $93.800 |
| | | | | | | |
| Median | | | | | $89.960 -- | $93.800 |
| Mean | | | | | $86.523 -- | $92.173 |
| **Selected Enterprise Value Range as of FY2025, on a Minority Interest Basis** | | | | | **$88.200 --** | **$93.000** |
| | | | | | | |
| **Selected Enterprise Value Range, Discounted Back to May 15, 2024 (2)** | | | | | **$74.148** | **$78.184** |
| Less: Total Interest-Bearing Debt | | | | | 10.732 | 10.732 |
| **Aggregate Value of Minority Interest, as if Marketable** | | | | | **$63.417** | **$67.452** |
| Add: Control Premium @ 10.0% (3) | | | | | - | - |
| **Value of Total Equity, on a Controlling Interest Basis** | | | | | **$63.417** | **$67.452** |
| Add: Total Interest-Bearing Debt | | | | | 10.732 | 10.732 |
| | | | | | | |
| **Selected Enterprise Value Range, on a Controlling Interest Basis** | | | | | **$74.100 --** | **$78.200** |

FY2025 financials are considered most representative of the Company, as it includes expansion of Long Beach as well as development of Colton 1 and 2.

**Footnotes**

(1) Management indicated that the Company requires a $10 million infusion of capital in order to achieve the projections. This infusion is estimated to be in place by July 2024.
(2) FY2025 results are discounted back to the Valuation Date using a WACC of 18.1% as estimated in Exhibit 9.
(3) Given the nature of the Projections, the forecasted FY2025 results are considered control.

*View Behavioral Health, LLC*
*Exhibit 4*

# Market Approach – Comparable Public Company Multiples

*(figures in millions)*

### EV / EBITDA

| | EV | FYE | LTM | NFY (a) | NFY + 1 |
|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | $8,417.6 | 12.4x | 12.0x | 11.2x | 10.2x |
| Community Health Systems, Inc. | $12,703.9 | 9.1x | 8.8x | 8.6x | 8.2x |
| Encompass Health Corporation | $11,803.8 | 11.2x | 10.8x | 11.1x | 10.0x |
| Evolent Health, Inc. | $3,214.7 | 27.5x | 26.3x | 13.3x | 10.4x |
| LifeStance Health Group, Inc. | $3,143.5 | NMF | NMF | 34.1x | 26.1x |
| National HealthCare Corporation | $1,398.3 | 13.7x | 12.9x | NA | NA |
| Universal Health Services, Inc. | $17,554.2 | 9.6x | 9.1x | 8.7x | 8.3x |
| Low | | 9.1x | 8.8x | 8.6x | 8.2x |
| High | | 27.5x | 26.3x | 34.1x | 26.1x |
| Median | | 11.8x | 11.4x | 11.2x | 10.1x |
| Mean | | 13.9x | 13.3x | 14.5x | 12.2x |

### EV / EBIT

| | EV | FYE | LTM | NFY (a) | NFY + 1 |
|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | $8,417.6 | 16.4x | 15.9x | 14.5x | 13.0x |
| Community Health Systems, Inc. | $12,703.9 | 14.6x | 13.7x | 12.2x | 11.3x |
| Encompass Health Corporation | $11,803.8 | 16.1x | 15.5x | 15.2x | 13.6x |
| Evolent Health, Inc. | $3,214.7 | NMF | NMF | 26.9x | 19.8x |
| LifeStance Health Group, Inc. | $3,143.5 | NMF | NMF | NMF | NA |
| National HealthCare Corporation | $1,398.3 | 24.3x | 22.2x | NA | NA |
| Universal Health Services, Inc. | $17,554.2 | 14.9x | 13.7x | 12.4x | 12.0x |
| Low | | 14.6x | 13.7x | 12.2x | 11.3x |
| High | | 24.3x | 22.2x | 26.9x | 19.8x |
| Median | | 16.1x | 15.5x | 14.5x | 13.0x |
| Mean | | 17.3x | 16.2x | 16.2x | 13.9x |

### EV / Revenue

| | EV | FYE | LTM | NFY (a) | NFY + 1 |
|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | $8,417.6 | 2.87x | 2.81x | 2.62x | 2.40x |
| Community Health Systems, Inc. | $12,703.9 | 1.02x | 1.01x | 1.01x | 0.97x |
| Encompass Health Corporation | $11,803.8 | 2.46x | 2.38x | 2.22x | 2.03x |
| Evolent Health, Inc. | $3,214.7 | 1.64x | 1.48x | 1.26x | 1.10x |
| LifeStance Health Group, Inc. | $3,143.5 | 2.98x | 2.85x | 2.58x | 2.30x |
| National HealthCare Corporation | $1,398.3 | 1.22x | 1.20x | NA | NA |
| Universal Health Services, Inc. | $17,554.2 | 1.23x | 1.20x | 1.12x | 1.07x |
| Low | | 1.02x | 1.01x | 1.01x | 0.97x |
| High | | 2.98x | 2.85x | 2.62x | 2.40x |
| Median | | 1.64x | 1.48x | 1.74x | 1.57x |
| Mean | | 1.92x | 1.85x | 1.80x | 1.64x |

### Price / Earnings

| | MVE | FYE | LTM | NFY (a) | NFY + 1 |
|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | $6,426.5 | 24.2x | NMF | 20.1x | 17.6x |
| Community Health Systems, Inc. | $523.9 | NMF | 22.3x | 6.2x | 2.7x |
| Encompass Health Corporation | $8,977.7 | 18.9x | 17.9x | 17.1x | 15.1x |
| Evolent Health, Inc. | $2,736.8 | NMF | NMF | 26.2x | 19.1x |
| LifeStance Health Group, Inc. | $2,863.3 | NMF | NMF | NA | NA |
| National HealthCare Corporation | $1,559.7 | 23.9x | 19.4x | NA | NA |
| Universal Health Services, Inc. | $12,430.1 | 17.3x | 15.1x | 13.4x | 13.0x |
| Low | | 17.3x | 15.1x | 6.2x | 2.7x |
| High | | 24.2x | 22.3x | 26.2x | 19.1x |
| Median | | 21.4x | 18.7x | 17.1x | 15.1x |
| Mean | | 21.1x | 18.7x | 16.6x | 13.5x |

Footnotes:
(a) Next Fiscal Year (NFY) is the the year ending December 31, 2024.
(1) Projected financial figures are based on the average of several analyst reports, when available.

