| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| JESSICA M. SIMON – SBN 277581<br>HEMAR, ROUSSO & HEALD, LLP<br>15910 Ventura Blvd., 12th Floor<br>Encino, California  91436<br>Telephone: (818) 501-3800<br>Facsimile: (818) 501-2985<br>Email: jsimon@hrlaw.com<br><br>☐ *Movant appearing without an attorney*<br>☒ *Attorney for Movant* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| In re:<br><br>SEATON INVESTMENTS, LLC, et al.,<br><br><br><br>XX Affects SLA Investments, LLC<br>Case No. 2:24-bk-12082-VZ<br><br><br><br>Debtor(s). | CASE NO.: 2:24-bk-12079-VZ (Lead Case)<br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (REAL PROPERTY)** |
| | DATE: 01/06/2026<br>TIME:  10:30 a.m.<br>COURTROOM:  1368 |

| **Movant:**  HARVEST SMALL BUSINESS FINANCE, LLC |
|---|

1. **Hearing Location**:

   ☒ 255 East Temple Street, Los Angeles, CA 90012        ☐ 411 West Fourth Street, Santa Ana, CA 92701

   ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101

   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                           Page 1                           **F 4001-1.RFS.RP.MOTION**

4.   When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.   If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.   ☒   This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7.   ☐   This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

   a.   ☐   An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b.   ☐   An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c.   ☐   An application for order setting hearing on shortened notice was filed and remains pending.  After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date:  12/15/2025

HEMAR, ROUSSO & HEALD, LLP
Printed name of law firm (if applicable)

JESSICA M. SIMON
Printed name of individual Movant or attorney for Movant

/s/ Jessica M. Simon
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO REAL PROPERTY

1. **Movant is the:**

   ☒ Holder: Movant has physical possession of a promissory note that either (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer.

   ☐ Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g., mortgage or deed of trust) or (2) is the assignee of the beneficiary.

   ☐ Servicing agent authorized to act on behalf of the Holder or Beneficiary.

   ☐ Other (*specify*):

2. **The Property at Issue (Property):**

   a. Address:

   *Street address*: 1040 S. Los Angeles Street
   *Unit/suite number*:
   *City, state, zip code*: Los Angeles, California 90015

   b. Legal description, or document recording number (including county of recording), as set forth in Movant's deed of trust (attached as Exhibit _2_ ):

3. **Bankruptcy Case History:**

   a. A ☒ voluntary ☐ involuntary   bankruptcy petition under chapter   ☐ 7  ☒ 11  ☐ 12  ☐ 13
   was filed on (*date*) _03/19/2024_ .

   b. ☐ An order to convert this case to chapter  ☐ 7  ☐ 11  ☐ 12  ☐ 13  was entered on (*date*) _____.

   c. ☐ A plan, if any, was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant relief from stay as follows:

   (1) ☒ Movant's interest in the Property is not adequately protected.

       (A) ☒ Movant's interest in the Property is not protected by an adequate equity cushion.

       (B) ☒ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

       (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

   (2) ☐ The bankruptcy case was filed in bad faith.

       (A) ☐ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case commencement documents.

       (B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

       (C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

       (D) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

       (E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition.  Schedules and the statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

       (F) ☐ Other (*see attached continuation page*).

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                        Page 3                              **F 4001-1.RFS.RP.MOTION**

(3) ☐ (*Chapter 12 or 13 cases only*)

    (A) ☐ All payments on account of the Property are being made through the plan.
        ☐ Preconfirmation ☐ Postconfirmation  plan payments have not been made to the chapter 12
        trustee or chapter 13 trustee.

    (B) ☐ Postpetition mortgage payments due on the note secured by a deed of trust on the Property have not
        been made to Movant.

(4) ☐ The Debtor filed a Statement of Intentions that indicates the Debtor intends to surrender the Property.

(5) ☐ The Movant regained possession of the Property on (*date*) _____,
    which is ☐ prepetition ☐ postpetition.

(6) ☐ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to
    § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

c. ☐ Pursuant to 11 U.S.C. § 362(d)(3), the Debtor has failed, within the later of 90 days after the order for relief or
    30 days after the court determined that the Property qualifies as "single asset real estate" as defined in
    11 U.S.C. § 101(51B) to file a reasonable plan of reorganization or to commence monthly payments.

d. ☐ Pursuant to 11 U.S.C. § 362(d)(4), the Debtor's filing of the bankruptcy petition was part of a scheme to delay,
    hinder, or defraud creditors that involved:

    (1) ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or
        court approval; or

    (2) ☐ Multiple bankruptcy cases affecting the Property.

5. ☐ **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have
    been entitled to relief from the stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed
    with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other (*specify*):

6. **Evidence in Support of Motion:  (D***eclaration(s) MUST be signed under penalty of perjury and attached to this
motion***)

a. The REAL PROPERTY DECLARATION on page 6 of this motion.

b. ☐ Supplemental declaration(s).

c. ☒ The statements made by Debtor under penalty of perjury concerning Movant's claims and the Property as set
    forth in Debtor's case commencement documents.  Authenticated copies of the relevant portions of the case
    commencement documents are attached as Exhibit <u> 4   </u>.

d. ☐ Other:

7. ☒ **An optional Memorandum of Points and Authorities is attached to this motion.**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                   Page 4                                   **F 4001-1.RFS.RP.MOTION**

**Movant requests the following relief:**

1. Relief from the stay is granted under: ☒ 11 U.S.C. § 362(d)(1)    ☒ 11 U.S.C. § 362(d)(2)    ☐ 11 U.S.C. § 362(d)(3).

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

3. ☐ Movant, or its agents, may, at its option, offer, provide and enter into a potential forebearance agreement, loan modification, refinance agreement or other loan workout or loss mitigation agreement. Movant, through its servicing agent, may contact the Debtor by telephone or written correspondence to offer such an agreement.

4. ☐ Confirmation that there is no stay in effect.

5. ☐ The stay is annulled retroactive to the bankruptcy petition date. Any postpetition actions taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

6. ☐ The co-debtor stay of 11 U.S.C. §1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

7. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

8. ☐ A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing on this Motion:
   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

9. ☐ Relief from the stay is granted under 11 U.S.C. § 362(d)(4): If recorded in compliance with applicable state laws governing notices of interests or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than 2 years after the date of the entry of the order by the court, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

10. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be:

   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

12. ☐ Upon entry of the order, for purposes of Cal. Civ. Code § 2923.5, the Debtor is a borrower as defined in Cal. Civ. Code § 2920.5(c)(2)(C).

13. ☐ If relief from stay is not granted, adequate protection shall be ordered.

14. ☐ See attached continuation page for other relief requested.

Date:  12/15/2025

HEMAR, ROUSSO & HEALD, LLP
Printed name of law firm (*if applicable*)
JESSICA M. SIMON
Printed name of individual Movant or attorney for Movant

/s/ Jessica M. Simon
Signature of individual Movant or attorney for Movant

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# REAL PROPERTY DECLARATION

I, (*print name of Declarant*) <u>ERIC JIANG</u>                                                                , declare:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age.  I have knowledge regarding Movant's interest in the real property that is the subject of this Motion (Property) because (*specify*):

   a. ☐ I am the Movant.

   b. ☒ I am employed by Movant as (*state title and capacity*):  Vice President, Special Assets Officer

   c. ☐ Other (*specify*):

2. a. ☒ I am one of the custodians of the books, records and files of Movant that pertain to loans and extensions of credit given to Debtor concerning the Property.  I have personally worked on the books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant.  These books, records and files were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the actions, conditions or events to which they relate.  Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

   b. ☐ Other (*see attached*):

3. The Movant is:

   a. ☒ Holder: Movant has physical possession of a promissory note that (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer.  A true and correct copy of the note, with affixed allonges/indorsements, is attached as Exhibit <u>1</u>.

   b. ☒ Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g.,mortgage or deed of trust) or (2) is the assignee of the beneficiary.  True and correct copies of the recorded security instrument and assignments are attached as Exhibit <u>2</u>.

   c. ☐ Servicing agent authorized to act on behalf of the:

      ☐ Holder.
      ☐ Beneficiary.

   d. ☐ Other (*specify*):

4. a. The address of the Property is:

   *Street address*:  1040 S. Los Angeles Street
   *Unit/suite no.*:
   *City, state, zip code*:  Los Angeles, California 90015

   b. The legal description of the Property or document recording number (including county of recording) set forth in the Movant's deed of trust is:
   APN 5145-020-057, Deed of Trust recorded in Los Angeles County Recorder's Office on February 15, 2018, bearing Instrument No. 20180154924

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                     Page 6                          **F 4001-1.RFS.RP.MOTION**

5. Type of property (*check all applicable boxes*):

a. ☐ Debtor's principal residence     b. ☐ Other residence
c. ☐ Multi-unit residential     d. ☒ Commercial
e. ☐ Industrial     f. ☐ Vacant land
g. ☐ Other (*specify*):

6. Nature of the Debtor's interest in the Property:

a. ☒ Sole owner

b. ☐ Co-owner(s) (*specify*):

c. ☐ Lienholder (*specify*):

d. ☐ Other (*specify*):

e. ☐ The Debtor ☐ did ☐ did not   list the Property in the Debtor's schedules.

f. ☐ The Debtor acquired the interest in the Property by ☐ grant deed ☐ quitclaim deed ☒ trust deed.

    The deed was recorded on (*date*) _____.

          Senior
7. Movant holds a ☒ deed of trust ☐ judgment lien ☐ other (*specify*) _____
that encumbers the Property.

a. ☒ A true and correct copy of the document as recorded is attached as Exhibit __2__.

b. ☒ A true and correct copy of the promissory note or other document that evidences the Movant's claim is attached as Exhibit __1__.

c. ☐ A true and correct copy of the assignment(s) transferring the beneficial interest under the note and deed of trust to Movant is attached as Exhibit _____.

8. Amount of Movant's claim with respect to the Property:

| | | PREPETITION | POSTPETITION | TOTAL |
|---|---|---|---|---|
| a. | Principal: | $ 1,735,388.63 | $ | $ 1,735,388.63 |
| b. | Accrued interest: | $ | $ 341,154.84 | $ 341,154.84 |
| c. | Late charges | $ | $ 18,230.62 | $ 18,230.62 |
| d. | Costs (attorney's fees, foreclosure fees, other costs): | $ | $ 59,465.00 | $ 59,465.00 |
| e. | Advances (property taxes, insurance): | $ | $ | $ |
| f. | Less suspense account or partial balance paid: | $[          ] | $[          ] | $[          ] |
| g. | TOTAL CLAIM as of (*date*):   11/20/2025 | $ 1,735,388.63 | $ 418,850.46 | $ 2,154,239.09 |

h. ☐ Loan is all due and payable because it matured on (*date*) _____

9. Status of Movant's foreclosure actions relating to the Property (*fill the date or check the box confirming no such action has occurred*):

a. Notice of default recorded on (*date*) _____ or ☒ none recorded.

b. Notice of sale recorded on (*date*) _____ or ☒ none recorded.

c. Foreclosure sale scheduled for (*date*) _____ or ☒ none scheduled.

d. Foreclosure sale currently scheduled for*(*date*) _____ or ☒ none scheduled.

e. Foreclosure sale already held on (*date*) _____ or ☒ none held.

f. Trustee's deed upon sale already recorded on (*date*) _____ or ☒ none recorded.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*           Page 7           **F 4001-1.RFS.RP.MOTION**

10. Attached (*optional*) as Exhibit  3  is a true and correct copy of a POSTPETITION statement of account that accurately reflects the dates and amounts of all charges assessed to and payments made by the Debtor since the bankruptcy petition date.

11. ☒ (*chapter 7 and 11 cases only*) Status of Movant's loan:

   a. Amount of current monthly payment as of the date of this declaration: $ 19,190.05  for the month of  December 1  20 25 .

   b. Number of payments that have come due and were not made:  16 .* Total amount: $ 398,394.04 

   c. Future payments due by time of anticipated hearing date (*if applicable*):    *Debtor's adequate protection payments of $9,015.00 do not cover monthly payments or all interest due.

      An additional payment of $ 19,190.05  will come due on (*date*) 12/01/2025 , and on the 1st  day of each month thereafter. If the payment is not received within 10  days of said due date, a late charge of $ 959.50  will be charged to the loan. *As of November 20, 2025, accrued but unpaid interest is $534.88.

   d. The fair market value of the Property is $ 2,100,000 , established by:

      (1) ☒ An appraiser's declaration with appraisal is attached as Exhibit 5 .

      (2) ☐ A real estate broker or other expert's declaration regarding value is attached as Exhibit ____.

      (3) ☒ A true and correct copy of relevant portion(s) of the Debtor's schedules is attached as Exhibit 4 .

      (4) ☐ Other (*specify*):

   e. **Calculation of equity/equity cushion in Property:**

      Based upon ☐ a preliminary title report ☐ the Debtor's admissions in the schedules filed in this case, the Property is subject to the following deed(s) of trust or lien(s) in the amounts specified securing the debt against the Property:

| | Name of Holder | Amount as Scheduled by Debtor (*if any*) | Amount known to Declarant and Source |
|---|---|---|---|
| 1st deed of trust: | Harvest Small Business Finance, LLC | $ 1,805,485.00 | $ 2,154,239.09 |
| 2nd deed of trust: | Archway Real Estate Income Fund I | $ 125,000.00 | $ 131,875.00 |
| 3rd deed of trust: | | $ | $ |
| Judgment liens: | | $ | $ |
| Taxes: | Los Angeles County - Property Taxes | $ 18,934.00 | $ 96,795.43 |
| Other: | Costs of sale (6%) | $ | $ 126,000.00 |
| **TOTAL DEBT: $** 2,508,909.52 | | | |

   f. Evidence establishing the existence of these deed(s) of trust and lien(s) is attached as Exhibit  4  and consists of:

      (1) ☐ Preliminary title report.

      (2) ☒ Relevant portions of the Debtor's schedules.

      (3) ☒ Other (*specify*): Ex. 2 DOT and Ex. 6 Los Angeles Treasurer and Tax Collector Defaulted Tax Roll

   g. ☒ **11 U.S.C. § 362(d)(1) - Equity Cushion:**
      I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant's debt is $0  and  ___ is 0% of the fair market value of the Property.

   h. ☒ **11 U.S.C. § 362(d)(2)(A) - Equity:**
      By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 11(e) above, I calculate that the Debtor's equity in the Property is $ 0 .

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                    Page 8                    **F 4001-1.RFS.RP.MOTION**

i. ☒ Estimated costs of sale: $ __126,000.00_____ (estimate based upon __6_____% of estimated gross sales price)

j. ☒ The fair market value of the Property is declining because:
Real property taxes continue to accrue and remain unpaid while this case remains in bankruptcy, and there is no equity cushion for Movant (or equity in the property for the estate).

12. ☐ (*Chapter 12 and 13 cases only*) Status of Movant's loan and other bankruptcy case information:

a. A 341(a) meeting of creditors is currently scheduled for (*or concluded on*) the following date: _____.
A plan confirmation hearing currently scheduled for (or concluded on) the following date: _____.
A plan was confirmed on the following date (*if applicable*): _____.

b. Postpetition preconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit _____.)

c. Postpetition postconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

d. Postpetition advances or other charges due but unpaid:                              $
(*For details of type and amount, see Exhibit _____*)

e. Attorneys' fees and costs:                              $
(*For details of type and amount, see Exhibit _____*)

f. Less suspense account or partial paid balance:                              $[                    ]

TOTAL POSTPETITION DELINQUENCY:                              $

g. Future payments due by time of anticipated hearing date (*if applicable*): _____.
An additional payment of $_____ will come due on _____, and on the _____ day of each month thereafter. If the payment is not received by the _____ day of the month, a late charge of $_____ will be charged to the loan.

h. Amount and date of the last 3 postpetition payments received from the Debtor in good funds, regardless of how applied (if applicable):

$_____   received on (*date*) _____
$_____   received on (*date*) _____
$_____   received on (*date*) _____

i. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. A plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (*attach LBR form F 4001-1.DEC.AGENT.TRUSTEE*).

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                              Page 9                              **F 4001-1.RFS.RP.MOTION**

13. ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

14. ☐ The court determined on (*date*) _____ that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B).  More than 90 days have passed since the filing of the bankruptcy petition; more than 30 days have passed since the court determined that the Property qualifies as single asset real estate; the Debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or the Debtor has not commenced monthly payments to Movant as required by 11 U.S.C. § 362(d)(3).

15. ☐ The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

16. ☐ Movant regained possession of the Property on (*date*) _____, which is ☐ prepetition ☐ postpetition.

17. ☐ The bankruptcy case was filed in bad faith:

   a. ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

   b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

   c. ☐ The Debtor filed only a few case commencement documents.  Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

   d. ☐ Other (*specify*):


18. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

   a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

   b. ☐ Multiple bankruptcy cases affecting the Property include:

      1. Case name: _____
         Chapter: _____  Case number: _____
         Date dismissed: _____  Date discharged: _____  Date filed: _____
         Relief from stay regarding the Property ☐ was  ☐ was not   granted.

      2. Case name: _____
         Chapter: _____  Case number: _____
         Date dismissed: _____  Date discharged: _____  Date filed: _____
         Relief from stay regarding the Property ☐ was  ☐ was not   granted.

      3. Case name: _____
         Chapter: _____  Case number: _____
         Date dismissed: _____  Date discharged: _____  Date filed: _____
         Relief from stay regarding the Property  ☐ was  ☐ was not   granted.

   ☐ See attached continuation page for information about other bankruptcy cases affecting the Property.

   ☐ See attached continuation page for facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                               Page 10                               **F 4001-1.RFS.RP.MOTION**

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

   a. ☐ These actions were taken before Movant knew the bankruptcy petition had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

   b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

   c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/15/2025 | ERIC JIANG | _Eric Jiang_ (signature) |
|---|---|---|
| Date | Printed name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2017                                   Page 11                          F 4001-1.RFS.RP.MOTION

JESSICA M. SIMON – SBN 277581
**HEMAR, ROUSSO & HEALD, LLP**
15910 Ventura Boulevard, 12th Floor
Encino, California 91436
Telephone: (818) 501-3800
Facsimile:  (818) 501-2985
Email: jsimon@hrhlaw.com
File No. 4969-20240337

Attorneys for Movant/Secured Creditor,
HARVEST SMALL BUSINESS FINANCE, LLC

**HEMAR, ROUSSO & HEALD, LLP**
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA (LOS ANGELES DIVISION)

| | |
|---|---|
| IN RE: | Lead Case No. 2:24-bk-12079-VZ |
| SEATON INVESTMENTS, LLC, | Jointly Administered with Case Nos.: 2:24-bk-12080-VZ; 2:24-bk-12081-VZ; **2:24-bk-12082-VZ**; 2:24-bk-12091-VZ; 2:24-bk-12074-VZ; 2:24-bk-12075-VZ and 2:24-bk-12076-VZ |
| ☐ Affects All Debtors.<br>☐ Affects Seaton Investments, LLC (Dismissed)<br>☐ Affects Colyton Investments, LLC (Dismissed)<br>☐ Affects Broadway Avenue Investments, LLC<br>☒ Affects SLA Investments, LLC<br>☐ Affects Negev Investments, LLC<br>☐ Affects Alan Gomperts<br>☐ Affects Daniel Halevy<br>☐ Affects Susan Halevy | Chapter 11 |
| Debtors. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY [REAL PROPERTY: [1040 S. Los Angeles Street, Los Angeles, CA 90015, APN 5145-020-057]** |
| HARVEST SMALL BUSINESS FINANCE, LLC, | |
| Movant, | (*Notice of Motion & Motion, and Declarations of Eric Jiang and David Shioji filed concurrently herewith*) |
| vs. | DATE:   January 6, 2026<br>TIME:    10:30 a.m.<br>CTRM:  1368<br>JUDGE: Vincent P. Zurzolo |
| SLA INVESTMENTS, LLC, | |
| Debtor. | |

**HEMAR, ROUSSO & HEALD, LLP**
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### I.  PRELIMINARY STATEMENT

Movant Harvest Small Business Finance, LLC ("Movant") seeks relief from the automatic stay to enforce its state law rights and remedies to the real property located at 1040 S. Los Angeles Street, Los Angeles, CA 90015, APN 5145-020-057 (the "Property") against the subject debtor SLA Investments, LLC (the "Debtor").

Movant is a senior lienholder on the Property.  There is no equity cushion in the Property for Movant (much less equity for the estate) with a fair market value of $2.1 million and at least $2,154,239.09 owed to Movant as of November 20, 2025, plus over $96,000.00 in senior defaulted real property taxes.  (This does not even include the junior lien on the Property).  The Debtor also has been unable to confirm a plan in over one and a half years since this bankruptcy was filed, and any plan hinges on a settlement with another secured creditor that (in approximately six months) still has not been finalized.

There is no reason to stay Movant's enforcement actions any longer.  Movant, thus, respectfully requests the Court to grant it stay relief under 11 U.S.C. §§ 362(d)(1) and (d)(2), with waiver of the 14-day stay.

### II.  STATEMENT OF FACTS

1.      On or about March 19, 2024 (the "Petition Date"), Debtor commenced the above-captioned bankruptcy case by filing a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), imposing an automatic stay. This case is jointly administered with the other debtors by Order entered on April 1, 2024.

2.      This Court has jurisdiction in this core proceeding pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(2)(G). Pursuant to 28 U.S.C. § 1409(a), this proceeding is properly commenced and prosecuted in this Court in which Debtors' Chapter 11 cases are pending.

#### A.      The Loan and Movant's Security

3.      On or about February 7, 2018, Movant made a loan (the "Loan") to SLA Investments, LLC (the "Debtor"), in the original principal amount of $2,000,000.00, as evidenced by a U.S. Small Business Administration Note executed by Debtor and a non-debtor co-borrower (the "Note").  (See

Declaration of Eric Jiang ["<u>Jiang Decl.</u>"], ¶ 7, Ex. 1.)

4.    To secure payment obligations under the Note, the Debtor granted, transferred, and assigned to Movant all of its right, title, and interest in and to the Property, and all leases thereof and rents therefrom, pursuant to a Deed of Trust recorded in the Official Records of Los Angeles County, California on February 15, 2018 (the "<u>DOT</u>").   (*See* Jiang Decl., ¶ 7, Ex. 2.)  Movant holds a senior lien position on the Property.  (*See* id., ¶ 7, 11.e.)

5.    The Note, DOT, and all related documents in connection with the Loan are hereinafter referred to collectively as the "<u>Loan Documents.</u>"

**B.    <u>Defaulted Amounts Under the Loan</u>**

6.    As of November 20, 2025, defaulted amounts under terms of the Loan were at least $398,394.04 (plus a further payment that came due on December 1, 2025 and another that will come due on January 1, 2026 by the time of the hearing on this Motion).  (*See* Jiang Decl., ¶¶ 11.b.)

7.    Monthly payments under the Loan are $19,190.05.  (*See* Jiang Decl., ¶ 11.a. and c.)

**C.    <u>Debtor's Adequate Protection Payments Are Inadequate to Protect Its Interests</u>**

8.    On May 23, 2025, Debtor and Movant entered into a cash collateral stipulation to authorize the final use of cash collateral (the "<u>Stipulation</u>," Dkt. 510.)  Pursuant to terms of the Stipulation, the Debtor has been making adequate protection payments to Movant in the amount of $9,015.00 per month since May 2025.  (*See* Stipulation, Dkt. 510.)

9.    The adequate protection payments are $10,175.05 less than the normal monthly payments of $19,190.05, do not even cover all accrued interest (with at least $534.88 in accrued but unpaid interest due as of November 20, 2025), and do not make a dent in the defaulted payments of $398,394.04.  (*See* Jiang Decl., ¶ 11.a., b., and c.)  (As discussed below, given the Property valuation and 2024 delinquent real property taxes, the payments are wholly inadequate to protect Movant against the depreciating Property value.)

**D.    <u>Indebtedness Owed to Movant</u>**

10.    As of November 20, 2025, Movant was owed not less than the following sums under the Note:

| | |
|---|---|
| Principal | $1,735,388.63 |
| Accrued Interest | $341,154.84 |

HEMAR, ROUSSO & HEALD, LLP
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

| Late Fees | $18,230.62 |
| Other Misc. Fees | $59,465.00 |
| **Total** | **$2,154,239.09** |
| *Per Diem Interest is $534.88 | |

Interest, fees, and costs continue to accrue, including attorneys' fees and costs. (*See* Jiang Decl., ¶ 8.)

### E.  Property Valuation, Junior Lien, and Defaulted Property Taxes

11.  Based on an appraisal conducted of the Property, Movant understands and believes that the "as is" fair market value ("FMV") of the Property is $2,100,000.00.  (*See* Ex. 5 to Motion, Declaration of David Shioji ["Shioji Decl."], ¶ 5, Ex. A thereto; Jiang Decl., ¶ 11.d.)  Moreover, "the lingering economic uncertainties and interviews with market participants suggest additional discounting would be warranted to facilitate a closed sale within the defined timeframe [of 6 to 9 months]," thus lending to a 10% discount for a liquidation value of $1,890,000.00. (*See* Ex. 5, Shioji Decl., ¶ 5, p. 65; Jiang Decl., ¶ 11.d (4).)

12.  Movant understands and believes that Archway Real Estate Income Fund I REIT, LLC ("Archway") holds a second lien on the Property in the amount of at least $131,875.00 (as evidenced by Archway's Proof of Claim No. 2 and recognized in Debtor's schedules). (*See* 11.e. and Ex. 4, Schedule D.)

13.  Movant also understands and believes that Debtor is delinquent on payment of 2024 real property taxes on the Property, with a redemption amount of at least $96,795.43 as of November 21, 2025.  Monthly penalties continue to accrue in the amount of $1,148.22, and further taxes in the amount of $19,599.92 will increase the delinquent amounts if not paid by December 10, 2025.  (*See* Jiang Decl., ¶ 11.e, Ex. 6 Los Angeles Treasurer and Tax Collector Defaulted Tax Roll.)

### F.  Debtor's Prior Unapproved Disclosure Statement and Nonconfirmed Plan

14.  On June 18, 2024, Debtor filed a Disclosure Statement and Plan (Dkt. 107), which subsequently were amended several times.  (*See* Dkt. 267, 398, 426.)  Movant, among other parties-in-interest, objected to approval of adequacy of the disclosure statement.  (*See* Dkt. 433.)  On March 18, 2025, the Court entered an order dismissing the motion to approve adequacy of the disclosure statement.  (*See* Dkt. 469.)

15.  Since then, Movant understands and believes that Debtor has been negotiating a

HEMAR, ROUSSO & HEALD, LLP
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

compromise with Archway, pursuant to a Motion to Approve Settlement Agreement with Archway Broadway Loan SPE, LLC, filed on June 19, 2025 ("9019 Motion").  (*See* Dkt. 520.)

16.    A hearing on the 9019 Motion has been continued various times, with the most recent hearing set on January 27, 2026.  Movant understands and believes that, unless the 9019 Motion is approved, Debtor will be unable to confirm a plan.  By the time of this hearing, over 6 months will have passed since the 9019 Motion was filed, without Court approval, and over one and a half years since the Debtor filed this case without approval of a disclosure statement or confirmation of a Plan.

# I.    ARGUMENT

## A.    Stay Relief Standard

Pursuant to Section 362(d)(1) and (2) of the Bankruptcy Code, a party-in-interest is entitled to relief from the automatic stay of the Bankruptcy Code:

> (1)    For cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2)    With respect to a stay of an action against property under subsection (a) of this section, if –
>
> (A)    the debtor does not have any equity in such property; and
>
> (B)    such property is not necessary to an effective reorganization;

\*\*\*

Section 362d) is phrased in the disjunctive and, in order to obtain relief from the automatic stay, the movant need prevail on only one of the alternative tests set forth in the section.  La Jolla Mortg. Fund v. Rancho El Cajon Associates, 18 B.R. 283, 286 (Bankr. S.D. Cal. 1982).

"The decision to grant or deny relief from the automatic stay is committed to the sound discretion of the bankruptcy court[.]" Benedor Corp. v. Conejo Enterprises, Inc. (In re Conejo Enterprises, Inc.), 96 F.3d 346, 351 (9th Cir. 1996).  The Debtor has the burden of proof on all issues other than the Debtor's equity, including adequate protection.  See 11 U.S.C. § 362(g); La Jolla Mortg. Fund, 18 B.R. at 288 ("Of course, since this is a question of providing adequate protection, the debtor has the burden of proof").  The Debtor cannot meet its burden.

## B.    "Cause" Exists to Grant Movant Stay Relief Under Section 362(d)(1).

The Bankruptcy Code does not define "cause" for Section 362(d)(1) purposes.  Accordingly,

HEMAR, ROUSSO & HEALD, LLP
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1    courts enjoy considerable discretion in modifying the stay for cause.  See Christensen v. Tucson

2    Estates, Inc. (In re Tucson Estates, Inc.), 912 F.2d 1162, 1166 (9th Cir. 1990) ("'Cause' has no clear

3    definition and is determined on a case-by-case basis."); Benedor Corp. v. Conejo Enters., Inc. (In re

4    Conejo Enters., Inc.), 96 F.3d 346, 351 (9th Cir. 1996) (same).

5        The failure to provide adequate protection payments where property value is declining

6    constitutes cause for relief from the stay.  See United Savings Association of Texas v. Timbers of

7    Inwood Forest Associates, Ltd., 484 U.S. 365, 370 (1988); see also In re Lane, 108 B.R. 6, 11 (Bankr.

8    D. Mass. 1989) (finding relief warranted where the value of a mortgage interest declined due to a

9    failure to pay taxes, which were senior secured interests, and conditioning the stay upon payment of all

10    taxes); Matter of East-West Associates, 106 B.R. 767, 773 (S.D.N.Y. 1989) (finding adequate

11    protection payments warranted because accruing real estate taxes increased the senior tax lien on the

12    premises).  "Adequate protection" usually takes the form of post-petition payments on account of the

13    secured loans or the existence of an adequate "equity cushion" in the collateral securing the property.

14    "Equity cushion" has been defined as any value in the property over and above the amount owed to the

15    creditor.  See La Jolla Mortg. Fund, 18 B.R. at 287-88.

16        Cause is warranted for lack of adequate protection against a continuing decline in the Property

17    value from accrued (and accruing) real property taxes while the stay remains in effect.  With a FMV of

18    the Property of $2.1 million (which may be closer to $1,890,000.00 based on "lingering economic

19    uncertainties" and market participant interviews), there is no equity above Movant's lien of at least

20    $2,154,239.09, much less any cushion within an appropriate range.  (See Ex. 5 to Motion, Shioji Decl.,

21    ¶ 5, Ex. A thereto; Jiang Decl., ¶¶ 8, 11.d.; see, e.g., In re Lane, 108 B.R. 6, 11 (Bankr. D. Mass. 1989)

22    (equity cushions ranging from 8% to 18% have been deemed inadequate).  In re Mellor, 734 F2d 1396,

23    1400 (9th Cir. 1984) ("A 20% cushion has been held to be an adequate protection for a secured

24    creditor."); In re Helionetics, Inc., 70 BR 433, 440 (Bankr. C.D. Cal. 1987) (20.4% equity cushion was

25    adequate).

