Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone: (424) 500-8552

Counsel to Debtors Broadway Avenue
Investments, LLC, SLA Investments, LLC,
and Negev Investments, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SEATON INVESTMENTS, LLC, *et al.*,<br><br><br>Debtors and Debtors in<br>Possession. | Lead Case No. 2:24-bk-12079-VZ<br><br>Jointly Administered with Case Nos.:<br>2:24-bk-12080-VZ; 2:24-bk-12081-VZ;<br>2:24-bk-12082-VZ; 2:24-bk-12091-VZ;<br>2:24-bk-12074-VZ; 2:24-bk-12075-VZ<br>and 2:24-bk-12076-VZ<br><br>Chapter 11 |
| ☐ Affects All Debtors.<br>☐ Affects Seaton Investments, LLC (*Dismissed*)<br>☐ Affects Colyton Investments, LLC (*Dismissed*)<br>☒ Affects Broadway Avenue Investments, LLC<br>☒ Affects SLA Investments, LLC<br>☒ Affects Negev Investments, LLC<br>☒ Affects Alan Gomperts<br>☒ Affects Daniel Halevy<br>☒ Affects Susan Halevy | **MOTION TO APPROVE SETTLEMENT AGREEMENT WITH ARCHWAY BROADWAY LOAN SPE, LLC UNDER RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; DECLARATIONS OF ALAN D. GOMPERTS AND DERRICK TALERICO IN SUPPORT THEREOF**<br><br>Hearing:<br>Date:          June 23, 2026<br>Time:          11:00 a.m.<br>Courtroom:   1368<br>                    255 E. Temple Street<br>                    Los Angeles, CA 90012 |

1

**TABLE OF CONTENTS**

**Page**

I.   STATEMENT OF FACTS ......................................................................................................2

     A.   Jurisdiction and Venue...........................................................................................2

     B.   Background and Current Status ..............................................................................2

          1.   Debtor's Business .....................................................................................2
          2.   Bankruptcy Filing ....................................................................................3
          3.   Broadway Background................................................................................3
          4.   Current Status...........................................................................................5
          5.   Other Debtors and Their Real Property .....................................................5

II.   SUMMARY OF SETTLEMENT .........................................................................................6

III.   THE SETTLEMENT IS IN THE BEST INTEREST OF THE
ESTATES AND SHOULD BE APPROVED UNDER THE
STANDARD SET BY THE NINTH CIRCUIT ....................................................................8

     A.   Legal Standard ......................................................................................................8

     B.   Argument ............................................................................................................10

IV.   CONCLUSION...................................................................................................................12

DECLARATION OF ALAN D. GOMPERTS...........................................................................13

DECLARATION OF DERRICK TALERICO.............................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*Am. W. Airlines, Inc. v. City of Phoenix (In re Am. W. Airlines, Inc.)*,
    214 B.R. 382 (Bankr. D. Ariz. 1997)...................................................................10

*Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*,
    292 B.R. 415 (9th Cir. BAP 2003) ....................................................................9

*In re Lee Way Holding Co.*,
    120 B.R. 881 (Bankr. S.D. Ohio 1990)..............................................................10

*Martin v. Kane (In re A & C Props.)*,
    784 F.2d 1377 (9th Cir. 1986) .....................................................................9, 10

*Newman v. Stein*,
    464 F.2d 689 (2d Cir.), *cert. denied sub nom.*
    *Benson v. Newman*, 409 U.S. 1039 (1972) ......................................................10

*Protective Committee of independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)..........................................................................................9

*U.S. v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*,
    669 F.2d 1325 (9th Cir. 1982) ..........................................................................9

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
    839 F.2d 610 (9th Cir. 1988) ............................................................................9

**STATUTES**

28 U.S.C. § 157.....................................................................................................2

28 U.S.C. § 157(b)(2)(A)......................................................................................2

28 U.S.C. § 157(b)(2)(M).....................................................................................2

28 U.S.C. § 157(b)(2)(O)......................................................................................2

28 U.S.C. § 1334...................................................................................................2

28 U.S.C. § 1408...................................................................................................2

28 U.S.C. § 1409...................................................................................................2

**RULES**

Fed. R. Bankr. P. 9019..........................................................................................9

Fed. R. Bankr. P. 9019(a) .....................................................................................9

Broadway Avenue Investments, LLC ("**Broadway**"), SLA Investments, LLC ("**SLA**"), Negev Investments, LLC ("**Negev**," together with Broadway and SLA, the "**Corporate Debtors**"), Susan Halevy ("**Susan**" or "**Susan Halevy**"), Daniel Halevy ("**Daniel**" or "**Daniel Halevy**"), and Alan Gomperts ("**Alan**" or "**Alan Gomperts**," together with Susan and Daniel, the "**Individual Debtors**," and the Individual Debtors, collectively with the Corporate Debtors, the "**Debtors**"), the debtors and debtors-in-possession in the pending jointly administered chapter 11 bankruptcy cases herein (the "**Cases**"), hereby submit this *Motion to Approve Settlement Agreement and Supporting Documents with Archway Broadway Loan SPE, LLC* ("**Motion**") pursuant to Federal Rule of Bankruptcy Procedure ("**FRBP**") 9019.

The Motion seeks approval of the Settlement Agreement, attached hereto as **Exhibit 1**. The Settlement Agreement sets forth a global settlement of Archway Real Estate Income Fund I REIT, LLC fka Archway Real Estate Income Fund I SPE I, LLC and its affiliates' ("**Archway**") claims against each of the Debtors, that have dominated the course of these Cases. The Settlement Agreement is the basis for a joint plan to be filed prior to the hearing scheduled on this Motion that will bring a fair result to the Debtors and their creditors, superior to the alternatives of conversion or dismissal. The Debtors request that the Court enter an order approving the Settlement Agreement.

**I.    STATEMENT OF FACTS**

    **A.    Jurisdiction and Venue**

The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

    **B.    Background and Current Status**

        **1.    Debtors' Business**

The Individual Debtors are family and operate a family business together through the investment and management of the Corporate Debtors. Debtor Susan Halevy is mother to debtor Daniel Halevy and three other non-debtor children, including Sharon Gomperts, wife of debtor Alan Gomperts.

Before these Cases were filed, Susan's husband, David Halevy (deceased), together with Daniel and Alan, and on occasion non-debtor Simon Harkham, invested in and operated real estate properties. Upon David Halevy's passing in 2023, his interests, to the extent they were not community property, passed to Susan via the Halevy Trust (defined below). As such, Susan Halevy is now the owner – direct, beneficial, equitable, or otherwise – of all interests in the various Debtors previously owned by David Halevy.

### 2.    Bankruptcy Filing

On March 18, 2024 (the "**Individual Petition Date**") and on March 19, 2024 (the "**Corporate Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors continue to operate and manage their affairs as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in the Cases.

These Cases involved two real estate investments that required a restructuring to address defaults on their senior loans: (1) the buildings at 440 Seaton Street, Los Angeles, CA, 90013, and 421 Colyton Street, Los Angeles, CA, 90013, which together are operated as an economic unit and were owned by Debtors Seaton Investments, LLC, ("**Seaton**") and Colyton Investments, LLC ("**Colyton**"), respectively; and (2) the building at 737 S. Broadway, Los Angeles, CA, 90014 (the "**Broadway Building**"), owned by Debtor Broadway. By an order of the Court entered on March 6, 2025, through a settlement with secured lender KDM California LLC, the Seaton and Colyton bankruptcy cases were dismissed.

### 3.    Broadway Background

Broadway was formed in July 2013 for the purpose of acquiring, developing, and operating the Broadway Building. Broadway's membership consists of: (1) the Halevy Trust (Susan Halevy, beneficial owner); (2) the G&H Trust (Alan Gomperts and Sharon Gomperts, beneficial owners of community property); and (3) Daniel Halevy.

Broadway acquired the Broadway Building in 2013. The Broadway Building is an eight-story structure. At the time it was acquired by Broadway, only the ground floor was habitable. Broadway

understands the seven higher floors have not been occupied since the 1950s. In 2015, Broadway entered into a 15-year lease with The GAP for the ground floor of the Broadway Building and developed a plan to remodel and modernize the entire Broadway Building to make every floor habitable and available to lease to commercial tenants.

A majority of the intensive remodel and modernization of the Broadway Building took place between 2015 and 2020.  The improvements that were performed included the rehabilitation of the façade of the first three floors of the Broadway Building per the guidance of the Cultural Heritage Commission, installation of a fire and life safety system throughout the building, modernization of the elevator, installation of an HVAC system, fire pump and sprinkler system, emergency backup generator and replacement and installation of electric and plumbing systems throughout the building. In March 2020, after first confirming the full term of its lease, The GAP exercised a one-time early termination provision on its lease as the uncertainty of COVID began to take hold.

With an end to the remodel and modernization in sight, Broadway refinanced its outstanding loans with a single loan from Archway in July 2021, in the original principal amount of $16,942,500 (the "**Broadway Loan**"). The Broadway Loan was guaranteed by David Halevy, Daniel Halevy, and Alan Gomperts.

The Broadway Loan matured on August 1, 2022.  After Archway commenced an action for breach against the guarantors and filed a notice of default to begin foreclosure on the Broadway Building, the parties agreed to a restructure (the "**Broadway Restructure**") that extended the maturity date of the Broadway Loan to December 1, 2023, affirmed the balance due under the Broadway Loan in the principal amount of $15,241,093, and called for $4 million in new loans (the "**New Loans**") from Archway to benefit the Broadway Loan and the Broadway Building. By way of three loan agreements, the New Loans were made: (1) to Negev for $1,300,000 (the "**Negev Loan**"); (2) to SLA for $125,000 (the "**SLA Loan**"); and (3) jointly to David Halevy, the Halevy Trust, Alan Gomperts, the G&H Trust, and Daniel Halevy for $2,575,000 (the "**Guarantor Loan**"). The Negev Loan was secured by the real property located at 12800 Foxdale Drive, Desert Hot Springs, California ("**Foxdale**"), and was guaranteed by David Halevy, with the guaranty secured by David Halevy's membership interests in Negev. The SLA Loan was secured by the real property located at 1040 S.

4

Los Angeles Street and was guaranteed by David Halevy, Susan Halevy, Alan Gomperts, and Daniel Halevy, with the guarantees secured by the guarantors' membership interests in SLA. The Guarantor Loans were secured by the following real property: (1) 3538 Greenfield Avenue, Los Angeles, California ("**Greenfield**," owned by the G&H Trust); (2) 133 S. Palm Drive, Beverly Hills, California ("**Palm**," owned by the Halevy Trust); and (3) 8561 Horner Street, Los Angeles, California ("**Horner**," owned by Daniel Halevy). The $4 million of proceeds from the New Loans were distributed exclusively for the benefit of Archway and the Broadway Loan, with $1,701,407.01 applied to pay down the balance of the Broadway Loan.

### 4.    Current Status

As of December 2024, Archway Broadway Loan SPE, LLC ("**Archway**") was granted relief from the automatic stay as to the Broadway Building, effective immediately for foreclosure noticing purposes and effective April 11, 2025 for a foreclosure sale. The Debtors have intensely negotiated with Archway throughout the majority of these Cases. At an in-person settlement meeting on May 5, 2025, the Debtors and Archway (together, the "**Parties**") reached an agreement on material terms for a "global" settlement (the "**2025 Settlement**") to resolve all disputes between the Parties and to secure Archway's support for a plan of reorganization. The 2025 Settlement was structured around a new long-term lease of the entire Broadway Building that would cash flow the payments needed to fund a joint plan for all of the Debtors and allow the Individual Debtors the opportunity to retain most of their real estate holdings, including the Broadway Building.

Following months of intense drafting between the Debtors and Archway to document the terms of the 2025 Settlement, in January 2026, Broadway learned that its intended tenant could not obtain the corporate approvals necessary for it to enter into the anticipated long-term lease. At or about the same time, the DMB Fund ("**DMB**"), a non-profit affiliate of the intended lessee, expressed interest in purchasing the Broadway Building.

A Broadway Building sale versus lease completely upended the 2025 Settlement. The Debtors and Archway quickly pivoted to negotiate new settlement terms premised upon a sale of the Broadway Building and were able to come to terms on a new settlement in April 2026 (the "**2026 Settlement**"). The Debtors and Archway have worked cooperatively through difficult and tedious negotiation and

drafting to come to the attached Settlement Agreement based upon the 2026 Settlement. Instead of retaining most real property, the 2026 Settlement and the Settlement Agreement will require the Debtors to sell most of their real property. However, the structured sell-off set forth by the Settlement Agreement is better for the Debtors and their creditors as opposed to conversion, dismissal, foreclosure, and litigation – the alternatives to the Settlement Agreement and the consensual joint plan it calls for the Debtors to confirm and for Archway to support.

### 5.    Other Debtors and Their Real Property

In addition to the real properties pledged as collateral to Archway as set forth in Section I.B.3 above, the Debtors own the following real properties either directly or through trusts that are components of the Settlement Agreement:

- Alan and Sharon Gomperts: 2220 Bagley Avenue, Los Angeles, California 90034 and legally described in such deed of trust ("**Bagley**"); 2247 South Canfield Avenue, Los Angeles, California 90034 and legally in such deed of trust ("**Canfield**"); 264 South Oakhurst Drive, Beverly Hills, California 90212 ("**Oakhurst**");

- Sue Halevy: 257 South Linden Drive, Beverly Hills, California 90212 ("**Linden**"); 50% interest in 140 South Roxbury Drive, Beverly Hills, CA 90212, and legally described therein (the "**Roxbury Interest**").

## II.    SUMMARY OF SETTLEMENT

The material terms of the Settlement Agreement (subject to, and as set forth and memorialized in the attached Settlement Agreement, and the various ancillary documents that support and execute the terms of the Settlement Agreement (together with the Settlement Agreement, the "**Settlement Documents**")) are as follows:

- Settlement Amount. Archway will receive $21,300,000 subject to certain increases as set forth in Section 5(A) of the Settlement Agreement.

- Broadway Building. To be sold pursuant to 363 motion;

- Collateral. The following real properties and interests in real property are collectively referred to as the "**Collateral**":

6

  a. Archway maintains all existing liens on collateral, including real property: Broadway Property; SLA Property; Foxdale; Greenfield; Palm; and Horner;

  b. New collateral: Canfield; Bagley; Oakhurst; Linden; Roxbury Interest.

- Canon. Sue Halevy and Daniel Halevy, through ownership and control of 341 South Cannon LLC ("**Canon LLC**"), to market and sell the real property located at 341 S. Canon ("**Canon**"). The sale proceeds from the sale of Canon shall be distributed as follows, all as more fully set forth in the Settlement Agreement: (1) existing liens and encumbrances; (2) carve-out for benefit of Sue and Daniel; (3) balance to Archway.

- Payment Benchmark. Archway to receive $16,000,000 (the "**Floor Amount**") by March 1, 2027 (the "**Drop Dead Date**"). If Archway does not receive the Floor Amount by the Drop Dead Date, Archway may proceed with foreclosure on the Collateral per the tiered foreclosure terms. The Debtors will proceed with selling the Collateral on their terms leading up to the Drop Dead Date and otherwise causing Archway to receive the Floor Amount by the Drop Dead Date.

- Term Note. If Archway does receive at least the Floor Amount by the Drop Dead Date, the balance of the Settlement Amount is converted into a term note (the "**Term Note**"). The Term Note will be due and payable five years from issue with monthly interest payments due and accruing at the Wall Street Journal Prime Rate ("**Prime**") plus 1.25% (with a Prime floor rate of 6.5%).

- Tiered Foreclosure. In the event of a default, including but not limited to the failure of Archway to receive the Floor Amount by the Drop Dead Date or a Default on the Term Note, Archway may proceed to foreclose against collateral with respect to the following tiers, without foreclosing from property in a successive tier until first conducting non-judicial foreclosure auctions of all properties in the prior tier:

  a. Tier 1: Broadway Property, SLA, Foxdale;

  b. Tier 2: Greenfield, Palm, Bagley, Canon, and Canfield;

  c. Tier 3: Roxbury Interest

  d. Tier 4a: Linden (subject to restrictions set forth in the Settlement Agreement);

7

    e.   Tier 4b: Oakhurst (subject to restrictions set forth in the Settlement Agreement);

    f.   Tier 4c: Horner (subject to restrictions set forth in the Settlement Agreement).

