Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN
TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone: (424) 500-8552

Counsel to Debtors Broadway Avenue
Investments, LLC, SLA Investments, LLC,
and Negev Investments, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SEATON INVESTMENTS, LLC, *et al.*,<br><br><br>Debtors and Debtors in<br>Possession. | Lead Case No. 2:24-bk-12079-VZ<br><br>Jointly Administered with Case Nos.:<br>2:24-bk-12080-VZ; 2:24-bk-12081-VZ;<br>2:24-bk-12082-VZ; 2:24-bk-12091-VZ;<br>2:24-bk-12074-VZ; 2:24-bk-12075-VZ<br>and 2:24-bk-12076-VZ<br><br>Chapter 11 |
| ☐ Affects All Debtors.<br>☐ Affects Seaton Investments, LLC (*Dismissed*)<br>☐ Affects Colyton Investments, LLC (*Dismissed*)<br>☒ Affects Broadway Avenue Investments, LLC<br>☐ Affects SLA Investments, LLC<br>☐ Affects Negev Investments, LLC<br>☐ Affects Alan Gomperts<br>☐ Affects Daniel Halevy<br>☐ Affects Susan Halevy | **NOTICE OF MOTION AND MOTION FOR ORDER: (1) APPROVING BIDDING PROCEDURES FOR THE SALE OF REAL PROPERTY; (2) AUTHORIZING EMPLOYMENT OF ELIZABETH CLARK OF KIDDER MATHEWS AS REAL ESTATE BROKER; (3) AUTHORIZING SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS; AND RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ALAN D. GOMPERTS, JACK STEPHENS, AND ELIZABETH CLARK IN SUPPORT THEREOF** |

<u>Hearing</u>:
Date:        July 23, 2026
Time:        11:00 a.m.
Courtroom:   1368
             255 E. Temple Street
             Los Angeles, CA 90012

**TO ALL PARTIES IN INTEREST, PLEASE TAKE NOTICE:**

Broadway Avenue Investments, LLC ("**Broadway**," "**Debtor**," or "**Seller**"), the debtor and debtor-in-possession in the pending jointly administered chapter 11 bankruptcy cases herein (the "**Cases**"),[1] hereby submits this *Motion for Order (1) Approving Bidding Procedures for the Sale of Real Property; (2) Authorizing Employment of Elizabeth Clark of Kidder Mathews as Real Estate Broker; (3) Authorizing Sale of Real Property Free and Clear of Liens, Claims, and Interests; and Related Relief* ("**Motion**") pursuant to §§ 105(a), 327(a), and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"),[2] Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 6004-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("**LBR**"), for the entry of:

1. An order (the "**Bidding Procedures Order**") following the hearing scheduled to be held on July 23, 2026 at 11:00 a.m. (the "**Bidding Procedures Hearing**"):

   (A) approving the terms and conditions stated in the Standard Offer, Agreement and Escrow Instructions fo Purchase of Real Estate, as amended (the "**Stalking Horse APA**") attached to this Notice (the "**Notice**") as **Exhibit 1**, between the Debtor and The DMB Fund dba Broadway Community Care Centers or assignee ("**Stalking Horse Purchaser**"), for a sale ("**Sale**") of the Debtor's primary asset, 737 S. Broadway, Los Angeles, CA, 90014 (the "**Property**") to (a) the Stalking Horse Purchaser, or (b) any prospective overbidders (each an "**Overbidder**" and collectively, the "**Overbidders**") who seek to participate in a planned auction ("**Auction**");

   (B) establishing the Stalking Horse Purchaser as the stalking horse bidder for the Property;

---

[1] "Cases" refers to the jointly administered cases that as of the date of this Motion, have not been dismissed: Broadway Avenue Investments, LLC, SLA Investments, LLC, Negev Investments, LLC, Alan Gomperts, Susan Halevy, and Daniel Halevy (together, the "**Cases**," and the debtors thereto, the "**Debtors**")

[2] Unless otherwise stated, all section references herein are to the Bankruptcy Code.

(C)    approving the bidding procedures (the "**Bidding Procedures**," attached to this Notice as **Exhibit 2**), relating to the proposed Auction described below and in the attached Memorandum of Points and Authorities (the "**Memorandum**");

(D)    approving the employment of Kidder Mathews and Elizabeth Clark as real estate broker (the "**Broadway Broker**");[3] and

(E)    scheduling a hearing (the "**Sale Hearing**") in August 2026, following any Auction, to consider the approval of the sale of the Property to a buyer (the "**Buyer**") which is to be either the Stalking Horse Purchaser or, if there is a higher or better bid at the Auction that is selected by the Debtor as the successful bid (the "**Successful Bid**"), then to the bidder that submitted such Successful Bid (the "**Successful Bidder**"); and

2.    entry of an order (the "**Sale Order**"), following the Sale Hearing,  authorizing the sale of the Property to the Buyer, free and clear of all claims, liens, encumbrances and other interests with such claims, liens encumbrance and other interests to attach to the proceeds of sale and otherwise consistent with the Stalking  Horse APA or Marked Agreement (as defined below), as applicable;

**PLEASE TAKE FURTHER NOTICE** of the following Bidding Procedures (subject to Court approval):

### a.  Participation in Bidding Process

Any person who wishes to participate in the Bidding Process (as defined in the Bidding Procedures) must be a "**Qualified Bidder**." A Qualified Bidder will be:

(a)    the Stalking Horse Purchaser;

(b)    Archway Broadway Loan SPE, LLC ("**Archway**"); and

(c)    any prospective bidder that

i.    delivers to the Debtor financials or other evidence of financial wherewithal that demonstrates, to the Debtor's reasonable satisfaction, the such bidder's financial capability to fully and timely consummate an acquisition of the Property and;

---

[3] "Broadway Broker" shall refer to Kidder Mathews generally and Elizabeth Clark specifically.

ii.       submits a competing bid on substantially the same terms as those set forth in the Stalking Horse APA that:

1.       results in the Debtor's receipt of cash consideration at closing ("**Cash Proceeds**") in an amount that is no less than $12,850,000, unless the competing bid is made by an Exempt Party, in which case the Cash Proceeds shall be not less than $12,250,000 ("**Minimum Competing Offer**");

2.       states that the Qualified Bidder is exempt from Los Angeles City ULA tax ("**ULA Tax**") and provide satisfactory evidence of such exemption and, whether or not a ULA Tax exemption is asserted, acknowledge that the Qualified Bidder shall satisfy any ULA Tax obligation resulting from the Sale, in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

3.       acknowledges that the Qualified Bidder will satisfy any broker commission due to the Qualified Bidder's broker in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

4.       is accompanied by a good faith cash or cash equivalent deposit in the amount of $500,000 (the "**Good Faith Deposit**").

Any Qualified Bidder must disclose its connections to the Debtor, its major creditors and equity holders, and their respective professionals and agents and will be deemed to submit to the Court's exclusive jurisdiction with respect to all matters relating to its bid, the Bidding Process and sale of the Property.

### b.  Bid Requirements

Any written bid submitted will be deemed an irrevocable offer that the Qualified Bidder is prepared to close: (i) upon the terms and conditions substantially in the form set forth in the Stalking Horse APA, marked to show any proposed amendments and modifications or otherwise in a form and substance acceptable to the Debtor, or (ii) on such other terms as may be set forth in the bid documents, in form and substance acceptable to the Debtor (in either case, including such amendments and modifications made at the Auction as may be acceptable to the Debtor, (the "**Marked Agreement**").

In addition to the terms set forth above for a bidder to be a Qualified Bidder, a Qualified Bid (as defined in the Bidding Procedures) also must satisfy each of the below requirements:

(a)      be an irrevocable offer through the conclusion of the Auction;

(b)      not be conditioned on any internal approvals;

(c)      not be subject to financing, diligence or other conditions more burdensome in respect of a closing than those set forth in the Stalking Horse APA;

(d)      not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment; and

(e)      acknowledge and represent that the bidder (i) has had an opportunity to inspect and examine the Property and (ii) in making its bid, has relied solely on its own independent review, investigation and/or inspection of same, and (iii) has not relied upon any statements, representations, promises, warranties or guaranties whatsoever, or the completeness of any information provided in connection therewith at the Auction, except as expressly stated in the Marked Agreement or these Bidding Procedures; and fully discloses the identity of each entity that will be bidding or otherwise participating in connection with such bidding, and all terms of any such participation that, in the reasonable business judgment of the Debtor, are relevant to such bid.

