# EXHIBIT 1

EXHIBIT 1 - Page 44



## STANDARD OFFER, AGREEMENT AND ESCROW
## INSTRUCTIONS FOR PURCHASE OF REAL ESTATE
### (Non-Residential)
AIR Commercial Real Estate Association

February 4, 2026
(Date for Reference Purposes)

**1.    Buyer.**

1.1 The DMB Fund dba Broadway Community Care Centers or Assignee , ( **"Buyer"**) hereby offers to purchase the real property, hereinafter described, from the owner thereof (**"Seller"**) (collectively, the **"Parties"** or individually, a **"Party"**), through an escrow (**"Escrow"**) to close 30 or 14 days after the waiver or expiration of the Buyer's Contingencies, (**"Expected Closing Date"**) to be held by _____ (**"Escrow Holder"**) whose address is

_____ , Phone No. _____ , Facsimile No. _____

upon the terms and conditions set forth in this agreement (**"Agreement"**). Buyer shall have the right to assign Buyer's rights hereunder, but any such assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.

1.2    The term **"Date of Agreement"** as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.

**2.    Property.**

2.1 The real property (**"Property"**) that is the subject of this offer consists of (insert a brief physical description) Office building of 68,640 square feet on 10,019 square feet of land.

is located in the City of Los Angeles , County of Los Angeles , State of California , is commonly known by the street address of 737 S. Broadway

and is legally described as: Huber Tract Lot 4

(APN: 5144-014-030 ).

2.2    If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected to meet the requirements of _____ (**"Title Company"**), which shall issue the title policy hereinafter described.

2.3    The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only); space heaters; heating, ventilating, air conditioning equipment (**"HVAC"**); air lines; fire sprinkler systems; security and fire detection systems; carpets; window coverings; wall coverings; and _____

_____ (collectively, the **"Improvements"**).

2.4    The fire sprinkler monitor ☐ is owned by Seller and included in the Purchase Price, ☐ is leased by Seller, and Buyer will need to negotiate a new lease with the fire monitoring company, ☐ ownership will be determined during Escrow, or ☐ there is no fire sprinkler monitor.

2.5    Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and _____ all of

which shall be removed by Seller prior to Closing.

**3.    Purchase Price.**

3.1    The purchase price (**"Purchase Price"**) to be paid by Buyer to Seller for the Property shall be $12,000,000.00 , payable as follows:

|  |  |  |  |
|---|---|---|---|
| | (a)    Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash transaction, the Purchase Price): | | $100,000.0 |
| ~~(Strike if not applicable)~~ | ~~(b)    Amount of "New Loan" as defined in paragraph 5.1, if any:~~ | | ~~$~~ |
| | ~~(c)    Buyer shall take title to the Property subject to and/or assume the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)"):~~ | | |
| | ~~(i)    An Existing Note ("First Note") with an unpaid principal balance as of the Closing of approximately:~~ | | ~~$~~ |
| ~~(Strike if not applicable)~~ | ~~Said First Note is payable at $_____ per month, including interest at the rate of ____ % per annum until paid (and/or the entire unpaid balance is due on _____).~~ | | |
| | ~~(ii)    An Existing Note ("Second Note") with an unpaid principal balance as of the Closing of approximately:~~ | | ~~$~~ |
| | ~~Said Second Note is payable at $_____ per month, including interest at the rate of ____ % per annum until paid (and/or the entire unpaid balance is due on _____).~~ | | |
| ~~(Strike if not applicable)~~ | ~~(d)    Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the property, to secure the promissory note of Buyer to Seller described in paragraph 6 ("Purchase Money Note") in the amount of:~~ | | $ |
| | Total Purchase Price: | | $12,000,000.00 |

INITIALS

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-12-07/13E

**EXHIBIT 1 - Page 45**

3.2  If Buyer is taking title to the Property subject to, or assuming, an Existing Deed of Trust and such deed of trust permits the beneficiary to demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.

4.    **Deposits.**

4.1 ☐  Buyer has delivered to Broker a check in the sum of $_____ , payable to Escrow Holder, to be delivered by Broker to Escrow Holder within 2 or _____ business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or ☑ within 2 or _____ business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder Buyer shall deliver to Escrow Holder a check in the sum of $100,000.00 _____ . If said check is not received by Escrow Holder within said time period then Seller may elect to unilaterally terminate this transaction by giving written notice of such election to Escrow Holder whereupon neither Party shall have any further liability to the other under this Agreement.  Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2  Additional deposits:

(a)  Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $_____ to be applied to the Purchase Price at the Closing.

(b)  Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $260,000.00 _____ to be applied to the Purchase Price at the Closing.

4.3  Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the **"Deposit"**), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity.  Buyer's Federal Tax Identification Number is_____ . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

4.4  Notwithstanding the foregoing, within 5 days after Escrow Holder receives the monies described in paragraph 4.1 above, Escrow Holder shall release $100 of said monies to Seller as and for independent consideration for Seller's' execution of this Agreement and the granting of the contingency period to Buyer as herein provided.  Such independent consideration is non-refundable to Buyer but shall be credited to the Purchase Price in the event that the purchase of the Property is completed.

~~5.    **Financing Contingency.** *(Strike if not applicable)*~~

~~5.1  This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least _____% of the Purchase Price, on terms reasonably acceptable to Buyer. Such loan ("New Loan") shall be secured by a first deed of trust or mortgage on the Property. If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.~~

~~5.2  Buyer hereby agrees to diligently pursue obtaining the New Loan.  **If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within _____ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.**~~

~~5.3  If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.~~

~~6.    **Seller Financing** (Purchase Money Note).  *(Strike if not applicable)*~~

~~6.1  If Seller approves Buyer's financials (see paragraph 6.5) the Purchase Money Note shall provide for interest on unpaid principal at the rate of _____% per annum, with principal and interest paid as follows:_____~~

~~The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan expressly called for by this Agreement.~~

~~6.2  The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 10.3 (b)):~~

~~(a)  *Prepayment.* Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~

~~(b)  *Late Charge.* A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~

~~(c)  *Due On Sale.* In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~

~~6.3  If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~

~~6.4  **WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING.  IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.**~~

~~6.5  Seller's obligation to provide financing is contingent upon Seller's reasonable approval of Buyer's financial condition.  Buyer to provide a current financial statement and copies of its Federal tax returns for the last 3 years to Seller within 10 days following the Date of Agreement.  Seller has 10 days following receipt of such documentation to satisfy itself with regard to Buyer's financial condition and to notify Escrow Holder as to whether or not Buyer's financial condition is acceptable.  If Seller fails to notify Escrow Holder, in writing, of the disapproval of this contingency within said time period, it shall be conclusively presumed that Seller has approved Buyer's financial condition.  If Seller is not satisfied with Buyer's financial condition or if Buyer fails to deliver the required documentation then Seller may notify Escrow Holder in writing that Seller Financing will not be available, and Buyer shall have the option, within 10 days of the receipt of such notice, to either terminate this transaction or to purchase the Property without Seller financing.  If Buyer fails to notify Escrow Holder within said time period of its election to terminate this transaction then Buyer shall be conclusively presumed to have elected to purchase the Property without Seller financing.  If Buyer elects to terminate, Buyer's Deposit shall be refunded less Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.~~

7.    **Real Estate Brokers.**

7.1  The following real estate broker(s) (**"Brokers"**) and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes):

_____  represents Seller exclusively (**"Seller's Broker"**);

_____  represents Buyer exclusively (**"Buyer's Broker"**); or

☐ _____  represents both Seller and Buyer (**"Dual Agency"**).

~~The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 regarding the nature of a real estate agency relationship. Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the date inserted for reference purposes at the top of page 1.~~

~~7.2  Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.~~

8.    **Escrow and Closing.**

8.1  Upon acceptance hereof by Seller, this Agreement, including any counteroffers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions.