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Exhibit 5*

# Market Approach – Risk Analysis Rankings

**Size** (Revenue, millions)

| Company | Value |
|---|---|
| Universal Health Services, Inc. | $14,658.0 |
| Community Health Systems, Inc. | $12,522.0 |
| Encompass Health Corporation | $4,956.8 |
| Acadia Healthcare Company, Inc. | $2,992.5 |
| Evolent Health, Inc. | $2,175.9 |
| LifeStance Health Group, Inc. | $1,169.2 |
| National HealthCare Corporation | $1,103.5 |
| View Behavioral Health, LLC | $13.3 |

Smaller

**Size** (Total Assets, millions)

| Company | Value |
|---|---|
| Community Health Systems, Inc. | $14,417.0 |
| Universal Health Services, Inc. | $14,046.1 |
| Encompass Health Corporation | $6,231.4 |
| Acadia Healthcare Company, Inc. | $5,517.2 |
| Evolent Health, Inc. | $2,643.7 |
| LifeStance Health Group, Inc. | $2,106.3 |
| National HealthCare Corporation | $1,319.6 |
| View Behavioral Health, LLC | $17.3 |

Smaller

**Historical Growth** (2-Year Revenue)

| Company | Value |
|---|---|
| Evolent Health, Inc. | 47.1% |
| LifeStance Health Group, Inc. | 25.8% |
| Acadia Healthcare Company, Inc. | 12.5% |
| Encompass Health Corporation | 9.4% |
| Universal Health Services, Inc. | 6.3% |
| National HealthCare Corporation | 3.1% |
| Community Health Systems, Inc. | 0.3% |
| View Behavioral Health (1) | NA |

NA

**Historical Growth** (1-Year Revenue)

| Company | Value |
|---|---|
| Evolent Health, Inc. | 60.9% |
| VBH (Q1'23 - Q1'24) | 28.6% |
| LifeStance Health Group, Inc. | 28.4% |
| Acadia Healthcare Company, Inc. | 14.6% |
| Encompass Health Corporation | 10.4% |
| National HealthCare Corporation | 7.7% |
| Universal Health Services, Inc. | 6.6% |
| VBH (FY22-FY23) | 5.7% |
| Community Health Systems, Inc. | 2.5% |

Stronger

**Projected Growth** (1-Year Revenue)

| Company | Value |
|---|---|
| View Behavioral Health, LLC | 112.7% |
| Evolent Health, Inc. | 17.7% |
| LifeStance Health Group, Inc. | 10.4% |
| Encompass Health Corporation | 7.4% |
| Acadia Healthcare Company, Inc. | 7.2% |
| Universal Health Services, Inc. | 6.5% |
| Community Health Systems, Inc. | 0.3% |
| National HealthCare Corporation | NA |

Stronger

**Historical Growth** (2-Year EBITDA)

| Company | Value |
|---|---|
| Universal Health Services, Inc. | 88.5% |
| LifeStance Health Group, Inc. | 67.7% |
| Acadia Healthcare Company, Inc. | 12.0% |
| Encompass Health Corporation | 7.9% |
| Evolent Health, Inc. | 6.8% |
| National HealthCare Corporation | -3.6% |
| Community Health Systems, Inc. | -16.2% |
| View Behavioral Health (1) | Nd |

NA

**Historical Growth** (1-Year EBITDA)

| Company | Value |
|---|---|
| Evolent Health, Inc. | 64.7% |
| LifeStance Health Group, Inc. | 51.1% |
| National HealthCare Corporation | 17.0% |
| Encompass Health Corporation | 16.4% |
| Acadia Healthcare Company, Inc. | 13.8% |
| Universal Health Services, Inc. | 9.6% |
| Community Health Systems, Inc. | -3.4% |
| View Behavioral Health (FY22-FY23) | NMF |

NMF

**Projected Growth** (1-Year EBITDA)

| Company | Value |
|---|---|
| Evolent Health, Inc. | 97.9% |
| LifeStance Health Group, Inc. | 20.4% |
| Acadia Healthcare Company, Inc. | 6.9% |
| Encompass Health Corporation | 3.9% |
| Community Health Systems, Inc. | 2.8% |
| Universal Health Services, Inc. | -2.5% |
| View Behavioral Health, LLC | NMF |
| National HealthCare Corporation | Nd |

NMF

**Profitability** (EBITDA to Revenue)

| Company | Value |
|---|---|
| Acadia Healthcare Company, Inc. | 23.4% |
| Encompass Health Corporation | 22.1% |
| View Behavioral Health - 2025 | 18.7% |
| Universal Health Services, Inc. | 13.2% |
| Community Health Systems, Inc. | 11.5% |
| National HealthCare Corporation | 9.3% |
| LifeStance Health Group, Inc. | 6.9% |
| Evolent Health, Inc. | 5.6% |
| View Behavioral Health, LLC | -21.4% |