26        Moreover, Debtor bears the burden of establishing adequate protection, and it cannot show that

27    the payments of $9,015.00 that Movant has been receiving since May 2025 shield Movant from the

28    post-petition (2024) senior accruing taxes.  La Jolla Mortg. Fund, 18 B.R. at 288.  More specifically,

1  as mentioned, the payments do not even cover the normal monthly payments of $19,190.05 (or all

2  interest, with accrued but unpaid interest of $534.88 as of November 20, 2025), much less real

3  property taxes of at least $96,795.43, which only continue to increase without payment. (*See* Jiang

4  Decl., ¶ 11.a., b., c. and e. [Ex. 6 Los Angeles Treasurer and Tax Collector Defaulted Tax Roll];

5  Stipulation, Dkt. 510.)

6      The failure to keep taxes current alone is cause for stay relief, and the lack of any cushion for

7  Movant demonstrates that it is inadequately protected against this decline. *See, e.g.,* In re Mr. D

8  Realty Co., 27 B.R. 359, 366 (Bankr. S.D. Ohio 1983) ("In addition, debtors must provide adequate

9  assurance that property taxes, insurance and maintenance of the property is kept current"); In re Lane,

10  108 B.R. 6, 11 (Bankr. D. Mass. 1989) (finding relief warranted where the value of a mortgage interest

11  declined due to a failure to pay taxes, which were senior secured interests, and conditioning the stay

12  upon payment of all taxes); In re Pittman, 7 B.R. 760, 763 (Bankr. S.D.N.Y. 1980) (failure to pay

13  property taxes creates a danger of in rem proceedings warranting stay relief); In re El Patio Ltd., 6

14  B.R. 518 (Bankr. C.D. Cal. 1980); Sunshine Dev. v. FDIC, 33 F.3d 106, 109 (1st Cir. 1994) (granting

15  relief from stay where party failed to pay real property taxes and insurance premiums).

16      Thus, there is ample cause to lift the stay for Movant to exercise its nonbankruptcy rights and

17  remedies to the Property, including but not limited to recording the Notice of Default, Notice of Sale,

18  and proceeding to foreclose the Property,  Movant respectfully requests the Court to grant it stay relief

19  for "cause" under Section 362(d)(1) of the Bankruptcy Code.

20      **C.    There Is No Equity in the Property for the Estate, and the Property is
        Unnecessary to a Reorganization; Thus, Stay Relief Should Be Granted Under
21      Section 362(d)(2)**

22       First, the Property is fully encumbered, leaving no equity for the estate.  With liens of at least

23  $2,382,909.52 (including Movant's lien of at least $2,154,239.09, Archway's lien of at least

24  $131,875.00, and real property taxes of $96,795.43 as of November 2025 which are increasing) on a

25  Property with a FMV of $2,100,000.00 (and may be closer to $1,890,000.00), without even including

26  other costs, such as attorneys' fees and costs, there is no equity for the estate. (*See* Jiang Decl., ¶¶ 8,

27  11.e, Ex. 4, Schedule D, Ex. 6 Los Angeles Treasurer and Tax Collector Defaulted Tax Roll;

28  Archway's Proof of Claim No. 2.)

1    Second, the Debtor is unable to show that this Property is necessary to an "effective" and

2    "likely" reorganization within a reasonable time. *See* <u>Timbers of Inwood Forest Associates, Ltd.</u>,

3    484 U.S. 365, 376 (1987) (finding that this prong means that there must be "a reasonable possibility

4    of a successful reorganization within a reasonable time"); <u>La Jolla Mortg. Fund v. Rancho El Cajon</u>

5    <u>Assocs.</u>, 18 B.R. 283, 291 (Bankr. S.D. Cal. 1982) (citing <u>In re Clark Tech. Assocs., Ltd.</u>, 9 B.R.

6    738, 740 (Bankr. D. Conn. 1981) for the proposition that the "key word" under Section 362(d)(2)(B)

7    is "effective," and finding that debtor completely failed "to present evident that would support the

8    finding that reorganization is likely"). This is the Debtor's burden to bear. *See* <u>Sun Valley Ranches,</u>

9    <u>Inc. v. The Equitable Life Assurance Soc'y (In re Sun Valley Ranches, Inc.)</u>, 823 F.2d 1373, 1375

10    (9th Cir. 1987) (acknowledging debtor's burden to demonstrate necessity for reorganization

11    purposes). This bankruptcy case has been pending for over one and a half years, without approval of

12    a disclosure statement or confirmation of a Plan. Any plan hinges on the Debtor's ability to finalize

13    settlement negotiations with Archway and have the settlement approved in the 9019 Motion, which

14    has not been accomplished in over 6 months from the time of the hearing on this Motion. Thus,

15    because there is no equity in the Property, and this case is well past a reasonable timeframe for a

16    likely reorganization, Movant respectfully requests the Court to grant it stay relief under Section

17    362(d)(2) of the Bankruptcy Code.

## II. <u>CONCLUSION</u>

18    For the foregoing reasons, Movant respectfully requests that the Court grant it stay relief under

19    Sections 362(d)(1) and (d)(2) to exercise its state law rights and remedies to the Property, including

20    but not limited to recording the Notice of Default, Notice of Sale, and proceeding to foreclose the

21    Property, with waiver of the 14-day stay under FRBP 4001(a)(3).

22    DATED: December 15, 2025            HEMAR, ROUSSO & HEALD, LLP

24                                        /s/ *Jessica M. Simon*

25    BY: _____

26                                        JESSICA M. SIMON
                                          Movant/Secured Creditor,
                                          HARVEST SMALL BUSINESS FINANCE, LLC

**HEMAR, ROUSSO & HEALD, LLP**
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA 91436
(818) 501-3800

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

# EXHIBIT 1



U.S. Small Business Administration

# NOTE

| SBA Loan # | ████████████ |
|---|---|
| SBA Loan Name | **Sienna Rose, Inc.** |
| Date | **02-07-2018** |
| Loan Amount | **$2,000,000.00** |
| Interest Rate | **Variable** |
| Borrower | **SLA Investments, LLC and Sienna Rose, Inc.** |
| Operating Company | **Sienna Rose, Inc.** |
| Lender | **Harvest Small Business Finance, LLC** |

### 1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of **Two Million and 00/100** Dollars , interest on the unpaid principal balance, and all other amounts required by this Note.

### 2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

### 3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is **7.25%** per year. This initial rate is the "Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus **2.75%**. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10."

Borrower must pay principal and interest payments of **$14,456.14** every month beginning **two** months from the month of initial disbursement on this Note; payments must be made on the **first calendar day** in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

Lender and Borrower may agree to pay an additional amount into an escrow account for payment of real estate taxes and required insurance related to commercial real estate securing the loan. Any such account must comply with SOP 50 10.

The interest rate will be adjusted **every calendar quarter** (the "change period").

The date of the first interest rate adjustment will be **April 1, 2018**.

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the **wall Street Journal** newspaper ) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be **2.75%** above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

> **Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
>
> a. Give Lender written notice;
>
> b. Pay all accrued interest; and
>
> c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.
>
> If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.
>
> **Subsidy Recoupment Fee.** When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:
>
> a. During the first year after the date of initial disbursement, 5% of the total prepayment amount;
>
> b. During the second year after the date of initial disbursement, 3% of the total prepayment amount; and
>
> c. During the third year after the date of initial disbursement, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable **25** years from **date of initial disbursement**.

**Late Charge:** If a payment on this Note is more than **10** days late, Lender may charge Borrower a late fee of up to **5.00%** of the unpaid portion of the regularly scheduled payment.

**4. DEFAULT:**    Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

**A.**  Fails to do anything required by this Note and other Loan Documents;

**B.**  Defaults on any other loan with Lender;

**C.**  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

**D.**  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

**E.**  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

**F.**  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

**G.**  Fails to pay any taxes when due

**H.**  Becomes the subject of a proceeding under any bankruptcy or insolvency law;

**I.**  Has a receiver or liquidator appointed for any part of their business or property;

**J.**  Makes an assignment for the benefit of creditors;

**K.**  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

**L.**  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

**M.**  Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

**5. LENDER'S RIGHTS IF THERE IS A DEFAULT:**   Without notice or demand and without giving up any of its rights, Lender may:

   **A.**  Require immediate payment of all amounts owing under this Note;

   **B.**  Collect all amounts owing from any Borrower or Guarantor;

   **C.**  File suit and obtain judgment;

   **D.**  Take possession of any Collateral; or

   **E.**  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

**6. LENDER'S GENERAL POWERS:**   Without notice and without Borrower's consent, Lender may:

   **A.**  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

   **B.**  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

   **C.**  Release anyone obligated to pay this Note;

   **D.**  Compromise, release, renew, extend or substitute any of the Collateral; and

   **E.**  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

**7. WHEN FEDERAL LAW APPLIES:**   When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**8. SUCCESSORS AND ASSIGNS:**   Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

**9. GENERAL PROVISIONS:**

   **A.**  All individuals and entities signing this Note are jointly and severally liable.

   **B.**  Borrower waives all suretyship defenses.

   **C.**  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

   **D.**  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

   **E.**  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

   **F.**  If any part of this Note is unenforceable, all other parts remain in effect.

   **G.**  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

**10. STATE-SPECIFIC PROVISIONS:**
NONE

**11. BORROWER'S NAME(S) AND SIGNATURE(S):**

**By signing below, each individual or entity becomes obligated under this Note as Borrower.**

**BORROWER:**

**SLA Investments, LLC**

By _____
Alan D. Gomperts, Manager of SLA
Investments, LLC

**Sienna Rose, Inc.**

By _____
Sue Halevy, President of Sienna Rose, Inc.

The guaranteed portion of the outstanding principal balance of this
note has been transferred to a Registered Holder for value.

Date: 2/22/18
By: _____

# EXHIBIT 2



**This page is part of your document - DO NOT DISCARD**



# 20180154924



**Pages:**
**0010**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**02/15/18 AT 08:00AM**

| | | |
|---|---|---|
| FEES: | | 82.00 |
| TAXES: | | 0.00 |
| OTHER: | | 0.00 |
| SB2: | | 225.00 |
| PAID: | | 307.00 |



**L E A D S H E E T**



201802150200003

**00014897213**

008907842

**SEQ:**
**01**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

E441968

T55

RECORDATION REQUESTED BY:

**FIDELITY** NATIONAL TITLE COMPANY

02/15/2018

*20180154924*

WHEN RECORDED MAIL TO:
Harvest Small Business Finance, LLC
24422 Avenida De La Carlota, Suite 232
Laguna Hills, CA  92653

FOR RECORDER'S USE ONLY

# DEED OF TRUST

**THIS DEED OF TRUST** is dated February 7, 2018, among SLA Investments, LLC, a California Limited Liability Company whose address is 1040 S. Los Angeles, Los Angeles, CA  90015 ("Trustor"); Harvest Small Business Finance, LLC, whose address is 24422 Avenida De La Carlota, Suite 232, Laguna Hills, CA  92653 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Fidelity National Title Company, whose address is 4400 MacArthur Blvd., Suite 200, Newport Beach, CA  92660 (referred to below as "Trustee").

**CONVEYANCE AND GRANT.  For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary,** all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Los Angeles County, State of California:**

LOT 4 IN BLOCK 4 OF THE O.W. CHILD'S TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 6 PAGE(S) 378 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**The Real Property or its address is commonly known as  1040 S. Los Angeles Street, Los Angeles, CA  90015. The Assessor's Parcel Number for the Real Property is 5145-020-057.**

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938.  In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.**  Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.**  Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Trustor may  (1)  remain in possession and control of the Property; (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

**Duty to Maintain.**  Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Trustor represents and warrants to Lender that:  (1)  During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws,  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and

**Loan No:** ███████

## DEED OF TRUST
### (Continued)

Page 2

ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage

| Loan No: | **DEED OF TRUST** | Page 3 |
|----------|-------------------|--------|
|          | **(Continued)**   |        |

endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Trustor warrants that:  (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and  (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to

**Loan No:** 

### DEED OF TRUST
### (Continued)

Page 4

Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Loan No:** ▉▉▉▉▉▉▉

## DEED OF TRUST
### (Continued)

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Trustor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Trustor's existence as a going business or the death of any member, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment, is curable and if Trustor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Trustor, after Lender sends written notice to Trustor demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with

Loan No: ████████

# DEED OF TRUST
## (Continued)

Page 6

the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Los Angeles County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

# DEED OF TRUST
**(Continued)**

**Loan No:** ▮▮▮▮▮▮▮

Page 7

---

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**FIXTURE FILING.** This Deed of Trust covers Good which are or are to become fixtures on the real property described herein and is to be recorded in the Real Estate Records as a Fixture Filing. Trustor is the "Debtor", Beneficiary is the "Secured Party"; and the addresses of each are specified in the first paragraph of this Deed of Trust.

**COMMERCIAL PURPOSE.** The party of parties executing this document below represent and warrant to Lender that the proceeds of the loan referenced herein shall be used exclusively for commercial and business purposes, and that none of the proceeds of such loan shall be used for personal, family or household purposes.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

   **Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

   **Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require.  "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

   **Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

   **Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

   **Applicable Law.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: (a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. (b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.  Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

   **Choice of Venue.** If there is a lawsuit, Trustor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

   **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust.  No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

   **Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

   **Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns.  If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

   **Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

   **Waive Jury.** To the extent permitted by applicable law, all parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

   **Beneficiary.** The word "Beneficiary" means Harvest Small Business Finance, LLC, and its successors and assigns.

   **Borrower.** The word "Borrower" means SLA Investments, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

   **Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**DEED OF TRUST**
**(Continued)**

Loan No:                                                                                                    Page 8

---

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Harvest Small Business Finance, LLC, its successors and assigns.

**Note.** The word "Note" means the promissory note dated February 7, 2018, **in the original principal amount of $2,000,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO TRUSTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means Fidelity National Title Company, whose address is 4400 MacArthur Blvd., Suite 200, Newport Beach, CA 92660 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means SLA Investments, LLC.

TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.

TRUSTOR:

SLA INVESTMENTS, LLC

By:
Alan D. Gomperts, Manager of SLA Investments, LLC

**Loan No:** ████████

## DEED OF TRUST
## (Continued)

Page 9

---

## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF _____CALIFORNIA_____ )
                                                          ) SS
COUNTY OF _____LOS ANGELES_____ )

On _____FEBRUARY 11_____, 20 19 before me, _____VALERIE S. LUNA NOTARY PUBLIC_____,
(here insert name and title of the officer)

personally appeared **Alan D. Gomperts,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

VALERIE S. LUNA
Notary Public - California
Los Angeles County
Commission # 2191204
My Comm. Expires May 8, 2021

(Seal)

---

### (DO NOT RECORD)
### REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

_____.

Date: _____        Beneficiary: _____
                                                              By: _____
                                                              Its: _____

LaserPro, Ver. 17.4.10.006 Copr. D+H USA Corporation 1997, 2018.  All Rights Reserved.  - CA C:\CFI\LPL\G01.FC TR-192 PR-1

# EXHIBIT 3

### *Summary of Post Petition Payments as of 12/12/2025*

| Date | Amount ($) | Description |
|------|-----------|-------------|
| 6/16/25 | 18,030.00 | Payment Received |
| 7/3/25 | 9,015.00 | Payment Received |
| 8/1/25 | 9,015.00 | Payment Received |
| 9/2/25 | 9,015.00 | Payment Received |
| 10/1/25 | 9,015.00 | Payment Received |
| 11/3/25 | 9,015.00 | Payment Received |
| 12/1/25 | 9,015.00 | Payment Received |

### *Summary of Post Petition Fee Charges as of 12/12/2025*

| Date | Amount ($) | Description |
|------|-----------|-------------|
| 4/19/2024 | 5,250 | Legal Fee |
| 5/17/2024 | 9,625 | Legal Fee |
| 6/21/2024 | 6,825 | Legal Fee |
| 7/19/2024 | 3,040 | Legal Fee |
| 7/30/2024 | 3,000 | Appraisal Fee |
| 9/20/2024 | 4,690 | Legal Fee |
| 10/18/2024 | 2,345 | Legal Fee |
| 11/15/2024 | 5,915 | Legal Fee |
| 12/20/2024 | 7,455 | Legal Fee |
| 1/24/2025 | 495 | Legal Fee |
| 3/21/2025 | 1,085 | Legal Fee |
| 2/21/2025 | 2,345 | Legal Fee |
| 4/18/2025 | 630 | Legal Fee |
| 5/16/2025 | 735 | Legal Fee |
| 6/20/2025 | 700 | Legal Fee |
| 7/18/2025 | 805 | Legal Fee |
| 8/15/2025 | 140 | Legal Fee |
| 9/19/2025 | 105 | Legal Fee |
| 10/17/2025 | 280 | Legal Fee |
| 10/30/2025 | 4,000 | Appraisal Fee |
| 11/21/2025 | 560 | Legal Fee |

### *Summary of Post Petition Late Charges as of 12/12/2025*

| Date | Amount ($) | Description |
|------|-----------|-------------|
| 4/11/24 | 959.62 | Late Charge |
| 5/11/24 | 959.50 | Late Charge |
| 6/11/24 | 959.50 | Late Charge |

| 7/11/24 | 959.50 | Late Charge |
|---|---|---|
| 8/11/24 | 959.50 | Late Charge |
| 9/11/24 | 959.50 | Late Charge |
| 10/11/24 | 959.50 | Late Charge |
| 11/11/24 | 959.50 | Late Charge |
| 12/11/24 | 959.50 | Late Charge |
| 1/11/25 | 959.50 | Late Charge |
| 2/11/25 | 959.50 | Late Charge |
| 3/11/25 | 959.50 | Late Charge |
| 4/11/25 | 959.50 | Late Charge |
| 5/11/25 | 959.50 | Late Charge |
| 6/11/25 | 959.50 | Late Charge |
| 7/11/25 | 959.50 | Late Charge |
| 8/11/25 | 959.50 | Late Charge |
| 9/11/25 | 959.50 | Late Charge |
| 10/11/25 | 959.50 | Late Charge |
| 11/11/25 | 959.50 | Late Charge |
| 12/11/25 | 959.50 | Late Charge |

# EXHIBIT 4

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor name</td><td>SLA INVESTMENTS, LLC</td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION</td></tr>
<tr><td>Case number (if known)</td><td>2:24-bk-12082-VZ</td></tr>
</table>

☐ Check if this is an amended filing

## Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property                          12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☒ Yes. Fill in all of the information below.

<table>
<tr><td colspan="2"><strong>Part 1:    List Creditors Who Have Secured Claims</strong></td><td></td><td></td></tr>
<tr><td colspan="2">2. <strong>List in alphabetical order all creditors who have secured claims.</strong> If a creditor has more than one secured claim, list the creditor separately for each claim.</td><td><em>Column A</em><br><strong>Amount of claim</strong><br><br>Do not deduct the value of collateral.</td><td><em>Column B</em><br><strong>Value of collateral that supports this claim</strong></td></tr>
<tr>
<td><strong>2.1</strong> Archway Real Estate Income<br><small>Creditor's Name</small><br>Fund I SPE I, LLC<br>10100 Santa Monica Blvd<br>Ste 500<br>Los Angeles, CA 90067<br><small>Creditor's mailing address</small><br><br><br><small>Creditor's email address, if known</small><br><br><strong>Date debt was incurred</strong><br>4/21/2023<br><strong>Last 4 digits of account number</strong></td>
<td><strong>Describe debtor's property that is subject to a lien</strong><br>Non-residential real property located at 1040 S Los Angeles St., Los Angeles, CA 90015<br><br><br><strong>Describe the lien</strong><br>Second Mortgage<br><strong>Is the creditor an insider or related party?</strong><br>☒ No<br>☐ Yes<br><strong>Is anyone else liable on this claim?</strong><br>☐ No<br>☒ Yes. Fill out <em>Schedule H: Codebtors</em> (Official Form 206H)</td>
<td>$125,000.00</td>
<td>$3,500,000.00</td>
</tr>
<tr>
<td><strong>Do multiple creditors have an interest in the same property?</strong><br>☐ No<br>☒ Yes. Specify each creditor, including this creditor and its relative priority.<br>1. Los Angeles County Tax Collector<br>2. Harvest Small Business Finance (SBA)<br>3. Archway Real Estate Income</td>
<td><strong>As of the petition filing date, the claim is:</strong><br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed</td>
<td></td>
<td></td>
</tr>
<tr>
<td><strong>2.2</strong> Harvest Small Business Finance (SBA)<br><small>Creditor's Name</small><br>24422 Avenida de la Carlota<br>Ste 400<br>Laguna Hills, CA 92653<br><small>Creditor's mailing address</small><br><br><br><small>Creditor's email address, if known</small><br><br><strong>Date debt was incurred</strong><br>4/23/2021</td>
<td><strong>Describe debtor's property that is subject to a lien</strong><br>Non-residential real property located at 1040 S Los Angeles St., Los Angeles, CA 90015<br><br><br><strong>Describe the lien</strong><br>First Mortgage<br><strong>Is the creditor an insider or related party?</strong><br>☒ No<br>☐ Yes<br><strong>Is anyone else liable on this claim?</strong><br>☐ No<br>☒ Yes. Fill out <em>Schedule H: Codebtors</em> (Official Form 206H)</td>
<td>$1,805,485.00</td>
<td>$3,500,000.00</td>
</tr>
</table>

Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com                                                                    Best Case Bankruptcy

| Debtor | SLA INVESTMENTS, LLC | | Case number (if known) | 2:24-bk-12082-VZ |
|---|---|---|---|---|
| | Name | | | |

**Last 4 digits of account number**

| Do multiple creditors have an interest in the same property?<br>☐ No<br>☒ Yes. Specify each creditor, including this creditor and its relative priority.<br>Specified on line 2.1 | As of the petition filing date, the claim is:<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed |
|---|---|

---

| 2.3 | Los Angeles County Tax Collector | Describe debtor's property that is subject to a lien<br>Non-residential real property located at 1040 S Los Angeles St., Los Angeles, CA 90015 | $18,934.00 | $3,500,000.00 |
|---|---|---|---|---|

Creditor's Name

PO Box 54110
Los Angeles, CA 90054-0110

Creditor's mailing address

**Describe the lien**
Statutory Lien

**Is the creditor an insider or related party?**
☒ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☒ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

| Do multiple creditors have an interest in the same property?<br>☐ No<br>☒ Yes. Specify each creditor, including this creditor and its relative priority.<br>Specified on line 2.1 | As of the petition filing date, the claim is:<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed |
|---|---|

---

| 3. | Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any. | $1,949,419.00 |
|---|---|---|

| **Part 2:** | **List Others to Be Notified for a Debt Already Listed in Part 1** |
|---|---|

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name   and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| Joshua Mogin Esq<br>Thompson Coburn LLP<br>10100 Santa Monica Blvd Ste 500<br>Los Angeles, CA 90067 | Line  2.1 | |
| US Small Business Administration<br>Office of General Counsel<br>312 N Spring St 5th Fl<br>Los Angeles, CA 90012 | Line  2.2 | |
| US Small Business Administration<br>409 3rd St SW<br>Washington, DC 20416 | Line  2.2 | |
| US Small Business Administration<br>14925 Kingsport Rd<br>Fort Worth, TX 76155-2243 | Line  2.2 | |

Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

# EXHIBIT 5

1   JESSICA M. SIMON – SBN 277581
    **HEMAR, ROUSSO & HEALD, LLP**
2   15910 Ventura Boulevard, 12th Floor
    Encino, California 91436
3   Telephone: (818) 501-3800
    Facsimile:  (818) 501-2985
4   Email: jsimon@hrhlaw.com
    File No. 4969-20240337

5

6   Attorneys for Movant/Secured Creditor,
    HARVEST SMALL BUSINESS FINANCE, LLC

7

8                    **UNITED STATES BANKRUPTCY COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA (LOS ANGELES DIVISION)**

10  IN RE:                                    Lead Case No. 2:24-bk-12079-VZ

11  SEATON INVESTMENTS, LLC,                  Jointly Administered with Case Nos.:
                                              2:24-bk-12080-VZ; 2:24-bk-12081-VZ;
12  ☐ Affects All Debtors.                    **2:24-bk-12082-VZ**; 2:24-bk-12091-VZ;
                                              2:24-bk-12074-VZ; 2:24-bk-12075-VZ
13  ☐ Affects Seaton Investments, LLC (Dismissed)   and 2:24-bk-12076-VZ
    ☐ Affects Colyton Investments, LLC (Dismissed)
14  ☐ Affects Broadway Avenue Investments, LLC   Chapter 11
15  ☒ Affects SLA Investments, LLC
    ☐ Affects Negev Investments, LLC
16  ☐ Affects Alan Gomperts
17  ☐ Affects Daniel Halevy                   **DECLARATION OF APPRAISER DAVID
    ☐ Affects Susan Halevy                    SHIOJI IN REGARD TO MOTION FOR
18                          Debtors.          RELIEF FROM THE AUTOMATIC STAY
                                              [REAL PROPERTY: [1040 S. Los Angeles
19  _____          Street, Los Angeles, CA 90015, APN 5145-020-
                                              057]**
20  HARVEST SMALL BUSINESS FINANCE, LLC,
                                              (*Notice of Motion & Motion, Memorandum of
21                          Movant,           Points and Authorities, and Declaration of Eric
                                              Jiang filed concurrently herewith*)
22  vs.
                                              DATE:   January 6, 2026
23  SLA INVESTMENTS, LLC,                     TIME:   10:30 a.m.
                                              CTRM:   1368
24                          Debtor.           JUDGE:  Vincent P. Zurzolo

25

26

27

28

**HEMAR, ROUSSO & HEALD, LLP**
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

1

DECLARATION OF APPRAISER IN SUPPORT OF MOTION FOR RELIEF FROM STAY

## DECLARATION OF DAVID SHIOJI

I, DAVID SHIOJI, declare:

1.      I am a real estate appraiser at CBRE - Valuation & Advisory Services ("CBRE"), which has a business address of 400 South Hope Street, 25th Floor, Los Angeles, CA 90071.  Attached hereto as **Exhibit 5** is a true and correct copy of my resume, which details my education, licenses and certifications, employment history and relevant experience.

2.      CBRE was retained by Movant Harvest Small Business Finance, LLC ("Movant") to perform an appraisal of certain real property commonly known as 1040 S. Los Angeles Street, Los Angeles, CA 90015, APN 5145-020-057 (the "Property").  I have completed the work necessary to form an opinion of value and as a result of that work, the matters set forth herein are made of my own personal knowledge or are based upon my review of my files and records with respect to the Property.  As such, I could and would testify competently with respect thereto if called as a witness in this proceeding.

3.      I am a Certified General Real Estate Appraiser in the State of California.  I am also a designated member of the Appraisal Institute.

4.      I have 8 years of experience in the appraisal of a variety of commercial properties in California, including but not limited to office, industrial, retail and multi-family properties in California.

5.      Having undertaken my investigation of the Property, I am of the opinion that the fee simple "as is" value of the Property as of October 20, 2025 was $2,100,000.00.

6.      CBRE's opinion as to the value and the reasons for that opinion are set forth in the Appraisal Report that was prepared for Movant, a true and correct copy of which is attached hereto as **Exhibit 5** and incorporated herein by this reference.  The appraisal was developed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) and the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, as well as criteria/guidelines of the State of California Bureau of Real Estate Appraisers.

///

///

**H E M A R ,   R O U S S O   &   H E A L D ,   L L P**
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA  91436
(818) 501-3800

1        I declare under penalty of perjury pursuant to the laws of the United States of America that the

2    foregoing is true and correct.    Executed on this 12th day of December, 2025 at Los Angeles,

3    California.

4

5

6

7

_____

8    DAVID SHIOJI, MAI, Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HEMAR, ROUSSO & HEALD, LLP
15910 VENTURA BOULEVARD, 12TH FLOOR
ENCINO, CA 91436
(818) 501-3800

DECLARATION OF APPRAISER IN SUPPORT OF MOTION FOR RELIEF FROM STAY

CBRE Valuation & Advisory Services

# Appraisal Report

## MULTI-TENANT RETAIL

1040 South Los Angeles Street
Los Angeles, California  90015

Prepared for: Harvest Small Business Finance, LLC and the U.S. Small Business Administration
Date of Report: October 30, 2025
CBRE File No.: CB25US100642-1
Client Reference No.: Loan Name: Sienna Rose | Loan Number: 40000320

cbre.com/valuation

**CBRE Valuation & Advisory Services**



4301 La Jolla Village Dr. Ste. 3000
San Diego, CA  92122

T  (858) 546-2646
F  (858) 546-3985

www.cbre.com/valuation

Date of Report: October 30, 2025

Mr. Tanner Larkins
Credit Analyst
HARVEST SMALL BUSINESS FINANCE, LLC and the U.S. Small Business Administration
24422 Avenida de la Carlota, Ste 400
Laguna Hills, California  92653

RE:    Appraisal of: Multi-Tenant Retail
       1040 South Los Angeles Street
       Los Angeles, Los Angeles County, California
       CBRE File No.: CB25US100642-1
       Client Reference No.: Loan Name: Sienna Rose | Loan Number: 40000320

Dear Mr. Larkins:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

Briefly described, the subject is a multi-tenant retail building, originally constructed in 2016. Per the provided rent roll, the subject contains a total gross building area of 4,860 SF. The subject does not provide on-site parking. Per the Los Angeles County Assessor's Map, the improvements are situated on one (1) parcel with a total area of 6,765± square feet, or 0.16 acre of HM1-CHC1.5 (CX3-FA) – (CPIO) zoned land within the City of Los Angeles, Los Angeles County. As of the date of inspection, the subject was 88.9% occupied and in average condition. Please note that with the exception of Earth Bean Coffee, who occupies suite Nos. 2, 4 and 6, all remaining occupied units are currently on a month to month lease rate. The site is generally rectangular in shape and is level at street grade.

Please note that the subject property is currently listed for sale at $3,500,000, which exceeds prevailing market standards. For additional context regarding the current listing, please refer to the History section of this report. Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

### MARKET VALUE CONCLUSION

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | October 20, 2025 | $2,100,000 |
| Prospective As Stabilized | Leased Fee Interest | April 20, 2026 | $2,350,000 |
| | | | |
| Liquidation Value | Fee Simple Estate | April 20, 2026 | $1,890,000 |
| Compiled by CBRE | | | |

CBRE Valuation & Advisory Services

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Kyle Nelson, MAI
Vice President
CA License No. 3007858 (Expires: 8/24/26)

Phone: (858) 546-2646
Email: kyle.P.nelson@cbre.com

Nicholas Barwig, MAI, MRICS
Head of Southern California, Executive Managing Director
CA License No. 3011888 (Expires 10/16/27)
Phone: (858) 546-2646
Email: nick.barwig@cbre.com

David Shioji, MAI
First Vice President
CA License No. 3008157 (Expires: 11/23/2026)
Phone: (213) 613-3261
Email: david.shioji@cbre.com

# Certification

**We certify to the best of our knowledge and belief:**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. Kyle Nelson, MAI, Nickolas Barwig, MAI, MRICS and David Shioji have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the 2024 Uniform Standards of Professional Appraisal Practice.

9. David Shioji, MAI has made a personal inspection of the property that is the subject of this report. Kyle Nelson, MAI and Nicholas Barwig, MAI, MRICS have not  made a personal inspection of the property that is the subject of this report.

10. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

11. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

12. As of the date of this report, Kyle Nelson, MAI, David Shioji, MAI and Nicholas Barwig, MAI, MRICS, have completed the continuing education program for Designated Members of the Appraisal Institute.