These material terms are not the exclusive terms of the Parties' settlement, which will be set forth in full in the Settlement Documents. The Settlement Documents are anticipated to include the following documents:

- Settlement Agreement;
- A-Note;
- B-Note;
- Broadway Memorandum of Modification, notarized for recording purposes;
- Amended Broadway Guaranty as to A-Note;
- Alan/Sue/Daniel Guaranty as to B-Note;
- New Canfield Deed of Trust, notarized for recording purposes;
- New Bagley Deed of Trust, notarized for recording purposes;
- New Roxbury Deed of Trust, notarized for recording purposes;
- Roxbury Estoppel Certificate from the others on title, notarized for recording purposes;
- New Palm Deed of Trust, notarized for recording purposes;
- New Greenfield Deed of Trust, notarized for recording purposes;
- New Horner Deed of Trust, notarized for recording purposes;
- New Canon Drive Deed of Trust, notarized for recording purposes;
- New Linden Deed of Trust;
- Certifications of Trust for D&S Trust and G&H Trust;
- Roxbury Certification of Trust for the Haskell and Nurit Muhtar Revocable Trust;
- Roxbury Pledge and UCC-1;
- Guarantor Loan Modification, and one or more Memorandum of Modification of Deed of Trust each of which memorandum is notarized for recording purposes;
- New Oakhurst Deed of Trust, notarized for recording purposes.

The Settlement Documents, other than the Settlement Agreement, will be filed in a supplement to this Motion when in final or near final form and in advance of the hearing on this Motion. This Motion is nevertheless presented now, due to the dual exigencies of approving the Settlement Agreement, and demonstrating to the Court that a confirmable joint plan has been filed that has Archway's support.

**III.    THE SETTLEMENT IS IN THE BEST INTEREST OF THE ESTATES AND SHOULD BE APPROVED UNDER THE STANDARD SET BY THE NINTH CIRCUIT**

**A.    Legal Standard**

Federal Rule of Bankruptcy Procedure 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988); *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 420 (9th Cir. BAP 2003).

The Court is not required to conduct an exhaustive investigation into the validity, nor a mini trial on the merits of the claims sought to be compromised as a precondition to approving the Agreement. *U.S. v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). The Court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable. *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986); *see also Protective Committee of independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (establishing "fair and equitable" standard for approval of compromises in bankruptcy).

In evaluating the fairness of a proposed compromise, the Ninth Circuit has instructed courts to consider four factors, namely: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views. *Woodson*, 839 F.2d at 620 (quoting *A & C Props.*, 784 F.2d at 1381). Consideration of these factors does not require the Court to decide the

questions of law and fact raised in the controversies sought to be settled, or to determine whether the settlement presented is the best one that could possibly have been achieved. Rather, the Court need only canvass the issues to determine whether the settlement falls "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039 (1972). Finally, although the Court should give deference to the reasonable views of creditors, it is well established that compromises are favored in bankruptcy. *In re Lee Way Holding Co.*, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990); *see also A & C Props.*, 784 F.2d at 1381 ("The law favors compromise and not litigation for its own sake."); *Am. W. Airlines, Inc. v. City of Phoenix (In re Am. W. Airlines, Inc.)*, 214 B.R. 382, 386 (Bankr. D. Ariz. 1997) ("The law favors compromise.").

### B.    Argument

Based on these principles and application of the *A & C Props.* factors, the Settlement should be approved. It was negotiated in good faith and is reasonable, fair, equitable, and in the best interest of creditors and the Debtors' estates. If approved, the Settlement will resolve a multitude of complex and uncertain litigation.

(i)    Complexity of the Litigation Involved

As it applies to this compromise, the "litigation" at issue would be (i) state court litigation concerning the David Halevy Estate; (ii) foreclosure on the Collateral; and (iii) opposition to a plan of reorganization. The litigation required absent the Settlement Agreement would be particularly complex.

There are two proceedings in state court ("**Pending Litigation**"): administration of the David Halevy Estate and an action commenced by Archway following the dismissal of an action first brought in this Case concerning the nature of the community assets of Sue and David Halevy, the Halevy Trust, and in particular, Canon. Sue Halevy contends Canon is appropriately owned by Canon LLC (wholly owned by Sue Halevy) or belongs in the bankruptcy estate of Sue Halevy directly. Archway argues Canon should be administered for its benefit in the probate estate of David Halevy, subject to the only valid probate creditor claim of Archway. Sue Halevy holds that Canon was transferred to Canon LLC pre-petition in exchange for fair value (100% ownership of Canon LLC) and as such, she has the

10

authority to dissolve Canon LLC and absorb Canon directly into her bankruptcy estate should she choose to do so. Archway contends that Canon was jointly owned by David and Sue Halevy, and as such it could not be owned by Sue Halevy or Canon LLC until it is administered through David Halevy's probate estate for the benefit of his creditors (namely Archway). Archway is also pursuing causes of action for breach of fiduciary duty and fraudulent intent to transfer, among others. Sue Halevy has yet to file counter-claims, but would challenge the right of Archway to enforce certain of its liens. The Pending Litigation will require months of discovery and motion practice and involve complex issues of ownership and examination of the history of the loans and transactions among the Parties.

The Parties can be expected to litigate over the value of every component of Archway's collateral, which also relates to the Pending Litigation, the degree to which Archway is under or over secured as applied across the Debtors' estates, the amount of post-petition interest and attorneys' fees Archway is entitled to, if any, and the feasibility of the plan, among other issues.

The complexity of litigation factor weighs heavily in favor of approval of the Settlement.

(ii)    Probability of Success in Litigation

The Pending Litigation is currently stayed informally while the Parties have been negotiating a settlement. But should the Settlement Agreement not be approved by the Court, the hold on the Pending Litigation will dissolve and expand. How the Pending Litigation might resolve is entirely uncertain. Although the Debtors believe they are more likely to prevail, Archway similarly favors its prospects of success. As such, a neutral assessment of the Pending Litigation—as it currently stands— would likely conclude all matters in dispute, which cannot be assessed other than as 50/50 propositions. Considering the uncertainty of outcome of all of the litigation at hand and yet to come, resolving all of these matters to avoid the risk of success or failure weighs heavily in favor of approval of the Settlement.

(iii)    Difficulties in the Matter of Collection

Other than unarticulated claims the Debtors may hold against Archway, there are no issues for collection that bear weight in approval of the Settlement Agreement. This factor is neutral.

11

(iv)    Paramount Interest of the Creditors

The Settlement Agreement is the gateway to a plan that can maximize return to creditors. Without the Settlement Agreement, the results for creditors could be entirely uncertain. The Corporate Debtors' Cases would be dismissed. The Individual Debtors would seek to confirm separate plans, all of which would be subject to litigation with Archway. Archway would seek immediate recourse to its collateral owned by the Corporate Debtors and relief from stay on collateral owned by the Individual Debtors. The Pending Litigation would proceed along with potential new litigation to forestall foreclosures, both in and out of Bankruptcy Court. For dismissed cases, creditors would be left to their own efforts to recover from the Debtors. The Debtors anticipate many months and possibly years of intense litigation over the Pending Litigation and confirmation of Individual Debtor plans. The cost of attorneys' fees on both sides would be astronomical. This could wipe out value for all of the Debtors' creditors. At a minimum, the results for creditors is entirely uncertain without the Settlement Agreement. With the structure and value created by the Settlement Agreement, the Debtors can propose a joint plan that can be confirmed in the coming months that provides a return for creditors.

## VI.    CONCLUSION

The Debtors' Cases have been long and difficult. If the Settlement Agreement proposed by this Motion is approved, creditor recovery will be maximized. The Debtors, with the support of Archway, ask the Court to approve the Settlement Agreement, authorize the Debtors to enter into the Settlement Documents, and set these Cases on a path to confirmation.

Dated: June 2, 2026                    WEINTRAUB ZOLKIN TALERICO & SELTH LLP


                                       By:    /s/ Derrick Talerico
                                            Derrick Talerico
                                       Attorneys for Debtors Broadway Avenue Investments, LLC,
                                       SLA Investments, LLC, and Negev Investments, LLC

            -and-

                                       SAUL EWING LLP
                                            Zev Shechtman
                                       Attorneys for Debtors Alan Gomperts, Daniel Halevy, and
                                       Susan Halevy

## DECLARATION OF ALAN D. GOMPERTS

I, Alan D. Gomperts, hereby declare as follows:

1.      I am the managing member of Seaton Investments, LLC. I am a manager of Broadway Avenue Investments, LLC and SLA Investments, LLC. I am an authorized representative of Colyton Investments, LLC, and Negev Investments, LLC.

2.      I make this declaration in support of the Debtors' *Motion to Approve Settlement Agreement with Archway Broadway Loan SPE, LLC Under Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "**Motion**").  Terms not defined herein shall have the same meanings ascribed to them in the Motion.

3.      Debtors and Archway toiled in good faith over many months through counsel and at times directly to negotiate every aspect of the settlement. The settlement is a hard-earned compromise that is reasonable, fair, equitable, and in the best interest of creditors and the Debtors' estates. The alternative to the If approved, the Settlement will resolve a multitude of complex and uncertain litigation.

4.      The Motion seeks approval of the Settlement Agreement, attached to the Motion as **Exhibit 1**. The Settlement Agreement sets forth a global settlement of Archway's claims against each of the Debtors, that have dominated the course of these Cases. The Settlement Agreement is the basis for a joint plan to be filed prior to the hearing scheduled on this Motion that will bring a fair result to the Debtors and their creditors, superior to the alternatives of conversion or dismissal. The Debtors request that the Court enter an order approving the Settlement Agreement.

5.      Broadway was formed in July 2013 for the purpose of acquiring, developing, and operating the Broadway Building. Broadway's membership consists of: (1) the Halevy Trust (Susan Halevy, beneficial owner); (2) the G&H Trust (myself and Sharon Gomperts, beneficial owners of community property); and (3) Daniel Halevy.

6.      Broadway acquired the Broadway Building in 2013. The Broadway Building is an eight-story structure. At the time it was acquired by Broadway, only the ground floor was habitable. Broadway understands the seven higher floors have not been occupied since the 1950s. In 2015, Broadway entered into a 15-year lease with The GAP for the ground floor of the Broadway Building

13

and developed a plan to remodel and modernize the entire Broadway Building to make every floor habitable and available to lease to commercial tenants.

7. A majority of the intensive remodel and modernization of the Broadway Building took place between 2015 and 2020. The improvements that were performed included the rehabilitation of the façade of the first three floors of the Broadway Building per the guidance of the Cultural Heritage Commission, installation of a fire and life safety system throughout the building, modernization of the elevator, installation of an HVAC system, fire pump and sprinkler system, emergency backup generator and replacement and installation of electric and plumbing systems throughout the building. In March 2020, after first confirming the full term of its lease, The GAP exercised a one-time early termination provision on its lease as the uncertainty of COVID began to take hold.

8. With an end to the remodel and modernization in sight, Broadway refinanced its outstanding loans with a single loan from Archway in July 2021, in the original principal amount of $16,942,500 (the "**Broadway Loan**"). The Broadway Loan was guaranteed by David Halevy, Daniel Halevy, and Alan Gomperts.

9. The Broadway Loan matured on August 1, 2022. After Archway commenced an action for breach against the guarantors and filed a notice of default to begin foreclosure on the Broadway Building, the parties agreed to a restructure (the "Broadway Restructure") that extended the maturity date of the Broadway Loan to December 1, 2023, affirmed the balance due under the Broadway Loan in the principal amount of $15,241,093, and called for $4 million in new loans (the "New Loans") from Archway to benefit the Broadway Loan and the Broadway Building. By way of three loan agreements, the New Loans were made: (1) to Negev for $1,300,000 (the "**Negev Loan**"); (2) to SLA for $125,000 (the "**SLA Loan**"); and (3) jointly to David Halevy, the Halevy Trust, Alan Gomperts, the G&H Trust, and Daniel Halevy for $2,575,000 (the "**Guarantor Loan**"). The Negev Loan was secured by the real property located at 12800 Foxdale Drive, Desert Hot Springs, California ("**Foxdale**"), and was guaranteed by David Halevy, with the guaranty secured by David Halevy's membership interests in Negev. The SLA Loan was secured by the real property located at 1040 S. Los Angeles Street and was guaranteed by David Halevy, Susan Halevy, myself, and Daniel Halevy, with the guarantees secured by the guarantors' membership interests in SLA. The Guarantor Loans

14

were secured by the following real property: (1) 3538 Greenfield Avenue, Los Angeles, California ("**Greenfield**," owned by the G&H Trust); (2) 133 S. Palm Drive, Beverly Hills, California ("**Palm**," owned by the Halevy Trust); and (3) 8561 Horner Street, Los Angeles, California ("**Horner**," owned by Daniel Halevy). The $4 million of proceeds from the New Loans were distributed exclusively for the benefit of Archway and the Broadway Loan, with $1,701,407.01 applied to pay down the balance of the Broadway Loan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of June, 2026, at Los Angeles, California.

ALAN GOMPERTS

15

## <u>DECLARATION OF DERRICK TALERICO</u>

I, Derrick Talerico, hereby declare as follows:

1.      I am an attorney duly admitted to practice law in the state of California and am admitted inter alia to the United States District Court for the Central District of California, and therefore to practice in the United States Bankruptcy Court for the Central District of California. I have personal knowledge of the facts stated herein and knowledge based on business records of my law practice and of my law firm Weintraub Zolkin Talerico & Selth LLP.

2.      I am the general bankruptcy counsel for Broadway Avenue Investments, LLC, SLA Investments, LLC, and Negev Investments, LLC, the above-captioned corporate chapter 11 debtors and debtors-in-possession.

3.      I make this declaration in support of the Debtors' *Motion to Approve Settlement Agreement with Archway Broadway Loan SPE, LLC Under Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "**Motion**").  Terms not defined herein shall have the same meanings ascribed to them in the Motion.

4.      There are two proceedings in state court ("**Pending Litigation**"): administration of the David Halevy Estate and an action commenced by Archway following the dismissal of an action first brought in this Case concerning the nature of the community assets of Sue and David Halevy, the Halevy Trust, and in particular, Canon. Sue Halevy contends Canon is appropriately owned by Canon LLC (wholly owned by Sue Halevy) or belongs in the bankruptcy estate of Sue Halevy directly. Archway argues Canon should be administered for its benefit in the probate estate of David Halevy, subject to the only valid probate creditor claim of Archway. Sue Halevy holds that Canon was transferred to Canon LLC pre-petition in exchange for fair value (100% ownership of Canon LLC) and as such, she has the authority to dissolve Canon LLC and absorb Canon directly into her bankruptcy estate should she choose to do so. Archway contends that Canon was jointly owned by David and Sue Halevy, and as such it could not be owned by Sue Halevy or Canon LLC until it is administered through David Halevy's probate estate for the benefit of his creditors (namely Archway). Archway is also pursuing causes of action for breach of fiduciary duty and fraudulent intent to transfer, among others. Sue Halevy has yet to file counter-claims, but would challenge the right of Archway to

enforce certain of its liens. The Pending Litigation will require months of discovery and motion practice and involve complex issues of ownership and examination of the history of the loans and transactions among the Parties.

5.      The Parties can be expected to litigate over the value of every component of Archway's collateral, which also relates to the Pending Litigation, the degree to which Archway is under or over secured as applied across the Debtors' estates, the amount of post-petition interest and attorneys' fees Archway is entitled to, if any, and the feasibility of the plan, among other issues.

6.      The Pending Litigation is currently stayed informally while the Parties have been negotiating a settlement. But should the Settlement Agreement not be approved by the Court, the hold on the Pending Litigation will dissolve and expand. How the Pending Litigation might resolve is entirely uncertain. Although the Debtors believe they are more likely to prevail, Archway similarly favors its prospects of success.