If a bid as submitted to the Debtor does not comply with each of the requirements for a bid set forth in the Bidding Procedures, the Debtor may (but will not be required to) request that the bidder amend its bid to address any such failure.

### c.  Bid Deadline.

In order to be eligible to participate in the Auction, the Debtor has asked that any Qualified Bidder that desires to make a bid will deliver, by not later than 4:00 pm (Pacific Time), two (2) business days prior to the Auction (the "**Bid Deadline**"), a copy of its Marked Agreement to the attention of (a) Derrick Talerico, **dtalerico@wztslaw.com**; and (b) Elizabeth Clark, **elizabeth.clark@kidder.com**. The Debtor may extend the Bid Deadline once or successively but is not obligated to do so.

### d.  No Qualified Bid.

If no Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Stalking Horse Bidder shall be deemed the Successful Bidder, there will be no Auction and the Debtor will seek approval of the Stalking Horse APA at the Sale Hearing.

**e.  Auction.**

If any Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Debtor shall conduct the Auction to determine the bidder to become the Successful Bidder. The Auction, if required, shall be held at least 45 days following the Bidding Procedures Hearing, as set forth in the Bid Procedures Order and the Sale Notice.

At least one (1) business day prior to the date of the Auction, the Debtor shall notify all Qualified Bidders of the Qualified Bid that, as determined in the Debtor's sole discretion, constitutes the highest or otherwise best Qualified Bid (the "**Baseline Bid**").  Bidding at Auction is to start with the Baseline Bid.  Thereafter, bids are to be increased in increments of no less than $250,000. Subject to the Debtor's discretion, only the Debtor, Qualified Bidders that have submitted Qualified Bids and their respective advisors and will be permitted to attend the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for the Property and (b) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith and bona fide offer to purchase the Property.

**PLEASE TAKE FURTHER NOTICE** that Kidder Mathews originally listed the Property for sale around May 18, 2023. Kidder Mathews partnered with the largest platform in commercial real estate, TenX Auction to market the Property for sale. Kidder Mathews implemented a methodical and aggressive marketing campaign, with worldwide exposures and bidders/investors submitted bids from all over the world. In the fourth quarter of 2023 Kidder Mathews conducted an extensive cold calling campaign to locate buyers.

Kidder Mathews relisted the Property on March 17, 2026, in anticipation of a bankruptcy sale process. The offering memorandum created for the Property (the "**Offering Memorandum**") is attached to the Notice as **Exhibit 3**. Over the past three months, Kidder Mathews reached out to parties that had expressed interest in the Property prior to the bankruptcy filing, and has listed the Property on leading on-line platforms: Loopnet, Costar, Crexi, and Kidder Mathews websites. Kidder Mathews has also been marketing through email blasts to over 20,000 active investors, social

media posts with over 30,000 views, and personal outreach to our clients who fit the profile for this type of acquisition. Kidder Mathews will continue these marketing efforts through the Bid Deadline. Kidder Mathews will update their marketing materials and Offering Memorandum to reflect the Bidding Procedures. Kidder Mathews will provide site tours to all serious potential buyers and allow access for site inspections until the last day of the process.…

**PLEASE TAKE FURTHER NOTICE** that the Property is being sold on an "as is, where is" basis, with no warranties, recourse, contingencies, or representations of any kind. Debtor also seeks an order (i) authorizing payment of costs of sale and certain liens asserted against the Property from escrow, and (ii) waiving the fourteen (14) day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice of Motion and Motion, the Memorandum, the Declarations of Alan Gomperts, Jack Stephens, and Elizabeth Clark, supporting statements, arguments and representations of  counsel to the Debtor who will appear at the hearing on the Motion, the record in the Case, and any other evidence properly brought before the Court in all other matters of which this Court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** any party opposing the Bidding Procedures proposed by this Motion must file and serve its opposition (an "**Opposition**"), pursuant to LBR 6004-1(b)(2), not less than one (1) day prior to the upon the Debtor and the United States Trustee. A judge's copy of the Opposition must be served on the judge in chambers in accordance with LBR 5005-2(d). An Opposition must be a complete written statement of all reasons in opposition thereto, declarations and copies of all evidence on which the opposing party intends to rely and a memorandum of points and authorities.

**PLEASE TAKE FURTHER NOTICE** that any party that has not received a copy of this Notice, the Motion or the Bidding Procedures Order that wishes to obtain a copy of this Notice, the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request by email to Weintraub Zolkin Talerico & Selth LLP, Attn: Derrick Talerico (**dtalerico@wztslaw.com**) and Martha Araki (**maraki@wztslaw.com**).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

Dated:  June 16, 2026                                   **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**


By  */s/ Derrick Talerico*
                          Derrick Talerico
                          Attorneys for Broadway Avenue Investments, LLC

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

By this Motion, the Debtor seeks entry of an order: (a) approving the form of the Stalking Horse APA not only for the Stalking Horse Purchaser but, subject to mark-up, any Overbidder; (b) establishing Stalking Horse Purchaser as the stalking horse bidder for the Debtor's primary asset, the Property, (c) approving the Bidding Procedures to establish guidelines for parties that may be interested in purchasing the Property to submit an Overbid, (d) approving the form of Procedures Notice, and (e) scheduling the Sale Hearing at which the Court can approve the sale of the Property free and clear of liens, claims and encumbrances, to the Buyer. By the Motion, the Debtor also asks that, following the Debtor's submission of any Successful Bid and the identity of the Buyer to the Court for its consideration at the Sale Hearing, the Court enter the Sale Order.

The proposed Sale and this Motion are the result of years of lease and sale efforts both during and prior to the commencement of these Cases, by the Debtor, its principals, and brokers, culminating with the Stalking Horse APA. Debtor asks the Court to grant the Motion and enter a Bidding Procedures Order followed by a Sale Hearing and a Sale Order approving the Sale of the Property to the Buyer.

**II.    STATEMENT OF FACTS**

      **A.     Jurisdiction and Venue**

The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      **B.     Background and Current Status**

            **1.     Bankruptcy Filing**

On March 18, 2024 (the "**Individual Petition Date**") and on March 19, 2024 (the "**Corporate Petition Date**"), each of the above-captioned debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors continue to operate and manage their affairs as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Seaton and Colyton debtors sought and were granted dismissal. No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in the Cases.

### 2.      Broadway, the Property, and Secured Debt.

Broadway was formed in July 2013 for the purpose of acquiring, developing, and operating the Property. Broadway's membership consists of: (1) the Halevy Trust (Susan Halevy, beneficial owner); (2) the G&H Trust (Alan Gomperts and Sharon Gomperts, beneficial owners of community property); and (3) Daniel Halevy.

Broadway acquired the Property in 2013. The Property is an eight-story structure. At the time it was acquired by Broadway, only the ground floor was habitable. Broadway understands the seven higher floors have not been occupied since the 1950s. In 2015, Broadway entered into a 15-year lease with The GAP for the ground floor of the Property and developed a plan to remodel and modernize the entire Property to make every floor habitable and available to lease to commercial tenants.

A majority of the intensive remodel and modernization of the Property took place between 2015 and 2020.  The improvements that were performed included the rehabilitation of the façade of the first three floors of the Property per the guidance of the Cultural Heritage Commission, installation of a fire and life safety system throughout the building, modernization of the elevator, installation of an HVAC system, fire pump and sprinkler system, emergency backup generator and replacement and installation of electric and plumbing systems throughout the building. In March 2020, after first confirming the full term of its lease, The GAP exercised a one-time early termination provision on its lease as the uncertainty of COVID began to take hold.

With an end to the remodel and modernization in sight, Broadway refinanced its outstanding loans with a single loan from Archway Broadway Loan SPE, LLC ("**Archway**") in July 2021, in the original principal amount of $16,942,500 (the "**Broadway Loan**").[4] The Broadway Loan was guaranteed by David Halevy, Daniel Halevy, and Alan Gomperts.