**INITIALS**

PAGE 2 OF 8

**INITIALS**

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-12-07/13E

**EXHIBIT 1 - Page 46**

8.2  As soon as practical after the receipt of the contingency and release documents, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date ascertained.

8.3  Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4  Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the **"Closing"**) by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance with this Agreement.

8.5  Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance. (See also paragraph 11)

8.6  Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (i), (n), and (o), 9.4, 9.5, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties only and are not instructions to Escrow Holder.

8.7  If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement. In the event of such termination, Buyer shall be promptly refunded all funds deposited by Buyer with Escrow Holder, less only the $100 provided for in paragraph 4.4 and the Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.  If this transaction is terminated as a result of Seller's breach of this Agreement then Seller shall pay the Title Company and Escrow Holder cancellation fees and costs.

8.8  The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow  is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9  Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10  If this sale of the Property is not consummated for any reason other than Seller's breach or default, then at Seller's request, and as a condition to any obligation to return Buyer's deposit (see paragraph 21), Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others.

**9.    Contingencies to Closing.**

9.1  The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. **IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT.** Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (a) through (m) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a) *Disclosure*. Seller shall make to Buyer, through Escrow, all of the applicable disclosures required by law (See AIR Commercial Real Estate Association (**"AIR"**) standard form entitled "Seller's Mandatory Disclosure Statement") and provide Buyer with a completed Property Information Sheet (**"Property Information Sheet"**) concerning the Property, duly executed by or on behalf of Seller in the current form or equivalent to that published by the AIR within 10 or__14__ days following the Date of Agreement. Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

(b) *Physical Inspection*. Buyer has 10 or__30__ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c) *Hazardous Substance Conditions Report*. Buyer has 30 or_____days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A **"Hazardous Substance"** for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare. A **"Hazardous Substance Condition"** for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d) *Soil Inspection*. Buyer has 30 or_____days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e) *Governmental Approvals*. Buyer has 30 or_____days from the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

(f) *Conditions of Title*. Escrow Holder shall cause a current commitment for title insurance (**"Title Commitment"**) concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment (**"Underlying Documents"**), and a scaled and dimensioned plot showing the location of any easements to be delivered to Buyer within 10 or__14__ days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment, the Underlying Documents and the plot plan to satisfy itself with regard to the condition of title. The disapproval by Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g) *Survey*. Buyer has 30 or_____days from the receipt of the Title Commitment and Underlying Documents to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association (**"ALTA"**) standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h) *Existing Leases and Tenancy Statements*. Seller shall within 10 or_____days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, **"Existing Leases"**) affecting the Property, and with a tenancy statement (**"Estoppel Certificate"**) in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i) *Owner's Association*. Seller shall within 10 or_____days of the Date of Agreement provide Buyer with a statement and transfer package from any owner's association servicing the Property. Such transfer package shall at a minimum include: copies of the association's bylaws, articles of incorporation, current budget and financial statement. Buyer has 10 days from the receipt of such documents to satisfy itself with regard to the association. (j) *Other Agreements*. Seller shall within 10 or__14__ days of the Date of Agreement provide Buyer with legible copies of all other agreements (**"Other Agreements"**) known to Seller that will affect the Property after Closing. Buyer has 10 days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

(k) *Financing*. If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.

~~(l) *Existing Notes*. If paragraph 3.1(c) has not been stricken, Seller shall within 10 or__14__ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, **"Loan Documents"**) to which the Property will~~

PAGE 3 OF 8

INITIALS                                                                                                                   INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                    FORM OFA-12-07/13E

EXHIBIT 1 - Page 47

~~remain subject after the Closing. Escrow Holder _____ return from the beneficiary of each Existing Notes a beneficiary statement ("**Beneficiary Statement**") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or __14__ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof. Likewise if Seller is to carry back a Purchase Money Note then Seller shall within 10 or __14__ days of the Date of Agreement provide Buyer with a copy of the proposed Purchase Money Note and Purchase Money Deed of Trust. Buyer has 10 or __14__ days from the receipt of such documents to satisfy itself with regard to the form and content thereof.~~

(m) *Personal Property*. In the event that any personal property is included in the Purchase Price, Buyer has 10 or __30__ days from the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or 30 days of the Date of Agreement.

(n) *Destruction, Damage or Loss*. There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this Agreement or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this Agreement, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.

(o) *Material Change*. Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "**Material Change**" shall mean a substantial adverse change in the use, occupancy, tenants, title, or condition of the Property that occurs after the date of this offer and prior to the Closing. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(p) *Seller Performance*. The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

~~(q) *Brokerage Fee*. Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("**Brokerage Fee**"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.~~

9.2 Albf the contingencies specified in subparagraphs (a) through (m) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "**Buyer's Contingencies**."

9.3 If any of Buyer's Contingencies or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("**Disapproved Item**"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("**Seller's Election**"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the right, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this Agreement. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this Agreement. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4 The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

## 10. Documents Required at or Before Closing:

10.1 Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2 Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:

(a) Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.

(b) If applicable, the Beneficiary Statements concerning Existing Note(s).

(c) If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller and Buyer. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.

(d) If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.

(e) An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.

(f) If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

(g) If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.

(h) If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3 Buyer shall deliver to Seller through Escrow:

(a) The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder in immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date provided, however, that Buyer shall not be required to deposit such monies into Escrow if at the time set for the deposit of such monies Seller is in default or has indicated that it will not perform any of its obligations hereunder. Instead, in such circumstances in order to reserve its rights to proceed Buyer need only provide Escrow with evidence establishing that the required monies were available.

(b) If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.

(c) The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.

(d) Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.

(e) If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.

(f) If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4 At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

**IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION**

_____
**INITIALS**

PAGE 4 OF 8

_____
**INITIALS**

WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

**11. Prorations and Adjustments.**

11.1 *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2 *Insurance.* **WARNING:** Any insurance which Seller may have maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

11.3 *Rentals, Interest and Expenses.* Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4 *Security Deposit.* Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5 *Post Closing Matters.* Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by appropriate cash payment outside of the Escrow when the amount due is determined.

11.6 *Variations in Existing Note Balances.* In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("**Existing Note Variation**"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.

11.7 *Variations in New Loan Balance.* In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.

11.8 *Owner's Association Fees.* Escrow Holder shall: (i) bring Seller's account with the association current and pay any delinquencies or transfer fees from Seller's proceeds, and (ii) pay any up front fees required by the association from Buyer's funds.

**12. Representations and Warranties of Seller and Disclaimers.**

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 3 years, and any lawsuit or action based upon them must be commenced within such time period. Seller's warranties and representations are true, material and relied upon by Buyer and Brokers in all respects. Seller hereby makes the following warranties and representations to Buyer and Brokers:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) *Maintenance During Escrow and Equipment Condition At Closing.* Except as otherwise provided in paragraph 9.1(n) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted.

(c) *Hazardous Substances/Storage Tanks.* Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d) *Compliance.* Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e) *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f) *Possessory Rights.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g) *Mechanics' Liens.* There are no unsatisfied mechanics' or materialmens' lien rights concerning the Property.

(h) *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(o)) affecting the Property that becomes known to Seller prior to the Closing.

(j) *No Tenant Bankruptcy Proceedings.* Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(k) ~~*No Seller Bankruptcy Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.~~

(l) *Personal Property.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.

12.3 In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

**13. Possession.**

Possession of the Property shall be given to Buyer at the Closing subject to the rights of tenants under Existing Leases.

**14. Buyer's Entry.**

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

**15. Further Documents and Assurances.**

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

**16. Attorneys' Fees.**

If any Party or Broker brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

**17. Prior Agreements/Amendments.**

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

**18. Broker's Rights.**

18.1 If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers

PAGE 5 OF 8

INITIALS

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-12-07/13E

**EXHIBIT 1 - Page 49**

the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.

18.2 Upon the Closing, Brokers are authorized to publicize the facts of this transaction.

**19.  Notices.**

19.1 Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission.