Weaker

**Profitability** (EBIT to Revenue)

| Company | Value |
|---|---|
| Acadia Healthcare Company, Inc. | 17.7% |
| View Behavioral Health - 2025 | 17.2% |
| Encompass Health Corporation | 15.3% |
| Universal Health Services, Inc. | 8.8% |
| Community Health Systems, Inc. | 7.4% |
| National HealthCare Corporation | 5.4% |
| Evolent Health, Inc. | -2.3% |
| LifeStance Health Group, Inc. | -9.4% |
| View Behavioral Health, LLC | -27.8% |

Weaker

**Relative Depreciation** (Depreciation to EBITDA)

| Company | Value |
|---|---|
| LifeStance Health Group, Inc. | 235.2% |
| Evolent Health, Inc. | 141.1% |
| National HealthCare Corporation | 41.9% |
| Community Health Systems, Inc. | 35.4% |
| Universal Health Services, Inc. | 33.7% |
| Encompass Health Corporation | 30.4% |
| Acadia Healthcare Company, Inc. | 24.3% |
| View Behavioral Health, LLC | NMF |

NMF

**Projected Profitability** (NFY EBITDA to Revenue)

| Company | Value |
|---|---|
| LifeStance Health Group, Inc. | 23.5% |
| Acadia Healthcare Company, Inc. | 23.3% |
| Encompass Health Corporation | 20.0% |
| View Behavioral Health - 2025 | 18.7% |
| Universal Health Services, Inc. | 11.8% |
| Evolent Health, Inc. | 9.4% |
| View Behavioral Health, LLC | 7.0% |
| National HealthCare Corporation | Nd |

Weaker

**Liquidity** (Current Ratio)

| Company | Value |
|---|---|
| View Behavioral Health, LLC | 2.7 |
| National HealthCare Corporation | 2.0 |
| Community Health Systems, Inc. | 1.5 |
| Universal Health Services, Inc. | 1.4 |
| Acadia Healthcare Company, Inc. | 1.4 |
| Encompass Health Corporation | 1.3 |
| LifeStance Health Group, Inc. | 1.2 |
| Evolent Health, Inc. | 1.0 |

more liquid

**Leverage** (Debt to EV)

| Company | Value |
|---|---|
| Community Health Systems, Inc. | 96.3% |
| Universal Health Services, Inc. | 29.8% |
| Encompass Health Corporation | 24.7% |
| Acadia Healthcare Company, Inc. | 23.3% |
| Evolent Health, Inc. | 20.0% |
| View Behavioral Health, LLC | 15.6% |
| LifeStance Health Group, Inc. | 10.5% |
| National HealthCare Corporation | 6.1% |

Lower leverage

(1) No financial information was available prior to 2022 since the Company was acquired in Q4 2021.

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Exhibit 6*

# Transaction Approach – Publicly Announced Transaction Summary

*(figures in millions)*

| NFY+1 (12/31/25) | Representative Level | Selected Multiple | | Less: Required Capital (1) | Add: | Indicated Enterprise Value | |
|---|---|---|---|---|---|---|---|
| Revenues | $89.330 | 1.00 x  --  1.10 x | | $10.000 | | $79.330  -  $88.260 | |
| EBITDA | $16.714 | 5.0 x  --  5.5 x | | $10.000 | | $73.570  -  $81.920 | |
| | | | | | | | |
| Median | | | | | | $76.450  -  $85.090 | |
| Mean | | | | | | $76.450  -  $85.090 | |
| | | | | | | | |
| **Selected Enterprise Value Range** | | | | | | $76.450  -  $85.090 | |
| **Selected Enterprise Value Range, Discounted Back to May 15, 2024 (2)** | | | | | | $64.270  -  $71.534 | |
| | | | | | | | |
| **Selected Enterprise Value Range, on a Controlling Interest Basis** | | | | | | **$64.300  -  $71.500** | |

FY2025 financials are considered most representative of the Company going forward, as it includes expansion of Long Beach as well as development of Colton 1 and 2.
(1) Management indicated that the Company requires a $10 million infusion of capital in order to achieve the projections. This infusion is estimated to be in place by July 2024.
(2) FY2025 results are discounted back to the Valuation Date using a WACC of 18.1% as estimated in Exhibit 9.