13. No one provided significant real property appraisal assistance to the persons signing this report.


Kyle Nelson, MAI
Vice President
CA License No. 3007858 (Expires: 8/24/26)

Nicholas Barwig, MAI, MRICS
Head of Southern California, Executive Managing Director
CA License No. 3011888 (Expires 10/16/27)

David Shioji, MAI
Vice President
CA License No. 3008157 (Expires 11/23/2026)

# Subject Photographs



**Aerial View**

Subject Photographs



**Front View of Subject**



**Street View of South Los Angeles (South)**



**Street View of South Los Angeles (North)**



**Interior View**



**Bathroom View**



**Typical Interior Area**



Typical Interior Area



Typical Interior Area



Typical Interior Area



Typical Interior Area



Typical Interior Area



Typical Interior Area

**Subject Photographs**



Typical Interior (Coffee Tenant)



Typical Bathroom



Interior Walk Way



Interior Walk Way

# Executive Summary

| | |
|---|---|
| **Property Name** | Multi-Tenant Retail |
| **Location** | 1040 South Los Angeles Street<br>Los Angeles, Los Angeles County, CA 90015 |
| **Parcel Number(s)** | 5145-020-057 |
| **Client** | Harvest Commercial Capital, LLC |
| **Client Reference Number** | Loan Name: Sienna Rose \| Loan Number: 40000320 |
| **Highest and Best Use** | |
|   As If Vacant | Hold for future development |
|   As Improved | Retail |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Inspection** | October 20, 2025 |
| **Estimated Exposure Time** | 6 - 12 Months |
| **Estimated Marketing Time** | 6 - 12 Months |
| **Land Area (Improved)** | 0.16 AC          6,765 SF |
| **Zoning** | HM1-CHC1.5 (CX3-FA) - (CPIO) |

| **Improvements** | | Comments |
|---|---|---|
|   Property Type | Retail | (Freestanding Retail) |
|   Number of Buildings | 2 | |
|   Number of Stories | 1 | |
|   Gross Leasable Area | 4,860 SF | |
|   Year Built | 2016 | |
|   Effective Age | 5 Years | |
|   Remaining Economic Life | 45 Years | |
|   Condition | Average | |
| **Buyer Profile** | Investor-Local | |

| **Financial Indicators** | |
|---|---|
|   Current Occupancy | 88.9% |
|   Stabilized Occupancy | 95.0% |
|   Stabilized Credit Loss | 0.0% |
|   Overall Capitalization Rate | 6.25% |

| Pro Forma | | Total | Per SF |
|---|---|---|---|
| Effective Gross Income | | $210,864 | $43.39 |
| Operating Expenses | | $64,663 | $13.31 |
| Expense Ratio | | 30.67% | |
| Net Operating Income | | $146,201 | $30.08 |
| **VALUATION** | | **Total** | **Per SF** |
| **Market Value As Is** | **October 20, 2025** | | |
| Sales Comparison Approach | | $1,950,000 | $401.23 |
| Income Approach | | $2,100,000 | $432.10 |
| **Market Value As Stabilized** | **April 20, 2026** | | |
| Sales Comparison Approach | | $2,200,000 | $452.67 |
| Income Approach | | $2,350,000 | $483.54 |
| Insurable Replacement Cost | | $800,000 | $164.61 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is | Leased Fee Interest | October 20, 2025 | $2,100,000 |
| Prospective As Stabilized | Leased Fee Interest | April 20, 2026 | $2,350,000 |

Compiled by CBRE

## Strengths, Weaknesses, Opportunities and Threats (SWOT)

### Strengths/ Opportunities

- The subject include several micro-retail units, which enable to subject to generate a relatively high per SF rental rate.

### Weaknesses/ Threats

- Commercial real estate market conditions have deteriorated at the macro level due to the significant increase in the cost of capital beginning in 2022, reducing the volume of transaction activity. Over the past few years, this has impacted price discovery and created an increase in uncertainty.
- Recent tariffs implemented by the US have created global economic uncertainty. The outcome of the US tariffs, retaliatory tariffs, and global trade disruption is uncertain as of the date of value. Macro-economic conditions may change and impact the value of commercial real estate.

## Market Volatility

At the September 2025 FOMC meeting, the Federal Reserve lowered the federal funds rate by 25 basis points, to a range of 4.00% to 4.25% This latest interest rate cut will support capital markets activity by bolstering investor sentiment and reducing borrowing costs. Improved liquidity will benefit most sectors, and we expect to see continued refinancing opportunities. However, challenges persist, particularly for distressed office assets. CBRE forecasts limited cap rate compression this cycle, as long-term interest rates are expected to remain elevated. This points toward a more income-focused investment cycle that underscores the importance of strategic investment decisions and careful asset selection.

Experience has shown that consumer and investor behavior can quickly change during periods of heightened volatility. Lending or investment decisions should consider the potential for a continuation of recent volatility, which may affect market conditions disproportionately, depending on asset class.

It is important to note that the conclusions set out in this report are valid as at the valuation date only. Where appropriate, we recommend that the valuation is closely monitored, as we continue to track how markets respond to evolving events.

## Extraordinary Assumptions

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- Appraisers were provided with an updated rent roll as of October 2025 indicating that the subject property has an active lease with Earth Bean Coffee, commencing in June 2018 and expiring in May 2028. Although documentation was requested, only the original lease—containing extension options through June 2023—was provided. As a result, this appraisal is based on the extraordinary assumption that the lease term stated in the rent roll is accurate and that the tenant holds an active and enforceable lease through May 2028, with no additional extension options. The use of this extraordinary assumption may have impacted the results of this assignment.

## Hypothetical Conditions

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purposes of analysis." [2]

- None noted

---

[1] The Appraisal Foundation, *USPAP, USPAP, 2024 Edition* (Effective January 1, 2024)

[2] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

## Ownership and Property History

The following table summarizes the subject's ownership history.

| OWNERSHIP SUMMARY | |
|---|---|
| Item | Current |
| **Current Ownership** | |
| Owner: | SLA Investments LLC |
| Sale in Last 3 Years?: | No |
| **Current Listing** | |
| Currently Listed For Sale: | Yes |
| Listing Price: | $3,500,000 |
| Listing Date: | 10/1/203 |
| Comments: | Please note that the subject property is currently listed for sale at $3,500,000, or approximately $583 per square foot. According to Elizabeth Clark of Kidder Mathews, the listing broker, the property has been on the market for nearly two years at the current asking sale price. Despite this exposure, it has not received any offers at the listed sale price. |
| | The broker indicated that the asking price has generated little to no interest, and in her opinion, a significant price reduction would be necessary to attract potential buyers. She further noted that the building's micro-retail unit layout contributes to its limited appeal, as this unique configuration is less desirable in the current market. The appraisers have concluded that the subjects current listing price is above-market standards. |

Compiled by CBRE

## Exposure/Marketing Time

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| | Exposure/Mktg. (Months) | | |
| Investment Type | Range | | Average |
| Comparable Sales Data | 3.0 - 24.0 | | 10.3 |
| *PwC Strip Shopping Center (3rd Qtr. 2025)* | | | |
| National Data | 1.0 - 12.0 | | 5.9 |
| Local Market Professionals | 6.0 - 12.0 | | 9.0 |
| **CBRE Exposure Time Estimate** | **6 - 12 Months** | | |
| **CBRE Marketing Period Estimate** | **6 - 12 Months** | | |

Various Sources Compiled by CBRE

# Table of Contents

Certification ............................................................................................................................. i

Subject Photographs ............................................................................................................. ii

Executive Summary ............................................................................................................. vi

Table of Contents ................................................................................................................. x

Scope of Work ...................................................................................................................... 1

Area Analysis ........................................................................................................................ 6

Neighborhood Analysis ......................................................................................................... 8

Site Analysis ....................................................................................................................... 12

Improvements Analysis ....................................................................................................... 17

Zoning ................................................................................................................................. 20

Tax and Assessment Data .................................................................................................. 22

Market Analysis ................................................................................................................... 23

Highest and Best Use ......................................................................................................... 38

Insurable Replacement Cost .............................................................................................. 40

Sales Comparison Approach ............................................................................................... 42

Income Capitalization Approach .......................................................................................... 47

Reconciliation of Value ....................................................................................................... 64

Liquidation Value ................................................................................................................ 65

Assumptions and Limiting Conditions ................................................................................. 66

**ADDENDA**

A    Comparable Data Sheets
B    Lease Contract
C    Rent Roll
D    Operating Data
E    Tax Bill
F    Client Contract Information
G    Qualifications

# Scope of Work

This Appraisal Report is intended to comply with the real property appraisal development and reporting requirements set forth under Standards Rule 1 and 2 of USPAP. The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.

## Non-Discrimination

This appraisal was completed without discrimination of any kind. Specifically, this appraisal report was completed without regard for age, race, color, religion, national origin, sex, marital status or any other prohibited basis as identified under federal and/or state law.

## Statement of Competency

Kyle Nelson, MAI, Nickolas Barwig, MAI, MRICS and David Shioji, MAI possess the appropriate knowledge, education and experience to complete this assignment competently and in accordance with the competency provision in the USPAP. Further, this appraisal was completed without influence or bias.

## Intended Use Of Report

The intended use of this appraisal is for mortgage financing and no other use is permitted.

## Client

The client is Harvest Small Business Finance, LLC.

## Intended User Of Report

This appraisal is to be used by Harvest Small Business Finance LLC and the U.S. Small Business Administration. No other user(s) may rely on our report unless as specifically indicated in this report.

> Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users. It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience. [3]

---

[3] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago: Appraisal Institute, 2020), 40.

## Reliance Language

Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

## Purpose of the Appraisal

The purpose of this appraisal is to develop an opinion of the market value of the subject property.

## Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price is the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## Interest Appraised

The value estimated is the Leased Fee Interest as defined below:

Fee Simple Estate - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. [5]

**_Leased Fee Interest -_** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [6]

---

[4] 12 CFR, Part 34, *Subpart C-Appraisals*, 34.42(h).

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 73.

[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 105.

*Leasehold Estate* - The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. [7]

*Going Concern* – An established and operating business having an indefinite future life. [8]

## Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

## Extent to Which the Property is Inspected

David Shioji, MAI inspected the interior and exterior of the subject, as well as its surrounding environs on the effective date of appraisal. This inspection was considered adequate and is the basis for our findings.

## Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data
- comparable data

## Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

---

[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, *7th ed.* (Chicago: Appraisal Institute, 2022), 105.

[8] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, *7th ed.* (Chicago: Appraisal Institute, 2022), 83.

## Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| *Item:* | *Source(s):* |
| **Site Data** | |
| Size | Public records and the assessor's map |
| **Improved Data** | |
| Building Area | Public records and lease documents |
| No. Bldgs. | Inspection |
| Seating Capacity | Inspection |
| Parking Spaces | Inspection |
| Year Built/Developed | Public Records |
| **Economic Data** | |
| Deferred Maintenance: | None |
| Building Costs: | MVS Cost Data |
| Income Data: | Ownership |
| Expense Data: | Ownership |
| Compiled by CBRE | |

## Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that is the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

### Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, among others, or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

### Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

Scope of Work

## Methodology Applicable to the Subject

In valuing the subject, only the sales comparison and income capitalization approaches are applicable and have been used. The cost approach is not applicable in the estimation of market value due to the age of the facility and the lack of market participants valuing similar properties via this methodology. The exclusion of said approach does not compromise the credibility of the assignment results.

# Area Analysis



The subject is located in the Los Angeles-Long Beach-Anaheim, CA Metropolitan Statistical Area. Key information about the area is provided in the following tables.

## Population

The area has a population of 12,879,186. Population has increased by 50,379 since 2010, reflecting an annual increase of 0.0%. Population is projected to decrease by 111,434 between 2024 and 2029, reflecting a 0.2% annual population decline.

Source: ESRI, downloaded on Oct, 6 2025



## Income

The area features an average household income of $139,051 and a median household income of $97,753. Over the next five years, median household income is expected to increase by 13.1%, or $2,565 per annum.



## Education

A total of 40.4% of individuals over the age of 24 have a college degree, with 26.0% holding a bachelor's degree and 14.4% holding a graduate degree.



## Employment



The area includes a total of 6,530,147 employees and has a 5.9% unemployment rate. The top three industries within the area are Health Care/Social Assistance, Prof/Scientific/Tech Services and Retail Trade, which is a combined total of 33% of the workforce.

Source: ESRI, downloaded on Oct 6, 2025; BLS.gov dated Aug 1, 2025 (preliminary)

In summary, the area is forecasted to experience a decrease in population and an increase in household income.

# Neighborhood Analysis



## Location

The subject is located on the south side of South Los Angeles Street in the Fashion District of Downtown Los Angeles.

## Boundaries and Districts

The following map shows the general boundaries of Downtown along with its various neighborhoods and sub-districts.



The general boundaries of Downtown Los Angeles are the Harbor (110) Freeway to the west, the Hollywood (101) Freeway to the north, the Los Angeles River to the east, and the Santa Monica (10) Freeway to the south. Some outlying communities to the west (City West), north (Chinatown, Dodger Stadium and Elysian Park), and East (Boyle Heights) are generally considered part of, or heavily influenced by, Downtown Los Angeles.

A primary characteristic of Downtown Los Angeles is the central location at the confluence of the regional transportation system. Freeways serving Downtown Los Angeles include: The Santa Monica Freeway (Interstate 10), the Santa Ana/Hollywood Freeway (U.S. Highway 101), the Harbor/Pasadena Freeway (State Route 110), and the Golden State Freeway (Interstate 5) just to the east. Union Station, the central hub of all public rail transportation is situated in the El Pueblo District, adjacent to Chinatown, in the northeastern portion of Downtown. A more detailed description of the local/regional transportation infrastructure is presented later in this section.

## Land Use

Land uses surrounding the subject include primarily fashion district oriented, retail and office uses along Main Street.  Uses west of the subject property are similar storefront retail uses associated with the Fashion District.  Uses east of the subject property also include similar storefront retail uses.  Uses north of the subject property also include storefront retail uses. Uses south of the subject property include a variety of Fashion District oriented uses followed by the 1-10 Santa Monica Freeway.  There are also pockets of old and newer residential uses located throughout the general area.



## Access

Primary access to the subject neighborhood is provided by the Santa Monica I-10 Freeway which extends in an east/west direction and is located ¼ mile south of the subject property.  The major north/south surface arterials are Main Street, Broadway, Hill Street, Olive Street, Grand Avenue and Maple Street. The major east/west surface arterials are Pico Boulevard, Venice Boulevard and 11th Street.  Overall, access to the subject is considered to be good.

## Demographics

Selected neighborhood demographics in 1-, 3- and 5-mile radius from the subject are shown in the following table:

### SELECTED NEIGHBORHOOD DEMOGRAPHICS

| 1040 South Los Angeles Street<br>Los Angeles, CA 90015 | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Los Angeles-Long Beach-Anaheim, CA Metropolitan Statistical Area |
|---|---|---|---|---|
| Population | | | | |
| 2029 Total Population | 60,161 | 532,412 | 1,225,928 | 12,767,752 |
| 2024 Total Population | 57,147 | 521,416 | 1,217,028 | 12,879,186 |
| 2010 Total Population | 34,230 | 502,061 | 1,242,665 | 12,828,807 |
| 2000 Total Population | 23,289 | 493,719 | 1,240,875 | 12,365,375 |
| *Annual Growth 2024 - 2029* | *1.03%* | *0.42%* | *0.15%* | *-0.17%* |
| *Annual Growth 2010 - 2024* | *3.73%* | *0.27%* | *-0.15%* | *0.03%* |
| *Annual Growth 2000 - 2010* | *3.93%* | *0.17%* | *0.01%* | *0.37%* |
| Households | | | | |
| 2029 Total Households | 34,288 | 205,784 | 451,639 | 4,618,648 |
| 2024 Total Households | 31,548 | 194,498 | 433,557 | 4,551,896 |
| 2010 Total Households | 16,972 | 158,317 | 383,755 | 4,233,969 |
| 2000 Total Households | 9,364 | 143,227 | 366,144 | 4,068,976 |
| *Annual Growth 2024 - 2029* | *1.68%* | *1.13%* | *0.82%* | *0.29%* |
| *Annual Growth 2010 - 2024* | *4.53%* | *1.48%* | *0.88%* | *0.52%* |
| *Annual Growth 2000 - 2010* | *6.13%* | *1.01%* | *0.47%* | *0.40%* |
| Income | | | | |
| 2024 Median Household Income | $65,485 | $56,833 | $63,383 | $97,753 |
| 2024 Average Household Income | $101,851 | $82,532 | $92,518 | $139,051 |
| 2024 Per Capita Income | $58,199 | $31,145 | $33,142 | $49,239 |
| 2024 Pop 25+ College Graduates | 24,437 | 114,036 | 252,380 | 3,709,056 |
| Age 25+ Percent College Graduates - 202 | 50.7% | 31.1% | 29.6% | 40.4% |

Source: ESRI

## Conclusion

The subject is located within the Fashion District of Downtown Los Angeles, an urban location. This area is primarily catered towards wholesale retail uses, with the district organized with specific blocks/sections being catered towards specific types of clothing or accessories. The subject's immediate area reflects a blend of a variety of wholesale retail uses. Overall, the subject's buildout and current use are well in-line with the composition of the neighborhood.

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

## SITE SUMMARY AND ANALYSIS

**Physical Description**

| | | |
|---|---|---|
| Net Site Area | 0.16 Acres | 6,765 Sq. Ft. |
| Primary Road Frontage | South Los Angeles Street | 50 Feet |
| Shape | Rectangular | |
| Topography | Generally Level | |
| Primary Traffic Counts (24 hrs.) | E 11th St | 4,603 |
| | @ S Los Angeles St NW | Date: 2025 |
| Secondary Traffic Counts (24 | S Los Angeles St | 12,832 |
| | @ E Olympic Blvd NE | Date: 2025 |
| Parcel Number(s) | 5145-020-057 | |
| Zoning District | HM1-CHC1.5 (CX3-FA) - (CPIO) | |
| Flood Map Panel No. & Date | 06037C1617G | 21-Dec-18 |
| Flood Zone | Zone X (Shaded) | |

**Comparative Analysis** — **Comments**

| | |
|---|---|
| Visibility | Average |
| Functional Utility | Average |
| Traffic Volume | Average |
| Adequacy of Utilities | Average |
| Landscaping | Average |
| Drainage | Average |
| Mass Transit | |

**Utilities** — **Comments**

| | |
|---|---|
| Water | Yes |
| Sewer | Yes |
| Natural Gas | Yes |
| Electricity | Yes |
| Telephone/Cable/Internet | Yes |

**Other**

| | Yes | No | Unknown |
|---|---|---|---|
| Detrimental Easements | | | X |
| Encroachments | | | X |
| Deed Restrictions | | | X |
| Reciprocal Parking Rights | | | X |

Various sources compiled by CBRE

## Ingress/Egress

Ingress and egress is not available at the subject.

## Easements and Encroachments

There are no known easements or encroachments impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## Covenants, Conditions and Restrictions

There are no known covenants, conditions or restrictions impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a copy of the current covenants, conditions and restrictions, if any, prior to making a business decision.

## Environmental Issues

CBRE, Inc. is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Seismic Hazards (Earthquake)

All properties in California are subject to some degree of seismic risk. The Alquist-Priolo special Studies Zone Act of 1972 was enacted by the State of California to regulate development near active earthquake faults. The Act required the State Geologist to delineate "special studies zones" along known active faults in California. Cities and Counties affected by the identified zones must limit certain development projects within the zones unless geologic investigation demonstrates that the sites are not threatened by surface displacement from future faulting.

According to "Fault-Rupture Hazard Zones in California" published in 1992 by the California Department of Conservation, Department of Mines and Geology, the subject is not within an area affected by the Alquist-Priolo Special Studies Zone Act.



## Conclusion

The site is well suited for retail use. The topography, access, available utilities, and zoning are all supportive of the subject's highest and best use. There are no known negative easements, encroachments, or adverse environmental issues impacting the marketability of the subject.

## Plat Map



## Flood Plain Map



# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Retail | (Freestanding Retail) |
| Number of Buildings | 2 | |
| Number of Stories | 1 | |
| Gross Leasable Area | 4,860 SF | |
| Site Coverage | 71.8% | |
| Parking Improvements | None | |
| Year Built / Renovated | 2016 | |
| Actual Age | 9 Years | |
| Effective Age | 5 Years | |
| Total Economic Life | 50 Years | |
| Remaining Economic Life | 45 Years | |
| Age/Life Depreciation | 10.0% | |
| Functional Utility | Typical | |
| Source: Various sources compiled by CBRE | | |

The subject is a modern, single-story retail complex constructed in 2016. It spans approximately 4,860 square feet and comprises 18 individual retail units. The building is designed with contemporary materials, including all-glass storefronts that enhance visibility and natural lighting, contributing to both aesthetic appeal and energy efficiency. The structural framework is likely composed of steel with a concrete slab foundation, which is typical for urban retail developments. The flat roof is likely finished with reflective or membrane materials suitable for the Southern California climate, and each unit is equipped with independent HVAC systems, indicating a modern mechanical infrastructure.

## Year Built

The subject was built in 2016.

## Construction Class

Building construction class is as follows:

C - Masonry/concrete ext. walls & wood/steel roof & floor struct., exc. concrete slab on grade

The construction components are assumed to be in working condition and adequate for the building.

The overall quality of the facility is considered to be average for the neighborhood and age. However, CBRE, Inc. is not qualified to determine structural integrity and it is recommended that the client/reader retain the services of a qualified, independent engineer or contractor to determine the structural integrity of the improvements prior to making a business decision.

## Functional Utility

The overall layout of the property is considered functional in utility and provides adequate accessibility and visibility for retail use.

## ADA Compliance

All common areas of the property appear to be accessible to individual with disabilities. The client/reader's attention is directed to the specific limiting conditions regarding ADA compliance.

## Furniture, Fixtures and Equipment

Any personal property items contained in the property are not considered to contribute significantly to the overall value of the real estate.

## Environmental Issues

Although CBRE was not provided an Environmental Site Assessment (ESA), a tour of the site did not reveal any obvious issues regarding environmental contamination or adverse conditions.

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Deferred Maintenance

No items of deferred maintenance were observed by the appraiser in the areas inspected.

## Economic Age and Life

CBRE, Inc.'s estimate of the subject improvements effective age and remaining economic life is depicted in the following chart:

| ECONOMIC AGE AND LIFE | |
|---|---|
| Actual Age | 9 Years |
| Effective Age | 5 Years |
| MVS Expected Life | 50 Years |
| Remaining Economic Life | 45 Years |
| Accrued Physical Incurable Depreciation | 10.0% |
| Compiled by CBRE | |

The remaining economic life is based upon our on-site observations and a comparative analysis of typical life expectancies as published by Marshall and Swift, LLC, in the Marshall Valuation Service cost guide. While CBRE, Inc. did not observe anything to suggest a different economic life, a capital improvement program could extend the life expectancy.

## Conclusion

The improvements are in Average overall condition. Overall, there are no known factors that adversely impact the marketability of the improvements.

## Improvements Layout



# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | HM1-CHC1.5 (CX3-FA) - (CPIO) |
| Legally Conforming | Yes |
| Uses Permitted | Multifamily (special use program), supportive housing, civic facility, daycare, parking (in conjunction with other uses), recreation, retail, entertainment, office, and medical office |
| Zoning Change | Not likely |

| Category | Zoning Requirement |
|---|---|
| Minimum Lot Size | None |
| Minimum Lot Width | 25 Feet |
| Maximum Height | None |
| Minimum Setbacks | |
|    Front Yard | 0 Feet |
|    Street Side Yard | 0 Feet |
|    Interior Side Yard | 0 Feet |
|    Rear Yard | 0 Feet |
| Maximum Floor Area Ratio (FAR) | 9.00 |
| Subject's Actual FAR | 0.72 |
| Parking Requirements | Various Requirements |
| Subject's Actual Parking | Adequate |

Source: Los Angeles County Planning and Zoning Dept.

## Analysis and Conclusion

The improvements are a legally conforming use of the site. Additional information may be obtained from the appropriate governmental authority. For purposes of this appraisal, CBRE has assumed the information obtained is correct.

## Zoning Map



| Special Notes | None |
|---|---|
| Zoning | [HM1-CHC1-5] [CX3-FA] [CPIO] |
| Site Specific Condition | No |
| Zoning Information (ZI) | ZI-2374 State Enterprise Zone: Los Angeles |
| Zoning Information (ZI) | ZI-2538 Retention of Loading Elevators and Loading Bays in Subarea A.1 |

# Tax and Assessment Data

In California, privately held real property is typically assessed at 100% of full cash value (which is interpreted to mean market value of the fee simple estate) as determined by the County Assessor. Generally, a reassessment occurs only when a property is sold (or transferred) or when new construction occurs (as differentiated from replacing existing construction). In the case of long term ground leases, the general rule is that a reassessment is made at the time of assigning or terminating a lease where the remaining term is more than 35 years. For reassessment purposes, the lease term includes all options to extend. Assessments for properties that were acquired before the tax year 1975-1976 were stabilized as of the tax year 1975-1976. Property taxes are limited by state law to 1% of the assessed value plus voter approved obligations and special assessments. If no sale (or transfer) occurs or no new building takes place, assessments may not increase by more than 2% annually. The following table summarizes the actual and pro forma assessment values.

| AD VALOREM TAX INFORMATION | | |
|---|---|---|
| | | Pro Forma |
| Parce  Assessor's Parcel No. | 2025 | |
| 1          5145-020-057 | $3,046,406 | |
| | | |
| Subtotal | $3,046,406 | $2,100,000 |
| % of Assessed Value | 100% | 100% |
| Final Assessed Value | $3,046,406 | $2,100,000 |
| | | |
| General Tax Rate (per $100 A.V.) | 1.187380 | 1.187380 |
| | | |
| General Tax: | $36,172 | $24,935 |
| Special Assessment | 3,027 | 3,027 |
| Effective Tax Rate (per $100 A.V.) | 1.286757 | 1.331543 |
| | | |
| **Total Taxes** | **$39,200** | **$27,962** |
| Taxes per SF | $8.07 | $5.75 |

Source: Assessor's Office

## Conclusion

Appraisers have confirmed with the Los Angeles County Treasurer and Tax Collector notes that the 2024 property taxes were unpaid and are outstanding, resulting in an unpaid tax bill totaling $38,679.99. We assume that this tax delinquency plus any penalties would be paid by the seller prior to close of escrow. Unpaid property taxes and any associated penalties are a liability of current ownership and do not impact the market value of the real estate.

If the subject sold for the value estimate in this report, a reassessment at that value would most likely occur, with tax increases limited to two percent annually thereafter until the property is sold again. The consequences of this reassessment have been considered in the appropriate valuation sections.

Market Analysis

# Market Analysis



FIGURES | LOS ANGELES RETAIL | Q2 2025

## Availability rate holds while construction pipeline remains mute

▸ 6.2%          ▲ (236K)          ▾ 86K          ▾ $2.94
Availability Rate    SF Net Absorption (000s)    SF Completed (000s)    Avg. Asking Rent (NNN)

Note: Arrows indicate change from previous quarter.
Source: CBRE Econometric Advisors, Q2 2025

### MARKET HIGHLIGHTS

— The Los Angeles retail market closed Q2 2025 with an availability rate of 6.2%. The overall availability rate was unchanged from Q1 2025.

— The total retail sq. ft. absorbed in Q2 2025 was negative 236,000 sq. ft., compared to negative 836,000 sq. ft. in Q1 2025.

— There was 86,000 sq. ft. delivered in Q2 2025, compared to 107,000 sq. ft. in Q1 2025.

— The overall average net asking rent for retail in Los Angeles ended Q2 2025 at $2.94, representing a $0.04 drop from Q1 2025.

— The total retail investment sales in Q2 2025 amounted to $540.1 million in total volume, compared to $389 million in Q1 2025.

FIGURE 1: Completions, Net Absorption, and Availability Rate

Source: CBRE Econometric Advisors, Q2 2025.

1   CBRE RESEARCH                                                        © Q2 2025 CBRE, INC.

Market Analysis

FIGURES | LOS ANGELES RETAIL | Q2 2025

## Market Overview

FIGURE 2: Market Statistics by Product Type

| Market | Inventory (SF, 000s) | Availability Rate (%) | Net Absorption (SF 000s) | Completions (SF 000s) | Net Rent |
|---|---|---|---|---|---|
| Lifestyle & Mall | 39,975 | 8.0 | 67 | – | $2.52 |
| Neighborhood, Community & Strip | 138,342 | 7.0 | (92) | 12 | $2.78 |
| Power | 22,454 | 6.6 | (68) | – | $3.43 |
| Street, Freestanding, Other | 181,719 | 5.1 | (143) | 74 | – |
| Total Market | 382,490 | 6.2 | (236) | 86 | $2.94 |

Source: CBRE Econometric Advisors, Q2 2025

FIGURE 3: Net Absorption by Center Type

Sq. Ft. (000s)



Source: CBRE Econometric Advisors, Q2 2025

FIGURE 4: Market Statistics by Submarket

| Market | Inventory (SF 000s) | Availability Rate (%) | Net Absorption (SF 000s) | Completions (SF 000s) | Net Rent |
|---|---|---|---|---|---|
| Total Market | 382,490 | 6.2 | (236) | 86 | $2.94 |
| Antelope Valley | 16,062 | 6.5 | 27 | 0 | $1.59 |
| Downtown Los Angeles | 12,941 | 8.0 | (27) | 0 | $3.11 |
| Gateway Cities | 36,698 | 5.6 | (36) | 0 | $2.36 |
| Hollywood/Wilshire | 27,522 | 8.2 | 124 | 0 | $3.93 |
| Outlying Los Angeles | 295 | 4.1 | 0 | 0 | $1.00 |
| San Fernando Valley | 54,275 | 5.1 | (106) | 4 | $3.01 |
| San Gabriel Valley | 63,860 | 5.4 | (26) | 7 | $2.13 |
| Santa Clarita Valley | 12,503 | 5.7 | 17 | 46 | $2.38 |
| South Bay | 59,143 | 6.8 | 41 | 6 | $2.67 |
| Southeast Los Angeles | 35,769 | 6.0 | (106) | 20 | $2.34 |
| Tri-Cities | 32,725 | 4.9 | (70) | 3 | $3.60 |
| Westside | 29,697 | 9.0 | (71) | 0 | $4.71 |

Source: CBRE Econometric Advisors, Q2 2025

**Market Analysis**



FIGURES | LOS ANGELES RETAIL | Q2 2025

## Asking Rents & Availablity

**FIGURE 5: Net Asking Rent and Availability Rate**

Source: CBRE Econometric Advisors, Q2 2025

**FIGURE 6: Net Rent and % Change**

Source: CBRE Econometric Advisors, Q2 2025

**FIGURE 7: Availablity by Center Type**

Source: CBRE Econometric Advisors, Q2 2025

**FIGURE 8: Top 5 Submarket by Net Rent**

Source: CBRE Econometric Advisors, Q2 2025

3  CBRE RESEARCH

© Q2 2025 CBRE, INC.

Market Analysis

FIGURES | LOS ANGELES RETAIL | Q2 2025

## Investment Sales



FIGURE 9: Retail Investment Sale Volume

Source: MSCI Real Capital Analytics, Q2 2025.

FIGURE 10: Retail Investment Sale Price Per Sq. Ft.

Source: MSCI Real Capital Analytics, Q2 2025.

FIGURE 11: Q2 2025 Sale Transactions

| Buyer | Property Name | City | Building SF | Sale Price | Price / SF |
|---|---|---|---|---|---|
| TIAA-CREF | River Oaks | Santa Clarita | 272,000 | $107,500,000 | $279 |
| Justin Mateen | Hollywood Galaxy | Los Angeles | 180,000 | $37,297,167 | $207 |
| Justin Mateen | Peterson Building | Los Angeles | 153,000 | $31,702,592 | $207 |
| Longpoint Realty Partners LP | Grand Covina Plaza | Covina | 112,200 | $24,975,000 | $223 |
| Rami Darghalli Living Trust | Palmade Promenade | Palmdale | 96,352 | $9,800,000 | $102 |
| Jason Iloulian | Autozone | Pomona | 66,906 | $5,700,000 | $85 |
| TRC Retail | Pasadena Plaza | Pasadena | 61,155 | $42,000,000 | $687 |
| Mushmel Properties | Market Lofts (Retail) | Los Angeles | 54,948 | $20,900,000 | $380 |
| Cape Point Dev | The Grove Shopping Center | Pomona | 48,950 | $12,000,000 | $245 |
| Jacquelyn F Myers | Pasadena Playhouse & Lofts | Pasadena | 47,424 | $9,500,000 | $200 |
| RMG Housing | The Wedding Plaza | Los Angeles | 43,514 | $7,550,500 | $174 |
| Agree Realty Corp | fmr Big Lots | Lancaster | 32,890 | $4,803,000 | $146 |

Source: MSCI Real Capital Analytics, Q2 2025.