7.      The Settlement Agreement is the gateway to a plan that can maximize return to creditors. Without the Settlement Agreement, the results for creditors could be entirely uncertain. The Corporate Debtors' Cases would be dismissed. The Individual Debtors would seek to confirm separate plans, all of which would be subject to litigation with Archway. Archway would seek immediate recourse to its collateral owned by the Corporate Debtors and relief from stay on collateral owned by the Individual Debtors. The Pending Litigation would proceed along with potential new litigation to forestall foreclosures, both in and out of Bankruptcy Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of June, 2026, at Los Angeles, California.

/s/ Derrick Talerico
DERRICK TALERICO

17

# EXHIBIT 1

# Settlement Agreement

EXHIBIT 1 - Page 18

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is dated as of June 1, 2026, by and among Archway Broadway Loan SPE, LLC, a Delaware limited liability company, successor in interest to Archway Real Estate Income Fund I REIT, LLC fka Archway Real Estate Income Fund I SPE I, LLC ("Archway"), on the one hand, and Broadway Avenue Investments LLC, a California limited liability company ("Broadway"), Negev Investments, LLC, a California limited liability company ("Negev"), SLA Investments, LLC, a California limited liability company ("SLA"), Alan Gomperts, individually ("Alan") and in his capacity as trustee of the Gomperts and Halevy Family Trust ("G&H Trust"), Sharon Gomperts, in her capacity as trustee of the G&H Trust, Daniel Halevy, individually ("Daniel") and in his capacity as personal representative of the probate estate ("Probate Estate") of David Halevy ("Decedent"), and Susan Halevy, individually ("Sue") and in her capacity as trustee of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), and 341 South Cannon, LLC, a California limited liability company ("Cannon LLC" and collectively with Broadway, Negev, SLA, Alan, individually and as trustee of the G&H Trust, Daniel, individually and as personal representative of the Probate Estate of Decedent, and Sue, individually and as trustee of the D&S Trust, the "Obligors" and collectively with Archway, the "Parties"), on the other hand, with respect to the following facts, matters, and issues.

## RECITALS

A.    Archway has heretofore made a loan to Broadway (the "Broadway Loan") in the original principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (1) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Broadway Note"), in the original principal face amount of $16,942,500.00, executed by Broadway to and in favor of Archway, and (2) that certain Loan Agreement dated July 21, 2021, by and between Broadway and Archway (together with any and all amendments thereto or modifications thereof, the "Broadway Loan Agreement").

B.    As security for, among other things, the indebtedness and obligations under the Broadway Loan, Broadway, as trustor, executed and delivered to and in favor of Archway, as beneficiary, that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Broadway Deed of Trust"), encumbering, without limitation, certain real property commonly known as 737 South Broadway, Los Angeles, CA 90014, as more particularly described therein (the "Broadway Real Property Collateral") and certain personal property collateral (collectively, the "Broadway Personal Property Collateral" and together with the Broadway Real Property Collateral, the "Broadway Collateral"). Pursuant to the Broadway Deed of Trust, Broadway granted to and in favor of Archway a first priority security interest in and lien upon the Broadway Collateral. Archway's security interest in the Broadway Collateral was and is perfected under applicable law.

C.    Concurrently with the execution and delivery of the Broadway Note and Broadway Deed of Trust, Alan, Daniel, and Decedent (collectively, "Broadway Guarantors") executed and delivered to Archway that certain unsecured Continuing Guaranty dated as of July 21, 2021

**EXHIBIT 1 - Page 19**

("Broadway Guaranty"), whereby they guaranteed payment and performance of Broadway's indebtedness and obligations in connection with the Broadway Loan.

D.      The Broadway Loan Agreement, Broadway Note, Broadway Deed of Trust, Broadway Guaranty, and other agreements, instruments, and other documents executed in connection with the Broadway Loan are referred to, collectively, as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Broadway Loan Agreement.

E.      Subsequent to the Broadway Loan, Broadway and the Broadway Guarantors defaulted under the terms of the Broadway Loan Documents by, among other things, (1) failing to obtain a certificate of occupancy for the Broadway Property by January 21, 2022, and (2) failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively, "Defaults 1").

F.      On April 19, 2023, Broadway, Alan, Daniel, and Decedent entered into a Settlement and Loan Modification Agreement with Archway ("First Agreement"). In connection with the First Agreement, Archway made (1) a $1,300,000.00 loan to Negev ("Negev Loan"), (2) a $125,000.00 loan to SLA ("SLA Loan"), and (3) a $2,575,000.00 loan to Decedent, individually and as trustee of the D&S Trust, Alan, individually and as trustee of the G&H Trust, and Daniel ("Guarantor Loan" and collectively with the Negev Loan and SLA Loan, the "New Loans").

G.      In connection with the Negev Loan, Negev executed and delivered to Archway certain loan documents, including, but not limited to, a Loan Agreement ("Negev Loan Agreement") and a Promissory Note in the principal amount of $1,300,000.00 ("Negev Note"). As security for Negev's obligations under the Negev Loan, which obligations include a third-party accommodation pledge of collateral in support of Broadway's obligations under the Broadway Loan, Negev executed and delivered to Archway, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Negev Deed of Trust" and collectively with other agreements, instruments, and other documents executed in connection with the Negev Loan, the "Negev Loan Documents"), whereby Negev granted to Archway security interests in, among other things, that certain real property located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240 ("Foxdale Property"). Archway perfected such security interests by, among other things, recording the Negev Deed of Trust in the appropriate county recorder's office and filing UCC-1 financing statements with the California Secretary of State (collectively, "Negev Collateral"). Decedent guaranteed the Negev Loan.

H.      In connection with the SLA Loan, SLA executed and delivered to Archway certain loan documents, including, but not limited to, a Loan Agreement ("SLA Loan Agreement") and a Promissory Note in the principal amount of $125,000.00 ("SLA Note"). As security for SLA's obligations under the SLA Loan, which obligations include a third-party accommodation pledge of collateral in support of Broadway's obligations under the Broadway Loan, SLA executed and delivered to Archway, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("SLA Deed of Trust" and collectively with other agreements, instruments, and other documents executed in connection with the SLA Loan, the "SLA Loan Documents"), whereby SLA granted to Archway security interests in, among other things, that certain real property located at 1040 South Los Angeles Street, Los Angeles, CA 90015 ("SLA Property"). Archway perfected such security interests by, among other things, recording

**EXHIBIT 1 - Page 20**

the SLA Deed of Trust in the appropriate county recorder's office and filing UCC-1 financing statements with the California Secretary of State (collectively, "SLA Collateral"). Alan, Daniel, Decedent, and Sue each guaranteed the SLA Loan.

I.     In connection with the Guarantor Loan, Alan and Sharon Gomperts a/k/a Sharon Halevy ("Sharon"), as trustees of the G&H Trust, Decedent and Sue, as trustees of the D&S Trust, and Daniel executed and delivered to Archway certain loan documents, including, but not limited to, a Loan Agreement ("Guarantor Loan Agreement") and a Promissory Note in the principal amount of $2,575,000.00 ("Guarantor Loan Note"). As security for their obligations under the Guarantor Loan (1) Alan and Sharon, as trustees of the G&H Trust, executed and delivered to Archway, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Greenfield Deed of Trust"), whereby they granted to Archway security interests in, among other things, that certain real property located at 3538 Greenfield Avenue, Los Angeles, CA 90034 ("Greenfield Property"), (2) Decedent and Sue, as trustees of the D&S Trust, executed and delivered to Archway, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Palm Deed of Trust"), whereby they granted to Archway security interests in, among other things, that certain real property located at 133 South Palm Drive, Apt. 0005, Beverly Hills, CA 90212 ("Palm Property"), and (3) Daniel executed and delivered to Archway, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Horner Deed of Trust" and collectively with the Greenfield and Palm Deeds of Trust, the "Guarantor Loan Deeds of Trust"), whereby he granted to Archway security interests in, among other things, that certain real property located at 8561 Horner Street, Los Angeles, CA 90035 ("Horner Property"). Archway perfected such security interests by, among other things, recording the Guarantor Loan Deeds of Trust in the appropriate county recorder's offices and filing UCC-1 financing statements with the California Secretary of State (collectively, "Guarantor Collateral," and with the Negev Collateral and the SLA Collateral, the "New Loan Collateral"). The Parties intended that the Guarantor Loan Documents and Guarantor Loan Deeds of Trust do not constitute third party accommodation pledges in support of the Broadway Loan, and they do not. The documents evidencing the Negev Loan, including agreements, instruments, and other documents executed in connection with the Negev Loan are referred to, collectively, as the "Negev Loan Documents." The documents evidencing the SLA Loan, including agreements, instruments, and other documents executed in connection with the SLA Loan are referred to, collectively, as the "SLA Loan Documents." The documents evidencing the Guarantor Loan, including agreements, instruments, and other documents executed in connection with the Guarantor Loan are referred to, collectively, as the "Guarantor Loan Documents." The Negev, SLA, and Guarantor Loan Documents are collectively referred to as the "New Loan Documents." The Broadway Loan Documents and the New Loan Documents are collectively referred to as the "Loan Documents."

J.     On June 3, 2023, Decedent passed away.

K.     On September 5, 2023, Alan filed a Statement of Information for 341 South Cannon LLC ("Cannon LLC"). On September 20, 2023, Sue executed a Grant Deed ("Grant Deed"), transferring that certain real property located at 341 South Canon Drive, Beverly Hills, CA 90212 ("Canon Property") to Cannon LLC. On September 21, 2023, the Grant Deed was recorded in the Los Angeles Recorder's Office as document number 20230646027, and Daniel, as manager of Cannon LLC, executed a Deed of Trust, Assignment of Leases and Rents, Fixture Filings and

EXHIBIT 1 - Page 21

Security Agreement ("Canon Deed of Trust") to secure a loan in the principal sum of $1,300,000.00 from Eastern Financial Mortgage Corporation, a Florida corporation and Yarden Consulting LLC, a Delaware limited liability company, to Cannon LLC ("Canon Loan").

L.      On December 1, 2023, Broadway, the Broadway Guarantors, Negev, SLA, Alan, individually and as trustee of the G&H Trust, Daniel, Sue, individually and as trustee of the D&S Trust, and Decedent, defaulted under the terms of the Loan Documents by, among other things, (1) failing to obtain a certificate of occupancy for the Broadway Property, and (2) failing to pay the loans off in full as of December 1, 2023, the maturity date (collectively with the Cannon Loan, which constituted another default under the Loan Documents, the "Defaults 2").

M.      On January 4, 2024, Archway filed a *Verified Complaint for; 1. Breach of Guaranty (Alan Gomperts); 2. Breach of Guaranty (Alan Gomperts); 3. Breach of Guaranty (Daniel Halevy); 4. Breach of Guaranty (Daniel Halevy); 5. Breach of Guaranty (Sue Halevy)* ("Archway v. Gomperts Complaint") commencing Los Angeles Superior Court case number 24SMCV00073 ("Archway v. Gomperts Action").

N.      On February 21, 2024, Daniel, as personal representative of Decedent's Probate Estate, filed a Petition for Probate commencing a matter entitled *Estate of David Halevy, Decedent*, assigned Los Angeles County Superior Court case number 24STPB01963 ("Probate Action"). Daniel is the personal representative of Decedent's Probate Estate pursuant to the Letters of Administration issued in the Probate Action.

O.      On March 18, 2024, Alan, Sue, and Daniel (collectively, the "Individual Debtors") filed chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court"), commencing case numbers 2:24-bk-12074-VZ, 2:24-bk-12076-VZ, 2:24-bk-12075-VZ, respectively (collectively, the "Individual Cases").

P.      On March 19, 2024, Broadway, Negev, and SLA (collectively, the "Corporate Debtors," together with the Individual Debtors, the "Debtors") filed chapter 11 bankruptcy petitions in the Bankruptcy Court, commencing case numbers 2:24-bk-12081-VZ (the "Broadway Case"), 2:24-bk-12091-VZ (the "Negev Case"), 2:24-bk-12082-VZ (the "SLA Case"), respectively (collectively, the "Corporate Cases" and together with the Individual Cases, the "Cases"). The Cases later became jointly administered under the lead case of Seaton Investments, LLC, case number 2:24-bk-12079-VZ.

Q.      Archway duly and timely filed a creditor's claim in the amount of $18,327,141.08 against the Decedent's Probate Estate with the Clerk of the Court in the Decedent's Probate Estate on May 30, 2024, ("Creditor's Claim").

R.      Also on May 30, 2024, Archway served the Creditor's Claim via U.S. Mail upon, among others, Daniel, as personal representative of Decedent's Estate. Daniel, as personal representative of the Decedent's Probate Estate, neither accepted nor rejected Archway's Creditor's Claim within 30 days as provided for under the California Probate Code, giving Archway the option to deem the Creditor's Claim rejected, pursuant to California Probate Code.

S.      Archway duly and timely filed proofs of claim in the Cases, reflecting amounts owed as of the respective March 18 and March 19 petition dates for the Individual Cases and Corporate Cases, respectively, on July 15, 2024 (collectively, "Proofs of Claim").

T.      Archway has been granted replacement liens in the SLA Case and the Negev Case ("Replacement Lien Collateral," and together with the Broadway Collateral and the New Loan Collateral hereafter collectively the "Existing Collateral").

U.      Broadway thrice sought Bankruptcy Court approval of a transaction for the redevelopment of the Broadway Real Property Collateral ("Broadway Redevelopment"). Archway opposed each such motion and Broadway sought dismissal of each such motion following receipt of the Archway oppositions. The Broadway Redevelopment project is now not feasible and has been terminated.

V.      On December 10, 2024, the Bankruptcy Court granted Archway's second motion for relief from the automatic stay, allowing Archway to proceed with noticing for a foreclosure sale of the Broadway Collateral. The stay relief order entered on December 19, 2024 (Docket No. 364) permits Archway to foreclose on the Broadway Collateral at any time on or after April 11, 2025.

W.      On October 14, 2024, Archway filed an adversary complaint in the Bankruptcy Court, commencing adversary proceeding number 2:24-ap-01241-VZ, seeking a declaration that the Canon Property was an asset of Decedent's Probate Estate, among other related causes of action (the "Probate Adversary Complaint"). On December 12, 2024, the Bankruptcy Court entered an order abstaining from considering the Probate Adversary Complaint and accordingly dismissed the Probate Adversary Complaint without prejudice. (Adversary Docket No. 20).

X.      Following the dismissal of the Probate Adversary Complaint, on December 17, 2024, Archway filed a Motion for Relief from the Automatic Stay to pursue claims stated or related to those brought in the Probate Adversary Complaint (the "Probate Relief from Stay Motion") (Docket No. 357). Sue and Daniel stipulated to entry of an order granting the Probate Relief from Stay Motion (the "Probate Stipulation") (Docket No. 379), which the Bankruptcy Court approved on December 27, 2024 (Docket No. 381). On January 2, 2025, pursuant to the order approving the Probate Stipulation, the Bankruptcy Court terminated the automatic stay and annulled it retroactively to the petition date of the Individual Cases (Docket No. 384), to permit Archway to proceed in a non-bankruptcy forum in connection with the Probate Action and to commence and prosecute fully its causes of action to judgment, post-judgment, and appeals, if any, against Sue in her capacity as Trustee of the D&S Trust, Cannon LLC, Daniel, in his capacity as personal representative of the estate of Decedent, and to enforce any such judgment against the them, including any non-debtors and non-bankruptcy-estate property and including Sue and Daniel, but only in their non-individual capacities and not against their property or property of the jointly-administered bankruptcy estates.

Y.      Archway filed a *Verified Complaint on Probate Creditor's Claim, Deemed Rejected, for: 1. Breach of Decedent's Guaranty (Broadway Loan); 2. Breach of Decedent's Guaranty (Negev Loan); 3. Breach of Decedent's Guaranty (SLA Loan); 4. Liability of Trustee of Decedent's Revocable Trust; 5. Fraudulent Transfer; 6. Declaratory Relief re Constructive Trust*

**EXHIBIT 1 - Page 23**

*and Equitable Lien; 7. Breach of Fiduciary Duty; 8. Conversion; 9. Declaratory Relief; and 10. Injunctive Relief* ("Archway v. Halevy Complaint") on January 9, 2025, against Sue, in her capacity as trustee of the D&S Trust; Cannon LLC; Daniel, in his capacity as personal representative of the estate of Decedent (collectively, "Halevy Defendants") commencing Los Angeles Superior Court case number 25SMCV00113 ("Archway v. Halevy Action" and collectively with the Archway v. Gomperts Action, the "Actions").