---

[4] The Broadway Loan was originally made by a predecessor in interest to Archway and assigned to Archway during the Case.

The Broadway Loan matured on August 1, 2022.  After Archway commenced an action for breach against the guarantors and filed a notice of default to begin foreclosure on the Property, the parties agreed to a restructure (the "**Broadway Restructure**") that extended the maturity date of the Broadway Loan to December 1, 2023, affirmed the balance due under the Broadway Loan in the principal amount of $15,241,093, and called for $4 million in new loans (the "**New Loans**") from Archway to benefit the Broadway Loan and the Property. By way of three loan agreements, the New Loans were made: (1) to Negev Investments, LLC ("**Negev**") for $1,300,000 (the "**Negev Loan**"); (2) to SLA Investments, LLC ("**SLA**") for $125,000 (the "**SLA Loan**"); and (3) jointly to David Halevy, the Halevy Trust, Alan Gomperts, the G&H Trust, and Daniel Halevy for $2,575,000 (the "**Guarantor Loan**"). The Negev Loan was secured by the real property located at 12800 Foxdale Drive, Desert Hot Springs, California (the "**Negev Property**"), and was guaranteed by David Halevy, with the guaranty secured by David Halevy's membership interests in Negev. The SLA Loan was secured by the real property located at 1040 S. Los Angeles Street (the "**SLA Property**") and was guaranteed by David Halevy, Susan Halevy, Alan Gomperts, and Daniel Halevy, with the guarantees secured by the guarantors' membership interests in SLA. The Guarantor Loans were secured by the following real property: (1) 3538 Greenfield Avenue, Los Angeles, California (owned by the G&H Trust); (2) 133 S. Palm Drive, Beverly Hills, California (owned by the Halevy Trust); and (3) 8561 Horner Street, Los Angeles, California (owned by Daniel Halevy). The $4 million of proceeds from the New Loans were distributed exclusively for the benefit of Archway and the Broadway Loan, with $1,701,407.01 applied to pay down the balance of the Broadway Loan. The Negev Property and the SLA Property were pledged to secure the Broadway Loan as third party accommodation pledges. Together, the Property, the Negev Property, and the SLA Property constitute the "**Broadway Loan Collateral**."

As of the Petition Date, the outstanding debt owed to Archway is not less than $15,663,398 on the Broadway Loan (the "**Broadway Claim**"), not less than $1,336,020 on the Negev Loan, not less than $128,958 on the SLA Loan, and not less than $2,646,348.96 on the Guarantor Loan.

### 3.    Current Status

As of December 2024, Archway Broadway Loan SPE, LLC ("**Archway**") was granted relief from the automatic stay as to the Property, effective immediately for foreclosure noticing purposes

and effective April 11, 2025 for a foreclosure sale. On February 12, 2026, the Court entered an Order providing that the Cases would be dismissed effective July 3, 2026 (the "**Dismissal Order**"). The Debtors have filed a motion to be heard on June 23, 2026 requesting that the Court modify the Dismissal Order to provide time for the Sale contemplated by this Motion to be consummated and for a confirmation hearing on the Plan to be held.

The Debtors have intensely negotiated with Archway throughout 2025. At an in-person settlement meeting on May 5, 2025, the Debtors and Archway (together, the "**Parties**") reached an agreement on material terms for a "global" settlement to resolve all disputes between the Parties and to secure Archway's support for a plan of reorganization premised upon a long-term lease of the Property (the "**2025 Settlement**"). Following months of intense drafting between the Debtors and Archway to document the terms of the 2025 Settlement, in January 2026, Broadway learned that its intended tenant could not obtain the corporate approvals necessary for it to enter into the anticipated long-term lease. At or about the same time, the intended lessee expressed interest in purchasing the Property, which culminated in the execution of the Stalking Horse APA with the Stalking Horse Purchaser,

With the lease of the Property switching to a sale of the Property, the 2025 Settlement – premised upon a lease of the Property – was no longer viable. The Debtors and Archway negotiated a new settlement based upon the Sale (the "**2026 Settlement**") with terms that were necessarily materially different from the 2025 Settlement. The 2026 Settlement is documented by the Settlement Agreement among Archway and the Debtors (the "**Settlement Agreement**") which has been filed this Court for approval at a hearing scheduled for June 23, 2026 (the "**Settlement Hearing**"). The Settlement Agreement is the basis for a joint chapter 11 plan of reorganization for the Debtors (the "**Plan**") supported by Archway. The Plan will be filed prior to the Settlement Hearing and Bidding Procedures Hearing. The Settlement Agreement requires the filing of this Motion.

**III.    THE STALKING HORSE AND BIDDING PROCEDURES**

As of February 4, 2026, Broadway and Stalking Horse Purchaser entered into the Stalking Horse APA. An escrow with Wilshire Escrow Company was established to close the Sale. The Stalking Horse Purchaser wired the $100,000 deposit (the "**Deposit**") to Escrow on February 20, 2026.

As of June 2, 2026, the conditions for the Deposit to be non-refundable were either satisfied or waived by Stalking Horse Purchaser other than the Remaining Contingencies: that (i) View Behavioral Health, LLC ("**VBH**") (a facilities operator related to Stalking Horse Purchaser) obtaining a CSU Designation (as defined in the Stalking Horse APA); and (ii) Debtor obtaining Permit Approvals (as defined in the Stalking Horse APA) for the Property.

The Stalking Horse APA sets forth the terms of Sale of the Property to the Stalking Horse Purchaser, which terms are modified pursuant to this Motion and the Bidding Procedures to the extent the Motion or Bidding Procedures include additional terms not contained in the Stalking Horse APA. To the extent the Sale terms set forth in this Motion conflict with the terms of the Stalking Horse APA, the terms set forth in this Motion and the Bidding Procedures shall control.

**1.    Sale Free and Clear of Liens, Claims, Interests.**

The Property will be sold, in fee simple, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f).

**2.    Excluded Liabilities**

Buyer will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of the Seller, whether existing on the Closing Date or arising thereafter, including on the basis of any law imposing successor liability.

**3.    "As Is, Where Is" Sale**

Except as otherwise provided in the Stalking Horse APA or the Marked Agreement, as the case may be, the sale of the Property is to be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor.  The Property is to be sold, subject to Court approval, free and clear of all liens, claims, adverse claims of ownership, and other interests, in accordance with sections 105 and 363 of the Bankruptcy Code.

**4.    Bidding Increments.**

The initial Overbid shall be a minimum of $12,850,000 Each Overbid shall be in increments of not less than $250,000 over the Stalking Horse Bid or an accepted Overbid, as the case may be.

**5.    Brokers' Commissions.**

Any Overbid submitted by an Overbidder is subject to a 2% broker commission (the "**Broadway Broker Commission**") due to the Broadway Broker. Any Overbid requires the Overbidder to satisfy any broker commission due to the Overbidder's broker (if any, the "**Buyer's Broker Commissions**"), in addition to the Overbid. The Broadway Broker is not due any Broadway Broker Commission if the Property is sold to the Stalking Horse Purchaser unless the Stalking Horse Purchaser is selected as the Buyer on an Overbid at an Auction, in which case the Broadway Broker Commission shall be the greater of (i) $50,000 or (ii) 2% of the Cash Proceeds in excess of $12,000,000.

**6.    Sale Order.**

The Sale Order must contain, among other provisions, findings that (i) Buyer's purchase constitutes a purchase in good faith under Bankruptcy Code § 363(m) and that Buyer is entitled to have the protections afforded by that section; (ii) reasonable and adequate notice of the sale and transfer of the Property has been provided to all parties required to be given notice under the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Central District of California; and (iii) neither Seller nor Buyer has engaged in any conduct that would cause or permit the sale to be avoided under Bankruptcy Code § 363(n).

The Sale Order must also provide for a waiver of the stay of the Sale Order imposed under Bankruptcy Rule 6004(h).

**7.    Closing**

Unless otherwise modified or waived in writing by Buyer and Seller, the Closing shall occur on or before thirty (30) business days following the date on which the Sale Order approving the Sale becomes a Final Order, unless the Buyer is the Stalking Horse Purchaser, in which case the timing of the closing shall align with the satisfaction of or waiver of the Remaining Contingencies.