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

19.3 Any Party or Broker hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

**20.  Duration of Offer.**

20.1 If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of

Los Angeles                                               on the date of February 11, 2026                                              ,

it shall be deemed automatically revoked.

20.2 The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.

**21.  LIQUIDATED DAMAGES.  (This Liquidated Damages paragraph is applicable only if initialed by both Parties).**

THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT.   THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $360,000.                                     UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

_____                    _____
Buyer Initials                                       Seller Initials

**22.  ARBITRATION OF DISPUTES.** *(This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)*

22.1 ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("**COMMERCIAL RULES**"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, BE RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.

22.2 BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.

22.3 NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

_____                    _____
Buyer Initials                                       Seller Initials

**23.  Miscellaneous.**

23.1 **Binding Effect.**   This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.

23.2 **Applicable Law.**   This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located. Any litigation or arbitration between the Parties hereto concerning this Agreement shall be initiated in the county in which the Property is located.

23.3 **Time of Essence.**  Time is of the essence of this Agreement.

23.4 **Counterparts.**   This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.

23.5 **Waiver of Jury Trial.**   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

23.6 **Conflict.**          Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be

_____                    PAGE 6 OF 8                                           _____
INITIALS                                                                                                          INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM OFA-12-07/13E

EXHIBIT 1 - Page 50

controlled by the typewritten or handwritten provisions.

23.7 **1031 Exchange.**    Both Seller and Buyer agree to cooperate with each other in the event that either or both wish to participate in a 1031 exchange.  Any party initiating an exchange shall bear all costs of such exchange.

23.8 **Days.**            Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days.

**24.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

24.1 The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.

24.2  When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:

(a) *Seller's Agent.* A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) *To the Seller*: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) *To the Buyer and the Seller*: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b) *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) *To the Buyer*: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) *To the Buyer and the Seller*: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this transaction may be brought against Broker more than one year after the Date of Agreement and that the liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3  *Confidential Information:* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**25.  Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**26  Additional Provisions:**

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs _____

through _____ . (If there are no additional provisions write "NONE".)

Both parties acknowledge that Bankruptcy Court approval is required.

"Due Diligence" is defined as fourteen (14) business days after opening escrow. "Due Diligence" period begins upon execution of AIR PSA.

The expected closing date is no later than 30 days following the approval of the contingencies.

Buyer shall pay for any ULA or transfer taxes if applicable.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.     SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.     RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1.    THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.

_____
INITIALS

PAGE 7 OF 8


INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-12-07/13E

**EXHIBIT 1 - Page 51**

**2.** IF EITHER PARTY IS A CORPORATION IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

| BROKER: | BUYER: |
|---|---|
| | The DMB Fund |
| | |
| Attn: | By: _(signature)_ |
| Title: | Date: |
| Address: | Name Printed: Jack Stephens |
| | Title: Manager |
| Telephone:() | Telephone:( ) 714 404 6678 |
| Facsimile:() | Facsimile:( ) |
| Email: | Email: jackstephens@OVPHF.com |
| Federal ID No. | By: |
| | Date: |
| Broker/Agent BRE License #: | Name Printed: |
| | Title: |
| | Address: |
| | |
| | Telephone:( ) |
| | Facsimile:( ) |
| | Email: |
| | Federal ID No. |

**27. Acceptance.**

27.1   Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

27.2   Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum equal to _____ % of the Purchase Price to be divided between the Brokers as follows: Seller's Broker _____ % and Buyer's Broker _____ %. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.

27.3   Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

**NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.**

| BROKER: | SELLER: |
|---|---|
| | Broadway Avenue Investments, LLC |
| | |
| Attn: | By: _(signature)_ |
| Title: | Date: |
| Address: | Name Printed: Alan Gomperts |
| | Title: Managing Partner |
| Telephone: | Telephone:( ) |
| Facsimile: | Facsimile:( ) |
| Email: | Email: |
| Federal ID No.: | By: |
| | Date: |
| Broker/Agent BRE License #: | Name Printed: |
| | Title: |
| | Address: |
| | |
| | Telephone:( ) |
| | Facsimile:( ) |
| | Email: |
| | Federal ID No.: |

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  500 N Brand Blvd, Suite 900, Glendale, CA 91203. Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

© Copyright 2003 By AIR Commercial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

INITIALS _(initials)_

PAGE 8 OF 8

INITIALS _(initials)_

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-12-07/13E

**EXHIBIT 1 - Page 52**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

**FIRST AMENDMENT TO THE FEBRUARY 4TH 2026 STANDARD OFFER
AGREEMENT AND ESCROW INSTRUCTIONS
FOR PURCHASE OF REAL ESTATE**

This FIRST AMENDMENT TO THE FEBRUARY 4TH 2026 STANDARD OFFER AGREEMENT AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE (the "The First Amendment to the Agreement") is hereby made as of ~~June 6, 2026~~ by and between BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("**Seller**"), and BROADWAY COMMUNITY CARE CENTERS, a California not for profit company ("**Buyer**").  Seller and Buyer shall be referred to herein individually as a "**Party**" and collectively as the "**Parties.**"

## RECITALS

A.    **WHEREAS** the Parties entered into the underlying Agreement on February 4, 2026.

B.    **WHEREAS** the Parties desire to amend the underlying Agreement in accordance with the terms and conditions outlined below.

**NOW THEREFORE,** the Parties agree as follows:

1.    Amendment

    1.1    Paragraph 3.1 Purchase Price - which provides that "The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be $12,000,000" shall be amended to state that "The purchase price for the real property commonly referred to as 737 South Broadway Los Angeles CA 90014 (the "Property") shall be Seven Million ($7,000,000) US Dollars and the purchase price on account of the fixtures and appurtenances to the Property shall be Five Millon ($5,000,000) US Dollars, for a total purchase price of $12,000,000 (the "Purchase Price")."

2.    Prior Assignments and Agreements – In accordance with paragraph 17.2 of the Agreement which provides that "Amendments to this Agreement are effective only if made in writing and executed by the Buyer and Seller" the First Amendment to the Agreement is effective and duly entered into by the Buyer and Seller.

3.    Conflicts – except for the Amendment provided for herein any conflicts or discrepancies by or between the Agreement and The First Amendment to the Agreement, the Agreement shall govern and control.

1

**EXHIBIT 1 - Page 53**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

IN WITNESS HEREOF, the parties hereto have executed this Agreement as of the dates set forth below.

SELLER:

BROADWAY AVENUE INVESTMENTS LLC
a California limited liability company

By: _____
Name:  Alan Gomperts
Title:   Manager

Date of Execution: June 9 , 2026

BUYER:

THE DMB FUND
d/b/a BROADWAY COMMUNITY CARE CENTERS
a California not for profit company

By: _____
Name:  Jack Stephens
Title:   Chairman

Date of Execution: 6/8/2026 , 2026

2

EXHIBIT 1 - Page 54

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

## ACCEPTANCE BY ESCROW HOLDER

The undersigned, Escrow Holder, identified in the foregoing Purchase and Sale Agreement and Preliminary Escrow Instructions (the **"Instructions"**), and this First Amendment to the Purchase and Sale Agreement and Preliminary Escrow Instructions hereby accepts the Instructions and First Amendment and agrees to be bound thereby, subject to such additional or supplemental instructions and general provisions as Escrow Holder shall require which shall not be inconsistent of in conflict with the Instructions.

**WLSHIRE ESCROW COMPANY**

By: _____

Name: Brian Shewfelt

Title: Escrow Officer

Escrow Number: 145509-024

Date: 06/08/2026

3

**EXHIBIT 1 - Page 55**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

## SECOND AMENDMENT TO THE FEBRUARY 4TH 2026 STANDARD OFFER AGREEMENT AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE

This SECOND AMENDMENT TO THE FEBRUARY 4TH 2026 STANDARD OFFER AGREEMENT AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE ("**Second Amendment**") is hereby made as of June 6, 2026 by and between BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("**Seller**"), and BROADWAY COMMUNITY CARE CENTERS, a California not for profit company ("**Buyer**"). Seller and Buyer shall be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

### RECITALS

A.  **WHEREAS** the Parties entered into the underlying Agreement on February 4, 2026 (the "**Agreement**"; said date being the Date of Agreement, as such term is defined under paragraph 1.2 of the Agreement).