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Exhibit 7*

## Transaction Approach – Publicly Announced Transaction Analysis (1)

*(figures in millions)*

| Date | Source | Target | Target Industry/Segment | Acquirer | Purchase Price (2) | LTM Revenue | LTM EBITDA | LTM EBIT | EV/Revenue | EV/EBITDA | EV/EBIT | EBITDA Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/2024 | DealStats | | Pain Control Center Franchise | | $ 0.375 | 0.6 | -- | -- | 0.67x | -- | -- | -- |
| 11/1/2023 | DealStats | | Respiratory Therapy Clinic | | $ 1.400 | 0.9 | $0.1 | -- | 1.59x | 10.0x | 11.5x | 15.9% |
| 10/2/2023 | DealStats | | Substance Abuse Counseling Practice | | $ 0.315 | 0.4 | $0.2 | $0.2 | 0.8x | 1.4x | 1.4x | 55.1% |
| 9/26/2023 | DealStats | | Pain Management Clinic | | $ 9.650 | 5.4 | $1.6 | $1.6 | 1.78x | 6.1x | 6.1x | 29.3% |
| 11/30/2022 | DealStats | | Substance Abuse Treatment Facility | | $ 1.000 | 0.9 | $0.3 | $0.3 | 1.17x | 3.2x | 3.3x | 37.1% |
| 8/29/2022 | DealStats | | Multi-Therapeutic Clinic Specializing in Woman's Health (Medical Weight Loss) | | $ 1.400 | 2.5 | -- | $0.1 | 0.56x | -- | 14.6x | -- |
| 7/21/2022 | CapIQ | Hanger, Inc. | Hanger, Inc. provides orthotic and prosthetic (O&P) services in the United States. It operates in two segments, Patient Care and Products & Services. The Patient Care segment owns and operates Hanger clinic, which specializes in the design, fabrication, and delivery of custom O&P devices through patient care clinics and satellite locations, and offers payor network contracting services to other O&P providers. | Patient Square Capital, LP | $ 1,373.3 | 1,173.8 | $158.0 | $70.0 | 1.17x | 8.69x | 19.61x | 13.5% |
| 7/14/2022 | DealStats | Check Five LLC (d.b.a Success TMS) | Provides Treatment for Depression and Anxiety Through Transcranial Magnetic Stimulation Therapy Services | Greenbrook TMS Inc. | $ 44.207 | 25.1 | -- | -- | 1.76x | -- | -- | -- |
| 4/12/2022 | CapIQ | Novamind Inc. | Novamind Inc., a mental health company, builds a network of psychiatry clinics, retreats, and clinical research sites in the United States. The company offers outpatient mental health services, which includes psychotherapy, psychiatric medication management, transcranial magnetic stimulation, and ketamine-assisted psychotherapy, and clinical trial services. It also manages and hosts third-party clinical trials and participates in organized research studies, as well as clinical research for psychedelic medicines. The company is headquartered in Toronto, Canada. | Numinus Wellness Inc. (TSX:NUMI) | $ 17.930 | 7.4 | -- | -- | 2.43x | -- | -- | -- |
| 7/30/2021 | DealStats | | Behavioral Health Center | | $ 0.785 | 0.9 | $0.2 | $0.2 | 0.89x | 3.8x | 3.8x | 23.7% |
| 4/10/2021 | DealStats | | Outpatient Rehabilitation Center | | $ 0.040 | 0.1 | -- | $0.0 | 0.32x | -- | 3.2x | -- |
| 1/14/2020 | DealStats | | Mental Healthcare Practice | | $ 0.900 | 1.1 | $0.2 | $0.2 | 0.79x | 3.9x | 4.2x | 20.2% |

| | Purchase Price | LTM Revenue | LTM EBITDA | LTM EBIT | EV/Revenue | EV/EBITDA | EV/EBIT | EBITDA Margin |
|---|---|---|---|---|---|---|---|---|
| Low | 0.0 | $0.1 | $0.1 | $0.0 | 0.32x | 1.4x | 1.4x | 13% |
| High | $1,373.3 | $1,173.8 | $158.0 | $70.0 | 2.43x | 10.0x | 19.6x | 55% |
| Median - All Transactions | $1.2 | $1.0 | $0.2 | $0.2 | 1.03x | 3.9x | 4.2x | 24% |
| Median - Most Comparable Target Companies (highlighted) | $9.4 | $4.3 | $0.2 | $0.2 | 1.33x | 3.8x | 4.0x | 22% |
| Median - Transactions 2023-2024 (4 transactions) | $0.9 | $0.7 | $0.2 | $0.2 | 1.18x | 6.1x | 6.1x | 29% |
| Mean - All Transactions | $120.9 | $101.6 | $23.0 | $8.1 | 1.16x | 5.3x | 7.5x | 28% |

Footnotes:
(1) Transaction study based on announced and completed, controlling interest acquisitions with announcement dates between 2020 and the valuation date for which purchase price multiples were available.
(2) Total consideration paid

*View Behavioral Health, LLC*
*Exhibit 8*

# Discounted Cash Flow Valuation – Consolidated Projections

*(figures in millions)*

| | 6.5 Mos. Ending 12/31/2024 | Proj. FYE December 31, 2025 | 2026 | 2027 |
|---|---|---|---|---|
| | (1) | | | |
| Revenue | $14.372 | $89.330 | $110.428 | $115.949 |
| *Revenue Growth* | | 236.7% | 23.6% | 5.0% |
| Cost of Revenue | $8.175 | $49.125 | $60.580 | $63.609 |
| SG&A | 5.746 | 24.827 | 29.947 | 31.444 |
| Adjusted EBIT | $0.450 | $15.379 | $19.901 | $20.896 |
| *Adjusted EBIT Margin* | 3.1% | 17.2% | 18.0% | 18.0% |
| Less: Taxes (2) | 0.122 | 4.152 | 5.373 | 5.642 |
| **Debt-Free Earnings** | $0.329 | $11.226 | $14.528 | $15.254 |
| Less: Capital Expenditures (3, 5) | (2.754) | (3.200) | (0.100) | (0.100) |
| Less: Working Capital Requirements (4) | (1.827) | (15.072) | (5.064) | (1.325) |
| Add: Depreciation (5) | 0.065 | 0.435 | 0.540 | 0.540 |
| Add: Amortization (5) | 0.488 | 0.900 | 0.900 | 0.900 |
| Less: Capital Requirement (6) | (10.000) | 0.000 | 0.000 | 0.000 |
| **Total Net Investment** | ($14.029) | ($16.937) | ($3.724) | $0.015 |
| **Net Debt-Free Cash Flows:** | ($13.700) | ($5.710) | $10.804 | $15.269 |
| Discount Period | 0.27 | 1.04 | 2.04 | 3.04 |
| Discount Factor @ 18.1% | 0.96 | 0.84 | 0.71 | 0.60 |
| **Present Value of Net Debt-Free Cash Flows:** | ($13.096) | ($4.800) | $7.689 | $9.199 |