4    CBRE RESEARCH

© Q2 2025 CBRE, INC.

**Market Analysis**



FIGURES | LOS ANGELES RETAIL | Q2 2025

## Economic Overview

**FIGURE 12: Total Retail Sales**

**FIGURE 13: Retail Employment vs. Unemployment**

**FIGURE 14: GDP & Consumer Spending**

**FIGURE 15: Total Population & Net Migration**

5   CBRE RESEARCH

© Q2 2025 CBRE, INC.

## Metropolitan Los Angeles - CA USA Retail Market Overview

### Recent Performance

The following table summarizes historical and projected performance for the overall metropolitan Los Angeles - CA USA retail market, as reported by Costar.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **LOS ANGELES - CA USA RETAIL MARKET** | | | | | | | | |
| Year Ending | Inventory (SF) | Completions (SF) | Occupied Stock (SF) | Occupancy | Asking Rent ($/SF NNN) | Asking Rent Change | Net Absorption (SF) | Transaction Price Per Area (SF) |
| 2015 | 446,391,825 | 1,505,733 | 426,639,200 | 95.6% | $29.67 | 4.03% | 2,072,584 | $388.16 |
| 2016 | 447,626,219 | 1,234,394 | 430,358,400 | 96.1% | $30.54 | 2.93% | 3,718,827 | $341.69 |
| 2017 | 448,554,591 | 924,372 | 431,020,096 | 96.1% | $31.52 | 3.19% | 740,616 | $345.60 |
| 2018 | 448,385,160 | -169,431 | 429,453,696 | 95.8% | $32.32 | 2.55% | -1,544,748 | $483.27 |
| 2019 | 448,583,170 | 156,080 | 428,000,832 | 95.4% | $33.15 | 2.57% | -1,564,673 | $440.24 |
| 2020 | 448,702,170 | 99,074 | 425,194,880 | 94.8% | $33.57 | 1.28% | -2,757,326 | $361.05 |
| 2021 | 447,445,046 | -1,265,782 | 424,732,032 | 94.9% | $34.57 | 2.95% | -496,399 | $408.03 |
| 2022 | 447,154,873 | -290,173 | 425,062,848 | 95.1% | $35.79 | 3.53% | 363,937 | $329.09 |
| 2023 | 447,749,283 | 594,410 | 424,380,640 | 94.8% | $36.64 | 2.39% | -672,909 | $416.19 |
| Q1 2024 | 447,256,077 | -493,206 | 423,708,640 | 94.7% | $36.70 | 0.16% | -704,533 | $466.63 |
| Q2 2024 | 447,119,072 | -137,005 | 422,810,464 | 94.6% | $36.76 | 0.15% | -865,639 | $519.84 |
| Q3 2024 | 447,085,571 | -33,501 | 421,993,664 | 94.4% | $36.83 | 0.20% | -816,781 | $431.73 |
| Q4 2024 | 447,063,058 | -22,513 | 421,577,184 | 94.3% | $36.87 | 0.11% | -416,496 | $230.61 |
| 2024 | 447,063,058 | -686,225 | 421,577,184 | 94.3% | $36.87 | 0.63% | -2,803,449 | $230.61 |
| Q1 2025 | 446,743,174 | -319,884 | 420,872,064 | 94.2% | $36.88 | 0.02% | -705,116 | $411.32 |
| Q2 2025 | 446,750,803 | 7,629 | 420,707,584 | 94.2% | $36.51 | -1.01% | -164,473 | $356.86 |
| Q3 2025* | 446,631,328 | -119,475 | 420,419,712 | 94.1% | $36.25 | -0.69% | -202,717 | - |
| Q4 2025* | 446,490,282 | -141,046 | 420,247,424 | 94.1% | $36.23 | -0.08% | -143,862 | - |
| 2025* | 446,490,282 | -572,776 | 420,247,424 | 94.1% | $36.23 | -1.75% | -1,216,168 | - |
| 2026* | 445,801,188 | -689,094 | 419,558,784 | 94.1% | $36.38 | 0.43% | -604,707 | - |
| 2027* | 445,008,087 | -793,101 | 419,489,280 | 94.3% | $37.06 | 1.86% | 19,691 | - |
| 2028* | 444,451,366 | -556,721 | 419,767,904 | 94.4% | $37.95 | 2.39% | 356,754 | - |
| 2029* | 444,430,691 | -20,675 | 420,061,408 | 94.5% | $38.73 | 2.08% | 338,165 | - |
| 2030* | 444,662,607 | 231,916 | 420,510,176 | 94.6% | $39.49 | 1.94% | 404,998 | - |
| * Future Projected Data according to Costar | | | | | | | | |
| Source: Costar, 2nd Quarter 2025 | | | | | | | | |

The Los Angeles - CA USA retail market consists of approximately 446,750,803 square feet of retail space. The following observations are noted from the table above:

- As of 2nd Quarter 2025, there was approximately 420,707,584 square feet of occupied retail space (including sublet space), resulting in an occupancy rate of 94.2% for the metro area. This reflects no change from the previous quarter's occupancy of 94.2%, and a small decrease from an occupancy rate of 94.3% from last year.

- The area experienced negative 164,473 square feet of net absorption for the current quarter. This indicates an improvement from the previous quarter's negative 705,116 square feet of net absorption, and an improvement from the negative 2,803,449 square feet of net absorption from last year.

- The area had completions of positive 7,629 square feet for the current quarter, which indicates an increase from the previous quarter's completions of negative 319,884 square feet, and indicates an improvement from completions of negative 686,225 square feet from last year.

- The area achieved average asking rent of $36.51 per square foot, which indicates a decrease from the previous quarter's asking rent of $36.88 per square foot, and a decrease from the asking rent of $36.87 per square foot from last year.

## Historical Inventory – Market



Inventory is projected to be 446,490,282 square feet at the end of the current year, which is a decrease from the previous year's inventory of 447,063,058 square feet. Inventory for next year is projected to be 445,801,188 square feet, reflecting a decrease from the current year.

## Historical Occupancy - Market



At the end of the current year, the occupancy rate is projected to be 94.1%, which reflects a small decrease from the 94.3% occupancy rate at the end of last year. Occupancy for next year is projected to be 94.1%, reflecting no change from the current year.

## Historical Net Absorption - Market



At the end of the current year, the area is projected to experience negative 1,216,168 square feet of net absorption, which indicates an improvement from the negative 2,803,449 square feet of net absorption for the previous year. The area is projected to experience negative 604,707 square feet of net absorption as of the end of next year, which indicates an improvement from the current year.

## Historical Completions - Market



The area is projected to achieve completions of negative 572,776 square feet for the current year, which indicates an improvement from the previous year's completions of negative 686,225 square feet. The area is projected to experience completions of negative 689,094 square feet as of the end of next year, which indicates a decline from the current year.

## Historical Asking Rent - Market



The area is projected to achieve average asking rent of $36.23 per square foot at the end of the current year, which indicates a decrease from the previous year's asking rent of $36.87 per square foot. The area is projected to achieve asking rent of $36.38 per square foot by the end of next year, indicating an increase from the current year.

Market Analysis

## Submarket Snapshot

The following table summarizes the supply of retail square footage for each submarket within the Los Angeles - CA USA market as of 2nd Quarter 2025.

## SUBMARKET SNAPSHOT

| Submarket | Inventory (SF) | Completions* (SF) | Asking Rent ($/SF NNN) | Occupancy |
|---|---|---|---|---|
| 190th Street Corridor | 418,132 | 9,621 | $35.27 | 84.4% |
| Antelope Valley | 16,359,875 | 5,000 | $26.95 | 93.9% |
| Beach Cities/Palos Verdes | 10,805,640 | 0 | $39.62 | 94.6% |
| Beverly Hills | 3,588,150 | 0 | $100.62 | 92.6% |
| Brentwood | 879,193 | 0 | $65.40 | 92.8% |
| Burbank | 8,540,840 | -101,566 | $41.18 | 93.5% |
| Calabasas/Westlake Vill | 3,327,215 | 0 | $42.35 | 95.5% |
| Century City | 1,401,910 | 0 | $44.34 | 99.5% |
| Culver City | 6,925,033 | -5,700 | $44.15 | 94.5% |
| **Downtown Los Angeles** | **15,204,241** | **0** | **$37.90** | **90.1%** |
| Eastern SFV | 18,814,897 | 31,696 | $32.05 | 94.2% |
| Eastern SGV | 42,416,551 | 78,339 | $28.02 | 94.7% |
| East Hollywood/Silver Lake | 8,248,663 | 3,121 | $41.12 | 94.1% |
| East LA County Outlying | 170,851 | 0 | $28.55 | 100.0% |
| El Segundo | 2,687,755 | 0 | $51.62 | 94.5% |
| Encino | 1,680,284 | 0 | $42.55 | 93.5% |
| Glendale | 16,101,655 | 17,835 | $38.82 | 95.7% |
| Hawthorne/Gardena | 10,314,043 | -2,780 | $29.01 | 88.1% |
| Hollywood | 4,830,153 | 0 | $55.98 | 92.2% |
| Inglewood/South LA | 13,959,129 | -7,656 | $27.55 | 94.7% |
| Koreatown | 10,935,934 | 0 | $34.75 | 95.4% |
| LAX | 1,466,008 | 0 | $33.90 | 95.4% |
| Long Beach: Downtown | 6,527,355 | -4,400 | $35.55 | 95.1% |
| Long Beach: Suburban | 13,189,001 | 0 | $30.43 | 96.4% |
| Marina Del Rey/Venice | 5,265,921 | 0 | $63.44 | 93.7% |
| Mid-Cities | 51,091,246 | 12,418 | $29.08 | 94.7% |
| Miracle Mile | 2,177,831 | 0 | $37.70 | 93.3% |
| NE LA County Outlying | 228,697 | 0 | $22.70 | 93.9% |
| North Hollywood | 6,263,455 | 1,812 | $35.30 | 95.5% |
| NW LA County Outlying | 114,177 | 0 | $25.78 | 100.0% |
| Olympic Corridor | 2,243,558 | 0 | $45.04 | 88.1% |
| Outlying LA County | 9,600 | 0 | $32.99 | 100.0% |
| Pacific Palisades/Malibu | 1,194,832 | -192,052 | $82.49 | 83.6% |
| Park Mile | 2,037,701 | 0 | $34.12 | 94.2% |
| Pasadena | 14,346,891 | -270,728 | $40.05 | 94.6% |
| Santa Clarita Valley | 13,015,647 | 45,714 | $33.62 | 95.0% |
| Santa Monica | 6,571,732 | -7,493 | $68.54 | 87.2% |
| Santa Monica Mountains | 112,463 | -2,724 | $67.61 | 87.4% |
| Sherman Oaks | 3,815,192 | 2,304 | $48.11 | 96.4% |
| Southeast Los Angeles | 24,720,484 | 63,568 | $30.06 | 95.1% |
| Studio/Universal Cities | 3,790,390 | 0 | $46.58 | 94.9% |
| Tarzana | 2,169,723 | 0 | $38.87 | 93.3% |
| Torrance | 18,197,990 | -6,532 | $37.10 | 94.5% |
| Western SFV | 17,423,344 | -3,230 | $32.59 | 95.6% |
| Western SGV | 27,708,390 | -15,636 | $32.71 | 96.1% |
| West Hollywood | 10,612,225 | 29,074 | $68.23 | 91.3% |
| West Los Angeles | 4,112,637 | 0 | $42.57 | 91.3% |
| Westwood | 2,241,125 | 0 | $51.31 | 93.6% |
| Woodland Hills/Warner Ctr | 8,242,707 | -48,274 | $43.00 | 92.0% |

*Completions include trailing 4 quarters

Source: Costar, 2nd Quarter 2025

## Downtown Los Angeles Submarket

Important characteristics of the Downtown Los Angeles retail market are summarized below:

| Year Ending | Inventory (SF) | Completions (SF) | Occupied Stock (SF) | Occupancy | Asking Rent ($/SF NNN) | Asking Rent Change | Net Absorption (SF) |
|---|---|---|---|---|---|---|---|
| | | | DOWNTOWN LOS ANGELES RETAIL SUBMARKET | | | | |
| 2015 | 15,178,142 | 150,823 | 14,483,429 | 95.4% | $31.22 | 4.11% | 539,598 |
| 2016 | 15,202,654 | 24,512 | 14,402,432 | 94.7% | $32.19 | 3.11% | -80,997 |
| 2017 | 15,292,711 | 90,057 | 14,522,179 | 95.0% | $33.09 | 2.80% | 119,739 |
| 2018 | 15,280,957 | -11,754 | 14,616,170 | 95.6% | $33.86 | 2.32% | 93,991 |
| 2019 | 15,116,957 | -198,000 | 14,315,506 | 94.7% | $34.72 | 2.54% | -333,864 |
| 2020 | 15,089,036 | -30,321 | 14,191,165 | 94.0% | $35.05 | 0.95% | -126,274 |
| 2021 | 15,009,513 | -79,523 | 14,216,317 | 94.7% | $36.02 | 2.76% | 25,152 |
| 2022 | 15,009,513 | 0 | 14,101,688 | 94.0% | $37.35 | 3.68% | -114,629 |
| 2023 | 15,234,891 | 225,378 | 14,272,910 | 93.7% | $38.16 | 2.17% | 171,222 |
| Q1 2024 | 15,232,891 | -2,000 | 14,168,339 | 93.0% | $38.15 | -0.01% | -104,571 |
| Q2 2024 | 15,204,241 | -28,650 | 13,877,881 | 91.3% | $38.17 | 0.06% | -290,458 |
| Q3 2024 | 15,204,241 | 0 | 13,765,244 | 90.5% | $38.23 | 0.15% | -112,637 |
| Q4 2024 | 15,204,241 | 0 | 13,820,314 | 90.9% | $38.29 | 0.16% | 55,070 |
| 2024 | 15,204,241 | -30,650 | 13,820,314 | 90.9% | $38.29 | 0.36% | -452,596 |
| Q1 2025 | 15,204,241 | 0 | 13,723,313 | 90.3% | $38.30 | 0.02% | -97,001 |
| Q2 2025 | 15,204,241 | 0 | 13,691,810 | 90.1% | $37.90 | -1.04% | -31,503 |
| Q3 2025* | 15,068,484 | -135,757 | 13,518,098 | 89.7% | $37.61 | -0.77% | -123,710 |
| Q4 2025* | 15,060,297 | -8,187 | 13,498,898 | 89.6% | $37.55 | -0.16% | -18,648 |
| 2025* | 15,060,297 | -143,944 | 13,498,898 | 89.6% | $37.55 | -1.95% | -270,862 |
| 2026* | 15,027,352 | -32,945 | 13,448,742 | 89.5% | $37.58 | 0.10% | -48,661 |
| 2027* | 14,994,660 | -32,692 | 13,457,330 | 89.7% | $38.16 | 1.53% | 10,013 |
| 2028* | 14,975,829 | -18,831 | 13,488,177 | 90.1% | $38.95 | 2.08% | 32,237 |
| 2029* | 14,975,729 | -100 | 13,513,044 | 90.2% | $39.65 | 1.79% | 26,134 |
| 2030* | 14,984,440 | 8,711 | 13,539,180 | 90.4% | $40.31 | 1.67% | 24,737 |
| *Future Projected Data according to Costar | | | | | | | |
| Source: Costar, 2nd Quarter 2025 | | | | | | | |

The Downtown Los Angeles retail submarket consists of approximately 15,204,241 square feet of retail space. The current submarket inventory is approximately 3.4% of the overall market inventory. The following observations were noted from the table above:

- As of 2nd Quarter 2025, there was approximately 13,691,810 square feet of occupied retail space (including sublet space), resulting in an occupancy rate of 90.1% for the submarket. This reflects a small decrease from the previous quarter's occupancy of 90.3%, and a decrease from an occupancy rate of 90.9% from last year. The submarket occupancy is below the 94.2% market occupancy.

- The submarket experienced negative 31,503 square feet of net absorption for the current quarter. This indicates an improvement from the previous quarter's negative 97,001 square feet of net absorption, and an improvement from the negative 452,596 square feet of net absorption from a year ago. Overall, the submarket has experienced negative 128,504 square feet of net absorption for the current year-to-date period. The submarket's current net absorption of negative 31,503 square feet compares favorably with the overall market net absorption of negative 164,473 square feet.

- The submarket had zero completions for the current quarter, which indicates no change from the previous quarter's zero completions, and an increase from the completions of negative 28,650 square feet from last year.

- The submarket achieved average asking rent of $37.90 per square foot, which indicates a decrease from the previous quarter's asking rent of $38.30 per square foot, and a decrease from the asking

rent of $38.29 per square foot from last year. The submarket's current asking rent of $37.90 per square foot compares favorably with the overall market asking rent of $36.51 per square foot.

## Historical Inventory - Submarket



Submarket Inventory is projected to be 15,060,297 square feet at the end of the current year, which is a small decrease from the previous year's submarket inventory of 15,204,241 square feet. Inventory for next year is projected to be 15,027,352 square feet, reflecting a small decrease from the current year.

## Historical Occupancy - Submarket



Submarket occupancy is projected to be 89.6% at the end of the current year, which is a decrease from the previous year's submarket occupancy of 90.9%. Submarket occupancy for next year is projected to be 89.5%, reflecting a small decrease from the current year.

## Historical Net Absorption - Submarket



Net absorption in the submarket is projected to be negative 270,862 square feet at the end of the current year, reflecting an improvement from the previous year's net absorption of negative 452,596 square feet. Net absorption for next year is projected to be negative 48,661 square feet, indicating an improvement from the current year.

## Historical Completions - Submarket



The submarket is projected to achieve completions of negative 143,944 square feet at the end of the current year, which indicates a decline from the previous year's completions of negative 30,650 square feet. The submarket is projecting completions of negative 32,945 square feet for next year, which indicates an improvement from the current year.

## Historical Asking Rent - Submarket



The submarket is projected to achieve average asking of $37.55 per square foot at the end of the current year, which is a decrease from the previous year's asking rent of $38.29 per square foot. The submarket is projected to achieve average asking rent of $37.58 per square foot, reflecting a small increase from the current year.

## Occupancy

Based on the foregoing analysis, CBRE, Inc.'s conclusion of stabilized occupancy for the subject is illustrated in the following table. This estimate considers both the physical and economic factors of the market.

| OCCUPANCY CONCLUSIONS | |
|---|---|
| Los Angeles - CA USA Market | 94.2% |
| Downtown Los Angeles Submarket | 90.1% |
| Subject's Current Occupancy | 88.9% |
| Subject's Stabilized Occupancy | 95.0% |
| Compiled by CBRE | |

## Conclusion

The subject is adequately located for a retail development near major transportation routes. In addition, the area is supply constrained. Based upon the previous analysis, the subject should continue to achieve market acceptance for the foreseeable future.

# Highest and Best Use

In appraisal practice, the concept of highest and best use is the premise upon which value is based. The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## As If Vacant

### Legal Permissibility

The legally permissible uses were discussed in the Site Analysis and Zoning Sections.

### Physical Possibility

The subject is adequately served by utilities, and has an adequate shape and size, sufficient access, and other necessary attributes to be a separately developable site. There are no known physical reasons why the subject site would not support any legally probable development (i.e. it appears adequate for development).

Existing structures on similar sites provides additional evidence for the physical possibility of development.

### Financial Feasibility

The determination of financial feasibility is dependent primarily on the relationship of supply and demand for the legally probable land uses versus the cost to create the uses. As discussed in the market analysis, the subject retail market is generally stabilized.

Few retail projects have been recently developed in this market due to economic conditions. Further, there are proposed developments which are no longer moving forward due to inadequate construction financing and market conditions. Overall, there is significant risk in the retail market and most investors would not move forward with new construction at this time on a speculative basis.

### Maximum Productivity - Conclusion

The final test of highest and best use of the site, as if vacant, is that the use be maximally productive, yielding the highest return to the land.

As noted, new development is not financially feasible at this time. Therefore, the highest and best use of the site, as vacant, would be to hold for future retail development when economic conditions improve.

The most likely purchaser as if vacant would be a developer or a speculator.

## As Improved

### Legal Permissibility

The site has been improved with a retail development that is a legal, conforming use.

### Physical Possibility

The layout and positioning of the improvements are considered functional for retail use. While it would be physically possible for a wide variety of uses, based on the legal restrictions and the design of the improvements, the continued use of the property for retail users would be the most functional use.

### Financial Feasibility

The financial feasibility of an retail property is based on the amount of rent which can be generated, less operating expenses required to generate that income; if a residual amount exists, then the land is being put to a productive use. Based upon the income capitalization approach conclusion, the subject is producing a positive net cash flow and continued utilization of the improvements for industrial purposes is considered financially feasible.

### Maximum Productivity - Conclusion

As shown in the applicable valuation sections, buildings that are similar to the subject have been acquired or continue to be used by retail investors. None of the comparable buildings have been acquired for conversion to an alternative use. The most likely buyer for the subject property is as follows:

- investor-local

Based on the foregoing, the highest and best use of the property, as improved, is consistent with the existing use as a retail development.

# Insurable Replacement Cost

Insurable Replacement Cost is defined as follows:

> *Replacement Cost for Insurance Purposes* - The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). [9]

CBRE, Inc. has followed traditional appraisal standards to develop a reasonable calculation based upon industry practices and industry-accepted publications such as the Marshall Valuation Service. The methodology employed is a derivation of the cost approach and is not reliable for Insurable Replacement Cost estimates. Actual construction costs and related estimates can vary greatly from this estimate.

The Insurable Replacement Cost estimate presented herein is intended to reflect the value of the destructible portions of the subject, based on the replacement of physical items that are subject to loss from hazards (excluding indestructible items such as basement excavation, foundation, site work, land value and indirect costs). In the case of the subject, this estimate is based upon the base building costs (direct costs) as obtained via the Marshall Valuation Service cost guide, with appropriate deductions.

This analysis should not be relied upon to determine proper insurance coverage as only consultants considered experts in cost estimation and insurance underwriting are qualified to provide an Insurable Replacement Cost. It is provided to aid the client/reader/user as part of their overall decision-making process and no representations or warranties are made by CBRE, Inc. regarding the accuracy of this estimate. It is strongly recommended that other sources be utilized to develop any estimate of Insurable Replacement Cost.

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 163.

## INSURABLE REPLACEMENT COST

| | | | |
|---|---|---|---|
| Primary Building Type: | Retail | Height per Story: | 20' |
| Effective Age: | 5 YRS | Number of Buildings: | 2 |
| Condition: | Average | Gross Building Area: | 4,860 SF |
| Number of Units: | 1 | Average Unit Size: | 4,860 SF |
| Number of Stories: | 1 | Average Floor Area: | 4,860 SF |

| | |
|---|---|
| **MVS Sec/Page/Class** | 13/14 |
| **Quality/Class** | Average/C |
| **Building Component** | Retail |
| **Component Sq. Ft.** | 4,860 SF |
| **Base Square Foot Cost** | $154.00 |
| | |
| **Square Foot Refinements** | |
| Heating and cooling | $0.00 |
| Sprinklers | $0.00 |
| Subtotal | $154.00 |
| | |
| **Height and Size Refinements** | |
| Number of Stories Multiplier | 1.000 |
| Height per Story Multiplier | 1.000 |
| Floor Area Multiplier | 1.000 |
| Subtotal | $154.00 |
| | |
| **Cost Multipliers** | |
| Current Cost Multiplier | 1.05 |
| Local Multiplier | 1.19 |
| **Final Square Foot Cost** | **$192.42** |
| | |
| **Base Component Cost** | **$935,176** |

| | | |
|---|---|---|
| **Base Building Cost** | *(via Marshall Valuation Service cost data)* | **$935,176** |
| | | |
| **Insurable Exclusions** | 15.0% of Total Building Cost | ($140,276) |
| | | |
| **Indicated Insurable Replacement Cost** | | **$794,899** |
| **Rounded** | | **$800,000** |

Compiled by CBRE

# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda.



| SUMMARY OF COMPARABLE RETAIL SALES | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | Property Name | Transaction Type | Date | Interest Transferred | Land (Acres) | YOC / Reno'd | Property Type | NRA (SF) | GLA (SF) | Actual Sale Price | Adjusted Sale Price [1] | Price Per SF [1] | NOI Per SF | OAR |
| 1 | Freestanding Retail Building 3251-3255 Beverly Boulevard Los Angeles, CA 90057 | Available /Listing | Oct-25 | Leased Fee | 0.25 | 1980 | Retail | 5,251 | 5,251 | $2,600,000 | $2,600,000 | $495.14 | $32.68 | 6.60% |
| 2 | Century Plaza Retail 2157-2165 West Century Boulevard Los Angeles, CA 90047 | Sale | May-25 | Leased Fee | 0.26 | 1985 | Retail | 5,826 | 5,826 | $2,575,000 | $2,575,000 | $441.98 | $28.86 | 6.53% |
| 3 | Storefront Retail 738 E. 12th Street Los Angeles, CA 90021 | Sale | Jan-25 | Leased Fee | 0.14 | 1964 | Retail | 5,000 | 5,000 | $2,050,000 | $2,050,000 | $410.00 | $0.00 | N/A |
| 4 | 7-Eleven Center 728 West Vernon Avenue Los Angeles, CA 90037 | Sale | May-24 | Leased Fee | 0.49 | 2000 | Retail | 6,300 | 6,300 | $3,500,000 | $3,500,000 | $555.56 | $32.91 | 5.92% |
| 5 | Multi-Tenant Strip Center 11038 S. Inglewood Avenue Inglewood, CA 90304 | Sale | Aug-23 | Leased Fee | 0.44 | 1967 | Retail | 6,443 | 6,443 | $2,657,500 | $2,657,500 | $412.46 | $0.00 | N/A |
| 6 | Multi Tenant Retail KTown 3426-3444 W 8th St Los Angeles, CA 90005 | Sale | Jun-23 | Leased Fee | 0.28 | 1942 | Retail | 7,670 | 7,670 | $3,700,000 | $3,700,000 | $482.40 | $0.00 | N/A |
| Subj. Pro Forma | Multi-Tenant Retail 1040 South Los Angeles Street Los Angeles, CA 90015 | Listed | 10/1/203 | — | 0.16 | 2016 | Retail | 4,860 | 4,860 | $3,500,000 | $3,500,000 | N/A | $30.08 | — |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

## Discussion/Analysis of Improved Sales

### Improved Sale One

This multi-tenant retail building is currently listed for sale at $2,600,000 ($495/SF) with a 6.60% cap rate. Located on Beverly Boulevard, a four-lane commercial thoroughfare, the property is surrounded primarily by retail uses along the main corridor, with residential development on adjacent two-lane secondary streets. The tenant mix consists of local businesses.

### Improved Sale Two

This is the May 2025 sale of a 5,826 SF multi-tenant retail property located at 2157-2165 West Century Boulevard in Los Angeles. It was built in 1985 and is situated on a 0.26-acre site. The parking ratio is 2 per 1,000 SF. The property was on the market approximately four months, listed at $2,750,000, and sold for $2,575,000, or $442 per square foot with a 6.53% cap rate based on in-place income.

### Improved Sale Three

This is the February 2025 sale of 738 E. 12th Street, a 5,000 SF freestanding retail property located in Downtown Los Angeles. The improvements were constructed in 1964 and were in average condition as of the date of survey. The property was 100% occupied at the time of sale. The sale price was $2,050,000 or $410 PSF.

### Improved Sale Four

This is a 6,300 square foot strip shopping center located at 728 West Vernon Avenue in the city of Los Angeles.  The property was built in 2000 and the parking ratio is 4.76 spaces per 1,000 square feet of building area.  The property was fully occupied and tenants include 4M Laundry, Boost Mobile, and 7-Eleven.  The property also has a signage lease at $125 per month.  The property is listed for sale at $3,455,000 or $548 per square foot for approximately three months.  The property sold in May 2024 for $3,500,000 or $555 per square foot. The capitalization rate based on in-place income is 5.92%.

### Improved Sale Five

This represents the sale of a 6,443-square foot, retail strip center building located at 11038 S. Inglewood Avenue in the city of Inglewood. The building was constructed in 1967 and is improved upon a 0.42 acre site. There are a reported 25 surface parking spaces making for a 3.88 parking ratio per 1,000 SF. The property sold in August 2023 for $2,657,500 or $412/SF. The property was 100% occupied at the time of sale and the buyer is a partial owner/user and existing tenant. The tenant/buyer is a retailer called Carniceria Guadalajara that has a meat market and restaurant located on-site. There was no reported income to derive a capitalization rate from the sale.

### Improved Sale Six

The Admiral William M Lawson Maritime Trust sold this 7,670 SF Class B General Retail Building to Myi Star LLC for $3,700,000.The building which was built in 1942 is located in the heart of Koreatown. The property had 2,542 SF available for lease at the time of sale. The property consists of multiple tenant spaces with tenants that are local in nature and consist of a restaurant and beauty salon.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

### Conditions of Sale

Sale No. 1 is a current listing. We have applied a downward adjustment to this comparable to account for sale negotiations.

### Location

Sale Nos. 1 and 6 are located northwest of the subject. These properties are located within close proximity to Hollywood and Koreatown. This areas are superior in exposure and location characteristics compared to the subject. Therefore, a downward adjustment was applied.

### Age/Condition

Sale Nos. 1, 2, 3, 5 and 6 are inferior in condition compared to the subject. Therefore, an upward adjustment was applied.

### Tenancy

Sale No. 4 contains a credit tenant 7-Eleven. This tenancy is superior compared to the subject. Therefore, a downward adjustment was applied.

### Parking Ratio

| Parking Ratio | | | | | | |
|---|---|---|---|---|---|---|
| Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 |
| None | 2.86 | 2.06 | | 4.76 | 3.88 | 3.13 |
| | Superior | Superior | Similar | Superior | Superior | Superior |
| Compiled by CBRE | | | | | | |

Sales Comparison Approach

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| RETAIL SALES ADJUSTMENT GRID | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | 6 | Subj. Pro Forma |
| Transaction Type | Available/Listing | Sale | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Oct-25 | May-25 | Jan-25 | May-24 | Aug-23 | Jun-23 | --- |
| Interest Transferred | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | --- |
| Year Built/Renovated | 1980 | 1985 | 1964 | 2000 | 1967 | 1942 | 2016 / |
| Property Type | Retail | Retail | Retail | Retail | Retail | Retail | Retail |
| Parking Ratio | 2.86 | 2.06 | | 4.76 | 3.88 | 3.13 | 0.00 |
| GLA (SF) | 5,251 | 5,826 | 5,000 | 6,300 | 6,443 | 7,670 | 4,860 |
| Actual Sale Price | $2,600,000 | $2,575,000 | $2,050,000 | $3,500,000 | $2,657,500 | $3,700,000 | --- |
| Price Per SF [1] | $495.14 | $441.98 | $410.00 | $555.56 | $412.46 | $482.40 | --- |
| NOI Per SF | $32.68 | $28.86 | $0.00 | $32.91 | $0.00 | $0.00 | $30.08 |
| OAR | 6.60% | 6.53% | N/A | 5.92% | N/A | N/A | --- |
| Adj. Price Per SF | $495.14 | $441.98 | $410.00 | $555.56 | $412.46 | $482.40 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | -5% | 0% | 0% | 0% | 0% | 0% | |
| ...due to: | Listing | | | | | | |
| Market Conditions (Time) | 0% | 0% | 0% | 0% | 0% | 0% | |
| Subtotal - Price Per SF | $470.38 | $441.98 | $410.00 | $555.56 | $412.46 | $482.40 | |
| Location | -5% | 0% | 0% | 0% | 0% | -5% | |
| ...due to: | Superior Location | | | | | Superior Location | |
| Size | 0% | 0% | 0% | 0% | 0% | 0% | |
| Age/Condition | 10% | 10% | 10% | 0% | 10% | 10% | |
| ...due to: | its older construction and more long-lived physical deterioration | its older construction and more long-lived physical deterioration | its older construction and more long-lived physical deterioration | | its older construction and more long-lived physical deterioration | its older construction and more long-lived physical deterioration | |
| Quality of Construction | 0% | 0% | 0% | 0% | 0% | 0% | |
| Tenancy | 0% | 0% | 0% | -5% | 0% | 0% | |
| ...due to: | | | | Superior Tenancy | | | |
| Parking Ratio | -5% | -5% | 0% | -10% | -5% | -5% | |
| ...due to: | Superior Parking Ratio | Superior Parking Ratio | | Superior Parking Ratio | Superior Parking Ratio | Superior Parking Ratio | |
| Total Other Adjustments | 0% | 5% | 10% | -15% | 5% | 0% | |
| Indicated Value Per SF | $470.38 | $464.08 | $451.00 | $472.23 | $433.08 | $482.40 | |
| Absolute Adjustment | 25% | 15% | 10% | 15% | 15% | 20% | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

## Market Participants

Per discussion with the subjects current listing broker, Elizabeth Clark of Kidder Mathews, the subject would likely sell near the low two million dollar range.