Z.      Archway caused a Notice of Trustee's Sale to be published and recorded, scheduling a non-judicial foreclosure sale under the Broadway Deed of Trust as to the Broadway Collateral ("Broadway Foreclosure Sale"). The Broadway Foreclosure Sale has been continued from time to time to allow the Parties time to negotiate and document a global resolution to their disputes.

AA.     The Parties now desire to avoid the expenses and uncertainty of resolving their differences through litigation, including as to the Debtors pursuing and Archway opposing a contested Broadway cram down Plan, or for Archway to have to conduct its Broadway Foreclosure Sale, and otherwise to resolve and settle the Actions, on and subject to the terms, covenants, and conditions set forth herein, and to provide for such a settlement to be approved by the Bankruptcy Court under Rule 9019 and thereafter to be implemented by the Obligors, including without limitation eventually by a consensual joint chapter 11 plan of reorganization that complies with the terms, covenants, and conditions in this Agreement ("Consensual Plan").

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto do hereby promise, state, represent, warrant, and agree as follows:

1.      Recitals. The recitals above are incorporated herein by this reference as are all exhibits attached hereto. The Obligors, and each of them, represent and warrant to Archway that the factual information recited above and therein is true and correct at all material times hereto, and shall remain so up to and including the Effective Date.

2.      Reaffirmation. This Agreement is, in part, a reaffirmation of the obligations and indebtedness of the Obligors, and each of them, to Archway as evidenced by the Loan Documents and the Existing Collateral. Therefore, the Obligors each represent, warrant, covenant, and agree, that except as specified herein, all of the terms, covenants, and conditions of the Loan Documents and respecting the Existing Collateral are and shall remain in full force and effect, without waiver or modification of any kind whatsoever, except as may otherwise be modified herein, and the Loan Documents and the Existing Collateral are ratified and confirmed in all respects.

3.      Acknowledgments.

A.      Archway and the Obligors disagree as to the value of the Collateral securing Archway's claims, as evidenced in the Archway Proofs of Claim, and whether Archway is entitled to continue to accrue interest, fees, costs, and expenses after the Petition Date under section 506 on the amounts otherwise set forth in the Proofs of Claim filed by Archway in the Cases (the "Dispute"), with Archway contending that the value of such Collateral secured the entirety of the

Alleged Amounts Owed, which include post-petition accruing interest, fees, costs, and expenses, are due, owing, and collectible under the Archway filed Proofs of Claim and the Obligors disputing that and contending that the value of the Archway Collateral only entitled Archway to collect the amounts due as of the Petition Date as set forth in the Archway Proofs of Claim (the "Petition Date Claim"). Notwithstanding the Dispute, the Obligors, and each of them, acknowledge that as of the Effective Date (defined below), if Archway were to prevail in litigating the Dispute, the amount of Archway-claimed debts owed to Archway would total Twenty-Eight Million Seventy-Six Thousand Three Hundred Forty-Three Dollars and Ninety-Two Cents ($28,076,343.92) as of January 1, 2026, on the various outstanding credit facilities evidenced by the Loan Documents (collectively "Alleged Amounts Owed"). The Alleged Amounts Owed consist of the following:

(1)     Twenty-Two Million Five Hundred Fifty Thousand Three Hundred Forty-Three Dollars and 92 Cents ($22,550,343.92) is owed under the Broadway Note ("Alleged Broadway Amounts Owed") comprised of principal in the amount of not less than $15,241,093.00; accrued but unpaid interest at the existing non-default contract rate in the amount of not less than $3,068,751.74; accrued but unpaid interest at the existing default rate in the amount of not less than $2,745,725.24; accrued but unpaid attorney's fees, costs, and other reimbursable expenses in the amount of not less than $1,494,773.94.

(2)     One Million Seven Hundred Ninety-Five Thousand Nine Hundred Fifty Dollars ($1,795,950.00) is owed in the aggregate under the Negev Note ("Alleged Negev Amounts Owed") comprised of principal in the amount of not less than $1,300,000.00; accrued but unpaid interest at the existing non-default contract rate in the amount of not less than $261,751.30; accrued but unpaid interest at the existing default rate in the amount of not less than $234,198.1.

(3)     One Hundred Seventy-Two Thousand Six Hundred Eighty-Seven Dollars and Fifty Cents ($172,687.50) is owed in the aggregate under the SLA Note ("Alleged SLA Amounts Owed") comprised of principal in the amount of not less than $125,000.00; accrued but unpaid interest at the existing non-default contract rate in the amount of not less than $25,168.40; accrued but unpaid interest at the existing default rate in the amount of not less than $22,519.10.

(4)     Three Million Five Hundred Fifty-Seven Thousand Three Hundred Sixty-Two Dollars and Fifty Cents ($3,557,362.50) is owed in the aggregate under the Guarantor Loan Note ("Alleged Guarantor Loan Amounts Owed") comprised of principal in the amount of not less than $2,575,000.00; accrued but unpaid interest at the existing non-default contract rate in the amount of not less than $518,469.10 and accrued but unpaid interest at the existing default rate in the amount of not less than $463,893.40.

B.     In the event of a Default, interest ("Interest") at the existing non-default contract rate of interest under the Loan Documents ("Existing Contract Rate of Interest") and at the existing default rate of interest under the Loan Documents ("Existing Default Rate of Interest," and together with the Existing Contract Rate of Interest, collectively, the "Existing Interest Rates") accrues on the balance of the Settlement Amount from and after the date of any Default at the rates specified in the respective Loan Documents, which Interest as then accruing is added thereafter to the Settlement Amount and included in that term (as it is defined below).

5676822v18 | 101415-0002                              7

EXHIBIT 1 - Page 25

C.      Except as provided in this Agreement:

(1)      The Obligors, and each of them, acknowledge and confirm that under this Agreement, as of the Effective Date, not one of them has any valid defenses, disputes, setoffs, offsets, recoupments, counterclaims, crossclaims, disagreements, avoidance rights, recharacterization rights, subordination rights, and/or objections (collectively, "Objections") whatsoever, whether legal or equitable, to the amounts set forth in the Proofs of Claim, and/or to any portion thereof, and/or to the Settlement Amount (defined below), and/or to any lien rights, security interests, obligations, and/or liability evidenced by or arising under the Loan Documents and/or the Existing Collateral (collectively, "Archway Settled Debt and Liens"), and waive any such Objections as of that time.

(2)      The Obligors, and each of them, acknowledge and agree that if the Dispute would be resolved in Archway's favor, their total obligations and indebtedness to Archway under the Loan Documents and this Agreement would be as reflected by the Alleged Amounts Owed, which would be immediately due and payable in full as of the Effective Date ("Archway Alleged Debt and Liens" and together with the Archway Settled Debt and Liens, the "Archway Debt and Liens").

(3)      In consideration of the financial accommodations set forth herein, the Obligors, and each of them, specifically, expressly, and forever waive any and all Objections to the Archway Debt and Liens, except solely as to the Dispute.

(4)      Except as to future alleged breaches by Archway as to its obligations hereunder occurring solely following the Effective Date of this Agreement, the Obligors, and each of them, expressly specifically and forever waive any claim and all claims against Archway, including any and all rights or theories on which to invoke or obtain legal and/or equitable relief, whether injunctive relief and/or otherwise, in order to abate, postpone, and/or terminate any enforcement by Archway of repayment of the obligations of the Obligors, and each of them, under the Loan Documents, or to impair the enforcement by Archway as to the Archway Debt and Liens, and as to any Existing Collateral.

(5)      The Obligors, and each of them, specifically and forever waive and relinquish any such right to legal and/or equitable relief to cause any such abatement, postponement, or termination of enforcement proceedings as to the Archway Debt and Liens, except as otherwise set forth herein.

4.      Real Property Sales. The Obligors, and each of them, shall arrange for sales of all of the various parcels of real property that are described and otherwise set forth in this Agreement (other than the Oakhurst Property and Horner Property, defined below). They shall file a motion under section 363 for the sale through the Bankruptcy Court of the Broadway Collateral to be heard by no later than June 23, 2026. As to all other real properties on which Archway now holds, or through this Agreement will hold encumbrances (other than the Oakhurst Property and the Horner Property), the Obligors shall from time-to-time file motions under section 363 if prior to confirmation of the Consensual Plan (each a "363 Sale"), or conduct private sales if subsequent to

5676822v18 | 101415-0002                                    8

EXHIBIT 1 - Page 26

confirmation of the Consensual Plan (each a "Plan Sale"),[1] as needed to pay Archway under this Agreement and the Consensual Plan. Each Sale shall be for the payment of the Sale price in cash only on the closing date in immediately available money and be on such terms and yield payment to Archway of the full net proceeds of such Sale in an amount acceptable to Archway in its sole opinion and judgment as to what Archway will receive. The net proceeds of each such Sale shall equal the full amount of the cash purchase price, less only amounts necessary to pay senior monetary encumbrances and prorated *ad valorem* real property taxes, plus closing costs in an amount of not more than seven percent (7%) of the gross Sales amounts for broker's commissions plus customary escrow, title, and transfer taxes (if payable under a Consensual Plan) closing costs, and fees, ("Closing Costs"), which Closing Costs may be payable only to arm's length third parties in commercially reasonable and standard amounts ("Archway Approved Net Proceeds"). Closing Costs shall never exceed seven percent (7%) in any Sale without the express written consent of Archway in each and every instances, in the exercise of Archway's sole opinion and judgment. Archway must be paid the Archway Approved Net Proceeds through wire transfer directly from the Sale escrow of immediately available funds. Archway reserves and preserves all of its credit bid rights under 11 U.S.C. § 363(k) on every 363 Sale as they occur, and the Consensual Plan shall provide for Archway to have the same credit bid rights on each and every Plan Sale as they occur.

5.      The Settlement Amount; The Floor Amount; and The Drop Dead Date.

A.      To settle the Dispute and all matters associated with the Proofs of Claim and the Archway Alleged Debt and Liens, Obligors agree that they shall pay to Archway Twenty One Million Three Hundred Thousand Dollars ($21.3 million), *plus* that increment of any and all Archway-incurred attorney's fees, costs, and other third party expenses going forward from and after January 1, 2026, including any amounts that the Obligors owe to Archway under Section 11 of this Agreement, that is in excess of $200,000 ("Costs Over the Threshold"), , *plus* any and all post-Default Interest accruing after any Default under this Agreement (the "Settlement Amount"). Archway may allocate such Settlement Amount between and among any and all Loan Documents and this Agreement howsoever Archway from time to time may determine in the exercise of its sole opinion and judgment, including those remaining amounts being owed under this Agreement. Archway may also change such allocation from time to time in the exercise of its sole opinion and judgment.

B.      No less than Sixteen Million Dollars ($16,000,000.00) of the Settlement Amount (the "Floor Amount") must be paid to and received by Archway no later than by Monday March 1, 2027 (the "Drop Dead Date").

C.      Failure by the Obligors, and each of them, to timely pay to Archway at least the Floor Amount by the Drop Dead Date is an incurable and immediate Default under this Agreement and in such an event Archway may foreclose on all of its remaining collateral that has not been the subject of a Sale, including without limitation the Horner Property, but not the Oakhurst Property.

D.      If Archway actually and timely receives all Archway Approved Net Proceeds that total or exceed the Floor Amount on or before the Drop Dead Date, on the Drop

---

[1] Every 363 Sale and Plan Sale shall cumulatively be referred to as "Sales," and each individual, a "Sale."

5676822v18 | 101415-0002                    9

EXHIBIT 1 - Page 27

Dead Date the Parties will subtract the Archway Approved Net Proceeds that Archway has actually and timely received on or before the Drop Dead Date from the Settlement Amount to calculate the remaining shortfall under the provisions of this Agreement (the "Shortfall"). Payment of the Shortfall shall continue to be secured by, and guaranteed by, all remaining Collateral not otherwise the subject of a closed Sale, as set forth in the following sections. Archway may allocate such Shortfall between and among any and all Loan Documents and this Agreement howsoever Archway shall determine in the exercise of its sole opinion and judgment, including those remaining amounts being owed under this Agreement. Archway may also change such allocation from time to time in the exercise of its sole opinion and judgment. On the Drop Dead Date, any such Shortfall (i) will become the full amount owed to Archway under all Loan Documents, including this Agreement; (ii) payment to Archway of the Shortfall will remain secured by the unsold real properties on which Archway still holds encumbrances, including without limitation the Oakhurst Property and the Horner Property and the Linden Property; and (iii)  the Obligors, and each of them, shall pay the Shortfall to Archway (x) through the continuing Collateral sales, and (y) otherwise in monthly payment installments on a termed out basis ("Shortfall Term Out"), such Shortfall Term Out payments to be fully amortized over 30 years, accruing interest at  Wall Street Journal ("WSJ") Prime (with a Prime floor rate of 6.5%) plus 1.25% ("Shortfall Term Out Amortization"), all due and payable in 5 years, with no prepayment fee ("Shortfall Term Out Period").

E.    Notwithstanding the Obligors satisfying the conditions above for them to qualify to have the Shortfall Term Out, the Obligors, and each of them, shall remain obligated to sell all remaining Collateral held by Archway (except for the Oakhurst Property and the Horner Property and the real property located at 257 South Linden Drive, Beverly Hills, California 90212 ("Linden Property") if Obligors qualify for the Linden Property to be added to the Term Out Collateral as set forth below, unless there is a Default, which still remain Archway's Collateral (collectively, the Oakhurst Property, Horner Property, and Linden Property shall sometimes be referred to as the "Shortfall Residential Collateral")) within a reasonable time not to exceed six (6) months following the Drop Dead Date. Any Archway Approved Net Proceeds received after the Drop Dead Date will be applied to the amounts owed to Archway under the Shortfall Term Out and Archway shall recalculate the Shortfall Term Out Amortization as a result of such payment;

F.    The Linden Property may be included in the Shortfall Residence Collateral that does not need to be sold after the Drop Dead Date unless there is a Default on condition that (i) Archway shall have received Archway Approved Net Proceeds in a minimum amount of $10 million from the closing of a timely Broadway sale before the Drop Dead Date; and (ii) the amortization on the Shortfall Term Out shall change to being on a 15-year basis as opposed to the 30-year term stated above, with all Shortfall amounts still all due and payable in 5 years; and (iii) the Obligors shall continue to sell all of the other non-Residential Collateral real properties in a timely manner.

G.    For the avoidance of any doubt, and notwithstanding the Forbearance (defined in the following Section) and the other provisions set forth herein, but subject to the proviso that the Obligors get credit for any payments actually made to Archway under this Agreement, in the event of any Default under this Agreement, including without limitation due to the failure to pay the Floor Amount by the Drop Dead Date: (i) the Obligors, and each of them, shall be liable and obligated to pay all Interest following such Default at the Existing Interest Rates

accruing on the balance of the Settlement Amount, which shall be added to the Settlement Amount; and (ii) the Consensual Plan shall provide for Archway to have the right to immediately foreclose on all unsold Collateral, including the Oakhurst Property, the Linden Property, and the Horner Property, to collect the unpaid Settlement Amount plus interest thereon and fees, costs, and expenses associated therewith.

6.    Forbearance. The Obligors, and each of them, hereby request that, and Archway shall, forbear from enforcing its rights due to the Existing Defaults, including forbearing from foreclosing on its security interests in the Existing Collateral, including, but not limited to, the Broadway Deed of Trust, and from otherwise exercising its remedies against the Obligors or any other Existing Collateral. Archway is willing to so forbear , but only subject to the terms and conditions as set forth in this Agreement ("Forbearance"), including as set forth below.

A.    The Forbearance shall be for the period of time through and including the Drop Dead Date of Monday March 1, 2027, unless earlier terminated under the terms of this Agreement ("Forbearance Period").