**8.    Bidding Procedures**

As indicated above, a true and correct copy of the Bidding Procedures is attached hereto as **Exhibit 2**. Below is a summary of the Bidding Procedures (subject to Court approval):

### a. Participation in Bidding Process

Any person who wishes to participate in the Bidding Process (as defined in the Bidding Procedures) must be a "**Qualified Bidder**." A Qualified Bidder will be:

(a)    the Stalking Horse Purchaser;

(b)    Archway; and

(c)    any prospective bidder that

i.    delivers to the Debtor financials or other evidence of financial wherewithal that demonstrates, to the Debtor's reasonable satisfaction, the such bidder's financial capability to fully and timely consummate an acquisition of the Property and;

ii.    submits a competing bid on substantially the same terms as those set forth in the Stalking Horse APA that:

1.    results in the Debtor's receipt of cash consideration at closing ("**Cash Proceeds**") in an amount that is no less than $12,250,000 ("**Minimum Competing Offer**");

2.    states that the Qualified Bidder is exempt from Los Angeles City ULA tax("**ULA Tax**") and provide satisfactory evidence of such exemption and, whether or not a ULA Tax exemption is asserted, acknowledge that the Qualified Bidder shall satisfy any ULA Tax obligation resulting from the Sale, in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

3.    acknowledges that the Qualified Bidder will satisfy any broker commission due to the Qualified Bidder's broker in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

4.    is accompanied by a good faith cash or cash equivalent deposit in the amount of $500,000 (the "**Good Faith Deposit**").

Any Qualified Bidder must disclose its connections to the Debtor, its major creditors and equity holders, and their respective professionals and agents and will be deemed to submit to the Court's exclusive jurisdiction with respect to all matters relating to its bid, the Bidding Process and sale of the Property.

### b. Bid Requirements

Any written bid submitted will be deemed an irrevocable offer that the Qualified Bidder is prepared to close: (i) upon the terms and conditions substantially in the form set forth in the Stalking

Horse APA, marked to show any proposed amendments and modifications or otherwise in a form and substance acceptable to the Debtor, or (ii) on such other terms as may be set forth in the bid documents, in form and substance acceptable to the Debtor (in either case, including such amendments and modifications made at the Auction as may be acceptable to the Debtor, (the "**Marked Agreement**").

In addition to the terms set forth above for a bidder to be a Qualified Bidder, a Qualified Bid (as defined in the Bidding Procedures) also must satisfy each of the below requirements:

(a) be an irrevocable offer through the conclusion of the Auction;

(b) not be conditioned on any internal approvals;

(c) not be subject to financing, diligence or other conditions more burdensome in respect of a closing than those set forth in the Stalking Horse APA;

(d) not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment; and

(e) acknowledge and represent that the bidder (i) has had an opportunity to inspect and examine the Property and (ii) in making its bid, has relied solely on its own independent review, investigation and/or inspection of same, and (iii) has not relied upon any statements, representations, promises, warranties or guaranties whatsoever, or the completeness of any information provided in connection therewith at the Auction, except as expressly stated in the Marked Agreement or these Bidding Procedures; and fully discloses the identity of each entity that will be bidding or otherwise participating in connection with such bidding, and all terms of any such participation that, in the reasonable business judgment of the Debtor, are relevant to such bid.

If a bid as submitted to the Debtor does not comply with each of the requirements for a bid set forth in the Bidding Procedures, the Debtor may (but will not be required to) request that the bidder amend its bid to address any such failure.

### c. Bid Deadline.

In order to be eligible to participate in the Auction, the Debtor has asked that any Qualified Bidder that desires to make a bid will deliver, by not later than 4:00 pm (Pacific Time), two (2) business days prior to the Auction (the "**Bid Deadline**"), a copy of its Marked Agreement to the attention of (a) Derrick Talerico, **dtalerico@wztslaw.com**; and (b) Elizabeth Clark,

**elizabeth.clark@kidder.com**. The Debtor may extend the Bid Deadline once or successively but is not obligated to do so.

### d.  No Qualified Bid.

If no Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Stalking Horse Bidder shall be deemed the Successful Bidder, there will be no Auction and the Debtor will seek approval of the Stalking Horse APA at the Sale Hearing.

### e.  Auction.

If any Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Debtor shall conduct the Auction to determine the bidder to become the Successful Bidder. The Auction, if required, shall be held at least 45 days following the Bidding Procedures Hearing, as set forth in the Bid Procedures Order and the Sale Notice.

At least one (1) business day prior to the date of the Auction, the Debtor shall notify all Qualified Bidders of the Qualified Bid that, as determined in the Debtor's sole discretion, constitutes the highest or otherwise best Qualified Bid (the "**Baseline Bid**").  Bidding at Auction is to start with the Baseline Bid.  Thereafter, bids are to be increased in increments of no less than $250,000. Subject to the Debtor's discretion, only the Debtor, Qualified Bidders that have submitted Qualified Bids and their respective advisors and will be permitted to attend the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for the Property and (b) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith and bona fide offer to purchase the Property.

### f.  Selection of Successful Bid.

Prior to the conclusion of the Auction, the Debtor, in its sole discretion, but in consultation with its advisors, will identify the Successful Bid and the Successful Bidder and the Back-Up Bid and the Back-Up Bidder (each as defined in the Bidding Procedures), along with the respective amounts and terms of such bids.  If the Next Highest Bidder so elects, it will be designated the Back-up Bidder (as defined in the Bidding Procedures).

The Debtor and the Successful Bidder shall be required to close the transactions contemplated by the Stalking Horse APA (or the applicable Marked Agreement) in the manner set forth in the Stalking Horse APA (or the applicable Marked Agreement).  In the event that the Successful Bidder fails to close the transactions contemplated in the Stalking Horse APA (or the applicable Marked Agreement), the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtor and the Debtor will be authorized, but not be required, to close with the Back-up Bidder, without notice to any other party or further court order.  If the Debtor decides to close with the Back-up Bidder, the Debtor and the Back-up Bidder shall have an additional ten (10) calendar days to close.

### g.  Return of Good Faith Deposits.

All Good Faith Deposits shall be returned to each Qualified Bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Auction.

### h.  Sale Hearing.

The Debtor will seek entry of the Sale Order at the Sale Hearing to approve and authorize the sale transaction to the Buyer on terms and conditions determined in accordance with the Bidding Procedures.  The Debtor proposes that the Sale Hearing take place in August (or at another date and time convenient to the Court).  At the Sale Hearing, the Debtor will seek Court approval of the Sale to the Buyer, free and clear of all liens, claims, interests, and encumbrances pursuant to §363(f) of the Bankruptcy Code, with all liens, claims, interests, and encumbrances to attach to the sale proceeds with the same validity and in the same order of priority as they attached to the Property prior to the Sale.

The Debtor will submit and present additional evidence, if and as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties and satisfies the standards necessary to approve a sale of the Property.

### i.  Credit Bidding by Archway.

Archway will be permitted to submit an Overbid and participate as a bidder in the sale process and credit bid the full amount of the Broadway Lien as of the Auction (a "**Credit Bid**"). To

the extent an Overbid by Archway requires a cash component in addition to the Credit Bid, Archway is deemed a Qualified Bidder subject to the same conditions and requirements as any other Qualified Bidder.

### 9.    Further Marketing of Property.

Through the Bid Deadline, the Broadway Broker will continue to market the Property through her prior methods.  Among other marketing methods, the Broadway Broker will follow up with prior prospects and continue to use the electronic media methods of listing the Property through websites such as Loopnet, Costar, Crexi, and Kidder Mathews websites and others.  The Broadway Broker will also network with other brokers and perform additional outreach to potential Qualified Bidders.  The materials that will be included in the marketing efforts will include the Offering Memorandum (attached as **Exhibit 3** to the Notice) and the Notice. The Offering Memorandum will be revised to reflect the timing for submission to qualify as a Qualified Bidder, the date of a potential Auction, and the date set for the Sale Hearing.