B.  **WHEREAS**, prior to, or concurrently with, the execution of this Second Amendment, the Parties executed that certain First Amendment to the Agreement (the "**First Amendment**").

C.  **WHEREAS** the Parties desire to amend the underlying Agreement (as amended by the First Amendment) in accordance with the terms and conditions outlined below.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### AGREEMENT

1.  Amendments.

    1.1  Paragraph 1 of the Agreement is amended to identify "Wilshire Escrow Company" as the Escrow Holder.

    1.2  Paragraph 4.2(b) of the Agreement is hereby amended to read as follows:

        "Within 5 business days of after the contingencies discussed in paragraph 9.1(a) through (q) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $260,000.00 to be applied to the Purchase Price at the Closing."

    1.3  Paragraph 9.1(l) is hereby added to the Agreement to read as follows:

        "*CSU Designation.* Buyer shall have until August 7, 2026 to receive a CSU Designation, which shall be required in connection with Buyer's proposed use of the Property and is a contingency to

1

EXHIBIT 1 - Page 56

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

Closing. As used herein, "**CSU Designation**" means the designation of View Behavioral Health, LLC (or its designee; "**VBH**") as an approved operator of a *psychiatric crisis stabilization unit* ("**CSU**") at the Property for the provision of mental health and substance use evaluation and assessment, crisis intervention, medication support, and related management services, to persons experiencing a crisis, as provided under applicable ordinances, rules, regulations, policies, guidelines, and/or statements of work of the City of Los Angeles and/or the County of Los Angeles, and as awarded under a valid and binding CSU contract entered into between the City of Los Angeles and VBH."

1.4    Paragraph 9.1(q) is hereby added to the Agreement to read as follows:

"*Permit Approvals*. Notwithstanding the provisions under subparagraph 9(e) of this Agreement, Seller has until August 7, 2026 to obtain all Permit Approvals. As used herein, "**Permit Approvals**" means the issuance and approval (through final sign-off) of any and all HVAC permits, fire alarm permits, fire sprinkler permits, and all other necessary permits and/or approvals (including temporary and final certificate(s) of occupancy) by the City of Los Angeles, and any other public agency exercising jurisdiction over occupancy and use of the Property (if any), which are required in order for the Property to be lawfully used and occupied."

1.5    Paragraph 9.2 of the Agreement is hereby amended to read as follows:

"All of the contingencies specified in subparagraphs (a) through (m), along with the contingency specified in subparagraph (q), of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "**Buyer's Contingencies**." Further, by Buyer's execution of this Second Amendment, each of the Buyer's Contingencies are hereby waived and approved, other than the following: (i) the contingency for *CSU Designation* (paragraph 9.1(l) of the Agreement, as described and provided for under Section 1.3 of this Second Amendment, above); and (ii) the contingency for *Permit Approvals* (paragraph 9.1(q) of the Agreement, as described and provided for under Section 1.4 of this Second Amendment, above)."

1.6    Paragraph 9.5 is hereby added to the Agreement to read as follows:

"Notwithstanding the provisions under paragraph 9.3 or elsewhere in this Agreement, in the event either a CSU Designation and/or

2

**EXHIBIT 1 - Page 57**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

Permit Approvals are not attained by August 7, 2026 (the "**Contingency Deadline**"), Buyer and Seller shall each have the right to unilaterally extend the Contingency Deadline by 30 additional days (a "**Contingency Extension**") for Seller to obtain all Permit Approvals and/or for the CSU Designation to be satisfied. A unilateral Contingency Extension shall not extend the Contingency Deadline beyond October 6, 2026. Buyer and Seller may jointly agree to extend the Contingency Deadline beyond October 6, 2026.

Any such extension shall be made by written notice delivered to Buyer/Seller (as the case may be) and to Escrow Holder. In the event either CSU Designation and/or Permit Approvals are thereafter not attained by the then-applicable Contingency Deadline, Buyer and Seller shall each separately have the right to terminate this Agreement. Any termination pursuant to this paragraph 9.5 shall be without regard to any Seller's Election or opportunity to cure. The provisions under paragraph 8.7 shall apply in the event of such termination."

1.7    Paragraph 9.6 is hereby added to the Agreement to read as follows:

"Notwithstanding any other provision in this Agreement, the sale of the Property shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by Seller. All of the Seller's right, title and interest in the Property shall be sold, subject to approval by order of the Bankruptcy Court entered after the Sale Hearing, free and clear all liens, claims, adverse claims of ownership, and other interests (collectively, "**Encumbrances**"), other than those arising hereunder, in accordance with, among other provisions, sections 105 and 363 of the Bankruptcy Code, with such Encumbrances, if any, to attach to the net proceeds of the sale with the same priority as existed with respect to the Property."

1.8    Paragraph 12.2 of the Agreement is hereby amended to read as follows:

"Notwithstanding any other provision in this Agreement, Buyer acknowledges and represents that Buyer (i) has had an opportunity to inspect and examine the Property and (ii) in executing this Agreement, waives and releases Seller from any and all claims, whether presently known or unknown, which arise from any written or oral statement, representation, promise, warranty, or guaranty whatsoever, whether express, implied or by operation of law or otherwise, or the completeness of any information provided in connection therewith. Said waiver and release shall not extend

3

**EXHIBIT 1 - Page 58**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

to Seller's agents or to persons who arc not a party to this Agreement."

1.9    Paragraph 12.3 is hereby deleted from the Agreement, in its entirety.

2.    Prior Assignments and Agreements. In accordance with Paragraph 17.2 of the Agreement (which provides that "Amendments to this Agreement are effective only if made in writing and executed by the Buyer and Seller"), this Second Amendment is effective and duly entered into by Buyer and Seller.

3.    Further Assurances. Each Party shall, at the reasonable request of the other Party and/or Escrow Holder, execute and deliver such additional documents and instruments (including but not limited to amendments to escrow instructions), and shall take such further actions, as may be reasonably required to carry out and effectuate the provisions of this Second Amendment.

4.    Remaining Provisions in Full Force and Effect. Except as expressly modified or amended by this Second Amendment, all other terms and conditions of the Agreement (as modified by the First Amendment) shall remain unchanged and continue in full force and effect.

5.    Counterparts. This Second Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which, taken together with the Agreement and the First Amendment, shall constitute a single instrument.

6.    Electronic Signatures. This Second Amendment may be executed by electronic signature and/or through signatures reflected on scanned copies of signed pages (or by DocuSign or other electronic form signifying a Party's consent in the same fashion as a printed signature inscribed by hand).

7.    Conflicts. In the event any provision of this Second Amendment conflicts with those of the Agreement or the First Amendment, the provisions of this Second Amendment shall govern and control.

*[signatures appear on following page]*

4

EXHIBIT 1 - Page 59

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

*[continued from previous page]*

**IN WITNESS HEREOF**, the parties hereto have executed this Second Amendment as of the dates set forth below.

**SELLER:**

**BROADWAY AVENUE INVESTMENTS LLC**
a California limited liability company

By: _____

Name: Alan Gomperts

Title:  Manager

Date of Execution: _June 5_____, 2026

**BUYER:**

**THE DMB FUND**
**d/b/a BROADWAY COMMUNITY CARE CENTERS**
a California not for profit company

By: _____

Name: Jack Stephens

Title:  Chairman

Date of Execution: ____6/8/2026_____, 2026

*[Escrow Holder's acceptance appears on following page]*

5

**EXHIBIT 1 - Page 60**

Docusign Envelope ID: 5B20E944-C598-80BF-8106-7DEECD29FE26

## ACCEPTANCE BY ESCROW HOLDER

The undersigned, Escrow Holder, identified in the above-identified Purchase and Sale Agreement and Preliminary Escrow Instructions (as amended by the First Amendment; the "**Instructions**"), and this Second Amendment, hereby accepts the Instructions and Second Amendment and agrees to be bound thereby, subject to such additional or supplemental instructions and general provisions as Escrow Holder shall require which shall not be inconsistent of in conflict with the Instructions and this Second Amendment.