### DCF Assumptions

| | |
|---|---|
| Discount Rate | 18.1% |
| Tax Rate (2) | 27.0% |

### Gordon Growth Assumptions

| | |
|---|---|
| 2028 Cash Flow (4.5% Growth) | $15.496 |
| Gordon Growth Rate | 4.5% |
| Terminal Value | $113.710 |
| Discount Period | 3.04 |
| Discount Factor @ 18.1% | 0.60 |
| **PV of Terminal Value** | **$68.505** |

### Distribution of Value

| | |
|---|---|
| Period Cash Flow | -1.5% |
| Terminal Cash Flow | 101.5% |
| Total | 100.0% |

### Implied Analyses

| | |
|---|---|
| 2024 Revenue Multiple | 2.5x |
| 2024 EBITDA Multiple | 36.5x |
| 2025 EBITDA Multiple | 4.0x |
| Implied Terminal Multiple | 5.1 x |

**Sensitivity Analysis: Enterprise Value**

| Discount Rate | Gordon Growth Rate | | | | |
|---|---|---|---|---|---|
| | 3.5% | 4.0% | 4.5% | 5.0% | 5.5% |
| 17.1% | $68,922 | $71,923 | $75,161 | $78,667 | $82,474 |
| 17.6% | $65,440 | $68,205 | $71,180 | $74,390 | $77,866 |
| 18.1% | $62,203 | $64,757 | $67,497 | $70,447 | $73,630 |
| 18.6% | $59,186 | $61,550 | $64,082 | $66,799 | $69,723 |
| 19.1% | $56,368 | $58,562 | $60,906 | $63,416 | $66,110 |

**Range of Selected Enterprise Values:** $64,800 -- $70,400

Source : Consolidated VBH LLC historical and projected financial statements ("VBH Growth Projection 2022-2026"). FY2027 projection based on discussions with management.
(1) Represents the stub year period from May 16, 2024 to December 31, 2024.
(2) Effective tax rate.
(3) Capital expenditures are per management's projections and discussions with management. Management indicated that after the initial large capital expenditures to develop Colton 1 and 2, normalized capital expenditures are estimated to be $100K per year.
(4) Consistent with the Company's historical requirements, we assumed projected working capital to be 24% of revenue.
(5) Depreciation/amortization and cap ex are assumed to be equal in perpetuity.
(6) Management indicated that the Company requires a $10 million infusion of capital in order to achieve the projections. This infusion is estimated to be in place by July 2024.

*Simon Financial, Inc.*

**STEPHENS DECL. - EXHIBIT 2 - Page 113**

View Behavioral Health, LLC
Exhibit 9.A

Simon Financial, Inc.

STEPHENS DECL. - EXHIBIT 2 - Page 114

# Discounted Cash Flow – Weighted Average Cost of Capital Analysis

*(figures in millions)*

| | Debt | Preferred Stock | Market Value of Equity | Total Capitalization | Size Risk Premium (3) | Debt to Equity | Debt to Total Capitalization | Preferred to Total Capitalization | Equity to Total Capitalization |
|---|---|---|---|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | $1,959.1 | $0.0 | $6,426.5 | $8,385.6 | 0.64% | 30.5% | 23.4% | 0.0% | 76.6% |
| Community Health Systems, Inc. | $12,228.0 | $0.0 | $523.9 | $12,751.9 | 1.99% | 2334.0% | 95.9% | 0.0% | 4.1% |
| Encompass Health Corporation | $2,919.4 | $0.0 | $8,977.7 | $11,897.1 | 0.61% | 32.5% | 24.5% | 0.0% | 75.5% |
| Evolent Health, Inc. | $643.1 | $0.0 | $2,736.8 | $3,379.9 | 1.21% | 23.5% | 19.0% | 0.0% | 81.0% |
| LifeStance Health Group, Inc. | $329.6 | $0.0 | $2,863.3 | $3,192.9 | 1.21% | 11.5% | 10.3% | 0.0% | 89.7% |
| National HealthCare Corporation | $85.7 | $0.0 | $1,559.7 | $1,645.4 | 1.39% | 5.5% | 5.2% | 0.0% | 94.8% |
| Universal Health Services, Inc. | $5,236.2 | $0.0 | $12,430.1 | $17,666.3 | 0.61% | 42.1% | 29.6% | 0.0% | 70.4% |
| Median | $2,439.3 | $0.0 | $2,863.3 | $8,385.6 | 1.21% | 27.0% | 21.2% | 0.0% | 76.6% |
| Mean | $3,845.2 | $0.0 | $5,074.0 | $8,417.0 | 1.10% | 24.3% | 18.7% | 0.0% | 70.3% |

| | Levered Beta | Unlevered Beta | Relevered Beta (1) | Equity Risk Premium (2) | Size Risk Premium (3) | Cost of Equity | Cost of Debt | Cost of Preferred | WACC |
|---|---|---|---|---|---|---|---|---|---|
| Acadia Healthcare Company, Inc. | 1.31 | 1.07 | 1.26 | 5.50% | 0.64% | 12.2% | 6.2% | 0.0% | 10.4% |
| Community Health Systems, Inc. | 1.55 | 0.09 | 0.10 | 5.50% | 1.99% | 7.2% | 6.6% | 0.0% | 4.9% |
| Encompass Health Corporation | 0.82 | 0.66 | 0.78 | 5.50% | 0.61% | 9.5% | 4.8% | 0.0% | 8.0% |
| Evolent Health, Inc. | 1.57 | 1.34 | 1.58 | 5.50% | 1.21% | 14.5% | 2.9% | 0.0% | 12.1% |
| LifeStance Health Group, Inc. | 1.29 | 1.19 | 1.40 | 5.50% | 1.21% | 13.5% | 9.8% | 0.0% | 12.9% |
| National HealthCare Corporation | 0.38 | 0.37 | 0.43 | 5.50% | 1.39% | 8.4% | 0.0% | 0.0% | 7.9% |
| Universal Health Services, Inc. | 1.27 | 0.97 | 1.14 | 5.50% | 0.61% | 11.5% | 4.6% | 0.0% | 9.1% |
| Median | 1.29 | 0.97 | 1.14 | 5.50% | 1.21% | 11.5% | 4.8% | 0.0% | 9.1% |
| Mean | 1.17 | 0.81 | 0.96 | 5.50% | 1.10% | 11.0% | 5.0% | 0.0% | 9.3% |
| View Behavioral Health (4) | | 1.04 | 1.23 | 5.50% | 4.70% | 23.1% | 14.00% | 0.0% | 18.1% |