## Sale Price Per Square Foot Conclusion

| Price/SF Range | | |
|---|---|---|
| | **Unadjusted** | **Adjusted** |
| Minimum | $410.00 | $433.08 |
| Maximum | $555.56 | $482.40 |
| Average | $466.26 | $462.20 |
| Median | $462.19 | $467.23 |
| Compiled by CBRE | | |

These sales indicate an unadjusted price PSF unit range between $410.00 to $555.56 per square foot. After adjustments, the range tightened, varying from $433.08 to $482.40 per square foot, average of $462.20 per square foot. Due to the high level of overall correlation, all comparables were given equal weight when concluding to a price/SF range. Based on our analysis, we have concluded toward the middle portion of the adjusted range indicated by the comparables, as shown in the following exhibit:

Based on this analysis, we have concluded to a price per square foot range of $425  to $475  reflecting current market dynamics and the most reliable comparable data.

| SALES COMPARISON APPROACH | | | | |
|---|---|---|---|---|
| **GLA (SF)** | **X** | **Value Per SF** | **=** | **Value** |
| 4,860 | X | $425 | = | $2,065,500 |
| 4,860 | X | $475 | = | $2,308,500 |

**VALUE CONCLUSION**

| | |
|---|---|
| Prospective As Stabilized Value | $2,187,000 |
| **Rounded** | **$2,200,000** |
| Lease-Up Discount | (227,311) |
| As Is Value | 1,972,689 |
| **Rounded** | **$1,950,000** |
| **Value Per SF** | **$401.23** |

Compiled by CBRE

Please note that the subject's current occupancy is below market stabilization levels. As a result, the appraisers have applied a lease-up cost to account for the time and expenses required to achieve stabilized occupancy. For further details regarding this cost calculation, please refer to the conclusion of the Income Capitalization Approach section.

# Income Capitalization Approach

The following map and table summarize the primary comparable data used in the valuation of the subject. A detailed description of each transaction is included in the addenda. Given the mixed-commercial nature of the subject, we begin with rental comparables for restaurant and general retail space. A detailed description of each transaction is included in the addenda.



**SUMMARY OF COMPARABLE RETAIL RENTALS**

| No. | Property Name and Location | YOC / Reno'd | Parking Ratio | Tenant Name | Lease Area (SF) | Lease Date | Lease Term | Base Rent | Tenant Improvements | Reimbursements | Escalations | Free Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Multitenant Retail 1216-1220 W 7th St Los Angeles, CA 90017 | 1912 | 2.40 | Hammy's Smash Burgers | 830 | Jun-24 | 3.0 Yrs. | $56.40 PSF | $0.00 PSF | Modified Gross | 3.00% | 0 Months |
| 2 | Retail Property 1487 W Sunset Boulevard Los Angeles, CA 90026 | 1922 / 2022 | 1.49 | Slurpin' Ramen Bar | 1,926 | Apr-24 | 10.0 Yrs. | $72.00 PSF | $55.00 PSF | NNN | 3.00% | 0 Months |
| 3 | 2512 South Figueroa 2512-2540 S. Figueroa Street Los Angeles, CA 90007 | 1982 | 2.37 | Eggtuck | 1,350 | Mar-24 | 10.0 Yrs. | $75.00 PSF | $0.00 PSF | NNN | 3.00% | 0 Months |
| 4 | Mid-Rise Apartments (Retail Only) 752 South Main Street Los Angeles, CA 90014 | 1910 | | Picasso Pizza | 500 | Dec-22 | 5.0 Yrs. | $60.00 PSF | $0.00 PSF | Modified Gross | 3.00% | 0 Months |
| 5 | 3rd & Traction 734-740 E. 3rd Street and 702 Traction Avenue Los Angeles, CA 90013 | 1946 / 2021 | 0.00 | Sushi 715 | 2,333 | Jan-22 | 5.0 Yrs. | $57.00 PSF | $0.00 PSF | NNN | Annual 3.0% | 0 Months |
| Subj. | Multi-Tenant Retail 1040 South Los Angeles Street Los Angeles, CA 90015 | 2016 | 0.00 | | | | | — | — | | | |

Compiled by CBRE

## Discussion/Analysis of Rent Comparables

### Rent Comparable One

This comparable is a 4,160 SF multi-tenant retail property located at 1216-1220 W. 7th Street in Los Angeles. It was built in 1912 of concrete block construction. The most recent lease was signed for 830 SF of restaurant space at a rental rate of $56.40/sf/year ($4.70/sf/mo) on a modified gross basis for a three-year term. The tenant is Hammy's Smash Burger.

### Rent Comparable Two

This is 1487 W Sunset Boulevard, a 14,799 SF retail property located in the Silverlake area of Los Angeles. The improvements were constructed in 1922, renovated in 2022 and were in good condition as of the date of value. The property exhibits 22 surface parking spaces.

### Rent Comparable Three

This is a one-story, multi-tenant strip retail center, anchored by 7-Eleven and Popeyes, located on the northeast corner of Figueroa Street and West Adams Boulevard, in the city of Los Angeles, Los Angeles County. More specifically, the street address is 2512-2540 S. Figueroa Street. The improvements were built in 1982 and consist of 19,838 square feet of net rentable area on a 0.94-acre site. Parking is provided at a ratio of 2.37 spaces per 1,000 square feet of building area.

### Rent Comparable Four

This is the executed lease to a Picasso Pizza for a 500 square foot in-line space at 752 South Main Street. The lease was executed in November 2022 and commenced in December 2022. The term was 5 years.

### Rent Comparable Five

This is 3rd & Traction, a multi-tenant storefront retail building located on the southwest corner of East 3rd Street and Traction Avenue, in the Arts District area of Downtown Los Angeles, Los Angeles County. The improvements were built in 1946 and consist of one building totaling 10,923 square feet of gross building area on a 0.251-acre site. There is no onsite parking.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

### Expense Adjustment

As illustrated in the lease comparables above, the subjects general retail lease is on a modified gross lease rate basis, where tenants are directly billed for utilities. However, Lease Nos. 2, 3 and 5 are on a NNN basis, where tenants reimburse ownership for all operating expense. To account for the differences between these lease types, the appraiser has applied lease expense adjustment calculations, which are briefly outlined below.

| EXPENSE COMPARABLES (EXPENSES PER SF) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comparable | 1 | 2 | 3 | 4 | **Min** | **Max** | **Average** |
| Property Insurance | $1.36 | $2.31 | $1.81 | $1.50 | **$1.36** | **$2.31** | **$1.75** |
| Utilities | $2.14 | $1.89 | $2.01 | $2.07 | **$1.89** | **$2.14** | **$2.03** |
| Common Area Maintenance | $3.03 | $2.25 | $2.68 | $3.21 | **$2.25** | **$3.21** | **$2.79** |
| Management Fee | $1.20 | $1.11 | $1.06 | $1.41 | **$1.06** | **$1.41** | **$1.19** |
| Compiled by CBRE | | | | | | | |

| EXPENSE ADJUSTMENTS (PER SF PER YEAR) | | | | | | |
|---|---|---|---|---|---|---|
| Row No. | | Rent - 1 | Rent - 2 | Rent - 3 | Rent - 4 | Rent - 5 |
| 1 | Property Insurance | | $1.75 | $1.75 | | $1.75 |
| 2 | Utilities | | | | | |
| 3 | Common Area Maintenance | | $2.50 | $2.50 | | $2.50 |
| 4 | Management Fee | | $1.30 | $1.30 | | $1.30 |
| | Total (Row 1+3+4) | $0.00 | $5.55 | $5.55 | $0.00 | $5.55 |
| | **Total Expense Adjustment** | **$0.00** | **$5.55** | **$5.55** | **$0.00** | **$5.55** |
| Compiled by CBRE | | | | | | |

## Size

Please note that the subject contains one (1) restaurant tenant that occupies three (3) 270 SF units, equating to a total rentable area of 810 SF.

Typically, larger buildings lease at a lower price per square foot than larger ones due to economies of scale. Lease Nos. Nos. 2 and 5 are larger in size compared to the subject. Therefore, an upward adjustment was warrant.

## Age/Condition

Lease No. 1 is inferior in condition compared to the subject. Therefore, an upward adjustment was applied.

Lease Nos. 2 and 3 are superior in condition compared to the subject. Therefore, a downward adjustment was applied.

Income Capitalization Approach

## RETAIL RENT ADJUSTMENT GRID

| Comparable Number | 1 | 2 | 3 | 4 | 5 | | Subject |
|---|---|---|---|---|---|---|---|
| **Building Information** | | | | | | | |
| Year Built | 1912 | 1922 / | 1982 | 1910 | 1946 / | | 2016 / |
| Parking Ratio | 2.40 | 1.49 | 2.37 | | 0.00 | | 0.00 |
| **Lease Specific Information** | | | | | | | |
| TenantName | Hammy's Smash Burgers | Slurpin' Ramen Bar | Eggtuck | Picasso Pizza | Sushi 715 | | |
| LeaseArea (SF) | 830 | 1,926 | 1,350 | 500 | 2,333 | | 810 |
| LeaseDate | Jun-24 | Apr-24 | Mar-24 | Dec-22 | Jan-22 | | |
| LeaseTerm | 3 | 10 | 10 | 5 | 5 | | |
| Base Rent | $56.40 | $72.00 | $75.00 | $60.00 | $57.00 | | |
| Tenant Improvements | $0.00 | $55.00 | $0.00 | $0.00 | $0.00 | | |
| Reimbursements | Modified Gross | NNN | NNN | Modified Gross | NNN | | |
| Escalations | 3.00% | 3.00% | 3.00% | 3.00% | Annual 3.0% | | |
| Free Rent (Months) | 0 Months | 0 Months | 0 Months | 0 Months | 0 Months | | |
| Adj. Rent Per SF | $56.40 | $72.00 | $75.00 | $60.00 | $57.00 | | |
| Expense Adjustment | $0.00 | $5.55 | $5.55 | $0.00 | $5.55 | | |
| Adj. Rent Per SF | $56.40 | $77.55 | $80.55 | $60.00 | $62.55 | | |
| Conditions of Lease | 0% | 0% | 0% | 0% | 0% | | |
| Market Conditions (Time) | 0% | 0% | 0% | 0% | 0% | | |
| Subtotal | $56.40 | $77.55 | $80.55 | $60.00 | $62.55 | | |
| Location | 0% | 0% | 0% | 0% | 0% | | |
| Size | 0% | 0% | 0% | 0% | 0% | | |
| Age/Condition | 10% | -10% | -10% | 0% | 0% | | |
| Quality of Finish | 0% | 0% | 0% | 0% | 0% | | |
| Parking | 0% | 0% | 0% | 0% | 0% | | |
| Tenancy | 0% | 0% | 0% | 0% | 0% | | |
| Total Other Adjustments | 10% | -10% | -10% | 0% | 0% | | |
| **Indicated Rent Per SF** | **$62.04** | **$69.80** | **$72.50** | **$60.00** | **$62.55** | | |
| *Absolute Adjustment* | 10% | 10% | 10% | 0% | 0% | | |
| Source: CBRE | | | | | | | |

## Rent Per SF Conclusion (Restaurant)

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| Rent / SF | | |
|---|---|---|
| | **Unadjusted** | **Adjusted** |
| Minimum | $56.40 | $60.00 |
| Maximum | $75.00 | $72.50 |
| Average | $64.08 | $65.38 |
| Median | $60.00 | $62.55 |
| *Compiled by CBRE* | | |

In concluding market rental rates for the subject's restaurant space, units ranging from 500 to 2,333 square feet, all comparables were given equal weight due to minimal net adjustments. The data reflects a rental range of $60.00  to $72.50  per square foot, with an average of $65.38 per square foot. Based on this analysis, we have concluded to a lease rate near the midpoint of the range at $66.00, MG.

## General Retail – Lease Comparables



| Comp. No. | Property Name and Location | YOC / Reno'd | Parking Ratio | Tenant Name | Area (SF) | Lease Date | Lease Term | Base Rent | Tenant Improvements | Reimbursements | Escalations | Free Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SUMMARY OF COMPARABLE RETAIL RENTALS | | | | | | |
| 6 | Retail Building 845 South Broadway Los Angeles, CA 90014 | 2007 | 1.88 | Retail Tenant | 1,600 | Jan-25 | 3.0 Yrs. | $37.44 PSF | $0.00 PSF | NNN | None | 0 Months |
| 7 | LA-Pico Plaza 1307 South Los Angeles Street Los Angeles, CA 90015 | 1987 | 9.02 | Confidential | 1,200 | Jul-24 | 3.1 Yrs. | $35.04 PSF | $0.00 PSF | Modified Gross | Not Disclosed | 0 Months |
| 8 | Downtown Executive Plaza 1153-1159 Santee Street & 221 East 12th Street | 1989 | | Nil Shop | 890 | Jul-24 | 3.0 Yrs. | $41.64 PSF | $0.00 PSF | Modified Gross | 3.00% | 0 Months |
| Subj. | Multi-Tenant Retail 1040 South Los Angeles Street Los Angeles, CA 90015 | 2016 | 0.00 | | | | | --- | | | | |

Compiled by CBRE

Income Capitalization Approach

## Discussion/Analysis of Rent Comparables

### Rent Comparable Six

This comparable is a 1,600-square-foot single-tenant retail property located at 845 South Broadway in the city of Los Angeles. The property was built in 2007 and is situated on a 0.45-acre site. The parking ratio is 1.88/1,000 sf. In December 2024 a lease was signed for 1,600 square feet of retail space at a rental rate of $37.44/sf/year ($3.12/sf/mo) with NNN reimbursements for a term of three years.

### Rent Comparable Seven

This is an executed first floor lease within the building located at 1301-1309 Los Angeles Street in the Fashion District of Downtown Los Angeles. It is a corner space (#1301) with a starting base rate of $2.92 PSF/month + utilities. It was on the market for one month before being signed to a 37-month term.

### Rent Comparable Eight

This is a signed ground-floor retail lease rate. Lease was signed by Nil Shop, a 890 SF retail space, signed in July of 2024 at $41.64/SF/Yr, modified gross. The property rests along Santee Street, a two (2) lane secondary street. Surrounding development consists primarily of retail use.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

### Expense Adjustment

As illustrated in the lease comparables above, the subjects general retail lease is on a modified gross lease rate basis, where tenants are directly billed for utilities. However, Lease No. 6 is on a NNN basis, where tenants reimburse ownership for all operating expense. To account for the differences between these lease types, the appraiser has applied lease expense adjustment calculations, which are briefly outlined below.

| EXPENSE COMPARABLES (EXPENSES PER SF) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comparable | 1 | 2 | 3 | 4 | **Min** | **Max** | **Average** |
| Property Insurance | $1.36 | $2.31 | $1.81 | $1.50 | **$1.36** | **$2.31** | **$1.75** |
| Utilities | $2.14 | $1.89 | $2.01 | $2.07 | **$1.89** | **$2.14** | **$2.03** |
| Common Area Maintenance | $3.03 | $2.25 | $2.68 | $3.21 | **$2.25** | **$3.21** | **$2.79** |
| Management Fee | $1.20 | $1.11 | $1.06 | $1.41 | **$1.06** | **$1.41** | **$1.19** |
| Compiled by CBRE | | | | | | | |

| EXPENSE ADJUSTMENTS (PER SF PER YEAR) | | | | |
|---|---|---|---|---|
| Row No. | | Rent - 6 | Rent 7 | Rent - 8 |
| 1 | Property Insurance | $1.75 | | |
| 2 | Utilities | | | |
| 3 | Common Area Maintenance | $2.50 | | |
| 4 | Management Fee | $1.30 | | |
| | Total (Row 1+3+4) | $5.55 | $0.00 | $0.00 |
| | **Total Expense Adjustment** | **$5.55** | **$0.00** | **$0.00** |
| Compiled by CBRE | | | | |

Income Capitalization Approach

**RETAIL RENT ADJUSTMENT GRID**

| Comparable Number | 6 | 7 | 8 | | Subject |
|---|---|---|---|---|---|
| **Building Information** | | | | | |
| Year Built | 2007 | 1987 | 1989 | | 2016 / |
| **Lease Specific Information** | | | | | |
| TenantName | Retail Tenant | Confidential Retail Tenant | Nil Shop | | |
| LeaseArea (SF) | 1,600 | 1,200 | 890 | | |
| LeaseDate | Jan-25 | Jul-24 | Jul-24 | | |
| LeaseTerm | 3 | 3 | 3 | | |
| Base Rent | $37.44 | $35.04 | $41.64 | | |
| Tenant Improvements | $0.00 | $0.00 | $0.00 | | |
| Reimbursements | NNN | Modified Gross | Modified Gross | | |
| Escalations | None | Not Disclosed | 3.00% | | |
| Free Rent (Months) | 0 Months | 0 Months | 0 Months | | |
| Adj. Rent Per SF | $37.44 | $35.04 | $41.64 | | |
| Expense Adjustment | $5.55 | $0.00 | $0.00 | | |
| Adj. Rent Per SF | $42.99 | $35.04 | $41.64 | | |
| Conditions of Lease | 0% | 0% | 0% | | |
| Market Conditions (Time) | $0.00 | $0.00 | $0.00 | | |
| Subtotal | $42.99 | $35.04 | $41.64 | | |
| Location | 0% | 0% | 0% | | |
| Size | 0% | 0% | 0% | | |
| Age/Condition | -10% | 0% | -10% | | |
| Quality of Finish | 0% | 0% | 0% | | |
| Parking | 0% | 0% | 0% | | |
| Tenancy | 0% | 0% | 0% | | |
| Total Other Adjustments | -10% | 0% | -10% | | |
| **Indicated Rent Per SF** | **$38.69** | **$35.04** | **$37.48** | | |

Source: CBRE

## Rent Per SF Conclusion (General Retail)

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| Rent / SF | | |
|---|---|---|
| | Unadjusted | Adjusted |
| Minimum | $56.40 | $60.00 |
| Maximum | $75.00 | $72.50 |
| Average | $64.08 | $65.38 |
| Median | $60.00 | $62.55 |
| *Compiled by CBRE* | | |

In concluding market rental rates for the subject's general retail use, units ranging from 890 to 1,600 square feet, all comparables were given equal weight due to minimal net adjustments. The data reflects a rental

Income Capitalization Approach

range of $35.04 to $38.69 per square foot, with an average of $37.07 per square foot. Based on this analysis, we have concluded to a lease rate near the midpoint of the range at $36.00, MG.

## Market Rent Conclusions

The following chart shows the market rent conclusions for the subject:

| MARKET RENT CONCLUSIONS | | |
|---|---|---|
| Category | Restaurant | General Retail |
| Market Rent ($/SF/Yr.) | $66.00 | $36.00 |
| Reimbursements | MG | MG |
| Escalations | 3.00% | 3.00% |
| Tenant Improvements (New Tenants) | $10.00 | $10.00 |
| Average Lease Term | 36 Months | 36 Months |
| Compiled by CBRE | | |

## Rent Roll

The following chart shows the subjects current rent roll:

| RENT ROLL ANALYSIS FOR MULTI-TENANT RETAIL | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Suite No. | Tenant | Tenant Type | Lease Start | Lease Expiration | Term (Mos.) | Size (GLA) SF | % Total | Market Rent $/SF/Yr. | Market Rent $/Yr. | Market Expense Basis | Contract Rent $/SF/Yr. | Contract Rent $/Yr. | |
| 2 | Earth Bean Coffee | Restaurant | Jun-18 | May-28 | 120 | 270 | 5.6% | $66.00 | $17,820 | MG | $90.04 | $24,311 | |
| 4 | Earth Bean Coffee | Restaurant | Jun-18 | May-28 | 120 | 270 | 5.6% | $66.00 | $17,820 | MG | $90.04 | $24,311 | |
| 6 | Earth Bean Coffee | Restaurant | MTM | MTM | | 270 | 5.6% | $66.00 | $17,820 | MG | $34.22 | $9,240 | |
| 8 | Pirate World - David Garay | General Retail | MTM | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 10 | Saul Good and David Garay | General Retail | MTM | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $22.22 | $6,000 | |
| 12 | Tailor - Juliana Sanchez | General Retail | Mar-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 14 | Pirate World - David Garay | General Retail | MTM | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $35.56 | $9,600 | |
| 16 | The Miracle Lifestyle - Miracle Watts | General Retail | May-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 18 | Secret Spot | General Retail | Sep-25 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $35.56 | $9,600 | |
| 5 | Secret Spot | General Retail | Mar-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $35.56 | $9,600 | |
| 7 | Secret Spot | General Retail | Apr-24 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 9 | Secret Spot | General Retail | MTM | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $35.56 | $9,600 | |
| 11 | Tailor - Juliana Sanchez | General Retail | Aug-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 13 | Instant Bae LA, LLC Nya | General Retail | Sep-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| 15 | Pirate World - David Garay | General Retail | MTM | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $24.44 | $6,600 | |
| 17 | Saul Good Global, LLC - Saul Good | General Retail | Feb-22 | MTM | | 270 | 5.6% | $36.00 | $9,720 | MG | $44.44 | $12,000 | |
| Occupied Subtotals | | | | | | 4,320 | 88.9% | $41.63 | $179,820 | | $44.64 | $192,862 | |
| Suite No. | Tenant | Tenant Type | Lease Start | Lease Expiration | Term (Mos.) | Size (GLA) SF | % Total | Market Rent $/SF/Yr. | Market Rent $/Yr. | Market Expense Basis | Vacant at Market $/SF/Yr. | Vacant at Market $/Yr. | |
| 1 | Vacant | General Retail | - | - | --- | 270 | 5.6% | $36.00 | $9,720 | MG | --- | $9,720 | |
| 3 | Vacant | General Retail | - | - | --- | 270 | 5.6% | $36.00 | $9,720 | MG | --- | $9,720 | |
| Vacant Subtotals | | | | | | 540 | 11.1% | $36.00 | $19,440 | | --- | $19,440 | |
| Property Totals - Contract Rent | | | | | | 4,860 | 100.0% | | | | $43.68 | $212,302 | |
| Property Totals - Market Rent | | | | | | 4,860 | 100.0% | $41.00 | $199,260 | | $41.00 | | |
| Compiled by CBRE | | | | | | | | | | | | | |

## Potential Rental Income Conclusion

Within this analysis, potential rental income is estimated based upon:

| POTENTIAL RENTAL INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| 2022 | $125,563 | $25.84 |
| 2023 | $150,339 | $30.93 |
| 2024 | $129,325 | $26.61 |
| Annualized - 2025 | $132,633 | $27.29 |
| **CBRE Estimate** | **$212,242** | **$43.67** |
| Compiled by CBRE | | |

Income Capitalization Approach

Please note that in the subject's pro forma, vacant units have been projected at market rent levels. A cost of stabilization has been applied at the conclusion of the Income Capitalization Approach to reflect the effort required to achieve stabilized occupancy. As a result, the potential rental income shown in the pro forma exceeds that of historical financial statements, which reflect lower occupancy levels.

## Operating History

The following table presents available operating data for the subject.

**OPERATING HISTORY**

| Year-Occupancy | 2022 Total | $/SF | 2023 Total | $/SF | 2024 Total | $/SF | Annualized - 2025 Total | $/SF | Pro Forma Total | 95.0% $/SF |
|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | |
| Potential Rental Income | $125,563 | $25.84 | $150,339 | $30.93 | $129,325 | $26.61 | $132,633 | $27.29 | $212,242 | $43.67 |
| Vacancy & Credit Loss | - | - | - | - | - | - | - | - | (10,612) | (2.18) |
| **Net Rental Income** | **$125,563** | **$25.84** | **$150,339** | **$30.93** | **$129,325** | **$26.61** | **$132,633** | **$27.29** | **$201,630** | **$41.49** |
| Expense Reimbursements | - | - | - | - | - | - | - | - | 9,720 | 2.00 |
| Vacancy & Credit Loss | - | - | - | - | - | - | - | - | (486) | (0.10) |
| **Subtotal Effective Other Income** | **-** | **$0.00** | **-** | **$0.00** | **$0** | **$0.00** | **$0** | **$0.00** | **$9,234** | **$1.90** |
| **Effective Gross Income** | **$125,563** | **$25.84** | **$150,339** | **$30.93** | **$129,325** | **$26.61** | **$132,633** | **$27.29** | **$210,864** | **$43.39** |
| **EXPENSE** | | | | | | | | | | |
| Real Estate Taxes | $17,825 | $3.67 | $18,182 | $3.74 | $18,545 | $3.82 | $18,916 | $3.89 | $27,962 | $5.75 |
| Property Insurance | 4,482 | 0.92 | 4,854 | 1.00 | 6,112 | 1.26 | 8,919 | 1.84 | 8,505 | 1.75 |
| Utilities | 6,248 | 1.29 | 952 | 0.20 | 11,974 | 2.46 | 8,919 | 1.84 | 9,720 | 2.00 |
| Common Area Maintenance | 5,604 | 1.15 | 9,050 | 1.86 | 10,940 | 2.25 | 19,526 | 4.02 | 12,150 | 2.50 |
| Management Fee | - | - | - | - | - | - | - | - | 6,326 | 1.30 |
| **Total Operating Expenses** | **$34,160** | **$7.03** | **$33,037** | **$6.80** | **$47,571** | **$9.79** | **$56,280** | **$11.58** | **$64,663** | **$13.31** |
| **Net Operating Income** | **$91,403** | **$18.81** | **$117,301** | **$24.14** | **$81,754** | **$16.82** | **$76,353** | **$15.71** | **$146,201** | **$30.08** |
| Management Fee (% of EGI) | *0.0%* | | *0.0%* | | *0.0%* | | *0.0%* | | *3.0%* | |

Source: Operating statements

## Vacancy & Collection Loss

As established in the Market Analysis section of the report, the general retail marketplace is stabilized, with occupancy rates in the broader market and local submarket bracketing the 95% range. This is consistent with the expectations and underwriting of typical investors and we have modeled the property similarly, with an overall charge of 5.0% applied for vacancy & credit loss. Note that the charge for Vacancy & credit loss is not intended to mirror the actual vacancy at any given time but rather reflect an investor's expectations over a typical holding period. The subject's vacancy is detailed as follows:

**VACANCY & CREDIT LOSS**

| Year | Total | % of PGI |
|---|---|---|
| **CBRE Estimate** | **($10,612)** | **5.0%** |

Compiled by CBRE

## Expense Reimbursements

The subject's leases are typically based on a modified gross lease rate, where tenants reimburse ownership for their pro-rata share of utilities. Those expenses considered to be eligible for reimbursement are as follows:

**EXPENSES ELIGIBLE FOR REIMBURSEMENT**

| Utilities |
|---|

Compiled by CBRE

The subject's expense reimbursements are detailed as follows:

| EXPENSE REIMBURSEMENTS | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| **CBRE Estimate** | **$9,720** | **$2.00** |
| Compiled by CBRE | | |

## Effective Gross Income

The subject's effective gross income is detailed as follows:

| EFFECTIVE GROSS INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| 2022 | $125,563 | $25.84 |
| 2023 | $150,339 | $30.93 |
| 2024 | $129,325 | $26.61 |
| Annualized - 2025 | $132,633 | $27.29 |
| Expense Comparable 1 | --- | $40.25 |
| Expense Comparable 2 | --- | $34.14 |
| Expense Comparable 3 | --- | $30.28 |
| Expense Comparable 4 | --- | $50.28 |
| **CBRE Estimate** | **$210,864** | **$43.39** |
| Compiled by CBRE | | |

## Operating Expense Analysis

### Expense Comparables

The following chart summarizes expenses obtained from recognized industry publications and/or comparable properties.

| EXPENSE COMPARABLES | | | | | |
|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | Subject |
| Location | SoCal | SoCal | SoCal | SoCal | Los Angeles, CA |
| GLA (SF) | 5,481 | 6,084 | 3,547 | 2,680 | 4,860 |
| | $/SF | $/SF | $/SF | $/SF | $/SF |
| *Expenses* | | | | | |
| Real Estate Taxes | $6.04 | $4.54 | $6.14 | $5.20 | $5.75 |
| Property Insurance | $1.36 | $2.31 | $1.81 | $1.50 | $1.75 |
| Utilities | $2.14 | $1.89 | $2.01 | $2.07 | $2.00 |
| Common Area Maintenance | $3.03 | $2.25 | $2.68 | $3.21 | $2.50 |
| Management Fee | $1.20 | $1.11 | $1.06 | $1.41 | $1.30 |
| **Total Operating Expenses** | **$13.77** | **$12.10** | **$13.70** | **$13.39** | **$13.31** |
| Operating Expenses Excluding Taxes | $7.73 | $7.56 | $7.56 | $8.19 | $7.55 |
| Operating Expense Ratio | 34.2% | 35.4% | 45.2% | 26.6% | 30.7% |
| Management Fee (% of EGI) | 3.0% | 3.2% | 3.5% | 2.8% | 3.0% |
| ² The median total differs from the sum of the individual amounts. | | | | | |
| Compiled by CBRE | | | | | |

A discussion of each expense category is presented on the following pages.

## Real Estate Taxes

The comparable data and projections for the subject are summarized as follows:

| REAL ESTATE TAXES | | |
|---|---:|---:|
| Year | Total | $/SF/Yr |
| 2022 | $17,825 | $3.67 |
| 2023 | $18,182 | $3.74 |
| 2024 | $18,545 | $3.82 |
| Annualized - 2025 | $18,916 | $3.89 |
| **CBRE Estimate** | **$27,962** | **$5.75** |
| Compiled by CBRE | | |

Please note that our projected real estate taxes are based on a reassessment of real estate taxes.

## Property Insurance

Property insurance expenses typically include fire and extended coverage and owner's liability coverage. The comparable data and projections for the subject are summarized as follows:

| PROPERTY INSURANCE | | |
|---|---:|---:|
| Year | Total | $/SF/Yr |
| 2022 | $4,482 | $0.92 |
| 2023 | $4,854 | $1.00 |
| 2024 | $6,112 | $1.26 |
| Annualized - 2025 | $8,919 | $1.84 |
| Expense Comparable 1 | --- | $1.36 |
| Expense Comparable 2 | --- | $2.31 |
| Expense Comparable 3 | --- | $1.81 |
| Expense Comparable 4 | --- | $1.50 |
| **CBRE Estimate** | **$8,505** | **$1.75** |
| Compiled by CBRE | | |

Please note that property insurance is typically a property specific cost. When concluding to an insurance expense, most weight was placed on 2024 – annualized 2025 historical figures.