B.    If Archway receives the Floor Amount by the Drop Dead Date, Archway will continue to forbear from foreclosing on any remaining Collateral so long as Obligors do not default on the obligation timely to sell the remaining Collateral as set forth above or on the Shortfall Term Out payments.

C.    Archway shall get immediate relief from stay as to all Collateral hereunder (except as to the Broadway Collateral as to which it already has relief from stay), including without limitation as to the SLA Property, Foxdale Property, Greenfield Property, Horner Property, Palm Property, and as to the following properties which are all defined below: Canfield Property, Bagley Property, Linden Property, Canon Property, Oakhurst Property, and Roxbury Property. Nevertheless, Archway shall not record a Notice of Default against any Collateral unless: (i) an Event of Default has occurred that has not been Cured, including, without limitation, the Obligors having failed to meet the condition set forth in the following Section 6(D) as to the SLA Property, Foxdale Property, Greenfield Property, and Palm Property;

D.    The Obligors, and each of them, shall immediately start the sale process for the SLA Property, Foxdale Property, Greenfield Property, and Palm Property under applicable sections of the Bankruptcy Code. Archway may proceed to foreclosure on all such Collateral unless by September 1, 2026, the Obligors, and each of them, close a sale of at least one (1) of such properties and pay Archway Approved Net Proceeds from such sale;

E.    Archway may consent to the Forbearance Period being further extended in Archway's sole opinion and judgment without further consent from the Bankruptcy Court being required, which Archway consent will be given or withheld in the exercise of Archway's sole opinion and judgment, and the Consensual Plan shall so provide. The Existing Defaults remain outstanding and uncured during the Forbearance Period unless and until there is full and complete performance by the Obligors, and each of them, to and for Archway under the terms, covenants, and conditions of this Agreement.

5676822v18 | 101415-0002                    11

EXHIBIT 1 - Page 29

F.     The Forbearance Period shall immediately and instantaneously terminate and cease without any further notice or demand at such time as (i) a payment or performance Event of Default occurs under this Agreement and/or under any Consensual Plan, after the expiration of any applicable Grace Period (defined below) and/or the expiration of any applicable Cure Period (defined below); or (ii) the Floor Amount has not been paid in the aggregate to Archway by the Drop Dead Date, or (iii) the termination of the Forbearance Period, whichever occurs first. For the avoidance of doubt (x) with respect to termination of the Forbearance Period as a result of one or more of the foregoing, the Interest at the Existing Interest Rates shall accrue and be added to the Settlement Amount following an Event of Default, and (y) this Agreement and the Consensual Plan amend the existing Loan Documents and do not replace them, except as amended hereby.

7.     Canon Property Sale. As to the Canon Property:

A.     The Obligors, and each of them, including without limitation Sue and Daniel, shall and hereby do represent, warrant, and agree that the Canon Property is not property of Sue's bankruptcy estate or of any other bankruptcy estate.

B.     The Obligors, and each of them, shall immediately through a Rule 9019 proceeding to approve this Agreement (the "9019 Motion") disclose to the Bankruptcy Court (i) their acknowledgment to Archway that the Canon Property is not property of any bankruptcy estate, (ii) that Sue in her capacity as trustee of the D&S Trust and Daniel in his capacity as the manager of Cannon LLC will be marketing for immediate sale the Canon Property ("Canon Sale") such that all Archway Approved Net Proceeds of such Canon Sale are paid directly to Archway from the Canon Sale escrow subject to the Carve Out and the Senior Canon Lender Payoff.

C.     Except for any Carve Out (as defined below) permitted hereunder, all proceeds from the sale of the Canon Property net of only bona fide closing payments to encumbrance holders of record on the petition date that are senior in priority to the lis pendens ("Senior Canon Lender"), in the actual amounts owed ("Senior Canon Lender Payoff"), which in no event shall exceed in the aggregate $1,320,000.00, and Closing Costs as defined and limited above to arm's length unrelated third parties for closing costs ("Canon Sale Closing Costs" and together with the Carve Out and the Senior Canon Lender Payoff, the"Canon Permitted Sale Proceeds Payments") shall be immediately disbursed directly from the Canon Sale Escrow to Archway.

D.     The Obligors may also instruct the Canon Sale Escrow holder to withhold from the Canon Sale Proceeds the carve outs from the Canon Sale Proceeds ("Carve Outs" and each a "Carve Out"), as more particularly described in Section 3.C and 3.D of that certain Canon Side Letter dated as of June 1, 2026, a copy of which is attached hereto as Exhibit 22 and incorporated by reference herein, and which Carve Outs shall also be Canon Permitted Sales Proceeds Payments. The holder of the Canon Sale Escrow shall disburse each such Carve Out as otherwise set forth in this sub-paragraph directly to the intended recipients of such Carve Out. To dispel any doubts, Archway is entitled to receive from the Canon Sale Escrow Holder all Canon Sale proceeds other than the Canon Permitted Sale Proceeds Payments.

E.    The Sue Allowance (as defined in the Canon Side Letter) funds may be used by Sue in her sole discretion. The disbursement and use of the Sue Allowance funds for Sue are not subject to oversight or control by Archway.

8.    <u>Broadway Note Split</u>. Upon the Effective Date, the Broadway Note shall be amended and modified as follows:

A.    The Broadway Note shall be fractionalized and split into two new notes: (1) a new "A" note in the principal amount of Eleven Million Dollars ($11,000,000.00) together with all accruing interest, default interest, attorney's fees, and costs that become due and owing thereafter under the new "A" note ("<u>A-Note</u>") as set forth herein; and (2) a new "B" note in the principal amount of Ten Million Three Hundred Thousand Dollars ($10,300,000.00) together with all accruing interest, default interest, attorney's fees, and costs that become due and owing thereafter ("<u>B-Note</u>") as set forth herein. The obligations under the A-Note and B-Note shall each be, and shall remain, secured by the Broadway Collateral.

B.    Broadway shall execute and deliver to Archway (1) the A-Note, (2) the B-Note, and (3) a memorandum of the modification to the Broadway Loan Documents in recordable form ("<u>Broadway Memorandum of Modification</u>"), notarized for recording purposes.

9.    <u>A-Note Guaranty</u>. Upon the Effective Date, the Broadway Guaranty shall be amended and modified to guaranty the obligations under the A-Note only ("<u>Amended Broadway Guaranty as to A-Note</u>").

10.    <u>Guaranty of B-Note and Other Obligations</u>. Upon the Effective Date, Alan, Sue, and Daniel shall execute and deliver to Archway a secured guaranty in favor of Archway of the obligations under not just the B-Note, but also the SLA Note, the Negev Note, and any Shortfall under this Agreement ("<u>Alan/Sue/Daniel Guaranty as to B-Note</u>") . Archway agrees not to seek a deficiency judgment on the Alan/Sue/Daniel Guaranty as to the B Note. The following describes the security for the Alan/Sue/Daniel Guaranty as to B-Note, and as to the SLA Note, the Negev/Foxdale Note, and any Shortfall amounts, which may become due and payable under the terms, covenants, and conditions of this Agreement:

A.    Alan and Sharon shall execute and deliver to Archway in their capacities as trustees of the G&H Trust a deed of trust ("<u>New Canfield Deed of Trust</u>") encumbering all of the G&H Trust's right, title, and interest in and to that certain parcel of real property commonly known as 2247 South Canfield Avenue, Los Angeles, California 90034 and legally in such deed of trust (the "<u>Canfield Property</u>"), together with Certifications of Trust acceptable to Archway in the exercise of its sole opinion and judgment for each interest in any real property vested in whole or in part to the G&H Trust that are the subject of this Agreement.

B.    Alan and Sharon shall execute and deliver to Archway in their capacities as trustees of the G&H Trust a deed of trust ("<u>New Bagley Deed of Trust</u>) encumbering all of the G&H Trust's right, title, and interest in and to that certain parcel of real property commonly known as 2220 Bagley Avenue, Los Angeles, California 90034 and legally described in such deed of trust (the "<u>Bagley Property</u>").

5676822v18 | 101415-0002                    13

**EXHIBIT 1 - Page 31**

C.      Sue shall execute and deliver to Archway in her capacity as the trustee of the D&S Trust a deed of trust ("New Roxbury Deed of Trust") encumbering all of the D&S Trust's right, title, and interest in and to that certain parcel of real property commonly known as 140 South Roxbury Drive, Beverly Hills, CA 90212, and legally described therein (the "Roxbury Property"), together with together with Certifications of Trust, that are acceptable to Archway in the exercise of its sole opinion and judgment, for each interest in any real property vested in whole or in part to the D&S Trust that are the subject of this Agreement, including without limitation the Roxbury Property, and further provide to Archway an estoppel certificate from the others on title to the Roxbury Property, all as are acceptable to Archway in the exercise of its sole opinion and judgment, together with Certifications of Trust for each trust holding an interest in the Roxbury Property.

D.      Sue shall execute and deliver to Archway in her capacity as the trustee of the D&S Trust a new deed of trust ("New Palm Deed of Trust") encumbering all of the D&S Trust's right, title, and interest in and to the Palm Property and legally described in such deed of trust.

E.      Sue shall execute and deliver to Archway in her capacity as the trustee of the D&S Trust a new deed of trust on the Linden Property ("New Linden Deed of Trust") encumbering all of the D&S Trust's right, title, and interest in and to the Linden Property and legally described in such deed of trust, such that the New Linden Deed of Trust shall secure payment and performance of the Alan/Sue/Daniel Guaranty as to B Note, together with Certifications of Trust acceptable to Archway in the exercise of its sole opinion and judgment for each interest in any real property vested in whole or in part to the D&S Trust that are the subject of this Agreement.

F.      Alan and Sharon shall execute and deliver to Archway in their capacities as trustees of the G&H Trust a new deed of trust ("New Greenfield Deed of Trust") encumbering all of the G&H Trust's right, title, and interest in and to the Greenfield Property and legally described in such deed of trust.

G.      Daniel shall execute and deliver to Archway a new deed of trust ("New Horner Deed of Trust") encumbering all of his right, title, and interest in and to the Horner Property and legally described in such deed of trust.

H.      Daniel in his capacity as the manager of Cannon LLC shall execute and deliver to Archway a deed of trust ("New Canon Deed of Trust") encumbering all of the right, title, and interest of Cannon LLC in and to the Canon Property as legally described in such deed of trust.

I.      Sue represents and warrants to Archway that she personally owns a fifty percent (50%) undivided interest in and to that certain partnership with Haskell Fuaad Muhtar and Nurit Muhtar named "Yeheskel/Nurit Muhtar & David/Sue Halevy" ("Roxbury Partnership") concerning the Roxbury Property. As additional security for the Alan/Sue/Daniel Guaranty, Sue shall (1) execute and deliver to Archway an assignment and pledge in favor of Archway encumbering all of her right, title, and interest in and to the Roxbury Partnership (the "Roxbury

EXHIBIT 1 - Page 32

Pledge") and (2) authorize Archway to file and/or record a UCC-1 financing statement to permit Archway to perfect such assignment and pledge ("Roxbury UCC-1").

J.    Alan and Sharon shall execute and deliver to Archway in their capacities as trustees of the G&H Trust a deed of trust ("New Oakhurst Deed of Trust") encumbering all of the G&H Trust's right, title, and interest in and to that certain parcel of real property commonly known as 264 South Oakhurst Drive, Beverly Hills, California 90212, and legally in such deed of trust (the "Oakhurst Property"), together with Certifications of Trust acceptable to Archway in the exercise of its sole opinion and judgment for each interest in any real property vested in whole or in part to the G&H Trust that are the subject of this Agreement (such Oakhurst Property collectively with the new deeds of trust on the Canfield, Bagley, Roxbury, Palm, Greenfield, and Horner Properties, and the new deeds of trust on the Palm Property, the Greenfield Property, the Linden Property, and the Horner Property, are the "Alan/Sue/Daniel Restructure Collateral" and collectively with the Existing Collateral, the "Collateral").

11.    Alan/Sue/Daniel Restructure Collateral and Senior Encumbrances Balances Owed. The Obligors, and each of them, consent, acknowledge, represent, warrant, and agree as follows:

A.    So long as Broadway remains obligated to Archway for any amount to be paid or performance hereunder, or under the Broadway Loan Documents, Archway shall have the right, but not the obligation, in its sole opinion and judgment, at least every three (3 months, or during such different earlier or later times or intervals as Archway may decide at any given time, to (1) reevaluate the value to Archway of the Alan/Sue/Daniel Restructure Collateral, and each and every component thereof separately, (2) adjust the balances owed to Archway under the A-Note and B-Note and Alan/Sue/Daniel Guaranty of the B Note respectively in line with the balance owed on the Settlement Amount, which will accordingly also impact the obligations owed to Archway under the real property secured by the Alan/Sue/Daniel Restructure Collateral, to reflect any determination by Archway that the value of the Alan/Sue/Daniel Restructure Collateral, and each and every component thereof, to Archway has increased, decreased, or both ("Net Value Adjustment"), and (3) obtain such title insurance endorsements regarding the Alan/Sue/Daniel Restructure Collateral and the Net Value Adjustment that it decides are needed or desired in the exercise of its sole opinion and judgment. Any Net Value Adjustment may not increase the cumulative amount owed under the A-Note and B-Note, except for any and all unpaid accruals thereunder from and after January 1, 2026.

B.    The Obligors, and each of them as applicable, shall execute in favor of Archway such amended Loan Documents and/or documents to be executed hereunder, including without limitation an amended A-Note, an amended B-Note, a consent under the Alan/Sue/Daniel Guaranty, and one or more memorandums of modification in recordable form as to the Alan/Sue/Daniel Restructure Collateral regarding each and every such Net Value Adjustment. The Obligors, and each of them, shall also pay for any title insurance endorsements ("Adjustment Title Endorsements") regarding the Net Value Adjustments that Archway decides are needed or desirable in the exercise of its sole opinion and judgment to ensure the continuing priority of the New Canfield Deed of Trust, New Bagley Deed of Trust, New Roxbury Deed of Trust, New Palm Deed of Trust, New Greenfield Deed of Trust, New Oakhurst Deed of Trust, New Canon Deed of Trust, New Linden Deed of Trust, New Horner Deed of Trust, and/or any of the Alan/Sue/Daniel Restructure Collateral. The premiums associated with and to be paid concerning the Adjustment

5676822v18 | 101415-0002                          15

EXHIBIT 1 - Page 33

Title Endorsements constitute a cost to be added to the other post January 1, 2026, fees, costs, and expenses in calculating the Costs Over the Threshold, but the costs of such premiums for Adjustment Title Endorsements used in calculating the Costs Over the Threshold and costs payable by Obligors under this Agreement as part of the Settlement Amount shall not total more than $100,000.00 in the aggregate.

C.      The Obligors, and each of them, acknowledge, consent, and agree that the value to Archway under this Agreement includes in part the value to Archway of the Alan/Sue/Daniel Restructure Collateral, such that to protect Archway's rights from time to time to make one or more Net Value Adjustments Archway shall have the right to accelerate for immediate payment of the full balances owed to Archway under this Agreement, including without limitation under either the A-Note, or the B-Note, or both of them("Acceleration") should (i) the Obligors, or any of them, further encumber any of the Alan/Sue/Daniel Restructure Collateral without the prior written consent of Archway, which may be given or withheld in the exercise of Archway's sole opinion and judgment, or (ii) any non-consensual lien or encumbrance and/or judicial lien attaches to the Alan/Sue/Daniel Restructure Collateral or any portion thereof, or  (iii) any Default by Obligors, or any of them, under this Agreement including without limitation any failure by the Obligors, and each of them, to pay off the full balances owed under the A-Note and the B-Note within any Grace Period. Any such Acceleration shall be an Event of Default hereunder that is not subject to cure.