### 10.    Notice of Bidding Procedures and Sale Hearing.

The Debtor proposes that any opposition to the Bidding Procedures (a "**Bidding Procedures Opposition**") or the Sale (a "**Sale Opposition**"), must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) set forth the specific basis for the Bidding Procedures Opposition or Sale Opposition; (iv) be filed and served upon the Court at 255 East Temple St., Suite 1368, (Attn: Honorable Vincent Zurzolo), Los Angeles, CA 90012, together with proof of service, on or before one (1) day prior to the Bidding Procedures Hearing or by the Sale Opposition Deadline set forth in the Bidding Procedures Order as applicable (each an "**Opposition Deadline**"); and (v) be served, so as to be actually received on or before the Opposition Deadline, upon (1) Weintraub Zolkin Talerico & Selth LLP, (2) the Office of the United States Trustee, and (3) Archway (the "**Notice Parties**").  If an Opposition is not filed and served on or before the Opposition Deadline, the Debtor requests that any opposing party be barred from opposing the Bidding Procedures or Sale and not be heard at the applicable Bidding Procedures Hearing or Sale Hearing, and the Court may enter a Bidding Procedures Order or Sale Order, as the case may be, without further notice.

The Debtor proposes to deliver  the Notice and Bidding Procedures Order to any party that expresses or has expressed an interest in participating in the bidding process and to any persons known or reasonably believed to have asserted an interest in the Property (collectively with the Notice Parties, the "**Procedures Notice Parties**") within five (5) business days following entry of the Bidding Procedures Order by email or first-class mail.  The Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request by email to Weintraub Zolkin Talerico & Selth LLP, Attn: Derrick Talerico (dtalerico@wztslaw.com) and Martha Araki (maraki@wztslaw.com).

The Debtor submits that the foregoing notice procedures comply fully with Bankruptcy Rule 2002 and LBR 6004-1(b)(2) and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction and the Sale Hearing to the Procedures Notice Parties.

## IV.    <u>ARGUMENT</u>

### A.    <u>Approval of the Bidding Procedures is Appropriate and in the Best Interests of the Debtor's Estate and Parties in Interest.</u>

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b)(1). Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Rules</u>") govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363.

With respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f).  LBR 6004-1 provides, in pertinent part, as follows:

**(b)    Motion for Order Establishing Procedures for the Sale of Estate Property.**

(2) <u>Contents of Notice [of a Sale Procedure Motion]</u>. The notice must describe the proposed bidding procedures and include a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts the anticipated marketing plan, or explain why no marketing is required.…

(3) <u>Service of the Notice and Motion</u>. The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court.

LBR 6004-1(b).

Neither the Bankruptcy Code nor the Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale.  Nonetheless, as one court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." <u>In re Atlanta Packaging Products, Inc.</u>, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the need for competitive bidding at hearings; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'"  <u>Id</u>.; <u>see also</u> <u>Burtch v. Ganz (In re Mushroom Transp. Co.)</u>, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor's fiduciary duties included maximizing and protecting the value of the estate's assets); <u>Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand.").  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate and, therefore, are appropriate.  <u>See</u> <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote

competitive bidding provide benefit to debtor's estate); <u>Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)</u>, 147 B.R. 650, 659 (S.D.N.Y. 1992) (such sale procedures "encourage bidding and to maximize the value of the Purchased Assets").

Here, the Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's bankruptcy estate: maximizing the value of sale proceeds received by the estate.  The Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may submit offers to purchase the Property.  Specifically, the Debtor, with the assistance of its advisors, have structured the  Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Property.  Additionally, the Bidding Procedures will allow the Debtor to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtor, its estate, creditors, and all parties in interest.

**B.      Authorization to Retain the Broadway Broker is Appropriate and in the Best Interests of the Debtor's Estate and Parties in Interest.**

**1.   The Services to be Provided by the Broadway Broker**

In connection with her employment by the Debtor as its real estate broker, the professional services that the Broadway Broker will render may include, but not limited to:

(a)      marketing and sale of the Property; and

(b)      assisting the Debtor and Debtor's professionals in execution of the Bidding Procedures and Action.

**2.      Prior Marketing and Marketing Plan.**

Kidder Mathews originally listed the Property for sale around May 18, 2023. Kidder Mathews partnered with the largest platform in commercial real estate, TenX Auction to market the Property for sale. Kidder Mathews implemented a methodical and aggressive marketing campaign, with worldwide exposures and bidders/investors submitted bids from all over the world. In the fourth quarter of 2023 Kidder Mathews conducted an extensive cold calling campaign to locate buyers.

Eager to resume their efforts to locate a buyer for the Property, Kidder Mathews relisted the Property on March 17, 2026, in anticipation of a bankruptcy sale process. The offering memorandum created for the Property (the "**Offering Memorandum**") is attached to the Notice as **Exhibit 3**. Over the past three months, Kidder Mathews reached out to parties that had expressed interest in the Property prior to the bankruptcy filing, and have listed the Property on leading on-line platforms: Loopnet, Costar, Crexi, and Kidder Mathews websites. Kidder Mathews has also been marketing through email blasts to over 20,000 active investors, social media posts with over 30,000 views, and personal outreach to our clients who fit the profile for this type of acquisition. Kidder Mathews will continue these marketing efforts through the Bid Deadline. Kidder Mathews will update their marketing materials and Offering Memorandum to reflect the Bidding Procedures. Kidder Mathews will provide site tours to all serious potential buyers and allow access for site inspections until the last day of the process.

### 3.     The Broadway Broker's Qualifications

The Debtor believes that the Broadway Broker's retention is in the best interest of the Debtor's estate.  The Broadway Broker is a full service commercial real estate brokerage firm with 19 offices across five states with a concentration in Southern California.  The Broadway Broker has significant transactional experience in commercial real estate.  The Broadway Broker's recent experience and great familiarity with the Property and its potential buyers make the Broadway Broker the best available real estate broker option to the Debtor.  Elizabeth Clark's qualifications and experience are set forth in the brochure attached to the Notice as **Exhibit 4**.

### 4.     Compensation of the Broadway Broker

The Broadway Broker received no payment from the Debtor for its prepetition or postpetition marketing efforts of the Property. If the Property is sold to any Buyer other than the Stalking Horse Purchaser and those parties identified as Excluded Parties in the Clark Declaration, Broadway Broker shall be entitled to the 2% Broadway Broker Commission calculated on the Cash Proceeds. The Broadway Broker is not due any Broadway Broker Commission if the Property is sold to an Excluded Party (including the Stalking Horse Purchaser as defined in the Clark Declaration) unless such Excluded Party is selected as the Buyer on an Overbid at an Auction, in which case

the Broadway Broker Commission shall be the greater of (i) $50,000 or (ii) 2% of the Cash Proceeds in excess of $12,000,000.

The Broadway Broker does not hold a retainer and expects only to be paid from Escrow from the Cash Proceeds of a Sale to a Buyer.

### 5.      The Broker is Disinterested

To the best of the Debtor's knowledge and based upon the Clark Declaration attached hereto, except as otherwise set forth therein, the Broadway Broker and its representatives are "disinterested persons" within the meaning of section 101(14) of the Bankruptcy Code.  As discussed in the Clark Declaration, the Broadway Broker does not hold or represent any interest adverse to the Debtor, its creditors, the Office of the United States Trustee, or any other party in interest in the Case.

The following supplemental disclosures are made with respect to the Broadway Broker's disinterestedness and connections with the Debtor.  References to the Broadway Broker include all members and employees of Kidder Mathews who are expected to render services in the Case:

(a)      the Broadway Broker is not a creditor, an equity security holder, or an insider of the Debtor;

(b)      the Broadway Broker is not and was not an investment banker for any outstanding security of the Debtor;

(c)      the Broadway Broker is not and was not, within three years before the Petition Date, either an investment banker for a security of the Debtor or an attorney for any such investment banker in connection with the offer, sale or issuance of any security of the Debtor;

(d)      the Broadway Broker is not and was not, within two years before the Petition Date, a director, officer, or employee either of the Debtor or of any investment banker for any security of the Debtor;

(e)      Except in its capacity as real estate broker to the Debtor, and subject to the disclosures set forth in the Clark Declaration, the Broadway Broker has no interest materially adverse to the interests of the Debtor or of any of Debtor's creditors, either by reason of any direct or indirect relationship to, connection with, or interest in the Debtor or for any other reason;

(f)    To the best of the Debtor's knowledge, and as set forth in the Clark Declaration, none of the brokers, associates or employees comprising or employed byKidder Mathews are related to any judge of the United States Bankruptcy Court for the Central District of California, the United States Trustee, or any person currently employed in the Office of the United States Trustee.