**WILSHIRE ESCROW COMPANY**

By: _____
Name: **Brian Shewfelt**
Title: Escrow Officer
Escrow Number: 145509-024
Date: _06/08/2026_

6

**EXHIBIT 1 - Page 61**

# EXHIBIT 2

EXHIBIT 2 - Page 62

## BIDDING PROCEDURES

Broadway Avenue Investments, LLC (the "**Debtor**") has entered into an agreement (the "**Stalking Horse APA**") to sell its primary asset, an mixed use building located at 737 S. Broadway, Los Angeles, CA, 90014 (the "**Property**"), to The DMB Fund dba Broadway Community Care Centers or its assignee (the "**Stalking Horse Purchaser**"), for a cash purchase price of $12,000,000.00 (the "**Purchase Price**").  The Stalking Horse APA and sale of the Property will be subject to competitive bidding, as set forth herein, and approval by the Bankruptcy Court of (i) the Debtor's determination of the prevailing bid at an auction, if needed ("**Auction**") and (ii) pursuant to, among other provisions, sections 105 and 363 of the Bankruptcy Code.

Set forth below are the bidding procedures ("**Bidding Procedures**") to be employed in connection with the right of the Stalking Horse Purchaser, or another Qualified Bidder (as defined below), to purchase the Property.  These Bidding Procedures are intended to maximize the value of the Debtor's interest in the Property to the Debtor's bankruptcy estate (the "**Estate**").

### Bidding Procedures and Sale Motion and Hearings

The Debtor has filed a motion requesting that the Bankruptcy Court enter orders (1) approving the terms and conditions stated in the Standard Offer, Agreement and Escrow Instructions fo Purchase of Real Estate, as amended (the "Stalking Horse APA") attached to this Notice (the "Notice") as Exhibit 1, between the Debtor and The DMB Fund dba Broadway Community Care Centers or assignee ("Stalking Horse Purchaser"), for a sale ("Sale") of the Debtor's primary asset, 737 S. Broadway, Los Angeles, CA, 90014 (the "Property") to (a) the Stalking Horse Purchaser, or (b) any prospective overbidders (each an "Overbidder" and collectively, the "Overbidders") who seek to participate in a planned auction ("Auction"); (2) establishing the Stalking Horse Purchaser as the stalking horse bidder for the Property; (3) approving these Bidding Procedures; (4) approving the employment of Kidder Mathews and Elizabeth Clark as real estate broker (the "Broadway Broker"); (5) scheduling a hearing (the "Sale Hearing") in August 2026, following any Auction, to consider the approval of the sale of the Property to a buyer (the "Buyer") which is to be either the Stalking Horse Purchaser or, if there is a higher or better bid at the Auction that is selected by the Debtor as the successful bid (the "Successful Bid"), then to the bidder that submitted such Successful Bid (the "Successful Bidder"); and (6) authorizing the sale of the Property to the Buyer, free and clear of all claims, liens, encumbrances and other interests with such claims, liens encumbrance and other interests to attach to the proceeds of sale and otherwise consistent with the Stalking  Horse APA or Marked Agreement (as defined below), as applicable Such motion, as it pertains to items (1)-(5) above, hereafter shall be referred to as the "**Bidding Procedures Motion**" and, as it pertains to item (6) above, as the "**Sale Motion**."  The hearing on the Bidding Procedures Motion hereafter shall be referred to as the "**Bidding Procedures Hearing**."

### Participation

Any person who wishes to participate in the Bidding Process (as defined in the Bidding Procedures) must be a "**Qualified Bidder**." A Qualified Bidder will be:

    (a)    the Stalking Horse Purchaser;

    (b)    Archway Broadway Loan SPE, LLC ("**Archway**"); and

    (c)    any prospective bidder that

1

**EXHIBIT 2 - Page 63**

i.        delivers to the Debtor financials or other evidence of financial wherewithal that demonstrates, to the Debtor's reasonable satisfaction, the such bidder's financial capability to fully and timely consummate an acquisition of the Property and;

ii.        submits a competing bid on substantially the same terms as those set forth in the Stalking Horse APA that:

1.        results in the Debtor's receipt of cash consideration at closing ("**Cash Proceeds**") in an amount that is no less than $12,850,000, unless the competing bid is made by an Exempt Party, in which case the Cash Proceeds shall be not less than $12,250,000 ("**Minimum Competing Offer**");

2.        states that the Qualified Bidder is exempt from Los Angeles City ULA tax ("**ULA Tax**") and provide satisfactory evidence of such exemption and, whether or not a ULA Tax exemption is asserted, acknowledge that the Qualified Bidder shall satisfy any ULA Tax obligation resulting from the Sale, in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

3.        acknowledges that the Qualified Bidder will satisfy any broker commission due to the Qualified Bidder's broker in addition to the Minimum Competing Offer and any subsequent bid made at the Auction;

4.        is accompanied by a good faith cash or cash equivalent deposit in the amount of $500,000 (the "**Good Faith Deposit**").

Any Qualified Bidder must disclose its connections to the Debtor, its major creditors and equity holders, and their respective professionals and agents and will be deemed to submit to the Court's exclusive jurisdiction with respect to all matters relating to its bid, the Bidding Process and sale of the Property.

## **Bid Deadline**

In order to be eligible to participate in the Auction, the Debtor has asked that any Qualified Bidder that desires to make a bid will deliver, by not later than 4:00 pm (Pacific Time), two (2) business days prior to the Auction (the "**Bid Deadline**"), a copy of its Marked Agreement to the attention of (a) Derrick Talerico, dtalerico@wztslaw.com; and (b) Elizabeth Clark, elizabeth.clark@kidder.com. The Debtor may extend the Bid Deadline once or successively but is not obligated to do so.     If no Qualified Bid (other than that of the Stalking Horse Purchaser) has been received by the Debtor by the Bid Deadline, the Stalking Horse Purchaser shall be deemed the Successful Bidder, there will be no Auction and the Debtor will seek approval of the Stalking Horse APA at the Sale Hearing.

If no Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Stalking Horse Bidder shall be deemed the Successful Bidder, there will be no Auction and the Debtor will seek approval of the Stalking Horse APA at the Sale Hearing.

## **Bid Requirements**

2

**EXHIBIT 2 - Page 64**

Any written bid submitted will be deemed an irrevocable offer that the Qualified Bidder is prepared to close: (i) upon the terms and conditions substantially in the form set forth in the Stalking Horse APA, marked to show any proposed amendments and modifications or otherwise in a form and substance acceptable to the Debtor, or (ii) on such other terms as may be set forth in the bid documents, in form and substance acceptable to the Debtor (in either case, including such amendments and modifications made at the Auction as may be acceptable to the Debtor, (the "**Marked Agreement**").

In addition to the terms set forth above for a bidder to be a Qualified Bidder, a Qualified Bid (as defined in the Bidding Procedures) also must satisfy each of the below requirements:

(a)      be an irrevocable offer through the conclusion of the Auction;

(b)      not be conditioned on any internal approvals;

(c)      not be subject to financing, diligence or other conditions more burdensome in respect of a closing than those set forth in the Stalking Horse APA;

(d)      not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment; and

(e)      acknowledge and represent that the bidder (i) has had an opportunity to inspect and examine the Property and (ii) in making its bid, has relied solely on its own independent review, investigation and/or inspection of same, and (iii) has not relied upon any statements, representations, promises, warranties or guaranties whatsoever, or the completeness of any information provided in connection therewith at the Auction, except as expressly stated in the Marked Agreement or these Bidding Procedures; and fully discloses the identity of each entity that will be bidding or otherwise participating in connection with such bidding, and all terms of any such participation that, in the reasonable business judgment of the Debtor, are relevant to such bid.