Footnotes:

Excluded from range

Weighted Average Cost of Capital (WACC) = (Cost of Debt * (1-Tax Rate) * Debt to Enterprise Value) + (Cost of Equity * Equity to Enterprise Value) + (Cost of Preferred * Preferred to Enterprise Value)

Cost of Equity = Risk Free Rate + (Levered Beta * Equity Risk Premium) + Size Risk Premium

Source: Kroll 2024 Cost of Capital Navigator. (Kroll suggests yield on 20-year treasury security if yield is greater than 3.5%). As of May 15, 2024, the 20-year treasury security was 4.61%.

(1) The Company and the comparables relevered for the average industry capital structure.

(2) Source: 2024 Kroll (formerly Duff and Phelps) Cost of Capital Navigator – Long-Horizon Equity Risk Premium (conditional).

(3) Source: 2024 Kroll (formerly Duff and Phelps) Cost of Capital Navigator – Size Premium (Return in Excess of CAPM) Estimation.

(4) Size risk premium reflects Duff & Phelps' 10th decile, which represents companies with market capitalizations of up to $213 million. Cost of debt reflects the weighted average of the Company's cost of debt. Includes a Company specific risk premium of 7% to account for high growth and risk in achieving projections, key man risk and geographic concentration relative to the comparable companies. See Exhibit 9.B.

Case 2:24-bk-12079-VZ    Doc 421-4    Filed 02/04/25    Entered 02/04/25 23:53:01    Desc
Jack Stephens Declaration and Exhibits    Page 99 of 110

STEPHENS DECL. - EXHIBIT 2 - Page 115

*View Behavioral Health, LLC*
*Exhibit 9.B*

# Weighted Average Cost of Capital - Company Specific Risk Premium

*(Per Ibbotson)*

**Company Specific Risk Premium Analysis**

| Negative Attributes (Discount) | Premium / Discount |
|---|---|
| Risk of Realizing Projections (1) | 3.00% |
| Lack of Customer Diversification | 0.00% |
| Vendor / Supplier Concentration | 0.00% |
| Lack of Long Term Contracts | 0.00% |
| Limitations on Financial Reporting, Information Systems and Controls | 0.00% |
| Operational Risk Associated with High Growth | 1.50% |
| Over Reliance on Key Management Personnel (2) | 1.50% |
| M & A Integration Risk | 0.00% |
| Risk of Technological Obsolescence | 0.00% |
| Lack of Geographic Diversification (3) | 1.00% |
| Lack of Brand Diversification | 0.00% |
| Lack of Product Diversification | 0.00% |
| Specific Competitive Threats | 0.00% |
| Threat of Substitute Products or Services | 7.00% |
| **Net Company Specific Risk Premium** | **7.0%** |

(1) The company has 39 beds in Long Beach and is expanding to 80 beds; plus opening 2 facilities in Colton; however, they have all the approvals, construction is approximately 90% complete and they have raised capital and bought buildings in Colton. One of the largest risks to achieving the projections is that the Company runs out of funding before its goals are reached. Furthermore, the projections show a quick path to profitability, while fiscal 2022 and 2023 had negative earnings.
(2) The Company would be impacted without the 2 executives, until a replacement could be found.
(3) The Company has operations only in Southern California, in Los Angeles and Riverside Counties. Eventually, the Company would like to expand geographically.

# Appendix

*Appendix*

# Closed End General Equity Fund Discounts (1)

(Per Wall Street Journal, as of March 28, 2024)

| General Equity Funds | Share Price (2) | Net Asset Value Per Share | Discount (Premium) | Implied Control Premium (3) | 52 week Market Return (4) |
|---|---|---|---|---|---|
| Central Securities | $41.77 | $50.86 | 17.9% | 21.8% | 26.1% |
| CohenSteers CEOpp Fund | $11.69 | $11.42 | -2.4% | -2.3% | 17.6% |
| Gabelli Dividend & Income | $22.98 | $27.49 | 16.4% | 19.6% | 17.1% |
| General American | $46.51 | $57.09 | 18.5% | 22.7% | 27.5% |
| J Hancock Tax Advisor | $19.66 | $21.99 | 10.6% | 11.9% | 0.4% |
| Liberty AllStar Equiity | $7.15 | $7.21 | 0.8% | 0.8% | 27.2% |
| Liberty AllStar Gr | $5.49 | $6.08 | 9.7% | 10.7% | 12.9% |
| Royce Micro | $9.45 | $10.75 | 12.1% | 13.8% | 17.0% |
| Royce Value | $15.17 | $17.10 | 11.3% | 12.7% | 20.8% |
| Source Capital | $42.49 | $45.41 | 6.4% | 6.9% | 21.2% |
| Sprott Focus Trust | $8.04 | $9.01 | 10.8% | 12.1% | 5.9% |
| SRH Total Return | $15.06 | $19.52 | 22.8% | 29.6% | 27.5% |
| Tri-Continental | $30.80 | $35.06 | 12.2% | 13.8% | 21.2% |
| **High** | $46.51 | $57.09 | 22.8% | 29.6% | |
| **Low** | $5.49 | $6.08 | -2.4% | -2.3% | |
| **Median** | $15.17 | $19.52 | 11.3% | 12.7% | |
| **Average** | $21.25 | $24.54 | 11.3% | 13.4% | |

**Footnotes:**

(1) Unlike open-ended funds, closed end funds do not buy their shares from investors; stocks trade on a stock exchange.