## Utilities

Utilities expenses typically include electricity, natural gas, water, sewer and trash removal. The comparable data and projections for the subject are summarized as follows:

| Year | Total | $/SF/Yr |
|---|---|---|
| **UTILITIES** | | |
| 2022 | $6,248 | $1.29 |
| 2023 | $952 | $0.20 |
| 2024 | $11,974 | $2.46 |
| Annualized - 2025 | $8,919 | $1.84 |
| Expense Comparable 1 | --- | $2.14 |
| Expense Comparable 2 | --- | $1.89 |
| Expense Comparable 3 | --- | $2.01 |
| Expense Comparable 4 | --- | $2.07 |
| **CBRE Estimate** | **$9,720** | **$2.00** |
| Compiled by CBRE | | |

## Common Area Maintenance

Common area maintenance expenses typically include utilities, parking lot sweeping and maintenance, and routine repairs and maintenance of the building and site improvements. The comparable data and projections for the subject are summarized as follows:

| Year | Total | $/SF/Yr |
|---|---|---|
| **COMMON AREA MAINTENANCE** | | |
| 2022 | $5,604 | $1.15 |
| 2023 | $9,050 | $1.86 |
| 2024 | $10,940 | $2.25 |
| Annualized - 2025 | $19,526 | $4.02 |
| Expense Comparable 1 | --- | $3.03 |
| Expense Comparable 2 | --- | $2.25 |
| Expense Comparable 3 | --- | $2.68 |
| Expense Comparable 4 | --- | $3.21 |
| **CBRE Estimate** | **$12,150** | **$2.50** |
| Compiled by CBRE | | |

Please note that the subjects CAM expense has been trending upward form 2022 to present. However, it appears as if annualized 2025 may be an outlier as it is nearly double that of 2024 figures. Therefore, we have concluded to a CAM expense slightly above the 2024 figures at $2.50/SF.

## Management Fee

Management expenses are typically negotiated as a percentage of collected revenues (i.e., effective gross income). The comparable data and projections for the subject are summarized as follows:

### MANAGEMENT FEE

| Year | Total | % of EGI |
|------|------:|---------:|
| Expense Comparable 1 | --- | 3.0% |
| Expense Comparable 2 | --- | 3.2% |
| Expense Comparable 3 | --- | 3.5% |
| Expense Comparable 4 | --- | 2.8% |
| **CBRE Estimate** | **$6,326** | **3.0%** |
| Compiled by CBRE | | |

Please note that in the historical operating statements provided to appraisers, a management expense was not included, which is not typical of market expenses. Therefore, most weight was placed expense comparables when determining a management fee.

## Operating Expense Conclusion

The comparable data and projections for the subject are summarized as follows:

### TOTAL OPERATING EXPENSES

| Year | Total | $/SF/Yr |
|------|------:|--------:|
| 2022 | $34,160 | $7.03 |
| 2023 | $33,037 | $6.80 |
| 2024 | $47,571 | $9.79 |
| Annualized - 2025 | $56,280 | $11.58 |
| Expense Comparable 1 | --- | $13.77 |
| Expense Comparable 2 | --- | $12.10 |
| Expense Comparable 3 | --- | $13.70 |
| Expense Comparable 4 | --- | $13.39 |
| **CBRE Estimate** | **$64,663** | **$13.31** |
| Compiled by CBRE | | |

Please note that our projected total operating expenses is above that of historical statements due to the reassessment of real estate taxes and the inclusion of a management expense.

## Net Operating Income Conclusion

The comparable data and projections for the subject are summarized as follows:

| NET OPERATING INCOME | | |
|---|---|---|
| Year | Total | $/SF/Yr |
| 2022 | $91,403 | $18.81 |
| 2023 | $117,301 | $24.14 |
| 2024 | $81,754 | $16.82 |
| Annualized - 2025 | $76,353 | $15.71 |
| Expense Comparable 1 | --- | $26.48 |
| Expense Comparable 2 | --- | $22.04 |
| Expense Comparable 3 | --- | $16.58 |
| Expense Comparable 4 | --- | $36.89 |
| **CBRE Estimate** | **$146,201** | **$30.08** |
| Compiled by CBRE | | |

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication. The following subsections are different techniques for deriving an overall capitalization rate.

### Comparable Sales

The overall capitalization rates (OARs) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

| | | COMPARABLE CAPITALIZATION RATES | | | |
|---|---|---|---|---|---|
| Sale | Sale Date | Sale Price $/SF | Occupancy | Buyer's Primary Analysis | OAR |
| 1 | Oct-25 | $495.14 | n/a | Trailing Actuals | 6.60% |
| 2 | May-25 | $441.98 | 100% | Trailing Actuals | 6.53% |
| 4 | May-24 | $555.56 | 100% | Trailing Actuals | 5.92% |
| **Indicated OAR:** | | | 95% | | **5.92%-6.60%** |
| Compiled by CBRE | | | | | |

The overall capitalization rates for these sales were derived from the actual income characteristics of each property. Sales 1, 2, and 4 reflect a capitalization rate range of 5.92% to 6.60%, with an average of 6.35%. Sales 1 and 2 offer market relevance due to their recent transaction dates, while Sale 4 provides comparable market evidence given its similar location, size, and age relative to the subject property. Accordingly, primary emphasis has been placed on the most recent sales data, which better reflects current market trends, prevailing interest rates, and buyer expectations and motivations. Each of these comparable sales demonstrates a similar tenant profile with respect to lease stability and credit quality, requiring minimal adjustments when compared to the subject property.

## Market Participants

| MARKET PARTICIPANTS | |
|---|---|
| Respondent | Comments |
| Samuel Jang, Good Members Investments | Proforma cap rate of properties leased at market levels generally tend to be higher at 5.75% to 6.75% in the strong retail neighborhoods in downtown Los Angeles. Small spaces also attract owner users in these communities, as well as local investors. |
| **Indicated OAR:** | **5.75% to 6.75%** |
| Compiled by CBRE | |

## Published Investor Surveys

The results of the most recent investor surveys are summarized in the following chart.

| OVERALL CAPITALIZATION RATES | | |
|---|---|---|
| Investment Type | OAR Range | Average |
| *RealtyRates.com - Retail (3rd Qtr. 2025)* | | |
| Retail | 5.91% -14.09% | 9.84% |
| Anchored | 5.91% -12.82% | 10.06% |
| Un-Anchored | 6.44% -14.09% | 10.72% |
| *PwC Strip Shopping Center (3rd Qtr. 2025)* | | |
| National Data | 5.50% -10.00% | 7.10% |
| **Indicated OAR:** | | **5.50% - 6.50%** |
| Compiled by CBRE | | |

The subject is considered to be a Class C property.

## Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE - CONCLUSION | |
|---|---|
| Source | Indicated OAR |
| Comparable Sales | 5.92%-6.60% |
| Published Surveys | 5.50% - 6.50% |
| Market Participants | 5.75% - 6.75% |
| **CBRE Estimate** | **6.25%** |
| Compiled by CBRE | |

Our concluded overall capitalization rate also considers recent events and prevailing market conditions with respect to capitalization rates. This includes the higher cost of capital that began in 2022 and recent rate cuts from the Federal Reserve. The cap rate conclusion also considers buyers' and sellers' sentiment around slow job growth and the potential for an economic downturn. While the overall long-term outlook for commercial real estate remains positive, the full effect of these factors may not yet be reflected in transactional data or may be lagging recent changes. Overall, the relative uncertainty has been considered with respect to our conclusion herein.

Income Capitalization Approach

## Direct Capitalization Summary

A summary of the direct capitalization is illustrated in the following chart.

| DIRECT CAPITALIZATION SUMMARY | | | |
|---|---|---|---|
| **Income** | | $/SF/Yr | Total |
| Potential Rental Income | | $43.67 | $212,242 |
| Vacancy & Credit Loss | 5.00% | (2.18) | (10,612) |
| **Net Rental Income** | | **$41.49** | **$201,630** |
| Expense Reimbursements | | 2.00 | 9,720 |
| Vacancy & Credit Loss | 5.00% | (0.10) | (486) |
| **Subtotal Effective Other Income** | | **$1.90** | **$9,234** |
| **Effective Gross Income** | | **$43.39** | **$210,864** |
| | | | |
| **Expenses** | | | |
| Real Estate Taxes | | $5.75 | 27,962 |
| Property Insurance | | 1.75 | 8,505 |
| Utilities | | 2.00 | 9,720 |
| Common Area Maintenance | | 2.50 | 12,150 |
| Management Fee | 3.00% | 1.30 | 6,326 |
| **Total Operating Expenses** | | **$13.31** | **$64,663** |
| **Operating Expense Ratio** | | | 30.67% |
| **Net Operating Income** | | **$30.08** | **$146,201** |
| **OAR** | | ÷ | **6.25%** |
| **Prospective As Stabilized Value** | April 20, 2026 | | **$2,339,211** |
| **Rounded** | | | **$2,350,000** |
| Lease-Up Discount | | | (227,311) |
| **As Is Value** | October 20, 2025 | | **$2,111,900** |
| **Rounded** | | | **$2,100,000** |
| **Value Per SF** | | | **$432.10** |
| | | | |
| **Matrix Analysis** | | **Cap Rate** | **Value** |
| | | 6.00% | $2,450,000 |
| | | 6.25% | $2,350,000 |
| | | 6.50% | $2,250,000 |

Compiled by CBRE

Income Capitalization Approach

## Lease-Up Deduction

The following lease-up deduction has been included in order to conclude to as-is value.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cost of Stabilization** | | | | | | | | | | | |
| Suite | Type | Market Rent/SF/ Year | Market Rent/SF/ Mo. | SF | Rent Loss (Months) | Rent Loss ($) | Rent Concessions (Months) | Rent Concessions | Leasing Commission (6%) | T.I.'s ($/SF) | T.I. ($) |
| 6 | Restaurant | $66.00 | $5.50 | 270 | 6 | $8,910 | 0 | $0 | $3,208 | $20 | $5,400 |
| 8 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 10 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 12 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 14 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 16 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 18 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 5 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 7 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 9 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 11 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 13 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 15 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 17 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 1 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| 3 | General Retail | $36.00 | $3.00 | 270 | 6 | $4,860 | 0 | $0 | $1,750 | $20 | $5,400 |
| | | | | | | $81,810 | | $0 | $29,452 | | $86,400 |

|  |  |
|---|---|
| **Subtotal** | $197,662 |
| Profit (15%) | $29,649 |
| **TOTAL COST OF STABILIZATION** | $227,311 |

# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| Appraisal Premise | Date of Value | Sales Comparison Approach | Income Approach | Reconciled Value |
|---|---|---|---|---|
| **SUMMARY OF VALUE CONCLUSIONS** | | | | |
| As Is | October 20, 2025 | $1,950,000 | $2,100,000 | $2,100,000 |
| Prospective As Stabilized | April 20, 2026 | $2,200,000 | $2,350,000 | $2,350,000 |
| Compiled by CBRE | | | | |

In the sales comparison approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known. The sales used in this analysis are considered comparable to the subject, and the required adjustments were based on reasonable and well-supported rationale. In addition, market participants are currently analyzing purchase prices on similar investor properties as they relate to available substitutes in the market. Therefore, the sales comparison approach is considered to provide a reliable value indication and has been given secondary emphasis in the final value reconciliation.

The income capitalization approach is applicable to the subject since it could be an income producing property leased in the open market. However, given the property's investor market segmentation, the results of the Income Capitalization Approach  is a reliable method in the valuation of the subject. Therefore, the results of the approach was given primary consideration disregarded in the final conclusion of value.

Based on the foregoing, the market value of the subject has been concluded as follows:

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| **MARKET VALUE CONCLUSION** | | | |
| As Is | Leased Fee Interest | October 20, 2025 | $2,100,000 |
| Prospective As Stabilized | Leased Fee Interest | April 20, 2026 | $2,350,000 |
| | | | |
| Liquidation Value | Fee Simple Estate | April 20, 2026 | $1,890,000 |
| Compiled by CBRE | | | |

# Liquidation Value

In addition to the As Is market value, the client has also requested an estimate of the Liquidation Value with an exposure time of six months or less.

The definition of liquidation value per the 7th Edition of the Dictionary of Real Estate Appraisal is as follows: The most probable price that a specified interest in property should bring under the following conditions:

- Consummation of sale within a short time period.

- The property is subjected to market conditions prevailing as of the date of valuation.

- Both the buyer and seller are acting prudently and knowledgeably.

- The seller is under extreme impulsion to sell.

- The buyer is typically motivated.

- Both parties are acting in what they consider to be their best interests.

- A normal marketing effort is not possible due to the brief exposure time.

- Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.

- The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

The exposure time estimate coinciding with the market value estimate previously provided is 6 to 9 months, based on the available historic data. However, given the lingering economic uncertainties and interviews with market participants suggest additional discounting would be warranted to facilitate a closed sale within the defined timeframe. Based on the foregoing, and our interviews with market participants during the appraisal process, a 10.00% discount is applied to the As Is market value to derive the requested liquidation value.

| Liquidation Value | | |
|---|---|---|
| As Is Market Value | | $2,100,000.00 |
| Less: Liquidation Sale Discount @ | -10% | ($210,000.00) |
| Estimated <6-Month Liquidation Sale Price | | $1,890,000.00 |
| Compiled by CBRE | | |

# Assumptions and Limiting Conditions

1. CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

2. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3. Unless otherwise expressly noted in the Report, CBRE has assumed that:

   (i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

   (ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

   (iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

   (iv) Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

   (v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

   (vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

   (vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

   (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently, nor super-efficiently.

   (ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

   (x) The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

   (xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property, nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report and any conclusions stated therein. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4.  CBRE has assumed that all documents, data and information furnished by or on behalf of the client, property owner or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report and any conclusions stated therein. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5.  CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including, without limitation, any termite inspection, survey or occupancy permit.

6.  All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7.  Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. This Report has been prepared in good faith, based on CBRE's current anecdotal and evidence-based views of the commercial real estate market. Although CBRE believes its views reflect market conditions on the date of this Report, they are subject to significant uncertainties and contingencies, many of which are beyond CBRE's control. In addition, many of CBRE's views are opinion and/or projections based on CBRE's subjective analyses of current market circumstances. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections. Further, other firms may have different opinions, projections and analyses, and actual market conditions in the future may cause CBRE's current views to later change or be incorrect. CBRE has no obligation to update its views herein if its opinions, projections, analyses or market circumstances later change.

8.  The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decision based upon the Report that the client, intended user, or any buyer, seller, investor, or landing institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9.  No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge including, but not limited to, environmental, social, and governance principles ("ESG"), beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10.  CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11.  Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12.  The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.

13.  The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14.  The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15.  The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

# Addenda

# Addendum A

## Comparable Data Sheets

© 2025 CBRE, INC

# Rental Survey    Office – Multi-Tenant    No. 8

| | |
|---|---|
| **Property Name** | Downtown Executive Plaza |
| **Address** | 1153-1159 Santee Street & 221 East 12th Street |
| | Los Angeles, CA 90015 |



| | |
|---|---|
| **County** | Los Angeles |
| **Govt./Tax ID** | N/A |
| **Net Rentable Area (NRA)** | N/A |
| **Condition** | N/A |
| **Number of Buildings** | N/A |
| **Parking Type/Ratio** | N/A/ N/A |
| **Year Built/Renovated** | 1989/ N/A |
| **Investment Class** | N/A |
| **Floor Count** | N/A |
| **Occupancy Type** | N/A |
| **Land Area Net** | N/A/ N/A |
| **Actual FAR** | N/A |
| **Zoning** | N/A |
| **Construction Class/ Type** | N/A/ N/A |
| **External Finish** | N/A |
| **Amenities** | N/A |

## Quoted Terms

| | | | |
|---|---|---|---|
| **Reimbursements** | N/A | **Rent Changes/Steps** | N/A |
| **Occupancy** | N/A | **TI Allowance** | N/A |
| **Tenant Size** | N/A | **Reimbursement Amount** | N/A |
| **Survey Date** | 10/2024 | **Annual Base Rent** | per sf |
| **Verification** | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Nil Shop | Retail | 890 | 36 | New | Jul 2024 | Modified Gross | 3% | 0.00 | $0.00 | $41.64 |

## Comments

This is a signed ground-floor retail lease rate. Lease was signed by Nil Shop, a 890 SF retail space, signed in July of 2024 at $41.64/SF/Yr, modified gross. The property rests along Santee Street, a two (2) lane secondary street. Surrounding development consists primarily of retail use.



## Rental Survey
### Retail - Misc. Free Standing Retail
## No. 1

| | |
|---|---|
| Property Name | Multitenant Retail |
| Address | 1216-1220 W 7th St<br>Los Angeles, CA 90017 |
| County | Los Angeles |
| Govt./Tax ID | 5143-009-009 |
| Gross Building Area (GBA) | 4,160 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Surface/ 2.40:1,000 sf |
| Year Built/Renovated | 1912/ N/A |
| Status | Existing |
| Floor Count | 1.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.170 ac/ 7,405 sf |
| Shape | Rectangular |



| | |
|---|---|
| Zoning | CW |
| Primary Traffic Count/ Location | 18,777 ADT / 7th Street |
| Investment Class | C |
| Construction Class/ Type | C/ Average |
| Exterior Finish | Concrete Block |

### Quoted Terms

| | | | |
|---|---|---|---|
| Reimbursements | Modified Gross | Rent Changes/Steps | N/A |
| Occupancy / In Line | 100% / 100% | TI Allowance | N/A |
| Tenant Size | 830 sf | Reimbursement Amount | N/A |
| Lease Term | 36 Mo(s). | Annual Base Rent | $56.40 per sf |
| Survey Date | 06/2025 | | |
| Verification | CoStar and Public Records | | |

### Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Hammy's Smash Burgers | Retail | 830 | 36 | New | Jun 2024 | Modified Gross | 3% | 0.00 | $0.00 | $56.40 |

### Comments

This comparable is a 4,160 SF multi-tenant retail property located at 1216-1220 W. 7th Street in Los Angeles. It was built in 1912 of concrete block construction. The most recent lease was signed for 830 SF of restaurant space at a rental rate of $56.40/sf/year ($4.70/sf/mo) on a modified gross basis for a three-year term. The tenant is Hammy's Smash Burger.



# Rental Survey    Retail - Misc. Free-standing Retail    No. 2

| | |
|---|---|
| **Property Name** | Retail Property |
| **Address** | 1487 W Sunset Boulevard<br>Los Angeles, CA 90026 |
| **County** | Los Angeles |
| **Govt./Tax ID** | N/A |
| **Gross Leasable Area (GLA)** | 14,799 sf |
| **Condition** | Good |
| **Number of Buildings** | 1 |
| **Parking Type/Ratio** | Surface/ 1.49:1,000 sf |
| **Year Built/Renovated** | 1922/ 2022 |
| **Status** | Existing |
| **Floor Count** | 1.00 |
| **Occupancy Type** | Multi-tenant |
| **Land Area Net** | 0.710 ac/ 30,928 sf |
| **Shape** | N/A |



| | |
|---|---|
| **Zoning** | N/A |
| **Primary Traffic Count/ Location** | N/A |
| **Investment Class** | N/A |
| **Construction Class/ Type** | N/A/ Average |
| **Exterior Finish** | N/A |

## Quoted Terms

| | | | |
|---|---|---|---|
| **Reimbursements** | NNN | **Rent Changes/Steps** | N/A |
| **Occupancy / In Line** | 81% / N/A | **TI Allowance** | N/A |
| **Tenant Size** | 1,000 sf | **Reimbursement Amount** | N/A |
| **Lease Term** | 60 Mo(s). | **Annual Base Rent** | $72.00 per sf |
| **Survey Date** | 02/2025 | | |
| **Verification** | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Slurpin' Ramen Bar | N/A | 1,926 | 120 | N/A | Apr 2024 | NNN | 3% | 0.00 | $55.00 | $72.00 |

## Comments

This is 1487 W Sunset Boulevard, a 14,799 SF retail property located in the Silverlake area of Los Angeles. The improvements were constructed in 1922, renovated in 2022 and were in good condition as of the date of value. The property exhibits 22 surface parking spaces.



# Rental Survey    Retail - Un-Anchored Retail Strip    No. 3

| | |
|---|---|
| **Property Name** | 2512 South Figueroa |
| **Address** | 2512-2540 S. Figueroa Street |
| | Los Angeles, CA 90007 |



| | |
|---|---|
| **County** | Los Angeles |
| **Govt./Tax ID** | 5124-027-016 |
| **Net Rentable Area (NRA)** | 19,838 sf |
| **Condition** | Average |
| **Number of Buildings** | 1 |
| **Parking Type/Ratio** | Surface/ 2.37:1,000 sf |
| **Year Built/Renovated** | 1982/ N/A |
| **Status** | Existing |
| **Floor Count** | 1.00 |
| **Occupancy Type** | Multi-tenant |
| **Land Area Net** | 0.940 ac/ 40,946 sf |
| **Shape** | Rectangular |

| | |
|---|---|
| **Zoning** | N/A |
| **Primary Traffic Count/ Location** | N/A |
| **Investment Class** | N/A |
| **Construction Class/ Type** | C/ Average |
| **Exterior Finish** | Concrete |

## Quoted Terms

| | | | | |
|---|---|---|---|---|
| **Reimbursements** | NNN | **Rent Changes/Steps** | N/Av | |
| **Occupancy / In Line** | 100% / 100% | **TI Allowance** | N/A | |
| **Tenant Size** | 1,350 sf | **Reimbursement Amount** | N/A | |
| **Lease Term** | N/A | **Annual Base Rent** | per sf | |
| **Survey Date** | 04/2024 | | | |
| **Verification** | CoStar and Public Records | | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Eggtuck | Retail | 1,350 | 120 | New | Mar 2024 | NNN | 3% | 0.00 | $0.00 | $75.00 |

## Comments

This is a one-story, multi-tenant strip retail center, anchored by 7-Eleven and Popeyes, located on the northeast corner of Figueroa Street and West Adams Boulevard, in the city of Los Angeles, Los Angeles County. More specifically, the street address is 2512-2540 S. Figueroa Street. The improvements were built in 1982 and consist of 19,838 square feet of net rentable area on a 0.94-acre site. Parking is provided at a ratio of 2.37 spaces per 1,000 square feet of building area.  The most recent lease signed at the property was for Unit 2528, containing 1,350 square feet, which was leased on March 2024 for a new 10 year lease agreement at a starting rental rate of $75.00 per square foot, NNN.



# Rental Survey
## Retail - Misc. Free-standing Retail
### No. 4

| | |
|---|---|
| **Property Name** | Mid-Rise Apartments (Retail Only) |
| **Address** | 752 South Main Street |
| | Los Angeles, CA 90014 |
| **County** | Los Angeles |
| **Govt./Tax ID** | 5145-001-012 |
| **Gross Leasable Area (GLA)** | N/A |
| **Condition** | N/A |
| **Number of Buildings** | 1 |
| **Parking Type/Ratio** | N/A/ N/A |
| **Year Built/Renovated** | 1910/ N/A |
| **Status** | Existing |
| **Floor Count** | N/A |
| **Occupancy Type** | Multi-tenant |
| **Land Area Net** | 0.623 ac/ 27,136 sf |
| **Shape** | Rectangular |



| | |
|---|---|
| **Zoning** | N/A |
| **Primary Traffic Count/ Location** | N/A |
| **Investment Class** | N/A |
| **Construction Class/ Type** | N/A/ N/A |
| **Exterior Finish** | N/A |

## Quoted Terms

| | | | |
|---|---|---|---|
| **Reimbursements** | N/A | **Rent Changes/Steps** | N/A |
| **Occupancy / In Line** | N/A% / N/A | **TI Allowance** | N/A |
| **Tenant Size** | N/A | **Reimbursement Amount** | N/A |
| **Lease Term** | N/A | **Annual Base Rent** | per sf |
| **Survey Date** | 10/2024 | | |
| **Verification** | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Picasso Pizza | Retail | 500 | 60 | New | Dec 2022 | Modified Gross | 3% | 0.00 | $0.00 | $60.00 |

## Comments

This is the executed lease to a Picasso Pizza for a 500 square foot in-line space at 752 South Main Street. The location is on the ground floor of a historic multi-family residential building. The lease was executed in November 2022 and commenced in December 2022. The term was 5 years.



# Rental Survey
## Retail - Misc. Free-standing Retail
## No. 5

| | |
|---|---|
| **Property Name** | 3rd & Traction |
| **Address** | 734-740 E. 3rd Street and 702 Traction Avenue |
| | Los Angeles, CA 90013 |
| **County** | Los Angeles |
| **Govt./Tax ID** | 5163-012-004 |
| **Gross Leasable Area (GLA)** | 10,923 sf |
| **Condition** | Good |
| **Number of Buildings** | 1 |
| **Parking Type/Ratio** | None/ N/A |
| **Year Built/Renovated** | 1946/ 2021 |
| **Status** | Existing |
| **Floor Count** | 1.00 |
| **Occupancy Type** | Multi-tenant |
| **Land Area Net** | 0.251 ac/ 10,923 sf |
| **Shape** | Irregular |



| | |
|---|---|
| **Zoning** | M3-1-RIO |
| **Primary Traffic Count/ Location** | 20,342 ADT / E 3rd St |
| **Investment Class** | N/A |
| **Construction Class/ Type** | C/ Good |
| **Exterior Finish** | Masonry |

## Quoted Terms

| | | | |
|---|---|---|---|
| **Reimbursements** | NNN | **Rent Changes/Steps** | Annual 3.0% |
| **Occupancy / In Line** | 100% / 100% | **TI Allowance** | N/A |
| **Tenant Size** | 846 - 5,234 sf | **Reimbursement Amount** | N/A |
| **Lease Term** | 60 Mo(s). | **Annual Base Rent** | $54.00 - $72.00 per sf |
| **Survey Date** | 09/2024 | | |
| **Verification** | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Sushi 715 | Retail | 2,333 | 60 | New | Jan 2022 | NNN | Annual 3.0% | 0.00 | $0.00 | $57.00 |

## Comments

This is 3rd & Traction, a multi-tenant storefront retail building located on the southwest corner of East 3rd Street and Traction Avenue, in the Arts District area of Downtown Los Angeles, Los Angeles County. The improvements were built in 1946 and consist of one building totaling 10,923 square feet of gross building area on a 0.251-acre site. There is no onsite parking. Recent leases range from $54.00 to $78.00 PSFY, triple net.



# Rental Survey

## Retail - Misc. Free-standing Retail

## No. 6

| | |
|---|---|
| Property Name | Retail Building |
| Address | 845 South Broadway<br>Los Angeles, CA 90014 |
| County | Los Angeles |
| Govt./Tax ID | 5144-017-038 |
| Gross Leasable Area (GLA) | 1,600 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Surface/ 1.88:1,000 sf |
| Year Built/Renovated | 2007/ N/A |
| Status | Existing |
| Floor Count | 1.00 |
| Occupancy Type | Single Tenant |
| Land Area Net | 0.450 ac/ 19,602 sf |
| Shape | Rectangular |



| | |
|---|---|
| Zoning | LAC5 |
| Primary Traffic Count/ Location | 24,981 ADT / S Broadway |
| Investment Class | B |
| Construction Class/ Type | B/ Average |
| Exterior Finish | Glass |

## Quoted Terms

| | | | |
|---|---|---|---|
| Reimbursements | NNN | Rent Changes/Steps | None |
| Occupancy / In Line | 100% / 100% | TI Allowance | $0.00 per sf |
| Tenant Size | 1,600 sf | Reimbursement Amount | N/A |
| Lease Term | 36 Mo(s). | Annual Base Rent | $37.44 per sf |
| Survey Date | 12/2024 | | |
| Verification | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Retail Tenant | Retail | 1,600 | 36 | New | Jan 2025 | NNN | None | 0.00 | $0.00 | $37.44 |

## Comments

This comparable is a 1,600-square-foot single-tenant retail property located at 845 South Broadway in the city of Los Angeles. The property was built in 2007 and is situated on a 0.45-acre site. The parking ratio is 1.88/1,000 sf. In December 2024 a lease was signed for 1,600 square feet of retail space at a rental rate of $37.44/sf/year ($3.12/sf/mo) with NNN reimbursements for a term of three years.



# Rental Survey

**Retail - Misc. Free-standing Retail**

**No. 7**

| | |
|---|---|
| Property Name | LA-Pico Plaza |
| Address | 1307 South Los Angeles Street (Fashion District) Los Angeles, CA 90015 |
| County | Los Angeles |
| Govt./Tax ID | 5133-011-019 |
| Gross Leasable Area (GLA) | 13,856 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Garage/ 9.02:1,000 sf |
| Year Built/Renovated | 1987/ N/A |
| Status | Existing |
| Floor Count | 3.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.378 ac/ 16,460 sf |
| Shape | Rectangular |



| | |
|---|---|
| Zoning | M2-2D |
| Primary Traffic Count/ Location | N/A |
| Investment Class | B |
| Construction Class/ Type | B/ Average |
| Exterior Finish | Masonry |

## Quoted Terms

| | | | | |
|---|---|---|---|---|
| Reimbursements | N/A | Rent Changes/Steps | N/A |
| Occupancy / In Line | N/A% / N/A | TI Allowance | N/A |
| Tenant Size | N/A | Reimbursement Amount | N/A |
| Lease Term | N/A | Annual Base Rent | per sf |
| Survey Date | 10/2024 | | |
| Verification | CoStar and Public Records | | |

## Actual Leases

| Tenant Name | Tenancy Use Type | Size (sf) | Term (Mo.) | Type of Lease | Start Date | Reimbs. | Rent Changes / Steps | Free Rent (Mo.) | TI Allowance per sf | Annual Base Rate per sf |
|---|---|---|---|---|---|---|---|---|---|---|
| Confidential Retail Tenant | Retail | 1,200 | 37 | New | Jul 2024 | Modified Gross | Not Disclosed | 0.00 | $0.00 | $35.04 |

## Comments

This is an executed first floor lease within the building located at 1301-1309 Los Angeles Street in the Fashion District of Downtown Los Angeles. It is a corner space (#1301) with a starting base rate of $2.92 PSF/month + utilities. It was on the market for one month before being signed to a 37-month term.



**Available/Listing**                 **Retail Neighborhood Community**          **No. 1**

| | | |
|---|---|---|
| Property Name | Freestanding Retail Building | |
| Address | 3251-3255 Beverly Boulevard | |
| | Los Angeles, CA 90057 | |

| | |
|---|---|
| County | Los Angeles |
| Govt./Tax ID | N/A |
| Gross Leasable Area (GLA) | 5,251 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Open/ 2.86:1,000 sf |
| Year Built/Renovated | 1980/ N/A |
| Status | Existing |
| Floor Count | 1.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.250 ac/ 10,890 sf |
| Land Area Gross | N/A/ N/A |
| Shape | Rectangular |
| Topography | Generally Level |
| Utilities | Adequate |
| Primary Frontage | 50 ft on Beverly Boulevard |
| Secondary Frontage | N/A |
| Actual FAR | 0.48 |

| | |
|---|---|
| Zoning | N/A |
| Primary Traffic Count/ Location | N/A |
| Construction Class/ Type | D/ Average |
| Exterior Finish | Stucco |
| Flood Zone Class | N/A |

## Transaction Details

| | | | |
|---|---|---|---|
| Type | Available/Listing | Primary Verification | N/A |
| Interest Transferred | Leased Fee | Transaction Date | 10/01/2025 |
| Condition of Sale | None | Recording Date | N/A |
| Recorded Buyer | N/A | Sale Price | $2,600,000 |
| Buyer Type | N/A | Financing | N/A |
| Recorded Seller | N/A | Cash Equivalent | $2,600,000 |
| Marketing Time | 24 Month(s) | Capital Adjustment | $0 |
| Listing Broker | N/A | % Interest Purchased | 100% |
| Doc # | N/A | Adjusted Price | $2,600,000 |
| | | **Adjusted Price / sf** | **$495.14** |
| Buyer's Primary Analysis | N/A | Retail Sales | N/A |
| Static Analysis Method | Trailing Actuals | Occupancy at Sale | N/A |
| Source | N/A | Underwritten Occupancy | N/A |
| NOI / sf | $32.68 | Potential Gross Income | N/A |
| IRR | N/A | Expenses | N/A |
| Cap Rate | 6.60% | Net Operating Income | $171,600 |

## Comments

This multi-tenant retail building is currently listed for sale at $2,600,000 ($495/SF) with a 6.60% cap rate. Located on Beverly Boulevard, a four-lane commercial thoroughfare, the property is surrounded primarily by retail uses along the main corridor, with residential development on adjacent two-lane secondary streets. The tenant mix consists of local businesses.