D.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Canfield Property that are senior in lien priority to the New Canfield Deed of Trust total no more than $343,353.00 ("Canfield Senior Encumbrance Balance Owed");

E.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Bagley Property that are senior in lien priority to the New Bagley Deed of Trust total no more than $692,278.00 ("Bagley Senior Encumbrance Balance Owed"). As it relates to the Bagley Property, the Obligors, and each of them, shall immediately terminate the Home Equity Line of Credit secured by a deed of trust on the Bagley Property in favor of Wells Fargo Bank and cause the reconveyance of such deed of trust;

F.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Roxbury Property that are senior in lien priority to the New Roxbury Deed of Trust total no more than $2,017,998.00 ("Roxbury Senior Encumbrance Balance Owed");

G.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Palm Property that are senior in lien priority to the existing balance owed on the senior Palm monetary encumbrances owed to Archway on the existing Palm Deed of Trust owed to Archway total no more than $1,445,020.00 ("Palm Senior Encumbrance Balance Owed");

H.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Greenfield

5676822v18 | 101415-0002                                    16

**EXHIBIT 1 - Page 34**

Property that are senior in lien priority to the existing balance owed on the senior Greenfield monetary encumbrances owed to Archway on the existing Greenfield Deed of Trust owed to Archway total no more than $171,123.00 ("Greenfield Senior Encumbrance Balance Owed");

I.      As of the date of this Agreement, the principal balance owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Oakhurst Property that are senior in lien priority to the New Oakhurst Deed of Trust total no more than $1,249,998.00 ("Oakhurst Senior Encumbrance Balance Owed");

J.      As of the date of this Agreement, the principal balance owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Canon Property that are senior in lien priority to the New Canon Deed of Trust total no more than $1.3 million ("Canon Senior Encumbrance Balance Owed");

K.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Linden Property that are senior in lien priority to the New Linden Deed of Trust total no more than $1,075,152.00 ("Linden Senior Encumbrance Balance Owed");

L.      As of the date of this Agreement, the principal balances owed on each and every monetary obligation the payment of which is secured by any encumbrances on the Horner Property that are senior in lien priority to the existing balance owed on the senior Horner monetary encumbrances owed to Archway total no more than $956,780.00 ("Horner Senior Encumbrance Balance Owed" and collectively with the Canfield, Bagley, Roxbury, Palm, Greenfield, Canon, Horner, Oakhurst, and Linden Senior Encumbrances Balances Owed, the "Senior Encumbrances Balances Owed"); and

M.      Any increase above the Senior Encumbrances Balances Owed or any of them encumbering any of the properties, including without limitation the making of any new advances thereon for any reason, and/or encumbering such properties with any new loan for any reason, without the prior written consent of Archway, which may be given or withheld in the exercise of Archway's sole opinion and judgment, shall give Archway the right of Acceleration, and any failure by the Obligors, and each of them, to pay off the full balances owed under the A-Note, or the B-Note, or both of them within ten (10) days' written notice from Archway of Acceleration shall be an Event of Default hereunder not subject to cure.

12.      Modification to Guarantor Loan Documents. The Guarantor Loan Documents shall be modified by a loan modification agreement ("Guarantor Loan Modification") to, among other provisions, delete any cross-collateralization and/or third-party accommodation pledge provisions, including those provisions set forth in the Guarantor Loan Agreement at § 6.1(a) and (b), § 6.2(a) and (b), and § 6.3(a) and (b). Upon the Effective Date, Alan, Sue, and Daniel shall execute and deliver to Archway one or more  memorandums of such modification to the Guarantor Loan Documents in recordable form ("Guarantor Loan Memorandum of Modification" and together with the Broadway Memorandum of Modification, the "Memorandums of Modification"), notarized for recording purposes.

13.     Controlling Document. Except as specified herein, all of the terms, covenants, and conditions of the Loan Documents, and each of them, shall remain in full force and effect, as shall all provisions in any stipulation and/or order of the Bankruptcy Court concerning the use of cash collateral ("Cash Collateral"), during the Cases. In the event of any conflict or inconsistency between the terms, conditions, and/or provisions of this Agreement and the Loan Documents, the terms, conditions, and/or provisions of this Agreement shall prevail.

14.     Conditions Precedent to the Effectiveness of this Agreement. The obligations of Archway under this Agreement are expressly conditioned upon each of the following having occurred, or Archway having received what is required, including without limitation as stated in this Section 14, or such requirements or deadlines have been deemed satisfied or waived or extended in writing by Archway in its sole opinion and judgment (the "Effective Date").  All of the following documents and instruments shall be fully executed and delivered by all Parties and/or persons for whom a signature block is provided in such document, all in form and content satisfactory to Archway in its sole and absolute discretion, opinion, and judgment. Unless extended by Archway, the Effective Date shall occur on or prior to June 23, 2026.

A.     This Agreement;

B.     A-Note (Exhibit 1);

C.     B-Note (Exhibit 2);

D.     Broadway Memorandum of Modification, notarized for recording purposes (Exhibit 3);

E.     Amended Broadway Guaranty as to A-Note (Exhibit 4);

F.     Alan/Sue/Daniel Guaranty as to B-Note (Exhibit 5);

G.     New Canfield Deed of Trust, notarized for recording purposes (Exhibit 6);

H.     New Bagley Deed of Trust, notarized for recording purposes (Exhibit 7);

I.     New Roxbury Deed of Trust, notarized for recording purposes (Exhibit 8);

J.     Roxbury Estoppel Certificate from the others on title, notarized for recording purposes (Exhibit 9);

K.     New Palm Deed of Trust, notarized for recording purposes (Exhibit 10);

L.     New Greenfield Deed of Trust, notarized for recording purposes (Exhibit 11);

M.     New Horner Deed of Trust, notarized for recording purposes (Exhibit 12);

N.     New Canon Drive Deed of Trust, notarized for recording purposes (Exhibit 13);

EXHIBIT 1 - Page 36

O.    New Linden Deed of Trust (Exhibit 14);

P.    Certifications of Trust for D&S Trust and  G&H Trust; (Exhibits 15 and  16 [Exhibit 17 intentionally deleted]);

Q.    Roxbury Certification of Trust for the Haskell and Nurit Muhtar Revocable Trust (Exhibit 18);

R.    Roxbury Pledge and UCC-1 (Exhibit 19);

S.    Guarantor Loan Modification, and one or more Memorandum of Modification of Deed of Trust each of which memorandum is notarized for recording purposes (Exhibit 20);

T.    New Oakhurst Deed of Trust, notarized for recording purposes (Exhibit 21);

U.    Filing of a motion by the Debtors for the entry of an order from the Bankruptcy Court in all of the pending Cases approving this Agreement under Rule 9019 ("Rule 9019 Order") by June 2, 2026, and 14 days elapsing after entry of such Rule 9019 Order  without any stay pending an appeal having been granted;

V.    At the Obligors' expense, Archway shall have received or been given an irrevocable commitment to issue (1) such new ALTA loan policies of title insurance written by an institutional title insurance company containing only such exceptions to coverage and endorsements as Archway shall require; (2) a modification endorsement to Archway's existing Broadway Deed of Trust title policy insuring the continued priority in senior-most priority of such encumbrance under this Agreement; and (3) such endorsements to Archway's existing policies of title insurance insuring the continuing priority of the liens of all of Archway's currently existing deeds of trust in their existing priority positions without adverse impact due to this Agreement;

W.    Any document notarized for recording purposes required or suggested by an institutional title company for the issuance of any modification and/or other endorsement to effectuate the terms, covenants, and conditions set forth in this Agreement; and

X.    Recordation in the official records of Los Angeles County of the Memorandums of Modification, the Canfield Deed of Trust, the Bagley Deed of Trust, the Roxbury Deed of Trust, the New Palm Deed of Trust, the New Greenfield Deed of Trust, the New Oakhurst Deed of Trust, the New Linden Deed of Trust, and the New Horner Deed of Trust.

15.    Conditions Subsequent to this Agreement. The obligations of Archway under this Agreement to continue to perform from and after the Effective Date upon satisfaction of each of the express conditions precedent to the effectiveness of this Agreement, are expressly conditioned upon the following having occurred by, or Archway having received what is required, or waived such in writing, on or prior to each of the indicated subsequent performance dates below all in form and content satisfactory to Archway in its sole and absolute discretion, opinion, and judgment:

5676822v18 | 101415-0002                    19

EXHIBIT 1 - Page 37

A.      The Obligors, and each of them, shall file with the Bankruptcy Court a proposed joint disclosure statement and their joint Consensual Plan by no later than June 23, 2026, the terms and provisions of which comply in all respects with this Agreement and its implementation;

B.      The Obligors, and each of them, shall receive confirmation and the entry of the confirmation order by the Bankruptcy Court confirming the Consensual Plan ("Confirmation Order"), and retaining post-confirmation jurisdiction by the Bankruptcy Court to implement, interpret, and enforce same, by no later than October 15, 2026, that has not been stayed pending appeal within 14-days of the entry thereof;

C.      The Obligors, and each of them, shall have their Consensual Plan go effective by no later than the fifteenth (15th) day following entry of the Confirmation Order;

D.      The Obligors, and each of them as applicable, from time to time as required by Archway, shall execute in favor of Archway such amended Loan Documents, including without limitation an amended A-Note, an amended B-Note, and one or more memorandums of modification in recordable form as to such Alan/Sue/Daniel Restructure Collateral regarding each and every Net Value Adjustment;

E.      The Obligors, and each of them, shall provide to Archway each and every listing agreement and/or purchase and sale agreement for each of the real properties listed and for each offer accepted on such listed properties, within seven (7) days of the execution of each.

16.    Archway Plan Treatment. The Obligors, and each of them, shall and hereby do agree that the provisions of the Agreement are and shall be Archway's treatment in the Consensual Plan or other plan of reorganization. It shall conclusively be deemed not only to be an Event of Default under this Agreement, but also to be bad faith in fact for the Obligors, or any of them, to:

A.      File, propose, support, or seek confirmation of any plan of reorganization in any of the Cases or in any successor or other bankruptcy cases or estates that (1) contradicts, impairs, or otherwise is materially inconsistent with this Agreement or the terms, covenants, and/or agreements contained in this Agreement; (2) contradicts or impairs Archway's treatment or rights under this Agreement or that differs in any material respect with Archway's treatment or rights under this Agreement; and/or (3) supports any third person's proposed plan that contradicts, impairs, and/or otherwise is materially inconsistent with (a) the terms, covenants, and agreements contained in this Agreement; or (b) contradicts or impairs Archway's treatment or rights under this Agreement or that differs in any material respect with Archway's treatment or rights under this Agreement (collectively, a "Contrary Plan").

B.      The filing of any Contrary Plan shall also constitute an immediate Event of Default hereunder, terminating the Forbearance Period and leading to the right of immediate enforcement by Archway of its rights against the Obligors including, but not limited to, foreclosure remedies. The Obligors, and each of them, also agree and acknowledge that any such bad faith shall conclusively defeat and prevent confirmation of any such Contrary Plan under and by virtue of the provisions of 11 U.S.C. § 1129(a)(3).

5676822v18 | 101415-0002

20

EXHIBIT 1 - Page 38

17.      <u>Prior Canon Transfer Accounting</u>. Sue, as trustee of the D&S Trust, shall provide to Archway, before execution of this Agreement, an accounting of the use of the Canon Loan proceeds.

18.      <u>Dismissal of the Actions</u>. Upon the Consensual Plan going effective, Archway shall dismiss the Actions.

19.      <u>Validation of Amounts Owed and Archway's Allowed Bankruptcy Claims</u>. As to the Proofs of Claim, the Obligors agree that:

A.      The Obligors and each of them, are in default under the Loan Documents by virtue of their failure to pay and to perform to Archway under the Provision thereof.

B.      The Obligors, and each of them, are unaware of, have waived, and represent and warrant that there are not any, disputes, offsets, defenses, reductions, or counterclaim to the amounts owed to Archway under the Loan Documents or which would adversely impact Archway's claims under the Proofs of Claims.

C.      Archway shall have allowed secured claims as of the Petition Date as to any Proof of Claim which includes any Collateral in the Settlement Amount which will be allowed and receive treatment in the Consensual Plan consistent with the terms set forth in this Agreement and in such Proofs of Claim as outstanding and owed to Archway as a result of the pre-petition obligations of the Obligor, and each of them.

D.      The Obligors, and each of them, acknowledge and agree that Archway holds valid and duly perfected security interests in all of the Collateral as of the petition dates, that Archway holds that collateral in the priority position that existed on the petition dates, and that repayment of the amount owed to Archway, and performance of all of the obligation the Obligors, and each of them, to Archway, were and are secured by the value of each of the Obligors' interests in the Collateral as of the petition dates as to any Proof of Claim that evidences a collateral interest.

E.      The Obligors, and each of them, acknowledge and agree that the value of Archway's rights in the Cases, and in the Collateral, is such that any and all of Archway's post-petition accruing interest, fees and costs included in the Settlement Amount as defined above, including without limitation any Interest, reasonable attorney's fees and costs, are recoverable under and up to, and included in, the Settlement Amount, which resolves the Dispute.

F.      Archway shall have an allowed unsecured claim as of the petition dates as to any Proof of Claim which includes any Collateral in the amounts set forth in such Proofs of Claim as outstanding and owed to Archway as set forth above. Any of the pre-petition obligations of each of the Obligors to Archway that turn out not to fully collateralize the debt indicated, or which evidence an unsecured claim, are and shall be allowed unsecured claims in the respective Cases ("<u>Allowed Unsecured Claims</u>").

20.      <u>No Surcharge Against Archway's Collateral</u>. No Obligor, nor any of them, shall be entitled to recover upon any claim under 11 U.S.C. §§ 506(c), 552(b), or other applicable law against or surcharging any Collateral or Cash Collateral or Archway's interest therein for fees, costs, and/or expenses arising out of and/or appertaining to any of the Cases or any proceeding to

**EXHIBIT 1 - Page 39**

which these Cases, or any of them, including, without limitation, and by way of example only, charges for accrued and/or unpaid management fees or any claims by unpaid suppliers of goods, services, and/or materials to the Collateral, and any claims by and/or on behalf of any members, general and/or limited partners against the Collateral ("Surcharge Claims"). The Obligors, and each of them, waive any and all such Surcharge Claims. The Obligors further waive all claims and rights under the "equities of the case exception" set forth in 11 U.S.C. § 552.

21.     Agreement Binding Upon Successors. The terms, covenants, and conditions of this Agreement shall be binding on the parties hereto and their assigns immediately upon the final approval hereof by the Bankruptcy Court. All provisions of this Agreement shall become binding upon this estate, all of the Obligors, or any of them, successors, any successor estates, all creditors, interest-holders, and any and all other actual or potential successors in interest to the Obligors, and each of them, including without limitation, any trustee appointed in these Cases, or any of them, any trustee in a Chapter 7 case if any Case that is converted, any committees formed in any Cases or following any conversion of any of these Cases, and/or any successor estates which are, or which may hereafter be, appointed, created, or approved.

22.     Tiered Foreclosures.  Upon the occurrence of any Event of Default that triggers a right of Archway to foreclose on Collateral, Archway may foreclose on its Collateral, except that it agrees not to conduct a judicial or a non-judicial foreclosure auction on Collateral listed in a lower "Tier" until the occurrence of non-judicial foreclosure auctions of each item of Collateral listed in any prior "Tier," or such property has otherwise been consensually disposed of, as follows:

**Tier 1:** Broadway Property, SLA Property, and Foxdale Property;

**Tier 2:** Greenfield Property, Palm Property, Bagley Property, Canon Property, and Canfield Property;

**Tier 3:** Roxbury Property;

**Tier 4a:** Linden Property (only after a default in any payment due to Archway hereunder, after an unapproved sale of the property, or the death of Sue, or she no longer lives there, or the failure to sell the property by the Drop Dead Date and pay the net proceeds thereof to Archway unless Linden qualifies to be Shortfall Residence Collateral);

**Tier4b:** Oakhurst Property (only after a default in any payment due to Archway hereunder, or an unapproved sale of the property, or the deaths of Alan and Sharon Gomperts, or they no longer live there); and

**Tier 4c:** Horner Property (only after a default in payment of any amounts due to Archway hereunder, or an unapproved sale of the property, or the death of Daniel, or he no longer lives there).