**6.    The Bankruptcy Code Authorizes the Debtor to Employ Professionals**

Section 327 of the Bankruptcy Code, which governs employment of professional persons, provides, in pertinent part, as follows:

> [T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title

11 U.S.C. § 327(a)

"Section 327(a) requires the application of a two-pronged test for the employment of professional persons.  A debtor in possession or trustee may employ attorneys with court approval only if (1) they do not hold or represent an interest adverse to the estate, and (2) they are disinterested persons."  In re Tevis, 347 B.R. 679, 687 (B.A.P. 9th Cir. 2006)

The term, "disinterested person," as used in section 327 of the Bankruptcy Code, is defined as, among other things, a person that is not a creditor, equity security holder, or insider of the debtor, and who does not have an interest materially adverse to the interests of the debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to the debtor, or for any other reason.   See 11 U.S.C. § 101(14).

"The term 'adverse interest' is not defined in the Bankruptcy Code.  The reported cases have defined what it means to hold an adverse interest as follows:  (1) to possess or assert any economic interest that would tend to lessen the value of the bankrupt estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate."  Tevis, at 688.

Bankruptcy Rule 2014 mandates that a professional seeking approval of its employment by the bankruptcy estate must disclose ". . . any proposed arrangement for compensation . . ." and ". .

all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, [and] the United States Trustee . . . ."  Fed. R. Bankr. P. 2014.

All facts pertinent to a court's determination of whether the professional is disinterested or holds an interest adverse to the estate must be disclosed.  The professional is required to make a full, candid, and complete disclosure in its application for employment.   See In re Lotus Properties LP, 200 B.R. 388, 391 (Bankr. C.D. Cal. 1996) (citing In re Park Helena Corp., 63 F.3d 877, 880-82 (9th Cir.  1995)); In re Gire, 107 B.R. 739, 746 (Bankr. E.D. Cal. 1989); Fed. R. Bankr. P. 2014).

Here, the Broadway Broker has complied fully with the disclosure requirements set forth in the Bankruptcy Code and Bankruptcy Rules.  By the Clark Declaration, the Broadway Broker has provided a full and complete disclosure of the relevant facts which demonstrates that the Broker has satisfied all of the requirements imposed by the Bankruptcy Code and Bankruptcy Rules as to conflicts, disinterestedness, and otherwise for employment in the Case.

Neither the Broadway Broker, nor any member or associate who are members of, or associated with the Broadway Broker, holds any interest materially adverse to the interests of the Debtor.  At this time there are no known conflicts among the Broadway Broker and any of Debtor's creditors or parties-in-interest in the Case that would create a materially adverse interest.

Therefore, since the Broadway Broker's disclosure satisfies the requirements for employment in the Case, the Court may authorize the proposed employment of the Broadway Broker pursuant to section 327(a) of the Bankruptcy Code.

**C.      Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code.**

As discussed above, Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

**1.      The Sale of the Property is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment**

In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or auction.  The Debtor has determined in its business judgment that the sale of the Property by auction will enable it to obtain the highest or best offer

for the Property (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors.  In particular, because the Stalking Horse APA, which is the result of comprehensive arms-length negotiations for the sale of the Property, will be subject to higher or otherwise better offers at the Auction, it should provide for a greater recovery for the Debtor's creditors than would be available by any other existing alternative.  The Property was originally marketed by the Broadway Broker in 2023 prior to the filing of the Bankruptcy Case. The Broadway Broker relisted the Property in March 2026 and will continue to market the Property through the Bid Deadline.

Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co.*, 124 BR. 169, 176 (D. Del. 1991); *see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate,

court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

Applying Section 363, the proposed sale of the Property should be approved. The Debtor has determined that the best way for the Debtor's estate to realize value from the Property is through a sale. As assurance of value, bids will be tested through a sale process culminating in an auction consistent with the requirements of the Bankruptcy Code, the Rules, and pursuant to the Bidding Procedures approved by the Court. Consequently, the fairness and reasonableness of the consideration to be paid by the Buyer ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process - the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid. The Broadway Broker has been contacting potential interested parties and has been in active discussions with potential purchasers.

**2.      The Sale of the Property Free and Clear of Liens and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

The Debtor further submits that it is appropriate to sell the Property free and clear of liens, claims, interests and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the sale proceeds. Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

This provision is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Property "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Section 363(f) is met).

With respect to Archway's lien(s), at least one of the tests of Section 363(f) will be satisfied by the proposed sale of the Property.  In particular, Section 363(f)(2) will be satisfied because, Archway has consented to the Sale to the Stalking Horse Purchaser or any Buyer.  Archway's lien will attach to the proceeds of the Sale, which shall be paid to Archway directly from Escrow.

      **3.**       **The Sale has been Proposed in Good Faith and Without Collusion and the Successful Bidder is a "Good Faith Purchaser"**

The Debtor intends to request at the Sale Hearing a finding that the Buyer is a good faith purchaser entitled to the protections of Sections 363(m) and (n) of the Bankruptcy Code.

Debtor submits that the Stalking Horse Purchaser, or other Successful Bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and that the Stalking Horse APA, or any marked version thereof, is or would be a

good faith agreement on arm's-length terms entitled to the protections of Section 363(m).  First, the consideration to be received by the Debtor pursuant to the Stalking Horse APA is substantial, fair and reasonable.  Second, the Debtor and the Stalking Horse Purchaser entered into the Stalking Horse APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the sale or Stalking Horse APA to be avoided under Section 363(n) of the Bankruptcy Code.

The Debtor's selection of the Successful Bidder will be the product of arms-length, good-faith negotiations in an anticipated competitive purchasing process.  Hence, the Buyer, whether it is the Stalking Horse Bidder or a competing bidder, should be afforded the protections of Sections 363(m) and (n).

### D.    Relief From the 14-Day Waiting Period Under Bankruptcy Rule 6004(h) is Appropriate

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtor requests that the Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived.

The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  *Collier on Bankruptcy*, ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, *Collier* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id*.

The Debtor hereby requests that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file an appeal.

**THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED**

All of the applicable requirements of LBR 6004-1(b) pertaining to the Motion and the request therein to approve the Bidding Procedures have been satisfied.  First, as required by LBR 6004-1(b)(2), the Notice describes the proposed Bidding Procedures, the marketing efforts undertaken, the anticipated marketing plan, and includes a copy of the Stalking Horse APA. Second, as required by LBR 6004-1(b)(2), the Notice of the Bid Procedures Motion and this Memorandum describe marketing efforts undertaken and the anticipated marketing of the Property through the deadline for prospective overbidders to submit bids for the Auction.  Therefore, the Debtor submits that service of the Notice, the Motion, and this Memorandum was adequate and appropriate.

**V.    CONCLUSION**

The Debtors' Cases have been long and difficult. The Sale of the Broadway Property proposed by this Motion is a cornerstone of the 2026 Settlement, which is before this Court by the Settlement Motion. The Debtor, with the support of Archway, move the Court to approve this Motion and the proposed notice procedures, enter the Bidding Procedures Order, set a Sale Hearing, and at the conclusion of the Sale Hearing, enter a Sale Order.

Dated: June 16, 2025          WEINTRAUB ZOLKIN TALERICO & SELTH LLP

By: ___/s/ Derrick Talerico_____
     Derrick Talerico
     Attorneys for Debtors Broadway Avenue Investments, LLC

## DECLARATION OF ALAN D. GOMPERTS

I, Alan D. Gomperts, hereby declare as follows:

1.    I am a manager of Broadway Avenue Investments, LLC. I make this declaration in support of the Debtors' *Motion for Order (1) Approving Bidding Procedures for the Sale of Real Property; (2) Authorizing Employment of Elizabeth Clark of Kidder Mathews as Real Estate Broker; (3) Authorizing Sale of Real Property Free and Clear of Liens, Claims, and Interests; and Related Relief* ("**Motion**"). Terms not defined herein shall have the same meanings ascribed to them in the Motion.