If a bid as submitted to the Debtor does not comply with each of the requirements for a bid set forth in the Bidding Procedures, the Debtor may (but will not be required to) request that the bidder amend its bid to address any such failure.

### "As Is, Where Is"

Except as otherwise provided in the Stalking Horse APA or the Marked Agreement, as the case may be, the sale of the Property is to be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor.  The Property is to be sold, subject to Court approval, free and clear of all liens, claims, adverse claims of ownership, and other interests, in accordance with sections 105 and 363 of the Bankruptcy Code

### Auction

If any Qualified Bid (other than that of the Stalking Horse Bidder) is received by the Bid Deadline, then the Debtor shall conduct the Auction to determine the bidder to become the Successful Bidder. The Auction, if required, shall be held at least 45 days following the Bidding Procedures Hearing, as set forth in the Bid Procedures Order and the Sale Notice.

At least one (1) business day prior to the date of the Auction, the Debtor shall notify all Qualified Bidders of the Qualified Bid that, as determined in the Debtor's sole discretion, constitutes

**EXHIBIT 2 - Page 65**

the highest or otherwise best Qualified Bid (the "**Baseline Bid**").  Bidding at Auction is to start with the Baseline Bid.  Thereafter, bids are to be increased in increments of no less than $250,000.  Subject to the Debtor's discretion, only the Debtor, Qualified Bidders that have submitted Qualified Bids and their respective advisors and will be permitted to attend the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for the Property and (b) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith and bona fide offer to purchase the Property.

### Acceptance of Successful Bid

Prior to the conclusion of the Auction, the Debtor, in its sole discretion, but in consultation with its advisors, will identify the Successful Bid and the Successful Bidder and the Back-Up Bid and the Back-Up Bidder (each as defined in the Bidding Procedures), along with the respective amounts and terms of such bids.  If the Next Highest Bidder so elects, it will be designated the Back-up Bidder (as defined in the Bidding Procedures).

The Debtor and the Successful Bidder shall be required to close the transactions contemplated by the Stalking Horse APA (or the applicable Marked Agreement) in the manner set forth in the Stalking Horse APA (or the applicable Marked Agreement).  In the event that the Successful Bidder fails to close the transactions contemplated in the Stalking Horse APA (or the applicable Marked Agreement), the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtor and the Debtor will be authorized, but not be required, to close with the Back-up Bidder, without notice to any other party or further court order.  If the Debtor decides to close with the Back-up Bidder, the Debtor and the Back-up Bidder shall have an additional ten (10) calendar days to close.

### Broker's Commission

Any Overbid submitted by an Overbidder is subject to a 2% broker commission (the "Broadway Broker Commission") due to the Broadway Broker. Any Overbid requires the Overbidder to satisfy any broker commission due to the Overbidder's broker (if any, the "Buyer's Broker Commissions"), in addition to the Overbid. The Broadway Broker is not due any Broadway Broker Commission if the Property is sold to the Stalking Horse Purchaser unless the Stalking Horse Purchaser is selected as the Buyer on an Overbid at an Auction, in which case the Broadway Broker Commission shall be the greater of (i) $50,000 or (ii) 2% of the Cash Proceeds in excess of $12,000,000.

### Los Angeles City ULA Tax

The Stalking Horse Purchaser has provided Debtor documentation establishing that its purchase of the Property is exempt from the Los Angeles City ULA tax. Any Overbid requires the Overbidder to satisfy any applicable ULA tax in addition to the Qualified Bid or any subsequent bid made at the Auction, or provide documentation establishing that the Qualified Bidder's purchase of the Property is exempt from the Los Angeles City ULA tax as part of its submission of a Qualified Bid.

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held by the Debtor in one or more escrow accounts or, with respect to that of the Stalking Horse Purchaser, in a manner consistent with

4

**EXHIBIT 2 - Page 66**

the Stalking Horse APA and these Bidding Procedures but shall not become property of the Debtor's estate absent further order of the Bankruptcy Court.

Good Faith Deposits made by Qualified Bidders, other than those made by the Successful Bidder and any Next Highest Bidder who agrees to maintain its status as the Back-up Bidder, shall be returned to such Qualified Bidder within three (3) business days following the conclusion of the Auction. If the Successful Bidder, or the Back-up Bidder, as the case may be, timely closes by the closing date set forth in the Stalking Horse APA or, if applicable, a Marked Agreement, then its Good Faith Deposit and all accrued interest shall be credited towards the amount due at closing under the Stalking Horse APA or such Marked Agreement.  If the Successful Bidder, or the Back-up Bidder, as the case may be, fails to timely close by the closing date set forth in the Stalking Horse APA or, if applicable, a Marked Agreement, by reason of any failure of performance, breach or default by the Successful Bidder, or the Back-up Bidder, as the case may be, then such Qualified Bidder's Good Faith Deposit will be forfeited to the Debtor and the bankruptcy estate as liquidated damages.

### Credit Bidding

Archway will be permitted to submit an Overbid and participate as a bidder in the sale process and credit bid the full amount of the Broadway Lien as of the Auction (a "Credit Bid"). To the extent an Overbid by Archway requires a cash component in addition to the Credit Bid, Archway is deemed a Qualified Bidder subject to the same conditions and requirements as any other Qualified Bidder.

### Modifications

Notwithstanding any other provision herein, the Debtor may extend or alter any deadline contained herein if it will better promote the goals of the Bidding Process. At or before the Auction, the Bankruptcy Court or the Debtor may impose such other terms and conditions as it may determine to be in the best interests of the Debtor's estate, its creditors and other parties in interest.

### Estimated/Proposed Key Dates and Deadlines

| June 23, 2026 | Bidding Procedures Hearing |
|---|---|
| | Sale Objection Deadline |
| | Bid Deadline |
| | Auction |
| | Deadline for Debtor to file Notice of Auction Results |
| | Sale Hearing |
| | Deadline to consummate approved Sale Transaction |

5

**EXHIBIT 2 - Page 67**

# EXHIBIT 3

EXHIBIT 3 - Page 68



OFFERING MEMORANDUM

# 737 S BROADWAY

**Bankruptcy Auction Sale - Call for Offers**
**Subject to Court Approval**

DOWNTOWN LA JEWELRY DISTRICT

km Kidder Mathews

EXHIBIT 3 - Page 69

# TABLE OF CONTENTS

*01*
EXECUTIVE
SUMMARY

*02*
PROPERTY
OVERVIEW

*03*
FINANCIAL
OVERVIEW

*04*
MARKET
OVERVIEW

*Exclusively
Listed by*

**ELIZABETH CLARK**
Senior Vice President
424.653.1820
elizabeth.clark@kidder.com
LIC N° 01811246

**JAY MARTINEZ**
Senior Vice President
424.653.1841
jay.martinez@kidder.com
LIC N° 01811246

KIDDER.COM



The information contained in the following Marketing Brochure is proprietary and strictly confidential. It is intended to be reviewed only by the party receiving it from Kidder Mathews and should not be made available to any other person or entity without the written consent of Kidder Mathews.

This Marketing Brochure has been prepared to provide summary, unverified information to prospective purchasers, and to establish only a preliminary level of interest in the subject property. The information contained herein is not a substitute for a thorough due diligence investigation. Kidder Mathews has not made any investigation, and makes no warranty or representation, with respect to the income or expenses for the subject property, the future projected financial performance of the property, the size and square footage of the property and improvements, the presence or absence of contaminating substances, PCB's or asbestos, the compliance with State and Federal regulations, the physical condition of the improvements thereon, or the financial condition or business prospects of any tenant, or any tenant's plans or intentions to continue its occupancy of the subject property. The information contained in this Marketing Brochure has been obtained from sources we believe to be reliable; however, Kidder Mathews has not verified, and will not verify, any of the information contained herein, nor has Kidder Mathews conducted any investigation regarding these matters and makes no warranty or representation whatsoever regarding the accuracy or completeness of the information provided. All potential buyers must take appropriate measures to verify all of the information set forth herein.