(2) Weekly statistics published by Lipper for the week ended March 28, 2024. Source : Wall Street Journal

(3) A discount for lack of control is the inverse of the control premium, calculated as follows: Discount = 1 - 1/(1+Control Premium).

(4) Based on market prices plus dividends.

*Simon Financial, Inc.*

*View Behavioral Health, LLC*
*Appendix*

# Comparable Company Market Analysis

*(figures in millions)*

| | Acadia Healthcare Company, Inc. | Community Health Systems, Inc. | Encompass Health Corporation | Evolent Health, Inc. | LifeStance Health Group, Inc. | National HealthCare Corporation | Universal Health Services, Inc. |
|---|---|---|---|---|---|---|---|
| **General Market Information** | | | | | | | |
| Ticker Symbol | **ACHC** | **CYH** | **EHC** | **EVH** | **LFST** | **NHC** | **UHS** |
| Exchange | NASDAQ | NYSE | NYSE | NYSE | NASDAQ | NYSE | NYSE |
| Fiscal Year End | 12/31/23 | 12/31/23 | 12/31/23 | 12/31/23 | 12/31/23 | 12/31/23 | 12/31/23 |
| Latest Financial Information | 03/31/24 | 03/31/24 | 03/31/24 | 03/31/24 | 03/31/24 | 03/31/24 | 03/31/24 |
| | | | | | | | |
| Closing Price as of Valuation Date | $68.79 | $3.77 | $87.09 | $23.55 | $7.49 | $100.27 | $182.24 |
| 20-Day Average Stock Price | $70.47 | $3.27 | $83.69 | $27.32 | $6.55 | $92.92 | $169.23 |
| 52 Week Price Range | | | | | | | |
| High | $87.38 | $4.92 | $87.09 | $34.85 | $9.40 | $100.27 | $182.46 |
| Low | $66.06 | $3.03 | $59.28 | $23.55 | $5.21 | $55.94 | $121.88 |
| 52 Week Return | -4.4% | 5.9% | 42.8% | -28.6% | -9.0% | 74.0% | 36.4% |
| | | | | | | | |
| **Market Valuation Information** | | | | | | | |
| Fully Diluted Shares | 93.422 | 138.966 | 103.085 | 116.213 | 382.288 | 15.555 | 68.207 |
| Closing Price as of Valuation Date | $68.79 | $3.77 | $87.09 | $23.55 | $7.49 | $100.27 | $182.24 |
| | | | | | | | |
| Market Value of Equity (MVE) | $6,426.472 | $523.903 | $8,977.700 | $2,736.819 | $2,863.335 | $1,559.658 | $12,430.082 |
| *plus:* Total Debt (book) | 1,959.100 | 12,228.000 | 2,919.400 | 643.066 | 329.599 | 85.737 | 5,236.185 |
| *less:* Converted Debt | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| *plus:* Preferred Stock Redemption/Market/Liq. Value | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| *less:* Converted Preferred | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| *less:* Cash & Cash Equivalents (book) | 77.303 | 48.000 | 134.400 | 165.147 | 49.451 | 247.122 | 112.093 |
| *plus:* Minority Interest in Subsidiaries | 109.333 | 0.000 | 41.100 | 0.000 | 0.000 | 0.000 | 0.000 |
| Enterprise Value | $8,417.602 | $12,703.903 | $11,803.800 | $3,214.738 | $3,143.483 | $1,398.273 | $17,554.174 |

*Simon Financial, Inc.*

**STEPHENS DECL. - EXHIBIT 2 - Page 118**

# Synopsis of Comparable Publicly Traded Companies

## Acadia Healthcare Company, Inc.

Acadia Healthcare Company, Inc. (NASDAQ: ACHC) provides behavioral healthcare services in the United States and Puerto Rico. The company develops and operates acute inpatient psychiatric facilities, specialty treatment facilities comprising residential recovery facilities and eating disorder facilities, comprehensive treatment centers, and residential treatment centers, as well as facilities offering outpatient behavioral healthcare services for the behavioral healthcare and recovery needs of communities.

Acadia Healthcare Company, Inc. was founded in 2005 and is headquartered in Franklin, Tennessee.

*View Behavioral Health, LLC*
*Appendix*

# Synopsis of Comparable Publicly Traded Companies

## Community Health Systems, Inc.

Community Health Systems, Inc. (NYSE: CYH) owns, leases, and operates general acute care hospitals in the United States. It offers general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric, and rehabilitation services, as well as skilled nursing and home care services. The company also provides outpatient services at primary care practices, urgent care centers, free-standing emergency departments, ambulatory surgery centers, imaging and diagnostic centers, and direct-to-consumer virtual health visits.

The company was incorporated in 1996 and is headquartered in Franklin, Tennessee.

*View Behavioral Health, LLC*
*Appendix*

# Synopsis of Comparable Publicly Traded Companies

## Encompass Health Corporation

Encompass Health Corporation (NYSE: EHC) provides post-acute healthcare services in the United States and Puerto Rico. It owns and operates inpatient rehabilitation hospitals that provide medical, nursing, therapy, and ancillary services. The company provides specialized rehabilitative treatment on an inpatient basis to patients who have experienced physical or cognitive disabilities or injuries due to medical conditions, such as strokes, hip fractures, and various debilitating neurological conditions. It offers services through the Medicare program to federal government, managed care plans and private insurers, state governments, and other patients.