**Sale**      **Retail - Misc. Free-standing Retail**      **No. 2**

| | |
|---|---|
| Property Name | Century Plaza Retail |
| Address | 2157-2165 West Century Boulevard<br>Los Angeles, CA 90047 |
| County | Los Angeles |
| Govt./Tax ID | 6057-020-031 |
| Gross Leasable Area (GLA) | 5,826 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Surface/ 2.06:1,000 sf |
| Year Built/Renovated | 1985/ N/A |
| Status | Existing |
| Floor Count | 1.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.260 ac/ 11,326 sf |
| Land Area Gross | 0.260 ac/ 11,326 sf |
| Shape | Irregular |
| Topography | Generally Level |
| Utilities | At Site |
| Primary Frontage | 112 ft on Van Ness |
| Secondary Frontage | N/A |
| Actual FAR | 0.51 |



| | |
|---|---|
| Zoning | C2, Los Angeles |
| Primary Traffic Count/ Location | 34,820 ADT / West Century Boulevard |
| Construction Class/ Type | D/ Average |
| Exterior Finish | Stucco |
| Flood Zone Class | Zone X (Unshaded) |

## Transaction Details

| | | | |
|---|---|---|---|
| Type | Sale | Primary Verification | Public Records, CoStar |
| Interest Transferred | Leased Fee | Transaction Date | 05/07/2025 |
| Condition of Sale | None | Recording Date | N/A |
| Recorded Buyer | 2157 W Century, LLC | Sale Price | $2,575,000 |
| Buyer Type | Private Investor | Financing | Market Rate Financing |
| Recorded Seller | Century 2157 Llc | Cash Equivalent | $2,575,000 |
| Marketing Time | 4 Month(s) | Capital Adjustment | $0 |
| Listing Broker | Albert Blanck (319) 621-4997; Hildreth Real Estate Advisors | % Interest Purchased | 100% |
| Doc # | TBD | Adjusted Price | $2,575,000 |
| | | **Adjusted Price / sf** | **$441.98** |
| Buyer's Primary Analysis | Price and Capitalization Analyses | Retail Sales | N/A |
| Static Analysis Method | Trailing Actuals | Occupancy at Sale | 100% |
| Source | N/A | Underwritten Occupancy | N/A |
| NOI / sf | $28.86 | Potential Gross Income | N/A |
| IRR | N/A | Expenses | N/A |
| Cap Rate | 6.53% | Net Operating Income | $168,148 |

## Comments

This is the May 2025 sale of a 5,826 SF multi-tenant retail property located at 2157-2165 West Century Boulevard in Los Angeles. It was built in 1985 and is situated on a 0.26-acre site. The parking ratio is 2 per 1,000 SF. The property was on the market approximately four months, listed at $2,750,000, and sold for $2,575,000, or $442 per square foot with a 6.53% cap rate based on in-place income.



| Property Name | Storefront Retail |
|---|---|
| Address | 738 E. 12th Street |
| | Los Angeles, CA 90021 |
| County | Los Angeles |
| Govt./Tax ID | N/A |
| Gross Leasable Area (GLA) | 5,000 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | N/A/ N/A |
| Year Built/Renovated | 1964/ N/A |
| Status | N/A |
| Floor Count | 1.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.137 ac/ 5,976 sf |
| Land Area Gross | 0.137 ac/ 5,977 sf |
| Shape | N/A |
| Topography | Generally Level |
| Utilities | N/A |
| Primary Frontage | N/A |
| Secondary Frontage | N/A |
| Actual FAR | 0.84 |

| | |
|---|---|
| Zoning | N/A |
| Primary Traffic Count/ Location | N/A |
| Construction Class/ Type | N/A/ Average |
| Exterior Finish | N/A |
| Flood Zone Class | Zone X (Unshaded) |

## Transaction Details

| | | | |
|---|---|---|---|
| Type | Sale | Primary Verification | Public Records, Costar |
| Interest Transferred | Leased Fee | Transaction Date | 01/31/2025 |
| Condition of Sale | None | Recording Date | 02/07/2025 |
| Recorded Buyer | CANDYLANE HOLDINGS LLC | Sale Price | $2,050,000 |
| Buyer Type | N/A | Financing | Market Rate Financing |
| Recorded Seller | DAILEY ROMY | Cash Equivalent | $2,050,000 |
| Marketing Time | N/A | Capital Adjustment | $0 |
| Listing Broker | N/A | % Interest Purchased | 100% |
| Doc # | 78776 | Adjusted Price | $2,050,000 |
| | | **Adjusted Price / sf** | **$410.00** |
| Buyer's Primary Analysis | Price (Primary Unit of Comparison) | Retail Sales | N/A |
| Static Analysis Method | Trailing Actuals | Occupancy at Sale | 100% |
| Source | N/A | Underwritten Occupancy | N/A |
| NOI / sf | N/A | Potential Gross Income | N/A |
| IRR | N/A | Expenses | N/A |
| Cap Rate | 0.00% | Net Operating Income | N/A |

## Comments

This is the February 2025 sale of 738 E. 12th Street, a 5,000 SF freestanding retail property located in Downtown Los Angeles. The improvements were constructed in 1964 and were in average condition as of the date of survey. The property was 100% occupied at the time of sale. The sale price was $2,050,000 or $410 PSF.



| | | | |
|---|---|---|---|
| Property Name | 7-Eleven Center | | |
| Address | 728 West Vernon Avenue | | |
| | Los Angeles, CA 90037 | | |
| County | Los Angeles | | |
| Govt./Tax ID | 5018-032-032 | | |
| Net Rentable Area (NRA) | 6,300 sf | | |
| Condition | Average | | |
| Number of Buildings | 1 | | |
| Parking Type/Ratio | Surface/ 4.76:1,000 sf | | |
| Year Built/Renovated | 2000/ N/A | | |
| Status | Existing | | |
| Floor Count | 1.00 | | |
| Occupancy Type | Multi-tenant | | |
| Land Area Net | 0.490 ac/ 21,365 sf | | |
| Land Area Gross | N/A/ N/A | | |
| Shape | Rectangular | | |
| Topography | Generally Level | Zoning | N/A |
| Utilities | N/A | Primary Traffic Count/ Location | 14,837 ADT / S. Hoover Street |
| Primary Frontage | N/A | Construction Class/ Type | D/ Average |
| Secondary Frontage | N/A | Exterior Finish | Stucco |
| Actual FAR | 0.29 | Flood Zone Class | Zone X (Shaded) |
| Key Tenant(s) | 7-Eleven | | |



## Transaction Details

| | | | |
|---|---|---|---|
| Type | Sale | Primary Verification | Broker |
| Interest Transferred | Leased Fee | Transaction Date | 05/01/2024 |
| Condition of Sale | None | Recording Date | N/A |
| Recorded Buyer | Ahmad Cahla Plaza LLC | Sale Price | $3,500,000 |
| Buyer Type | Private Investor | Financing | Not Available |
| Recorded Seller | 4M Red Maple LLC | Cash Equivalent | $3,500,000 |
| Marketing Time | 3 Month(s) | Capital Adjustment | $0 |
| Listing Broker | Lance Mordachini / Progressive Real Estate Partners | % Interest Purchased | 100% |
| Doc # | 24-0275072 | Adjusted Price | $3,500,000 |
| | | **Adjusted Price / sf** | **$555.56** |
| Buyer's Primary Analysis | Static Capitalization Analysis | Retail Sales | N/A |
| Static Analysis Method | Trailing Actuals | Occupancy at Sale | 100% |
| Source | Broker | Underwritten Occupancy | 100% |
| NOI / sf | $32.91 | Potential Gross Income | $308,118 |
| IRR | N/A | Expenses | $100,807 |
| Cap Rate | 5.92% | Net Operating Income | $207,311 |

## Comments

This is a 6,300 square foot strip shopping center located at 728 West Vernon Avenue in the city of Los Angeles. The property was built in 2000 and the parking ratio is 4.76 spaces per 1,000 square feet of building area. The property was fully occupied and tenants include 4M Laundry, Boost Mobile, and 7-Eleven. The property also has a signage lease at $125 per month. The property is listed for sale at $3,455,000 or $548 per square foot for approximately three months. The property sold in May 2024 for $3,500,000 or $555 per square foot. The capitalization rate based on in-place income is 5.92%.



# Sale

**Retail - Un-Anchored Retail Strip** **No. 5**

| | |
|---|---|
| Property Name | Multi-Tenant Strip Center |
| Address | 11038 S. Inglewood Avenue Inglewood, CA 90304 |
| | |
| County | Los Angeles |
| Govt./Tax ID | 4037-002-026 |
| Gross Leasable Area (GLA) | 6,443 sf |
| Condition | Average |
| Number of Buildings | 1 |
| Parking Type/Ratio | Surface/ 3.88:1,000 sf |
| Year Built/Renovated | 1967/ N/A |
| Status | Demolished |
| Floor Count | 1.00 |
| Occupancy Type | Multi-tenant |
| Land Area Net | 0.438 ac/ 19,090 sf |
| Land Area Gross | 0.438 ac/ 19,090 sf |
| Shape | Irregular |

| | | | |
|---|---|---|---|
| Topography | Level, At Street Grade | Zoning | C-2, Neighborhood Business |
| Utilities | Available | Primary Traffic Count/ Location | N/A |
| Primary Frontage | 129 ft on Inglewood Avenue | Construction Class/ Type | C/ Average |
| Secondary Frontage | 126 ft on 111th Street | Exterior Finish | Masonry |
| Actual FAR | 0.34 | Flood Zone Class | Zone X (Unshaded) |

## Transaction Details

| | | | |
|---|---|---|---|
| Type | Sale | Primary Verification | Secondary Verification via Tax Records/Deeds/Assessor's Maps |
| Interest Transferred | Leased Fee | Transaction Date | 08/25/2023 |
| Condition of Sale | None | Recording Date | 08/25/2023 |
| Recorded Buyer | Millo Plaza LLC, a California Limited Liability Company | Sale Price | $2,657,500 |
| Buyer Type | End User | Financing | Cash to Seller |
| Recorded Seller | Paul P. Keys, Trustee of The Paul P. Keys Living Trust dated November 14, 1987 | Cash Equivalent | $2,657,500 |
| Marketing Time | N/A | Capital Adjustment | $0 |
| Listing Broker | N/A | % Interest Purchased | 100% |
| Doc # | 567195 | Adjusted Price | $2,657,500 |
| | | **Adjusted Price / sf** | **$412.46** |
| Buyer's Primary Analysis | Other | Retail Sales | N/A |
| Static Analysis Method | Other (see comments) | Occupancy at Sale | 100% |
| Source | N/A | Underwritten Occupancy | N/A |
| NOI / sf | N/A | Potential Gross Income | N/A |
| IRR | N/A | Expenses | N/A |
| Cap Rate | 0.00% | Net Operating Income | N/A |

## Comments

This represents the sale of a 6,443-square foot, retail strip center building located at 11038 S. Inglewood Avenue in the city of Inglewood. The building was constructed in 1967 and is improved upon a 0.42 acre site. There are a reported 25 surface parking spaces making for a 3.88 parking ratio per 1,000 SF. The property sold in August 2023 for $2,657,500 or $412/SF. The property was 100% occupied at the time of sale and the buyer is a partial owner/user and existing tenant. The tenant/buyer is a retailer called Carniceria Guadalajara that has a meat market and restaurant located on-site. There was no reported income to derive a capitalization rate from the sale.



# Sale

## Retail - Un-Anchored Retail Strip

**No. 6**

| | |
|---|---|
| **Property Name** | Multi Tenant Retail KTown |
| **Address** | 3428-3444 W 8th St |
| | Los Angeles, CA 90005 |
| | |
| **County** | Los Angeles |
| **Govt./Tax ID** | N/A |
| **Gross Building Area (GBA)** | 7,670 sf |
| **Condition** | Average |
| **Number of Buildings** | 1 |
| **Parking Type/Ratio** | Surface/ 3.13:1,000 sf |
| **Year Built/Renovated** | 1942/ N/A |
| **Status** | Existing |
| **Floor Count** | 2.00 |
| **Occupancy Type** | Multi-tenant |
| **Land Area Net** | 0.280 ac/ 12,197 sf |
| **Land Area Gross** | 0.280 ac/ 12,197 sf |
| **Shape** | Rectangular |
| **Topography** | Generally Level |
| **Utilities** | All to site |
| **Primary Frontage** | 282 ft on W 8th St |
| **Secondary Frontage** | N/A |
| **Actual FAR** | 0.63 |



| | |
|---|---|
| **Zoning** | C2 |
| **Primary Traffic Count/ Location** | 15,239 ADT / W 8th St |
| **Construction Class/ Type** | C/ Average |
| **Exterior Finish** | Stucco |
| **Flood Zone Class** | N/A |

## Transaction Details

| | | | |
|---|---|---|---|
| **Type** | Sale | **Primary Verification** | Public records, Grant Deed |
| **Interest Transferred** | Leased Fee | **Transaction Date** | 06/12/2023 |
| **Condition of Sale** | None | **Recording Date** | N/A |
| **Recorded Buyer** | Myi Star LLC | **Sale Price** | $3,700,000 |
| **Buyer Type** | Private Investor | **Financing** | Market Rate Financing |
| **Recorded Seller** | Admiral William M Lawson Maritime Trust | **Cash Equivalent** | $3,700,000 |
| **Marketing Time** | N/A | **Capital Adjustment** | $0 |
| **Listing Broker** | N/A | **% Interest Purchased** | 100% |
| **Doc #** | 0380466 | **Adjusted Price** | $3,700,000 |
| | | **Adjusted Price / sf** | **$482.40** |
| **Buyer's Primary Analysis** | Static and Yield Capitalization Analyses | **Retail Sales** | N/A |
| **Static Analysis Method** | Trailing Actuals | **Occupancy at Sale** | 67% |
| **Source** | N/A | **Underwritten Occupancy** | N/A |
| **NOI / sf** | N/A | **Potential Gross Income** | N/A |
| **IRR** | N/A | **Expenses** | N/A |
| **Cap Rate** | 0.00% | **Net Operating Income** | N/A |

## Comments

The Admiral William M Lawson Maritime Trust sold this 7,670 SF Class B General Retail Building to Myi Star LLC for $3,700,000.The building which was built in 1942 is located in the heart of Koreatown. The property had 2,542 SF available for lease at the time of sale. The property consists of multiple tenant spaces with tenants that are local in nature and consist of a restaurant and beauty salon.



# Addendum B

## Lease Contract

## AMENDMENT TO Commercial Tenant LEASE AGREEMENT

THIS AMENDMENT TO Air Commercial Real Estate Association Standard Industrial/ Commercial Multi-Tenant Lease- Gross AGREEMENT (this "Amendment") is entered into as of January 18, 2018, by and between SLA Investments, LLC("Assignor/Lessor") and Earth Bean Coffee, LLC ("Lessee").

### R E C I T A L S :

A.      Lessee has previously entered into that certain Lease dated February 12, 2017 as amended on April 19, 2017 by the first amendment to lease (the "Lease) under which Lessee has leased the premises known as 1040 S. Los Angeles Street #1 & 2, Los Angeles, CA 90015 (the"Premises") from Assignor/Lessor.

### W I T N E S S E T H :

WHEREAS, the parties wish to amend the above described Lease;

NOW, THEREFORE, the parties agree to the following:

AMENDMENTS.

1.      Assignor/Lessor, SLA Investments, LLC, shall be known
as the Lessor ("Lessor") of subject property.

2.      It is agreed by both Lessor and Lessee that subject lease agreement shall
become a Sub-Lease ("Sub-Lease") of that certain lease agreement between
Lessor, SLA Investments, LLC, and Sienna Rose, Inc. dated January 18, 2018 (the
"Master Lease").

3.      Sienna Rose, Inc. shall now be known as the Lessee ("Lessee").

4.      Sienna Rose, Inc., as Lessee shall also become a Sub-Lessor ("Lessee/Sub-
Lessor") and will sub-lease to Earth Bean Coffee, LLC, as Sub-Lessee ("Sub-
Lessee").

ALL OTHER TERMS AND CONDITIONS OF SAID LEASE SHALL REMAIN THE SAME.

IN WITNESS WHEREOF, this Amendment has been executed as of the day and year first set forth above.

LESSOR:                                              LESSEE/SUB-LESSOR:
SLA Investments, LLC                                 Sienna Rose, Inc.

By: _____                           By: _____
Alan D. Gomperts, Manager                                    Sue Halevy, President

SUB-LESSEE:
Earth Bean Coffee, LLC

By: DAVID LECLERC
Name:_____
Title:_____



## __First__ AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE is made and entered into as of _____ April 19, 2017 _____ , by and between
___ SLA Investments, LLC ___ ("Lessor") and
___ Earth Bean Coffee, LLC ___ ("Lessee").

WHEREAS, on or about ___ February 12, 2017 ___ a Lease was entered into by and between Lessor and Lessee relating to certain real property commonly known as: 1040 S Los Angeles Street, Los Angeles, CA 90015 ___ (the "Premises"), and

WHEREAS, Lessor and Lessee ☐ have ☒ have not previously amended said Lease, and

WHEREAS, the Lessor and Lessee now desire to amend said Lease,

NOW, THEREFORE, for payment of TEN DOLLARS and other good and valuable consideration to Lessor, the receipt and sufficiency of which is hereby acknowledged, the parties mutually agree to make the following additions and modifications to the Lease:

☐   TERM: The Expiration Date is hereby ☐ advanced ☐ extended to _____ .

☐   AGREED USE: The Agreed Use is hereby modified to: _____
_____ .

☒   BASE RENT ADJUSTMENT: Monthly Base Rent shall be as follows: $3600 per month (Base Year)
_____
_____
_____
_____

☒   Other: 1. The premises is the 2 front units on the North (facing Los Angeles St.)
2. Rent escalations are 3% annually
3. Security deposit is increased to $3600
4. Rent shall be abated for four months
5. Rent commencement shall start on 8/20/2017

This Amendment shall not be construed against the party preparing it, but shall be construed as if all Parties jointly prepared this Amendment and any uncertainty and ambiguity shall not be interpreted against any one party.

All other terms and conditions of the Agreement shall remain unchanged and shall continue in full force and effect except as specifically amended herein.

INITIALS                     PAGE 1 OF 2                     INITIALS

©2006 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                     FORM ATL-0-7/06E

JWJ Realty, 152 Oakhurst Dr. Beverly Hills, CA 90212
Phone: 310-617-6356      Fax:              JWJ Realty                     1040 Los Angeles
                Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

EXECUTED as of the day and year first above written.

By LESSOR:
SLA Investments, LLC

By: _Alan Gompers_
Name Printed: _Alan Gompers_
Title: _Manager_

By: _____
Name Printed: _____
Title: _____

By LESSEE:
Earth Bean Coffee, LLC

By: _JP Joan Pino_
Name Printed: _JOAN PINO_
Title: _____

By: _____
Name Printed: _David Laclerc_
Title: _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203. Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

INITIALS
_____

INITIALS
_____

©2006 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM ATL-0-7/06E

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

1040 Los Angeles



# AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL
## MULTI-TENANT LEASE - GROSS

1. **Basic Provisions ("Basic Provisions").**

   1.1   Parties: This Lease ("Lease"), dated for reference purposes only _____ **February 12, 2017** _____ ,
is made by and between **SLA Investments, LLC** _____

_____

_____ ("Lessor")

and **Earth Bean Coffee, LLC** _____

_____

_____ ("Lessee"), (collectively the "Parties", or individually a "Party").

   1.2(a)  Premises: That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor
under the terms of this Lease, commonly known by the street address of _____ **1040 S. Los Angeles Street** _____ ,
located in the City of _____ **Los Angeles** _____ , County of _____ **Los Angeles** _____ ,
State of _____ **CA** _____ , with zip code ____ **90015** ____ , as outlined on Exhibit _____ attached
hereto ("Premises") and generally described as (describe briefly the nature of the Premises): **+/- 270 SF Commercial space, 3rd**
**unit from the front (Los Angeles St.) on the south side**

_____

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility
raceways of the building containing the Premises ("Building") and to the Common Areas (as defined in Paragraph 2.7 below), but shall not have
any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the
land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See
also Paragraph 2)

   1.2(b)  Parking: _____ **0** _____ unreserved vehicle parking spaces. (See also Paragraph 2.6)

   1.3   Term: ____ **5** ____ years and ____ **0** ____ months ("Original Term") commencing _____ **March 1, 2017** _____
("Commencement Date") and ending ____ **February 28, 2022** ____ ("Expiration Date"). (See also Paragraph 3)

   1.4   Early Possession: If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
**February 14, 2017** ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

   1.5   Base Rent: $ **1,700.00** _____ per month ("Base Rent"), payable on the **1st** _____
day of each month commencing _____ **June 1, 2017** _____ . (See also Paragraph 4)

☒ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

   1.6   Lessee's Share of Common Area Operating Expenses: _____ **0** _____ percent ( _____ %) ("Lessee's
Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's
Share to reflect such modification.

   1.7   Base Rent and Other Monies Paid Upon Execution:

     (a)   Base Rent: $ **1,700.00** _____ for the period **June 1, 2017- June 30, 2017** _____ .

     (b)   Common Area Operating Expenses: $ _____ for the period _____ .

     (c)   Security Deposit: $ **1,700.00** _____ ("Security Deposit"). (See also Paragraph 5)

     (d)   Other: $ _____ for _____ .

     (e)   Total Due Upon Execution of this Lease: $ **3,400.00** _____ .

   1.8   Agreed Use: **Coffee roasting and coffee sales per permits and zoning** _____

_____

_____

_____ . (See also Paragraph 6)

**PAGE 1 OF 20**

**INITIALS**

**INITIALS**

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION               **FORM MTG-22-09/16E**
The Passman Group, Inc, 9025 Wilshire Blvd #200 Beverly Hills, CA 90211
Phone: (310) 859-8160    Fax:        TPG Estates               1040 S Los
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

# Addendum C

## Rent Roll

| Property Address: | City: | State: | Zip Code: | Total # of Units: | # Vacant Units |
|---|---|---|---|---|---|
| 1040 S. Los Angeles Street | Los Angeles | CA | 90015 | 18 | 18 |

| Unit # | Tenant | Sq. Feet | Current Rent | Rent/SF | NNN or Gross | Lease Start Date | Lease End Date | Options to Extend | Security Deposit | Utilities | Total Rent | Rent Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Earth Bean Coffee | 270 | 2,025.92 | $ 7.50 | Gross | 6/1/2018 | 5/31/2028 | no | 1,800.00 | $ 100.00 | $ 2,125.92 | 3% increase annually June 1, 2019 |
| 4 | Earth Bean Coffee | 270 | 2,025.92 | $ 7.50 | Gross | 6/1/2018 | 5/31/2028 | no | 1,800.00 | $ 100.00 | $ 2,125.92 | 3% increase annually June 1, 2019 |
| 6 | Earth Bean Coffee | 270 | 770.00 | $ 2.85 | Gross | M-T-M | M-T-M | | | $ - | $ 770.00 | storage |
| 8 | Pirate World - David Garay | 270 | 1,000.00 | $ 3.70 | Gross | M-T-M | M-T-M | | 1,000.00 | $ - | $ 1,000.00 | |
| 10 | Saul Good and David Garay | 270 | 500.00 | $ 1.85 | Gross | M-T-M | M-T-M | | 500.00 | $ - | $ 500.00 | Storage |
| 12 | Tailor - Juliana Sanchez | 270 | 1,000.00 | $ 3.70 | Gross | 3/1/2022 | 8/31/2022 | M-T-M | 1,000.00 | $ - | $ 1,000.00 | |
| 14 | Pirate World - David Garay | 270 | 800.00 | $ 2.96 | Gross | M-T-M | | | - | $ - | $ 800.00 | |
| 16 | The Miracle Lifestyle - Miracle Watts | 270 | 1,000.00 | $ 3.70 | Gross | 5/1/2022 | 10/31/2022 | M-T-M | 2,000.00 | $ - | $ 1,000.00 | |
| 18 | Secret Spot | 270 | 800.00 | $ 2.96 | Gross | 9/1/2025 | M-T-M | | | $ - | $ 800.00 | |
| 1 | Vacant | 270 | | | | | | | - | $ - | $ - | |
| 3 | Vacant | 270 | | | | | | | - | $ - | $ - | |
| 5 | Secret Spot | 270 | 800.00 | $ 2.96 | Gross | 1/1/2022 | 3/31/2022 | M-T-M | - | $ - | $ 800.00 | |
| 7 | Secret Spot | 270 | 1,000.00 | $ 3.70 | Gross | 11/1/2022 | 4/30/2024 | M-T-M | 2,000.00 | $ - | $ 1,000.00 | |
| 9 | Secret Spot | 270 | 800.00 | $ 2.96 | Gross | 3/1/2025 | M-T-M | | | $ - | $ 800.00 | |
| 11 | Tailor - Juliana Sanchez | 270 | 1,000.00 | $ 3.70 | Gross | 3/1/2022 | 8/31/2022 | M-T-M | 900.00 | $ - | $ 1,000.00 | |
| 13 | Instant Bae LA, LLC Nya | 270 | 1,000.00 | $ 3.70 | Gross | 3/15/2022 | 9/30/2022 | M-T-M | 2,000.00 | $ - | $ 1,000.00 | |
| 15 | Pirate World - David Garay | 270 | 550.00 | $ 2.04 | Gross | 1/1/2025 | M-T-M | | | $ - | $ 550.00 | |
| 17 | Saul Good Global, LLC - Saul Good | 270 | 1,000.00 | $ 3.70 | Gross | 2/1/2020 | 2/28/2022 | M-T-M | 2,000.00 | $ - | $ 1,000.00 | |
| | | | | | | | | | | | $ 16,271.84 | |

| | | Notes: |
|---|---|---|
| Total Square Footage | 4,860 | |
| Monthly Current Rent: | $ 16,072 | |
| Monthly Other Charges: | $ - | |
| | | |
| TOTAL GROSS MONTHLY INCOME: | $ 16,072 | |
| TOTAL GROSS ANNUAL INCOME: | $ 192,862 | |

Note Tenant is paying $2,300/month until business improves. We are accruing the difference.

# Addendum D

## Operating Data

**SLA Investments, LLC**

## Preliminary Profit & Loss

**January through December 2022**

|  | Jan - Dec 22 |
|---|---:|
| **Ordinary Income/Expense** | |
|   **Income** | |
|     **Rental Income** | 125,563.28 |
|   **Total Income** | 125,563.28 |
|   **Expense** | |
|     **Amortization expense** | 7,235.00 |
|     **Bank Service Charges** | 15.00 |
|     **Depreciation Expense** | 25,067.00 |
|     **Franchise taxes paid** | 800.00 |
|     **Insurance Expense** | 4,482.25 |
|     **Interest Expense** | 127,924.09 |
|     **Repairs and Maintenance** | 5,604.34 |
|     **Taxes - Property** | 17,825.22 |
|     **Utilities** | 6,248.36 |
|   **Total Expense** | 195,201.26 |
|   **Net Ordinary Income** | -69,637.98 |
| **Net Income** | **-69,637.98** |

**SLA Investments, LLC**
## Preliminary Profit & Loss
**January through December 2023**

|  | Jan - Dec 23 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | 150,338.75 |
| **Total Income** | 150,338.75 |
| **Expense** | |
| **Amortization expense** | 7,235.00 |
| **Bank Service Charges** | 0.00 |
| **Depreciation Expense** | 29,948.00 |
| **Franchise taxes paid** | 800.00 |
| **Insurance Expense** | 4,853.82 |
| **Interest Expense** | 221,104.17 |
| **Professional Fees** | 2,050.00 |
| **Repairs and Maintenance** | 7,000.00 |
| **Taxes - Property** | 0.00 |
| **Utilities** | 951.81 |
| **Total Expense** | 273,942.80 |
| **Net Ordinary Income** | -123,604.05 |
| **Net Income** | **-123,604.05** |

## January through December 2024

|  | Jan - Dec 24 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | 129,325.00 |
| **Total Income** | 129,325.00 |
| **Expense** | |
| **Bank Service Charges** | 0.00 |
| **Franchise taxes paid** | 800.00 |
| **Insurance Expense** | 6,111.97 |
| **Interest Expense** | 30,648.46 |
| **Office Supplies** | 57.94 |
| **Repairs and Maintenance** | 10,939.74 |
| **Taxes and Licenses** | 918.78 |
| **Utilities** | 11,974.12 |
| **Total Expense** | 61,451.01 |
| **Net Ordinary Income** | 67,873.99 |
| **Net Income** | **67,873.99** |

**SLA Investments, LLC**

## Preliminary Profit & Loss

**January through September 2025**

|  | Jan - Sep 25 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | 99,475.00 |
| **Total Income** | 99,475.00 |
| **Expense** | |
| **Bank Service Charges** | 0.00 |
| **Insurance Expense** | 6,689.33 |
| **Interest Expense** | 45,075.00 |
| **Repairs and Maintenance** | 14,644.25 |
| **Taxes and Licenses** | 919.10 |
| **Utilities** | 23,646.37 |
| **Total Expense** | 90,974.05 |
| **Net Ordinary Income** | 8,500.95 |
| **Net Income** | **8,500.95** |

# Addendum E

## Tax Bill

 © 2025 CBRE, INC

# ANNUAL SECURED PROPERTY TAX BILL
### CITIES, COUNTY, SCHOOLS AND ALL OTHER TAXING AGENCIES IN LOS ANGELES COUNTY
## SECURED PROPERTY TAX FOR FISCAL YEAR JULY 1, 2025 TO JUNE 30, 2026
#### ELIZABETH BUENROSTRO GINSBERG, TREASURER AND TAX COLLECTOR
FOR ASSISTANCE, CALL 1(213) 974-2111 OR 1(888) 807-2111, ON THE WEB AT propertytax.lacounty.gov

**DETAIL OF TAXES DUE FOR**  5145 020 057  25 000  51

| ASSESSOR'S ID. NO. | YR | SEQ | CK |
| --- | --- | --- | --- |

| AGENCY | AGENCY PHONE NO. | RATE | AMOUNT |
| --- | --- | --- | --- |
| GENERAL TAX LEVY | | | |
| ALL AGENCIES | | 1.000000 | $ 30,464.06 |
| | | | |
| **VOTED INDEBTEDNESS** | | | |
| CITY-LOS ANGELES | | .012232 | $ 372.63 |
| METRO WATER DIST | | .007000 | 213.25 |
| COMMNTY COLLEGE | | .048543 | 1,478.82 |
| UNIFIED SCHOOLS | | .119605 | 3,643.65 |
| | | | |
| **DIRECT ASSESSMENTS** | | | |
| SAFE CLEAN WATER | (833) 275-7297 | $ | 169.10 |
| LACO VECTR CNTRL | (800) 273-5167 | | 19.27 |
| FSHN DIST BID | (213) 725-3373 | | 2,218.14 |
| FLOOD CONTROL | (626) 979-5498 | | 58.56 |
| CITY LT MAINT | (213) 847-1821 | | 85.72 |
| LA STORMWATER | (213) 485-4094 | | 46.68 |
| LACITY PARK DIST | (213) 485-4795 | | 27.26 |
| RPOSD MEASURE A | (833) 265-2600 | | 93.68 |
| TRAUMA/EMERG SRV | (866) 587-2862 | | 309.01 |

## PROPERTY IDENTIFICATION
ASSESSOR'S ID.NO.: 5145 020 057 25 000

OWNER OF RECORD AS OF JANUARY 1, 2025
NOT AVAILABLE ONLINE

## MAILING ADDRESS
0058809-0058809 PDFEC 001 1234-- 831487

ASSESSEE NAME AND ADDRESS ARE NOT
AVAILABLE ONLINE PER CA GOV CODE §6254.21

**Save Money – Save Time – Pay Online**
ltc.lacounty.gov
**Electronic Payment Information**
**(Required for Online and Telephone Payments)**
ID#:19 5145 020 057 4 YEAR:25 SEQUENCE:000 1
**Personal Identification Number (PIN)**
PIN:  3YUHAN

## SPECIAL INFORMATION

DELINQUENT TAX INFORMATION:
YOU OWE BACK TAXES WHICH MAY RESULT IN YOUR
PROPERTY BEING SOLD.  THE AMOUNT OWING FOR
PRIOR YEARS IS NOT INCLUDED IN THIS STATEMENT.
PLEASE CONTACT US IMMEDIATELY TO DISCUSS
YOUR PAYMENT OPTIONS.