The only credits against the Settlement Amount from time to time based on a Tiered foreclosure or other disposition of any of the properties shall be based only on Archway's actual and successful foreclosure bid amount, or the net sale proceeds actually received by Archway from the foreclosure sale ("Archway Proceeds Received"). No Obligor, or any of them, shall ever claim

22

**EXHIBIT 1 - Page 40**

or assert that a different or higher credit against the Settlement Amount should be given for any reason other than the Settlement Amount was not credited with the Archway Proceeds Received. The requirement that Archway foreclose in "Tiers," however, shall be excused and rendered null and void if there is any interference with, postponement, delay, or hinderance by anyone of any Archway foreclosure or enforcement actions, including its commencement or conducting of foreclosure. For the avoidance of doubt, if Archway reasonably determines that its foreclosure against any particular property or properties listed in this paragraph is prevented, stayed, and/or delayed for any reason, including, but not limited to, a voluntary or involuntary bankruptcy, injunction, condemnation proceeding, and/or any other form of injunctive, governmental, or other process or proceeding that prevents, delays, or tends to prevent or delay such foreclosure, then Archway shall not be required to foreclose on such property before foreclosing on properties in lower "Tiers."

23.     Oakhurst and Homestead. On condition that Alan or Sharon continually live at the Oakhurst Property:

A.     Archway will not foreclose on the  Oakhurst Property so long as Alan or Sharon live there, on the further conditions that they, or either of them, do not (a) default in timely payment or performance to Archway under this Agreement, including without limitation as to the Shortfall Term Out payments, if any become due; (b) default in timely payment or performance on any senior encumbrance on Oakhurst; (c) default in timely payment of the accrued or accruing *ad valorem* real property taxes without interest or penalties; (d) further encumber or transfer the Oakhurst property; (e) fail to maintain the Oakhurst Property; and (f) fail to keep the  Oakhurst Property adequately insured with Archway as a listed additional insured and loss payee.

B.     Alan and Sharon shall retain their homestead exemption on the Oakhurst Property in the maximum amount allowed under California state law for that property as of the Effective Date, notwithstanding the New Oakhurst Deed of Trust in favor of Archway ("Oakhurst Homestead").

24.     Exercise of Discretion . The exercise by Archway of any judgment or discretion concerning this Agreement is deemed to have been exercised by Archway in good faith and in accordance with commercially-reasonable practices, to be reasonable in all respects, and shall not create any fiduciary duties of Archway whatsoever.

25.     No Third-Party Beneficiaries.  There shall be no third-party beneficiaries associated with this Agreement. This Agreement is made solely for the benefit of the Parties hereto (and the Released Parties with respect solely to the release provisions herein). This Agreement is not intended to constitute, and shall not be construed as, a third-party beneficiary contract for the benefit of anyone else. No other person or entity shall have any rights or remedies under or by reason of this Agreement.

26.     Document Turnover. Except as may otherwise be set forth herein, within five (5) business days of the entry of the order approving this Agreement, or otherwise as set forth herein, the Obligors, and each of them, shall turn over to Archway, through its legal counsel, each and every of the following documents, writings, and other things not previously provided via electronic

mail to counsel for Archway at the addresses set forth below, or if not in electronic form, via legible copies:

A.     All documents pertaining to each and every Sale;

B.     All filings with the Office of the United States Trustee including without limitation any operating reports, interim statements, the seven day package, all exhibits and attachments to each and every one of the foregoing, and any other filings and/or submission including without limitation currently effective insurance policies being written by one or more insurance carriers and contain insurance coverages comprehensive and those currently in effect pre-petition.

C.     All documents as may be requested by Archway pertaining to the nature and value of the ownership interests held in the Obligors, and each of them, and in any member of the Obligors, and each of them, to the extent such member is a non-natural person (or general or limited partner of the Obligors, and each of them, to the extent such partner is a non-natural person), including but not limited to the status of any capital accounts of such member or partner, the amount and date of any capital contributions or investments in the Obligors, and each of them, or such member of partner of the Obligors, and each of them, and all communications by or between the Obligors, and each of them, or any officers, directors, agents, representatives, employees, members or partners of the Obligors, and each of them, pertaining to such capital accounts and capital contributions within two years prior to the petition date.

D.     All documents evidencing, reflecting, or referring to solicitations of investments or capital contributions in the Obligors, and each of them, or any member or partner of the Obligors, and each of them, including offering memorandums and private placement memorandums, within two (2) years prior to the petition date.

E.     All documents evidencing, reflecting, or referring to offers to purchase investment or ownership interests in the Obligors, and each of them, or any member or partner of the Obligors, and each of them, within two years prior to the petition date.

F.     Federal and state income tax returns for the Obligors, and each of them, for the past two years for which such returns have been prepared and filed.

G.     Copies of all other contracts and/or agreements materially affecting, pertaining to, or relating to the operation of the Collateral.

H.     Copies of the reports of any other experts or professionals whose opinions were used and/or relied upon in the preparation of the budgets referred to herein and operating projections.

I.     Mortgage Statements on all newly and previously pledged real properties.

J.     Updated financial statements from the Guarantors, including cash accounts.

K.     Full accounting of all delinquent property taxes and updates on all expenses for each collateral real property hereunder.

5676822v18 | 101415-0002            24

**EXHIBIT 1 - Page 42**

27.     <u>No Further Stays</u>. All Obligors, and each of them including Broadway, give up any right to seek to reimpose, condition, or alter any and all lift stay orders entered by the Bankruptcy Court in favor of Archway, or to seek to stay, enjoin, prohibit, delay, or condition Archway's assertion of any of its rights against any Obligor including Broadway, either in any state or federal court, or otherwise, including without limitation affecting Archway's foreclosure on any of the properties of any Obligor including Broadway and/or Archway's other Collateral. Any Consensual Plan will contain such prohibitions in favor of Archway, and any confirmation order and post-confirmation injunction will contain such prohibitions in favor of Archway against all parties. All the Obligors including Broadway also to acknowledge that:

A.      they will not transfer any interest on any basis as to any property in which Archway has any interest; and

B.      any further bankruptcy filings by anyone or transfers to anyone impacting any Archway collateral is conclusively presumed to be in bad faith and a violation of 11 U.S.C. § 362(d)(4) as part of a scheme to delay, hinder, and defraud Archway.

28.     <u>No Further Encumbrances</u>. Without Archway's express written consent, which consent may be given or withheld for any reason, or no reason, in the exercise of Archway's sole opinion and judgment, neither the Obligors, not any of them, nor any other person, may, or shall be entitled to, seek to obtain any lien in any of the Collateral, nor shall any such lien be granted, that has or enjoys lien priority equal to or greater than the lien priority enjoyed by Archway therein, whether under 11 U.S.C. § 364 or otherwise.

29.     <u>Events of Default</u>. Subject to the notice and cure provisions below, in addition to any further default under the Loan Documents each of the following shall be deemed an "<u>Event of Default</u>" or "<u>Default</u>" hereunder:

A.      failure of any Obligor to pay when due any payment required to be made by it pursuant to this Agreement or the Consensual Plan, including without limitation as to any Sale;

B.      default by any Obligor in the timely performance of any material term, condition, covenant, or agreement contained in this Agreement, including without limitation as to any Sale;

C.      default by any Obligor in the performance of any material term, condition, covenant, or agreement contained in any of the Loan Documents (except as otherwise modified by this Agreement);

D.      any representation or warranty made by any Obligor hereunder or under the Loan Documents or any other documents and instruments executed in connection with this Agreement, shall prove to be at any time to be incorrect and the Obligor who made such representation or warranty was aware that it was incorrect at the time it was made or did not take action to inform Archway of the incorrect representation or warranty within a reasonable time of learning such representation or warrant was or became incorrect;

5676822v18 | 101415-0002                           25

**EXHIBIT 1 - Page 43**

E.     failure of any Obligor to provide Archway with any material reports, information, financial statements, documents, or instruments required under this Agreement or the Loan Documents;

F.     the filing of any lawsuit or other legal action by any Obligor or others on their behalf challenging: (1) the existence or priority of Archway's security interests; or (2) the enforceability or validity of this Agreement or the Loan Documents;

G.     if any Obligor is enjoined, restrained, or in any way prevented by court order or otherwise from continuing to conduct any material part of its business affairs; or

H.     the Obligors fail to pay the Floor Amount to Archway in full on or before the Drop Dead Date;

I.     the filing of a Contrary Plan, as set forth in Section 16 herein.

30.     <u>Notice and Cure</u>.

A.     Any payment obligation under this Agreement is subject to a ten (10) calendar day grace period ("Grace Period") before it would be considered to be late or defaulted or not timely paid, but any failure to pay Archway timely is not subject to any notice to Obligors and is not otherwise curable;

B.     Archway shall give to the Obligors, and each of them, written notice of an Event of Default other than a failure to make a payment that is a failure to perform, or a covenant default, or at Archway's option the existence of an event or omission or failure to perform which would become an Event of Default with the passage of time, the giving of notice, or both, ("<u>Notice of Default</u>").

C.     For any Event of Default that may be cured, Obligors, and each of them, shall be allowed to attempt to cure such Event of Default, and shall have thirty (30) calendar days ("<u>Cure Period</u>") to effectuate such a cure ("<u>Cure</u>" or "<u>Cured</u>," as applicable), on condition that such Event of Default is capable of being Cured and that no such Event of Default has occurred and been previously Cured twice in the preceding twelve (12) months.

31.     <u>Remedies on Default</u>.

A.     Subject to the following sub-paragraph, upon a payment Event of Default, and/or any other Event of Default and the expiration of any Cure Period for such other Event of Default that is allowed under this Agreement without a timely Cure having been effectuated, then, at the option of Archway, in the sole and absolute discretion, opinion, and judgment of Archway the entire Settlement Amount to Archway, and all amounts payable thereunder, shall be immediately due and payable, without any further presentment, demand, protest, or notice of any kind whatsoever, all of which are expressly waived by the Obligors, and each of them. Archway may immediately enforce any and all obligations and indebtedness of the Obligors, and each of them, to Archway and exercise any and all remedies under the Loan Documents, this Agreement, and/or as otherwise available to Archway, at law or in equity unless otherwise stated in this Agreement.

5676822v18 | 101415-0002                           26

**EXHIBIT 1 - Page 44**

B.    Upon the existence of an Event of Default, following any Notice of Default if a Notice of Default is required and/or the expiration of any Cure period if such is allowed, the Obligors, and each of them, shall not be obligated to pay to Archway the interest that has accrued up to that point at the Existing Default Rate of Interest unless the Obligors, or any of them, are at-fault in such Event of Default ("At Fault Default" as defined below); provided, however, that any Event of Default at any time for any reason shall trigger the new accrual of default rate interest at the Existing Default Rate of Interest going forward, irrespective of whether or not such Event of Default is or is not an At Fault Default.

C.    An At Fault Default occurs when, if, and/or where the Obligors, or any of them (1) have taken any action that is prohibited under, or constitutes a breach of, any term, covenant, or condition in this Agreement or any other agreement or obligation associated in any way with this Agreement or the Consensual Plan (collectively, "Agreements"), or have failed or omitted to take any action required of any of them to be taken under, or constitutes a breach of, any term, covenant, or condition in any of the Agreements; and (2) have sufficient tangible or intangible assets, real or personal, liquid or otherwise, to act as required under this Agreement, and/or the Consensual Plan.

D.    The rights and remedies of Archway hereunder are cumulative and not exclusive. Any waiver, permit, consent, or approval of any kind by Archway of any breach or default hereunder, or waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

32.    Neutral Construction of the Agreement. This Agreement is a product of negotiation among the parties hereto and represents the jointly conceived, bargained-for, and agreed-upon language mutually determined by the parties to express their intentions in entering into this Agreement. Any ambiguity or uncertainty in this Agreement shall be deemed to be caused by or attributable to the parties hereto collectively. In any action to enforce or interpret this Agreement, the Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or the Agreement as a whole, shall be construed more or less favorably to any one party to this Agreement.

33.    Representations and Warranties of Obligors. The Obligors, and each of them, hereby represent and warrant to Archway and covenant and agree with Archway as follows:

A.    The Obligors, and each of them, have full legal right, power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by the Obligors, and each of them, and the consummation by the Obligors, and each of them, of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of the Obligors, and each of them. This Agreement is a valid and binding obligation of the Obligors, and each of them, enforceable against the Obligors, and each of them, in accordance with its terms.

B.    Neither the execution and delivery of this Agreement by the Obligors, or any of them, nor the consummation by the Obligors, and each of them, of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to the Obligors, or any of them, or any contract, commitment, agreement, arrangement or

restriction of any kind to which the Obligors, and each of them, is a party, by which the Obligors, and each of them, is bound or to which any of the Obligors' property or assets are subject.

C.      There are no actions, suits or proceedings pending, or to the knowledge of the Obligors, and each of them, threatened against or affecting the Obligors, and each of them, in relation to its obligations to Archway or involving the validity and enforceability of this Agreement, or any of the Loan Documents, as applicable, at law or in equity, or before or by any governmental agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of the Obligors, and each of them, or the ability of the Obligors, and each of them, to perform their obligations to Archway.

D.      The representations and warranties of the Obligors, and each of them, contained in the Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

E.      There are no modifications, changes to, or amendments of the Loan Documents unless such modification, change to, or amendment is expressly set forth herein, or will otherwise be evidenced hereafter in a writing to be signed by all Parties hereto.

F.      The Obligors, and each of them, have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Obligors, and each of them, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes.

G.      Except as expressly stated in this Agreement, neither Archway nor any other person or entity has made any statement or representation to any Obligor regarding facts relied upon by any Obligor.

H.      The Obligors, and each of them, do not rely upon any statement, representation or promise of Archway or any other person or entity in executing this Agreement except as expressly stated in this Agreement.

I.      The terms of this Agreement are contractual and not a mere recital.

J.      This Agreement has been carefully read by Obligors, and each of them, and the contents hereof are known and understood by, and it is signed freely by Obligors, and each of them.

K.      This Agreement and the releases contained herein are intended to be final and binding against the Obligors, and each of them, acknowledge that Archway is expressly relying on the finality of this Agreement as a substantial, material factor inducing Archway's execution of this Agreement.

L.      The D&S Trust and the Probate Estate have no assets to administer that are not otherwise referred to in the schedules filed in the Bankruptcy Proceedings (the "Accountings").

5676822v18 | 101415-0002                              28

**EXHIBIT 1 - Page 46**

34.    Representations and Warranties of Archway. Archway hereby represents and warrants to Obligors and covenants and agrees with Obligors as follows:

A.    Archway has full legal right, power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Archway and the consummation by Archway of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Archway. This Agreement is a valid and binding obligation of Archway, enforceable against Archway in accordance with its terms.

B.    Neither the execution and delivery of this Agreement by Archway, nor the consummation by Archway, of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Archway, or any contract, commitment, agreement, arrangement or restriction of any kind to which Archway is a party or by which Archway is bound.

C.    There are no modifications, changes to, or amendments of the Loan Documents unless such modification, change to, or amendment is expressly set forth herein, or will otherwise be evidenced hereafter in a writing to be signed by all Parties hereto.

D.    Archway has received, or has had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Archway, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes.

E.    Except as expressly stated in this Agreement, neither any Obligor nor any other person or entity has made any statement or representation to Archway regarding facts relied upon by Archway.

F.    Archway does not rely upon any statement, representation or promise of an Obligor or any other person or entity in executing this Agreement except as expressly stated in this Agreement.

G.    The terms of this Agreement are contractual and not a mere recital.

H.    This Agreement has been carefully read by Archway, and the contents hereof are known and understood by, and it is signed freely by Archway.

I.    This Agreement and the releases contained herein are intended to be final and binding against Archway, acknowledge that the Obligors are expressly relying on the finality of this Agreement as a substantial, material factor inducing the Obligors' execution of this Agreement.

35.    Revival of Obligation.

A.    The Obligors, and each of them, acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or

5676822v18 | 101415-0002                    29

EXHIBIT 1 - Page 47

recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Archway is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Archway related thereto, including, without limitation, relief from stay or similar proceedings), the liability of the Obligors, and each of them, to Archway shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Archway.