2.    Broadway was formed in July 2013 for the purpose of acquiring, developing, and operating the Property. Broadway's membership consists of: (1) the Halevy Trust (Susan Halevy, beneficial owner); (2) the G&H Trust (Alan Gomperts and Sharon Gomperts, beneficial owners of community property); and (3) Daniel Halevy.

3.    Broadway acquired the Property in 2013. The Property is an eight-story structure. At the time it was acquired by Broadway, only the ground floor was habitable. Broadway understands the seven higher floors have not been occupied since the 1950s. In 2015, Broadway entered into a 15-year lease with The GAP for the ground floor of the Property and developed a plan to remodel and modernize the entire Property to make every floor habitable and available to lease to commercial tenants.

4.    A majority of the intensive remodel and modernization of the Property took place between 2015 and 2020.  The improvements that were performed included the rehabilitation of the façade of the first three floors of the Property per the guidance of the Cultural Heritage Commission, installation of a fire and life safety system throughout the building, modernization of the elevator, installation of an HVAC system, fire pump and sprinkler system, emergency backup generator and replacement and installation of electric and plumbing systems throughout the building. In March 2020, after first confirming the full term of its lease, The GAP exercised a one-time early termination provision on its lease as the uncertainty of COVID began to take hold.

5.    With an end to the remodel and modernization in sight, Broadway refinanced its outstanding loans with a single loan from Archway Broadway Loan SPE, LLC ("**Archway**") in July

2021, in the original principal amount of $16,942,500 (the "**Broadway Loan**").[5] The Broadway Loan was guaranteed by David Halevy, Daniel Halevy, and Alan Gomperts.

6. The Broadway Loan matured on August 1, 2022. After Archway commenced an action for breach against the guarantors and filed a notice of default to begin foreclosure on the Property, the parties agreed to a restructure (the "**Broadway Restructure**") that extended the maturity date of the Broadway Loan to December 1, 2023, affirmed the balance due under the Broadway Loan in the principal amount of $15,241,093, and called for $4 million in new loans (the "**New Loans**") from Archway to benefit the Broadway Loan and the Property. By way of three loan agreements, the New Loans were made: (1) to Negev Investments, LLC ("**Negev**") for $1,300,000 (the "**Negev Loan**"); (2) to SLA Investments, LLC ("**SLA**") for $125,000 (the "**SLA Loan**"); and (3) jointly to David Halevy, the Halevy Trust, Alan Gomperts, the G&H Trust, and Daniel Halevy for $2,575,000 (the "**Guarantor Loan**"). The Negev Loan was secured by the real property located at 12800 Foxdale Drive, Desert Hot Springs, California (the "**Negev Property**"), and was guaranteed by David Halevy, with the guaranty secured by David Halevy's membership interests in Negev. The SLA Loan was secured by the real property located at 1040 S. Los Angeles Street (the "**SLA Property**") and was guaranteed by David Halevy, Susan Halevy, Alan Gomperts, and Daniel Halevy, with the guarantees secured by the guarantors' membership interests in SLA. The Guarantor Loans were secured by the following real property: (1) 3538 Greenfield Avenue, Los Angeles, California (owned by the G&H Trust); (2) 133 S. Palm Drive, Beverly Hills, California (owned by the Halevy Trust); and (3) 8561 Horner Street, Los Angeles, California (owned by Daniel Halevy). The $4 million of proceeds from the New Loans were distributed exclusively for the benefit of Archway and the Broadway Loan, with $1,701,407.01 applied to pay down the balance of the Broadway Loan. The Negev Property and the SLA Property were pledged to secure the Broadway Loan as third party accommodation pledges. Together, the Property, the Negev Property, and the SLA Property constitute the "**Broadway Loan Collateral**."

---

[5] The Broadway Loan was originally made by a predecessor in interest to Archway and assigned to Archway during the Case.

7.      As of December 2024, Archway Broadway Loan SPE, LLC ("**Archway**") was granted relief from the automatic stay as to the Property, effective immediately for foreclosure noticing purposes and effective April 11, 2025 for a foreclosure sale. On February 12, 2026, the Court entered an Order providing that the Cases would be dismissed effective July 3, 2026 (the "**Dismissal Order**"). The Debtors have filed a motion to be heard on June 23, 2026 requesting that the Court modify the Dismissal Order to provide time for the Sale contemplated by this Motion to be consummated and for a confirmation hearing on the Plan to be held.

8.      The Debtors have intensely negotiated with Archway throughout 2025. At an in-person settlement meeting on May 5, 2025, the Debtors and Archway (together, the "**Parties**") reached an agreement on material terms for a "global" settlement to resolve all disputes between the Parties and to secure Archway's support for a plan of reorganization premised upon a long-term lease of the Property (the "**2025 Settlement**"). Following months of intense drafting between the Debtors and Archway to document the terms of the 2025 Settlement, in January 2026, Broadway learned that its intended tenant could not obtain the corporate approvals necessary for it to enter into the anticipated long-term lease. At or about the same time, the intended lessee expressed interest in purchasing the Property, which culminated in the execution of the Stalking Horse APA with the Stalking Horse Purchaser.

9.      With the lease of the Property switching to a sale of the Property, the 2025 Settlement – premised upon a lease of the Property – was no longer viable. The Debtors and Archway negotiated a new settlement based upon the Sale (the "**2026 Settlement**") with terms that were necessarily materially different from the 2025 Settlement. The 2026 Settlement is documented by the Settlement Agreement among Archway and the Debtors (the "**Settlement Agreement**") which has been filed this Court for approval at a hearing scheduled for June 23, 2026 (the "**Settlement Hearing**"). The Settlement Agreement is the basis for a joint chapter 11 plan of reorganization for the Debtors (the "**Plan**") supported by Archway. The Plan will be filed prior to the Settlement Hearing and Bidding Procedures Hearing. The Settlement Agreement requires the filing of this Motion.

10.      As of February 4, 2026, Broadway and Stalking Horse Purchaser entered into the Stalking Horse APA. An escrow with Wilshire Escrow Company was established to close the Sale.

The Stalking Horse Purchaser wired the $100,000 deposit (the "**Deposit**") to Escrow on February 20, 2026. As of June 2, 2026, the conditions for the Deposit to be non-refundable were either satisfied or waived by Stalking Horse Purchaser other than the Remaining Contingencies: that (i) View Behavioral Health, LLC ("**VBH**") (a facilities operator related to Stalking Horse Purchaser) obtaining a CSU Designation (as defined in the Stalking Horse APA); and (ii) Debtor obtaining Permit Approvals (as defined in the Stalking Horse APA) for the Property.

11. The Stalking Horse APA sets forth the terms of Sale of the Property to the Stalking Horse Purchaser, which terms are modified pursuant to this Motion and the Bidding Procedures to the extent the Motion or Bidding Procedures include additional terms not contained in the Stalking Horse APA.

12. I believe that the Broadway Broker's retention is in the best interest of the Debtor's estate. The Broadway Broker's recent experience and great familiarity with the Property and its potential buyers make the Broadway Broker the best available real estate broker option to the Debtor.

13. The Broadway Broker received no payment from the Debtor for its prepetition or postpetition marketing efforts of the Property. If the Property is sold to any Buyer other than the Stalking Horse Purchaser and those parties identified as Excluded Parties in the Clark Declaration, Broadway Broker shall be entitled to the 2% Broadway Broker Commission calculated on the Cash Proceeds. The Broadway Broker is not due any Broadway Broker Commission if the Property is sold to an Excluded Party (including the Stalking Horse Purchaser as defined in the Clark Declaration) unless such Excluded Party is selected as the Buyer on an Overbid at an Auction, in which case the Broadway Broker Commission shall be the greater of (i) $50,000 or (ii) 2% of the Cash Proceeds in excess of $12,000,000.

14. To the best of my knowledge, the Broadway Broker and its representatives are "disinterested persons" within the meaning of section 101(14) of the Bankruptcy Code.

Docusign Envelope ID: GCBAE20E-4256-9FA1-92D9-EFECF5BB095B

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 16, 2026, at Los Angeles, California.