This information has been secured from sources we believe to be reliable. We make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Recipient of this report must verify the information and bears all risk for any inaccuracies.

**EXHIBIT 3 - Page 70**



**Kidder Mathews**

737 S BROADWAY

# EXECUTIVE
# SUMMARY

*Section 01*

**EXHIBIT 3 - Page 71**

## EXECUTIVE SUMMARY

# BANKRUPTCY COURT SALE
## *SOLD TO HIGHEST BIDDER*

Kidder Mathews is pleased to present the exclusive listing of 737 S Broadway. The Offering is comprised of an 8-story office property located in Downtown Los Angeles. The building has undergone extensive improvements and will be delivered turnkey to the new ownership. The building's office floors have been reconfigured with open layouts, improving functionality and creating modern, friendly workspaces, while still maintaining the building's historic character.

The structure totals 75,160 in gross square footage, including the basement floor (7,254 SF) and mezzanine space (831 SF) on the ground floor. This would be a tremendous catalyst and anchor in stabilizing the asset.

The building sits on a 10,127 square foot lot with C5 zoning. The building falls within a Tier 3 TOC, Los Angeles State Enterprise Zone, and Downtown LA's Adaptive Reuse Incentive Area. With the city's redevelopment incentives, the property's flexible layout, and turnkey delivery, the asset makes for an attractive conversion project for affordable housing.





**Kidder Mathews**

737 S BROADWAY

# PROPERTY OVERVIEW

*Section 02*

**EXHIBIT 3 - Page 73**

PROPERTY OVERVIEW ————————————————————————

# PROPERTY OVERVIEW

## PROPERTY DETAILS

| | |
|---|---|
| ADDRESS | 737 S Broadway<br>DTLA, CA 90014 |
| SUBMARKET | Downtown Los Angeles |
| PROPERTY TYPE | Office |
| YEAR BUILT | 1913 |
| NO. OF STORIES | 8 Stories + Basement |
| GROSS BUILDING AREA (ASSESSOR) | ±67,906 SF |
| GROSS LEASABLE AREA | ±75,160 SF |
| LOT SIZE | ±10,127 SF / 0.23 AC |
| FRONTAGE | 60 Feet |
| ZONING | [Q]C5-4D-CDO-SN |
| PARCEL NUMBER | 5144-014-030 |



# PROPERTY OVERVIEW

## PROPERTY HIGHLIGHTS

Excellent location in the heart of Downtown Los Angeles

8 story office building with ground floor retail, basement and mezzanine

Extensively renovated asset with new plumbing, fire systems

Approximately 60 feet of frontage along Broadway

Affordable housing conversion opportunity

Ideal for an owner-user opportunity to occupy a portion of or the entire property

## ZONING OVERVIEW

| | |
|---|---|
| Zoning | [Q]C5-4D-CDO-SN |
| Historical Preservation Review | Yes |
| Transit Oriented Communities | Tier 3 |
| Redevelopment Project Area (RPA) | City Center |
| Adaptive Reuse Incentive Area | Yes |
| Community Design Overlay (CDO) | Broadway |
| State Enterprise Zone | Los Angeles |
| Opportunity Zone | N/A |

KIDDER MATHEWS



## 1ST & 2ND FLOOR



② FIRST FLOOR
SCALE: 1/8" = 1'-0"



① 2ND FLOOR
SCALE: 1/8" = 1'-0"

## 3RD & 4TH FLOOR





**3RD FLOOR**
SCALE: 1/8" = 1'-0"

**4TH FLOOR**
SCALE: 1/8" = 1'-0"

**EXHIBIT 3 - Page 77**

## 5TH & 6TH FLOOR



**5TH FLOOR**
SCALE: 1/8" = 1'-0"



**6TH FLOOR**
SCALE: 1/8" = 1'-0"

## 7TH, 8TH & BASEMENT FLOOR



2  7TH FLOOR
SCALE: 1/8" = 1'-0"

1  8TH FLOOR
SCALE: 1/8" = 1'-0"

1  BASEMENT
SCALE: 1/8" = 1'-0"

PROPERTY OVERVIEW

**EXHIBIT 3 - Page 80**

PROPERTY OVERVIEW



**EXHIBIT 3 - Page 81**

PROPERTY OVERVIEW

OFFERING MEMORANDUM  ■  737 S BROADWAY    **14**

**EXHIBIT 3 - Page 82**

# PROPERTY OVERVIEW



LITTLE TOKYO

FINANCIAL DISTRICT

ARTS DISTRICT

FASHION DISTRICT

SUBJECT PROPERTY

JW MARRIOT

GRAMMY MUSEUM LA LIVE

CRYPTO ARENA

FIDM

LOS ANGELES CONVENTION CENTER

DIGNITY HEALTH CALIFORNIA HOSPITAL

LOS ANGELES TRADE TECHNICAL COLLEGE

SANTEE HIGH SCHOOL

UTAH STREET ELEMENTARY SCHOOL

FELICITAS & GONZALO MENDEZ HIGH SCHOOL

LITTLE TOKYO MARKET PLACE

ROW DTLA

SOHO WAREHOUSE

PROPERTY OVERVIEW





737 S BROADWAY

# FINANCIAL ANALYSIS

*Section 03*

**EXHIBIT 3 - Page 85**

FINANCIAL ANALYSIS

# INVESTMENT SUMMARY

| Price | Highest Offer |
|---|---|
| Gross Building Area | ±67,906 SF |
| Building PSF (GBA) | $283.48 |
| Gross Leasable Area | ±75,160 SF |
| Building PSF (GLA) | $256.12 |
| Lot Size | ±10,127 SF |

## FLOOR AREA SUMMARY

| | |
|---|---|
| Basement | 7,254 SF |
| Ground Floor | 8,543 SF + 831 SF (Mezzanine) |
| 2nd Floor | 7,612 SF |
| 3rd Floor | 7,653 SF |
| 4th Floor | 8,085 SF |
| 5th Floor | 8,790 SF |
| 6th Floor | 8,795 SF |
| 7th Floor | 8,795 SF |
| 8th Floor | 8,802 SF |
| **Gross Leasable Area** | **75,160 SF** |

KIDDER MATHEWS



EXHIBIT    Page



737 S BROADWAY

# MARKET OVERVIEW

*Section 04*

**EXHIBIT 3 - Page 87**

MARKET OVERVIEW



# *TREND-SETTING*
# CULTURALLY
# RICH METROPOLIS

*LA's cultural attractions are second to none, whether it's the Space Shuttle Endeavour, Walt Disney Concert Hall, the Getty Center, or art galleries and urban art.*

From legendary studios, thriving nightlife, and renowned theatre productions, LA is truly the entertainment capital of the world. LA dining is acclaimed for Michelin-starred restaurants and multicultural neighborhoods alike. Sports fans know that LA is the city of champions, while active Angelenos can explore 75 miles of coastline and hundreds of miles of bike and hiking trails. Shop for everything from couture to vintage, or relax in one of LA's world-class spas.

Los Angeles has something for everyone, with flourishing neighborhoods, acclaimed restaurants, and trend-setting art and fashion scenes. One of the most popular ways to experience L.A. is by celebrating the city's incredible diversity, taking a scenic drive, or visiting the top cultural attractions.

Top shopping centers include Westfield Century City, the Fashion District in Downtown L.A., The Grove, Beverly Center, Hollywood & Highland, and Glendale Galleria. Eclectic shopping neighborhoods can be found throughout L.A., while museum gift shops offer unique cultural gifts. Rodeo Drive is a must-see for the jet set, while bargain hunters have several outlets to choose from.