The company was formerly known as HealthSouth Corporation and changed its name to Encompass Health Corporation in January 2018. The company was incorporated in 1984 and is based in Birmingham, Alabama.

*View Behavioral Health, LLC*
*Appendix*

# Synopsis of Comparable Publicly Traded Companies

## Evolent Health, Inc.

Evolent Health, Inc. (NYSE: EVH), through its subsidiary, Evolent Health LLC, offers specialty care management services in oncology, cardiology, and musculoskeletal markets in the United States. The company provides a platform for health plan administration and value-based business infrastructure. It offers administrative services, such as health plan services, pharmacy benefits management, risk management, analytics and reporting, and leadership and management; and Identifi, a proprietary technology system that aggregates and analyzes data, manages care workflows, and engages patients. In addition, the company provides holistic total cost of care management.

Evolent Health, Inc. was founded in 2011 and is headquartered in Arlington, Virginia.

.

# Synopsis of Comparable Publicly Traded Companies

## LifeStance Health Group, Inc.

LifeStance Health Group, Inc. (NASDAQ: LFST), through its subsidiaries, provides outpatient mental health services to children, adolescents, adults, and geriatrics in the United States. The company offers patients a suite of mental health services, including psychiatric evaluations and treatment, psychological, and neuropsychological testing, as well as individual, family, and group therapy. It treats a range of mental health conditions, including anxiety, depression, bipolar disorder, eating disorders, psychotic disorders, and post-traumatic stress disorder. In addition, the company operates an outpatient mental health platform, as well as offers patient care virtually through its online delivery platform or in-person at its centers.

LifeStance Health Group, Inc. was founded in 2017 and is headquartered in Scottsdale, Arizona.

*View Behavioral Health, LLC*
*Appendix*

# Synopsis of Comparable Publicly Traded Companies

## National HealthCare Corporation

National HealthCare Corporation (NYSE: NHC) engages in the operation of services to skilled nursing facilities, assisted and independent living facilities, homecare and hospice agencies, and health hospitals. Its skilled nursing facilities offer licensed therapy services, nutrition services, social services, activities, and housekeeping and laundry services, as well as medical services prescribed by physicians; and rehabilitative services, such as physical, speech, respiratory, and occupational therapy for patients recovering from strokes, heart attacks, orthopedic conditions, neurological illnesses, or other illnesses, injuries, or disabilities.

The company's medical specialty units comprise memory care units and sub-cute nursing units that provide specialized care and programs for persons with Alzheimer's or related disorders; and assisted living facilities offer personal care services and assistance with general activities of daily living, such as dressing, bathing, meal preparation, and medication management. Its independent living facilities offers specially designed residential units for the active and ambulatory elderly and provide various ancillary services for residents, including restaurants, activity rooms and social areas; and behavioral health services to both adults and geriatric patients with psychiatric, emotional, and addictive disorders. In addition, the company's homecare agencies assist those who wish to stay at home or in assisted living residences but still require some degree of medical care or assistance with daily activities; hospice agencies that provides hospice and palliative care; and operates pharmacies, as well as managed care insurance solutions. Further, it offers management, accounting, and financial services; and leases its properties to third party operators.

The company was founded in 1971 and is based in Murfreesboro, Tennessee.

*View Behavioral Health, LLC*
*Appendix*

# Synopsis of Comparable Publicly Traded Companies

## Universal Health Services, Inc.

Universal Health Services, Inc. (NYSE: UHS), through its subsidiaries, owns and operates acute care hospitals, and outpatient and behavioral health care facilities. It operates through Acute Care Hospital Services and Behavioral Health Care Services segments. The company's hospitals offer general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic and coronary care, pediatric services, pharmacy services, and/or behavioral health services. It also provides commercial health insurance services; and various management services, which include central purchasing, information, finance and control systems, facilities planning, physician recruitment, administrative personnel management, marketing, and public relations services.

Universal Health Services, Inc. founded in 1978 and is headquartered in King of Prussia, Pennsylvania.

*View Behavioral Health, LLC*
*Appendix*

# Qualifications

**Debbie A. Simon**

Ms. Debbie A. Simon is the founder and principal of Simon Financial, a financial valuation and advisory firm. Previously, from 1995 to 2002, Ms. Simon was at Houlihan Lokey Howard & Zukin, where she was a Senior Vice President, shareholder, and co-head of the Los Angeles office's technology practice. Since joining Houlihan Lokey in 1995, Ms. Simon has specialized in the valuation of technology companies, including internet, software, government technology services, aerospace, biotechnology, infrastructure, enabling technologies and new media companies. She has experience in performing valuations of both privately held and publicly traded companies as well as intangible assets for a wide variety of purposes including financial reporting purposes, tax reporting purposes, transactions, IPO planning, litigation, stock and stock option grants, recapitalizations, gift and estate tax planning, ESOP updates and general corporate planning purposes. She also has a broad range of experience in capital market transactions and is qualified as a valuation expert in U.S. Bankruptcy Court. Prior to joining Houlihan Lokey, Ms. Simon was at Bear, Stearns & Co. in New York, where she was involved with merger and acquisition transactions and structuring and executing public and private offerings of various debt and equity securities.

Ms. Simon has appeared as a speaker at numerous business seminars on topics involving financial valuation, mergers and acquisitions, and maximizing shareholder wealth.

Ms. Simon earned her B.A. in Economics with honors from the University of California at Berkeley and an M.B.A. in Finance and Accounting from the John E. Anderson Graduate School of Management at the University of California at Los Angeles. She is licensed with the Securities Exchange Commission as a registered general securities representative (NASD Series #7 and Series #63).