## PROPERTY LOCATION AND/OR PROPERTY DESCRIPTION
1040 S LOS ANGELES ST        LOS ANGELE
O W CHILDS TRACT EX OF ST LOT 4 BLK 4

## ASSESSOR'S REGIONAL OFFICE
REGION #23 INDEX:        TRA:13263
C/I CENTRAL
500 W TEMPLE STREET RM. 180
LOS ANGELES CA 90012
(213)974-3108

ACCT. NO.:        PRINT NO.: 298809 BILL ID.:

**VALUATION INFORMATION**

| ROLL YEAR 25-26 | CURRENT ASSESSED VALUE | TAXABLE VALUE |
| --- | --- | --- |
| LAND | 1,935,033 | 1,935,033 |
| IMPROVEMENTS | 1,111,373 | 1,111,373 |
| | | |
| TOTAL | | 3,046,406 |
| LESS EXEMPTION: | | |
| NET TAXABLE VALUE | | 3,046,406 |

| **1ST** | **$19,599.92** | **2ND** | **$19,599.91** | **1ST + 2ND** | **$39,199.83** |
| --- | --- | --- | --- | --- | --- |
| | DUE NOVEMBER 1, 2025 (After December 10, 2025, add 10% penalty) | | DUE FEBRUARY 1, 2026 (After April 10, 2026, add 10% penalty and $10 cost) | | IF PAYING BOTH BY DECEMBER 10, 2025 (Include 1st & 2nd stubs if paying by mail) |

ANY RETURNED PAYMENT MAY BE SUBJECT TO A FEE UP TO $50.00.        SEE REVERSE SIDE FOR MORE INFORMATION.

---

**DETACH AND MAIL WITH YOUR PAYMENT**
**SAVE MONEY! SAVE TIME! PAY ONLINE!**

PRIOR DELINQUENCY    **ANNUAL**    **2025**

ASSESSEE NAME AND ADDRESS ARE NOT
AVAILABLE ONLINE PER CA GOV CODE
§6254.21

| ASSESSOR'S ID. NO. | YR | SEQ | CK | PK |
| --- | --- | --- | --- | --- |
| 5145 020 057 | 25 000 | 51 | | 2 |

**2ND INSTALLMENT DUE**        INDICATE AMOUNT PAID

2ND Installment Taxes due Feb. 1 and must ------------>  **$19,599.91**
be received or USPS Postmarked by April 10
*If received or postmarked after, include
10% penalty and $10 cost*

**MAKE PAYMENT PAYABLE TO:**
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

41536

2642500001514502005700019599910002156990536204I0

## 2ND

---

**DETACH AND MAIL WITH YOUR PAYMENT**
**SAVE MONEY! SAVE TIME! PAY ONLINE!**

PRIOR DELINQUENCY    **ANNUAL**    **2025**

ASSESSEE NAME AND ADDRESS ARE NOT
AVAILABLE ONLINE PER CA GOV CODE
§6254.21

| ASSESSOR'S ID. NO. | YR | SEQ | CK | PK |
| --- | --- | --- | --- | --- |
| 5145 020 057 | 25 000 | 51 | | 1 |

**1ST INSTALLMENT DUE**        INDICATE AMOUNT PAID

1ST Installment Taxes due Nov. 1 and must ------------>  **$19,599.92**
be received or USPS Postmarked by December 10
*If received or postmarked after, include
10% penalty*

**MAKE PAYMENT PAYABLE TO:**
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

51549

2552500001514502005700019599920021559915491121O

## 1ST

**FOR MAILING ADDRESS CHANGE**
PLEASE SEE REVERSE SIDE OF THIS
PAYMENT COUPON.

# Addendum F

## Client Contract Information

© 2025 CBRE, INC

**harvest**
small business finance

9/30/2025

Nick Barwig
CBRE
Nick.Barwig

_____

**RE:    Loan Name: Sienna Rose      Loan Number: 40000320**

Dear Nick,

This Letter of Engagement confirms the selection of your appraisal firm to develop an appraisal report to assist Harvest Small Business Finance in making a credit decision in a real estate related transaction, subject to the following terms and conditions:

The parties expressly agree that no limitations on liability recovery will attach from the performance of the scope of work contemplated by this engagement agreement. This engagement agreement constitutes the entire contract for the engagement and any modifications to this contract must be in a written form signed by both parties.

| | |
|---|---|
| **Loan Name:** | **Include the above loan name and loan number on the title page of the appraisal.** |
| Intended Users: | The report must be addressed to Harvest Small Business Finance LLC and the U.S. Small Business Administration. |
| Property Address: | 1040 S. Los Angeles St., Los Angeles, CA 90015 |
| Description: | The subject property is a retail property consisting of approximately 6,480 Square Feet. |
| Hotels & Restaurants: | Please identify properties that have changed ownership within 3 years as soon as practical. Harvest must perform either a third party appraisal review or a site visit. |
| Report Format: | Complete Summary |
| Valuation Scenario: | |

- As Is Market Value & Liquidation Value on all reports
- As If Complete Market Value for buildings under construction or requiring tenant improvements
- As If Stabilized Market Value on all reports
- Insurable Value defined as Full Replacement Cost New in shell condition (<u>Include if Condo</u> "For condominiums, insurable value

CBRE - #LOAN #**40000320**
Appraisal Engagement Letter – 9/30/2025
Page 2

|  |  |
|---|---|
|  | should separately list the full replacement cost **new of the unit"**) see attached "Harvest Small Business Finance Minimum Appraisal Requirements" |
| Approaches to Value: | This appraisal assignment will be used for SBA financing and requires two out of the three approaches (Cost, Income and Sales Comparison). |
| Fee: | $4,000 |
| Delivery Date: | 10/15/2025 |
| Intended Use: | Mortgage Financing |
| Property Contact: | Daniel Halevy /310-467-4703/danhalevy@gmail.com |
| Appraisal Review Contact: | Tanner Larkins, tlarkins@harvestcref.com |

The items listed below are necessary to complete the appraisal report and should be received by you within 2 business days of receiving this engagement letter. If you do not receive the data necessary to adequately appraise the subject property, particularly a rent roll and leases for a leased fee analysis, please stop work and inform the undersigned prior to the inspection date.

The items being sent to you are:

        o   TBD

If you require additional items to properly appraise the subject property, please immediately contact the undersigned.

The subject property and comparable rentals and sales must be inspected by a licensed certified general appraiser.  The report must separate the value of the real estate from the going concern value and furniture, fixtures and equipment value.  The value of the real estate must be clearly stated and not include FF & E or business value.  **Two of the three approaches must be used in order for the report to be valid. We would prefer the Income and Sales Comparison approaches.**

The appraisal should be in conformance with the California Department of Financial Institutions appraisal requirements, USPAP, and the attached Harvest Small Business Finance appraisal scope of work requirements (Exhibit A).

**Harvest Small Business Finance requires one electronic copy of the report by email.** Please submit the electronic copy, including appendices and photographs to wodonnell@harvestcref.com, ryou@harvestcref.com, agreenberg@harvestcref.com, and tlarkins@harvestcref.com

CBRE - #LOAN #**40000320**
Appraisal Engagement Letter – 9/30/2025
Page 3

Include loan name and loan number on title page for all correspondences.  Please sign below and return the executed engagement letter within three (3) days of receipt.

If you have questions, please contact Tanner Larkins, Credit Analyst at tlarkins@harvestcref.com.

Sincerely,

*Tanner Larkins*

Tanner Larkins
Credit Analyst
Harvest Small Business Finance

Encl.

***Acknowledgment of Receipt and Acceptance of Assignment***

By acknowledging the receipt of this letter, you agree to the terms of the assignment and the stated delivery date.

Nick Barwig, As Agent on behalf of CBRE, Inc                9/30/25
_____          _____
Print Name                                                          Date

_____
Signature

***Please sign and return by email.***

CBRE - #LOAN #**40000320**
Appraisal Engagement Letter – 9/30/2025
Page 4

# HARVEST SMALL BUSINESS FINANCE – MINIMUM APPRAISAL REQUIREMENTS

The following are Harvest Small Business Finance minimum requirements for approval of appraisal reports.  The items below must be included in the appraisal report.  They must be either described or summarized depending on the report format.

## General Requirements
1. Conform to USPAP and All Supplemental Federal Appraisal Regulations
2. Disclose all items that will affect the utility and value of the subject property.
3. Include sufficient supporting documentation so that the analysis, judgment, logic and reasoning are clear to the reader
4. Include legal description of the property
5. Include Purchase Agreement if available
6. Include signed engagement letter in addendum
7. Include verification sources for all comparable sales and rentals unless those sources request confidentiality.

## Inspection
1. The subject and comparable sales and rentals must be inspected by a licensed certified general appraiser.  Reports with inspections by only an appraisal trainee will not be accepted.
2. An interior and exterior inspection of the subject property is required by a licensed certified general appraiser, and inspections by only an appraisal trainee will not be accepted unless otherwise noted in the engagement letter.
3. At a minimum, an exterior inspection of the comparable improved sales, land sales and rentals is required.
4. A complete visual inspection and description of the neighborhood is required.
5. Representative photographs of the entire subject property are required, including interior and exterior photographs of each building on the site, any other significant site improvements (signs, parking areas), and any surplus or excess land.  Exterior photographs of all comparable sales and rentals are required.

## Regional Analysis
1. Discuss regional data and market conditions as it pertains to the subject property type
2. Regional Map identifying the subject property

## Neighborhood Analysis
1. Identify the boundaries of the neighborhood
2. Discuss land uses within and surrounding the neighborhood
3. Disclose apparent nuisances

## Site Analysis
1. Plat map or survey with subject property identified in Site Section or addendum in form reports.
2. Physical address observed at inspection
3. Describe adjacent land uses
4. Disclose apparent easements and encroachments as applicable
5. Disclose apparent nuisances, as applicable.

## Improvement Description
1. Sketch or floor plans of subject property in Improvement Section or addendum in form reports or other documentation sufficient to identify the extent and character of the improvements, particularly

CBRE - #LOAN #**40000320**

Appraisal Engagement Letter – 9/30/2025

Page 5

    if proposed or under renovation.
2.  Include discussion of material specifications
3.  Effective wage
4.  Remaining economic life

**Highest and Best Use**
1.  Describe or summarize the four tests of highest and best use and not simply state the highest and best conclusion.  Parking conformity must be discussed.
2.  **If the highest and best use of the property is different than the existing use, please call Harvest Small Business Finance, LLC for possible changes to the scope of work.**

**Sales Comparison Approach**
1.  Include at least three recently closed sales from the market area or similar areas within the region. Sales must be selected based on the highest and best use regardless of geographic limitations and be physically similar to the subject.
2.  Pending sales and listings are acceptable along with the three required closed sales in attempt to bracket the subject property value.
3.  A quantitative adjustment grid with discussion of the sales and adjustments is required.  Pre- and post adjusted values must approximate each other to prove the applicability of the comparable data and reasonableness of the value conclusion.
4.  Photographs of each sale are required
5.  Location map identifying the location of the sales in relationship to the subject is required.

**Income Approach**
1.  Current rent roll that includes, but is not limited to the tenant name, unit size and lease amount, dates, terms escalations and options to renew.
2.  The rent survey must include but not be limited to tenant name, unit size and lease amounts, dates, terms, escalations and options to renew.
3.  Vacancy must be supported from market data
4.  Expenses must be compared to historical data, similar properties and/or industry standards and either discussed or summarized in the report.
5.  Direct capitalization method is required.  Overall capitalization rates must be supported by comparable sales from the market that have recently sold.  At least three closed sales are required.
6.  If appropriate, a discounted cash flow method of value is required for all appraisals.  Market conditions, the market area and the specific property type should support using or not using the DCF method.
7.  Photographs of each comparable rental are required
8.  **Location map identifying the comparable rental's location in relationship to the subject is required**
9.  Pending rental listings are acceptable along with the three required executed leases in an attempt to bracket the subject property.

**Cost Approach (if used)**
1.  Include at least three recently closed land sales from the market area or similar areas within the region.  Land sales must be selected based on the highest and best use regardless of geographic limitations and be physically similar to the subject.
2.  Pending sales and listings are acceptable along with the three required closed sales in an attempt to bracket the subject property value.
3.  An adjustment grid with discussion of the sales and adjustments is required.  Pre- and post adjusted values must approximately each other to prove the applicability of the comparable data and reasonableness of the value conclusion.
4.  Photographs of each sale or plat maps are required

CBRE - #LOAN #**40000320**
Appraisal Engagement Letter – 9/30/2025
Page 6

5.  Location map identifying their location in relationship to the subject are required.
6.  The opinion of replacement cost new or reproduction cost new must be supported by recognized industry sources such as Marshall Valuation Service or similar cost estimating services or by **comparable developer's costs for similar property types. Subject development costs should be** analyzed and discussed, for properties with tenant improvement construction or property rehabilitation.

**Insurable Value**
1.  For freestanding buildings defined as full replacement cost new and does not include any form of depreciation or obsolescence. The opinion must include the cost of the foundation and below grade plumbing, which under certain conditions could require replacement.
2.  **For condominiums, insurable value should separately list the full replacement cost new of the unit in shell condition – the shell cost based on an undivided interest in the building or project – and the cost of the interior tenant improvements for the subject unit.**

**As Is Value**
1.  All appraisals are required to report an "As Is" Value of the subject property. For improved property that is proposed, under construction, under rehabilitation or has not yet reached stabilization, appropriate deductions and discounts must be applied to the prospective stabilized or upon completion value. These deductions and discounts include, but are not limited to, leasing commissions, rent losses, tenant improvements and capital improvements.

**Market Value As If Complete**
1.  This represents the current market value of a proposed property or a property undergoing rehabilitation or tenant improvements. The date of completion must be disclosed and is that time when the improvements are completed and ready for delivery to the buyer or lessee.
2.  Report appropriate deductions and discounts for un-leased space including, but not limited to rent loss, commissions and tenant improvements, as appropriate.

**Market Value As If Stabilized**
1.  This represents the current market value of a property that has achieved stabilized occupancy.
2.  The date of stabilization must be disclosed.

ONLY TO BE USED FOR CONSTRUCTION LOANS
**Proposed Construction**
1.  Include copy of building plans or other documentation sufficient to identify the extent and character of the proposed improvements.
2.  Include construction, renovation or tenant improvement cost breakdown
3.  Report current market value as if complete on the appraisal inspection date, as appropriate.
4.  Report current market value as if stabilized on the appraisal inspection date, as appropriate.
5.  Report appropriate deductions and discounts for un-leased space including but not limited to rent loss, commissions and tenant improvements, as appropriate.

# Addendum G

## Qualifications

# PROFILES



VALUATION & ADVISORY SERVICES

# Kyle Nelson, MAI

**Vice President**

4301 La Jolla Village Drive, Suite 3000
San Diego, CA
Telephone     + 1 858 546 2646
E-mail         - Kyle.p.nelson@cbre.com

## Clients Represented

- ALDI
- United States Postal Service (USPS)
- Citizens Business Bank
- Live Oak Bank
- PNC Bank
- Umpaque Bank
- Chase Bank
- Wells Fargo Bank
- Western Alliance Bank
- Financial Institutions, Investors, Developers, Law Firms

## Pro Affiliations / Accreditations

- MAI, Appraisal Institute

## Education

- California State University – San Marcos

## Professional Experience

Kyle Nelson is a Vice President for Valuation & Advisory Services (VAS), based in San Diego, California. Mr. Nelson collaborates with a team of appraisers, researchers, and administrators dedicated to completing a diverse range of appraisal and consulting assignments throughout Southern California. His geographical reach extends throughout the Counties of San Diego, Orange, Riverside, Los Angeles, San Bernardino and Ventura.

Mr. Nelson has over 10 years of real estate experience specializing in institutional investment grade properties. He has continually cultivated new client relationships, focusing on providing client service. Throughout his career, Mr. Nelson has valued assets of a variety of purposes including mortgage lending, financial reporting, feasibility and fair market rent.

©2024 CBRE, INC.



Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
# REAL ESTATE APPRAISER LICENSE

### Kyle E. Nelson

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    3007858

Effective Date:    August 25, 2024
Date Expires:    August 24, 2026

*Angela Jemmott*
Angela Jemmott, Bureau Chief, BREA

3077370

# PROFILES



VALUATION & ADVISORY SERVICES

# Nick Barwig, MAI, MRICS

**Executive Managing Director, Head of Southern California & Hawaii**

T   +1 213 613 3402
C   +1 770 722 8922
E   nick.barwig@cbre.com

## Clients Represented

- Blackstone
- DART
- Eastdil Secured
- KKR
- Prologis
- VEREIT
- Q10 Capital
- Walker & Dunlop
- Whole Foods Market
- Financial Institutions, Lifecos, Investors, Developers, Law Firms

## Pro Affiliations / Accreditations

- MAI, Appraisal Institute
- MRICS, Royal Institution of Chartered Surveyors
- NAIOP Future Leader
- NAIOP SoCal Member

## Education

- University of Georgia, BBA Real Estate, Summa Cum Laude

## Professional Experience

Nick Barwig is Executive Managing Director, Head of Southern California and Hawaii for Valuation & Advisory Services (VAS) where he manages CBRE VAS offices spanning Greater Los Angeles, Inland Empire, Orange County, San Diego and Hawaii. Mr. Barwig oversees all aspects of SoCal VAS operations, including Valuation/Appraisal, Assessment & Consulting Services, and Property & Transaction Tax. As a member of the VAS U.S. Executive Team, he is involved in the development and execution of the strategic growth plan for the U.S. VAS platform, comprised of 800+ professionals and 90 offices.

Based in Los Angeles, Mr. Barwig serves a diverse set of clients including accounting firms, developers, commercial and investment banks, Fortune 500 companies, insurance companies, law firms, pension funds, and REITs.

Prior to joining CBRE, Mr. Barwig held a broad range of commercial real estate roles where he was involved in acquisitions, capital markets, development, leasing, and valuation/advisory at firms including Ernst & Young and Majestic Realty.

Mr. Barwig played Quarterback at Georgia Tech where he earned ACC Athletic Academic Honors. He went on to attend the University of Georgia where he graduated #1 in his class from the Terry College of Business.

©2025 CBRE, INC.



## Business, Consumer Services & Housing Agency
# BUREAU OF REAL ESTATE APPRAISERS
# REAL ESTATE APPRAISER LICENSE

## Nicholas A. Barwig

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:   3011888

Effective Date:   October 17, 2025
Date Expires:   October 16, 2027

*Angela Jemmott*
Angela Jemmott, Bureau Chief, BREA

3082942

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

# PROFILES



VALUATION & ADVISORY SERVICES

# David Shioji, MAI

**First Vice President**

T   +1 213 613 3261
C   +1 310 968 9030
E   david.shioji@cbre.com

## Clients Represented

– Pacific Premier Bank
– Capital One
– Shinhan Bank
– Homestreet Bank
– Amalgamated Bank
– First Foundation Bank
– Financial Institutions, Lifecos,
  Investors, Developers, Law Firms

## Pro Affiliations / Accreditations

– Designated Member, Appraisal
  Institute (MAI)

## Education

California State University, Los
Angeles- BBA, Economics Minor,
Cum Laude

## Professional Experience

David Shioji, MAI, is a First Vice President with CBRE, based in the Valuation & Advisory Services' downtown Los Angeles office, and a designated member of the Appraisal Institute (MAI).

Responsibilities include the preparation of full narrative appraisals for a wide variety of property types, with a primary geographic focus in Southern California.

Mr. Shioji's experience encompasses a wide variety of property types, including office, apartments, land, industrial, and special purpose properties, and serves a diverse set of clients including developers, commercial and investment banks, insurance companies, law firms, pension funds, and REITs.

Mr. Shioji has a specific focus on multifamily residential appraisals, and has appraised a wide variety of assets within that asset type, including existing, proposed, mixed-use, value-add, co-living, affordable/low-income, low income housing tax credit (LIHTC), and senior housing properties.



Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
# REAL ESTATE APPRAISER LICENSE

## David H. Shioji

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    3008157

Effective Date:    November 23, 2024
Date Expires:    November 22, 2026

*Angela Jemmott*
Angela Jemmott, Bureau Chief, BREA

3078315

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

CBRE Valuation & Advisory Services



# Delivering more than just a number

At CBRE, we offer more than expert appraisal services, we consult and advise to help you see the full picture of a property or portfolio.

## Valuation & Appraisal
Understand all aspects of value

— Lending & Debt Valuations
— Portfolio Valuations
— Institutional Fund Valuations
— Litigation Support & Testimony
— Right-of-Way & Eminent Domain
— Evaluations/Alternative Valuations

**cbre.com/appraisal**

## Assessment & Consulting
Understand all aspects of value

— Property Condition Assessments
— Environmental Site Assessments
— Land Surveying
— Seismic Risk Analysis
— Radon, Asbestos, Indoor Air Quality
— Zoning Reports & Compliance

**cbre.com/assessment**

## Property & Transaction Tax
Understand all aspects of value

— Assessment Reviews & Appeals
— Real Estate Transaction Tax
— Property Tax Payment Services
— Pre-Acquisition Due Diligence
— Pre-Construction Due Diligence
— Budgeting & Accruals

**cbre.com/propertytax**

## Quality You Can Count On

Reliable valuations depend on accurate insights. Our quality and risk management (QRM) framework ensures the highest-quality reports and analyses, giving you confidence in our calculations.


Upfront conflict and qualification checks


Embedded risk detection and leadership reviews


Landmark training, practice guidelines and governance


Dedicated, global team of QRM experts

**Industry-leading people, data and technologies**

## Experience You Can Trust

CBRE is the global leader in commercial real estate services, with more than 100 years of industry experience. We provide unmatched market coverage and sector expertise across every dimension of our Valuation & Advisory Services, delivering insights you can't get anywhere else

| 90+ | 80K+ | 600k+ | 200+ |
|---|---|---|---|
| U.S. Valuation Offices | U.S. Yearly Assignments | Global Yearly Assignments | Global Valuation Offices |

# EXHIBIT 6



Los Angeles County
## Treasurer and Tax Collector

**Property Tax Payment Inquiry**

**Last updated Friday November 21, 2025**

**Assessor ID Number:** 5145-020-057    **Year:** 25    **Seq. No.:** 000

**ELECTRONIC FUND TRANSFER (EFT) NUMBER**
**ID#:** 19 5145 020 057 4    **YEAR:** 25    **SEQUENCE:** 000 1

| Installment 1 | | Installment 2 | |
|---|---|---|---|
| Tax Amount | $19,599.92 | Tax Amount | $19,599.91 |
| Penalty Amount | $0.00 | Pen/Cost Amount | $0.00 |
| Total Due | $19,599.92 | Total Due | $19,599.91 |
| Paid Amount | $0.00 | Paid Amount | $0.00 |
| Balance Due | $19,599.92 | Balance Due | $19,599.91 |
| Delinquent If Not Paid By | 12/10/2025 | Delinquent If Not Paid By | 04/10/2026 |

**Message:**

# Defaulted Tax Roll

**Last updated Friday November 21, 2025**

| | | | |
|---|---|---|---|
| AIN Number | 5145-020-057 | 5-Pay Account Number | |
| Default Year | 2024 | 5-Pay Status | |
| Redemption Amount | $96,795.43 | 5-Pay Installment Amount Due | |
| Monthly Penalty Amount | $1,148.22 | 5-Pay Due Date | |
| Amount Paid | $0.00 | 5-Pay Installment Paid | |
| Last Payment Date | | | |

**Message:**
STATE LAW REQUIRES THAT WE APPLY PAYMENTS TO COSTS, PENALTIES AND THE BALANCE TO TAXES. IF YOU HAVE
QUESTIONS, PLEASE VISIT OUR **PUBLIC INQUIRIES** WEBPAGE.

**Tax Status: TAX DEFAULTED**

**Select Another Account**

For help or inquiries regarding online payments, visit: **ttc.lacounty.gov/public-inquiries**.
Our business hours are 8:00 a.m. to 5:00 p.m., Pacific Time, Monday through Friday, excluding **Los Angeles County holidays**.
Our office is located in the Kenneth Hahn Hall of Administration, 225 North Hill Street, First Floor Lobby, Los Angeles, CA 90012.

If you are having trouble using this site, it may be because your are using a slightly older internet browser or an unsupported internet browser.
See a **list of supported internet browsers**.

Terms of Use  |  Privacy & Security Policy

©2002-2025 Los Angeles County Treasurer and Tax Collector. All Rights Reserved.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

15910 Ventura Blvd., 12th Floor, Encino, CA 91436

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (REAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
 12/15/2025  , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  12/15/2025  , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  12/15/2025  , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/15/2025 | MARY ANN GRANZOW | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## SERVICE LIST

### BY PERSONAL DELIVERY:

*Chambers' Copy:*
Hon Vincent P. Zurzolo
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA 90012

### SERVED BY U.S. MAIL:

### Debtor
SLA Investments, LLC
264 S. Oakhurst Drive
Beverly Hills, CA 90212

### Debtor's Attorneys
Derrick Talerico
Weintraub Zolkin Talerico & Selth LLP
11766 Wilshire Blvd., Suite 730
Los Angeles, CA 90025

### U.S. Trustee
Kelly L. Morrison
Office of the US Trustee
915 Wilshire Blvd., Ste. 1850
Los Angeles, CA 90017

### Lienholder
Second Lienholder
Archway Broadway Loan SPE, LLC
c/o Michael Gerard Fletcher
Frandzel Robins Bloom & Csato, L.C.
1000 Wilshire Blvd., 19th Floor
Los Angeles, CA 90017-2427

Los Angeles County Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

**List of Creditors**

| | |
|---|---|
| Joshua Mogin Esq.<br>Thompson Coburn LLP<br>10100 Santa Monica Blvd., Suite 500<br>Los Angeles, CA 90067 | El Hadj Sy dba Entrepreneur/David Garay<br>1040 S. Los Angeles Street, Unit #10<br>Los Angeles, CA 90015 |
| US Small Business Administration<br>Office of General Counsel<br>312 N. Spring Street, 5th Floor<br>Los Angeles, CA 90012 | Los Angeles Dept of Water and Power<br>PO Box 30808<br>Los Angeles, CA 90030 |
| CA Dept of Tax and Fee Admin<br>Account Info Group MIC29<br>PO Box 942879<br>Sacramento, CA 94279-0029 | Miracle Watts<br>1040 S. Los Angeles Street<br>Los Angeles, CA 90015 |
| Employment Development Dept<br>Bankruptcy Group MIC 92E<br>PO Box 826880<br>Sacramento, CA 94280 | Nijai Burch dba Instant Bae LLC<br>1040 S. Los Angeles St., Unit #14<br>Los Angeles, CA 90015 |
| Franchise Tax Board<br>Bankruptcy Section MS A-340<br>PO Box 2952<br>Sacramento, CA 95812 | Saul Edi Faal<br>1040 S. Los Angeles St., Unit #17<br>Los Angeles, CA 90015 |
| Internal Revenue Service<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | Serafin Canizares<br>1040 S. Los Angeles Street<br>Los Angeles, CA 90015 |
| Commune Events Inc<br>802 Mateo Street<br>Los Angeles, CA 90021 | Sienna Rose Inc.<br>433 Colyton Street<br>Los Angeles, CA 90013 |
| David Garay<br>1040 S. Los Angeles St., Unit 8<br>Los Angeles, CA 90015 | Southern California Gas<br>PO Box C<br>Monterey Park, CA 91756 |
| Earth Bean Coffee LLC<br>1200 S. Grand Avenue #658<br>Los Angeles, CA 90015 | |

**SERVED BY COURT VIA NEF:**

- Scott R Albrecht     salbrecht@gsaattorneys.com, jackie.nguyen@sgsattorneys.com
- Tanya Behnam     tbehnam@polsinelli.com,
  tanyabehnam@gmail.com;ccripe@polsinelli.com;ladocketing@polsinelli.com
- Jacquelyn H Choi     jacquelyn.Choi@rimonlaw.com, docketingsupport@rimonlaw.com
- Carol Chow     Carol.Chow@saul.com,
  hannah.richmond@saul.com;easter.santamaria@saul.com;carol.chow@ecf.courtdrive.co
  m;litigationdocketing@saul.com
- Robert F Conte     robert.conte@usdoj.gov,
  caseview.ecf@usdoj.gov;usacac.tax@usdoj.gov
- Ryan Coy     ryan.coy@blankrome.com
- Christopher Cramer     secured@becket-lee.com
- Christopher Crowell     ccrowell@frandzel.com, mbrandenberg@frandzel.com
- Turner Falk     turner.falk@saul.com, tnfalk@recap.email
- Michael G Fletcher     mfletcher@frandzel.com,
  sking@frandzel.com,autodocket@frandzel.com
- Todd S. Garan     ch11ecf@aldridgepite.com,
  TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
- Richard Girgado     rgirgado@counsel.lacounty.gov
- Jacqueline L James     jjames@buchalter.com,
  gvidales@buchalter.com;docket@buchalter.com
- Kelly L Morrison     kelly.l.morrison@usdoj.gov
- Avi Edward Muhtar     amuhtar@crownandstonelaw.com
- Bruce D Poltrock     bpoltrock@frandzel.com,
  sking@frandzel.com,autodocket@frandzel.com
- Paige Selina Poupart     ppoupart@frandzel.com, achase@frandzel.com
- Zev Shechtman     Zev.Shechtman@saul.com,
  zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul
  .com
- David B Shemano     dshemano@shemanolaw.com
- Jessica M. Simon     jsimon@hrhlaw.com, mgranzow@hrhlaw.com
- Derrick Talerico     dtalerico@wztslaw.com,
  maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Garrick Vanderfin     gvanderfin@polsinelli.com,
  zyoung@Polsinelli.com;ladocketing@polsinelli.com
- Gerrick Warrington     gwarrington@frandzel.com,
  achase@frandzel.com,autodocket@frandzel.com
- Jennifer C Wong     bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com