B.      Nothing set forth herein is an admission that such Voidable Transfer has occurred. The Obligors, and each of them, expressly acknowledge that Archway may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Archway's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, the Obligors, and each of them, shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

36.     Waiver of Certain Bankruptcy Rights. The Obligors, and each of them, acknowledge and agree that, but for Archway entering into this Agreement with the Obligors, and each of them, Archway would have continued to diligently pursue all of its rights and remedies under the Loan Documents, at law and in equity, against the Obligors, and each of them. As an additional inducement to and material consideration for Archway agreeing to the modifications and extension provided in this Agreement, the Obligors, and each of them, agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined herein) is commenced which subjects Archway to any stay in the exercise of Archway's rights and remedies under the Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by 11 U.S.C. § 362 (individually and collectively, "Stay"), then the Obligors, and each of them, irrevocably consent and agree that such Stay shall automatically be lifted and released against Archway with respect to the Collateral, and Archway shall thereafter be entitled to exercise all of its rights and remedies under the Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement. The Obligors, and each of them, acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to the Obligors, and each of them, under the terms of this Agreement are valuable consideration for such waiver. As used in this Section, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against the Obligors, and each of them, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against the Obligors, and each of them, or either of them, any action where the Obligors, and each of them, are adjudicated as bankrupt or insolvent, any action for dissolution of the Obligors, and each of them, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Archway of its rights and remedies with respect to the Collateral under the Loan Documents.

37.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Obligors, and each of them, and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

5676822v18 | 101415-0002                            30

**EXHIBIT 1 - Page 48**

38.    Release by Obligors.

A.    On the Effective Date, and except as otherwise provided in this Agreement, the Obligors, and each of them, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Archway and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Obligors, and each of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Archway or granted in connection herewith, or to any other obligations of Obligors, or either of them, to Archway, or the lending arrangements between Archway and Obligors, and each of them, all individually and collectively. As to the matters released herein, Obligors, and each of them, expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

B.    The Obligors, and each of them, expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, the Obligors, and each of them, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of the Obligors, and each of them, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release from such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

C.    The Obligors, and each of them, are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims, or other matters herein released. The Obligors, and each of them, shall

5676822v18 | 101415-0002                              31

EXHIBIT 1 - Page 49

indemnify, defend, and hold Archway and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

39.    No Joint Venture, Management, or Control. Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

A.    Archway is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person, or other business associate or participant of any kind of any Obligor or other person;

B.    Archway shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of any Obligor; and

C.    The Obligors, and each of them, do not have any claims, causes of action or defenses to their obligations to Archway based on any allegations of management or control exercised by Archway. The Obligors, and each of them, acknowledge and agree that Archway does not manage or control them in any way.

40.    No Further Commitments to Lend. The Obligors, and each of them, agree and acknowledge that Archway will not and has no obligation to advance, provide or loan any further or additional monies or credit to any of the Obligors and the obligation of Archway to advance any further sums to any Obligor under the Loan Documents has been terminated thereunder. The Obligors, and each of them, further agree and acknowledge that Archway will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Archway by the Obligors, and each of them.

41.    Intent of the Parties in Interpreting Loan Documents. Neither this Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance, or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of the Obligors, and each of them, and Archway to at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Settlement Amount, and/or the Alleged Amounts Owed, as the case may be, as evidenced by the Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from the Obligors, and each of them, is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with any of the Loans, or on acceleration of the maturity of any of the Loan or as a result of any prepayment by Obligors, and each of them, or otherwise, violates that law, and the Obligors, and each of them, is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Archway in excess of the permitted amounts shall be applied by Archway to reduce the unpaid principal balance of any of the Loans without the payment of any prepayment premium (or, if any of the amounts owed under any Loans has been or would thereby be paid in full, shall

**EXHIBIT 1 - Page 50**

be refunded to the Obligors, and each of them), and the provisions of this Agreement and the Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under this Agreement and any Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under this Agreement or the Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Obligors, and each of them, has been violated, all Settlement Amount, and/or Alleged Amounts Owed, that constitutes interest, as well as all other charges made in connection with the Settlement Amount, and/or the Alleged Amounts Owed, that constitute interest, and any amount paid or agreed to be paid to Archway for the use, forbearance, or detention of the Settlement Amount, and/or the Alleged Amounts Owed , shall be deemed to be allocated and spread ratably over the stated term of this Agreement and/or the applicable Loan Documents. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Agreement and/or the applicable Loan Documents.

42.    <u>Miscellaneous</u>.

A.    The headings set forth herein are inserted for convenience of the parties only and shall not be used to interpret or construe or in any way affect the meaning of the terms and provisions of this Agreement.

B.    This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

C.    This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents. Nothing contained in this Agreement shall be deemed to constitute a waiver by Archway of any required performance by Obligors, and each of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents. In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

D.    This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California. This Agreement shall be construed under the laws of the State of California.

E.    The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term. No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other

**EXHIBIT 1 - Page 51**

provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

F.    Except as expressly provided in this Agreement, this Agreement is the final written expression and complete and exclusive statement of all the agreements, conditions, promises and covenants among the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, understandings and discussions among the parties and/or their respective counsel with respect to the subject matter conveyed hereby. Any amendment or modification of this Agreement, in order to be legally binding, must be in writing specifically referring to the Agreement and signed by duly authorized representatives of all parties hereto.

G.    This Agreement shall be submitted forthwith to the Bankruptcy Court for approval and, in that regard, the Obligors, and each of them, and/or Archway may give such notice and opportunity to be heard as is required under Bankruptcy Rule 4001, Local Bankruptcy Rule 4001-1 or other applicable law.

H.    Except as provided in this Agreement, Archway specifically reserves all of its rights, interests and remedies at law and in equity, or otherwise, with respect to, in connection with or relating to the Loan Documents, this Agreement and any other agreements, instruments, facts or matters relating to any of the foregoing. This reservation of rights is not intended and shall not be construed as exclusive.

I.    All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

J.    No failure or delay on the part of Archway in the exercise of any right, power, or privilege hereunder or under the documents or instruments referred to herein shall operate as a waiver thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

K.    This Agreement, any additional loan documents, the Loan Documents and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of California. The Obligors, and each of them, hereby submit to the jurisdiction of the courts of Los Angeles County, California, whether state or federal.

L.    This Agreement shall be binding upon and inure to the benefit of Archway, Obligors, and each of them, and their respective successors and assigns, except that Obligors, and each of them, 's' rights hereunder are not assignable without the prior written consent of Archway, which consent Archway may give or withhold in its sole and absolute opinion and judgment.

M.    This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

N.    If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement; and the

EXHIBIT 1 - Page 52

remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by severance from this Agreement.

O.  The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing and with an understanding of their significance and consequence and that they are reasonable.

P.  The Parties acknowledge and agree that time is of the essence including, without limitation, all deadlines and time periods provided for under this Agreement.

Q.  This Agreement may be executed and delivered in two or more counterparts, each of which when so executed and delivered, shall be either an original, or a copy of the original signature transmitted via facsimile, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it. Copies of the original signatures on this Agreement which are transmitted via facsimile shall have the same force and legal effect as original signatures, and a facsimile signature shall be accepted by all parties as an original signature. Original signatures shall be provided following submission of fax signatures, but the failure to do so shall not impact on the effectiveness of this Agreement.

R.  Any notice required to be given hereunder shall be given at the address set forth across from the signature of each party hereto. Any notice given by U.S. mail shall be deemed given no earlier than five (5) business days after placed in the U.S. mail and properly addressed with postage fully prepaid; any notice given by messenger or hand delivery, upon delivery; and any notice by overnight mail service such as FedEx, upon delivery. Each party to this Agreement agrees to keep every other party advised as to such party's current address.

**[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]**

Docusign Envelope ID: 154F839B-7775-8FE0-8230-4C3A00698FAA

43.    <u>Judicial Reference</u>. The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, or as to any document attached or referenced herein, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure § 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery. The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding. Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans. ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.*** The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

Broadway Initials

Negev Initials

SLA Initials

Alan and Sharon Initials

Sue Initials

Daniel Initials

Cannon Initials

[Signature Pages Follow]

**EXHIBIT 1 - Page 54**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**OBLIGORS:**

BROADWAY AVENUE INVESTMENTS LLC
A California limited liability company

By:_____
Name: Alan Gomperts
Its: Manager

NEGEV INVESTMENTS LLC
A California limited liability company

By:_____
Name: Alan Gomperts
Its: Manager

SLA INVESTMENTS LLC
A California limited liability company

By_____
Name: Alan Gomperts
Its: Manager

CANNON DRIVE LLC
A California limited liability company


By:_____
Name: Daniel Halevy
Its: Manager

_____
ALAN GOMPERTS, individually, and
in his capacity as Trustee of the
Gomperts and Halevy Family Trust

_____
SHARON GOMPERTS,
in her capacity as Trustee of the
Gomperts and Halevy Family Trust

5676822v18 | 101415-0002                    37

**EXHIBIT 1 - Page 55**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**OBLIGORS:**

BROADWAY AVENUE INVESTMENTS LLC
A California limited liability company


By:_____
Name: Alan Gomperts
Its: Manager

NEGEV INVESTMENTS LLC
A California limited liability company


By:_____
Name: Alan Gomperts
Its: Manager

SLA INVESTMENTS LLC
A California limited liability company


By:_____
Name: Alan Gomperts
Its: Manager

CANNON DRIVE LLC
A California limited liability company

By:_____
Name: Daniel Halevy
Its: Manager


_____
ALAN GOMPERTS, individually, and
in his capacity as Trustee of the
Gomperts and Halevy Family Trust


_____
SHARON GOMPERTS,
in her capacity as Trustee of the
Gomperts and Halevy Family Trust

5676822v18 | 101415-0002                      37

EXHIBIT 1 - Page 56

SUSAN HALEVY, individually, and
in her capacity as Trustee of the Halevy
Family Trust dated September 6, 2010

DANIEL HALEVY, individually, and
in his capacity as Personal Representative
of the Probate Estate of David Halevy

**LENDER:**

ARCHWAY BROADWAY LOAN SPE, LLC
A Delaware limited liability company


By: _____
Name: Bobby Khorshidi
Title:   Director

5676822v18 | 101415-0002                    38

**EXHIBIT 1 - Page 57**

---

SUSAN HALEVY, individually, and
in her capacity as Trustee of the Halevy
Family Trust dated September 6, 2010

---

DANIEL HALEVY, individually, and
in his capacity as Personal Representative
of the Probate Estate of David Halevy

**LENDER:**

ARCHWAY BROADWAY LOAN SPE, LLC
A Delaware limited liability company

By: _____
Name: Joshua Kohan
Title:   Authorized Signer

EXHIBIT 1 - Page 58

**EXHIBIT 1.**

**EXHIBIT 2.**

**EXHIBIT 3.**

**EXHIBIT 4.**

**EXHIBIT 5.**

**EXHIBIT 1 - Page 59**

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**
*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* Derrick Talerico _____, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
    a. Oral verification: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
    b. Explanation: I provide the following explanation why no such verification is provided (*e.g.,* that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR- Explanation why no verification is provided |
|---|---|---|---|
| 1. | Alan Gomperts | 6/2/2026 | ☐ See explanation below. |
| 2. | Sharon Halevy Gomperts | 6/2/2026 | ☐ See explanation below. |
| 3. | Susan Halevy | 6/2/2026 | ☐ See explanation below. |
| 4. | Daniel Halevy | 6/2/2026 | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:

☐ see attached continuation sheet

    *Verification must be oral*.  For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures.  *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/2/2026 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): **Motion To Approve Settlement Agreement With Archway Broadway Loan SPE, LLC Under Rule 9019 Of The Federal Rules Of Bankruptcy Procedure; Declarations Of Alan D. Gomperts And Derrick Talerico In Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 2, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See attached NEF Service List

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  June 2, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Vincent Zurzolo                    (via Priority Mail)
United States Bankruptcy Court
255 E Temple St Suite 1360
Los Angeles, CA 90012

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 2, 2026 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

Broadway Avenue Investments, LLC – Jointly Administered

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- <u>Attorneys for Corporate Debtors Broadway Avenue Investments, LLC, Negev Investments, LLC, SLA Investments, LCC.</u>: **Derrick Talerico**: dtalerico@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- <u>Attorneys for Individual Debtors Alan Gomperts, Daniel Halevy, Susan Halevy</u>: **Zev Shechtman, Carol Chow, Turner Falk, Ryan Coy**: zev.shechtman@saul.com; zshechtman@ecf.inforuptcy.com; carol.chow@saul.com; easter.santamaria@saul.com; turner.falk@saul.com; ryan.coy@saul.com
- <u>Attorneys for Creditor First Foundation Bank</u>: **Scott R Albrecht**: scott.albrecht@sgsattorneys.com; jackie.nguyen@sgsattorneys.com
- <u>Attorneys for Creditor Korth Direct Mortgage, Inc.</u>: **Tanya Behnam, Garrick Vanderfin**: gvanderfin@polsinelli.com, tbehnam@polsinelli.com; tanyabehnam@gmail.com; ladocketing@polsinelli.com; zyoung@polsinelli.com; ccripe@polsinelli.com;
- <u>Attorneys for Creditor Los Angeles County Treasurer and Tax Collector</u>: **Jacquelyn H Choi**: jacquelyn.choi@rimonlaw.com; docketingsupport@rimonlaw.com
- <u>Attorneys for Creditor United States of America on behalf of the Internal Revenue Service</u>: **Robert F Conte**: robert.conte@usdoj.gov; caseview.ecf@usdoj.gov; usacac.tax@usdoj.gov
- <u>Courtesy NEF/Interested Party</u>: **Christopher Cramer**: secured@becket-lee.com
- <u>Attorneys for Creditor Harvest Small Business Finance, LLC</u>: **Christopher Crowell, Jessica M Simon**: ccrowell@frandzel.com; mbrandenberg@frandzel.com
- <u>Attorneys for Creditors Archway Real Estate Income Fund I SPE I, LLC, Archway Broadway Loan SPE, LLC, fka Archway Real Estate Income Fund I REIT, LLC, Archway Real Estate Income Fund, and Plaintiff Archway Broadway Loan SPE, LLC</u>: **Michael G. Fletcher, Bruce D. Poltrock, Paige Selina Poupart, Gerrick Warrington**: mfletcher@frandzel.com; ppoupart@franddzel.com; gwarrington@frandzel.com; bpoltrock@frandzel.com; sking@frandzel.com; achase@frandzel.com; autodocket@frandzel.com
- <u>Attorneys for Creditors NewRez LLC d/b/a Shellpoint Mortgage Servicing, Wells Fargo National Bank West</u>: **Todd S Garan**: ch11ecf@aldridgepite.com; TSG@ecf.inforuptcy.com; tgaran@aldridgepite.com
- <u>Attorneys for Creditor Los Angeles County Treasurer and Tax Collector</u>: **Richard Girgado**: rgirgado@counsel.lacounty.gov
- <u>Attorneys for Creditor Harvest Small Business Finance, LLC</u>: **Jacqueline L James**: jjames@buchalter.com; gvidales@buchalter.com; docket@buchalter.com
- <u>Courtesy NEF/Interested Party Avi Muhtar</u>: **Avi Edward Muhtar**: amuhtar@crownandstonelaw.com
- <u>Attorneys for Creditor AIRE Ancient Baths Los Angeles, LLC</u>: **David B Shemano**: dshemano@shemanolaw.com
- <u>Attorneys for Creditor Harvest Small Business Finance, LLC</u>: **Jessica M. Simon**: jsimon@hrhlaw.com; mgranzow@hrhlaw.com
- <u>Attorneys for Creditor Wells Fargo Bank, N.A. dba Wells Fargo Auto</u>: **Samantha White**: Samantha.white@wellsfargo.com
- <u>Attorneys for Creditor Wells Fargo Bank, N.A.</u>: **Jennifer C Wong**: bknotice@mccartyholthus.com; jwong@ecf.courtdrive.com
- <u>US Trustee's Office</u>: ustpregion16.la.ecf@usdoj.gov; **Kelly L. Morrison**: Kelly.l.morrison@usdoj.gov

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**