Signed by:

*alan GOMPERTS*

1B9510E406BC475...

ALAN GOMPERTS

# DECLARATION OF JACK STEPHENS

I, Jack Stephens, hereby declare as follows:

1. I am the Manager of DMB Fund d/b/a Broadway Community Care Centers, a qualified non-profit ("**DMB**"). Through DMB and the associated company View Behavioral Health, LLC ("**VBH**") of which I am the Chief Executive Officer and partial owner, I have been involved in determining the terms upon which DMB and/or VBH might best operate a medical and social services care facility from 737 South Broadway (the "**Property**").

2. After good faith pursuit of a long-term lease agreement, in January 2026, the leadership of DMB and VBH determined that the Property would need to be owned by an associated qualified non-profit of the intended facility operator in order to sustain a viable business model.

3. On this basis DMB executed the Stalking Horse APA which has been modified by the First and Second Amendments thereto, all of which are attached to the Notice as **Exhibit 1**.

4. A $100,000 good faith deposit (the "**DMB Deposit**") has been submitted on behalf of DMB fund to Escrow. The only contingencies to DMB's purchase of the Property and the DMB Deposit becoming non-refundable are: (i) VBH obtaining a CSU Designation (as defined in the Stalking Horse APA); and (ii) Debtor obtaining Permit Approvals (as defined in the Stalking Horse APA) for the Property (together, the "**Remaining Contingencies**").

5. VBH has applied for a CSU Designation with the City of Los Angeles and I understand that the CSU Designation is expected to be granted at any time.

6. As a qualified non-profit, DMB will apply for an exemption from the Los Angeles City ULA Tax if it selected as the Buyer for the Property.

7. Subject to satisfaction or waiver of the Remaining Contingencies, DMB has agreed to purchase the Property pursuant to the terms of the Stalking Horse APA, and the Bidding Procedures (attached to the Notice as **Exhibit 2**).

Docusign Envelope ID: A8FC24E2-03E0-829E-83F7-A5859E053E23

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 16, 2026, at __Huntington Beach, California__ .

DMB FUND

Signed by:

857902C90D7C45E...

JACK STEPHENS, Manager

Docusign Envelope ID: 2C071597-057B-8F96-828A-94B72DB02316

## DECLARATION OF ELIZABETH CLARK

I, Elizabeth Clark, hereby declare as follows:

1.      I am a Senior Vice President at Kidder Mathews and a member of Kidder Mathews' Investment Services Group. I have been a real estate professional for nearly twenty years and have extensive experience in marketing and selling commercial real estate in Los Angeles. My professional biography and qualifications are set forth in more detail in the brochure attached to the Notice as **Exhibit 4**. The facts set forth herein are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience concerning the Property (defined below).  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

2.      I originally listed the 737 South Broadway (the "**Property**") for sale around May 18, 2023. Kidder Mathews partnered with the largest platform in commercial real estate, TenX Auction to market the Property for sale. We implemented a methodical and aggressive marketing campaign, with worldwide exposures and bidders/investors submitted bids from all over the world. In the fourth quarter of 2023 we conducted an extensive cold calling campaign to locate buyers.

3.      Eager to resume our efforts to locate a buyer for the Property, we relisted the Property on March 17, 2026, in anticipation of a bankruptcy sale process. The offering memorandum created for the Property (the "**Offering Memorandum**") is attached to the Notice as **Exhibit 3**. Over the past three months, we reached out to parties that had expressed interest in the Property prior to the bankruptcy filing, and have listed the Property on leading on-line platforms: Loopnet, Costar, Crexi, and Kidder Mathews websites. We have also been marketing through email blasts to over 20,000 active investors, social media posts with over 30,000 views, and personal outreach to our clients who fit the profile for this type of acquisition. We will continue these marketing efforts through the Bid Deadline. We have momentum, active dialogue with investors who will are able to purchase the Property. We will update our marketing materials and Offering Memorandum to reflect the Bidding Procedures. We will provide site tours to all serious potential buyers and allow access for site inspections until the last day of the process.

4.      Kidder Mathews has agreed to a 2% commission calculated on the Cash Proceeds of a sale of the Property to any party other than the Stalking Horse Purchaser, Shaun Tan (or a related

Docusign Envelope ID: 2C071597-057B-8F96-828A-94AF7CB07316

entity), or to Halevy or Gomperts family members (an "**Excluded Party**"). If the Property is sold to an Excluded Party, Kidder Mathews is not due any commission unless the Property is sold to an Excluded Party on an Overbid at an Auction, in which case the Kidder Mathews commission shall be the greater of (i) $50,000 or (ii) 2% of the Cash Proceeds in excess of $12,000,000.

5. Kidder Mathews does not hold a retainer and expects only to be paid from Escrow from the Cash Proceeds of a Sale to a Buyer.

6. Kidder Mathews makes the following disclosures regarding its disinterestedness and potential conflicts:

    a. Kidder Mathews does not hold or represent any interest adverse to the Debtor, its creditors, the Office of the United States Trustee, or any other party in interest in the Case.

    b. Kidder Mathews not a creditor, an equity security holder, or an insider of the Debtor;

    c. Kidder Mathews is not and was not an investment banker for any outstanding security of the Debtor;

    d. Kidder Mathews is not and was not, within three years before the Petition Date, either an investment banker for a security of the Debtor or an attorney for any such investment banker in connection with the offer, sale or issuance of any security of the Debtor;

    e. Kidder Mathews is not and was not, within two years before the Petition Date, a director, officer, or employee either of the Debtor or of any investment banker for any security of the Debtor;

    f. Except in its capacity as real estate broker to the Debtor and as set forth herein, Kidder Mathews has no interest materially adverse to the interests of the Debtor or of any of Debtor's creditors, either by reason of any direct or indirect relationship to, connection with, or interest in the Debtor or for any other reason;

    g. none of the brokers, associates or employees comprising or employed by Kidder Mathews are related to any judge of the United States Bankruptcy Court for the

Docusign Envelope ID: 2C071597-057B-8F96-828A-94B72DB02316

Central District of California, the United States Trustee, or any person currently employed in the Office of the United States Trustee.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 16, 2026, at Los Angeles, California.

Signed by:

*Elizabeth Clark*

1A8088D9D1214B2...

ELIZABETH CLARK
Senior Vice President, Kidder Mathews

**DECLARATION VERIFYING SOFTWARE GENERATED SIGNATURE(S)**
*(Attach this declaration immediately after the signature page of any document that is being Filed and that contains a Software Generated Signature, as those terms are defined in LBR 9011-1(b).)*

I, *(print name of declarant)* Derrick Talerico_____, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

2. I am an attorney admitted to practice in this district, or alternatively I am an attorney who has been granted leave to appear pro hac vice per LBR 2090-1.

3. As set forth in the table below, either–
      a. <u>Oral verification</u>: I have obtained oral verification from the following person(s), whose Software Generated Signature (as defined in LBR 9011-1(b)(4)(B)) appear(s) on the accompanying document, that the signer intended to sign this document electronically, or alternatively
      b. <u>Explanation</u>: I provide the following explanation why no such verification is provided (*e.g.,* that the signer is represented by a different attorney who will provide a separate declaration confirming their client's oral verification):

| | Name of signer | Date of oral* verification | -OR-   Explanation why no verification is provided |
|---|---|---|---|
| 1. | Alan Gomperts | 6/16/2026 | ☐ See explanation below. |
| 2. | Jack Stephens | 6/16/2026 | ☐ See explanation below. |
| 3. | Elizabeth Clark | 6/16/2026 | ☐ See explanation below. |
| 4. | | | ☐ See explanation below. |
| 5. | | | ☐ See explanation below. |

Explanation(s) *(if applicable)*:

☐ see attached continuation sheet

    *<u>Verification must be oral</u>.*  For the avoidance of doubt, verification must be oral, and any written verification is insufficient even if it includes a purported holographic signature, so as to protect against persons who might have access to the hardware and software of the alleged signer and could use such access to create (A) false Software Generated Signatures and (B) false images of holographic signatures purporting to verify those electronic signatures.  *See* LBR 9011-1(b)(4)(B).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/16/2026 | Derrick Talerico | /s/ Derrick Talerico |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.