**EXHIBIT 3 - Page 88**

# NOTABLE SITES

### PRIMARY COMMERCE AREA

Downtown Los Angeles, the city's historic hub and a significant business and financial center, is where most of Central Los Angeles' trade is situated. The Fashion District is located in the southeast area of Downtown and serves as a central commerce hub for the fashion industry. It is home to numerous showrooms and wholesale shops that sell apparel, accessories, and textiles.

### THE FASHION DISTRICT

It is a significant wholesale center for the fashion sector that spans several city blocks of storefronts and wholesale stores.

### L.A. LIVE

A sports and entertainment district that includes restaurants, bars, and the Microsoft Theater, which hosts concerts and other live events.

### THE CRYPTO ARENA

The Los Angeles Lakers and Los Angeles Clippers reside here, and it also serves as a significant sports and entertainment location for other events like concerts.

### THE LOS ANGELES CONVENTION CENTER

It is a substantial conference and exhibition facility that holds numerous significant occasions and trade shows annually.

### WALT DISNEY CONCERT HALL

It is a renowned lecture hall that serves as the Los Angeles Philharmonic orchestra's center and presents a wide range of classical and modern musical acts.

### THE GRAND CENTRAL MARKET

It is a historic indoor market with several food vendors and courts serving diverse foods.

### THE BROAD MUSEUM

It is a contemporary art museum with an extensive collection of works by artists like Andy Warhol, Jeff Koons, and Roy Lichtenstein.

### THE REEF

A creative office space and event venue that hosts various events, including art exhibitions, concerts, and conferences.

### FIDM MUSEUM & GALLERIES

A museum that showcases the history of fashion and design, with a particular emphasis on the role of California in shaping the fashion industry.

### GRAMMY MUSEUM

A museum dedicated to the history of music and the Grammy Awards, with exhibits and interactive experiences that explore the cultural impact of music.






*Exclusively listed by*

**ELIZABETH CLARK**
Senior Vice President
424.653.1820
elizabeth.clark@kidder.com
LIC N° 01811246

**JAY MARTINEZ**
Senior Vice President
424.653.1841
jay.martinez@kidder.com
LIC N° 01811246

KIDDER.COM



**EXHIBIT 3 - Page 90**

# EXHIBIT 4

EXHIBIT 4 - Page 91

# ELIZABETH CLARK

**Senior Vice President**

Elizabeth Clark is a Senior Vice President at Kidder Mathews, specializing in investment property acquisitions and dispositions. In this role, she is known for her aggressive advocacy on behalf of sellers across a broad range of commercial property types, with an unwavering commitment to achieving superior outcomes.

She is deeply collaborative and champions the integration of multiple disciplines to deliver well-conceived, strategic solutions for complex client assignments. Her extensive database of the most active principals in Los Angeles County provides clients with maximum market exposure, enabling swift and efficient transaction execution. Her expansive client network includes private investors, syndications, and institutional owners.

Elizabeth sets the standard through her exceptional work ethic and professionalism, both as a leader to her growing team and as a recognized market leader among commercial real estate agents throughout Greater Los Angeles. She consistently ranks in the top 1% nationally in annual transaction volume. Her ability to identify emerging opportunities, implement creative marketing strategies, and apply advanced problem-solving and negotiation skills ensures clients maximize the value of their investment assets. She is supported by a ten-member team of licensed agents, a dedicated transaction coordinator, and a senior financial analyst, all further enhanced by Kidder Mathews' unparalleled marketing platform and in-house design team.

Elizabeth began her real estate career at Marcus & Millichap in 2007, entering the industry during one of the most challenging markets of the modern era, an experience that helped shape her into a formidable and resilient leader. She later served as Senior Vice President at BRC Advisors, where she built and expanded her own team, developed expertise across new submarkets, and established a strong presence throughout Los Angeles County.

From BRC Advisors, she continued to lead her team at Compass Commercial (Beverly Hills), followed by Douglas Elliman Commercial (Beverly Hills) in 2022. Now aligned with Kidder Mathews, she continues to represent both long-standing and new clients with exceptional care, integrity, and financial advisory expertise.

## EDUCATION

BS in in communications, University of Wisconsin, Madison, WI

## SELECT AWARDS

Leaders of Influence - Los Angeles Business Journal 2022

Deal of the Year, Nominee - Los Angeles Business Journal 2020

Broker of the Year, Nominee - Los Angeles Business Journal 2020

50 Under 40 - Globe Street 2016

## AFFILIATIONS

American Industrial Real Estate Association (AIR), member

International Council of Shopping Centers (ICSC), member

Commercial Real Estate Women - Los Angeles (CREW), member

## SELECT CLIENT LIST

CIM Group

DLJ Development

Drollinger Properties

Engine Real Estate

HQ Development

Koss Real Estate

Lucent Capital

Ru Co, Inc

Sandstone Properties

Weiner Properties

Wallis Bank

# MARKETING PROCESS







## 01 CREDIBLE UNDERWRITING & ANALYSIS

Intelligent underwriting from a debt and equity perspective, which ensures greater buyer interest and a competitive bidding process.

## 02 BEST-IN-CLASS MARKETING

Kidder Mathews has an award-winning, in-house marketing team that provides a full suite of creative services, including project branding, web design & development, print collateral development (offering memorandum, flyer, etc.), email marketing, advertising, and Real Capital Markets investment platform partnership.

## 03 THE CAMPAIGN

The asset is marketed via our email platform, social media, and website in a streamlined process to create a competitive environment. We use our Team's proprietary database with thousands of contacts to identify and target the most likely buyers through direct solicitation.

Transparency is intrinsic – regular feedback is provided throughout the process, illuminating our conversations with potential buyers and "e-mail click-through" reports.

SAMPLE LISTING WEBSITE



KIDDER MATHEWS    ELIZABETH CLARK ▪ INVESTMENT REAL ESTATE SERVICES    2

**EXHIBIT 4 - Page 93**

# *WE KNOW THE WESTERN US.*
# WE'RE ITS LARGEST FULLY INDEPENDENT COMMERCIAL REAL ESTATE FIRM.

For over 55 years, our clients have gotten the best of both worlds – independent counsel from trusted experts, working as part of the largest fully independent real estate firm in the Western U.S. Today Kidder Mathews has over 900 real estate professionals and staff in 19 offices in Washington, Oregon, California, Nevada, and Arizona.

We offer a complete range of brokerage, appraisal, property management, consulting, and debt and equity finance services for all property types, giving our clients the competitive edge they need.

*Commercial Brokerage*

**$9B**
AVERAGE ANNUAL TRANSACTION VOLUME

**500+**
NO. OF BROKERS

*Asset Services*

**53M SF**
MANAGEMENT PORTFOLIO SIZE

**800+**
ASSETS UNDER MANAGEMENT

*Valuation Advisory*

**2,400+**
AVERAGE ASSIGNMENTS

**41/23**
TOTAL NO. OF APPRAISERS/MAI'S

## AWARD-WINNING SERVICES

**6X**
INC 5000 FASTEST GROWING COMPANY

**3X**
GLOBEST CRE'S BEST WORKPLACES

**2X**
GLOBEST INFLUENCERS IN CRE MARKETING

**13X**
LA TIMES TOP BROKERAGE FRIMS

### ELIZABETH CLARK

Senior Vice President
Investments
424.653.1820
elizabeth.clark@kidder.com
**LIC N° 01811246**

1925 Century Park East
Suite 2350
Los Angeles, CA 90067

KIDDER.COM

This information supplied herein is from sources we deem reliable. It is provided without any representation, warranty, or guarantee, expressed or implied as to its accuracy. Prospective Buyer or Tenant should conduct an independent investigation and verification of all matters deemed to be material, including, but not limited to, statements of income and expenses. Consult your attorney, accountant, or other professional advisor.  All Kidder Mathews designs are the sole property of Kidder Mathews. Branded materials and layouts are not authorized for use by any other firm or person.



**EXHIBIT 4 - Page 95**